LEARNING RIGHTS LAW CENTER
JANEEN STEEL (SBN 211401)
Janeen@learningrights.org
205 S. Broadway, Suite 808
Los Angeles, California 90012
Phone: (213) 489-4035
Fax:     (213) 489-4033

LAW OFFICE OF SHAWNA L. PARKS
SHAWNA L. PARKS (SBN 208301)
sparks@parks-law-office.com
4470 W. Sunset Blvd., Ste. 107-347
Los Angeles, CA 90027
Phone/Fax: (323) 389-9239

SEABORN LEGAL
STUART SEABORN (SBN 198590)
seabornlegal@outlook.com
2532 Santa Clara Ave., Suite 111
Alameda CA 94501
Telephone: (510) 473-6963
Facsimile: (510) 373-2583

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

J.R., a minor, by and through her guardian ad litem, Janelle McCammack; M.B., a minor, by and through her guardian ad litem, F.B.; I.G., a minor, by and through his guardian ad litem, M.E., on behalf of themselves and all those similarly situated,

Plaintiffs,

v.

OXNARD SCHOOL DISTRICT; CESAR MORALES, Superintendent of Oxnard School District, in his official capacity; ERNEST MORRISON, President of Board of Trustees, in his official capacity; DEBRA CORDES, Clerk of Board of Trustees, in her official capacity; DENIS O'LEARY, Trustee of Board of Trustees, in his official capacity; VERONICA ROBLES-SOLIS, Trustee of Board of Trustees, in her official capacity; MONICA MADRIGAL LOPEZ, Trustee of Board of Trustees, in her official capacity; and DOES 1 TO 10, inclusive,

Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 2:17-cv-04304-JAK-FFM

**CLASS ACTION**

**First Amended Complaint for Violations of the Individuals with Disabilities Education Act, 20 U.S.C. §1400, *et seq.*; Americans With Disabilities Act, 42 U.S.C. § 12101, *et. seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et. seq.*; Government Code §11135; The Unruh Civil Rights Act, Cal. Civ. Code § 51, *et. seq.; California Education Code § 56000**

## JURISDICTION AND VENUE

1.      The first three claims alleged herein arise under the Individuals with Disabilities Education Act, (20 U.S.C. §§1400 *et seq.*) ("IDEA"); Americans with Disabilities Act (42 U.S.C. §§ 12131 *et seq.*) ("ADA"), and Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. §794 *et seq.*) ("Section 504"), such that the jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343.  Through the same actions and omissions that form the basis of Plaintiffs' federal claims, Defendants have also violated Plaintiffs' rights under state law, over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2.      Jurisdiction and venue are proper under 20 U.S.C. § 1391(b) because the Oxnard School District is located within Ventura County, the Defendants are located in Ventura County and all the acts and/or omissions giving rise to the claims in this action occurred in Ventura County, which is located within the geographical boundaries of the judicial district for the United States District Court for the Central District of California.

## INTRODUCTION

3.      Federal and state laws require that every California school district provide students with disabilities a non-discriminatory and free appropriate public education ("FAPE"). These laws place specific obligations on school districts to timely locate, identify and evaluate schoolchildren who may have disabilities that impact their education and/or that require special education services, an obligation often referred to as "child find." *This obligation extends to children in early elementary school.*

4.      Oxnard School District ("OSD" or "District") systemically fails to meet these requirements. Indeed, the District's standard policy when confronted with failing students who exhibit signs of possible disability, or otherwise indicate a need for assessment, is *not* to refer such students for special education assessments. Instead, District staff either do nothing, or rely on an alternate but illegal system the District has developed of using informal Student Success Teams ("SSTs") to discuss a student's lack of progress. These SST meetings, which exist under no education law, are provided

1

First Amended Complaint

*instead of* mandatory referrals for assessments, and result in little or no special education services or empty referrals that put the onus on parents to secure and pay for services for their children.

5. While students such as named Plaintiffs J.R., M.B. and I.G. fail year after year without receiving appropriate special education services for their disability-related needs, District staff stand idly by, or at most convene an SST meeting, through which little or no real services are provided. This "wait and see" approach for its students with disabilities is both illegal and disastrous for students. Indeed, the District allowed the named Plaintiffs in this action to fail for *years* without assessing them for much-needed special education services and disability accommodations—only providing proper assessments after the students retained lawyers and filed administrative complaints.

6. For example, as early as second grade, during the 2011-2012 school year, J.R. already had a track record of demonstrable difficulties performing academically, difficulty understanding new concepts and an exceptionally low reading level—yet the District did not assess J.R. for special education until after she filed an administrative complaint with the Office of Administrative hearings ("OAH") in September 2016.

7. M.B. also demonstrated obvious difficulties as early as first grade, during the 2013-2014 school year. Despite these documented struggles, the District failed to comply with its obligations to properly assess M.B. in all areas of suspected disability. Instead, the District held a series of *seven* SST meetings for M.B. over the course of a *four-year* period, at which the District documented M.B.'s academic deficits, but failed to provide her with appropriate assessments or special education services or disability accommodations to address those deficits.

8. Similarly, the District was on notice of I.G.'s disabilities and the dramatic impact on his education no later than second grade, during the 2014-2015 school year, yet the District failed to provide I.G. with required special education assessments until after he filed an administrative complaint with OAH – two years later.

First Amended Complaint

9. The impact of the District's "wait and see" approach has been tragic. When the District finally assessed J.R. for special education, the evaluation showed what had been evident in school for years, that J.R. had significant disabilities that severely impacted her ability to access educational material, and that J.R. was functioning academically years behind where she should have been – as if she had received no instruction at all for the last four to five years. M.B.'s evaluation similarly showed striking deficits as a result of her disabilities, and that by the time of her assessment she functioned academically below 99.9% of her peers. I.G.'s evaluation documented clear struggles with anxiety and insomnia that had been present at school since Kindergarten, and that had led to a 50% absenteeism rate.

10. These are not isolated instances. The named Plaintiffs are but a few of a number of students from working class, primarily Spanish-speaking families in Oxnard who have been denied their rights to required programs, supports and services under the IDEA, the ADA, Section 504 and related state laws. Collectively, these cases are representative of a widespread and systemic failure by the District to ensure that it identifies students in possible need of services and accommodations, timely evaluates for such services, provides related procedural safeguards, and ultimately provides needed services and accommodations so that these students can access their education in a meaningful way.

11. The named Plaintiffs seek to remedy the District's broken system and its systemic failure to identify, evaluate and provide services and accommodations for students with disabilities in the District. They have exhausted her administrative remedies prior to bringing this suit. However, the administrative system cannot afford them complete relief given the nature of the systemic problems in the District, and its illegal policies and practices.

## PARTIES

12. Plaintiff J.R. ("J.R." or "Plaintiff") is currently thirteen years old, and about to enter the eighth grade. She resides with her family in Oxnard, California, which is

3

First Amended Complaint

located within Ventura County. J.R. currently attends a special day class at Haydoc Academy of Arts and Sciences in Oxnard School District. J.R. was and is a student who requires special education services under the IDEA and California Education Code, and a qualified individual with a disability within the meaning of Section 504, the ADA, Government Code Section 11135 and the Unruh Civil Rights Act, who required accommodations, modifications and services in order to meaningfully access her education.

13. Plaintiff M.B. ("M.B." or "Plaintiff") is currently ten years old, and about to enter the fifth grade. She resides with her family in Oxnard, California, which is located within Ventura County. M.B. currently attends a special day class at Rose Avenue Elementary School in Oxnard School District. M.B. was and is a student who requires special education services under the IDEA and California Education Code, and a qualified individual with a disability within the meaning of Section 504, the ADA, Government Code Section 11135 and the Unruh Civil Rights Act, who required accommodations, modifications and services in order to meaningfully access her education.

14. Plaintiff I.G. ("I.G." or "Plaintiff") is currently ten years old, and about to enter the fifth grade. He resides with his family in Oxnard, California, which is located within Ventura County. I.G. currently attends a general education class at Sierra Linda Elementary in Oxnard School District. I.G. was and is a student who requires special education services under the IDEA and California Education Code, and a qualified individual with a disability within the meaning of Section 504, the ADA, Government Code Section 11135 and the Unruh Civil Rights Act, who required accommodations, modifications and services in order to meaningfully access his education.

15. The Oxnard School District (sometimes referred to as the "District") is a public school district organized and existing under the laws of the State of California, located within Ventura County. It provides services to students from pre-school through the eighth grade. At all times relevant herein, the District was the local education agency

4

First Amended Complaint

responsible for providing Plaintiffs with special education services, and with full and equal access to its public education programs and activities in compliance with the requirements of state and federal law. The District receives both state and federal financial assistance.

16.     Cesar Morales is the Superintendent of Oxnard School District and is sued herein in his official capacity. Mr. Morales is responsible for establishing the policies and procedures within the District, and for oversight of the District.

17.     Ernest Morrison, Debra Cordes, Denis O'Leary, Veronica Robles-Solis, Monica Madrigal Lopez are members of the Board of Trustees for the Oxnard School District. The Board is responsible for establishing policies and procedures within the District, and for oversight of the District and the Superintendent. The Board members are sued in their official capacities.

18.     Plaintiffs are ignorant of the true names and capacities of the defendants named herein as DOES 1 through 10, inclusive, and therefore sue said defendants by such fictitious names.  Plaintiffs will seek leave of Court to amend this Complaint to allege the true names and capacities of said defendants when they have been ascertained. Plaintiffs are informed and believe, and on that basis allege, that DOES 1 through 10, inclusive, have or claim to have an interest in the controversy at issue in this Complaint and/or need to be joined to this action to give effect to the relief sought herein.

### FACTS APPLICABLE TO ALL CLAIMS

19.     Oxnard School District has a population of nearly 17,000 students, at twenty-one school sites. More than eighty percent of its student population is characterized as "socially disadvantaged," and more than half are classified as English Language Learners. Its students are more than ninety percent Hispanic.

20.     Data from the 2017 California Department of Education shows that the District scored in the lowest category available – categorized as red on a scale of red, orange, yellow, green, blue – for performance levels in English Language Arts and Math

First Amended Complaint

for its students with disabilities, English Language Learners and socioeconomically disadvantaged students.

21. Similarly, data from the California Assessment of Student Performance and Progress (CASPP), a comprehensive end of year assessments of grade level learning, show that for 2016 78% of the District's students did not meet grade level standards in English Language Arts, and 86% did not meet grade level standards in mathematics. The statistics for the District's students with disabilities are even more stark, with 96% of its identified students with disabilities not meeting standards in both categories.

22. The District's policy of using the SST process as an alternative to procedures under the IDEA, Section 504 and ADA is longstanding. It dates back to at least 2009, as documented in a special education audit of the District, which found that the District was employing the SST approach in special education, but that "[n]o one at the District level monitors SST implementation….[and] The staff considers SSTs to be the method of placing students in special education."

23. Similarly, in 2011, the Office for Civil Rights for the Department of Education found that Oxnard had illegally used the SST procedure to delay evaluations and services under Section 504 and IDEA for a young student with a disability, finding the school had a "policy of requiring an SST meeting prior to referring a student for an evaluation," and "a failure to timely evaluate and cover the Student under Section 504 or the IDEA." The Office for Civil Rights held that the District, *inter alia*, "discriminated against [the] first-grader with ADHD and a mood disorder not only by delaying his IDEA evaluation, but also by failing to evaluate his eligibility for Section 504 services. OCR found that the district violated Section 504 by referring the student to its student support team prior to conducting any evaluations." 56 IDELR 274 (2011).

24. Testimony from the evidentiary hearings underlying this matter demonstrated that the policy and practice of either doing nothing or only using the SST model, instead of making special education referrals or providing disability accommodations, persists throughout the District. Multiple teachers and staff testified

6

First Amended Complaint

during the evidentiary hearings in this matter that they had little to no training regarding their obligations to identify and refer students with suspected disabilities, had made either no or very few referrals for special education in their multi-year careers at the District, and had relied on the SST procedure over the course of many years because it was the District's policy to do so – assuming the SST team would make a referral for evaluation, if needed. Both of the Administrative Law Judges who conducted evidentiary hearings in the underlying proceedings in this matter found this problem to be widespread, with one labeling it as the District's "standard policy" not to proceed straight to a special education assessment, and another noting that District staff's misunderstanding of their obligations to identify and evaluate students with disabilities was "systemic."

25. As demonstrated by the named Plaintiffs in this case, the consequences for students in the District are calamitous.

### Plaintiff J.R.

26. J.R. has a severe language disorder that limits both her expressive and receptive language, as well as Attention Deficit Hyperactivity Disorder ("ADHD"). Her parents are both farmworkers, who work in the Strawberry fields of Oxnard. Her family, which includes two other siblings, is extremely low income. Neither of her parents completed an elementary school education. They are both Spanish speaking.

27. J.R. is a somewhat shy, but pleasant little girl, and most teachers agree that she has tried her best in school. However, J.R.'s academic difficulties manifested early, and were continuously ignored by the District. As a result, by the time she was in seventh grade J.R. was functioning academically like a student in the first or second grade.

28. By the end of kindergarten, J.R. received grades of "below basic" (the lowest possible grade) in most of language arts and math. Her kindergarten teacher specifically noted that she had difficulty understanding new concepts. By first grade, she continued to be below basic in nearly all of language arts and math. Per the

First Amended Complaint

psychoeducational assessment later conducted by the District, after J.R. filed a complaint, she "needed a lot of support in reading," as early as the first grade.

29.     J.R. continued to struggle in the second grade as shown by low-test scores and consistently low grades. J.R.'s scores on the State's Standardized Test and Reporting (STAR) test were below standard in all areas, and she struggled in all areas of learning in the classroom, again receiving below basic grades in math and writing.

30.     According to J.R.'s third grade report card, she was below basic math and most of language arts. The report card also noted that J.R. was making "slow progress in reading," that she made careless errors, and that she had difficulty understanding new concepts.

31.     Again, J.R. struggled during fourth grade. According to J.R.'s fourth grade report card, she again had low test scores and needed improvement in nearly all academic areas. She was also below basic in math and most of language arts. Her report card noted that she was "easily distracted."

32.     After five years with the District, J.R. continued to fail in many areas. As shown by her September 2014 California English Language Development Test ("CELDT") scores, J.R. was functioning at the "beginning" level in reading, having actually regressed from her earlier testing in that category.

33.     J.R.'s grades made it even more apparent that she needed supports. By the end of fifth grade she received 1's (minimal mastery, the lowest grade on a scale of 1-4) in writing standards, language conventions, math concepts, operations and algebraic thinking, numbers and operations in base ten, and geometric measurement. Again, her report card noted that she had difficulty understanding new concepts, and had low test scores.

34.     By the end of J.R.'s fifth grade year, her teacher was concerned about J.R.'s performance. However, rather than evaluate J.R. for special education as legally required, the District held an informal, SST meeting on May 11, 2015.

First Amended Complaint

35.    At this meeting, the District documented numerous red flags that should have prompted an assessment for special education services: 1) J.R. "has peer issues;" 2) Her reading level was at grade level 1.2 (despite being at the end of fifth grade); 3) "Word meaning inhibits her ability to complete comprehension tasks"; and 4) J.R. "[D]oes not seem to understand pragmatics and social skills."

36.    Despite these findings, the District did not conduct an evaluation to evaluate whether a J.R. had a qualifying disability. Rather, the District identified some vague, and undocumented support services that it purportedly provided to J.R.

37.    However, there is no record that the District provided J.R. any of the services, screenings, or supports that it documented in the SST. Rather than provide legally required evaluations and services, the District simply stood by and watched J.R. struggle with her social skills, academics and communication.

38.    In sixth grade, J.R. again scored low on her October 2015 CELDT. Her scores showed that she again did not make progress in overall performance, and actually regressed in speaking, reading and listening. Indeed, her scores in reading and speaking were *lower* than when she first tested in 2012-2013.

39.    In February of 2016, J.R.'s pediatrician diagnosed her with Attention Deficit Hyperactivity Disorder ("ADHD").

40.    By the end of her sixth grade year, J.R.'s records indicate that she "struggled in all academic subjects." She received a "D" in Language Arts and an "F" in math and science. At the end of sixth grade, her STAR test results showed that she had a grade equivalent of 2.8 in reading, and 2.2. in math – *nearly four years behind where she should have been.*

41.    Again, the District did not assess J.R., nor did it offer any services to her to address her disability-related educational needs.

42.    After retaining counsel, on September 22, 2016, J.R. filed a "due process complaint" under the Individuals with Disabilities Education Act with the Office of

9
First Amended Complaint

Administrative Hearings challenging the District's failure to assess and its failure to provide a FAPE for J.R.

43.    At no time prior to J.R.'s filing of her complaint did the District ever offer to assess her for special education or related services, provide her any such services or accommodations under federal nondiscrimination statutes, or provide her family with any information about their rights under IDEA or nondiscrimination statutes to evaluations, services or accommodations.

44.    After that filing, the District finally agreed to assess J.R. for purposes of determining special education eligibility. What those assessments found was striking:

- J.R. had severe deficits in receptive and expressive language, auditory processing, and auditory comprehension. These deficits impact every aspect of her learning and participation in the educational environment, including her ability to follow and comprehend lessons and directions; understand procedural information; express herself orally; take notes; understand written and oral material; and learn new vocabulary. For example, on tests of oral language, J.R. – who was then twelve years old – was performing between a pre-Kindergarten and second grade level.

- J.R. was light years behind her peers academically—testing at the second percentile in reading as a seventh grader, meaning she is below 98% of her peers, and testing so low in math that she did not score a percentile, meaning she was below 99.9% of her peers.

45.    The evaluation concluded that J.R. should be eligible for special education under the category of a severe speech or language disorder in the areas of receptive and expressive language. It also ruled out social and linguistic factors as the cause of J.R.'s academic delay, i.e. her academic collapse was due to her disabilities and not the result of her background or the fact that she was an English Language Learner.

First Amended Complaint

46.	On December 13, 2016, the District held an Individualized Education Plan ("IEP") meeting, and found J.R. eligible for special education services as a student with a speech or language impairment.

47.	Though she is now eligible for special education services, J.R. languished for years without receiving any appropriate services to address her disability-related needs due to the District's unlawful policy of not referring students for special education assessments when they exhibit signs of possible disabilities.

48.	On February 9, 2016, the District entered into a stipulated decision, admitting to liability under IDEA for the two years preceding the date of J.R.'s complaint – namely that it had failed to timely identify and evaluate J.R. for special education services, and had consequently failed to provide a free appropriate public education (FAPE) to address J.R.'s needs. It also agreed to provide certain compensatory services to J.R. to address the admitted liability. The Office of Administrative Hearings issued a Decision by Settlement on March 13, 2017 adopting the findings and relief submitted by the parties. This Decision is attached hereto as Exhibit A, and finds that student was prevailing party on all claims on all issues decided.

49.	Although J.R. prevailed in this Decision, she cannot be afforded complete relief, as she continues to be educated in a District that systemically violates the law by failing to identify students with disabilities, under-identifying disabilities even when it does assess students, failing to adhere to procedural protections, and otherwise violating the nondiscrimination mandates designed to ensure meaningful access to educational programs. The fundamental conduct of the District has not changed.

50.	She is also entitled to attorneys' fees and costs as the prevailing party in the underlying administrative proceeding, and requests those fees through this action.

### **Plaintiff M.B.**

51.	M.B. has a severe expressive and receptive language disorder, and also Attention Deficit Hyperactivity Disorder. M.B. lives with her twin sister, who also has

First Amended Complaint

many of the same learning challenges, her brother and parents in Oxnard. Her family is low income and monolingual Spanish speaking.

52. Despite ample notice of M.B's significant, disability-related needs since at least the first grade, the District failed to provide her the services she needed for years, causing M.B. to waste away academically, without any meaningful educational benefit. Rather than comply with its legal obligations to properly assess M.B. for special education or provide her necessary services, the District held a series of *seven* SST meetings over the course of four years, where it glossed over incomplete data about M.B.'s cognitive and academic abilities and told M.B.'s mother that M.B. was receiving services and making progress.

53. The result has been catastrophic. At ten years old, after filing a complaint in September of 2016, M.B. has finally been identified as a student with *significant* executive functioning and speech and language disabilities. Academically, it is as if she has not received any education at all. She cannot consistently write her name and reads at a kindergarten level. On academic testing, *she is below 99.9%* of her peers – across the board. However, these needs should have been flagged long before she filed a complaint with the District.

54. In Kindergarten, M.B.'s mother almost immediately identified to the teacher that she believed her daughter had ADHD or Autism. Among other things, she was also concerned about a lack of progress from preschool. Rather than provide M.B.'s mother with an assessment plan for special education, the District held the first of many SST meetings. The SST notes document M.B.'s mother's concern that M.B. may have ADHD, dyslexia or Autism.

55. The SST notes reflect M.B.'s academic deficits, which were already evident at the time. At the time of the SST meeting, M.B. was already rated Below Basic on her first trimester report card. The report card notes from her first trimester recommended intervention classes, and noted that M.B. had difficulty working with others.

56. The District finally provided a special education referral on January 22,

12
First Amended Complaint

2013, and an assessment plan was signed on January 25, 2013. When the District finally produced its special education assessment, on May 21, 2013 (approximately two months late), it was wholly deficient. Among other things, it tested M.B. primarily in English despite the fact that at the time she was monolingual Spanish speaking, failed to assess in all areas of disability, and ignored red flags that the assessor himself identified.

57.     Nevertheless, the District held an IEP on May 21, 2013 and, based on the faulty assessment, concluded that M.B. was not eligible for special education, affirmatively telling M.B.'s mother that she did not have a disability.

58.     At the end of Kindergarten, M.B. was "Below Basic" in all of reading, writing and math. She was so deficient that her teacher recommended her for retention.

59.     M.B. continued to struggle at the beginning of first grade, and her other requested another assessment. Rather than provide M.B. with a special education assessment, the District held another SST meeting. At the November 13, 2013 the SST meeting, M.B.'s mother reiterated her request for a "full" assessment. During that meeting, the school psychologist told M.B.'s mother that it was "too soon" to reevaluate. M.B.'s mother also testified that school staff cautioned her and her husband about seeking a special education evaluation, because they would be labeling her daughter in a way that would follow her for the rest of her life, and that it was "not necessary." As a result, M.B.'s father, who was also at the meeting, withdrew the request for an assessment. No one from the school assisted the parent in putting her request for an assessment in writing, provided her with procedural safeguards, or provided her with information about requesting an independent educational evaluation.

60.     Despite advising M.B.'s parents not to seek a special education evaluation, the SST notes clearly document signs of continued struggle. Among other things, the SST notes reflect that M.B. "has difficulty retaining information." *Critically, M.B.'s first grade teacher testified at the evidentiary hearing that she believed this was probably caused by a disability, and that she had shared this information at the SST meeting.* Yet the District did nothing. At that time, M.B. also had trouble with attention; throughout

13
First Amended Complaint

the school day she played with items and talked to others; she needed constant reminding; had a hard time putting sounds together; was constantly distracted; and confused the vowels a and e (one third of her vowels).

61.    Instead of responding to M.B.'s parents' concerns or acknowledging what M.B.'s teacher already realized in terms of her disability, the District held another SST meeting on March 27, 2014. At the SST meeting, M.B. was still struggling.  She was confusing a and e, still doing poorly in math topics, and was again at risk for retention. Her teacher recommended retention because M.B. was not at grade level.

62.    M.B.'s report card for the year shows that she was again Below Basic, all year, in reading comprehension, writing, and most of the sub-areas in math. The comments reflect, among other things, that she was not reading fluently. Her teacher believed that M.B. was significantly below grade level.

63.    At the beginning of second grade, M.B.'s mother again asked for help for her daughter, who continued to struggle at school. Again, the District held a number of SST meetings, all of which documented numerous red flags, as well as a medically diagnosed disability. Yet, the District made no referral for evaluation for special education services.

64.    At the first SST meeting of that year, on September 25, 2014, M.B.'s oral fluency was still low, she was not spelling, and wrote only numbers 1-9, despite the benchmark at that point being the ability to write 1-100. She still confused the vowels a and e and the consonants b and d. She could not independently work on math.

65.    M.B.'s mother specifically told the SST team that, at that point, M.B. had a diagnosis of ADD from her doctor, who also suspected dyslexia, and that M.B. saw "color balls" in the air. However, the District did not make a referral for a special education assessment. No one at the SST provided M.B.'s mother with any procedural safeguards, or any information about her rights under IDEA.

66.    The District held a second SST meeting on February 19, 2015. At that meeting M.B.'s mother informed the school M.B. was taking Ritalin. Again, no school

First Amended Complaint

official took action in response to that information. As of this SST, M.B. was still not reading fluently. M.B. was still unable to pass a spelling test, needed assistance for adding simple, one digit numbers, and continued to only be able to write numbers 1-9. The District provided no referral for a special education evaluation, no additional services, and no information to M.B.'s mother about her rights under IDEA.

67.     As M.B. continued to struggle, the District held yet another SST meeting on May 28, 2015. As of this meeting, M.B. could only recognize 59 high frequency words, despite the benchmark being 200. She was still "not reading fluently," despite being at the end of her second-grade year. She still could not spell, still required assistance for one digit math.

68.     *At this SST, school staff believed that M.B. required a special education assessment.* Nevertheless, they decided to wait because M.B. was transitioning to a full English immersion class, and they wanted to see how she would fare. No one gave M.B.'s mother procedural safeguards, put that decision in writing, or informed her of any rights under IDEA.

69.     By the end of the year, M.B. had all 1's in reading and writing. Her math scores all reflect 2's. Comments on the report card reflect low test scores, difficulty understanding new concepts, and problems with spelling. M.B.'s parents were so concerned that they raised the concept of retention with the school. The school advised them that M.B. was already old for her grade, and that retention would result in her not graduating high school until she is 19. As a result, M.B. was moved to third grade.

70.     In third grade, M.B. continued to struggle. The District held another SST meeting on August 20, 2015. At this point, M.B.'s mother indicated she was concerned about low self-esteem and low academics. The notes indicate that M.B. was reversing letters and that she did not want to come to school because she felt that she could not do the work. The notes also document that M.B. had been diagnosed with ADD and was taking Ritalin.

71.     Despite continued concerns, and a discussion regarding a medically

15
First Amended Complaint

diagnosed disability, the District did not make a referral for a special education evaluation.

72.   In November of 2015, M.B.'s STAR testing indicated that M.B., then a third grader, was in the first percentile for reading, and was at a grade level of 1.2. Her instructional level was pre-kindergarten. Ex. S22. In math, she was similarly low, at the first percentile, and a grade equivalent of 1.0.

73.   *By November of 2015, school staff again determined that M.B. needed a special education assessment, and again did not provide one.* The District provided M.B. with no assessment plan until March 7, 2015, after M.B.'s mother took the exceptional step of contacting the District Superintendent.

74.   M.B.'s grades at the end of third grade reflect a student in free fall. She received failing grades in reading, writing, math and language. Her highest grade in language arts was a D in speaking & listening. She also failed all areas of math.

75.   M.B.'s mother filed her request for due process shortly after the beginning of the fourth-grade year. The District then offered a 504 Plan in October of 2016, that finally made M.B. eligible for 504 accommodations based on her ADHD and dyslexia, among other conditions. The District then assessed M.B. for special education services under the IDEA.

76.   The result of these years of neglect was catastrophic. M.B. both lost educational opportunity and was denied meaningful educational benefits. At ten years old, M.B. cannot consistently write her name. As of the District's academic assessment – conducted over six sessions in November 2016 through January 2017 – M.B. was *below 99.9% of her peers in the following areas* in her academic testing in English:

(1) Basic Reading Skills; (2) Reading Comprehension (which was so low it did not rate a score); (3) Reading Fluency (which also did not rate a score); (4) Math Calculation Skills; (5) Math Problem Solving; (6) Written Language; (7) Written Expression; (8) Phoneme Grapheme Knowledge.

16
First Amended Complaint

77.     Her Spanish language testing was similarly low. Her instructional level and independent reading level is pre-primer.

78.     As a fourth grader, it is as if she has received no education at all. By all accounts, M.B. needed and needs a significantly more intensive program, and one not in the general education setting. The District school psychologist who finally conducted M.B.'s assessment stated that it is extremely difficult for M.B. to capture instructional delivery, and according to the testing, it would be "impossible" for M.B. to participate in a general education setting. Student's expert at her due process hearing, Karen Schnee, testified that M.B. is "light years below the average kid in the average classroom." The District's speech and language pathologist agreed that she is not progressing in her current program "at all."

79.     Though she is now eligible for special education services, M.B. languished for years without receiving any appropriate services to address her disability-related needs due to the District's unlawful policy of not referring students for special education assessments when they exhibit signs of possible disabilities, and otherwise failing to comply with the child find requirement and its attendant procedures.

80.     On May 26, 2017, after a five-day evidentiary hearing, the Administrative Law Judge determined that the District had violated M.B.'s rights, over the course of years, and that such violation was a result of the District's standard policy. Specifically, the Administrative Law Judge found that:

> *The evidence was overwhelming that District had enough information from November 2013 and through third grade to trigger its duty under the IDEA to reassess Student for special education eligibility. Instead, District relied instead on its practice of using the student study team process to address Student's growing needs, which proved to be disastrous for Student.* While it was not unreasonable for District to try using some interventions through the student study team during first grade, *the persistent reliance on the student study team process, as*

17
First Amended Complaint

*opposed to assessing in all areas of suspected need, denied Student a FAPE.* With proper assessments, she should have been found eligible for special education as early as fall 2013. She would have received specialized academic instruction from a special education teacher in a smaller classroom. She would have received speech therapy and possibly other related services from licensed providers trained to work with children with special needs. She would have had the benefit of an IEP team knowledgeable in special education procedures to evaluate her progress, establish goals, and monitor and report on her progress. Student received none of those benefits through the time of hearing.

Order at p. 26, para 42. (emphasis added).

81.     The Administrative Law Judge also noted that the:

*District's <u>standard policy was not to proceed straight to the special education assessment process under the IDEA</u> when requested, but instead to go through the COST referral[1] and student study team process, using the response to intervention [RTI] strategy in lieu of assessments.* However, an RTI process does not replace the need for a comprehensive evaluation. . . .Therefore, response to intervention is not intended to be used as a substitute for the assessment process under the IDEA.

Opinion at p. 31, para 66 (emphasis added).

82.     This Decision is attached hereto as Exhibit B, and finds that student was prevailing party on all claims on all issues decided.

83.     Although M.B. prevailed in this Decision, she cannot be afforded complete relief, as she continues to be educated in a District that systemically violates the law by

---

[1] The District relies on something it refers to as a "Coordination of Services Team" or "COST" referral to initiate the SST process, again in lieu of an assessment for special education or disability accommodations.

failing to identify students with disabilities, under-identifying disabilities even when it does assess students, failing to adhere to procedural protections, and otherwise violating the nondiscrimination mandates designed to ensure meaningful access to educational programs. The fundamental conduct of the District has not changed.

84. Moreover, although the Administrative Law Judge identified significant legal violations with respect to M.B., she failed to afford complete individual relief for M.B. in the form of necessary, appropriate and complete compensatory education to fully address the violations. M.B. thus appeals the remedial portion of her administrative decision.

85. She is also entitled to attorneys' fees and costs as the prevailing party in the underlying administrative proceeding, and requests those fees through this action.

### Plaintiff I.G.

86. I.G. has an anxiety disorder and medically diagnosed insomnia, for which he takes medication. I.G. lives with his parents and sister in Oxnard. His family is low income.

87. I.G. demonstrated clear signs of anxiety and insomnia that caused extensive absences and had a significant impact on his academic performance throughout his time at the District. Despite clear signs and admitted awareness of these conditions and their impact on his school performance, the District chose to do nothing, year after year. The District's inaction contributed to a dangerous cycle – without tools to address his school-related anxiety and insomnia, I.G.'s fear of attending school grew, his insomnia continued and he missed even more school, making it that much more difficult for him to return and be comfortable at school.

88. Teacher testimony and the District's own written record confirmed that the District was aware I.G. had a health condition that caused extensive absences and affected his academic performance at least by the Fall trimester of I.G.'s second grade year, if not before.

19
First Amended Complaint

89.     As early as kindergarten (2012-2013 school year) and first grade (2013-2014 school year) I.G. was extremely difficult to get up in the morning due to his insomnia, and often displayed extreme signs of anxiety at home. Sometimes I.G. would not fall asleep until one or two o'clock in the morning – he would toss and turn in his bed. I.G. was taking medication for his insomnia, and his mother would try to time the medication so that he would fall asleep on time, but not be groggy in the morning. She was not always successful. I.G. was often extremely tired in the mornings. When it came time to get ready for school I.G. would often cry and scream, and would sometimes be shaking. He would often hide under the blankets in his bed or in the bathroom. He would often scream "please don't take me to school!"  His mother's goal was to get her son to go to school, but she had a very difficult time doing so as a result of his sleep disorder and anxiety.

90.     The District's own analysis and records indicate that I.G. consistently demonstrated anxious behaviors and academic difficulties since kindergarten. I.G. was referred for R.T.I. (response to intervention) in kindergarten, although the District has no information about the nature, extent or duration of that R.T.I. services. In Kindergarten, his teacher noted that "I.G. had noticeable difficulty transitioning from home to school throughout the school year." By the end of the year, he was "Below Basic" in writing and number sense, and "Basic" in all other areas of Language Arts and Math.

91.     I.G.'s academic and behavioral troubles, as well as absences continued in the first grade, with his cumulative record reflecting "Many absences. Had difficulty separating from Mom in the morning." His academic performance decreased, particularly in Math., He was "Below Basic," in all areas of Math by the end of his first-grade year, and still only "Basic" in the vast majority of other categories, including almost all of Language Arts, and History, Science and Physical Education. Comments from his first-grade teacher, include "Needs to pay better attention;" "Does not actively participate in class discussions;" "Poor attendance affects school work and academic progress;" and "Making slow progress in reading."

20<br>First Amended Complaint

92.    I.G.'s first grade teacher said that I.G. was often worried at school about when he could see his mother, where his mother was, and when he could go home.

93.    Others noted similar troubling behaviors. The school counselor, recalled an incident that year when I.G. did not receive an award at a school ceremony and became extremely upset and began "hitting himself on the desk." The principal at the time, Ms. Wennes, considered I.G. to just be "one of their criers," in that she often saw him crying in the morning.

94.    Despite an enormous number of absences for I.G. during these years, 30 and 39 absences respectively, the school took *no* action, other than an unsigned attendance contract in the record and some attendance meetings.

95.    I.G.'s second grade (2014-2015 school year) teacher testified that she was aware early in the first trimester that I.G.'s absences were caused by his insomnia, and that his absenteeism increased as the year went on. I.G.'s mother told her that his absences were caused by insomnia in the first trimester.

96.    I.G.'s second-grade teacher, Ms. Pascual, saw the effects of the insomnia, testifying that he would fall asleep in class on average once per week and would become irritable when Ms. Pascual would wake him up. She testified that I.G. would have "outbursts" in class where he would become angry, slam his hand on the desk and lift the desk up, and would take out books and hit the desk with them. These outbursts happened with enough frequency to cause her concern. Typically, she would send I.G. to the office and his mother would come and pick him up. She estimated that she referred him to the office 10-20 times. When she spoke to I.G.'s mother, his mother explained it was probably due to lack of sleep. Ms. Pascual also testified that I.G. was not fully alert in class. She stated that she was concerned about academics as I.G. seemed to be missing out because he was absent and not fully alert in class. Ms. Pascual also testified that I.G. was "grumpy" at school about half the time.

21
First Amended Complaint

97.     The teachers notes for the year reflect a child in distress. The cumulative record notes that "I.G. has had many health issues and missed many days. He became very aggressive and defiant."

98.     Despite these concerns, Ms. Pascual did not make a special education referral. In essence, Ms. Pascual said she thought it was an issue (1) of a health/medical nature, (2) that affected school performance, but assumed the doctor would handle it. She also stated that she had not received training on special education referrals.

99.     At the end of the year, I.G.'s report card reflects a student who continued to fail academically. His grades were mostly 1's and 2's in the core areas of Language Arts and Math. In "Standards for Mathematical Practices," in particular, I.G. received all 1's. His report card was clear that "poor attendance affects school work and academic progress."

100.    Despite a total of *46* absences for the year and testimony indicating I.G.'s teacher knew the absences were related to hiss health condition, the school took no action.

101.    Ms. Gonzales, I.G.'s third grade (2015-2016 school year) teacher, said that I.G. was in an "emotional state" about coming to school, and would say he did not feel well, did not want to be there and wanted to go home. Ms. Gonzales recalled that he would frequently put his head down and cry. She noted that he was absent *a lot*. She believed he did not want to be at school. I.G.'s mother told her that I.G. feels anxious, that it was a struggle getting him to school, and that he had struggled with insomnia. Sometime in the first month of school, Ms. Gonzales recalls I.G.'s mother telling her that anxiety was the reason I.G. was not coming to school and that it was a struggle to get him to school. However, Ms. Gonzalez stated that she believed it was I.G.'s mother's responsibility to get a diagnosis. She also testified that she had never received training on special education assessments and that her understanding was that she could not make a special education referral without first utilizing the District's own procedures – including the SST process – first.

102.   Ms. Gonzalez also testified that she talked to the principal, the attendance clerk and school counselor about her concerns regarding I.G. and his absences, because she was "alarmed" and believed they needed to do something. However, she did not discuss any services for I.G. to address these concerns, and did not know of any actions that any of the others may have taken to do so.

103.   Again, by the end of third grade, it was clear I.G. was continuing to struggle. His report card reflects ongoing challenges in math, with about half of his scores as D's, despite "Excellent" effort. His teacher's notes in his cumulative file state that "Slowly developed more confidence. [H]igh # of absences. Struggles in Math. Separation issues with mom. *Very* respectful boy." I.G.'s standardized testing scores from June of 2016 show that he was below standard in reading and writing in language arts, and below standard in "concepts and procedures" and problem solving and modeling & data analysis" in math.

104.   Despite a total of *47* absences for the year, the school took no action other than some attendance meetings and another unsigned attendance contract.

105.   After the filing of I.G.'s due process complaint in September of 2016, the District finally assessed I.G. for special education. The assessment report that was completed December 13, 2016 by the District, and overseen by an outside school psychologist, stated that:

> I.G. has demonstrated anxious behaviors on a consistent basis since kindergarten; these behaviors are observed in the school as well as the home settings. These behaviors impact his educational performance within the school setting as he has not been able to regularly attend school since kindergarten.

106.   The assessment found that these anxious and depressive symptoms also impact his ability to learn when he is physically present at school as they "impact[] his ability to remain engaged in learning when he is physically present to the classroom."

Notably, "these behaviors have impacted his access to learning *to a marked degree.*" (emphasis added).

107.    I.G. was found eligible for special education at his initial IEP held on November 30 and December 14, 2016 and his special education services started on January 9, 2017.

108.    On May 12, 2017, after a four-day evidentiary hearing, the Administrative Law Judge in I.G.'s case found that the District had violated his rights under IDEA, and in particular child find, and its attendant procedure, since the beginning of second grade in 2014. More specifically, the "District failed to meet its child find duties and refer Student for assessment when it learned that Student's poor attendance, fatigue, and irritability were allegedly caused by a sleeping disorder or insomnia. Ms. Pascual [the second-grade teacher] had reason to suspect that Student had a disability as of September 30, 2014." Order at p. 30, para 26.

109.    The Administrative Law Judge noted, *inter alia*, that the problem in the District was systemic:

> Here, Student should have been assessed in the fall of 2014 but was not assessed until two year(s) [sic] later. Fundamental to District's failure to timely assess was a general misunderstanding of a school district's child find obligations. General education teachers, counselors, and administrators stated that they did not suspect Student to have a disability that might need to be addressed by special education services, because Student's absences were the consequence of a medical issue. Yet everyone agreed that Student's chronic absenteeism and early removal negatively affected his academics….[¶] *District personnel's misunderstanding in this regard was systemic.*

24
First Amended Complaint

Order at p. 35-36, para 16-17 (emphasis added). He further noted that the District's admitted policy of utilizing SST's "failed to address Student's educational needs and meet District child find duties." Order at p. 30, para 25.

110.   This Decision is attached hereto as Exhibit C, and finds that student was prevailing party on all claims on all issues decided from 2014 through the date of filing of the complaint.

111.   Although I.G. prevailed in this Decision, he cannot be afforded complete relief, as she continues to be educated in a District that systemically violates the law by failing to identify students with disabilities, under-identifying disabilities even when it does assess students, failing to adhere to procedural protections, and otherwise violating the nondiscrimination mandates designed to ensure meaningful access to educational programs. The fundamental conduct of the District has not changed.

112.   Moreover, although the Administrative Law Judge identified significant legal violations with respect to I.G., he failed to afford complete individual relief for I.G. in the form of necessary, appropriate and complete compensatory education to fully address the violations. I.G. thus appeals the remedial portion of his administrative decision.

113.   He is also entitled to attorneys' fees and costs as the prevailing party in the underlying administrative proceeding, and requests those fees through this action.

## CLASS ALLEGATIONS

114.   Plaintiffs bring this action on behalf of themselves and all other persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2).

115.   The class consists of all students in Oxnard School District who have or may have disabilities and who have been or will be subject to the District's policies and procedures regarding identification and evaluation of students for purposes of providing services or accommodations under the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act and/or the Americans with Disabilities Act.

116.   Class action status for this litigation is proper because:

25
First Amended Complaint

a.  The class of students is so numerous that joinder of all members is impractical. Plaintiffs maintain that the class of persons consists of hundreds of young students. For instance, data regarding typical special education enrollment as compared to the District here suggests that somewhere between 200 and 400 students in need of services and accommodations remain unidentified by the District. Moreover, the student population changes over time and not all class members can be specifically identified.  In addition, many students who have a disability are not identified as such, because of Defendants' failure to fulfill their obligations under federal and state laws to locate, identify and assess youth suspected of having a disability.

b.  There are questions of law and fact common to the class.

c.  The claims of Plaintiffs are typical of the claims of the class.  Plaintiffs are being and were denied their legal entitlement to special education, related services, and reasonable modifications to Defendants' policies and practices.

d.  Plaintiffs will fairly and adequately protect the interests of the class as there is no conflict between Plaintiffs and the other class members and Plaintiffs have retained counsel experienced in class action litigation relating to education, special education, and the civil rights of persons with disabilities.

e.  Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole.

/ / /

/ / /

/ / /

/ / /

/ / /

26

First Amended Complaint

## FIRST CAUSE OF ACTION

### Individuals With Disabilities Education Act

### 20 U.S.C. §14000, *et seq.*

117. Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs.

118. Under IDEA, as recipients of federal education funds, the Defendants have the duty to provide a Free Appropriate Public education (FAPE) to all students with disabilities. 20 U.S.C.§§ 1412(a)(l),(b), 1413(a).

119. A FAPE consists of special education and related services that are consistent with curriculum standards set by the state of California and conform to the student's IEP. 20 U.S.C. § 1401(9). Special education is "specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability." 20 U.S.C.§ 1401(29).

120. IDEA's primary mandate is the guarantee that "all children with disabilities have available to them a [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

121. To carry out this broad mandate, the District must have in effect policies, procedures and programs to ensure that all children who are in need of special education and related aids and services are identified, located, evaluated and provided a specially-designed Individualized Education Program ("IEP"). 20 U.S.C. §§ 1412(a)(1), (a)(3)-(7), (a)(16), 1413(a)(1), 1414(a)-(e); 34 C.F.R. §§ 300.111, .301, .304-.311; Cal. Educ. Code § 56337; Cal. Code Regs. tit. 5 §§ 3030(b)(10)(A)-(C) (2017).

122. More specifically, Districts must ensure that "children with disabilities residing in the State and children with disabilities attending private schools . . . regardless of the severity of their disabilities, and who are in need of special education and related aids and services are identified, located, and evaluated . . . ." 20 U.S.C. § 1412(a)(3)(A). This is commonly known as the "Child Find Duty."

123. The Child Find Duty requires school districts to timely identify, locate, and evaluate all children with suspected disabilities. Id. § 1412(a)(3); 34 C.F.R. §§ 300.101(c), .111. School districts, thus, must fulfill their Child Find obligation; otherwise, a child who has a disability or suspected disability under IDEA will not be identified and accordingly, will not receive appropriate special education.

124. Thus, the Child Find Duty requires that a school district systematically seek out and find those students in need of special education and related services and evaluate those students in a timely manner, such that they can receive needed services and accommodations.

125. Once a child is identified, school districts must promptly seek parental consent to evaluate him or her for special education, under mandated timeframes, including when the child has not made adequate progress after an appropriate period of time when provided with appropriate instruction. 20 U.S.C. §§ 1414(b)(6); 34 C.F.R. §§ 300.301, 300.309(c). School districts must evaluate a child who is referred for an evaluation by a parent unless they provide adequate written notice giving their reasons for refusal. 34 C.F.R. § 300.503; Cal. Educ. Code § 56500.4. IDEA requires school districts to conduct comprehensive "initial evaluations" to "determine whether a child is a child with a disability" and "determine the educational needs of such child." 20 U.S.C. §§ 1414(a)-(c); see also 34 C.F.R. § 300.301; Cal. Educ. Code § 56320.

126. The evaluation must encompass all suspected areas of the child's disability. 20 U.S.C. § 1414(a)(3)(B). Evaluation results are then discussed with parents in an IEP team meeting to determine if the child is eligible for special education. *Id*. § 1414(a)(4).

127. The results of these evaluations are used to determine the child's eligibility for special education and related aids and services as well as to make decisions about an appropriate educational program for the child.

128. As a corollary to this, school districts must give parents prior written notice within a reasonable time before they propose or refuse to initiate or change the identification, evaluation, or educational placement or the provision of FAPE to the

First Amended Complaint

child. 34 C.F.R. § 300.503; Cal. Educ. Code § 56500.4. Thus, school districts must obtain informed written parental consent in order to support an initial evaluation of a student and an initial provision of special education services. Parental consent is further required to provide special education services and re-evaluations. Parental consent means that the parent is "fully informed of all information relevant to the activity for which consent is sought, in his or her native language, or through another mode of communication," and that the parent "understands and agrees" in writing to the carrying out of the activity for which his or her consent is sought. 34 C.F.R. § 300.9.

129. By failing to identify and evaluate students in need of services and accommodations Defendants have violated the protections of IDEA.

130. As a result of the foregoing, Plaintiffs and members of the proposed class suffered and continue to suffer injury, including, but not limited to, denial of meaningful access to the benefits of a public education.

131. Because Defendants' discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies. Plaintiffs seek injunctive relief and attorneys' fees as a result.

132. Named Plaintiffs M.B. and I.G. also appeal the remedial portions of their underlying administrative decisions.

133. Plaintiffs seek attorneys' fees both for this federal case, as well as the underlying administrative actions, OAH Case No. 2016100053, OAH Case No. 2016100009, and OAH Case No. 2016091036.

## SECOND CAUSE OF ACTION

### Americans With Disabilities Act

### 42 U.S.C. §12131, *et seq.*

134. Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs.

135. Congress enacted the ADA upon finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms of

29

First Amended Complaint

discrimination continue to be a "serious and pervasive social problem."  42 U.S.C. § 12101(a) (2).

136.  In response to these findings, Congress explicitly stated that the purpose of the ADA is to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b) (1)-(2).

137.  Title II of the ADA provides in pertinent part: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

138.  Pursuant to Title II public entities are required to provide meaningful access to their programs, services and activities. Among the requirements to provide meaningful access, public entities must modify their policies and procedures when necessary to accommodate disability related needs, also known as "reasonable accommodation." 28 C.F.R. §35.130(b)(7). Public entities cannot provide programs, services or benefits to a person with a disability that are not equal to those provided to others or deny a person with a disability the opportunity to participate in programs, services or activities. 28 C.F.R. §35.130(b)(1)(iii). Moreover, public entities are required to administer their programs, services and activities in the most integrated setting appropriate. *Id.* at §35.130(d).

139.  At all times relevant to this action, the District is a "public entity" within the meaning of Title II of the ADA and provides a program, service or activity to the general public.

140.   At all times relevant, including at the time of each alleged violation of the ADA, Plaintiffs and members of the proposed class are qualified individuals with disabilities within the meaning of the ADA. Their disabilities substantially limit a

variety of major life activities, including but not limited to, learning, reading, writing, and concentrating.

141.   At all times relevant, including at the time of each alleged violation of the ADA, the District provided services, programs and activities in its public schools, and was obligated to provide Plaintiffs and members of the proposed class with reasonable accommodations that they needed to enjoy meaningful access to the benefits of those services, programs and activities, and otherwise not exclude them from its educational program.

142.    Defendants acted in violation of Title II of the Americans with Disabilities Act through failing to provide Plaintiffs and members of the proposed class with meaningful access to Defendants' educational program.

143.   As a result of the foregoing, Plaintiffs and members of the proposed class suffered and continue to suffer injury, including, but not limited to, denial of meaningful access to the benefits of Defendants' educational program.

144.   Because Defendants' discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies. Plaintiffs seek injunctive relief and attorneys' fees as a result.

**THIRD CAUSE OF ACTION**

**Section 504 of the Rehabilitation Act of 1973**

**29 U.S.C. § 794(a)**

145.   Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs.

146.   Under Section 504, a qualified individual with a disability may not, solely by reason of his/her disability, be subjected to discrimination, excluded from participation in, or denied the benefits of, any program or activity receiving Federal financial assistance.  29 U.S.C. § 794(a).

147.   Under Section 504, the phrase "program or activity" includes a local educational agency.  29 U.S.C. § 794(b) (2) (B).

31

First Amended Complaint

148. Under Section 504 public entities are required to provide meaningful access to their programs, services and activities. Specifically, the aids, benefits and services provided must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement." 34 C.F.R. §104.4(b)(2). Further, public entities may not "[p]rovide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others," *Id.* at §104.4(b)(1)(iii).

149. Section 504 mandates that a student who is eligible for special education and related aids and services under Section 504 is entitled to receive FAPE. 34 C.F.R. § 104.33.

150. Section 104.35(a) of the regulations requires school districts to conduct an evaluation of any student who needs or is believed to need special education or related aids and services because of disability before taking any action with respect to the students initial placement and before any subsequent significant change in placement.

151. At all times relevant, including at the time of each alleged violation of Section 504, Defendants received federal financial assistance as a public school.

152. At all times relevant, including at the time of each alleged violation of Section 504, Plaintiffs and members of the proposed class were qualified individuals with disabilities within the meaning of Section 504 or were regarded as having a disability. Plaintiffs disabilities substantially limits a variety of major life activities, including but not limited to, learning, reading, writing, and concentrating.

153. Defendants acted in violation of Section 504 by failing to provide Plaintiffs with meaningful access to their educational program.

154. As a result of the foregoing, Plaintiffs and members of the proposed class suffered and continue to suffer injury, including, but not limited to, denial of meaningful access to the benefits of a public education program.

First Amended Complaint

155.   Because Defendants' discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies. Plaintiffs seek injunctive relief and attorneys' fees as a result.

## FOURTH CAUSE OF ACTION

## Government Code Section 11135

156.   Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs.

157.   California Government Code section 11135 sets forth a nondiscrimination policy for state programs.  It provides that in pertinent part:

> [n]o person in the State of California shall, on the basis of race, national
> origin, ethnic group identification, religion, age, sex, sexual orientation,
> color, genetic information or disability, be unlawfully denied full and
> equal access to the benefits of, or be unlawfully subjected to
> discrimination under, any program or activity that is conducted, operated,
> or administered by the state or by any state agency, is funded directly by
> the state, or receives any financial assistance from the state.

Cal. Gov't Code § 11135(a).

158.   It is a discriminatory practice for a recipient of state financial assistance, in carrying out any program or activity, on the basis of disability, (a) to deny a person the opportunity to participate in, or benefit from an aid, benefit or service; (b) to afford a person the opportunity to participate in or benefit from an aid, benefit or service that is not equal to that afforded others; (c) to provide a person with an aid, benefit or service that is not as effective in affording an equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others . . . (g) to otherwise limit a person in the enjoyment of any right, privilege, advantage or opportunity enjoyed by others receiving any aid, benefit or service resulting from the program or activity." 22 Cal. Code Regs. § 98101 (a)-(c), (g).

33

First Amended Complaint

159. It is also discrimination for a recipient of state financial assistance to utilize criteria or methods of administration that: "(1) have the purpose or effect of subjecting a person to discrimination on the basis of disability; [or] (2) have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the recipient's program with respect to a person with a disability. . ." 22 Cal. Code Regs. § 98101(i).

160. Additionally, the failure of a recipient of state financial assistance to comply with Title II of the Americans with Disabilities Act (at 42 U.S.C. § 12132) violates Section 11135. Cal. Gov't Code § 11135(b).

161. Each Defendant was, at all times relevant to this action, and is currently operating or administering a program or activity that receives state financial assistance, within the meaning of Section 11135.

162. Defendants have violated the rights of Plaintiffs and members of the proposed class secured by Cal. Gov't Code § 11135 *et seq.*

163. Because Defendants' discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies. Further, as a direct result of Defendants' actions, Plaintiffs and members of the proposed class are suffering irreparable harm and therefore speedy and immediate relief is appropriate.

164. Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable attorneys' fees and costs incurred in bringing this action.

## FIFTH CAUSE OF ACTION

### Unruh Civil Rights Act

165. Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs.

166. California's Unruh Civil Rights Act prohibits discrimination against individuals with disabilities and also prohibits discrimination based on a person's disability or perceived disability.

34
First Amended Complaint

167. Section 51 of the California Civil Code provides, in relevant part: "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their . . . disability . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b).

168. Under Unruh, "[a] violation of the right of any individual under the federal Americans with Disabilities Act of 1990 (P.L. 101-336) shall also constitute a violation of this section." Civil Code §51(f).

169. Unruh holds liable anyone who "denies, aids or incites a denial, or makes any discrimination or distinction contrary to" Section 51 of the California Civil Code for "each and every offense." Cal. Civ. Code § 52.

170. The District is a business establishment for the purposes of Unruh.

171. Defendants violated Unruh by violating the rights of Plaintiffs and members of the proposed class under the Americans with Disabilities Act and other Federal and State laws designed to ensure that minors have free access to public schools and all of their benefits and privileges.

172. Defendants unlawfully denied Plaintiffs "the full and equal accommodations, advantages, facilities, privileges, or services" of the District. Defendants thus violated the California Unruh Act with respect to Plaintiffs.

173. As a result of the foregoing, Plaintiffs suffered and continues to suffer injury.

174. Because Defendants' discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies. Further, as a direct result of Defendants' actions, Plaintiffs and members of the proposed class are suffering irreparable harm and therefore speedy and immediate relief is appropriate.

175. Plaintiffs seek injunctive relief and attorneys' fees as a result.

/ / /

/ / /

35

First Amended Complaint

## SIXTH CAUSE OF ACTION

### Education Code Section 56000 *et seq.*

176. Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs.

177. California state law implementing IDEA also requires educational instruction and services to a student "with exceptional needs" if "the degree of the [student's] impairment . . . requires special education . . . ." Cal. Code Regs. tit. 5 § 3030(a) (2017); *see* Cal. Educ. Code §§ 56000 *et seq.*

178. Cal. Educ. Code § 56300 states, "A local educational agency shall actively and systematically seek out all individuals with exceptional needs, from birth to 21 years of age, inclusive, including children not enrolled in public school programs, who reside in a school district or are under the jurisdiction of a special education local plan area or a county office of education." *See also* Ed. Code, §§ 56501, 56502, 56505; Cal. Code Regs., tit. 5, § 3082.

179. Plaintiffs and members of the proposed class are students with exceptional needs pursuant to Cal. Educ. Code §§ 56000 *et seq.* Defendants have violated Plaintiffs' rights under Cal. Educ. Code §§ 56000 *et seq.* by failing to actively and systemically seek out all students with exceptional needs.

180. As a result of the foregoing, Plaintiff suffered and continues to suffer injury.

181. Because Defendants' discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies. Further, as a direct result of Defendants' actions, Plaintiffs are suffering irreparable harm and therefore speedy and immediate relief is appropriate.

182. Plaintiffs seek injunctive relief and attorneys' fees as a result.

/ / /

/ / /

/ / /

/ / /

36
First Amended Complaint

## **PRAYER FOR RELIEF**

Plaintiffs pray this Court enter judgment as follows:

1. A finding that Defendants' conduct violated the Individuals with Disabilities Education Act, 20 U.S.C. §1400, *et seq.*; Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* (the "ADA"); Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 *et seq.* ("Section 504"); Government Code Section 11135; the Unruh Civil Rights Act, Cal. Civ. Code § 51 *et seq.*, and California Education Code § 5600 *et seq.*

2. An injunction ordering Defendants to comply with the requirements of the IDEA, ADA, Section 504, Government Code 11135; Unruh Civil Rights Act; and California Education Code, including but not limited to reform of policies and procedures within the District, appropriate training for all staff, a process for seeking out and evaluating those students in need of evaluations, and monitoring by independent expert(s).

3. Appropriate compensatory educational services for M.B., I.G.

4. Plaintiffs' reasonable attorneys' fees and costs in this action and the underlying administrative proceedings OAH Case No. 20161000053, OAH Case No. 2016100009, and OAH Case No. 2016091036, including, but not limited to under, 20 U.S.C. §1415(i)(3); 42 U.S.C. §12205, 29 U.S.C. §794(b), Cal. Civil Code §52 and Cal. Code Civ. Proc. 1021.5.

5. Such other and further relief as the Court deems just and proper.

Dated:   July 26, 2017                    LEARNING RIGHTS LAW CENTER

LAW OFFICE OF SHAWNA L. PARKS

SEABORN LEGAL

By: _____

SHAWNA L. PARKS
*Attorneys for Plaintiffs*

Exhibit A

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of:<br><br>PARENT ON BEHALF OF STUDENT,<br><br>v.<br><br>OXNARD SCHOOL DISTRICT. | OAH Case No. 2016100053 |

**DECISION BY SETTLEMENT**
**(Cal. Code Regs., tit. 5, § 3087)**

Clifford H. Woosley, Administrative Law Judge, Office of Administrative Hearings, State of California, enters this Decision by Settlement pursuant to section 3087 of title 5 of the California Code of Regulations.

Student, by and through her Parent, filed a Due Process Hearing Request on September 22, 2016, with OAH, naming Oxnard School District. On November 4, 2016, OAH granted a continuance of the hearing to January 31, 2017.

ALJ Woosley started the hearing on January 31, 2017. Attorneys Janeen Steel and Shawna L. Parks appeared on behalf of Student. Mother attended the hearing. Attorneys Benifacio Bonny Garcia and Lawrence S. Joe appeared on behalf of District. Director of Special Education Services, Amelia Sugden, and Manager of Special Education, Nadia Villapudua, attended on behalf of District.

After hearing commenced, but before the entry of evidence, the parties announced that they had reached a stipulation to amended issues in favor of Student and that the only matters remaining for hearing were the remedies. The parties were granted an additional day to reach agreement as to remedies and, at parties' request, the matter was further continued to February 2, 2017.

On February 1, 2017, the parties submitted a proposed Stipulated Judgment, signed by the parties' attorneys, which OAH considered a request for a decision by settlement. ALJ Woosley continued the hearing to a telephonic status conference on February 3, 2017, at which time ALJ Woosley thoroughly discussed the parties' request for a Decision by

Settlement. [1]

The matter was continued to Friday, January 10, 2017, at which time the parties filed a fully executed, proposed Stipulated Decision in lieu of a decision on the merits. The matter was then submitted for decision by settlement, pursuant to the terms of the parties' agreement.

## STIPULATED AMENDED ISSUES IN FAVOR OF STUDENT

1. Since September 21, 2014, District denied Student a free appropriate public education by not meeting its child find obligations, not evaluating Student in all areas of suspected disability, and not finding Student eligible for special education placement and related services.

2. Since September 21, 2014, District denied Student a FAPE by failing to offer Student an individualized education program that met Student's unique needs.

3. Since September 21, 2014, District denied Student a FAPE by failing to offer an individualized education program that was reasonably calculated to offer educational benefit to Student.

4. Student is eligible for special education and related services as a student with a speech or language impairment. District should have found Student eligible for special education and related services as a student with a speech or language impairment as of September 21, 2014.

## FACTUAL FINDINGS

1. The parties stipulate that Student is 13 years old and attends the seventh grade at Kamala Elementary School within the Oxnard School District.

2. The parties stipulate that Student is eligible for special education and related services under the category of speech or language impairment. The parties stipulate that District is the local education agency responsible for Student's special education services. The parties stipulate that District should have found Student eligible for special education as of September 21, 2014

3. The parties entered into a Stipulated Decision, which they and their attorneys fully executed and which is part of the official record and incorporated herein. The parties have stipulated to four issues in favor of Student. The parties have further agreed to related and compensatory services.

---

[1] The recording of the status conference is part of this matter's official record.

4.     The stipulated issues in favor of Student have been set forth above.  The stipulated related and compensatory education services have been incorporated in the Order below.

5.     The Stipulated Decision does not contain any agreed-upon terms that are contrary to the law.

## LEGAL CONCLUSIONS

1.     The Individuals with Disabilities in Education Act and related state laws strongly encourage the settlement of special education disputes.  (See, e.g., 20 U.S.C. § 1415(f)(1)(B); Ed. Code, § 56501.5, subd. (a) [requirement of resolution session before due process hearing]; 20 U.S.C. § 1415(e); Ed. Code, § 56500.3 [availability of mediation before due process hearing]; 20 U.S.C. § 1415(f)(1)(B)(ii); 34 C.F.R. § 300.510(d)(2)(2006); Cal. Code Regs., tit. 5, § 4650, subd. (a)(4); *Wyner v. Manhattan Beach Unified Sch. Dist.* (9th Cir. 2000) 223 F.3d 1026, 1028-1030 [administrative enforcement of settlements of due process disputes].)

2.     Decision by settlement is authorized by California administrative law.  (Gov. Code, § 11415.60; *Rich Vision Centers, Inc. v. Board of Medical Examiners* (1983) 144 Cal.App.3d 110, 115-116 [". . .we see no limitations on the conditions that may be included in a settlement except that such conditions must not violate public policy"].)  Government Code section 11415.60 does not apply to special education due process disputes (Cal. Code Regs., tit. 5, § 3089), but the State Board of Education has adopted a similar regulation. Section 3087 of title 5 of the California Code of Regulations provides:

> Notwithstanding Government Code section 11415.60 of the Administrative Procedure Act, a decision by settlement may be issued on terms the parties determine are appropriate so long as the agreed-upon terms are not contrary to the law.

3.     Based on Factual Finding 3 and Legal Conclusion 2, the parties have settled their dispute on terms they have determined are appropriate.

4.     Based on Factual Finding 5 and Legal Conclusion 2, the Stipulated Decision does not contain any agreed-upon term that is contrary to the law.

## STIPULATED ORDER

The parties stipulate that Oxnard School District shall provide to Student the following related and compensatory education services:

3

1.     Fund an assessment by Lindamood-Bell Learning Processes in Santa Barbara within one week of this Decision, or as soon thereafter as Lindamood-Bell's Santa Barbara office will schedule an assessment.

2.     Upon receipt of the Lindamood-Bell assessment, fund provision of Lindamood-Bell services that are recommended by Lindamood-Bell for a period of two years.  District will provide any appropriate venue or other supports for Lindamood-Bell to implement and provide its recommended services, including but not limited to any physical requirements, such as a location with the provision of any online services in classroom or on campus.  District will fund any re-evaluations that are suggested or required by Lindamood-Bell.  The Lindamood-Bell services will be provided during the regular school day and will be coordinated with Student's teacher.

3.     Student will be placed in a mild-moderate special day class at Oxnard School District's Haydoc Academy of Arts and Sciences that includes, but is not limited to, the following:

a.     30 minutes per week of individual speech services until the end of Student's eighth grade year;

b.     60 minutes per week of group speech services until the end of Student's eighth grade year;

c.     No fewer than 12 social skills sessions provided for one hour on a weekly basis, with the option of continuing if recommended by the supervising counselor; and

d.     Services by a Language and Academic Development ("LAD") credentialed teacher, as needed, to support the special day class teacher to provide writing instruction.

4.     If Lindamood-Bell recommends continued services during summer, District shall provide these services for the 2017 and 2018 extended school year.  If the Lindamood-Bell program is offered at the Ventura location, then District will provide round trip transportation.  If the Lindamood-Bell program is not offered at the Ventura location, District will provide the Lindamood-Bell services at a location where District offers Extended School Year.  (Extended School Year may not be available at Student's home school.)  If Lindamood-Bell does not suggest a summer program for Student, District will provide standard Extended School Year services in a District program.  For any summer programs, District will provide transportation if the location of service is more than a fifteen-minute walk from Parent's home.

5.     District is a kindergarten through eighth grade school district and Student will be enrolled in District through Summer 2018.  Thereafter, if any Lindamood-Bell services

4

Monday 13 of Mar 2017, Faxination     ->3233899239          Page  6 of 7
Case 2:17-cv-04304-JAK-PD   Document 14   Filed 07/26/17   Page 44 of 122  Page ID
#:196

required under by this decision remain, such services will be provided by District in coordination with the High School District and Parent.

6.     If Parent moves more than a fifteen-minute walk from Haydoc Academy of Arts and Sciences, but remains within District, District will provide Student with transportation.  If Parent moves out of District in the next two years, the District will coordinate providing any remaining Lindamood-Bell services with the Parent and Student's new school district as follows:  (1) during school, if an arrangement can be reached with the new school district, or (2) after school, if no arrangements are able to be made with the new school district within sixty days of Student's enrollment.

7.     Student withdraws and dismisses all other claims.

PREVAILING PARTY

Education Code section 56507, subdivision (d), requires that this Decision indicate the extent to which each party prevailed on each issue heard and decided in this due process matter.  Here, the parties stipulated that Student is the prevailing party on Issues 1, 2, 3, and 4.

RIGHT TO APPEAL THIS DECISION

This was a final administrative Decision, and all parties are bound by it.  Pursuant to Education Code section 56506, subdivision (k), any party may appeal this Decision to a court of competent jurisdiction within ninety (90) days of receipt.

DATED:  March 13, 2017

DocuSigned by:

_____
3EEE11185C9F48D

CLIFFORD H. WOOSLEY
Administrative Law Judge
Office of Administrative Hearings

5

Exhibit B

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

In the Matter of:

PARENTS ON BEHALF OF STUDENT,

v.

OXNARD SCHOOL DISTRICT.

OAH Case No.  2016100009

## DECISION

Parents on behalf of Student filed a due process hearing request with the Office of Administrative Hearings, State of California, on September 22, 2016, naming Oxnard School District.

Administrative Law Judge Adrienne L. Krikorian heard this matter in Oxnard, California, on March 14, 15, 16, 21, 22 and 28, 2017.

Attorneys Shawna Parks and Janeen Steel represented Student.  Mother attended all hearing dates except March 22, 2017, testified on the last hearing day, and was assisted by a Spanish interpreter.  Attorney Lawrence Joe represented District.  Amelia Sugden, Director of Special Education Services, attended the hearing on behalf of District and testified.

A continuance was granted for the parties to file written closing arguments and the record remained open until May 3, 2017.  Upon timely receipt of the written closing arguments, the record was closed and the matter was submitted for decision.

## ISSUES

(1)      Did District deny Student a free appropriate public education since November 2012, by failing to meet its child find obligations by not evaluating Student in all areas of suspected disability, and not finding Student eligible for special education placement and related services?

(2)    Did District deny Student a FAPE since November 2012 by failing to offer Student an individualized education program that met Student's unique needs?

(3)    Did District deny Student a FAPE since November 2012 by failing to offer an IEP that was reasonably calculated to offer educational benefit to the Student?

(4)    Did District deny Student a FAPE since November 2012 by committing procedural violations that significantly impeded Parents' opportunity to participate in the decision-making process, by:

(a) Not providing Parents' with a copy of special education procedural safeguards; and/or

(b) Failing to inform Parents of District's obligation to offer assessments or provide an assessment plan if a need for special education services was suspected?

## SUMMARY OF DECISION

Student contends District failed its obligations under the Individuals with Disabilities Education Act from the fall of 2012 through the date she filed her complaint, denying her a FAPE and depriving Parents of the ability to participate in a meaningful way in developing her educational program.  Student contends District first failed to identify her as a child with a suspected disability despite ample evidence to the contrary, and then later inappropriately assessed her and failed to find her eligible for special education.  District contends that it used the "student study team" process, and implemented appropriate "responses to intervention" for Student.  District further contends that Student demonstrated no needs requiring assessment after it completed its initial assessment in May 2013, and until it offered to assess her in March 2016.

Student proved that, because of applicable exceptions to the two-year statute of limitations, she had viable claims as of November 13, 2013.  For the reasons discussed below, District's arguments that Student's claims after March 2016 should be barred based upon Parents' refusal to consent to assessment until November 2016, were not persuasive.

This Decision additionally finds that Student met her burden of proof on all issues, except for her contention that District violated its statutory "child find" duties, which was time-barred and moot.

## FACTUAL FINDINGS

1.    Student was a ten-year-old girl at the time of hearing.  She resided at all relevant times in District's boundaries with Parents, a twin sister, and a brother.  Student was developmentally delayed as a toddler.  She did not walk or speak until age two.  Her primary

2

language at home and school was Spanish.  She attended a private preschool until she was four years old.  District did not find her eligible for special education before she filed her complaint on September 22, 2016.

*Kindergarten- Special Education Assessment*

2.     Parents enrolled Student in a dual immersion language kindergarten program at District's Juan Lagunas Soria School at the beginning of the 2012-2013 school year.  The class consisted of 50 percent English speaking and 50 percent Spanish speaking students. Teachers delivered instruction 90 percent in Spanish and 10 percent in English.  The class was co-taught by general education kindergarten teachers Ms. Carrillo and Aracely Martinez until Ms. Martinez went on leave toward the end of the school year.

3.     In early fall 2012, Mother expressed concerns to Ms. Martinez that Student might have autism, based on family history.  Mother also reported Student might have attention deficit hyperactivity disorder, might have dyslexia because of her tendency to reverse words, that she could not hold a pencil, and that she had aggressive behaviors at home.  Mother verbally requested that District fully assess Student.

4.     Ms. Martinez observed that Student was performing low academically. However, she attributed the low performance to the fact that Student had just started kindergarten and came without any formal academic instruction from pre-school.  She did not observe the behavioral concerns in the classroom that Mother reported seeing at home. On November 8, 2012, Ms. Martinez filled out a Coordination of Services Team referral form and provided it to District's outreach specialist Maria Magana.  Ms. Martinez's COST referral form reported low academic performance and Mother's concerns about autism and attention deficit.  Ms. Martinez noted on the referral form that she did not think Student had either condition.  The form did not refer to Student's inability to hold a pencil or Mother's concern about dyslexia/reversing words.

5.     Ms. Magana's role was to facilitate communications and meetings with parents and district staff.  She regularly communicated with Mother regarding Student, and was aware of Mother's concerns about Student's academic difficulties and behaviors.  She coordinated referral of the COST form to the District COST team responsible for evaluating those referrals.

6.     District's COST referral process was the preliminary step after a parent or teacher raised concerns about a student's progress or health issues.  The COST team included a school psychologist, the school principal, an educator, and an administrative representative. It met weekly to discuss all students' progress, including addressing specific referrals from teachers.  When a parent or teacher requested or recommended assessments for special education, the COST team scheduled a student study team meeting, which included parents, to discuss the child's progress and all reported concerns.  District treated verbal requests for assessments as if they were written.  Decisions made by the student study team were documented in the notes from the meeting.  If a student study team decided not to refer for

3

assessments, District discussed that decision at the meeting and documented it in the notes. It did not provide prior written notice under special education procedures.

7.     Ms. Magana coordinated and District held a student study team meeting for Student on December 11, 2012. The team included Parents, Ms. Martinez, a school administrator, District school psychologist Steve Tobey, a Spanish interpreter, and Ms. Magana. Mother expressed her multiple concerns about Student's behaviors at home and difficulties in learning at school. The team reviewed Student's academic progress, including benchmark testing, for the first semester of the school year. Student was unable to recognize sounds or vowels on the literacy tests. She had difficulty retaining information. She did not return homework. The team discussed Student's multiple tardiness and absences, and dynamics between Student and her siblings in the home environment. The team recommended multiple interventions for Student in the classroom, requested Mother to sign a release for medical information, and recommended a special education evaluation by Mr. Tobey.

8.     On January 22, 2013, Mr. Tobey sent Parents a Notice of Special Education Referral and an Assessment Plan in Spanish and English. Mother signed and returned the Spanish version on January 25, 2013, along with the release for medical information. Also on January 25, 2013, District referred Student to the City Impact Counseling Center for emotional and behavior concerns related by Mother to Ms. Martinez and Ms. Magana. The referral form marked high risk characteristics including defiance, temper tantrums, lack of concentration and inattentiveness, unable to sit still, and difficulty following instructions.

9.     The January 2013 Assessment Plan identified the following areas of assessment: pre-academic/academic achievement; social emotional behavior; motor skills development; intellectual development; and health. The Assessment Plan did not identify assessments for autism, ADHD, fine motor, central auditory processing disorder, or any other area of suspected concern.

10.     Mr. Tobey was a licensed educational psychologist with a master's degree in educational psychology. He was employed with District as a school psychologist for 25 years. He developed the referral question for assessment based on his evaluation of concerns expressed by the student study team and the COST referral. He did not speak Spanish. He assessed Student in English, with occasional assistance from a Spanish interpreter, for possible disabilities in the areas of specific learning disability and emotional disturbance. Mr. Tobey did not administer specific assessment tools for autism, attention deficit hyperactivity/attention deficit disorder, or speech and language deficits, because they were not part of the referral question. He did not tell Parents that he was limiting the assessment to specific learning disability and emotional disturbance.

11.     As part of his assessment, Mr. Tobey reviewed Student's records, and observed Student in the classroom, finding her to be on-task 80 percent of the time. The 20 percent of the time Student was off-task was due solely to her inattention. Mr. Tobey considered whether concerns expressed by Mother and Ms. Martinez during the assessments

were the result of problems "intrinsic to Student" or other extrinsic factors that would be exclusionary factors for special education eligibility. In his opinion, consideration of extrinsic factors, including tardiness, absences, and environmental factors, were an important part of ruling out whether those factors impacted a child's performance at school.

12. Mr. Tobey administered the Kaufman Assessment Battery for Children, Second Edition; LA Preschool Test III; and Parent and Teacher Rating Forms on Connors Behavior Rating Scales. On the Kaufman II, Student's non-verbal cognitive abilities were in the below average range in comparison to her peers. Mr. Tobey administered Kaufman II subtests with low to moderate cognitive demands in Spanish with the assistance of a bilingual interpreter. Student's scores in visual processing and short term memory were below average, consistent with her other scores on the Kaufman II. The LA Preschool Test was a play-based assessment of cognitive functioning for children ages two through six. Her overall cognitive ability was five years and one month, approximately one year lower than her age. On the Connors Rating Scales for behavior Mother expressed significantly more concerns and rated Student lower than did Ms. Martinez. Mother's scores suggested that Student was significantly impaired and had profound disciplinary problems. Ms. Martinez's scores did not reflect the same intensity as Mother's. Mr. Tobey concluded Mother's descriptions of Student's behaviors did not reflect Student's behaviors at school.

13. Resource teacher Kathy Russell administered pre/academic and academic tests, including the standardized English version of the Brigance Comprehensive Inventory of Basic Skills, and a dominant language screening. Student performed at or above 60 percent accuracy on the Essential Literacy Skills for Spanish. Test results revealed that Student performed at a higher level in Spanish than English, and struggled learning concepts of "most" and "least," learning vowel and consonant sounds, and producing rhyming words in response to a prompt.

14. On May 6, 2013, Student's teachers developed a student study team information sheet, which included Student's present levels of performance and classroom modifications used by the teachers. Those modifications included daily small group instruction, preferential seating, a tablet for support with letter and sound identification and segmenting and blending words, and homework with materials provided by the teachers.

15. Mr. Tobey included the results of the multidisciplinary assessment in a report dated May 21, 2013. District held an IEP team meeting on May 21, 2013. Mother and all required District staff, including a general education and special education teacher, attended the meeting. Mother's primary language was Spanish. She understood some spoken words in English, but did not read or write in English. A District interpreter assisted Mother throughout the meeting. The IEP team reviewed Mr. Tobey's assessment report. The District IEP team members did not find Student eligible for special education. District therefore did not develop an IEP for her.

16. Mother never received the assessment report translated into Spanish. Mr. Tobey did not recall explaining to Mother at the meeting his reasoning about which areas

of need he excluded from assessments. The school principal told Mother after the meeting that "nothing was wrong with" her daughter, some children's brains develop later than others, and Student's delays were less than two years below her age, which reflected the process of the brain maturing. Mother understood at the end of the meeting that District did not find Student eligible for special education services.

17.     Mother signed the English version of the IEP confirming her attendance, initialed confirming her receipt of the IEP and assessment reports in English, initialed her request for the IEP document in Spanish, and that she asked for and received interpretation in Spanish. Mother also acknowledged her agreement with the IEP team's eligibility findings and receiving her procedural rights and safeguards by initialing the IEP that she had received them. She initialed the English version of the IEP where she was told to. The interpreter did not interpret each initialed line word for word, and no one explained to her in detail what she was initialing. However, District provided Mother with the Spanish version of the IEP at the end of the meeting. Mother admitted she did not read the lines written in Spanish that corresponded to the lines she initialed in the English version. Although Mother testified that the interpreter did not accurately interpret all parts of the meeting, her testimony on this point was not entirely credible in part because the meeting was more than four years earlier than the hearing, and she never informed anyone at the meeting that she did not understand what happened at the meeting, or what she signed.

18.     Student's kindergarten co-teacher, Ms. Carrillo, recommended at the meeting to retain Student in kindergarten. On May 29, 2013, Parents declined to retain Student and informed District they would seek private tutoring for Student. Student promoted to first grade.

*First Grade – 2013-2014 School Year*

19.     Student attended first grade at District's Elm Elementary School. Teacher Blanca Rodriguez had a multiple subject bilingual teaching credential and taught for District for 15 years. She received no District-provided training in special education, including special education assessment referrals. Student remained in the dual immersion Spanish program, which in first grade focused instruction 80 percent in Spanish and 20 percent in English. She was sweet, sociable, and had friends at school.

20.     District held a student study team meeting on November 13, 2013. Ms. Rodriguez learned for the first time that District had assessed Student for special education earlier that year. The student study team discussed Student's performance during the first semester of school, reviewed kindergarten interventions and modifications, and considered Mother's current concerns that Student was still struggling. Student had been late to school several times and had several absences. She was struggling with reading comprehension, fluency, retention of information, and was low in all academic areas. Ms. Rodriguez suggested the student study team consider retaining Student in the first grade.

6

She opined at hearing that Student's difficulty in memory retention was "probably" a disability. The team recommended community-based counseling for Student, based upon family issues.

21.    School psychologist Lupe Morales attended the meeting, along with school principal Leticia Ramos. Mother requested at the meeting that District assess Student for special education. No one assisted Mother with putting her request in writing. However, her request was documented in handwriting on the student study team notes. Ms. Morales advised Mother that, because Student had recently been assessed, assessing again would be too soon. Consistent with her general practice, she recommended Mother to wait to see if the tiered general education interventions recommended by District staff worked for Student.

22.    Ms. Ramos explained to Parents that Student was "like a flower" and in the spring "she would bloom." She warned Mother if District did another assessment, Student would be "labeled" as "disabled." She would not be able to have a normal life in school. Relying upon the representations by Ms. Morales and Ms. Ramos, Parents withdrew their request for assessment at the meeting, which the team recorded in handwriting on the notes.

23.    The student study team recommended continuing with current modifications, including repetition, differentiated instruction, educational games, challenging materials that allowed for success, providing meaningful concrete rather than abstract activities, sitting close to the teacher, one on one with teacher, practicing syllables at home daily, and parental help with homework.

24.    No one during the meeting or afterwards informed Parents that they were still entitled to ask for an independent educational evaluation if they disagreed with Mr. Tobey's earlier assessment. No one explained to Mother at that meeting that District had not assessed Student to rule out autism, ADHD or fine motor needs based on Mother's initial concerns expressed to Ms. Martinez. District did not provide Parents with prior written notice that it was declining to assess Student in response to Parents' request. No one gave Parents a copy of their procedural safeguards at or after the student study team meeting, or after Parents withdrew their request for assessment. Parents left the meeting believing that District was serving Student's needs through the student study team process with recommended tiered interventions.

25.    The student study team met again on March 27, 2014. Mother continued to express concerns about Student's lack of progress. Student made minimal progress academically based upon her scores from informal testing. She was still at risk for retention. She was tardy or absent several times during the year. Student resisted getting ready for school in the morning, and her resistance often resulted in her tardiness. She did not like going to school because she found school difficult and began to understand she was not performing at the level of her peers. Student also left school for medical appointments, resulting in her absence for all or part of the school day. Ms. Rodriguez reported Student was not turning in daily homework; her homework looked like someone else had completed it. The team recommended continuing tiered interventions in the general education

classroom and considered retention in first grade. It added color-coded vowels to remind of vowel sounds, timely arrival at school, and homework completed by Student. District recommended another student study team meeting for May 2014, but it did not hold another meeting until the following school year. No District staff recommended in first grade that Student should be assessed for special education or provided procedural safeguards to Parents.

26.    Student's first grade year-end progress report showed that she was performing at below basic level and needed improvement in all aspects of language arts, and three out of five areas of math. Her skills in vocabulary recognition, spelling and language were minimal. She needed improvement in homework completion. She performed relatively better when instructed in Spanish. District promoted Student to second grade at the end of the 2013-2014 school year.

*Second Grade – 2014-2015 School Year*

27.    Veronica Gonzalez was Student's second grade teacher. Ms. Gonzalez had a bilingual multiple subject credential, a master's degree in education, and had been employed by District for 11 years at the time of hearing. She was personally familiar with special education as a parent, but received no formal training from District on the IDEA or special education procedures. Ms. Gonzalez attended District training in behavior modifications, what to look for when children with special needs misbehaved, and received a list of strategies for behavior and academics. She was not familiar with the IDEA requirements for "child find," and had no training from District on referrals for special education assessments.

28.    Ms. Gonzalez knew Student had been assessed for special education at the end of kindergarten. She was familiar with her cumulative records. She knew Student had a history of tardiness and absences, and that she was performing one year behind other students. Ms. Gonzalez monitored Student's progress to see if she understood the curriculum because she knew Student did not qualify for special education based on Mr. Tobey's assessment.

29.    Student was a sweet child in second grade, well-behaved, tried her best in class, made friends and was very sociable. The classroom had 21-25 students, and instruction was 70 percent in Spanish. Most of the students were English language learners. Ms. Rodriguez taught all subjects in Spanish except for one hour a day of English language, where the students worked with sight words and phonics books in English.

30.    District held a student study team meeting for Student on September 25, 2014. Parents attended along with District staff, including psychologist Ms. Morales, Ms. Ramos, and special education resource teacher Heather Jue. Ms. Jue had a master's degree in special education and an education specialist instruction credential. She was familiar with the requirements for referral for special education assessments. She worked most of her day with special education students. She attended the meeting to listen to concerns expressed by Student's teacher and Parents.

31.     Student's oral fluency scores on statewide standard tests were low; she was unable to recall words. She was not reading fluently, paused frequently between words, and did not retain correct vowel sounds. She was not spelling words correctly. She required the use of manipulatives or drawings in math, but still struggled with adding simple one digit numbers. She sought peer or adult assistance in math. Her behavior was on task and she followed rules.

32.     Mother reported Student had been medically diagnosed with attention deficit disorder, and possible dyslexia, but did not provide anything in writing to the team documenting those diagnoses. Ms. Gonzalez did not see any signs of dyslexia in the classroom which would have prompted her to follow up on Mother's concerns. Ms. Morales opined at hearing that a diagnosis of attention deficit disorder was not enough to refer a child for an assessment, even though she acknowledged that Student was making slow progress in second grade. She opined that if a child is not eligible for special education based on a diagnosis of attention deficit disorder, the student study team considers the impact of the diagnosis on the child's education, discusses interventions with the parents, and documents the findings in the student study team notes. Ms. Ramos opined that Mother's report of attention deficit disorder did not trigger the need for an assessment, in part because Mother did not provide a note from the doctor which documented the diagnosis and outlined whether Student required medication management. However, District staff knew Student was taking Ritalin at home. In Ms. Ramos's opinion, family dynamics at home were impacting Student's attendance and performance at school.

33.     With Ms. Jue's input, the student study team recommended that previous modifications and interventions continue. The team added classroom modifications and interventions including small group instruction and modified work in class and homework. It recommended Student work at home practicing syllables and, again, recommended family counseling, which Mother had rejected in first grade. The team encouraged Parents to bring Student to school on time. They recommended to Parents to follow up with an optometrist because Mother reported Student saw "color balls' in the air. Ms. Jue saw no red flags based on the information she heard at the meeting suggesting Student should be assessed for special education eligibility. No one suggested District assess Student for special education.

34.     District held another student study team meeting on February 9, 2015. Ms. Gonzalez provided a progress report from the first trimester. Student's scores on standardized tests were at the beginning level. She misspelled all words on spelling tests, which had been modified for her. She read eight words per minute on standardized tests, which was significantly below where she should have been. She paused frequently between words with unfamiliar text. She recognized only 38 out of 100 sight words in Spanish. She mixed up vowel sounds and did not retain correct vowel sounds. Although she understood the concept of adding single digit numbers, while using manipulatives (physical objects), she was not progressing to the level of adding two-digit numbers, which is the level at which she should have been performing.

35.     Ms. Gonzalez noticed Student appeared more confused and uncertain about routines, but was unsure of the cause. District had arranged for after-school program support services, but Student only attended for a short time because Mother felt the day was too long for her. The team recommended continued small group instruction with adult support and decodable books. Parents provided private tutoring for English language after school. Mother expressed no questions or concerns with Student's progress at the February 2015 meeting.

36.     On May 28, 2015, District held a third student study team meeting to discuss Student's second grade progress. Parents attended along with District staff, including Ms. Jue and Ms. Morales. Ms. Gonzalez reported Student continued to struggle academically with reading fluency, reversing letters, spelling, math homework, and addition. Although Student showed some progress, she was performing significantly below second grade level.

37.     The team discussed Father's request to retain Student in second grade. The team also discussed possibly assessing Student for special education. The team concluded that, instead of assessing Student, District would matriculate Student to third grade, and transfer her out of the dual immersion program and into an English only classroom. Parents agreed that Student was not successful in the dual immersion program and a single language program might be better for Student. Student was still resisting going to school causing her to often be late. District did not provide Parents with anything in writing confirming that it was deferring assessments, or declining to assess, in lieu of changing Student's educational program. The team also suggested that, as a general education intervention, Student work with a speech and language therapist in English language development, and specifically vocabulary. This service was more intense, structured, and designed to address to her individual needs. No one suggested Student should be assessed for special education eligibility in speech and language, or any other suspected disability.

38.     To support her transition to the new program, the team recommended that Student immediately begin attending Ms. Jue's special education resource class as a "guest" for English Language Arts and English development. To qualify for this service, District's general education students must be performing two years below grade level. Student was scheduled to attend for 20-30 minutes a day, five days a week. The class met at the beginning of the school day. However, because Student was often late to school she did not regularly attend the class. By the end of second grade, Student had made little progress at school.

39.     Ms. Gonzalez opined that a child in the District should be performing two years below grade level before District staff considered assessing the child for special education. If a child had a student study team, the team developed responses to intervention based on three tiers, the third tier being the most intensive. She understood that if a parent asked for an assessment, the request would go straight to assessment. However, she contradicted herself by stating the assessment request would first go through the COST team,

then a student study team, before District initiated an assessment plan. She did not demonstrate a clear understanding of the process for special education assessment referrals.

40. District knew Parents were very concerned that Student was struggling with academics, had attention deficit disorder, and was making very little educational progress. Mother attended a school board meeting during Student's second grade, along with parents of other children. Mother expressed concern to the Board that District was not helping Student make progress in school. She asked for help, although her testimony was unclear as to what specific help she asked for or what response she received at the meeting. Ms. Gonzalez did not recall that Mother ever asked for an assessment for Student during second grade, and she never referred Student for assessments. In contrast, Mother credibly testified she regularly expressed her concerns about Student's lack of progress and struggles at school to Ms. Gonzalez and the student study team. Student matriculated to third grade without any referral by District for special education eligibility.

*Third Grade – 2015-2016 School Year*

41. Parents requested a student study team meeting at the beginning of third grade. The team met on August 20, 2015. Ms. Morales, Ms. Jue and Ms. Ramos were among District staff who attended the meeting. Student's teacher, Sara Cervantes, did not attend.

42. Parents expressed concern that Student had low self-esteem, and that she was low in all academic areas and was regressing. Mother felt Student was "playing catch up" instead of learning new concepts. Student reversed letters without realizing she was doing so; she put her shoes on the wrong feet. Student continued to resist going to school because she felt she could not do the work. Student received private tutoring outside of school, and Mother observed some improvement in reading as a result. The District team members reported Student made little progress in the resource class, except for some improvement in English language. The team recommended a "Tier 3" action plan, including continuing the "guest" special education resource class, school counselor support, additional time for interventions, and additional language development support by Ms. Jue.

43. Ms. Cervantes had a multiple subject teaching credential and a master's degree in education. She had no specific training in special education, other than what she received during her credential program. She did not know at the beginning of the school year that Student had been diagnosed with attention deficit disorder. She delivered instruction during class in English. She was aware of the student study team interventions recommended for Student, and implemented them. Student performed at the level of an average early first-grader. She was best served by using materials at the pre-kindergarten level. Ms. Cervantes opined at hearing that, during third grade, Student required urgent intervention. She was not performing at third grade level. She was in the first percentile for reading and math. She needed improvement staying on task, organizing her desk, and in penmanship. She needed frequent redirection, which was serious enough to impede her learning. Ms. Cervantes did not understand why Student's scores were so low, other than because Student came from a dual immersion program and was in the first year of the English-only program. She did not

11

refer Student for special education assessments. If she suspected a child had a disability, her practice was to talk to the school psychologist, principal and parent to see what should happen next. In Student's case, Ms. Cervantes did not suspect during the early part of the 2015-2016 school year Student had a disability requiring assessments for eligibility.

44.     District staff met to discuss Student's progress in the latter half of the fall 2015 semester. Parents were not included in the meeting. Ms. Morales, Ms. Cervantes, Ms. Jue and Ms. Ramos agreed Student was not making as much progress as they had hoped for. Ms. Cervantes did not see improvement in Student's foundational phonic skills, and changed her mind regarding the need for assessing Student. The District team members acknowledged Student's previous assessment was three years old and District needed updated information. The team decided it would offer Parents a special education assessment plan for Student at the next student study team meeting. District did not provide Parents with a proposed assessment plan before February 25, 2016.

45.     On February 25, 2016, District held another student study team meeting. Mother called in the morning of the meeting to inform District she could not attend because her son was ill. Father did not attend. Instead, Student's private tutor attended the meeting. District's primary purpose for calling the meeting was to offer an assessment for special education. District did not present an assessment plan to Student's tutor at this meeting because the tutor did not hold Student's educational rights.

46.     Mother, who was concerned about Student's continued lack of progress, called District's superintendent, Dr. Morales, in March 2016 and requested a meeting. She participated in a telephonic meeting with Dr. Morales during the first week of March 2016. Special education manager Nadia Villapadua participated in the telephonic meeting. Mother expressed her concerns about Student's lack of progress at school. After the meeting, at Dr. Morales' direction, Ms. Villapadua developed a comprehensive assessment plan for Student. She met with Mother on March 8, 2016, and reviewed the details of the plan with her. She also provided Mother with procedural safeguards in Spanish, prepared by the Ventura County Special Education Local Plan Area, and discussed timelines and parents' rights. Mother took the assessment plan to review with Father and her outside consultant.

47.     Parents retained counsel in the spring of 2016, and did not return the signed assessment plan until November 2016, after Parents filed their due process complaint in September 2016. District followed up with Parents in May 2016 to obtain their signatures on the proposed assessment plan. Mother explained that she was considering the assessment plan but wanted to talk to her private consultant and Dr. Morales. Mother told Ms. Villapadua that Student was receiving private tutoring. District provided Parents with prior written notice in May 2016 in a letter documenting District's attempts to obtain their consent to assess Student, and attached another copy of the assessment plan and procedural safeguards. Ms. Villapadua understood Mother wanted to meet with the consultant and superintendent, prepared a packet of information for the meeting, but no meeting occurred.

12

*2016-2017 School Year*

48.    Student attended fourth grade in general education teacher Corina Saturnino-Wright's English-only classroom.  Ms. Wright, who had a multiple subject bilingual, cross-cultural, language and academic development credential, had 20 years of teaching experience with District.  The classroom had 30 students.  Ms. Wright had no training in special education.  She talked to Ms. Cervantes, knew Student was involved in the student study team process, and that her performance was historically low in all areas.  She knew Student was constantly not focused and off-task.  Ms. Wright had a conference in the fall 2016-2017 semester with Father.  She informally met with Mother later in the semester.  Mother did not bring up any concerns about suspected disabilities or behavioral concerns.  Ms. Wright did not see Student engage in any self-injurious behavior, although she was aware that Student had begun to do so at home.  Ms. Wright was concerned about Student's academic deficiencies.

49.    District amended the March 2016 assessment plan to include assistive technology in October 2016, which Parents signed and returned through their attorney on November 7, 2016.  District began a comprehensive multi-disciplinary assessment of Student in November 2016, utilizing the amended version of the March 2016 assessment plan.  A variety of standardized assessment tools were utilized.  School psychologist Gabriela Dena Roman conducted the assessment in collaboration with other District staff, including Ms. Wright, and testified at hearing.  Ms. Roman had a pupil personnel services teaching credential, a master's degree in counseling with a specialty in school psychology, worked as a bilingual educator and literacy coach and, for the past 10 years, was a school psychologist for District.  She assessed Student in 2016, including reviewing her cumulative file, such that she had knowledge of Student's educational history at District.  Her experience and credentials qualified her to offer expert opinions regarding Student's needs based on her assessment results.

50.    The assessments were conducted primarily in Spanish by bilingual assessors.  Not all assessments were completed, and the multi-disciplinary assessment report was not final at the time of hearing, although the parties agreed that the March 9, 2017 version of the assessment report was sufficiently complete for purposes of the hearing.  Student had significant deficits and needs that justified finding her eligible for special education under the categories of other health impaired and language and speech disorder.  Ms. Roman opined Student had signs of intellectual disability, which she recommended should be monitored for possible eligibility.  Student did not test above "well below" or "limited" in any area.  She was extremely limited in Spanish broad oral language and oral comprehension.  Her auditory comprehension was very low.  She had extreme difficulty capturing instructional delivery.  She frequently responded to questions during assessment with "I don't know" and appeared anxious.  She struggled to sustain attention.  She had difficulty with visual activities, remembering and sound correspondence.  Student had significant difficulty with multitasking and attention.  In Ms. Roman's opinion, Student did not qualify under the category of specific learning disability.  She did not demonstrate the discrepancies required for eligibility under that category.  Ms. Roman recommended Student should receive instruction in a self-

13

contained classroom with a teacher who had a credential specific for language impairment. In her opinion, delivering appropriate supports and services to Student in a general education classroom would be difficult.

51.    Special Education Director Ms. Sugden testified at hearing.[1]  District was working with the Lindamood-Bell Learning Processes Program, a learning approach to help students with reading and other learning issues, based in Santa Barbara, California to provide contracted services as a non-public agency for District students on District campuses. However, neither party offered any evidence that, at the time of hearing, District had offered Student Lindamood-Bell services in any area of need.

52.    District's regular school year consisted of 180 school days, or 36 weeks. School was in session from the middle of August until the middle of June during the 2013-2014, 2014-2015, and 2015-2016 regular school years.

*Expert Opinions*

53.    Karen Schnee was a licensed speech pathologist and a certified education specialist.  She had master's degrees in special education/learning reading disorders, and in communication disorders.  She had worked in private practice for 16 years as a consultant and diagnostician for children and adults with specific learning disabilities and developmental delays.  Prior to her private practice, she worked in private institutions as a diagnostician and speech pathologist, and as a special education teacher.  She has had training and experience in administering assessments in cognition, memory, achievement, auditory processing and speech and language.  She frequently attended IEP meetings and received referrals for independent educational evaluations from school districts, parents and special education attorneys.  Ms. Schnee was qualified to offer expert opinions on Student's behalf.

54.    Ms. Schnee assessed Student in February 2017, when Student was 10 years old.  She reviewed Student's cumulative file including Mr. Tobey's 2013 assessment; District's recent multidisciplinary assessment reports; interviewed Mother; and administered selected assessment tools to supplement District's testing for a more thorough picture of Student's needs.  Ms. Schnee reported her findings in a report dated March 1, 2017.  At the time she testified, she did not know that District had recently found Student eligible for special education under the eligibility categories of other health impaired and speech and language.

---

[1] Student's IEP team met at least twice during this hearing to review assessments, and considered District's multi-disciplinary assessment report based on information it had. The parties in their post-closing briefs stipulated that after the last day of hearing, the IEP team found Student eligible for special education under the eligibility categories of other health impairment and speech and language.

14

Friday 26 of May 2017, Faxination                  ->3233899239                  Page 16 of 41
Case 2:17-cv-04304-JAK-PD     Document 14     Filed 07/26/17     Page 60 of 122   Page ID
#:212

55.     Ms. Schnee concluded that the nature and extent of Student's educational challenges were not secondary to English being her second language, as District staff had concluded over the years.  Instead, Ms. Schnee opined Student's challenges were secondary to severe cognitive and language processing disorders, unrelated to a diagnosis of attention deficit disorder, impacting her ability to access the core curriculum at school.  She was critical of District's conclusions over the years that Student could access the curriculum in a general education classroom, because Student's records showed she struggled as early as kindergarten.  In her opinion, if District had done a language assessment in 2013 or thereafter, including a thorough questionnaire of Mother's concerns at that time, District should have discovered that Student's language development in Spanish was abnormal.

56.     Ms. Schnee opined that Student's historic disabilities had a "disastrous" impact on her over the years because of the lack of appropriate interventions.  Sitting in a general education classroom caused her to become frustrated and tired because she could not process the information she was receiving.  Student had extremely severe phonological processing problems, could not decode, had visual perceptive processing issues, and had difficulty with numbers.

57.     Ms. Schnee opined Student should have been eligible for special education in kindergarten based on testing results at that time.  Student was one of the most impacted children she had ever assessed at Student's age.  Enough red flags existed in the 2013 assessment that District should have looked at whether Student was eligible as other health impaired when it concluded she did not have a specific learning disability.  District should have considered Mother's reports that Student had been diagnosed with attention deficit disorder and followed up by assessing Student under that eligibility category.  In her opinion, the fact that District was using the highest level of tiered interventions, including making Student a "guest" in the special education resource support program, should have been a red flag for District to consider finding her eligible for special education.

58.     Ms. Schnee offered several recommendations:  60 minutes daily of speech therapy by a licensed speech therapist; intensive reading and math instruction in programs such as Lindamood-Bell Learning Processes Program or On Cloud 9, the intensity and duration of which should be determined by screening by Lindamood-Bell; an occupational therapy evaluation with follow up services to address fine-motor development weaknesses; direct academic instruction one hour daily by a special education teacher using a graphic organizer to stimulate sentence construction; and a physical therapy evaluation with follow-up services to address gross motor development weaknesses. Ms. Schnee opined that Student should receive compensatory services to address District's failure to identify and treat Student's language disorder.  She was unable at hearing to specifically opine on the type or duration of either compensatory services or the Lindamood-Bell type services, due to the severity of Student's needs.  In her opinion, she was not certain that Student could ever recover to grade level even with the interventions and programming she recommended. Ms. Schnee charged Parents through their attorney $4,050 for her evaluation of Student.

59.   Ms. Villapadua, Ms. Roman, and District speech therapist Diane Dominguez concurred at hearing with Ms. Schnee that Student was eligible for special education, that she required an IEP and specialized academic instruction, and that she had limited language ability requiring speech and language therapy.  None of the four professionals disagreed as to the general nature of Student's disabilities, or that her difficulties were historic rather than recently developed.  Her levels of performance were consistently 99.9 percent below those of children at the same age.  None of the professionals disagreed that Student should be eligible for special education and required intensive interventions and services to help her make the appropriate level of progress toward her IEP goals when developed.

60.   Ms. Villapadua opined Student, at the time of hearing, was at kindergarten level in reading, and first grade in math.  She had auditory memory deficits.  Ms. Villapadua was unable to opine on how many years Student would need to reach grade level in her academic studies.  Ms. Villapadua opined that bilingual students like Student should be assessed in Spanish, and that the 2016-2017 assessments were appropriately conducted in Student's native language where necessary.  She also opined that providing Student compensatory hours after school, given Student's limited vitality, mental alertness and stamina, would be too much for her.  She agreed with Ms. Schnee that District could provide a blended program, which could include providing compensatory education hours during the school day.

61.   Ms. Dominguez opined, based upon her 2016 speech and language assessment results, Student would benefit from daily reading intervention, and speech and language services during the summer.  Student was moderate to severe in auditory comprehension.  Ms. Dominguez disagreed with Ms. Schnee's recommendation of speech and language therapy 60 minutes daily.  In her opinion, Student could make progress toward her goals with speech and language services three times a week for 30 minute sessions.  Pulling her out of class every day for one hour, as recommended by Ms. Schnee, would deprive Student of participation in other academic and social activities and would be too much for Student given her attention deficits and other needs.  While Ms. Schnee's overall testimony was credible, her estimate of five hours a week for speech and language services was less persuasive than Ms. Dominguez's recommendations, considering Student's significant learning deficits, lack of attention and memory deficits.  However, neither witness testified unequivocally whether any of the time they were recommending was for the regular school day, or as compensatory services.

## LEGAL AUTHORITIES AND CONCLUSIONS

*Introduction – Legal Framework under the IDEA[2]*

1.    This hearing was held under the IDEA, its regulations, and California statutes and regulations intended to implement it. (20 U.S.C. § 1400 et. seq.; 34 C.F.R. § 300.1 (2006)[3] et seq.; Ed. Code, § 56000, et seq.; Cal. Code. Regs., tit. 5, § 3000 et seq.) The main purposes of the IDEA are: (1) to ensure that all children with disabilities have available to them a free appropriate public education (FAPE) that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living, and (2) to ensure that the rights of children with disabilities and their parents are protected. (20 U.S.C. § 1400(d)(1); See Ed. Code, § 56000, subd. (a).)

2.    A FAPE means special education and related services that are available to an eligible child at no charge to the parent or guardian, meet state educational standards, and conform to the child's individualized education program (IEP). (20 U.S.C. § 1401(9); 34 C.F.R. § 300.17; Cal. Code Regs., tit. 5, § 3001, subd. (p).) "Special education" is instruction specially designed to meet the unique needs of a child with a disability. (20 U.S.C. § 1401(29); 34 C.F.R. § 300.39; Ed. Code, § 56031.) "Related services" are transportation and other developmental, corrective and supportive services that are required to assist the child in benefiting from special education. (20 U.S.C. § 1401(26); 34 C.F.R. § 300.34; Ed. Code, § 56363, subd. (a) [In California, related services are also called designated instruction and services].) In general, an IEP is a written statement for each child with a disability that is developed under the IDEA's procedures with the participation of parents and school personnel that describes the child's needs, academic and functional goals related to those needs, and a statement of the special education, related services, and program modifications and accommodations that will be provided for the child to advance in attaining the goals, make progress in the general education curriculum, and participate in education with disabled and non-disabled peers. (20 U.S.C. §§ 1401(14), 1414(d); Ed. Code, § 56032.)

3.    In *Board of Education of the Hendrick Hudson Central School Dist. v. Rowley* (1982) 458 U.S. 176, 201 [102 S.Ct. 3034, 73 L.Ed.2d 690] ("*Rowley*"), the Supreme Court held that "the 'basic floor of opportunity' provided by the [IDEA] consists of access to specialized instruction and related services which are individually designed to provide educational benefit to" a child with special needs. *Rowley* expressly rejected an interpretation of the IDEA that would require a school district to "maximize the potential" of each special needs child "commensurate with the opportunity provided" to typically developing peers. (*Id.* at p. 200.) Instead, *Rowley* interpreted the FAPE requirement of the IDEA as being met when a child receives access to an education that is reasonably calculated to "confer some educational benefit" upon the child. (*Id.* at pp. 200, 203-204.) In a recent

---

[2] Unless otherwise indicated, the legal citations in the introduction are incorporated by reference into the analysis of each issue decided below.

[3] All citations to the Code of Federal Regulations are to the 2006 edition.

unanimous decision, the United States Supreme Court also declined to interpret the FAPE provision in a manner that was at odds with the *Rowley* court's analysis, and clarified FAPE as "markedly more demanding than the 'merely more than the de minimus test'…" (*Endrew F. v. Douglas County Sch. Dist. RE-1 (2017) 580 U.S.____ [137 S. Ct. 988] (2017 WL 1066260)]* (*Endrew*)).  The Supreme Court in *Endrew* stated that school districts needed to "offer a cogent and responsive explanation for their decisions…" and articulated FAPE as that which is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstance." *Id.*

4.    The IDEA affords parents and local educational agencies the procedural protection of an impartial due process hearing with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a FAPE to the child.  (20 U.S.C. § 1415(b)(6); 34 C.F.R. 300.511; Ed. Code, §§ 56501, 56502, 56505; Cal. Code Regs., tit. 5, § 3082.)  The party requesting the hearing is limited to the issues alleged in the complaint, unless the other party consents.  (20 U.S.C. § 1415(f)(3)(B); Ed. Code, § 56505, subd. (i).)

5.    At the hearing, the party filing the complaint has the burden of persuasion by a preponderance of the evidence.  (*Schaffer v. Weast* (2005) 546 U.S. 56-62 [126 S.Ct. 528, 163 L.Ed.2d 387]; see 20 U.S.C. § 1415(i)(2)(C)(iii) [standard of review for IDEA administrative hearing decision is preponderance of the evidence].)  Here Student is the filing party and therefore bears the burden of proof.

*Threshold Issue:  Statute of Limitations*

6.    Student contends the facts support a finding that exceptions to the two-year statute of limitations apply, relating back to November 2012.  District contends Parents knew or should have known they had a claim against District in May 2013, after the May 21, 2013 IEP meeting and Mr. Tobey's assessment.  District argues Student should have filed a claim no later than two years after May 2013.  Because Student did not file until September 22, 2016, District argues her claims before September 22, 2014, were time-barred.

LEGAL AUTHORITY

7.    The statute of limitations in California is two years, consistent with federal law.  (Ed. Code, § 56505, subd. (l); see also 20 U.S.C. § 1415(f)(3)(C).)  A request for a due process hearing "shall be filed within two years from the date the party initiating the request knew or had reason to know of the facts underlying the basis for the request." (*Id.*)  The statute of limitations for due process complaints precludes claims that occurred more than two years before the date of filing the request for due process.  (Ed. Code § 56505(l); 20 U.S.C. § 1415(f)(3)(c); *M.M. v. Lafayette School District, et al* (9th Cir. 2014) 767 F.3d 842, 859 (*M.M.*).)

8.    In *G.L. v. Ligonier Valley School Dist. Authority* (3rd Cir. 2015) 802 F.3d 601 (*G.L.*) the Court concluded that sections 1415(f)(3)(C) and 1415(b)(6)(B) of the IDEA

function together "as a filing deadline that runs from the date of reasonable discovery, not as a cap on a child's remedy for timely-filed claims that happen to date back more than two years before the complaint is filed." (*G.L.*, *supra*, 802 F.3d at p. 616.) The Court explained that the IDEA's statute of limitations does, practically, curtail remedies in some cases: once a violation of the IDEA is reasonably discovered by a parent, any claim for that violation, however far back it dates, must be filed within two years of the "knew or should have known" date; "[i]f it is not, all but the most recent two years before the filing of the complaint will be time-barred; but if it is timely filed, then, upon a finding of liability, the entire period of the violation should be remedied." (*Id.* at pp. 620-621.) The Ninth Circuit Court of Appeals recently affirmed the "knew or should have known" approach in *G.L.* (*Avila v. Spokane School District 81* (9th Cir. 2017) 852 F.3d 936, 2017 WL 1173700.)

9.      A claim accrues for purposes of the statute of limitations when a parent learns of the injury that is a basis for the action, i.e., when the parent knows that the education provided is inadequate. (*M.D. v. Southington Board of Education* (2d Cir. 2003) 334 F.3d 217, 221.) In other words, the statute of limitations begins to run when a party is aware of the facts that would support a legal claim, not when a party learns that it has a legal claim. (See *El Pollo Loco, Inc. v. Hashim* (9th Cir. 2003) 316 F.3d 1016, 1039.)

10.     The "knowledge of facts" requirement does not demand that a party know the specific legal theory or even the specific facts of the relevant claim. Instead, the party must have known or reasonably should have known the facts underlying the supposed disability and their IDEA rights. (*Miller v. San Mateo-Foster City Unified School Dist.* (N.D. Cal. 2004) 318 F.Supp.2d 851, 861[citing *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1111]).

11.     In *Miller, supra,* 318 F.Supp.2d at p. 862, the child's parents became aware that the child may have a specific learning disability, but that the school district assessed him otherwise. The Court concluded the parents knew or should have known the facts that would have given them the required "suspicion of wrongdoing." The Court explained the IDEA does not contain any provision requiring educational authorities or school districts to apprise parents of what types of disabilities trigger the school district's requirement to provide a FAPE.

12.     Title 20 United States Code section 1415(f)(3)(D) and Education Code section 56505, subdivision (l), establish exceptions to the statute of limitations in cases where the parent was prevented from filing a request for due process due to specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint, or the local educational agency withheld information from the parent that was statutorily required to be provided to the parent. (*M.M., supra,* 767 F.3d at p. 859.)

13.     A notice of procedural safeguards must be given by a school district to a parent of a child with a disability a minimum of once a year and or: 1) upon initial referral for assessment or parent request for assessment; 2) upon filing a request for a due process hearing; or 3) upon parent request. (20 U.S.C. § 1415(d)(1)(A); 34 C.F.R. § 300.504(a).)

19

14.     Prior written notice must be given when the school district proposes or refuses to initiate a change in the identification, assessment, or educational placement of a child with special needs or the provision of a FAPE.  (20 USC §1415(b)(3) & (4); §1415(c)(1), §1414(b)(1); 34 CFR §300.503; Educ. Code §§ 56329 and 56506(a).)

15.     The procedures relating to prior written notice "are designed to ensure that the parents of a child with a disability are both notified of decisions affecting their child and given an opportunity to object to these decisions."  (*C.H. v. Cape Henlopen School Dist.* (3rd Cir. 2010) 606 F.3d 59, 70.)  Prior written notice must be sent "a reasonable time" before the public agency proposes or refuses to initiate or change the identification, evaluation, educational placement or provision of FAPE to the child.  (34 C.F.R. § 300.503(a)(1); Ed. Code, § 56500.4, subd. (a).)  This is to ensure that "parents have enough time to assess the change and voice their objections or otherwise respond before the change takes effect." (*Letter to Chandler*, 59 IDELR 110 (OSEP April 26, 2012).)

16.     A prior written notice must include (1) a description of the action proposed or refused by the agency; (2) an explanation for the action; (3) a description of each evaluation procedure, assessment, record, or report which is the basis of the action; (4) a statement that the parents of an individual with exceptional needs have protection under the procedural safeguards, and the means by which a copy of the procedural safeguards can be obtained; (5) sources for parents to contact to obtain assistance; (6) a description of the other options the IEP considered and the reasons why those options were rejected; and (7) a description of other factors relevant to the proposal or refusal of the agency.  (20 U.S.C. 1415(b)(3) and (c)(1); 34 C.F.R. § 300.503(a) and (b); Ed. Code, § 56500.4, subd. (a) and (b); see also Ed. Code, § 56500.5 [requiring "reasonable written prior notice" that a student "will be graduating from high school with a regular high school diploma . . ."].)  The notice is required even if the change is being proposed by the parent.  (*Letter to Lieberman*, 52 IDELR 18 (OSEP 2008).)

17.     When a violation of such procedures does not actually impair parental knowledge or participation in educational decisions, the violation is not a substantive harm under the IDEA.  (*C.H. v. Cape Henlopen School Dist., supra*, 606 F.3d at p. 70.)

ANALYSIS

*CLAIMS THROUGH NOVEMBER 12, 2013*

18.     Mother claimed at hearing she did not know in 2013 in what areas District was assessing Student, and did not understand that District did not assess in the areas of concern she expressed, including autism, ADHD, and fine motor.  District did not provide Parents with their procedural rights or prior written notice in January 2013 explaining why it was not assessing Student in autism, ADHD, or fine motor.  However, Parents received and signed the January 2013 proposed assessment plan in Spanish and it identified the areas in which District intended to assess Student.  Mother offered no credible or persuasive testimony that she questioned the content of the assessment plan at any time before the May 2013 IEP

meeting, or asked for additional testing between January 2013 and May 2013. She knew or had reason to know in what areas District planned to assess, Parents consented to the proposed assessments, and District did nothing to prevent Parents from challenging the January 2013 assessment plan or asking for additional assessments.

19. Mother attended the May 2013 IEP meeting, had assistance from a Spanish interpreter, participated in discussions about the assessment results, had the opportunity to ask questions, and acknowledged on the English version of the IEP document her receipt of procedural safeguards. Mother learned for the first time at the May 2013 IEP meeting that District did not find Student eligible for special education, including finding needs in any of the areas in which she voiced concern to Ms. Martinez in late 2012. She understood from the school principal that, based upon Student's young age, the IEP team recommended interventions through student study team meetings, instead of special education eligibility, to allow Student time to mature. Although Mother denied at hearing that District informed her of her right to an independent assessment, her testimony on this issue was not entirely credible. First, Mother was understandably confused during her testimony about events that occurred almost four years before hearing. She frequently referred to "the girls," meaning Student and her twin sister, during her testimony and had to be redirected to focus only on Student. Mother's testimony regarding what she knew about Student's claims back in spring 2013 suggested she was not always clear regarding which daughter she was referring to at this hearing. Although no one offered into evidence a copy of the procedural safeguards provided to Mother at the May 2013 meeting, Mr. Tobey credibly testified District gave them to Parents, and Mother admitted she received them, and signed her initials acknowledging her receipt, notwithstanding her claim at hearing that the interpreter did not accurately interpret the meeting. Mother knew or should have known at the May 2013 IEP that she had procedural rights, including the right to pursue an independent assessment or a due process hearing, if she disagreed with District's decision regarding eligibility or the appropriateness of the multi-disciplinary assessment.

20. Student offered no persuasive evidence that either exception applied to the statute of limitations for claims arising on or before May 13, 2013. Student did not prove that anything anyone from District said to Mother at the IEP meeting would have prevented Parents from pursuing their rights if they disagreed with the assessment results or the IEP team's decision on eligibility. Student's claims on and before May 13, 2013, are therefore time-barred.

21. Mother communicated her concerns about Student's progress with Student's teachers at the beginning of the 2013-2014 school year. However, she knew or should have known from May 2013 until November 13, 2013 that she had the right to challenge District's May 2013 assessment and IEP findings. Student offered no evidence of any procedural violations or misrepresentations by District from May 2013 until November 13, 2013 that would have invoked either exception to the statute of limitations. Student did not prove District prevented Parents from pursuing their claims, known to them in May 2013, until the November 13, 2013 student study team meeting. Claims between May 2013 and November 13, 2013 are also time-barred.

*CLAIMS FROM NOVEMBER 13, 2013, THROUGH SEPTEMBER 22, 2014*

22.    District's conduct at the November 13, 2013 meeting, and thereafter, prevented Parents from pursuing legal rights, and therefore Student's claims are not time barred from and after November 13, 2013. School psychologist Ms. Morales credibly testified that one of the reasons the student study team met on November 13, 2013, was because at the beginning of the 2013-2014 school year, Mother verbally expressed her continued concerns to first grade teacher Ms. Rodriguez about Student, including that Student had a diagnosis of attention deficit disorder. Mother asked for another assessment. Mother did not think Student's continued struggles and her ineligibility for special education supports and services was logical. Handwritten notes included in the study team report document Mother's request for an assessment. Ms. Rodriguez reported to the team that Student continued to perform low in all academic areas. She had difficulty retaining information, which Ms. Rodriguez opined might be a disability. Student's scores on testing during the first semester were well below average. She scored very low when asked to identify high frequency words and in fluency.

23.    However, in response to Mother's verbal request for an assessment, Ms. Morales told Mother at the meeting that assessing Student at that time was too soon after the kindergarten assessment. Elm Street principal Ms. Ramos told Mother that District staff were providing help at school, would give her more support, would take her out of first grade and send her to a kindergarten educational team to see if she could learn, and would modify her work by giving her kindergarten work. Mother would take her to the library to work on her homework. Mother credibly and persuasively testified that Ms. Ramos convinced Parents that Student would be "labeled" as "disabled" if District assessed her. The student study team notes reflect in a handwritten note that Parents withdrew their request for assessment at the meeting.

24.    Mother's testimony established that Parents relied on Ms. Ramos's and Ms. Morales's representations, causing them to believe District had resolved their concerns with the solutions offered at that meeting. No one rebutted Mother's testimony that Ms. Ramos warned Parents that assessing Student would effectively stigmatize her at school. Notwithstanding that they had received procedural safeguards in May 2013, Parents reasonably relied on those misrepresentations at the November 13, 2013 meeting, and as a result they withdrew their assessment request.

25.    District also omitted important and valuable information for Parents by failing to provide Parents with prior written notice at or after the November 2013 student study team meeting in response to Parents' requests for an assessment. District did not inform Parents in writing, or in the student study team notes, that instead of asking District for another assessment, they continued to have the right to challenge Mr. Tobey's assessment by asking for an independent educational evaluation. Nor did District inform Parents that they could challenge, through due process, the findings of the May 2013 IEP team, or the November 2013 student study team's decision that Student did not need an assessment for special

22

Case 2:17-cv-04304-JAK-PD    Document 14    Filed 07/26/17    Page 68 of 122    Page ID #:220

education. No one explained parental rights under the IDEA to parents, in part because none of the student study team members, except school psychologist Ms. Morales, had any training in special education procedures.

26.    District's misrepresentations that the problem had been solved through student study team interventions, and its failure to give prior written notice or procedural safeguards, caused Parents to withdraw their request for assessments and not pursue claims and rights on Student's behalf until at least February or March 2016, when Mother contacted a private consultant for help. District's misrepresentations in November 2013 met one of the two exceptions to the statute of limitations. Its failure to provide prior written notice or another copy of procedural safeguards met the second exception.

27.    Student's Issues 1 through 4, dating back to November 13, 2013, are not barred by the statute of limitations.

*Issue 1: Child Find and Duty to Assess*

28.    Student contends District failed its "child find" obligation by failing to appropriately assess her and failing to find her eligible for special education under the eligibility categories of other health impairment, language or speech disorder, or specific learning disability during the relevant statutory period. District contends it offered to assess in March 2016 and Parents declined to consent until after they filed for due process, arguing her claims should therefore be limited to before March 2016.

LEGAL AUTHORITY

29.    The legal conclusions reached under the discussion of the statute of limitations are incorporated by reference.

30.    Under the IDEA and California law, a school district has an affirmative, continuing obligation to identify, locate, and evaluate all children with disabilities residing within its boundaries. (20 U.S.C. § 1412(a)(3); Ed. Code, § 56300 et seq.) The duty is not dependent on any action or inaction by parents; the district must "actively and systematically seek out all individuals with exceptional needs" who reside in the district. (Ed. Code, § 56300.) In addition, the district must develop and implement "a practical method" to locate those individuals. (Ed. Code, § 56301.)

31.    A local educational agency shall provide for the identification and assessment of the exceptional needs of an individual, and the planning of an instructional program to meet the assessed needs. Identification procedures shall include systematic methods of utilizing referrals of pupils from teachers, parents, agencies, appropriate professional persons, and from other members of the public. Identification procedures shall be coordinated with school site procedures for referral of pupils with needs that cannot be met with modification of the regular instructional program. (Ed. Code § 56302.)

32.    Before any action is taken with respect to the initial placement of an individual with exceptional needs in special education instruction, an individual assessment of the pupil's educational needs shall be conducted, by qualified persons in accordance with testing requirements set forth in Education Code section 56320 subds. (a) through (i).  (Ed. Code §§ 56320 & 56322.)

33.    All referrals for special education and related services shall initiate the assessment process and shall be documented.  (20 C.C.R. § 3021.)  A local educational agency must assess a special education student in all areas of suspected disability. (20 U.S.C. § 1414(b)(3)(B); 34 C.F.R. § 300.304 (c)(4); Ed. Code, § 56320, subd. (f).)  To assess or reassess a student, a school district must provide proper notice to the student and his or her parents. ( 20 U.S.C. § 1414(b)(1); Ed. Code, §56381, subd. (a).)  The notice consists of the proposed assessment plan and a copy of parental and procedural rights under the IDEA and state law.  (20 U.S.C. § 1414(b)(l); Ed. Code, § 56321, subd. (a).)  The assessment plan must be understandable to the student, explain the assessments that the district proposes to conduct, and provide that the district will not implement an IEP without the consent of the parent.  (Ed. Code, § 56321, subd. (b)(l)-(4).)  The proposed written assessment plan must contain a description of any recent assessments that were conducted, including any available independent assessments and any assessment information the parent requests to be considered, information about the student's primary language and information about the student's language proficiency.  (Cal. Code Regs., tit. 5, § 3022.)

34.    A pupil shall be referred for special educational instruction and services only after the resources of the regular education program have been considered and, where appropriate, utilized.  (Ed. Code § 56303.)

35.    The parents or guardians of a pupil who has been referred for initial assessment, or of a pupil identified as an individual with exceptional needs, shall be afforded an opportunity to participate in meetings with respect to the identification, assessment, and educational placement and the provision of a FAPE.  (34 CFR § 300.501; Ed. Code § 56304.)

ANALYSIS

*KINDERGARTEN THROUGH NOVEMBER 2013*

36.    The statute of limitations barred this claim before November 2013.  The statutory bar discussed above precludes any entitlement by Parents or Student to any remedies for that time.  The procedural violations that existed prior to November 2013 are discussed here solely as background to the remedies ordered below.

37.    Student met her burden of proof that District never assessed her in *all* areas of suspected need before she filed her complaint.  Although outside the statutory period, District did not assess Student in all areas of suspected need in spring 2013.  Mr. Tobey designed the referral questions without considering that Mother had expressed concern about attention deficit disorder, autism, and fine motor skills.  He administered assessments

24

looking only at specific learning disability and emotional disturbance as possible bases for eligibility, disregarding the referral data on the COST form. He also considered whether circumstances at home and outside of school impacted Student at school. Although District assessed in academics, it did not assess in any of the areas of Mother's concern. Ms. Schnee credibly opined that Student's deficits as she saw them in 2017 were historic and profound, and had District fully assessed Student in all areas of need in May 2013, Student should have been found eligible, even though she was young, based upon developmental factors.

38. The evidence established that, while Student was in kindergarten and during the first semester of first grade, District procedurally violated the IDEA by failing to assess her in all areas of suspected need. Because of its failure, District deprived Parents of all necessary information for the decision-making process at the May 2013 IEP meeting. District's failure to fully assess in May 2013 also deprived Student of educational benefit and denied her a FAPE because she did not receive, during the fall semester of first grade, educational instruction in an appropriate setting from a special education teacher, or needed services such as speech and language therapy.

39. However, District complied with the statutory "child find" obligation to actively and systematically seek out individuals with special needs. District timely responded to Mother's verbal request for an assessment, referred her request to the COST team, held a student study team meeting in December 2012 with Parents, generated an assessment plan which Mother signed, and assessed Student in the spring of 2013. It held an IEP meeting in May 2013 and provided Parents with the appropriate procedural safeguards. District met its statutory "child find" duties as contemplated under Education Code sections 56300 and 56301.

*NOVEMBER 2013 THROUGH SEPTEMBER 2016*

40. From November 2013 until at least September 22, 2016, District procedurally violated the IDEA by failing to refer Student for assessments and failing to assess Student in all areas of suspected need. Student proved all three prongs of the analysis for procedural violations applied.

41. First, under *Rowley, supra,* 458 U.S. at p. 201, and *Endrew, supra,* 137 S.Ct. at p. 999, District's failure to assess Student denied her a FAPE and any progress appropriate based upon her circumstance. District should have at least reassessed Student for eligibility from and after November 2013, based on her lack of any appropriate academic progress, Parents' report that Student had been diagnosed with attention deficit disorder, and Mother's concerns of possible autism and deficits in fine motor skills. Ms. Morales compared Student to a blooming flower, instead of acknowledging Student had increasing needs and deficits that should have been assessed. District should have also assessed Student's language and speech disorders based upon her consistent low scores in vocabulary and poor language development, in the first, second and third grades. She consistently had low memory retention, struggled with numbers and spelling, but District did not assess her in academics. She struggled with fine motor skills, such as holding a pencil, but District did not consider

assessing her in occupational therapy.  In second grade, District acknowledged her ongoing struggles at school.  District expressed concerns about her tardiness, attributing her poor performance in part to absences and lateness.  The team added interventions to her program in the form of special education services as a "guest" at the end of second grade in May 2015.  The student study team justified the additional interventions as an alternative to assessing Student, hoping that doing so would help Student transition successfully to an English-only program.  The team, which included special education resource teacher Ms. Jue, deferred assessments with a "wait and see" mindset.  Those advanced interventions, to the extent Student accessed them, did not help Student make any progress.  Student was progressively falling behind, which impacted her emotionally and caused her to avoid school, because she could not keep up with her classmates.  District recommended outside counseling, but did not offer to assess.

42.    The evidence was overwhelming that District had enough information from November 2013 and through third grade to trigger its duty under the IDEA to reassess Student for special education eligibility.  Instead, District relied instead on its practice of using the student study team process to address Student's growing needs, which proved to be disastrous for Student.  While it was not unreasonable for District to try using some interventions through the student study team during first grade, the persistent reliance on the student study team process, as opposed to assessing in all areas of suspected need, denied Student a FAPE.  With proper assessments, she should have been found eligible for special education as early as fall 2013.  She would have received specialized academic instruction from a special education teacher in a smaller classroom.  She would have received speech therapy and possibly other related services from licensed providers trained to work with children with special needs.  She would have had the benefit of an IEP team knowledgeable in special education procedures to evaluate her progress, establish goals, and monitor and report on her progress.  Student received none of those benefits through the time of hearing.

43.    During the first grade in 2013-14, Student was performing at below basic level and needed improvement in all aspects of language arts, and three out of five areas of math.  Her skills in vocabulary recognition, spelling and language were minimal.  She needed improvement in homework completion.  She performed relatively better when instructed in Spanish.  Student's first grade teacher did not know that Student had been assessed until the November 2013 student study team meeting.  No one from District considered assessing Student for special education eligibility in any of the areas of suspected need evident to the student study team, and Parents.  Ms. Morales and Ms. Ramos persuaded Parents to withdraw their request for assessments at the November 2013 student study team meeting, even though Student's records included the December 2012 COST referral which clearly noted Mother's concerns that Student had attention deficit hyperactivity disorder, autism and dyslexia.

44.    During the second grade in 2014-15, Student continued to struggle.  Mother attended a school board meeting during the 2014-2015 school year to express her concerns.  The student study team met three times.  By the end of the school year, the team had implemented interventions and supports that included providing Student with special

education services in speech therapy, and resource support as a general education student. Yet, even though District considered assessing Student at the May 2015 meeting, District deferred assessing Student, instead changing her program to an English-only program. District did not start assessments of Student until 18 months later, in November 2016. Ms Schnee, Ms. Dominguez, Ms. Villapadua, and Ms. Roman credibly testified that Student had significant learning deficits in reading, writing, language processing, and fine motor, which were documented throughout Student's cumulative records, justifying the need for assessments from at least the time Student was in first grade.

45.    Student's third grade teachers in 2015-16 noted Student's deficits in vowel and consonant identification, number identification, language processing, and fine motor skills; her testing scores were consistently low in most areas.  The student study team created and modified tiered interventions that became more intensive as Student's deficits became more noticeable.  Her deficits did not occur over a short period of time; the deficits were historic and pervasive.  Ms. Cervantes was concerned at the beginning of third grade that Student performed well below expected performances levels, prompting her to talk with Ms. Morales, Ms. Jue, and Ms. Ramos about assessing Student.

46.    Parents regularly asked Student's teachers and other District staff to help Student with her delays in learning before and throughout third grade.  Mother contacted the school superintendent for help in March 2016.  Parents were genuinely and legitimately concerned about Student's lack of progress and regularly expressed those concerns to District staff.

47.    Student's fourth grade teacher, Ms. Wright, became concerned in the fall of 2016 that Student was not making progress at school.  At that point, Student was performing at early first grade level in most areas.

48.    Following the reasoning in the Ninth Circuit Court of Appeals in *Timothy O. v Paso Robles Unified School Dist.* (9th Cir. 2016) 822 F.3d 1105, 1124-1125, District's failure to assess Student from and after November 2013 substantially hindered Parents ability to participate in Student's educational program, and seriously deprived Parents, Student's teachers and District staff of the information necessary to develop an appropriate educational program with appropriate supports and services for Student.  The outcome of the 2016-2017 District assessments, in combination with Ms. Schnee's, Ms. Dominguez's, Ms. Wright's and Ms. Roman's assessment reports and testimony, further proves this point.  District found Student eligible for special education as other health impaired based upon her attention deficit disorder, and language and speech disorder based on her significant language processing deficits.  Her levels of performance were 99.9 percent below those of children at the same age.  Ms. Roman, Ms. Schnee and Ms. Cervantes credibly testified, and the student study team notes reflected, that Student historically demonstrated the same types of deficits as those found in District's multidisciplinary assessments.  District should have found Student eligible as far back as November 2013.  Its failure to do so deprived Parents of the opportunity to participate in an informed and meaningful way in her academic program from November 2013 through the time of hearing.

27

49.    Student met her burden of proving by the preponderance of evidence that, from November 13, 2013 through at least March 2016, when District offered Parents an assessment plan, District procedurally violated the IDEA by 1) failing to refer Student for reassessments for special education eligibility from and after November 13, 2013, 2) declining to assess based on Parents' requests without providing appropriate procedural safeguards or prior written notice, and 3) failing follow up in attempting to have Parents sign the March 2016 assessment plan in a timely manner.  The procedural violations resulted in 1) Student not being eligible for special education, 2) denied her a FAPE and the opportunity to acquire educational benefit from and after November 2013, and 3) deprived Parents of necessary information to allow them to participate in a meaningful way at an IEP meeting. Remedies will be discussed below.

*Issues 2 and 3:  Failure to offer Student an appropriate IEP*

50.    Student contends in Issue 2 that District denied a FAPE because it failed to offer Student an appropriate IEP during the statutory period that met her unique needs in academics and language.  In Issue 3 Student contends District denied Student a FAPE because it failed to offer Student an IEP that was reasonably calculated to offer her educational benefit.  District contends on both issues that Student demonstrated some progress through the second grade with student study team interventions, and that any liability for denial of FAPE should be limited to before March 2016 when District offered to assess Student.  The two issues will be analyzed together.

52.    Legal authorities and conclusions discussed in the preliminary issue and Issue 1 are incorporated by reference.

53.    Whether Student was denied a FAPE is determined by looking to what was reasonable at the time, not in hindsight.  (*Adams v. State of Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149 (*Adams*), citing *Fuhrman v. East Hanover Bd. of Education* (3d Cir. 1993) 993 F.2d 1031, 1041.)[4]

54.    District's 2017 multidisciplinary assessment and Ms. Schnee's assessment report, which was generated after Parents filed their due process complaint, and Ms. Schnee's, Ms. Dominguez's, Ms. Wright's and Ms. Ramon's  opinions revealed Student's historic educational needs and applied to what District should have known about Student's needs from November 2013 until September 22, 2016.  Both Ms. Schnee's and

---

[4]  In *E.M. v Pajaro Valley Unified School Dist., et al.* (9th Cir. 2011) 652 F3d 999, 1006, the Ninth Circuit Court of Appeals held that the district court erred by not considering whether a report generated three years after the due process hearing was otherwise admissible and relevant to the determination of whether the district met its obligations to the student under the IDEA several years earlier.  (*E.M., supra,* 652 F.3d at p. 1006.)  The holding in *E.M.* does not abrogate the general principle articulated in *Adams, supra,* 195 F.3d at p.1149, that the actions of school districts cannot be judged exclusively in hindsight.

District's assessments confirmed that Student had disabilities that historically and significantly impacted her access to her education. The 2017 assessment confirmed that Student had historic and ongoing deficits in reading, language processing, attention, fine motor and social emotional skills that impacted her ability to access her education beginning in first grade and continuing through the time of hearing. District witnesses who assessed Student in 2017 agreed that Student required an IEP with comprehensive goals and related services to address those needs, and additional assessments. Those disabilities should have qualified her for special education in 2013 under the eligibility categories of other health impairment related to her attention deficit disorder, and speech and language impairment related to her language processing deficits. During this hearing, Student's IEP team found her eligible for special education. Student's needs were the same from first grade until the 2017 assessments, establishing that Student should have been found eligible for special education as early as May 2013.

55. Student met her burden of proof on Issues 2 and 3, proving by a preponderance of evidence that 1) District denied Student a FAPE by failing to offer or provide Student an IEP from November 2013 until September 22, 2016, that addressed all her unique needs in academics and language development, and 2) District failed to offer or provide an IEP that was reasonably calculated to enable Student to make progress appropriate in light of Student's circumstance, which was known to District staff from as early the first semester of first grade.

56. District argued its liability should be limited because it had attempted since March 2016 to assess Student without receiving cooperation from Parents. The argument was not persuasive. Failed attempts to obtain consent did not abrogate District's duty to act proactively to ensure Student's needs were identified and addressed. Under *I.R. v Los Angeles Unified School Dist.* (2015) 805 F.3d 1164, District could have filed for due process at any time during spring 2016, or after, to obtain an order granting it permission to assess Student without parental consent, and it did not do so.

57. In summary, District's failure to assess Student in all areas of need at any time on or after November 13, 2013, through September 22, 2016, meant she was not eligible for special education services and supports. She did not have an IEP with goals and related services designed to address her unique needs. District deprived her of an educational benefit, as evidenced by her significant lack of progress up to the time of hearing. Additionally, District's failure to assess and develop an appropriate IEP in a timely manner deprived Parents and school staff of the opportunity to have enough information to participate in a meaningful way to develop an appropriate educational program for Student.

*Issue 4: Procedural Violations*

58. Student contends District procedurally violated the IDEA by a) failing to provide Parents with a copy of special education procedural safeguards; and b) failing to inform Parents of District's obligation to offer assessments or provide an assessment plan if a

need for special education services was suspected. As a result, Student contends Parents were deprived of the opportunity to participate in a meaningful way in the development of Student's educational program.

59.     District contended that its practice was to provide parents with information during student study team meetings, occasionally conduct those meetings in the parents' native language, or provide an interpreter, and it provided ongoing training to the school principals and assistant principals on child find and special education assessment referrals. District also contended that, although many of the general education teachers were not familiar with child find and assessment referrals, they participated in the COST referral process and student study team meetings.

LEGAL AUTHORITY

60.     The parents of a child with a disability must be afforded an opportunity to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of FAPE to the child. (34 C.F.R. § 300.501(a); Ed. Code, § 56500.4.) A parent has participated in the development of an IEP in a meaningful way when he or she is informed of the child's problems, attends the IEP meeting, expresses disagreement regarding the IEP team's conclusions, and requests revisions in the IEP. (*N.L. v. Knox County Schools* (6th Cir. 2003) 315 F.3d 688, 693; *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d at p. 1036 [parent who has an opportunity to discuss a proposed IEP and whose concerns are considered by the IEP team has participated in the IEP process in a meaningful way].)

61.     In matters alleging procedural violations, the denial of a FAPE may only be shown if the procedural violations impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE, or caused a deprivation of educational benefits. (Ed. Code, § 56505, subd. (f)(2); see also *W.G. v. Board of Trustees of Target Range School Dist. No. 23* (9th Cir. 1992) 960 F.2d 1479, 1484 (*Target Range*).) The hearing officer "shall not base a decision solely on non-substantive procedural errors, unless the hearing officer finds that the non-substantive procedural errors resulted in the loss of an educational opportunity to the pupil or interfered with the opportunity of the parent or guardian to participate in the formulation process of the individualized education program." (Ed. Code, § 56505, subd. (j).)

62.     Procedural violations that interfere with parental participation in the development of the IEP "undermine the very essence of the IDEA." (*Amanda J. v. Clark County School Dist.* (9th Cir. 2001) 267 F.3d 877, 892.) An IEP cannot address the child's unique needs if the people most familiar with the child's needs are not involved or fully informed. (*Ibid.*) A school district cannot independently develop an IEP without input or participation from the parents and other required members of the IEP team. (*Target Range, supra,* 960 F. 2nd at p. 1484.)

30

63.     A notice of procedural safeguards must be given by a school district to a parent of a child with a disability a minimum of once a year and/or: 1) upon initial referral for assessment or parent request for assessment; 2) upon filing a request for a due process hearing; or 3) upon parent request. (20 U.S.C. § 1415(d)(1)(A); 34 C.F.R. § 300.504(a).)

ANALYSIS

64.     The legal authorities and conclusions from the preliminary issue of the statute of limitations, and Issues 1 through 3 are incorporated by reference.

65.     District committed procedural violations of the IDEA by failing to provide prior written notice of its refusal at student study team meetings to assess, and failing to inform Parent of District's obligation to offer assessments or provide an assessment plan. Those violations met each of the three procedural analytical prongs discussed above.

66.     For example, District's standard policy was not to proceed straight to the special education assessment process under the IDEA when requested, but instead to go through the COST referral and student study team process, using the response to intervention strategy in lieu of assessments. However, an RTI process does not replace the need for a comprehensive evaluation. A public agency must use a variety of data gathering tools and strategies even if an RTI process is used. The results of an RTI process may be one component of the information reviewed as part of the evaluation procedures. An evaluation must include a variety of assessment tools and strategies and cannot rely on any single procedure as the sole criterion for determining eligibility for special education and related services. (71 Fed. Reg. 46648 (Aug. 14, 2006).) Therefore, response to intervention is not intended to be used as a substitute for the assessment process under the IDEA.

67.     Ms. Ramos's statements to Parents at the November 13, 2013 meeting, warning that Student might be stigmatized by assessments, effectively misrepresented what the IDEA requires a District to do when a Parent asks for an assessment. It also demonstrated lack of knowledge at that time by a school administrator as to the proper procedures for referring a child with a suspected disability for special education assessments, or for providing the required procedural safeguards to parents.

68.     As another example, in response to Father's request to retain Student at the May 2015 student study team meeting, although team members agreed an assessment might be appropriate for Student, they recommended deferring assessing Student and to try instead a "wait and see" intervention by changing her program to an English language immersion program, with special education "guest" support. Yet, at no time during the meeting did District expressly offer to assess Student or to provide Parents with an assessment plan, giving them the opportunity to consent to assessments or reject them. District failed to clearly explain to Parents, in writing, that they had a right to request an assessment for Student at that time, and District had an obligation to provide them an explanation in writing why it declined to do so. Instead, Parents concluded they had no other option but to agree

31

with District's proposal to "wait and see" hoping the change in program would help Student succeed in school. The student study team notes from that meeting made no reference to the subject of special education assessments, or the compromise arrangement District made with Parents.

69. The procedural violations significantly impeded Parents' opportunity to participate in the decision-making process regarding the provision of a FAPE. Although Parents participated at and asked questions at student study team meetings, expressed concerns to District staff and participated in the development of the interventions, Parents' participation was not fully informed by the assessment information they should have had, had assessments been conducted. District's failure to timely offer Parents an assessment plan and pursue assessments of Student, or provide procedural safeguards, from and after November 2013, was a substantial procedural violation that deprived Parents of the opportunity to participate in a meaningful way, denied Student educational benefit, and Student a FAPE.

## REMEDIES

1. Student prevailed on all issues from November 13, 2013, through September 22, 2016. Student requested several remedies in her complaint, including a finding of eligibility, compensatory education, independent educational evaluations and training of District staff. However, after the complaint was filed, District conducted multidisciplinary assessments, and Student obtained Ms. Schnee's private assessment. The parties stipulated after hearing that Student was eligible for special education. Therefore, the remedies discussed below take into consideration the evidence the parties offered at hearing, their stipulation, and their closing arguments relating to currently appropriate remedies.

2. School districts may be ordered to provide compensatory education or additional services to a student who has been denied a FAPE. (*Student W. v. Puyallup School Dist.* (9th Cir. 1994) 31 F.3d 1489, 1496.) These are equitable remedies that courts may employ to craft "appropriate relief" for a party. An award of compensatory education need not provide a "day-for-day compensation." (*Id.* at pp. 1496-1497.) The conduct of both parties must be reviewed and considered to determine whether equitable relief is appropriate. (*Id.* at p. 1496.) An award to compensate for past violations must rely on an individualized assessment, just as an IEP focuses on the individual student's needs. (*Reid ex rel. Reid v. District of Columbia* (D.D.C. Cir. 2005) 401 F.3d 516, 524, citing *Student W. v. Puyallup School District* (9th Cir. 1994) 31 F.3d 1489,1497.) The award must be fact-specific and be "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." (*Reid ex rel. Reid v. District of Columbia* (D.D.C. Cir. 2005) 401 F.3d 516, 524.)

32

3.      Here, Student first seeks an order finding Student eligible for special education under the eligibility categories of other health impairment and speech and language impairment.  The parties' stipulation renders the requested remedy moot.

4.      Next, Student seeks four years of compensatory academic instruction from Lindamood-Bell or another similar program.  Ms. Schnee recommended a blended program for Student, suggesting Lindamood-Bell was appropriate.  Ms. Sugden testified District was in the process of contracting with Lindamood-Bell to provide services to the District.  She acknowledged that a blended program for Student, incorporating compensatory educational hours with services, supports and other specialized academic instruction was feasible for Student.  However, at the time of hearing, no witness credibly testified as to what was the appropriate number of hours of compensatory education for Student.  Nevertheless, because the evidence unequivocally established that, during the applicable statutory period, Student was deprived of almost three years of educational benefit by District's failure to find her eligible for special education in November 2013, its failure to offer to or assess her in all areas of suspected disability between November 2013 and September 2016, and its failure to provide special education instruction, services and supports through the date Student filed her due process complaint, Student is equitably entitled to compensatory educational services to address her needs in academics.

5.      Therefore, District shall fund a comprehensive independent educational evaluation of Student by a licensed educational therapist or a nonpublic agency of Parents' choosing.  The evaluator shall consider Student's academic needs both during the regular and extended school year, and during school breaks.  District shall hold an IEP meeting not later than 30 calendar days after it receives the private evaluation report and recommendations, unless mutually agreed otherwise by District and Parents.  The IEP team shall discuss the educational evaluation and develop an appropriate educational program for Student considering the evaluator's recommendations, including any recommendations for educational therapy after school hours or during breaks to compensate Student for missed specialized academic instruction from November 13, 2013 until September 22, 2016.  District shall also fund up to four hours at the evaluator's usual hourly rate to prepare for and attend the IEP meeting.

6.      In the interim, until the assessment and IEP team meeting are completed, Student is entitled to compensatory education.  Considering the evidence of Student's attentional issues and her severe learning deficits, providing hour for hour compensatory services is not practical.  District shall fund a block of 72 hours, based upon three hours a week for six months, of compensatory academic instruction.  These services are intended to provide Student with compensatory education until the educational evaluation is completed and the IEP team meets.  The services shall be provided by a licensed educational therapist or non-public agency of Parents' choosing.  The services shall be provided at a site that is convenient to Parents; if no site is available within the District's boundaries, District shall reimburse Parents for the cost of round trip transportation to the nearest location available to Student for the services based on the then current Federal rate.  The block of hours may be used regardless if school is in session.  The block of hours shall be available to Student

through March 31, 2018. Student shall forfeit any unused hours ordered by this Decision after that date. The compensatory education hours ordered by this Decision shall not be Student's "stay put" under title 20 United States Code section 1415(j), unless the IEP team decides otherwise with parental consent. This remedy is in addition to any reasonable number of compensatory hours recommended by the independent evaluator and agreed to by the IEP team, including Parents. This remedy does not impact Student's right to challenge the resulting IEP through due process.

7. Student requests independent educational evaluations in autism, occupational therapy, physical therapy, and vision therapy based on her assertion that District never assessed Student before September 22, 2016. Student is equitably entitled to a publicly funded independent educational evaluation focused on whether she demonstrates needs attributable to autistic-like characteristics by a qualified provider chosen by Parents. District shall fund the assessment within 90 calendar days of this Decision in accordance with District policies for independent assessments. However, because District administered testing for autism in its 2016-2017 multi-disciplinary assessment, the publicly funded evaluation ordered by this Decision shall satisfy Student's right to an independent assessment in autism if she challenges District's 2016-2017 assessments.

8. Although Mother expressed concerns to Student's teachers and the student study team from and after November 2013 that Student struggled with grasping a pen and other fine motor skills, District did not assess her in occupational therapy before September 22, 2016. Accordingly, Student is equitably entitled to a publicly funded independent occupational therapy evaluation by a qualified provider chosen by Parents. District shall fund the assessment in accordance with District policies for independent assessments. District shall fund the assessment within 90 calendar days of the date of this Order, and hold an IEP meeting within 30 days after its receipt of the assessment report, unless otherwise agreed by District and Parents. The evidence was not conclusive that District assessed Student in occupational therapy in 2016-2017. If it did so, the publicly funded evaluation ordered by this Decision shall satisfy Student's right to an independent assessment in occupational therapy if she challenges District's 2016-2017 occupational therapy assessment. This remedy does not impact Student's right to challenge the resulting IEP through due process.

9. Student seeks an independent educational evaluation regarding vision therapy. Student did not meet her burden of proof. She offered no credible expert testimony or other evidence that Student exhibited deficits in vision before September 22, 2016, that should have prompted District to assess in that area during the statutory period. The student study team members recommended Parents have Student medically evaluated in vision based on Mother's report at the September 2014 student study team meeting. Student offered no evidence that the condition impacted her at school. Ms. Roman noted at hearing that Student failed a vision exam, but did not opine that vision was a historic area of need based upon her review of Student's cumulative records. Ms. Schnee's opinions regarding vision therapy

34

were equivocal, rendering them not persuasive as to the issues in this matter.  Student is not entitled to an independent educational evaluation at public expense in vision as a remedy for claims in this matter.

10.     Similarly, Student offered no evidence or expert testimony that supports a finding that District should have assessed Student in physical therapy before September 22, 2016.  Student is not entitled to an independent educational evaluation at public expense in physical therapy as a remedy for the claims raised in this matter.

11.     Next, Ms. Schnee and Ms. Dominguez agreed, and the evidence established, Student required speech and language therapy.  Student had significant and historic language processing and memory issues.  She required extensive interventions and supports to help her gradually acquire the language skills she had not received from first grade until September 2016.  But, Ms. Schnee's recommendation of speech therapy 60 minutes daily five days a week, when considered in the context of Student's disabilities and unique needs, including what would be a far more intensive academic program than she had previously received, was excessive.  Ms. Schnee's testimony and recommendations in her report were not clear as to whether her recommendations were focused on Student's daily program at school, or for compensatory purposes, or both.  Ms. Dominguez's recommendation of 30 minutes two to three times a week was more plausible for Student's daily academic program given her unique needs.  However, Ms. Dominguez's testimony was not clear as to whether she recommended those services as part of Student's IEP, or as compensatory services, or both.

12.     Based on the evidence of Student's delays in language development, her attention span, and her memory deficits, Student is entitled to publicly-funded compensatory services in speech and language.  Student received some speech therapy during second grade although neither party offered evidence as to the details of that service or for how long it was provided.  Considering Ms. Schnee's recommendation of five hours a week of speech therapy, and Ms. Dominguez's recommendation of 30 minutes two or three times a week, Student is equitably entitled to a block of 120 hours of speech and language therapy, based upon 60 minutes a week for 40 weeks a year, including four weeks for summer, from November 13, 2013 until September 22, 2016, when District failed to assess Student.  The services shall be provided by a nonpublic agency or licensed speech therapist chosen by Parents, focusing on Student's IEP goals developed by her IEP team.  The service provider shall determine whether the compensatory services will be delivered individually or in a small group setting, based on Student's IEP goals.  District shall reimburse Parents for the cost of round trip transportation to the nearest location available to Student for the services based on the then current Federal rate.  The compensatory services may be used regardless of whether school is in session, including during breaks and summer.  The block of hours shall be available to Student through December 31, 2019.  Student shall forfeit any unused hours after that date.

Friday 26 of May 2017, Faxination        ->3233899239              Page 37 of 41
Case 2:17-cv-04304-JAK-PD   Document 14   Filed 07/26/17   Page 81 of 122  Page ID
#:233

13.     Because District failed several times to assess Student in speech and language development, and based on Student's notable language deficits during the statutory period, Parents are equitably entitled to reimbursement for Ms. Schnee's assessment in an amount not to exceed $4,050.

14.     In addition, staff training is an appropriate compensatory remedy under these facts.  The IDEA does not require compensatory education services to be awarded directly to a student.  Staff training can be an appropriate compensatory remedy, and is appropriate in this case.  (*Park v. Anaheim Union High School Dist.* (9th Cir. 2006) 464 F.3d 1025,1034 [student, who was denied a FAPE due to failure to properly implement his IEP, could most benefit by having his teacher appropriately trained to do so].)  Appropriate relief considering the purposes of the IDEA may include an award that school staff be trained concerning areas in which violations were found, to benefit the specific pupil involved, or to remedy procedural violations that may benefit other pupils.  (*Ibid.* Also, e.g., *Student v. Reed Union School Dist.,* (Cal. SEA 2008) Cal. Ofc. Admin. Hrngs. Case No. 2008080580] [requiring training on predetermination and parental participation in IEP's]; *Student v. San Diego Unified School Dist.* (Cal. SEA 2005) 42 IDELR 249 [105 LRP 5069] [requiring training regarding pupil's medical condition and unique needs].)

15.     District acknowledged that it trains school principals and vice principals in special education referrals.  But it also admitted that general education teaching staff did not receive training, but instead used the COST and student study team process to address children who needed help.

16.     Student's kindergarten, first, second, third and fourth grade general education teachers had no District training on the appropriate procedures under the IDEA for referring a child who is suspected of having a disability that may qualify that child for special education services.  Although this occurred prior to the statutory period, District staff at Juan L. Soria School did not directly commence assessments of Student when Mother expressed concerns.  Instead, they first met privately as part of a COST team, and then held a student study team meeting to discuss whether to assess.  They did not assist Mother in putting her request in writing.  Mr. Tobey's assessment excluded areas of concern voiced by Mother, and documented by Ms. Martinez.  The May 2013 IEP team did not fully explain, if at all, to Parents why they excluded areas of concern Mother reported to Ms. Martinez.

17.     Testimony from Elm school principal Ms. Ramos and school psychologist Ms. Morales demonstrated they also did not understand the appropriate procedural requirements under the IDEA for referring children for special education assessments. District staff persuaded Parents to withdraw their request for assessments in November 2013, claiming assessing was too soon and would stigmatize Student.  They neglected to provide Parents with procedural rights and prior written notice after doing so.  In May 2015, the student study team deferred assessments, and instead made a change in Student's program, with a "wait and see" mindset.  Several of District's witnesses confirmed that District's standard process when a parent asked for an assessment, particularly of a child as young as Student was in 2013, was to refer the request, whether verbal or in writing, to the COST

36

team, which then determined without any parental participation whether to hold a student study team to discuss a possible referral for assessment. No one assisted Parents in documenting their assessment requests in writing, as required by the IDEA.

18.     While some early intervention for Student before another assessment may have been appropriate after her initial assessment in kindergarten, the District did not procedurally comply with the IDEA when Parents asked for another assessment in November 2013. Additionally, District staff relied on responses to intervention over the span of seven student study team meetings, instead of assessing Student after she consistently failed to make any notable progress.

19.     Therefore, to ensure that all students and parents within District receive the benefits contemplated under the IDEA, staff training in special education and IDEA procedures, including the proper process for referral for assessments and child find obligations is an appropriate remedy.

## ORDER

1.     Student is entitled to no remedies for Student's claims before November 13, 2013 because they are time-barred. Therefore those claims are dismissed.

2.     District shall, within 120 days of this Decision, fund a comprehensive independent educational evaluation of Student by a licensed educational therapist or comparable agency of Parents' choosing. The assessor shall evaluate Student's academic needs at school and determine a reasonable number of compensatory hours needed to assist her in making progress toward grade level, based on her claims from November 2013 until September 22, 2016, when she received no special education instruction. District shall hold an IEP meeting not later than 30 calendar days after it receives the private evaluation report and recommendations, unless mutually agreed otherwise by District and Parents. The IEP team shall discuss the evaluation and, considering the evaluator's recommendations, develop an appropriate educational program, including a reasonable number of compensatory hours, for Student. District shall fund up to four hours at the evaluator's usual hourly rate to prepare for and attend the IEP meeting.

3.     District shall fund a block of 72 hours, based upon three hours a week for six months, of compensatory academic instruction. The services shall be provided by a licensed educational therapist or non-public agency of Parents' choosing. The services shall be provided at a site that is convenient to Parents; if no site is available within the District's boundaries, District shall reimburse Parents for the cost of round trip transportation to the nearest location available to Student for the services based on the then current Federal rate. The block of hours may be used regardless if school is in session. The block of hours shall be available to Student through March 31, 2018. Student shall forfeit any unused hours after that date. The compensatory education hours shall not be Student's "stay put" under title 20 United States Code section 1415(j), unless the IEP team decides otherwise with parental

37

Friday 26 of May 2017, Faxination        ->3233899239        Page 39 of 41
Case 2:17-cv-04304-JAK-PD    Document 14    Filed 07/26/17    Page 83 of 122    Page ID
#:235

consent. This remedy is in addition to any reasonable number of compensatory hours recommended by the independent evaluator and agreed to by the IEP team, including Parents. This remedy does not impact Student's right to challenge the resulting IEP through due process.

4.      District shall within 30 days of this Decision fund independent educational evaluations in autism, and occupational therapy, including fine and gross motor, by qualified providers of Parents' choosing. District shall hold an IEP meeting not later than 30 calendar days after it receives the last of the two assessment reports and recommendations, unless mutually agreed otherwise by District and Parents, to discuss the evaluations and incorporate agreed upon recommended services into Student's IEP. These independent evaluations shall satisfy Student's right to independent evaluations if Student challenges District's 2016-2017 multidisciplinary assessments of Student in the areas of autism and occupational therapy.

5.      District shall reimburse Parents within 45 days of this Decision, in an amount not to exceed $4,050, for the cost of Karen Schnee's January 2017 independent evaluation. If Parents have not paid Ms. Schnee directly, District may reimburse Parents through their attorneys upon receipt of proof of payment to Ms. Schnee.

6.      District shall fund a block of 120 hours of speech and language therapy. The services shall be provided by a nonpublic agency or licensed speech therapist chosen by Parents, focusing on Student's IEP goals developed by her IEP team. The service provider shall determine whether the compensatory services should be delivered individually or in a small group setting, based on Student's IEP goals. The compensatory services may be used regardless of whether school is in session, including during breaks and summer. The block of hours shall be available to Student through December 31, 2019. Student shall forfeit any unused hours after that date.

7.      District shall, no later than two months after the start of the 2017-2018 school year, provide six hours of training to its staff at Elm Elementary School and Juan L. Soria School. Trainees shall include all general education teaching staff and paraprofessionals or aides, student study team members, school administrators including principals and vice principals, service providers including school psychologists, occupational and speech and language therapists, and any other staff who work with parents and students, regardless of eligibility, on students' educational programs. The training shall focus on the general principles of the IDEA, including child find procedures, the special education assessment process under the IDEA, the statutory requirements for providing parents with prior written notice and procedural, safeguards, and the rights of parents to participate in a meaningful way in developing a child's educational program during the assessment process and at IEP meetings including determining whether the child is eligible for special education. The training shall be provided by qualified professionals who are either employed by or contracted with the Ventura County Special Educational Local Plan Area, or a private provider selected by District. This Order does not preclude District from offering this training to staff at other District schools.

38

8.      All other claims for relief are denied.

## PREVAILING PARTY

Pursuant to California Education Code section 56507, subdivision (d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided. Here, Student was the prevailing party on all issues.

## RIGHT TO APPEAL

This Decision is the final administrative determination and is binding on all parties. (Ed. Code, § 56505, subd. (h).) Any party has the right to appeal this Decision to a court of competent jurisdiction within 90 days of receiving it. (Ed. Code, § 56505, subd. (k).)

DATED: May 25, 2017

DocuSigned by:

*Adrienne L. Krikorian*

3475616B5EDF4C6

ADRIENNE L. KRIKORIAN
Administrative Law Judge
Office of Administrative Hearings

Exhibit C

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

In the Matter of:

PARENTS ON BEHALF OF STUDENT,

v.

OXNARD SCHOOL DISTRICT.

OAH Case No. 2016091036

## DECISION

Student filed a Due Process Hearing Request on September 22, 2016, with the Office of Administrative Hearings, State of California, naming Oxnard School District. On November 4, 2016, OAH granted a continuance for good cause.

Administrative Law Judge Clifford H. Woosley heard this matter in Oxnard, California, on February 21, 22, 23, 24, and March 7, 2017.[1]

Attorneys Shawna L. Parks, Stuart Seaborn, and Janeen Steel appeared on behalf of Student. Mother attended portions of the hearing.[2] Attorney Lawrence Joe represented District. Director of Special Education Services, Amelia Sugden, and Manager of Special Education, Nadia Villapudua, attended on behalf of District.

At the parties' request, OAH granted a continuance to April 3, 2017, for the filing of written closing arguments. In light of recent appellate decisions, OAH again continued the matter to April 17, 2017, to allow the parties additional briefing time. On April 17, 2017, the parties submitted their final written closing briefs, the record was closed, and the matter submitted for decision.

---

[1] The last day of hearing was conducted via telephonic conference.

[2] Mother excused herself from much of the hearing, providing permission for the hearing to proceed in her absence.

ISSUES[3]

1.     Has District denied Student a free appropriate public education when it failed to meet its child find obligations by not evaluating Student in all areas of suspected disability, and not finding Student eligible for special education placement and related services, from (a) August 2013 and (b) fall 2014, to the filing of the complaint?

2.     Has District denied Student a FAPE by failing to offer Student an individualized education program that met Student's unique needs and that was reasonably calculated to offer education benefit to Student, from (a) August 2013 and (b) fall 2014, to the filing of the complaint?

SUMMARY OF DECISION

Student proved by a preponderance of the evidence that District denied him a FAPE by failing to meet its child find duties and refer Student for special education assessment in the fall of 2014. If Student had been assessed, he would have been found to have met the eligibility criteria for other health impairment. District's failure to timely assess denied Student's right to a FAPE, because he should have been found eligible and otherwise entitled to a FAPE and because he was deprived the educational benefit of the related services and placement that he should have received in an IEP. Therefore, District's failure to assess Student in the fall of 2014 was a procedural violation that denied Student a FAPE. Student prevailed on Issue One (b).

Student did not prevail on his assertion in Issue One (a) that District's child find duty was triggered as early as August of 2013. The reason for Student's chronic absences and Mother's repeated early removals from school remained a mystery throughout Student's first grade year. The evidence convincingly demonstrated that District did not have knowledge of or reason to suspect a disability, and reason to suspect that special education services may be needed to address that disability until the fall of 2014 when District was informed of Student's possible sleeping disorder as the cause of his poor attendance. Therefore, District's failure to assess resulted in a denial of FAPE for two years, not three as Student contends.

Student also demonstrated that District denied him a FAPE because he had not timely received an IEP which would have addressed his unique needs as a child with a disability, and conferred educational benefit so he could make progress appropriate for his circumstances, since fall 2014, thus prevailing on Issue Two (b). Student did not prevail on

---

[3] The issues have been reorganized for purposes of analysis. The ALJ has authority to redefine a party's issues, so long as no substantive changes are made. (*J.W. ex rel. J.E.W. v. Fresno Unified School Dist.* (9th Cir. 2010) 626 F.3d 431, 442–443.)

2

his assertion in Issue Two (a) that District's denied Student a FAPE as early as August of 2013.


FACTUAL FINDINGS

1.      At the time of the hearing, Student was nine years old and in fourth grade at District's Sierra Linda Elementary School.  He was eligible for special education services with a primary eligibility of emotional disturbance and a secondary eligibility of other health impairment.  Student first qualified for special education in November 2016 and, at all relevant times, attended District schools.

*2012-2013 School Year: Kindergarten*

2.      Student started kindergarten at District's Emilie Ritchen Elementary School for the 2012-2013 school year. Mother felt that the kindergarten teacher was abusive.  She said the teacher referred to Student as a "Mama's boy," ridiculed Student in front of the class, and generally had a mean-spirited demeanor whenever interacting with her son.

3.      As a consequence, Mother said she could not get Student to go to school. Student did not want to go to class and, when attending, would become anxious and upset because of the teacher's conduct.  Student was chronically absent and, when he did attend, Mother repeatedly checked Student out of school before the end of the day.  While at Ritchen, Student was absent 30 days and tardy 11 times, not including Mother's frequent early removals from school.

4.      District granted Mother's request to transfer Student out of Ritchen.  Student started attending kindergarten at Sierra Linda in May 2013, about five weeks before the end of the school year.  Armondo Arreguin was Student's new kindergarten teacher; he testified at the hearing.  Student was a happy child, with no behavior issues.  Mr. Arreguin talked with Mother daily.  He had a good working relationship with Mother, who told him that Student was having a difficult time transitioning to kindergarten and did not much care for school.

5.      Student was clingy with Mother and Mother wanted to be close to Student. Mother acknowledged this, noting that Father had encouraged Mother to "cut the apron strings," but Mother said it was hard.  Mr. Arreguin knew that Student had missed a lot of school at Ritchen.  Even though kindergarten attendance was not mandatory, Mr. Arrequin wanted Student to attend regularly.

6.      Student was in afternoon kindergarten, from 11:30 a.m. to 3:00 p.m. Mr. Arreguin persuaded Mother to drop Student off at class each day, and not return to check on him.  When Mother confirmed that Student did fine after the first week, she did not come to the school during class for the remainder of the school year.  Mother thanked Mr. Arreguin

3

that Student did well in his class, noting that she was finally able to do her chores.  While attending Mr. Arreguin's class, Student was once absent, never tardy, and never checked out early.  Mother thought Mr. Arreguin was a very good teacher.

7.     Mr. Arreguin did not see any signs that Student was in need of referral for special education assessment.  Student did not appear tired.  He was shy at first, but soon adjusted and was involved.  Student worked on assignments, was responsive, participated in small groups, and made friends.  Mr. Arreguin did not suspect a disability.  Mother never told Mr. Arreguin that Student was receiving, or needed to receive any type of services; she only talked about Student's struggles in transitioning from home to kindergarten.  Mother never said Student was anxious.  Mother said that Student had a hard time with the prior kindergarten teacher and did not like being in her class, making it hard for Mother to get Student to school and to remain in class.

8.     During testimony, Mr. Arreguin was referred to notations put on the cumulative file by Student's prior kindergarten teacher.  Under a section entitled "referrals to school services," the prior kindergarten teacher wrote "Tier I RTI."  "RTI" referred to a Response-to-Intervention model of tiered instructional processes.  The tier model was typically composed of three educational tiers, with some models using four tiers or subdividing the tiers.  Tier 1 instructional program was the same as the core reading or math curriculum.  Tier 1 intervention would normally be used to assist a student who required some small group or one-on-one instruction.  Tier 2 usually consisted of children who fell below expected benchmarks, were at some risk of academic failure, and needed more intense intervention.  Tier 3 intervention was for children at high risk for failure and often considered likely to be identified for special education.  Mr. Arreguin did not know what tier model or the areas of the curriculum to which the prior kindergarten teacher was referring.
Mr. Arreguin did not ask anyone about the RTI.

9.     During his testimony, Mr. Arreguin reviewed Student's Individual Student Report, which included a section entitled "DIBELS Next Benchmark – Kindergarten (2012-2013)."  DIBELS, Dynamic Indicators of Basic Early Literacy Skills, was a series of short tests that assessed early childhood literacy.  Mr. Arreguin noted that District had not used the DIBELS since 2013, that the third trimester scores were not on the report he was shown, and that he was confident he had done the test with Student.  The test was a one-on-one oral assessment of Student by the teacher consisting of words, sentences, and syllables.

10.    At the beginning of kindergarten, Student's literacy scores were average preschool level.  In the middle of year, the composite scores showed that there had not been growth.  Mr. Arreguin thought this may have been a result of Student's poor attendance.  Mr. Arreguin did not understand what some of the prior kindergarten teacher's scores meant.  These scores did not provide reliable insight into Student's abilities.

11.    Mr. Arreguin said that if a child received poor scores on the early literacy

4

skills tests, he would start some interventions, such as preteaching or reteaching, in a small group or individually.  He believed that this was similar to the "Tier 1 RTI" that the prior kindergarten teacher may have started.

12.    On the final report card, Student was Basic in nine academic areas consisting of language arts and math.  Student was Proficient in number sense, history/social science, science, physical education, visual arts, and music.  He demonstrated satisfactory effort and attitude in homework, citizenship, and behavior.  Mr. Arreguin commented that Student was progressing well in all areas, followed classroom rules, and was a nice boy.  Student needed to practice his rhyming, reading, and number writing.  He encouraged reading over the summer to better prepare Student for first grade.

*2013-2014 School Year: First Grade*

13.    Student attended first grade at Sierra Linda for the 2013-2014 school year. Georganna Pauley was Student's teacher; she testified at the hearing.  Ms. Pauley had been teaching first grade for almost 20 years.  Ms. Pauley demonstrated a clear recollection of her interaction with Student and Mother, often providing detailed descriptions of conversations and events.  She obviously cared about Student and was concerned about his performance in first grade.  Generally, Ms. Pauley was a credible and persuasive witness.

14.    Student's first grade class had 20 students.  Mother volunteered at the school and was on campus very often, if not daily.  Ms. Pauley talked to Mother a lot.  In the first trimester, Student had eight absences and, when at school, Mother frequently removed Student early.  In the first trimester progress report, Student was Below Basic in all three math sections.  He was Basic in the four language arts measures, history/social science, science, and physical education.  Ms. Pauley repeatedly explained to Mother that absences and early removals were negatively affecting Student's academics.  He was missing group time and tests, which affected his grades.

15.    On November 22, 2013, Ms. Pauley had a parent-teacher conference and provided Mother with a letter, formally indicating that Student was performing below grade level standards in Math.  Ms. Pauley proposed, and had already started, interventions of continuing small group support and the use of the Successmaker computer program, for improving math skills.  Mother signed the letter and acknowledged receipt.  Ms. Pauley had started Student on Successmaker earlier in the year.  Student used the program, but would not spend additional time.  His absences diminished the program's effectiveness.

16.    Student's absences increased to 18 in the second trimester.  Ms. Pauley continued working with Student one-on-one and in small groups.  Student performed best and improved academically in small groups, which were usually in the afternoon.  However, when Student was at school, Mother sometimes removed him after lunch.  Missing group time significantly contributed to Student's lack of improvement.  Early removal on Friday

caused Student to miss his weekly math tests.  The interventions had little opportunity for success because Student was absent or taken home early.

17.    When in school, Student generally appeared bored.  Student often had trouble focusing on work because he recurrently said he wanted to see Mother, who he knew was on campus.  Ms. Pauley encouraged him to wait, at least until after lunch.  When Student did see Mother, Mother usually removed him from school.  This pattern repeated throughout the year.  Mother acknowledged Ms. Pauley's concerns, but continued to keep Student home or remove him early.

18.    When in class the entire day, Student talked to friends on the playground and got some class work done.  About two or three times, Student got angry in class, as if he "just had it."  Ms. Pauley called for assistance.  The principal or outreach coordinator came and took Student for a walk or talk.  Student soon returned.  Ms. Pauley had other students with similar outbursts, who just needed some additional space or a break.  Student's angry outbursts were not a typical behavior for Student.

19.    Every morning, Ms. Pauley devoted a portion of her class to social training, helping her pupils understand their place in the community and home, their relationships with each other, and how to care for others.  Socialization was part of first grade: talking sincerely, asking to play, taking turns, looking at someone when speaking, attending, and participating in class.  Teaching these skills and characteristics was part of first grade curriculum.  This class instruction included Student, who Ms. Pauley tried to include conversationally, without singling him out.

20.    Ms. Pauley was not responsible for following up with parents regarding pupils' absences.  The school's office, administration, and outreach coordinator were responsible for maintaining records and contacting parents if the absences were excessive.  For example, Mother had to sign Student out at the front office whenever she removed him early.  Ms. Pauley repeatedly talked with Mother about how the absences were affecting Student's opportunity.

21.    Despite these numerous conversations, Mother never indicated any specific, ongoing problem that contributed to the absences.  Mother did not tell Ms. Pauley that Student was diagnosed as chronically ill, had insomnia, or was taking medication.  Mother did not explain why the absences more than doubled in the second trimester.  Ms. Pauley thought that Student and Mother had an extraordinarily close bond that made it difficult to disengage from each other.  Ms. Pauley repeatedly encouraged Mother to bring Student to school and to encourage Student to stay in school.  However, though Mother would say "yeah, we'll work at that," Student's attendance did not improve and the pattern of early withdrawal continued.

22.    Mother testified that during first grade, Student screamed and cried in the

6

morning.  He did not want to go to school because he would be bullied and was afraid. Mother said that Student was not sleeping, sometimes staying awake until 2 a.m.  Student's doctor prescribed medicine to help Student sleep, but managing the medicine so Student would sleep was difficult.  Mother claimed that Student said he was worried about school. Mother insisted that she told the school about Student's insomnia and medication.  Mother complained that the school provided no help or support.  These general contentions regarding first grade were contradicted by testimony and documentation.  Mother said that she told Ms. Pauley about the insomnia and that Student was on medication, at the parent-teacher conference; Ms. Pauley credibly testified that Mother did not.  Ms. Pauley remained perplexed all year as to why Student was regularly absent and removed early.  Ms. Pauley's parent-teacher conference and letter, proposing interventions, and Mother's signature, contradicted Mother's testimony that no one provided any help or support in first grade. Mother's testimony regarding informing Ms. Pauley and others of Student's insomnia and medication in first grade was not convincing.

23.    Susana Luna-Gamez was the Outreach Coordinator at Sierra Linda from October 2001 to September 2014, when she became the school counselor.  As the outreach coordinator, Ms. Luna worked with families regarding attendance issues.  The school's attendance policy was that the school focused on pupils who had five or more unverified absences, by meeting with parents.  Such meetings included the outreach coordinator, the school principal, and sometimes the attendance clerk.  She also arranged meetings with parents of students who had excessive excused absences.  The school considered an absence excused if a parent gave a reason, such as being sick, going to doctor, or family emergency. The school did not require verification of a pupil's illness.

24.    Ms. Luna learned of Student's frequent absences and talked to Mother. Eventually, Ms. Luna arranged for a formal meeting with her, the school principal Sally Wennes, and Mother, to inform Mother that Student was absent too much, advise Mother of the state and District attendance policies, find out how to support Student, and explain the consequences of letting absences continue.  One of the consequences was for Parents to be referred to the School Attendance Review Board, which had statutory authority to impose penalties upon parents who failed to have their children attend school, as mandated by law.  After 14 excused absences, the school principal was empowered to refer a family to the attendance review board.

25.    In preparation for the April 2, 2014 meeting, Ms. Luna prepared a form School Attendance Contract for Mother's signature, documenting her awareness of the situation and potential consequences of continued absences.  However, Mother did not appear for the meeting.  Ms. Luna called Mother, who said she was not coming in because "they were sick"; Ms. Luna made a note on the unsigned attendance contract.

26.    Mother attended a rescheduled meeting, which Ms. Luna recalled in some detail, although she was uncertain of the date.  At the meeting, Mother said that Student had

7

a bad experience in kindergarten and was not coming to school as a result.  Mother did not say what Student disliked about school.  Mother did not tell Ms. Luna and Ms. Wennes that Student had a sleeping disorder, anxiety, or was taking medication.  Mother did not say anything about her son worrying.  Ms. Luna said that she and Ms. Wennes were trying to get a sense if Student's absences were a parent or student issue.  Mother was not positive or open, did not want to participate in the meeting, and was generally resistant.  Ms. Luna did not suspect that Student might have a disability.  As a matter of her standard practice, Ms. Luna would have explained to Mother the possible referral to the attendance review board.  Mother did not sign a School Attendance Contract.  District did not document the attendance meeting.

27.     Ms. Wennes testified at the hearing.  She was the principal of Sierra Linda from October 2010 through March 2016, when she left to become principal in another District school.  She worked for District for seven years and had been an elementary school principal for 15 years.  Ms. Wennes had multiple meetings and discussions with Mother regarding attendance beginning in Student's first grade until Ms. Wennes left Sierra Linda.  Whenever Ms. Wennes discussed attendance, Mother became resistant, provided very little information, and quickly ended the conversation.  Mother claimed that she showed Ms. Wennes Student's bottle of medication, but Ms. Wennes denied this.  Mother did not tell Ms. Wennes that Student had insomnia and was taking medication.

28.     Ms. Wennes acknowledged that Student's first grade absences were excessive and that she could have referred Mother to the attendance review board process.  Ms. Wennes typically tried to figure out why a student was absent and offered services or interventions.  But she did not recall any services or interventions involving Student.

29.     For the remainder of the school year, Ms. Luna regularly communicated with Mother regarding absenteeism.  Mother never told her Student's absences were caused by insomnia, a sleeping disorder, or that he was taking medication.  Student's attendance improved slightly in the third trimester, down to 15 absences.  Ms. Luna was not aware of the frequency of Mother's early removals of Student, which continued for the remainder of the year.  District did not have another meeting with Mother during the first grade school year.

30.     Student's grades did not significantly improve over the year.  Student learned and made progress, knowing more each trimester, but he was not at grade level.  Ms. Pauley did not believe Student's poor performance was caused by a disability or that Student was a child who needed special education.

31.     Ms. Pauley believed her teaching experience enabled her to identify children who were learning or emotionally disabled.  She had never received any specific training in identifying and referring pupils for special education assessment, although she had students who were referred for assessment or were in special education.  At Sierra Linda, a teacher assisted a struggling student with one-on-on or group instruction.  Then, a pupil could be

referred to a Coordinated Services Team. The next level of support was a Student Success Team, which included the parent and could provide a number of interventions and supports. If the success team was proving ineffective, the pupil could be referred for special education assessment. Student was not referred to these more intensive interventions. Ms. Pauley believed the primary reason Student performed poorly was because of missed tests and instruction time and because Mother had not provided any reason for the continued absences and early removals.

32.     Student's final trimester grades were Below Basic in number sense, algebra and functions, measurement and geometry, statistics and data analysis, and mathematical reasoning. He was Basic in word analysis and vocabulary development, reading comprehension, writing, and written and oral conventions. Student was Proficient in listening and speaking. Ms. Pauley's last comments were that Student was making slow progress in reading and needed to memorize basic math facts.

33.     Student was absent 39 days for the school year. The number of absences could have resulted in a referral to the attendance review board. District did not do so.

*2014-2015 School Year: Second Grade*

34.     Student attended second grade at Sierra Linda; The first day of school was August 20, 2014. Esperanza Pascual was Student's teacher; she testified at the hearing. Ms. Pascual had been teaching second grade for almost 24 years and had been with District for 25 years.

35.     Ms. Pascual described Student as a happy boy, who fell asleep in class about once a week and had occasional angry outbursts. When awakened from sleeping, Student was irritable and not in a state to learn. Student then asked for Mother, who frequently withdrew Student early from class. Mother was very involved with Student. After taking Student to class, she usually remained to see how he was doing. Mother was always available for Student whenever he wanted to see her. On good days, Student was smiling, energetic, laughing, and sharing.

36.     Student had angry outbursts five or six times over the school year, enough to cause Ms. Pascual concern. Student got upset, hit his desk, picked his desk up and slammed it down on one occasion, and pulled his books out of his desk. He was unable to do school work and Ms. Pascual referred him to the school office, where Mother met and took him home. Student was chronically absent, more than 20 percent the first trimester and about 30 percent in the second and third trimesters.

37.     The absences, early withdrawals, sleeping, and angry outbursts caused Student to miss a substantial amount of instruction and tests. Ms. Pascual believed that Student was capable, but he could not learn if he was not emotionally or physically able to participate in

9

class or was absent from class.  Ms. Pascual explained this to Mother, with whom she spoke almost daily.

38.    Ms. Pascual came to believe within a month or so after school started that Student's absences, lethargy, and sleeping in class were caused by his insomnia.  Ms. Pascual had reason to suspect that Student had a disability as of September 30, 2014.

39.    Mother told Ms. Pascual that Student had insomnia, that she struggled to get Student to sleep, and Student often was not able to wake up and come to school.  This also caused Student to be sleepy and irritable when at school.  Shortly before the Thanksgiving break, Mother said she was taking Student to a doctor for help with the insomnia.  Ms. Pascual did not know what the doctor determined.  Ms. Pascual believed that Student's absences, lethargy, and sleeping in class were caused by his insomnia.  Neither Student nor District provided clear, unambiguous evidence of when Mother told Ms. Pascual that Student had insomnia, which caused the absences and early removals, but it was between the first day of school on August 20, 2014 and the Thanksgiving break.

40.    Over the years, Ms. Pascual had students who had been assessed and were receiving special education services.  She did not believe that Student had a disability because the absences, sleepiness, and irritability were caused by a medical issue.  If she believed Student had an academic problem, she would have referred Student to the success team process as a first step.  Medical issues were not referred to a student success team.  She did not believe that she could directly refer a pupil for special education assessment.

41.    Ms. Luna became Sierra Linda's school counselor at the beginning of the 2014-2015 school year.  She possessed a master's degree in school counseling and held a pupil personnel services credential.  She knew Mother from the previous year when Ms. Luna was the outreach coordinator involved in Student's attendance issue.

42.    In second grade, Mother told Ms. Luna that Student was being bullied at school and did not know how to make friends or handle himself socially.  Ms. Luna offered counseling and social skills classes to support Student; Mother agreed.

43.    Mother did not tell Ms. Luna that Student had insomnia, anxiety, or that he did not like coming to school.  Ms. Luna recalled being told by a teacher that Student fell asleep in class, but it did not appear to happen often.

44.    Ms. Pascual told Ms. Luna about Student's poor academics caused by poor attendance, early withdrawal (often within the first hour of school), and not being fully alert.  Ms. Luna did not recall this and did not address these issues in her counseling of Student.

45.    Before the social skills group started, Ms. Luna provided Student with four or five individual counseling sessions.  Student did not tell Ms. Luna that he was being bullied

10

or that he was anxious.  In the individual sessions, Ms. Luna determined how Student was doing and if he was upset.  Student never cried during the sessions.  He did not say he had had trouble sleeping or disliked school.

46.     The social skills group started in late fall and met on Fridays for 10 weeks. The group did not meet over the holidays.  Student only attended four or five group sessions because of absences or early withdrawals.  Ms. Luna tried to follow-up with Student, holding individual sessions to make up for the lost time with the group.  The individual sessions were on an "ad hoc" basis; there was no schedule.  Ms. Luna did not provide any other services to Student during second grade.  The social skills group sessions had sign-in sheets, which Ms. Luna destroyed after a year.  Ms. Luna and District did not have any record of Student's individual counseling sessions, his participation in the social skills class, or his progress.

47.     Mother recalled three meetings with Ms. Wennes during second grade.  The first meeting concerned Student having a difficult day at school.  The second meeting was for attendance.  Mother was shown the computer attendance record, reflecting the excess absences.  Mother told them she had provided the school with notes from the doctor regarding Student's insomnia and medication.  However, Student never produced evidence of any writings from Student's doctor before the filing of the due process request.

48.     Mother attended a third meeting regarding attendance at the end of the school year.  By this time, Ms. Wennes knew or should have known about Student's insomnia, which Mother claimed was a primary cause for his absences and early removal.  Mother asked for help in getting Student in school.  Ms. Wennes suggested paring Student with one of his good friends, next year, thus encouraging Student to come and stay in school.  Mother did not receive an attendance contract and was not told about the attendance review board.

49.     Ms. Pascual believed that Student showed some progress by the end of second grade, except in mathematic standards, where Student's scores lowered as the year progressed.  Overall, Student ended the year low.  For the 10 reading standards, he was proficient in three and below proficient for the remaining seven standards.  Student was proficient in science, progressing toward proficient in history/social science and the two physical education standards, and exceeded standards in visual arts.  In math, Student ended the year with grades of proficient in one standard, below proficient in eight standards, and minimally proficient in the remaining nine standards.  Ms. Pascual believed Student had potential, but his absences substantially contributed to his low scores.

50.     Student was absent 55 days in second grade.  At the end of the year, Ms. Pascual wrote on Student's cumulative education file that Student had many health issues, missed many school days, and became aggressive and defiant.  Ms. Pascual, Ms. Wennes, and Ms. Luna did not inform Mother of her special education rights.

11

*2015-2016 School Year: Third Grade*

51.    Student attended Sierra Linda for the 2015-2016 school year, attending a third grade class of 27 students.  Natalie Gonzales was Student's teacher; she testified at the hearing.  Ms. Gonzales had been a District teacher for 15 years, taught third grade for 10 years, and was at Sierra Linda for two years.  She had an excellent recall of Student's third grade year, answering questions in a forthright and sincere manner.  She demonstrated genuine concern for Student and appeared to have a good relationship with Mother.  Ms. Gonzales was a credible and persuasive witness.

52.    Ms. Gonzales described Student as intelligent, kind, and a good friend to his classmates.  He was a good reader, but struggled with math.  She experienced very few behavior issues with Student, who was generally honest, respectful, and helpful.

53.    Mother brought Student to the classroom door, carrying his backpack.  This was unusual; parents typically dropped their children off at the front of the school.  As a consequence, Student had great difficulty separating from Mother.  Student would continue to stare at Mother, reaching for her, as he came into class.  Ms. Gonzales urged Mother to leave by letting her know that Student would be fine.  Ms. Gonzales noted on Student's cumulative education file that Student had separation issues with Mother.

54.    The first trimester, Student was absent 12 days.  Also, for the first two months of the school year, Mother picked Student up early everyday he was in school, because she needed to pick up a sibling at another school.  As a result, Student missed the special intense reading instruction which took place at the end of each school day. Additionally, Mother often withdrew Student from school early, three or more times a week, at about lunchtime.  Student therefore missed math instruction, which was after lunch.  Because of excessive absences and early withdrawals from school, Student had a hard time connecting with the material.  Student then was frustrated or anxious and did not want to remain in class.

55.    Ms. Gonzales believed the lack of attendance was alarming and compromised Student's ability to learn.  Mother told Ms. Gonzales that the absences were caused by insomnia and that Student became anxious in the morning and did not want to come to school.  Student was sometimes tired in class and became anxious about not being with Mother.  However, Ms. Gonzales sensed that Student often simply did not want to come to school and Mother allowed Student to stay home.  On a number of occasions, Mother acknowledged that she needed to "back off" and let Student go, giving him more independence.  In September or early October 2016, Ms. Gonzales made a referral for attendance by emailing the outreach coordinator Elva Serrato and copying Ms. Wennes.  She also informed them that Mother said Student had insomnia, became anxious, and then resisted coming to school.

56.    Ms. Gonzales participated in two attendance meetings with Mother,

Ms. Serrato, and Ms. Wennes.  Ms. Serrato and Ms. Wennes held two additional meetings with Mother.  On December 11, 2015, Mother participated in an attendance meeting that included Ms. Serrato, Ms. Wennes, and Ms. Gonzales.  Mother was provided a proposed School Attendance Contract for the 2015-2016 school year, upon which the outreach coordinator wrote a note that Mother said the absences were caused by a medical reason but this "was not by medical diagnosis."  Mother was given a medical release form, which would have allowed District to contact Student's doctor.  Mother took the contract and release, to return by December 14, 2015.  Mother did not return a signed contract or release.

57.     For a short time in January 2016, Student was in class four or five days a week.  Student was less emotional when he was consistently in school.  However, Student soon returned to frequent absences and early withdrawals.

58.     Ms. Gonzales did not believe Student had a learning disability.  If she had, she would have made a referral to the coordinated services team, who would then decide if Student should be referred to a student success team.  She thought Student's academic challenges were caused by his lack of attendance; he could not learn if he was not in school.  Her goal was to get Student to come and remain in school.  At hearing, she acknowledged that she had since become better acquainted with the Sierra Linda coordinated services team process and, in hindsight, might have also referred Student because of his attendance.

59.     Ms. Gonzales had no specific training in special education assessment referral.  She believed that she could not make a referral for assessment without first going through the coordinated services team and student success team.  She previously had special education students in her class who received speech and language services.  Ms. Gonzales had never directly referred a child for special education assessment.

60.     For language arts standards, Student progressed from first trimester grades of five C's and two B's, ending the year with three A's in phonics and word recognition, speaking and listening, and language, three B's in reading fluency, literature, informational text, and one C in writing.  He received final grades of B in science and history/social standards.  Student remained well below standards in math throughout the year, with final grades of two C's in number sense and fractions and three D's in operations and algebraic thinking, knowing math facts, and geometry.  His effort increased from satisfactory to excellent in all areas.  He needed to improve in completing and returning homework and classwork, was satisfactory for writing legibly and taking responsibility for learning and behavior, and excellent in all seven remaining measures for behavior.

61.     Student was absent 47 days in third grade.  Ms. Gonzales thought the school referred Mother to the attendance review board, but District did not do so.

*2016-2017 School Year: Fourth Grade*

62.    Carmen Serrano was Sierra Linda's new school principal in the 2016-2017 school year.  She arranged for a meeting with Mother and Student about a week before the start of school.  Mother told Ms. Serrano about Student's sleep disorder, anxiety, and medication, which caused a lot of absences.  Ms. Serrano said she would invest time and build a relationship with Student.  Mother felt that Ms. Serrano made a difference for Student at school.

63.    Student's fourth grade teacher was Melissa Turner, who testified at the hearing.  Ms. Turner had been teaching for 31 years, has had pupils who were assessed for special education, and students who were receiving special education services.  She was Student's teacher at the time of hearing, having met him when school started in August 2016.  She had not received specific training in identifying students for special education assessment, although she believed her decades of experienced enabled her to identify children suspected of a disability.

64.    Ms. Turner had spoken to Ms. Gonzales and was aware that absences harmed Student's academic performance.  Ms. Turner spoke to Mother, who told her that Student had issues with anxiety and insomnia.  Therefore, Ms. Turner did not push Student to produce, but encouraged him to stay and work in class.  Student said he was anxious only a few times, in response to Ms. Turner's offer to help him with math.  Student occasionally appeared tired in class, two to three times a month.  Ms. Turner discussed the absences with Ms. Serrano, noting Mother's reference to Student's anxiety and insomnia.  Also, early in the school year, Mother told Ms. Luna for the first time that Student was taking prescription medication to help him sleep.

65.    On September 22, 2016, Student filed his request for due process.

66.    Mother was not cooperative in scheduling a parent-teacher meeting with Ms. Turner.  Finally, Ms. Turner had a meeting with Mother on October 11, 2016, with Ms. Serrano and Ms. Luna.  Mother brought a one-paragraph October 6, 2016 letter from Sam K. Hansuvadha, M.D., which stated that Student had been diagnosed with insomnia since June 2012 and anxiety disorder on February 20, 2015.  Dr. Hansuvadha also said Student had "either claustrophobia or school phobia on May 27, 2016."  Student was taking 0.1 mg of Clonidine at bedtime and was waiting to be evaluated by a psychiatrist.

NOVEMBER 3, 2016 SECTION 504[4] MEETING AND SERVICE PLAN

---

[4]  Pupils may qualify for service plans under Section 504 of the Rehabilitation Act of 1973, which guarantees certain rights to disabled people, including students in public schools.  The Office of Administrative Hearings has no jurisdiction over Section 504 claims.

67.     District convened a Section 504 meeting on November 3, 2016. Attending were: Mother; Student's attorney Janine Steel; Director of Special Education Services, Amelia Sugden; school psychologist, Rachel Boxer; District's attorney, Leah Smith (via telephone); and Ms. Serrano. The attendees reviewed Dr. Hansubadha's letter and discussed how Student's diagnoses affected his education. Student was absent, did not stay in class, did not complete work, could not catch up with missed work, would become stressed and anxious, and struggled managing his fatigue.

68.     The team found Student eligible under Section 504 and developed a Section 504 Service Plan, based on identified areas of difficulty. To assist in completing work and catching up on missed work, Student's classwork would be modified; incomplete classwork would be sent home; Student would use a daily planner; and District would provide a home hospital teacher, two hours per week. To encourage Student to maintain time in class, Student could use a "break card" and request to be referred to the counselor, school psychologist, or principal. The counselor and Parent would only employ positive behavior support and communication, with a log. To help Student manage his stress or anxiety, he could use a stress ball or silly putty; use a break card; and attend school counseling, 30 minutes a week. The school counselor would check Student in and out of school, daily, r would check in with Mother at school gate every morning to see how Student was doing; and the school counselor would talk with Student every afternoon. To help Student manage fatigue, he could use a "rest card," which gave Student 10 to 15 minutes to rest; and could go to the school nurse.

69.     Mother signed and agreed to the Section 504 Service Plan. Mother also signed an assessment plan for behavior, to be conducted by the Ventura County Behavioral Health department.

IMPLEMENTATION OF SECTION 504 SERVICE PLAN

70.     Student checked-in with Ms. Luna every morning when he came to school. Ms. Luna also saw Student at least twice per week, at the weekly counseling sessions and, informally, on an as needed basis.

71.     In the mornings, Ms. Luna asked Student how he was doing. Student said

---

Student's Section 504 service plan is considered herein for the sole purpose of evaluating appropriate compensatory remedies that may be awarded by this decision.

things like he was "mad at school," worried about natural disasters (like a meteorite hitting the earth), or frightened by something he saw on television (horror movies).  Student talked about his concerns for a while.  Ms. Luna and he then discussed ways to overcome his worries, anger, or fears. Student typically moved on to his class.

72.     Student was usually quiet in class, but was talkative with his friends. Ms. Turner described Student as intelligent and creative, but apprehensive to instruction. Student did not like to do work that required him to put forth a lot of effort or work.  He became anxious, sometimes worrying about current events.  In these situations, Student used his break card, and went to the office or counselor.

73.     Overall, Student used the break cards appropriately, though occasionally he used them to avoid work he did not want to do.  Sometimes when Student pulled out a break card, Ms. Turner encouraged Student to wait until after the instruction and Student agreed. Generally, the break cards helped Student better regulate, with the aim of keeping him in school.

STUDENT'S INITIAL PSYCHOEDUCATIONAL ASSESSMENT[5]

74.     School psychologist Jenny Ponzuric prepared an initial, 43-page Psychoeducational Assessment Report of Student, dated December 13, 2016.[6]  District contracted with Ms. Ponzuric to conduct Student's psychoeducational assessment.  Ms. Ponzuric had never previously worked with District or Student.  Ms. Ponzuric had a 1997 bachelor's degree and a 1999 master's degree in psychology.  She was a licensed educational psychologist and held California pupil personnel services and administrative services credentials.  In 2007, she obtained a certificate in neuropsychology from Texan Women's University.  Ms. Ponzuric was self-employed for three years and, previously, was a school psychologist with Conejo Valley Unified School District for 13 years.  She had conducted between 700 and 750 psychoeducational assessments.  Ms. Ponzuric's education and experience qualified her to conduct Student's assessment and prepare the report.

75.     Ms. Ponzuric reviewed available health and developmental records, Student's cumulative educational record, the Section 504 plan, and Student's release logs from

---

[5] Student's psychoeducational assessment report and individualized educational program are reviewed for the sole purpose of evaluating appropriate compensatory remedies that may be awarded by this decision.  Both parties affirmed on the record that they are not seeking a determination of whether District's assessment and IEP provided Student with a FAPE.

[6] Drafts of the report were presented at Student's November 30, 2016 initial IEP team meeting and the finalized, updated report was presented at the second IEP team meeting on December 14, 2016.

Sierra Linda.  She interviewed Student and Mother and obtained input from Student's teacher.  Ms. Ponzuric observed Student in the classroom, during physical education class, and throughout the testing sessions, where Student was comfortable doing tasks but uncomfortable sharing information.  She administered or conducted the following standardized tests:  the Kaufman Assessment Battery for Children – 2nd edition; Wechsler Intelligence Scales for Children – 5th Edition; Comprehensive Test of Phonological Processing – 2nd Edition; Beery-Buktenica Developmental Test of Visual-Motor Integration – 6th Edition; Sentence Completion Task; and the Kinetic School Drawing.[7]

76.    Special education teacher Courtney Saldana conducted the achievement tests, pathologist Cindy Evans did the speech and language evaluation, school nurse Jennifer Curry contributed the health evaluation, and Ventura County Behavioral clinician Cynthia Kravets conducted an intensive social emotional services assessment report.  Ms. Ponzuric included these contributions in her final assessment report.

77.    Ms. Ponzuric summarized her findings, noting that the ongoing and primary concern was Student's attendance.  Absences, tardies, and early removal from school meant Student had missed about 25 percent of the learning experiences in the school setting since kindergarten.  Student missed at least two afternoons a week during fourth grade.

78.    Student demonstrated many processing strengths or areas within expected range and had intact thinking and problem solving skills, with and without the use of language.  He had average speed of processing for tasks that involved paper and pencil, as well as the fluency of his verbal skills.  Student had some difficulties in short-term verbal memory and some aspects of auditory processing (phonological processing, specifically).

79.    Academically, Student had average reading decoding, reading fluency, and reading comprehension skills. His written language skills were in the average range.  Though Student showed average math problem solving skills, he had evident difficulties with math calculations, with scores below the expected level.  Ms. Ponzuric noted that Student's lower math scores were consistent with informal assessment results and his academic history.

80.    Ms. Ponzuric found that Student had difficulties with anxiety that caused him to be absent or leave school early.  Ms. Ponzuric's professional opinion was that the absences and early removals created a cycle, leading to greater anxiety.  Student would miss class instruction and work, become anxious when he went to school because he did not understand, would then be removed early or kept home, and would miss more instruction.  Therefore, addressing Student's attendance was foundational to addressing his academics.

---

[7]  Student's counsel stipulated at hearing that Student was not claiming the psychoeducational assessment's standardized tests did not comply with test protocols or were otherwise not legally appropriate.

81.     Ms. Kravets found diagnoses of dysthymia, generalized anxiety disorder, and insomnia related to anxiety.  Ms. Kravets concluded that Student had insight into what was triggering his anxiety, but at that time, he did not have the coping strategies to calm himself.

82.     Ms. Ponzuric considered various special education eligibilities.   She concluded that Student was not eligible under the classification of specific learning disability. Also, referring to the speech pathologist's findings, Student did not meet the eligibility criteria for speech and language impairment because Student's language abilities were found to be at the level of his peers and did not adversely impact his ability to be understood and express himself in the school setting.

83.     Ms. Ponzuric found Student met the criteria for other health impairment eligibility.  Student's insomnia caused "limited alertness" on some days.  His anxiety impacted his vitality and alertness on the days he attended school.  These also kept him from consistently attending school, which adversely impacted his academic performance.

84.     Ms. Ponzuric found that Student met the eligibility criteria as a student with an emotional disturbance.  Student exhibited three of the five characteristics used in evaluating emotional disturbance eligibility.  Ms. Ponzuric noted Student had demonstrated anxious behaviors on a consistent basis, which impacted his educational performance because he had not been able to regularly attend school since kindergarten.  Ms. Ponzuric concluded her report by suggesting some accommodations and strategies to assist Student.

STUDENT'S INITIAL INDIVIDUALIZED EDUCATION PROGRAM MEETINGS

85.     District convened Student's initial individualized education program team meetings on November 30, 2016, and December 14, 2016.  Attendees at both meetings were: Mother; attorney Ms. Steel; Manager of Special Education, Nadia Villapudua; resource specialist program teacher, Courtney Saldana; Ms. Evans; Ms. Ponzuric; Ms. Curry; Ms. Kravets, attorney Ms. Smith (via telephone); Ms. Luna; and Ms. Serrano.

86.     The team reviewed the psychoeducational assessment and discussed special education eligibility.  The team found Student primarily eligible as a student with emotional disturbance, with a secondary eligibility of other health impairment.  The team agreed upon two goals for math, two goals for social-emotional functioning, a vocational goal, and a goal in writing.

87.     The IEP team continued the accommodations provided by the Section 504 Service Plan.  Additional accommodations included testing in a small group, preferential seating, access to a multiplication chart or calculator, an extra set of books at home, pairing of visual with verbal directions, and the use of self-monitoring strategies.

88.     The IEP also had a positive behavior intervention plan, which identified

Student's behavior that interfered with his learning (problem behavior) and caused Student not to regularly attend school.  Irregular attendance meant missed instructional time.  Consequently, Student would then not understand a lesson and become anxious, causing him to escape the situation by not coming to school or leaving early.  Positive replacement behaviors included continued use of the break cards, ability to see the school counselor, and allowing Student to go to a safe, comfortable designated area on the school campus.  The case manager was to develop a list of appropriate coping strategies with the other service providers.  Whenever Student worked to completion on a task, he would receive positive reinforcement by the general education teacher.  The behavior plan stated that positive reinforcement of work completion was also to be provided Parent before and after school hours.  Ms. Kravets told the team that Ventura County Behavioral Health could provide child focused cognitive behavior therapy and break down interventions based on Student's individual needs, but cognitive behavior therapy was not further discussed.

89.    Special education services included specialized academic instruction in math for 160 minutes per week, four times a week, where the resource specialist teacher would pull Student out of class for small group instruction.  Student also received 200 minutes a week of specialized academic instruction in writing, by the resource specialist in a small group, with 50 minutes a week reserved of individual support of Student's vocational and social/emotional goals.  Those providing specialized academic instruction were to consult and collaborate on a weekly basis, for a minimum of 30 minutes a month.  The team agreed to provide Student with two hours a week of specialized academic instruction at home by a special education teacher.  However, the IEP clearly specifies the home instruction as an interim transitional service to support Student's attendance goal as of June 2017, at which time the home instruction services would be reevaluated, and was not intended to be a "stay-put" service after the November 2017 annual IEP meeting.

90.    A Ventura County Behavioral Health clinician would provide Student with intensive social emotional services, in the form of individual counseling, for 240 minutes a month, or a minimum of 60 minutes a week.  The county behavioral clinician had a higher level of training to serve students with mental health diagnoses and was able to provide intensive therapeutic support.  At the time of hearing, Ms. Luna had provided about 15 to 17 individual sessions with Student for the school year.  Ms. Luna also met with Student informally and had unscheduled sessions, as needed.  Ms. Luna testified that Student would benefit from additional, more consistent counseling from someone who could provide more time than a school counselor.

91.    Parents would receive a minimum of 40 minutes a month of social work services, consisting of parent education, parent training, and parent support in the form of referrals to community-based services.

92.    Ms. Ponzuric emphasized that the IEP services were designed to get Student to attend and remain in school, by decreasing his anxiety.  The two hours a week of home

19

tutoring by a special education teacher would assist Student in doing his homework, catching up on classwork, and reteaching concepts, with the intent of minimizing Student's anxiety about attending school. The specialized academic instruction at school was to assist in math and writing, helping to alleviate anxiety, and keep Student on campus. Similarly, the counseling and social services were intended to decrease Student's anxiety and provide support for Parents in increasing Student's attendance.

93.     Mother signed and agreed to the IEP, which was implemented on January 9, 2017. Mother was given the option to move Student to another fourth grade class but she decided to have Student remain in Ms. Turner's class, where Student said he was comfortable.

94.     District implemented the IEP. Student received related services of specialized academic instruction and counseling by Ms. Luna and Ventura County behavioral. Ms. Turner utilized the accommodations and the behavior intervention plan, employing interventions as needed. The special education teacher provided home tutoring, helping with classwork, homework, and keeping track of missing assignments and due dates. Ms. Turner provided a list of homework assignment to Student at the end of each day, if he was present. She also electronically sent assignments to Mother daily.

95.     Student's absences and early removals from school did not improve after implementation of the Section 504 service plan and IEP. As a consequence, Student missed instruction, class work, and related services. For example, on the day Ms. Turner testified at the hearing, Ventura County Behavioral Health went to Sierra Linda to provide therapy but Student was absent. Student was regularly missing the services that were calculated to increase his attendance. Ms. Turner and Ms. Luna had been unable to find out what occurred at home, which caused Mother not to bring Student to school. When asked, Mother sometimes said Student was upset or crying, but other times Mother said it was too hot, too windy, or too cold. When asked why not in school, Student recently said his sister was depressed and Student had to stay home to watch his sister while Mother went shopping. Mother said Student had been sick often, including a problem with a nose bleed that would not stop.

96.     Student's first trimester grades reflect his many absences and early removals. For reading, Student was far below meeting benchmarks in literature, informational text, writing, speaking and listening, not meeting benchmark in language, and striving toward meeting benchmark in phonics and word recognition. For math, Student was not meeting benchmark in operations and algebraic thinking, number sense and operation in base ten, and math facts. He was striving toward meeting benchmark in science and social studies. Ms. Turner noted Student needed improvement in taking responsibility for his own learning and behavior, staying on task and using time efficiently, listening and following directions, actively participating in class, and completing and returning homework and classwork. Student was satisfactory in legible writing, cooperating while in a group, critical thinking to

20

solve social problems, and respectful toward adults and peers.  He was excellent in the appropriate use of technology.

97.     At the time of hearing, Student had been absent about 40 days and was being removed from school early, on average two times a week.  Mother did not sign an attendance contract and District had not made a referral to the attendance review board.

*Student's Experts*

98.     Student called two experts to provide opinions regarding District's child find obligations and Student's compensatory services.  Both witnesses were highly qualified in their respective fields.  However, neither expert had assessed, observed, or met Student.  Neither had interviewed or met Mother, met any of Student's teachers or counselors, produced a report that was reviewed by Student's IEP team, or attended Student's IEP meetings.  The experts reviewed documents, only.  Nor were the experts qualified to assess the conflicting testimony at hearing, concerning what information District knew concerning Student, and when District knew it.

LOIS A. WEINBERG, PH.D.

99.     Lois A. Weinberg had been a professor at Charter College of Education, California State University-Los Angeles, Division of Special Education and Counseling, since 2002.  She held a 1969 bachelor of arts in Spanish, a 1973 master's degree in philosophy of education, and a 1978 doctorate in philosophy of education, with a minor in educational psychology, all from UCLA.  From 1985 to 2002, Dr. Weinberg was an education specialist with Mental Health Advocacy Services, Inc.  She received and participated in numerous grants and consulting roles, frequently served on boards, committees, roundtables and symposiums, and prolifically published scholarly articles, taught workshops, and presented at professional organizations for more than 35 years.

100.    Dr. Weinberg reviewed all available documentation regarding Student, including his educational records, grade reports, assessments, and IEP documents.  She prepared a report of her document review.

101.    Dr. Weinberg generally believed that Student's absences and consequential struggles in school since kindergarten, especially in math, were sufficient notice to trigger District's child find duties since at least first grade.  Her opinion would be unaffected even if District had been unaware of the reasons for Student's low attendance.  She did not discuss the legal requirements for triggering child find nor otherwise address the legal guidelines for evaluating a district's conduct in the past.

102.    Her reading of the psychoeducational assessment, especially the observations of the school psychologist and the pathologist, caused her to conclude that Student would

21

benefit from one-to-one education. She therefore recommended individual instruction, at least three time per week at home (one hour in addition to the two hours Student was provided in his IEP) and one-on-one specialized instruction in math and writing from a credentialed teacher, three time a week, as well as a paraeducator to work with Student in the classroom and keep him focused.[8]

103.    Dr. Weinberg cited research that indicated cognitive interventions for children with anxiety disorders might be helpful. Here, such therapy might enable Student to remain in the instructional setting. She suggested that such cognitive behavioral therapy include parents, since they are involved in a student's development of skills and strategies to properly evaluate and react to otherwise anxious situations.

104.    Dr. Weinberg recommended compensatory remedies be based upon the following services which Student should have been receiving for at least two years: (1) home teacher three times a week to complete his homework and to teach him the content he missed when absent because of his anxiety disorder; (2) individual instruction from a special education teacher during the school day three times per week for a total of 180 minutes for math; and (3) counseling at school, twice a week for 100 minutes total to address Student's anxiety.[9]

ANN SIMUN, PSY.D.

105.    Ann Simun was a neuropsychologist and, since 2005, was the principal at Neuropsychologist Partners, Inc., which provided neuropsychological and psychoeducational evaluations. She received a bachelor's degree in psychology from Pitzer College in 1986, a master's degree in school psychology in 1989 from California State University – Los Angeles, and her doctorate in clinical psychology from Pepperdine University in 1998. She also served as a neuropsychologist at St. Mary Medical Center from 2005 to 2009, and in a professional capacity various hospitals and clinics.

106.    Dr. Simun reviewed all available documentation regarding Student, including his educational records, grade reports, assessments, and IEP documents. She greatly relied upon Ms. Ponzuric's psychoeducational report. Dr. Simun opined that Student should have been referred to a student success team in kindergarten or first grade. She believed that the absences and loss of instructional time greatly impacted Student's academics, which were consistently below basic, especially in math. She was unaware that Student's attendance and

---

[8]  Paraeducator is defined as a school employee who works under the supervision of teachers or other professional practitioners.

[9]  Dr. Weinberg also enumerated additional services that she opined should be included in Student's current IEP in order to provide a FAPE. However, the IEP's offer of FAPE is not an issue in these proceedings.

22

class participation substantively improved when he transferred to Sierra Linda for the remainder of his kindergarten year.

107.   Dr. Simun agreed with the IEP's recommended eligibilities of emotional disturbance and other health impairment, primary and secondary, respectively.  However, Dr. Simun believed that Student's anxiety, and his continuing absences, required more intensive mental health services.  Sixty minutes a week of counseling was insufficient.

108.   Dr. Simun noted that Student's continuing absences and early removals from school strengthened his tendency to avoid school because of his anxiety.  As this cycle continued, the pattern became more intractable.  She suggested a multipronged approach that included individual counseling with a psychologist trained in anxiety disorder, and school avoidance and phobias.

109.   She also urged consideration of cognitive behavior therapy.  Cognitive therapy was the most effective means of addressing anxiety.  Student would be trained in identifying the actual, as opposed to imagined, causes of his anxiety and provided skills and techniques of responding appropriately.  Cognitive behavior therapy differed from applied behavior therapy, which focused on the behavior by gathering data, identifying antecedents, and encouraging replacement behavior.

110.   Dr. Simun recommended: an in-depth comprehensive mental health assessment, by a clinical psychologist; a functional behavior assessment to better understand how to intervene in the anxiety/absence cycle; cognitive behavior therapy, offsite; 240 minutes a month of individual counseling, onsite, in frequent short sessions of 20 minutes a week (basically what is in the IEP); and a family component that includes Parents.

111.   She believed that Mother was trying to deal with a child who became terrified and her response was to keep him safe.  Parents had not been given techniques to address Student's anxious behaviors.  Something was happening at home, before school, that was keeping Student from going to school.  Mother needed support to learn better ways of responding than merely keeping or taking him home.

LEGAL CONCLUSIONS

*Introduction – Legal Framework under the IDEA[10]*

---

[10]   Unless otherwise indicated, the legal citations in the introduction are incorporated by reference into the analysis of each issue decided below.

23

1.     This hearing was held under the Individuals with Disabilities Education Act (IDEA), its regulations, and California statutes and regulations intended to implement it. (20 U.S.C. § 1400 et seq.; 34 C.F.R. § 300.1 (2006)[11] et seq.; Ed. Code, § 56000 et seq.; Cal. Code Regs., tit. 5, § 3000 et seq.)  The main purposes of the IDEA are:  (1) to ensure that all children with disabilities have available to them a free appropriate public education (FAPE) that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living, and (2) to ensure that the rights of children with disabilities and their parents are protected.  (20 U.S.C. § 1400(d)(1); See Ed. Code, § 56000, subd. (a).)

2.     A FAPE means special education and related services that are available to an eligible child at no charge to the parent or guardian, meet state educational standards, and conform to the child's individualized education program (IEP).  (20 U.S.C. § 1401(9); 34 C.F.R. § 300.17; Cal. Code Regs., tit. 5, § 3001, subd. (p).)  "Special education" is instruction specially designed to meet the unique needs of a child with a disability. (20 U.S.C. § 1401(29); 34 C.F.R. § 300.39; Ed. Code, § 56031.)  "Related services" are transportation and other developmental, corrective and supportive services that are required to assist the child in benefiting from special education.  (20 U.S.C. § 1401(26); 34 C.F.R. § 300.34; Ed. Code, § 56363, subd. (a) [In California, related services are also called designated instruction and services].)  In general, an IEP is a written statement for each child with a disability that is developed under the IDEA's procedures with the participation of parents and school personnel that describes the child's needs, academic and functional goals related to those needs, and a statement of the special education, related services, and program modifications and accommodations that will be provided for the child to advance in attaining the goals, make progress in the general education curriculum, and participate in education with disabled and non-disabled peers.  (20 U.S.C. § 1401(14), 1414(d)(1)(A); Ed. Code, §§ 56032, 56345, subd. (a).)

3.     In *Board of Education of the Hendrick Hudson Central School Dist. v. Rowley* (1982) 458 U.S. 176, 201 [102 S.Ct. 3034, 73 L.Ed.2d 690] ("*Rowley*"), the Supreme Court held that "the 'basic floor of opportunity' provided by the [IDEA] consists of access to specialized instruction and related services which are individually designed to provide educational benefit to" a child with special needs.  *Rowley* expressly rejected an interpretation of the IDEA that would require a school district to "maximize the potential" of each special needs child "commensurate with the opportunity provided" to typically developing peers. (*Id*. at p. 200.) Instead, *Rowley* interpreted the FAPE requirement of the IDEA as being met when a child receives access to an education that is reasonably calculated to "confer some educational benefit" upon the child. (*Id.* at pp. 200, 203-204.) The Ninth Circuit Court of Appeals has held that despite legislative changes to special education laws since Rowley, Congress has not changed the definition of a FAPE articulated by the Supreme

---

[11]   All subsequent references to the Code of Federal Regulations are to the 2006 version.

Court in that case. (*J.L. v. Mercer Island School Dist.* (9th Cir. 2010) 592 F.3d 938, 950 [In enacting the IDEA 1997, Congress was presumed to be aware of the Rowley standard and could have expressly changed it if it desired to do so.].)  Although sometimes described in Ninth Circuit cases as "educational benefit," "some educational benefit" or "meaningful educational benefit," all of these phrases mean the *Rowley* standard, which should be applied to determine whether an individual child was provided a FAPE. (*Id*. at p. 951, fn. 10.)  In a recent unanimous decision, the United States Supreme Court also declined to interpret the FAPE provision in a manner that was at odds with the *Rowley* court's analysis, and clarified FAPE as "markedly more demanding than the 'merely more than the de minimus test.'" (*Endrew F. v. Douglas School Dist. RE-1* (2017) 580 U.S.____ [137 S.Ct. 988, 1000] (*Endrew F.*).)  The Supreme Court in *Endrew F.* stated that school districts must "offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." (*Id*. at p. 1002.)

4.     The IDEA affords parents and local educational agencies the procedural protection of an impartial due process hearing with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a FAPE to the child.  (20 U.S.C. § 1415(b)(6) & (f); 34 C.F.R. § 300.511; Ed. Code, §§ 56501, 56502, 56505; Cal. Code Regs., tit. 5, § 3082.)  The party requesting the hearing is limited to the issues alleged in the complaint, unless the other party consents.  (20 U.S.C. § 1415(f)(3)(B); Ed. Code, § 56502, subd. (i).)  Subject to limited exceptions, a request for a due process hearing must be filed within two years from the date the party initiating the request knew or had reason to know of the facts underlying the basis for the request. (20 U.S.C. § 1415(f)(3)(C), (D); Ed. Code, § 56505, subd. (*l*).)  At the hearing, the party filing the complaint has the burden of persuasion by a preponderance of the evidence. (*Schaffer v. Weast* (2005) 546 U.S. 49, 56-62 [126 S.Ct. 528, 163 L.Ed.2d 387]; see 20 U.S.C. § 1415(i)(2)(C)(iii) [standard of review for IDEA administrative hearing decision is preponderance of the evidence].)  Here, Student carries the burden of persuasion.

*Issue 1:  Child Find*

5.     Student alleges that District failed to meet its child find obligation by not evaluating Student in all areas of suspected disability, since August 2013.  Generally, Student contends District's child find duties were triggered at the beginning of first grade because District was aware that his chronic absenteeism was caused by a sleep disorder and anxiety. District asserts that Student's academic struggles were caused by unexplained chronic absenteeism, which was a consequence of Mother's willingness to allow Student to remain at home or leave school early.  Mother did not transparently or consistently inform District personnel of a reason for Student's poor attendance until October 2016, when she provided a letter from Student's doctor.  Thus, District personnel had no reason to suspect Student had a disability needing special education services.  As discussed below, Student met his burden of proof that District's child find duty was triggered, but not before September 30, 2014.

LAW RELATED TO CHILD FIND DUTY

6.      The IDEA places an affirmative, ongoing duty on the state and school districts to identify, locate, and evaluate all children with disabilities residing in the state who are in need of special education and related services.  (20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.111(a).)  This duty is commonly referred to as "child find."  California law specifically incorporates child find in Education Code section 56301, subdivision (a).

7.      A school district's child find obligation toward a specific child is triggered when there is knowledge of, or reason to suspect, a disability, and reason to suspect that special education services may be needed to address that disability.  (*Dept. of Education, State of Hawaii v. Cari Rae S.*  (D. Hawaii 2001) 158 F.Supp. 2d 1190, 1194 ("*Cari Rae S.*").)  The threshold for suspecting that a child has a disability is relatively low.  (*Id*. at p. 1195.)  A school district's appropriate inquiry is whether the child should be referred for an evaluation, not whether the child actually qualifies for services.  (*Ibid.*)[12]  The actions of a school district with respect to whether it had knowledge of, or reason to suspect, a disability, must be evaluated in light of information that the district knew, or had reason to know, at the relevant time.  It is not based upon hindsight.  (See *Adams v. State of Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149 (citing *Fuhrmann v. East Hanover Bd. of Educ.* (3rd Cir. 1993) 993 F.2d 1031, 1041).)

8.      For purposes of evaluating a child for special education eligibility, the district must ensure that "the child is assessed in all areas of suspected disability."  (20 U.S.C. § 1414(b)(3)(B); Ed. Code, § 56320, subd. (f).)  The determination of what tests are required is made based on information known at the time.  (See *Vasheresse v. Laguna Salada Union School Dist.* (N.D. Cal. 2001) 211 F.Supp.2d 1150, 1157–1158 [assessment adequate despite not including speech/language testing where concern prompting assessment was deficit in reading skills].)  A school district is also required to ensure that the evaluation is sufficiently comprehensive to identify all the child's needs for special education and related services whether or not commonly linked to the disability category in which the child has been classified.  (34 C.F.R. § 300.304(c)(6).)

ANALYSIS OF CHILD FIND ISSUE

9.      Student was a bright, generally sweet and respectful child.  Student had a difficult experience in kindergarten during 2012-2013, at Emilie Ritchen Elementary School.  Mother felt the kindergarten teacher was mean-spirited and abusive, publically ridiculing

---

[12]  In a footnote in an unpublished decision, the Ninth Circuit Court of Appeals noted that it has not yet articulated a test for determining when the child find obligation is triggered.  (*G.M. ex. rel. G.M. v. Saddleback Valley Unified Sch. Dist.* (9th Cir. 2014) 583 Fed.Appx. 702, 703, fn. 1.)

26

Student.  Mother started to keep Student home, or remove him early from class, because Student did not want to be in school. While at Ritchen, Student was absent 30 days and tardy 11 times.

10. In May 2013, Student transferred to Sierra Linda Elementary School.  Student finished the remaining five weeks of kindergarten in Mr. Arreguin's class.  Mr. Arreguin persuaded Mother to bring Student to school each day, and let him stay, to see how he would do.  Mother confirmed that Student did well and brought Student to school every day for the remainder of the year, except one day.  Mother was appreciative and thanked Mr. Arreguin. Student was happy, not tired, adjusted to the new class, worked on assignments, was responsive to instruction, participated in small groups, and made friends.  At no time did Mother indicate that Student's absences at Ritchen were for any reason other than her displeasure with the teacher.

11. Student argues the first kindergarten teacher's note that Student received "Tier I RTI" intervention put District on notice of Student's need for assessment.  However, District convincingly demonstrated that such intervention was for core curriculum, perhaps consisting of preteaching or reteaching, in a small group or individually.  Such intervention was not for pupils at risk of academic failure.  Mr. Arreguin viewed Student's difficulty with math as a consequence of his many absences at Ritchen.  The Tier I intervention did not indicate Student was in need of assessment and Mr. Arreguin did not have reason to suspect Student had a disability and needed assessment.  Student finished kindergarten with excellent attendance, good academic performance, and responsive class participation.

12. Student started first grade in August 2013.  Ms. Pauley regularly talked to Mother, especially about how Student's repeated absences and early removals from school negatively affected Student's academics.  This was especially true in math, where Student struggled with addition and subtraction.  Mother was on campus daily, often volunteering.

13. Mother said she told Ms. Pauley and others at school that Student was absent because he had insomnia and was taking medication, had asked for help, and no one offered assistance.  However, Mother's contention in this regard was contradicted by others' testimony and unsupported by additional evidence.  Contrary to Mother's assertion that no one offered to help, Ms. Pauley informed Mother at the November 2013 parent-teacher conference that Student was below standards in math and outlined the interventions she was using to assist Student.  Mother acknowledged in writing that Student was receiving the interventions.  Ms. Pauley was convincing in her testimony that Mother never mentioned insomnia, a sleep disorder, or medication at the meeting.  As Student's absences and early removals increased over the year, Mother never indicated any specific, ongoing problem that contributed to the absences.

14. Ms. Luna arranged a formal attendance meeting with Mother.  Mother failed to appear for the first meeting, saying "they were sick."  Mother appeared at a rescheduled

27

meeting with Ms. Luna and Ms. Wennes. Mother was resistant, was not open to inquiry, and did not want to be at the meeting. Ms. Luna demonstrated a good recollection of the attendance meeting, recalling that Mother did not say Student had a sleeping disorder, insomnia, anxiety, or was taking medication. This was confirmed by Ms. Wennes, who noted that Mother quickly cut short any conversation regarding Student's attendance.

15.     Ms. Pauley and Ms. Luna continued to regularly communicate with Mother regarding absenteeism for the remainder of the year and Mother never said Student's absences were caused by insomnia, a sleeping disorder, or medication. Ms. Pauley, Ms. Luna, and Ms. Wennes persuasively testified that Student's absences and early removals remained a mystery throughout the year.

16.     Student refers to District's December 2016 psychoeducational assessment as conclusively demonstrating that District's child find duties should have been triggered by first grade. Ms. Ponzuric stated that Student had exhibited behavior that impacted his educational performance since kindergarten. However, in evaluating whether the child find duty was triggered, District's actions with respect to whether it had knowledge of, or reason to suspect, a disability must be evaluated in light of information District knew, or had reason to know, at the relevant time. It is not based upon hindsight. District knew Student had excessive absences, which affected Student's academics. However, despite meetings and multiple inquiries, District personnel did not learn the reasons for Student's absences other than Student's attachment to Mother and Mother's willingness to keep him home or remove him early.

17.     Student further cites his experts' testimony, who independently came to the conclusion that Student should have been referred for assessment in first grade. Dr. Simun and Dr. Weinberg were well-qualified, recognized experts in their respective fields. However, a proposed expert must also possess factual information directly related to the issue upon which they provide an opinion. Here, they were not qualified to render an opinion as to whether District's child find duty was triggered in first grade. The experts reviewed documents, only. They did not observe, interview, or meet Student, did not meet Mother, and did not talk to any of Student's teachers, counselors or school personnel. They did not hear the witness testimony, which provided the evidence that enabled informed factual and legal findings.

18.     In conclusion, during Student's first grade year of 2013-2014, District did not have reason to suspect Student had a disability or that special education services may be needed to address that disability. Without such information, District's child find duty was not triggered.[13]  Student did not meet his burden of proof as to Issue 1(a).

---

[13] Student's excessive absenteeism warranted referral to the attendance review board. Pupils ages six through 18 years old are subject to compulsory full-time education (Ed. Code, §§ 48200). The student attendance review board legislation (Ed. Code, §§ 48320–48325)

28

19.     Circumstances changed when Student started second grade in the 2014-2015 school year.  Ms. Pascual saw Student as a generally happy boy, who fell asleep in class about once a week and had angry outbursts.  Ms. Pascual then saw a pattern of frequent absences and early withdrawals, which were negatively affecting Student's academics.  Student was missing a substantial amount of instruction and tests.  She concluded that Student was capable, but Student could not learn if he was not emotionally or physically capable to participate in class or was absent.  She told the school counselor Ms. Luna about the poor attendance and early removals, including how Student was often not fully alert.

20.     Ms. Pascual explained to Mother that the poor attendance was harming Student's academics.  Mother told Ms. Pascual that Student had insomnia and described how she struggled to get Student to sleep and that Student often was not able to wake up and come to school in the morning.  Mother also told Ms. Pascual that this caused Student to be sleepy and irritable at school, which contributed to his early removal.  Therefore, District was now aware of information that should have caused personnel to suspect that Student had a disability or that special education services may have been needed to address that disability.

21.     Neither Student nor District provided clear, unambiguous evidence of when Mother told Ms. Pascual that Student had insomnia, which caused the absences and early removals.  The first day of school was August 20, 2014.  Mother told Ms. Pascual shortly before Thanksgiving break that she was taking Student to a doctor to help with the insomnia.  However, Ms. Pascual came to believe within a month or so after school started that Student's absences, lethargy, and sleeping in class were caused by his insomnia.  Ms. Pascual had reason to suspect that Student had a disability as of September 30, 2014, at which time District's child find duties were triggered.

22.     Ms. Pascual said that she did not suspect a disability in need of assessment.  She thought the absences, sleepiness, and irritability were caused by a medical issue.  Ms. Pascual's belief in this regard was similar to that of Ms. Luna and Student's other teachers.  However, chronic medical issues such as insomnia can form a basis for special education eligibility, such as other health impairment.

---

establishes panels to address absenteeism, when a minor becomes a habitual truant (Ed. Code, § 48262).  OAH does not have jurisdiction over attendance review board proceedings and, therefore, District's failure to refer Student is not discussed herein.

23.      A student may be eligible for special education and related services in the category of other health impairment if he is a pupil with limited strength, vitality or alertness, due to chronic or acute health problems which adversely affect his educational performance (Cal. Code Regs., tit. 5, § 3030, subd. (b)(9)).  Ms. Pascual concluded Student could not learn if he was not emotionally or physically capable to participate in class or was absent.  Accordingly, Mother's statement that Student had insomnia which caused lack of alertness in school and which regularly prevented him from awakening to go to school, triggered District's child find duty to refer Student for assessment.

24.      District argues that it established a referral structure which assured that pupils in possible need of support were properly vetted by District professionals equipped to evaluate a pupil's needs.  District cites how its teachers were trained to spot and refer students suspected of needing academic support to a coordinated support team, which gathered information and determined if the pupil should be referred to a student success team that included additional professionals who would develop, with the parents, supports and interventions to address the pupil's academic needs.  Sometimes, these teams referred a pupil for special education assessment.

25.      Here, this referral process failed to address Student's educational needs and meet District child find duties.  Ms. Pascual thought the absences, sleepiness, and irritability were caused by a medical problem, not an academic problem.  She therefore did not refer Student because she incorrectly believed medical issues were not a basis for success team or special education intervention.  In fact, District personnel never referred Student to a support or success team, further demonstrating that District's referral process did not herein satisfy its child find obligations.

26.      In summary, Student met his burden of proof by demonstrating that District failed to meet its child find duties and refer Student for assessment when it learned that Student's poor attendance, fatigue, and irritability were allegedly caused by a sleeping disorder or insomnia.  Ms. Pascual had reason to suspect that Student had a disability as of September 30, 2014, at which time District's child find duties were triggered.  Student prevailed on Issue 1(b).[14]

ANALYSIS: FAPE DENIAL FROM PROCEDURAL VIOLATION

27.      Child find does not guarantee eligibility for special education and related services under the IDEA.  It is merely a locating and screening process used to identify those children who are potentially in need of special education and related services.  Once

---

[14] Since the District's child find duty was first triggered within two years of the date Student filed a due process request, this decision does not further discuss or analyze issues related to the tolling of the two-year timeline for requesting hearing.

identified, the district must conduct an initial evaluation to confirm the child's eligibility for special education.  (34 C.F.R § 300.301; Ed. Code, § 56302.1.)

28.     Violations of child find, and of the obligation to assess a student, are procedural violations of the IDEA and the Education Code.  (*Cari Rae S.*, *supra*, 158 F.Supp. 2d at p. 1196; *Park v. Anaheim Union High School District* (9th Cir. 2006) 464 F.3d 1025, 1031.)  A procedural violation results in liability for denial of a FAPE only if the violation: (1) impeded the child's right to a FAPE; (2) significantly impeded the parent's opportunity to participate in the decision-making process; or (3) caused a deprivation of educational benefits.  (20 U.S.C. § 1415(f)(3)(E)(ii); Ed. Code, § 56505, subd. (f)(2); see *W.G. v. Board of Trustees of Target Range School Dist.* No. 23 (9th Cir. 1992) 960 F.2d 1479, 1484.)

29.     In the fall of 2014, Student had limited strength, vitality and alertness, due to his chronic insomnia, which affected his educational performance.  Student's insomnia caused "limited alertness" on some days and affected his ability to awaken on other days. This kept him from consistently attending school, which adversely impacted his academic performance.  The evidence demonstrates that if District had assessed Student in the fall of 2014, Student would have been found to have met the eligibility criteria for other health impairment.

30.     District's failure to assess Student when its child find duty was triggered impeded Student's right to a FAPE, because he would have been found eligible and otherwise entitled to a FAPE.  Further, the failure to assess deprived Student of the educational benefit of the related services and placement that he would have received in an IEP.  Therefore, District's failure to assess Student in the fall of 2014 was a procedural violation that denied Student a FAPE.

*Issues 2(a) and (b):   Failure to Provide an IEP that Met Student's Unique Needs and that Was Calculated to Offer Him Educational Benefit*

31.     Student alleges in Issue Two that District denied Student a FAPE by failing to provide an individualized education program that met his unique needs and that was reasonably calculated to offer educational benefit to Student, since August 2013.  District generally argues that it was not obligated to provide an IEP because its child find duty had not been triggered. As discussed above, Student demonstrated District was obligated to provide Student with an individualized education program since the fall of 2014.  Student therefore did not prevail as to Issue Two (a) but met his burden of proof as to Issue Two (b) for the time period beginning in the fall of 2014.

32.     "Special education" is instruction specially designed to meet the unique needs of a child with a disability.  (20 U.S.C. § 1401(29); 34 C.F.R. § 300.39; Ed. Code, § 56031.) Here, Student was entitled to assessment in the fall of 2014.  As discussed above, Student would have been found eligible as other health impaired and, therefore, would have received

31

special education if he was assessed in fall of 2014. Because he was not assessed and could not receive special education, Student has met his burden of proof as to Issue Two. Student has not had his unique needs as a child with a disability addressed by special education since fall of 2014.

33. An IEP must be reasonably calculated to "confer some educational benefit" upon the child (*Rowley*), enabling the child "to make progress appropriate in light of his circumstances" (*Endrew F.*). Here, Student would have been entitled to special education had he been assessed in fall 2014. Student was not assessed until November 2016. Parents agreed to an IEP in December 2016 and Student started receiving special education placement and services in January 2017. Therefore, Student did not receive an IEP that conferred educational benefit so he could make progress appropriate for his circumstances, since fall 2014. Student has met his burden of proof as to Issue Two (b).

## REMEDIES

1. Student prevailed as to Issue One (b) and Issue Two (b), beginning September 30, 2014. If District prepared an assessment plan at that time, Parents could be assumed to have returned the same day, thus commencing the 60-day time period within which District would assess and hold an IEP. The 60 days are calendar days but do not include days between the pupil's regular school sessions, terms, or days of school vacation in excess of five school days. (Ed. Code, § 56344(a).) Sixty days from September 30, 2014 is November 29, 2014, but this included the five-day Thanksgiving break. So, District should have held the first IEP team meeting by December 5, 2014. Student's first IEP meeting was not held until November 30, 2016.

*Compensatory Services*

2. Federal law provides that a court that hears a civil action taken from a special education administrative due process hearing "shall grant such relief as the court deems appropriate." (20 U.S.C. § 1415(i)(2)(C)(iii); 34 C.F.R. § 300.516(c)(3)(2006).) The United States Supreme Court has held that this authority "confers broad discretion on the court" to grant relief that is appropriate in light of the purpose of the IDEA. (*School Committee of the Town of Burlington, Massachusetts v. Department of Education* (1985) 471 U.S. 359, 369 [105 S.Ct. 1996, 85 L.Ed.2d 385].) The broad authority to grant relief extends to the administrative law judges and hearing officers who preside at administrative special education due process proceedings. (*Forest Grove School District v. T.A.* (2009) 557 U.S. 230 [129 S.Ct. 2484, 2494, fn. 11; 174 L.Ed.2d 168].)

3. The fashioning of equitable relief in IDEA cases requires a "fact-specific" analysis. (*Parents of Student W. v. Puyallup School District No.* (9th Cir. 1994) 31 F.3d. 1489, 1497.) School districts may be ordered to provide compensatory education or

additional services to a student who has been denied a FAPE. (*Id.* at p. 1496.)  The conduct of both parties must be reviewed and considered to determine whether relief is appropriate. (*Ibid.*)  These are equitable remedies that courts may employ to craft "appropriate relief" for a party.  An award of compensatory education need not provide a "day-for-day compensation." (*Id.* at p. 1497.)  The award must be fact-specific and be "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." (*Reid ex rel. Reid v. District of Columbia* (D.D.C. Cir. 2005) 401 F.3d 516, 524 )

ACADEMICS

4.      Student seeks compensatory education that is primarily based on computations covering the approximately two years Student was without an IEP: 197 hours of specialized academic instruction in math; 246 hours of academic instruction in writing; and 148 hours of academic instruction (akin to home instruction).

5.      However, an award of compensatory education need not provide a "day-for-day compensation. The guiding principle of compensatory education is what will benefit Student.

6.      The 2016 IEP team's approach provides appropriate guidance for what compensatory services are appropriate to benefit Student now.  Part of the 2016 IEP team's strategy addressed Student's poor academic performance by intensive academic support in school and specialized academic instruction at home.  The intent is to ameliorate lost instructional time and improve academic performance, thus decreasing Student's school performance anxiety and encouraging better school attendance.

*INTENSIVE ACADEMIC SUPPORT IN SCHOOL*

7.      The 2016 IEP provides 160 minutes a week for math and 200 minutes a week for writing, by a resource teacher.  This is six hours a week of specialized academic instruction at school.  Student receives these services in the classroom and in a small group out of the classroom, with some individual instruction.  Consistent with the strategy of providing these services in school, some of Student's compensatory education should be provided in the school setting.

8.      Student responds well to individualized instruction.  An additional hour of individualized instruction can specifically identify and address Student's struggles in the areas he missed because of the lost instructional time, within the context of his current curriculum.  Using the two years in which Student should have had an IEP as a guideline, with 37-week school years, for an hour week, Student is entitled to school-based compensatory academic instruction of 74 hours.

33

*HOME INSTRUCTION*

9.     The other part of the IEP's stratagem is to support Student at home, keeping him fully informed and current on his assignments, well-prepared to attend school.  The IEP provides two hours a week of home instruction by a special education teacher.  However, the IEP emphasized that this was a temporary service, designed to get Student to decrease anxiety, and would be revaluated within the context of his 2017 attendance goal.  Yet, Student is below basic in his academics and, having been denied an IEP for two years, is entitled to compensatory service for support he should have otherwise been receiving. Student shall receive 37 hours of additional District home instruction, by a special education teacher, one hour a week.

10.     Additionally, to specifically address lost instruction because of the failure to assess and provide services for two years, District will provide 37 hours of intensive academic instruction, through a nonpublic agency, to be used by Student whether school is in session.

COUNSELLING AND BEHAVIOR THERAPY

11.     Student asks for 74 hours of individual counseling and 148 hours of off-site psychological counseling by a licensed psychologist, as compensatory mental health services.  However, no "fact specific" analysis supports Student's request for the counseling. If Student had been assessed in fall 2014, he would not have been found eligible for emotional disturbance; Student was not diagnosed with anxiety until the following year.  So the suggestion that Student would have been receiving counseling and intensive social - emotional services, to the extent provided in his present IEP, is conjecture. Dr. Hansuvadha's October 11, 2016 letter stated that Student was diagnosed with insomnia in June 2012, but Student was not diagnosed with anxiety disorder until February 20, 2015. Mother did not inform Ms. Pascual, Ms.Wennes, or Ms. Luna during Student's second grade.

12.     A more suitable approach to compensatory mental health services is to consider what would assist the Student now, to address emotional issues that might have been addressed earlier.  In this regard, Student submitted little evidence.  Student's two experts never met Student, much less evaluated his mental state.  Yet, they did provide insight as to possible avenues to be explored for possible additional or alternative mental health services.  Dr. Weinberg and Dr. Simun proposed evaluating Student for cognitive behavioral therapy to assist in regulating his anxiety.  Ms. Kravets apparently concurred; she concluded that Student had insight into what was triggering his anxiety, but at that time, he did not have coping strategies.  Ms. Kravets told the IEP team that Ventura County Behavioral Health could provide child-focused cognitive behavior therapy and break down interventions based on Student's individual needs.  However, the IEP did not further discuss this proposal.

34

13.    Pupils may be equitably entitled to publicly funded independent educational evaluations when a district was obligated to assess but failed to do so.  (See, e.g., *M.S. v. Lake Elsinore Unified School Dist.* (C.D. Cal. July 24, 2015) 2015 WL 4511947, at pp. 10-11; *Los Angeles Unified School Dist. v. D.L.* (C.D.Cal. 2008) 548 F.Supp.2d 815, 821-822.)  This equitable remedy is available independently from a student's statutory right to an independent educational evaluation.  (20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.502 (a)(1); Ed. Code, § 56329, subd. (b); *Letter to Baus*, 65 IDELR 81 (OSEP 2015).)

14.    Here, District had an opportunity to explore the viability of cognitive behavior therapy for Student.  It did not do so.  Also, District delayed providing IEP services to Student, which would likely have diminished Student's present need for mental health services.  Therefore, as an equitable and compensatory remedy, Student is entitled to a District funded independent educational assessment, to determine if Student is an appropriate candidate for cognitive behavior therapy to address his anxiety, with recommendations.  Such assessment will include Parents and suggest possible parental services to assist Parents in supporting Student's mental health.  District shall timely convene an IEP team meeting to review the assessment.  District's funding of the assessment shall include the assessor's time for attending the IEP team meeting.  The assessment shall be performed by a professional qualified to assess whether cognitive behavior therapy is indicated for Student's anxiety.

*Training of District Personnel*

15.    Staff training is also an appropriate remedy.  (*Park v. Anaheim Union High School Dist*, *supra*, 464 F.3d at p. 1034 [student, who was denied a FAPE due to failure to properly implement his IEP, could most benefit by having his teacher appropriately trained to do so].)  Appropriate relief in light of the purposes of the IDEA may include an award that school staff be trained concerning areas in which violations were found, to benefit the specific pupil involved, or to remedy procedural violations that may benefit other pupils.  (*Ibid*.  See also, e.g., *Student v. Reed Union School Dist.*, (OAH Case No. 2008080580) [requiring training on predetermination and parental participation in IEP's]; *Student v. San Diego Unified School Dist.* (OAH Case No. 2014120525) [requiring training regarding pupil's medical condition and unique needs].)

16.    Here, Student should have been assessed in the fall of 2014 but was not assessed until two year later.  Fundamental to District's failure to timely assess was a general misunderstanding of a school district's child find obligations.  General education teachers, counselors, and administrators stated that they did not suspect Student to have a disability that might need to be addressed by special education services, because Student's absences were the consequence of a medical issue.  Yet everyone agreed that Student's chronic absenteeism and early removal negatively affected his academics.  In fact, though Student's academics were obviously compromised by his lost instructional time, District personnel did not refer Student for a coordinated support team or a student success team.

17.     District personnel's misunderstanding in this regard was systemic.

18.     Therefore, to assure that Student and other special education students are afforded the procedural protections to which they are entitled under the IDEA and state law, District shall train its Sierra Linda Elementary School personnel in special education eligibility, child find duties, and the ability to directly refer a student for assessment, for a minimum of six hours.  Further, such training will provide guidelines to identify students who might have disabilities and might benefit by special education services.

ORDER

1.     District shall provide Student 74 hours of school-based, one-on-one specialized academic instruction, outside of the classroom, at a rate of one hour per week, beginning within 30 days of the date of this order, and continue each full week that school is in session, until the 74 hours have been used.  The services will be provided by a special education or resource specialist teacher, at a regularly scheduled time each week.  If Student misses a scheduled session because he was absent from school, or removed early from school, District shall not be required to again offer the one-hour session, unless the absence or early withdrawal is excused with a note from a doctor, medical professional, or mental health professional.

2.     District shall provide Student 37 hours of additional home instruction beyond what is provided in his 2016 IEP, by a special education teacher, at a rate of one hour per week, beginning within 30 days of the date of this order, and continuing each full week that school is in session, until the 37 hours have been used.  If Student misses or cancels less than 24 hours before a scheduled session, District shall not be required to again offer the one-hour session, unless the absence or late cancellation is excused with a note from a doctor, medical professional, or mental health professional.

3.     District will fund 37 hours of intensive academic instruction through a nonpublic agency, to be used by Student whether or not school is in session.  Scheduling of instruction shall be made by Parents and the agency.  Any scheduled appointments which Student misses and for which the agency bills the District, pursuant to the agency's cancellation/scheduling policy, shall be counted toward the 37 hours.

4.     District shall fund an independent educational evaluation to determine if Student is an appropriate candidate for cognitive behavior therapy to address his anxiety, with treatment recommendations. The assessment shall be performed by a professional qualified to assess whether cognitive behavior therapy is indicated for Student's anxiety. Such assessment will include Parents and suggest possible parental services to assist Parents in supporting Student's mental health services, if deemed appropriate.  District shall timely convene an IEP team meeting to review the assessment.  District's funding of the assessment shall include the assessor's time for attending the IEP team meeting.

5.      District shall, no later than August 30, 2017, provide six hours of training to all Sierra Linda Elementary School general education teaching staff, paraprofessionals, aides, student study team members, school administrators, service providers, counselors, school psychologists, speech and language therapists, and any other staff who work with parents and students on their educational programs.  The training shall address special education eligibility, child find duties, and the ability to directly refer a student for assessment.  Further, such training will provide guidelines to identify students who might have disabilities and might benefit by special education services.  The training shall be provided by qualified professionals either employed or contracted by the Ventura County Special Educational Local Plan Area, or a private provider selected by District. The training may be held concurrently or in coordination with any training ordered through any other OAH Decision issued within 90 days of this Decision, to the extent the ordered training overlaps or is duplicative.

PREVAILING PARTY

Education Code section 56507, subdivision (d), requires that this Decision indicate the extent to which each party prevailed on each issue heard and decided in this due process matter.  Student prevailed on Issue1 (b) and Issue 2 (b).  District prevailed on Issue 1 (a) and 2 (b).

RIGHT TO APPEAL THIS DECISION

This was a final administrative Decision, and all parties are bound by it.  Pursuant to Education Code section 56506, subdivision (k), any party may appeal this Decision to a court of competent jurisdiction within ninety (90) days of receipt.

DATED:  May 12, 2017

DocuSigned by:

_Clifford H. Woosley_

3EEE11185C9F48D...

CLIFFORD H. WOOSLEY
Administrative Law Judge
Office of Administrative Hearings

37