Appendix -
Comparison to Second
Amended Complaint

LEARNING RIGHTS LAW CENTER
JANEEN STEEL (SBN 211401)
Janeen@learningrights.org
205 S. Broadway, Suite 808
Los Angeles, California 90012
Phone: (213) 489-4035
Fax:    (213) 489-4033

LAW OFFICE OF SHAWNA L. PARKS
SHAWNA L. PARKS (SBN 208301)
sparks@parks-law-office.com
4470 W. Sunset Blvd., Ste. 107-347
Los Angeles, CA 90027
Phone/Fax: (323) 389-9239

Attorneys for Plaintiffs (continued on next page)
Attorneys for Plaintiffs (Continued next page)

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.R., a minor, by and through her guardian ad litem, Janelle McCammack; M.B., a minor, by and through her guardian ad litem, F.B.; I.G., a minor, by and through his guardian ad litem, M.E.,.; F.S., a minor, by and through her guardian ad litem, E.L.; I.H., a minor, by and through his guardian ad litem, C.C.; W.H., a minor, by and through her guardian ad litem, E.P.; I.B., a minor, by and through his guardian ad litem, F.B., and Primero Los Niños, an organization, on behalf of themselves and all those similarly situated,<br><br>                    Plaintiffs,<br>         v.<br><br>OXNARD SCHOOL DISTRICT; CESAR MORALES, Superintendent of Oxnard School District, in his official capacity; ERNEST MORRISON, President of Board of Trustees, in his official capacity; DEBRA CORDES, Clerk of Board of Trustees, in her official capacity; DENIS O'LEARY, Trustee of Board of Trustees, in his official | Case No.: 2:17-cv-04304-JAK-FFM<br><br>**CLASS ACTION**<br><br>**SecondThird Amended Complaint for Violations of the Individuals with Disabilities Education Act, 20 U.S.C. §1400, *et seq.*; Americans With Disabilities Act, 42 U.S.C. § 12101, *et. seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et. seq.* |

capacity; VERONICA ROBLES-SOLIS,    )
Trustee of Board of Trustees, in her
official capacity; MONICA MADRIGAL
LOPEZ, Trustee of Board of Trustees, in
her official capacity; and DOES 1 TO 10,
inclusive,

Defendants
.

DISABILITY RIGHTS ~~CALIFORNIA~~ADVOCATES
STUART SEABORN (SBN 198590)
~~Stuart.Seaborn@disabilityrightsca~~MELISSA RIESS (SBN 295959)
JESSICA AGATSTEIN (SBN 319817)
seaborn@dralegal.org
~~1330 Broadway, Suite 500~~
~~Oakland, California 94612~~
~~Telephone:~~ mriess@dralegal.org
jagatstein@dralegal.org
2001 Center St., 4th Fl.
Berkeley, CA 94704
Phone: (510) ~~267-1200~~665-8644
~~Facsimile:~~ Fax: (510) ~~267-1201~~665-8511

Attorneys for Plaintiffs (continued from previous page)

## JURISDICTION AND VENUE

1.	The first three claims alleged herein arise under the Individuals with Disabilities Education Act, (20 U.S.C. §§1400 *et seq.*) ("IDEA~~");~~"), Americans with Disabilities Act (42 U.S.C. §§ 12131 *et seq.*) ("ADA~~"),~~") and Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. §794 *et seq.*) ("Section 504"), such that the jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 ~~and,~~ 1343.

2.	Jurisdiction and venue are proper under 20 U.S.C. § 1391(b) because the Oxnard School District is located within Ventura County, the Defendants are located in Ventura County and all the acts and~~/or~~ omissions giving rise to the claims in this action occurred in Ventura County, which is located within the geographical boundaries of the judicial district for the United States District Court for the Central District of California.

## INTRODUCTION

3.	Federal laws require that every California school district provide students with disabilities a non-discriminatory and free appropriate public education ("FAPE"). These laws place specific obligations on school districts to timely locate, identify and evaluate schoolchildren who may have disabilities that impact their education and/or that require special education services, an obligation often referred to as "child find." *This obligation extends to children in early elementary school.*

4.	Oxnard School District ("OSD" or "District") systemically fails to meet these requirements. Indeed, the District's standard policy when confronted with failing students who exhibit signs of possible disability, or otherwise indicate a need for assessment, is *not* to refer such students for special education assessments. Instead, District staff either do nothing, or rely on an alternate but illegal system the District has developed of using informal Student Success Teams ("SSTs") to discuss a student's lack of progress. These SST meetings, which exist

1

~~Second~~Third Amended Complaint

under no education law, are provided *instead of* mandatory referrals for assessments, and result in little or no special education services or empty referrals that put the onus on parents to secure and pay for services for their children.

5.      While students such as named Plaintiffs J.R., M.B~.~, I.G., F.S., I.H., W.H., and I.~G.~B fail year after year without receiving appropriate special education services for their disability-related needs, District staff stand idly by, or at most convene an SST meeting, through which little or no real services are provided. This "wait and see" approach for its students with disabilities is both illegal and disastrous for students.  Indeed, the District allowed the named Plaintiffs in this action to fail for *years* without assessing them for much-needed special education services and disability accommodations—only providing ~proper~ assessments after the students retained lawyers and filed administrative complaints. Even when the District does finally perform assessments, it consistently fails to identify all areas in which a student should be assessed, resulting in the student continuing to be deprived of necessary education and accommodations for their disabilities.

6.      For example, as early as second grade, during the 2011-2012 school year, J.R. already had a track record of demonstrable difficulties performing academically, difficulty understanding new concepts, and an exceptionally low reading level—yet the District did not assess J.R. for special education until after she filed an administrative complaint with the Office of Administrative ~hearings~Hearings ("OAH") in September 2016.

7.      M.B. also demonstrated obvious difficulties as early as first grade, during the 2013-2014 school year. Despite these documented struggles, the District failed to comply with its obligations to properly assess M.B. in all areas of suspected disability.  Instead, the District held a series of *seven* SST meetings for M.B. over the course of a *four-year* period, at which the District documented

2

~Second~Third Amended Complaint

M.B.'s academic deficits, but failed to provide her with appropriate assessments or special education services or disability accommodations to address those deficits. When the District finally did assess M.B., it failed to assess her in all areas of suspected disability.

8.    Similarly, the District was on notice of I.G.'s disabilities and the dramatic impact on his education no later than second grade, during the 2014-2015 school year, yet the District failed to provide I.G. with required special education assessments until after he filed an administrative complaint with OAH – two years later.

9.    Plaintiff F.S. demonstrated dramatic academic deficits for years, failing the majority of subjects in her first, second and third grade years, before the District finally agreed to assess her for special education services. The District has conceded in administrative proceedings that it should have found her eligible for special education services two years prior to when it actually did. The District's assessment of F.S. also failed to assess her for all areas of suspected disability.

10.    Plaintiff I.H. also exhibited clear academic deficits and dramatic behavior issues throughout his kindergarten, first, and second grade years before the District agreed to assess him. The District has still refused to assess I.H. for autism, despite his significant behavioral indicators for autism.

11.    The experiences of Plaintiffs W.H. and I.B. are examples of the District's failures even outside the SST process, *i.e.*, situations where the District fails to take any action. Plaintiff W.H.'s parents have been attempting for two years to have the District complete its child find obligations as to W.H.'s suspected disabilities. The District's initial, delayed special education assessment failed to thoroughly assess for all areas of W.H.'s suspected disabilities, which resulted in a delay in her receiving the special education services she needs.

SecondThird Amended Complaint

Despite receiving three independent assessments indicating that she is eligible for special education services, the District has not appropriately considered those assessments, and has thus not found W.H. eligible for such services. Like her fellow plaintiffs, W.H.'s academics are exceptionally low, and her disabilities are not being addressed as a direct result of the District's failure to find her.

12. Plaintiff also I.B. has suspected disabilities. When the District finally agreed to perform an initial assessment of him, much later than it should have in light of flags that I.B. might have a disability, the District failed to completely evaluate all of I.B.'s suspected disabilities. Further, I.B. continues to wait for additional District evaluations and an independent assessment. Like W.H., the District failed to find him eligible for special education services, because of its failure to complete an initial assessment in all areas of suspected disability.

13. Thus, each of the new named Plaintiffs has lost between one and three years of special education services because of the District's delay in identifying and evaluating them for special education services, and its failure to identify and assess them in all areas of suspected disability.

14. Though the named student Plaintiffs all face ongoing harm due to the District's broken child find system, they are at different stages in their individual efforts to be identified, evaluated, and provided services. Plaintiff J.R. exhausted her administrative remedies prior to bringing this suit and fully prevailed on her individual claims. Plaintiffs M.B., F.S., I.H., and I.B. exhausted their administrative remedies, but have not fully prevailed; the District has not fulfilled its obligation to assess M.B., F.S., I.H., W.H., and I.B. for all areas of suspected disability. In addition, certain Plaintiffs have not prevailed for other reasons; the District has not provided F.S., I.G., and I.H. with compensatory education services, and it has not provided M.B. with complete compensatory services. Plaintiffs W.H. and I.B., by contrast, have not exhausted their

4

~~Second~~Third Amended Complaint

administrative remedies. Despite W.H.'s and I.B.'s families' serious advocacy efforts, the District has neither fulfilled its obligation to W.H. and I.B. to identify and evaluate all their suspected disabilities, nor has it provided them special education services and compensatory education services.

9.15. The impact of the District's "wait and see" approach has been tragic. When the District finally assessed J.R. for special education, the evaluation showed what had been evident in school for years, that J.R. had significant disabilities that severely impacted her ability to access educational material, and that J.R. was functioning academically years behind where she should have been – as if she had received no instruction at all for the last four to five years. M.B.'s evaluation similarly showed striking deficits as a result of her disabilities, and that by the time of her assessment she functioned academically below 99.9% of her peers. I.G.'s evaluation documented clear struggles with anxiety and insomnia that had been present at school since Kindergarten, and that had led to a 50% absenteeism rate. Like many of her fellow Plaintiffs, F.S. functions academically below 99.9% of her peers based on the District's own assessment. At the end of the third grade, she tested at the pre-kindergarten level in reading, and has not been acquiring English as a second language, despite being in a structured English immersion class for three years. For Plaintiff I.H., the District's delay has been catastrophic, leading not only to severe academic delays, but also increasing cycles of behavior incidents, lengthy holds, the use of restraints, consistent discipline, and involvement of law enforcement at school. Plaintiff W.H. demonstrates similar academic deficits, functioning at least two years behind where she should be. Finally, Plaintiff I.B. continues to struggle to be able to fully participate in his education due to his inability to process information and focus.

16. These are not isolated instances. The named Plaintiffs are but a few of a number of students from working class, primarily Spanish-speaking families

5

SecondThird Amended Complaint

in Oxnard who have been denied their rights to required programs, supports and services under the IDEA, the ADA, and Section 504.

17.   Indeed, a group of Oxnard parents set up an organization called Primero Los Niños to help parents of children with disabilities and/or difficulties learning English understand their rights and how to advocate for their children in light of the District's failure to address the needs of such students.

10.18. Collectively, these cases are representative of a widespread and systemic failure by the District to ensure that it identifies students in possible need of services and accommodations, timely and thoroughly evaluates for such services, provides related procedural safeguards, and ultimately provides needed services and accommodations so that these students can access their education in a meaningful way.

11.19. The named Plaintiffs seek to remedy the District's broken system and its systemic failure to identify, evaluate and provide services and accommodations for students with disabilities in the District. TheyAlthough many of them have exhausted hersought administrative remedies prior to bringing this suit. However, the administrative system cannot afford them complete relief given the nature of the systemic problems in the District, and its illegal policies and practices.

### PARTIES

12.20. Plaintiff J.R. ("J.R." or "Plaintiff") is currently thirteenfourteen years old, and about to enterin the eighthninth grade. She resides with her family in Oxnard, California, which is located within Ventura County. After eighth grade, J.R. currently attendsattended a special day class at Haydoc Academy of Arts and Sciences in Oxnard School District. She is now a student in the Oxnard Union High School District. J.R. was and is a student who requires special education services under the IDEA, and a qualified individual with a disability within the

6

SecondThird Amended Complaint

meaning of Section 504 and the ADA, who required accommodations, modifications and services in order to meaningfully access her education.

13.21. Plaintiff M.B. ("M.B." or "Plaintiff") is currently ten eleven years old, and about to enter in the fifth sixth grade. She resides with her family in Oxnard, California, which is located within Ventura County. M.B. currently attends a special day class at Rose Avenue Elementary School Haydoc Academy of Arts and Sciences in Oxnard School District. M.B. was and is a student who requires special education services under the IDEA, and a qualified individual with a disability within the meaning of Section 504 and the ADA, who required accommodations, modifications and services in order to meaningfully access her education.

14.22. Plaintiff I.G. ("I.G." or "Plaintiff") is currently ten eleven years old, and about to enter in the fifth sixth grade. He resides with his family in Oxnard, California, which is located within Ventura County. I.G. currently attends a general education class at Sierra Linda Elementary Freemont Middle School in Oxnard School District. I.G. was and is a student who requires special education services under the IDEA, and a qualified individual with a disability within the meaning of Section 504 and the ADA, who required accommodations, modifications and services in order to meaningfully access his education.

23.    Plaintiff F.S. ("F.S." or "Plaintiff") is currently nine years old and in the fourth grade. She resides with her family in Oxnard, California, which is located in Ventura County. F.S. currently attends a general education class at Brekke Elementary School in Oxnard School District. F.S. was and is a student who requires special education services under the IDEA, and a qualified individual with a disability within the meaning of Section 504 of the ADA, who required accommodations, modifications and services in order to meaningfully access her education.

7

Second Third Amended Complaint

24. Plaintiff I.H. ("I.H. or "Plaintiff") is currently eight years old and in the third grade. He resides with his family in Oxnard, California, which is located in Ventura County. I.H. continues to be a student within Oxnard School District but is not currently placed at a school. I.H. was and is a student who requires special education services under the IDEA, and a qualified individual with a disability within the meaning of Section 504 of the ADA, who required accommodations, modifications and services in order to meaningfully access his education.

25. Plaintiff W.H. ("W.H." or "Plaintiff") is currently eight years old and in the second grade. She resides with her family in Oxnard, California, which is located in Ventura County. W.H. currently attends a general education class at Marshall Elementary School in Oxnard School District. W.H. was and is a student who requires special education services under the IDEA, and a qualified individual with a disability within the meaning of Section 504 of the ADA, who required accommodations, modifications and services in order to meaningfully access her education.

26. Plaintiff I.B. ("I.B." or "Plaintiff") is currently nine years old and in the fourth grade. She resides with her family in Oxnard, California, which is located in Ventura County. I.B. currently attends a general education class at Driffil Elementary School in Oxnard School District. I.B. was and is a student who requires special education services under the IDEA, and a qualified individual with a disability within the meaning of Section 504 of the ADA, who required accommodations, modifications and services in order to meaningfully access her education.

27. Primero Los Niños is a membership organization made up of parents of children with disabilities and/or difficulties learning English who attend school in the Oxnard School District. It provides parents with educational information

8

~~Second~~Third Amended Complaint

about their rights as well as the procedures for filing complaints on a variety of issues, including special education, language access and school conditions. In response to several questions and concerns raised by parents of students with suspected or known disability-related needs, Primero Los Niños has had to educate its members about their rights to have their children assessed for appropriate disability-based services and the procedures for challenging the District's failures to conduct such assessments. It has also spent considerable time issuing public records act requests to obtain information about this issue and making referrals to advocates and lawyers.

15.28. The Oxnard School District (sometimes referred to as the "District") is a public school district organized and existing under the laws of the State of California, located within Ventura County. It provides services to students from pre-school through the eighth grade. At all times relevant herein, the District was the local education agency responsible for providing Plaintiffs with special education services, and with full and equal access to its public education programs and activities in compliance with the requirements of federal law. The District receives federal financial assistance.

16.29. Cesar Morales is the Superintendent of Oxnard School District and is sued herein in his official capacity. Mr. Morales is responsible for establishing the policies and procedures within the District, and for oversight of the District.

17.30. Ernest Morrison, Debra Cordes, Denis O'Leary, Veronica Robles-Solis, Monica Madrigal Lopez are members of the Board of Trustees for the Oxnard School District. The Board is responsible for establishing policies and procedures within the District, and for oversight of the District and the Superintendent. The Board members are sued in their official capacities.

18.31. Plaintiffs are ignorant of the true names and capacities of the defendants named herein as DOES 1 through 10, inclusive, and therefore sue said

9

SecondThird Amended Complaint

defendants by such fictitious names. Plaintiffs will seek leave of Court to amend this Complaint to allege the true names and capacities of said defendants when they have been ascertained. Plaintiffs are informed and believe, and on that basis allege, that DOES 1 through 10, inclusive, have or claim to have an interest in the controversy at issue in this Complaint and/or need to be joined to this action to give effect to the relief sought herein.

### FACTS APPLICABLE TO ALL CLAIMS

19.32. Oxnard School District has a population of nearly 17,000 students, at twenty-one school sites. More than eighty percent of its student population is characterized as "socially disadvantaged," and more than half are classified as English Language Learners. Its students are more than ninety percent Hispanic.

20.33. Data from the 2017 from the California Department of Education shows that the District scored in the lowest category available – categorized as red on a scale of red, orange, yellow, green, blue – for performance levels in English Language Arts and Math for its students with disabilities, English Language Learners and socioeconomically disadvantaged students.

21.34. Similarly, data from the California Assessment of Student Performance and Progress (CASPP), a comprehensive end of year assessmentsassessment of grade level learning, show that for 2016 78% of the District's students did not meet grade level standards in English Language Arts, and 86% did not meet grade level standards in mathematics. The statistics for the District's students with disabilities are even more stark, with 96% of its identified students with disabilities not meeting standards in both categories. These numbers remained essentially the same as of 2018.

22.35. The District's policy of using the SST process as an alternative to procedures under the IDEA, Section 504 and ADA is longstanding. It dates back to at least 2009, as documented in a special education audit of the District, which

10

SecondThird Amended Complaint

found that the District was employing the SST approach in special education, but that "[n]o one at the District level monitors SST implementation….[and] The staff considers SSTs to be the method of placing students in special education."

23.36. Similarly, in 2011, the Office for Civil Rights for the Department of Education found that Oxnard had illegally used the SST procedure to delay evaluations and services under Section 504 and IDEA for a young student with a disability, finding the school had a "policy of requiring an SST meeting prior to referring a student for an evaluation," and "a failure to timely evaluate and cover the Student under Section 504 or the IDEA." The Office for Civil Rights held that the District, *inter alia*, "discriminated against [the] first-grader with ADHD and a mood disorder not only by delaying his IDEA evaluation, but also by failing to evaluate his eligibility for Section 504 services. OCR found that the district violated Section 504 by referring the student to its student support team prior to conducting any evaluations." 56 IDELR 274 (2011).

24.37. Testimony from the evidentiary hearings underlying this matter demonstrated that the policy and practice of either doing nothing or only using the SST model, instead of making special education referrals or providing disability accommodations, persists throughout the District. Multiple teachers and staff testified during the evidentiary hearings in this matter that they had little to no training regarding their obligations to identify and refer students with suspected disabilities, had made either no or very few referrals for special education in their multi-year careers at the District, and had relied on the SST procedure over the course of many years because it was the District's policy to do so – assuming the SST team would make a referral for evaluation, if needed. Both of the Administrative Law Judges who conducted evidentiary hearings in the underlying proceedings in this matter found this problem to be widespread, with one labeling it as the District's "standard policy" not to proceed straight to a special education

11

Second Third Amended Complaint

assessment, and another noting that District staff's misunderstanding of their obligations to identify and evaluate students with disabilities was "systemic."

25.38. As demonstrated by the named Plaintiffs in this case, the consequences for students in the District are calamitous.

**Plaintiff J.R.**

26.39. J.R. has a severe language disorder that limits both her expressive and receptive language, as well as Attention Deficit Hyperactivity Disorder ("ADHD"). Her parents are both farmworkers, who work in the Strawberry fields of Oxnard. Her family, which includes two other siblings, is extremely low income. Neither of her parents completed an elementary school education. They are both Spanish speaking.

27.40. J.R. is a somewhat shy, but pleasant little girl, and most teachers agree that she has tried her best in school. However, J.R.'s academic difficulties manifested early, and were continuously ignored by the District. As a result, by the time she was in seventh grade J.R. was functioning academically like a student in the first or second grade.

28.41. By the end of kindergarten, J.R. received grades of "below basic" (the lowest possible grade) in most of language arts and math. Her kindergarten teacher specifically noted that she had difficulty understanding new concepts. By first grade, she continued to be below basic in nearly all of language arts and math. Per the psychoeducational assessment later conducted by the District, after J.R. filed a complaint, she "needed a lot of support in reading," as early as the first grade.

29.42. J.R. continued to struggle in the second grade as shown by low-test scores and consistently low grades. J.R.'s scores on the State's Standardized Test and Reporting (STAR) test were below standard in all areas, and she struggled in

12

all areas of learning in the classroom, again receiving below basic grades in math and writing.

30.43. According to J.R.'s third grade report card, she was below basic math and most of language arts. The report card also noted that J.R. was making "slow progress in reading," that she made careless errors, and that she had difficulty understanding new concepts.

31.44. Again, J.R. struggled during fourth grade. According to J.R.'s fourth grade report card, she again had low test scores and needed improvement in nearly all academic areas. She was also below basic in math and most of language arts. Her report card noted that she was "easily distracted."

32.45. After five years with the District, J.R. continued to fail in many areas. As shown by her September 2014 California English Language Development Test ("CELDT") scores, J.R. was functioning at the "beginning" level in reading, having actually regressed from her earlier testing in that category.

33.46. J.R.'s grades made it even more apparent that she needed supports. By the end of fifth grade she received 1's (minimal mastery, the lowest grade on a scale of 1-4) in writing standards, language conventions, math concepts, operations and algebraic thinking, numbers and operations in base ten, and geometric measurement. Again, her report card noted that she had difficulty understanding new concepts, and had low test scores.

34.47. By the end of J.R.'s fifth grade year, her teacher was concerned about J.R.'s performance. However, rather than evaluate J.R. for special education as legally required, the District held an informal, SST meeting on May 11, 2015.

35.48. At this meeting, the District documented numerous red flags that should have prompted an assessment for special education services: 1) J.R. "has peer issues;" 2) Her reading level was at grade level 1.2 (despite being at the end

13

SecondThird Amended Complaint

of fifth grade); 3) "Word meaning inhibits her ability to complete comprehension tasks"; and 4) J.R. "[D]oes not seem to understand pragmatics and social skills."

36.49. Despite these findings, the District did not conduct an evaluation to evaluate whether a J.R. had a qualifying disability. Rather, the District identified some vague, and undocumented support services that it purportedly provided to J.R.

37.50. However, there is no record that the District provided J.R. any of the services, screenings, or supports that it documented in the SST. Rather than provide legally required evaluations and services, the District simply stood by and watched J.R. struggle with her social skills, academics and communication.

38.51. In sixth grade, J.R. again scored low on her October 2015 CELDT. Her scores showed that she again did not make progress in overall performance, and actually regressed in speaking, reading and listening. Indeed, her scores in reading and speaking were *lower* than when she first tested in 2012-2013.

39.52. In February of 2016, J.R.'s pediatrician diagnosed her with Attention Deficit Hyperactivity Disorder ("ADHD").

40.53. By the end of her sixth grade year, J.R.'s records indicate that she "struggled in all academic subjects." She received a "D" in Language Arts and an "F" in math and science. At the end of sixth grade, her STAR test results showed that she had a grade equivalent of 2.8 in reading, and 2.2. in math – *nearly four years behind where she should have been.*

41.54. Again, the District did not assess J.R., nor did it offer any services to her to address her disability-related educational needs.

42.55. After retaining counsel, on September 22, 2016, J.R. filed a "due process complaint" under the Individuals with Disabilities Education Act with the Office of Administrative Hearings challenging the District's failure to assess and its failure to provide a FAPE for J.R.

14

SecondThird Amended Complaint

43.56. At no time prior to J.R.'s filing of her complaint did the District ever offer to assess her for special education or related services, provide her any such services or accommodations under federal nondiscrimination statutes, or provide her family with any information about their rights under IDEA or nondiscrimination statutes to evaluations, services or accommodations.

44.57. After that filing, the District finally agreed to assess J.R. for purposes of determining special education eligibility. What those assessments found was striking:

- J.R. had severe deficits in receptive and expressive language, auditory processing, and auditory comprehension. These deficits impact every aspect of her learning and participation in the educational environment, including her ability to follow and comprehend lessons and directions; understand procedural information; express herself orally; take notes; understand written and oral material; and learn new vocabulary. For example, on tests of oral language, J.R. – who was then twelve years old – was performing between a pre-Kindergarten and second grade level.
- J.R. was light years behind her peers academically—testing at the second percentile in reading as a seventh grader, meaning she is below 98% of her peers, and testing so low in math that she did not score a percentile, meaning she was below 99.9% of her peers.

45.58. The evaluation concluded that J.R. should be eligible for special education under the category of a severe speech or language disorder in the areas of receptive and expressive language. It also ruled out social and linguistic factors as the cause of J.R.'s academic delay, i.e. her academic collapse was due to her disabilities and not the result of her background or the fact that she was an English Language Learner.

15

SecondThird Amended Complaint

46.59. On December 13, 2016, the District held an Individualized Education Plan ("IEP") meeting, and found J.R. eligible for special education services as a student with a speech or language impairment.

47.60. Though she is now eligible for special education services, J.R. languished for years without receiving any appropriate services to address her disability-related needs due to the District's unlawful policy of not referring students for special education assessments when they exhibit signs of possible disabilities.

48.61. On February 9, 2016, the District entered into a stipulated decision, admitting to liability under IDEA for the two years preceding the date of J.R.'s complaint – namely that it had failed to timely identify and evaluate J.R. for special education services, and had consequently failed to provide a free appropriate public education (FAPE) to address J.R.'s needs. It also agreed to provide certain compensatory services to J.R. to address the admitted liability. The Office of Administrative Hearings issued a Decision by Settlement on March 13, 2017 adopting the findings and relief submitted by the parties. This Decision is attached hereto as Exhibit A, and finds that student was prevailing party on all claims on all issues decided.

49.62. Although J.R. prevailed in this Decision, she cannot bewas never afforded complete relief, as because she has not yet received all of the compensatory services awarded her in the Decision, and she continues to besuffer the lingering effects from having been educated in a District that systemically violates the law by failing to identify students with disabilities, under-identifying disabilities even when it does assess students, failing to adhere to procedural protections, and otherwise violating the nondiscrimination mandates designed to ensure meaningful access to educational programs. The fundamental conduct of the District has not changed. However, J.R. has now aged out of the District, and

16

SecondThird Amended Complaint

attends the high school district. She seeks an order that the District comply with the terms of the Decision, and attorneys' fees and costs for her underlying administrative action.

50.63. She is also entitled to attorneys' fees and costs as the prevailing party in the underlying administrative proceeding, and requests those fees through this action.

### Plaintiff M.B.

51.64. M.B. has a severe expressive and receptive language disorder, and also Attention Deficit Hyperactivity Disorder. M.B. lives with her twin sister, who also has many of the same learning challenges, her brother and parents in Oxnard. Her family is low income and monolingual Spanish speaking.

52.65. Despite ample notice of M.B's significant, disability-related needs since at least the first grade, the District failed to provide her the services she needed for years, causing M.B. to waste away academically, without any meaningful educational benefit. Rather than comply with its legal obligations to properly assess M.B. for special education or provide her necessary services, the District held a series of *seven* SST meetings over the course of four years, where it glossed over incomplete data about M.B.'s cognitive and academic abilities and told M.B.'s mother that M.B. was receiving services and making progress.

53.66. The result has been catastrophic. At ten years old, after filing a complaint in September of 2016, M.B. has finally been identified as a student with *significant* executive functioning and speech and language disabilities. Academically, it is as if she has not received any education at all. She cannot consistently write her name and reads at a kindergarten level. On academic testing, *she is below 99.9%* of her peers – across the board. However, these needs should have been flagged long before she filed a complaint with the District.

54.67. In Kindergarten, M.B.'s mother almost immediately identified to the

17

SecondThird Amended Complaint

teacher that she believed her daughter had ADHD or Autism. Among other things, she was also concerned about a lack of progress from preschool. Rather than provide M.B.'s mother with an assessment plan for special education, the District held the first of many SST meetings. The SST notes document M.B.'s mother's concern that M.B. may have ADHD, dyslexia or Autism.

55.68. The SST notes reflect M.B.'s academic deficits, which were already evident at the time. At the time of the SST meeting, M.B. was already rated Below Basic on her first trimester report card. The report card notes from her first trimester recommended intervention classes, and noted that M.B. had difficulty working with others.

56.69. The District finally provided a special education referral on January 22, 2013, and an assessment plan was signed on January 25, 2013. When the District finally produced its special education assessment, on May 21, 2013 (approximately two months late), it was wholly deficient. Among other things, it tested M.B. primarily in English despite the fact that at the time she was monolingual Spanish speaking, failed to assess in all areas of disability, and ignored red flags that the assessor himself identified.

57.70. Nevertheless, the District held an IEP on May 21, 2013 and, based on the faulty assessment, concluded that M.B. was not eligible for special education, affirmatively telling M.B.'s mother that she did not have a disability.

58.71. At the end of Kindergarten, M.B. was "Below Basic" in all categories of reading, writing and math. She was so deficient that her teacher recommended her for retention.

59.72. M.B. continued to struggle at the beginning of first grade, and her other requested another assessment. Rather than provide M.B. with a special education assessment, the District held another SST meeting. At the November 13, 2013 the SST meeting, M.B.'s mother reiterated her request for a "full"

18

Second Third Amended Complaint

assessment. During that meeting, the school psychologist told M.B.'s mother that it was "too soon" to reevaluate. M.B.'s mother also testified that school staff cautioned her and her husband about seeking a special education evaluation, because they would be labeling her daughter in a way that would follow her for the rest of her life, and that it was "not necessary." As a result, M.B.'s father, who was also at the meeting, withdrew the request for an assessment. No one from the school assisted the parent in putting her request for an assessment in writing, provided her with procedural safeguards, or provided her with information about requesting an independent educational evaluation.

60.73. Despite advising M.B.'s parents not to seek a special education evaluation, the SST notes clearly document signs of continued struggle. Among other things, the SST notes reflect that M.B. "has difficulty retaining information." *Critically, M.B.'s first grade teacher testified at the evidentiary hearing that she believed this was probably caused by a disability, and that she had shared this information at the SST meeting.* Yet the District did nothing. At that time, M.B. also had trouble with attention; throughout the school day she played with items and talked to others; she needed constant reminding; had a hard time putting sounds together; was constantly distracted; and confused the vowels a and e (one third of her vowels).

61.74. Instead of responding to M.B.'s parents' concerns or acknowledging what M.B.'s teacher already realized in terms of her disability, the District held another SST meeting on March 27, 2014. At the SST meeting, M.B. was still struggling.  She was confusing a and e, still doing poorly in math topics, and was again at risk for retention. Her teacher recommended retention because M.B. was not at grade level.

62.75. M.B.'s report card for the year shows that she was again Below Basic, all year, in reading comprehension, writing, and most of the sub-areas in

19

~~Second~~Third Amended Complaint

math. The comments reflect, among other things, that she was not reading fluently. Her teacher believed that M.B. was significantly below grade level.

63. 76. At the beginning of second grade, M.B.'s mother again asked for help for her daughter, who continued to struggle at school. Again, the District held a number of SST meetings, all of which documented numerous red flags, as well as a medically diagnosed disability. Yet, the District made no referral for evaluation for special education services.

64. 77. At the first SST meeting of that year, on September 25, 2014, M.B.'s oral fluency was still low, she was not spelling, and wrote only numbers 1-9, despite the benchmark at that point being the ability to write 1-100. She still confused the vowels a and e and the consonants b and d. She could not independently work on math.

65. 78. M.B.'s mother specifically told the SST team that, at that point, M.B. had a diagnosis of ADD from her doctor, who also suspected dyslexia, and that M.B. saw "color balls" in the air. However, the District did not make a referral for a special education assessment. No one at the SST provided M.B.'s mother with any procedural safeguards, or any information about her rights under IDEA.

66. 79. The District held a second SST meeting on February 19, 2015. At that meeting M.B.'s mother informed the school M.B. was taking Ritalin. Again, no school official took action in response to that information. As of this SST, M.B. was still not reading fluently. M.B. was still unable to pass a spelling test, needed assistance for adding simple, one digit numbers, and continued to only be able to write numbers 1-9. The District provided no referral for a special education evaluation, no additional services, and no information to M.B.'s mother about her rights under IDEA.

67. 80. As M.B. continued to struggle, the District held yet another SST meeting on May 28, 2015. As of this meeting, M.B. could only recognize 59 high

20

Second Third Amended Complaint

frequency words, despite the benchmark being 200. She was still "not reading fluently," despite being at the end of her second-grade year. She still could not spell, still required assistance for one digit math.

68.81. *At this SST, school staff believed that M.B. required a special education assessment.* Nevertheless, they decided to wait because M.B. was transitioning to a full English immersion class, and they wanted to see how she would fare. No one gave M.B.'s mother procedural safeguards, put that decision in writing, or informed her of any rights under IDEA.

69.82. By the end of the year, M.B. had all 1's in reading and writing. Her math scores all reflect 2's. Comments on the report card reflect low test scores, difficulty understanding new concepts, and problems with spelling. M.B.'s parents were so concerned that they raised the concept of retention with the school. The school advised them that M.B. was already old for her grade, and that retention would result in her not graduating high school until she is 19. As a result, M.B. was moved to third grade.

70.83. In third grade, M.B. continued to struggle. The District held another SST meeting on August 20, 2015. At this point, M.B.'s mother indicated she was concerned about low self-esteem and low academics. The notes indicate that M.B. was reversing letters and that she did not want to come to school because she felt that she could not do the work. The notes also document that M.B. had been diagnosed with ADD and was taking Ritalin.

71.84. Despite continued concerns, and a discussion regarding a medically diagnosed disability, the District did not make a referral for a special education evaluation.

72.85. In November of 2015, M.B.'s STAR testing indicated that M.B., then a third grader, was in the first percentile for reading, and was at a grade level of 1.2. Her instructional level was pre-kindergarten. Ex. S22. In math, she was

21

SecondThird Amended Complaint

similarly low, at the first percentile, and a grade equivalent of 1.0.

73.86. *By November of 2015, school staff again determined that M.B. needed a special education assessment, and again did not provide one.* The District provided M.B. with no assessment plan until March 7, 2015, after M.B.'s mother took the exceptional step of contacting the District Superintendent.

74.87. M.B.'s grades at the end of third grade reflect a student in free fall. She received failing grades in reading, writing, math and language. Her highest grade in language arts was a D in speaking & listening. She also failed all areas of math.

75.88. M.B.'s mother filed her request for due process shortly after the beginning of the fourth-grade year. The District then offered a 504 Plan in October of 2016, that finally made M.B. eligible for 504 accommodations based on her ADHD and dyslexia, among other conditions. The District then assessed M.B. for special education services under the IDEA.

76.89. The result of these years of neglect was catastrophic. M.B. both lost educational opportunity and was denied meaningful educational benefits. At ten years old, M.B. cannot consistently write her name. As of the District's academic assessment – conducted over six sessions in November 2016 through January 2017 – M.B. was *below 99.9% of her peers in the following areas* in her academic testing in English:

(1) Basic Reading Skills; (2) Reading Comprehension (which was so low it did not rate a score); (3) Reading Fluency (which also did not rate a score); (4) Math Calculation Skills; (5) Math Problem Solving; (6) Written Language; (7) Written Expression; (8) Phoneme Grapheme Knowledge.

77.90. Her Spanish language testing was similarly low. Her instructional level and independent reading level is pre-primer.

78.91. As a fourth grader, it is as if she has received no education at all. By all accounts, M.B. needed and needs a significantly more intensive program, and one not in the general education setting. The District school psychologist who finally conducted M.B.'s assessment stated that it is extremely difficult for M.B. to capture instructional delivery, and according to the testing, it would be "impossible" for M.B. to participate in a general education setting. Student's expert at her due process hearing, Karen Schnee, testified that M.B. is "light years below the average kid in the average classroom." The District's speech and language pathologist agreed that she is not progressing in her current program "at all."

79.92. Though she is now eligible for special education services, M.B. languished for years without receiving any appropriate services to address her disability-related needs due to the District's unlawful policy of not referring students for special education assessments when they exhibit signs of possible disabilities, and otherwise failing to comply with the child find requirement and its attendant procedures.

80.93. On May 26, 2017, after a five-day evidentiary hearing, the Administrative Law Judge determined that the District had violated M.B.'s rights, over the course of years, and that such violation was a result of the District's standard policy. Specifically, the Administrative Law Judge found that:

> *The evidence was overwhelming that District had enough*
> *information from November 2013 and through third grade to*
> *trigger its duty under the IDEA to reassess Student for special*
> *education eligibility. Instead, District relied instead on its*
> *practice of using the student study team process to address*
> *Student's growing needs, which proved to be disastrous for*
> *Student.* While it was not unreasonable for District to try using

23
Second Third Amended Complaint

some interventions through the student study team during first grade, *the persistent reliance on the student study team process, as opposed to assessing in all areas of suspected need, denied Student a FAPE.* With proper assessments, she should have been found eligible for special education as early as fall 2013. She would have received specialized academic instruction from a special education teacher in a smaller classroom. She would have received speech therapy and possibly other related services from licensed providers trained to work with children with special needs. She would have had the benefit of an IEP team knowledgeable in special education procedures to evaluate her progress, establish goals, and monitor and report on her progress. Student received none of those benefits through the time of hearing.

Order at p. 26, para 42. (emphasis added).

81.94. The Administrative Law Judge also noted that the:

District's <u>standard policy was not to proceed straight to the special education assessment process under the IDEA</u> when requested, but instead to go through the COST referral[1] and student study team process, using the response to intervention [RTI] strategy in lieu of assessments. However, an RTI process does not replace the need for a comprehensive evaluation. . . .Therefore, response to intervention is not intended to be used as a substitute for the assessment process under the IDEA.

---

[1] The District relies on something it refers to as a "Coordination of Services Team" or "COST" referral to initiate the SST process, again in lieu of an assessment for special education or disability accommodations.

24

~~Second~~Third Amended Complaint

Opinion at p. 31, para 66 (emphasis added).

82.95.This Decision is attached hereto as Exhibit B, and finds that student was prevailing party on all claims on all issues decided.

83.96.Although M.B. prevailed in this Decision, she cannot be afforded complete relief, as she continues to be educated in a District that systemically violates the law by failing to identify students with disabilities, under-identifying disabilities even when it does assess students, failing to adhere to procedural protections, and otherwise violating the nondiscrimination mandates designed to ensure meaningful access to educational programs. The fundamental conduct of the District has not changed.

84.97.Moreover, although the Administrative Law Judge identified significant legal violations with respect to M.B., she failed to afford complete individual relief for M.B. in the form of necessary, appropriate and complete compensatory education to fully address the violations. M.B. thus appeals the remedial portion of her administrative decision.

98.    SheIn addition, M.B. continues to be affected by the District's illegal policies and has never received a complete remedy for these violations. First, the Administrative Law Judge only provided M.B. relief as to the District's illegal actions taken on or before the date she filed her administrative complaint, September 16, 2016. However, M.B.'s claims continued to accrue even after that time. For instance, M.B.'s mother signed a plan to assess M.B.'s disabilities in November 2016; however, the District did not hold an IEP meeting, find M.B. eligible for services, or provide her initial services until May 8, 2017. This seven-month delay in completing M.B.'s child find, holding her IEP meeting and providing her with special education services was not addressed in her initial administrative hearing, and she did not receive a remedy as to it.

99. Second, the Administrative Law Judge in M.B.'s original case ordered that the District conduct an autism assessment, as M.B.'s mother had specifically identified autism as a possible disability as early as M.B.'s kindergarten year. However, the ALJ did not retain jurisdiction to monitor the outcome of this assessment, despite M.B.'s specific request that she do so, and the ALJ did not order that the District do anything as a result of any assessment findings. The assessment, completed in February of 2018, found that M.B. did in fact have autism. Thus, she had lost five years of autism services due to the District's failure to assess her in all areas of suspected disability. However, because the Administrative Law Judge did not retain jurisdiction over that assessment, M.B. has not yet received a remedy for that the District's child-find violation as to her autism.

100. Similarly, the ALJ ordered an educational therapist to provide a report to the parties regarding compensatory services based on then-known information regarding M.B. However, the ALJ only ordered the parties to discuss this report at an IEP, not that the remedies actually be provided. The independent educational therapist in her report recommended specific interventions including, but not limited to, 700 hours of individual compensatory instruction. However, because the order only stated the parties were to "discuss" this report, M.B. has not received any services recommend by the educational therapist.

101. The Order also included that M.B. would receive an independent occupational therapy assessment for fine and gross motor needs, but this evaluation has not been completed.

102. Further, M.B. – now identified as having autism – is still waiting for a final autism program, as the District decided to conduct further assessments to address her needs. Thus, M.B. still continues to suffer from the District's initial child find violations, which began a number of years ago.

26
~~Second~~Third Amended Complaint

85.103.    M.B. is also entitled to attorneys' fees and costs as the prevailing party in the underlying administrative proceeding, and requests those fees through this action.

### Plaintiff I.G.

86.104.    I.G. has an anxiety disorder and medically diagnosed insomnia, for which he takes medication. I.G. lives with his parents and sister in Oxnard. His family is low income.

87.105.    I.G. demonstrated clear signs of anxiety and insomnia that caused extensive absences and had a significant impact on his academic performance throughout his time at the District. Despite clear signs and admitted awareness of these conditions and their impact on his school performance, the District chose to do nothing, year after year. The District's inaction contributed to a dangerous cycle – without tools to address his school-related anxiety and insomnia, I.G.'s fear of attending school grew, his insomnia continued and he missed even more school, making it that much more difficult for him to return and be comfortable at school.

88.106.    Teacher testimony and the District's own written record confirmed that the District was aware I.G. had a health condition that caused extensive absences and affected his academic performance at least by the Fall trimester of I.G.'s second grade year, if not before.

89.107.    As early as kindergarten (2012-2013 school year) and first grade (2013-2014 school year)), I.G. was extremely difficult to get up in the morning due to his insomnia, and often displayed extreme signs of anxiety at home. Sometimes I.G. would not fall asleep until one or two o'clock in the morning – he would toss and turn in his bed. I.G. was taking medication for his insomnia, and his mother would try to time the medication so that he would fall asleep on time, but not be groggy in the morning. She was not always successful.

27

SecondThird Amended Complaint

I.G. was often extremely tired in the mornings. When it came time to get ready for school I.G. would often cry and scream, and would sometimes be shaking. He would often hide under the blankets in his bed or in the bathroom. He would often scream "please don't take me to school!"  His mother's goal was to get her son to go to school, but she had a very difficult time doing so as a result of his sleep disorder and anxiety.

90.108.     The District's own analysis and records indicate that I.G. consistently demonstrated anxious behaviors and academic difficulties since kindergarten. I.G. was referred for R.T.I. (response to intervention) in kindergarten, although the District has no information about the nature, extent or duration of that R.T.I. services. In Kindergarten, his teacher noted that "I.G. had noticeable difficulty transitioning from home to school throughout the school year." By the end of the year, he was "Below Basic" in writing and number sense, and "Basic" in all other areas of Language Arts and Math.

91.109.     I.G.'s academic and behavioral troubles, as well as absences continued in the first grade, with his cumulative record reflecting "Many absences. Had difficulty separating from Mom in the morning." His academic performance decreased, particularly in Math., He was "Below Basic," in all areas of Math by the end of his first-grade year, and still only "Basic" in the vast majority of other categories, including almost all of Language Arts, and History, Science and Physical Education. Comments from his first-grade teacher, include "Needs to pay better attention;" "Does not actively participate in class discussions;" "Poor attendance affects school work and academic progress;" and "Making slow progress in reading."

92.110.     I.G.'s first grade teacher said that I.G. was often worried at school about when he could see his mother, where his mother was, and when he could go home.

SecondThird Amended Complaint

93.111.    Others noted similar troubling behaviors. The school counselor, recalled an incident that year when I.G. did not receive an award at a school ceremony and became extremely upset and began "hitting himself on the desk." The principal at the time, Ms. Wennes, considered I.G. to just be "one of their criers," in that she often saw him crying in the morning.

94.112.    Despite an enormous number of absences for I.G. during these years, 30 and 39 absences respectively, the school took *no* action, other than an unsigned attendance contract in the record and some attendance meetings.

95.113.    I.G.'s second grade (2014-2015 school year) teacher testified that she was aware early in the first trimester that I.G.'s absences were caused by his insomnia, and that his absenteeism increased as the year went on. I.G.'s mother told her that his absences were caused by insomnia in the first trimester.

96.114.    I.G.'s second-grade teacher, Ms. Pascual, saw the effects of the insomnia, testifying that he would fall asleep in class on average once per week and would become irritable when Ms. Pascual would wake him up. She testified that I.G. would have "outbursts" in class where he would become angry, slam his hand on the desk and lift the desk up, and would take out books and hit the desk with them. These outbursts happened with enough frequency to cause her concern. Typically, she would send I.G. to the office and his mother would come and pick him up. She estimated that she referred him to the office 10-20 times. When she spoke to I.G.'s mother, his mother explained it was probably due to lack of sleep. Ms. Pascual also testified that I.G. was not fully alert in class. She stated that she was concerned about academics as I.G. seemed to be missing out because he was absent and not fully alert in class. Ms. Pascual also testified that I.G. was "grumpy" at school about half the time.

97.115.     The ~~teachers~~teachers' notes for the year reflect a child in distress.  The cumulative record notes that "I.G. has had many health issues and missed many days. He became very aggressive and defiant."

98.116.     Despite these concerns, Ms. Pascual did not make a special education referral. In essence, Ms. Pascual said she thought it was an issue (1) of a health/medical nature, (2) that affected school performance, but assumed the doctor would handle it. She also stated that she had not received training on special education referrals.

99.117.     At the end of the year, I.G.'s report card reflects a student who continued to fail academically. His grades were mostly 1's and 2's in the core areas of Language Arts and Math. In "Standards for Mathematical Practices," in particular, I.G. received all 1's. His report card was clear that "poor attendance affects school work and academic progress."

100.118.     Despite a total of *46* absences for the year and testimony indicating I.G.'s teacher knew the absences were related to hiss health condition, the school took no action.

101.119.     Ms. Gonzales, I.G.'s third grade (2015-2016 school year) teacher, said that I.G. was in an "emotional state" about coming to school, and would say he did not feel well, did not want to be there and wanted to go home. Ms. Gonzales recalled that he would frequently put his head down and cry. She noted that he was absent *a lot*. She believed he did not want to be at school. I.G.'s mother told her that I.G. feels anxious, that it was a struggle getting him to school, and that he had struggled with insomnia. Sometime in the first month of school, Ms. Gonzales recalls I.G.'s mother telling her that anxiety was the reason I.G. was not coming to school and that it was a struggle to get him to school. However, Ms. Gonzalez stated that she believed it was I.G.'s mother's responsibility to get a diagnosis.  She also testified that she had never received training on special

30

~~Second~~Third Amended Complaint

education assessments and that her understanding was that she could not make a special education referral without first utilizing the District's own procedures – including the SST process – first.

102.120.    Ms. Gonzalez also testified that she talked to the principal, the attendance clerk and school counselor about her concerns regarding I.G. and his absences, because she was "alarmed" and believed they needed to do something. However, she did not discuss any services for I.G. to address these concerns, and did not know of any actions that any of the others may have taken to do so.

103.121.    Again, by the end of third grade, it was clear I.G. was continuing to struggle. His report card reflects ongoing challenges in math, with about half of his scores as D's, despite "Excellent" effort. His teacher's notes in his cumulative file state that "Slowly developed more confidence. [H]igh # of absences. Struggles in Math. Separation issues with mom. *Very* respectful boy." I.G.'s standardized testing scores from June of 2016 show that he was below standard in reading and writing in language arts, and below standard in "concepts and procedures" and problem solving and modeling & data analysis" in math.

104.122.    Despite a total of *47* absences for the year, the school took no action other than some attendance meetings and another unsigned attendance contract.

105.123.    After the filing of I.G.'s due process complaint in September of 2016, the District finally assessed I.G. for special education. The assessment report that was completed December 13, 2016 by the District, and overseen by an outside school psychologist, stated that:

> I.G. has demonstrated anxious behaviors on a consistent basis
> since kindergarten; these behaviors are observed in the
> school as well as the home settings. These behaviors impact
> his educational performance within the school setting as he

31

SecondThird Amended Complaint

has not been able to regularly attend school since kindergarten.

106.124.    The assessment found that these anxious and depressive symptoms also impact his ability to learn when he is physically present at school as they "impact[] his ability to remain engaged in learning when he is physically present to the classroom." Notably, "these behaviors have impacted his access to learning *to a marked degree*." (emphasis added).

107.125.    I.G. was found eligible for special education at his initial IEP held on November 30 and December 14, 2016 and his special education services started on January 9, 2017.

108.126.    On May 12, 2017, after a four-day evidentiary hearing, the Administrative Law Judge in I.G.'s case found that the District had violated his rights under IDEA, and in particular child find, and its attendant procedure, since the beginning of second grade in 2014. More specifically, the "District failed to meet its child find duties and refer Student for assessment when it learned that Student's poor attendance, fatigue, and irritability were allegedly caused by a sleeping disorder or insomnia. Ms. Pascual [the second-grade teacher] had reason to suspect that Student had a disability as of September 30, 2014." Order at p. 30, para 26.

109.127.    The Administrative Law Judge noted, *inter alia*, that the problem in the District was systemic:

> Here, Student should have been assessed in the fall of 2014 but was not assessed until two year(s) [sic] later. Fundamental to District's failure to timely assess was a general misunderstanding of a school district's child find obligations. General education teachers, counselors, and administrators stated that they did not suspect Student to have

32

SecondThird Amended Complaint

a disability that might need to be addressed by special education services, because Student's absences were the consequence of a medical issue. Yet everyone agreed that Student's chronic absenteeism and early removal negatively affected his academics….[¶] *District personnel's misunderstanding in this regard was systemic.*

Order at p. 35-36, para 16-17 (emphasis added). He further noted that the District's admitted policy of utilizing SST's "failed to address Student's educational needs and meet District child find duties." Order at p. 30, para 25.

110.128.    This Decision is attached hereto as Exhibit C, and finds that student was prevailing party on all claims on all issues decided from 2014 through the date of filing of the complaint.

111.129.    Although I.G. prevailed in this Decision, he cannot be afforded complete relief, as shehe continues to be educated in a District that systemically violates the law by failing to identify students with disabilities, under-identifying disabilities even when it does assess students, failing to adhere to procedural protections, and otherwise violating the nondiscrimination mandates designed to ensure meaningful access to educational programs. The fundamental conduct of the District has not changed.

112.130.    Moreover, although the Administrative Law Judge identified significant legal violations with respect to I.G., he failed to afford complete individual relief for I.G. in the form of necessary, appropriate and complete compensatory education to fully address the violations. I.G. thus appeals the remedial portion of his administrative decision.

131.    He is also entitled to attorneys' fees and costs as the prevailing party in the underlying administrative proceeding, and requests those fees through this action.

33

SecondThird Amended Complaint

**Plaintiff F.S.**

132.    F.S. is eight years old and in the fourth grade in Oxnard School District, where she has attended school since the first grade. Like many students in the Oxnard School District, she is an English Language Learner and speaks Spanish at home. Her mother is a monolingual Spanish speaker.

133.   F.S. has struggled academically since beginning in Oxnard School District three years ago in the first grade. She has long demonstrated flags that should have prompted an evaluation for special education services.

134.   These flags should have been recognized by the District since at least the second grade. The District has conceded in administrative proceedings that F.S. should have been found eligible for special education services by August of 2016, the beginning of her second-grade year.

135.   Now entering the fourth grade, F.S. is far behind her peers.

136.   In first grade, during the 2015-2016 school year, F.S. received grades of "F" "D" and "C" in Language Arts, and "D" "F" and "B" in math. Her teacher noted on her report card that by the end of her first grade year, F.S. was below academic benchmarks in high frequency word spelling and far below benchmarks in fluency.

137.   By the end of second grade in the 2016-2017 school year, F.S. received "1's" – "far below meeting benchmark" – in *all academic subjects*. Her teacher's comments include "making slow progress in reading," and "she needs to remember to say in her seat and follow directions." F.S.'s scores on the California English Language Development test ("CELDT") from her second-grade year reflect that her writing scores actually went down as compared to her first-grade year. Despite this dire performance, she was promoted to third grade.

138.   There are no recorded interventions in F.S.'s file for her second-grade school year. Nor did the District provide F.S.'s parents with information

34

SecondThird Amended Complaint

about requesting a special education assessment or their rights under special education laws.

139.   Starting in August 2017, the District was on notice that F.S. had problems reading, as it offered reading interventions to F.S. in that month. However, it did not offer a special education assessment or provide F.S.'s parents with information about how to request such an assessment.

140.   By the beginning of third grade in the 2017-2018 school year, F.S. had scored all "1's" – the lowest grade possible – in Language Arts, and scored only "2's" in math, as well as listening comprehension and speaking. She was rated as "needing improvement" in staying on task, completing homework, and being respectful. Her report card notes that she was at risk of retention.

141.   Rather than making a referral for a special education assessment, in February of 2018, the school held an SST meeting for F.S. The notes of that meeting indicate that her mother expressed concerns about F.S.'s language acquisition, and that her teacher reported she was low in reading. They also note that F.S. remained at the "beginning" level on the CELDT exam, despite the fact that she had been in Structured English Immersion classes at the District.

142.   Rather than offer a special education assessment in February 2018, the District instead had F.S.'s mother bring her to school early every day for additional reading intervention, without any understanding of what was causing her reading delay, and despite the fact that prior general education interventions had resulted in no gains.

143.   F.S. continued to struggle at school. The District held another SST meeting on May 22, 2018. The notes from that meeting indicate that F.S.'s mother had taken her to her doctor to address questions regarding her hearing, lack of attention, and low academics. The notes further reflect that F.S.'s mother had requested an assessment from the District via written letter. The notes also reflect

35

~~Second~~Third Amended Complaint

that the reading interventions provided "no growth." The SST notes state that a "multidisciplinary assessment" would be conducted; however, no assessment plan was provided at the time of the meeting.  At the end of May 2018, which was the end of F.S.'s third-grade year, F.S. scored very low on standardized tests.  She scored below standard across the board on the California Assessment of Student Performance and Progress ("CASPP"), and she scored significantly below standard in both English Language Arts and Math on that test.  In her STAR testing in May of 2018, F.S. scored as a 1.7 grade level equivalent in math, even though she was about to complete the third grade. Her STAR reading scores reflected a student with little literacy, as she received a percentile rank of 1 and a grade equivalent of 0.8, along with an instructional reading level that was pre-kindergarten. Nor did F.S.'s grades improve at all over her third-grade year.

144.   Parent signed an assessment plan in June 2018, but this plan did not include a social emotional evaluation or adaptive skills as part of the initial evaluation.

145.   On August 16, 2018, F.S. started the fourth grade. F.S.'s counsel requested her records from the District on August 20, 2018, and on August 30, 2018, F.S.'s counsel filed an administrative complaint with the OAH. It was only after that date, on October 9, 2018, that the District completed its initial assessment of F.S. that also included social emotional and adaptive skills evaluation.

146.   The District's October 2019 assessment showed that, like the other plaintiffs in this matter, F.S.'s academic scores were catastrophically low. In fact, in many educational areas F.S. fell at or below the 0.1 percentile as compared to her peers. The assessment documented F.S.'s serious language issues; for example, it noted that during reading and writing tasks F.S. "struggled to write a complete sentence," that she can only read simple words correctly 40% of the

36

~~Second~~Third Amended Complaint

time, and that she is not acquiring English at a level commensurate to her peers.

147.   The October 2019 assessment also identified other possible attention and emotional issues.  On rating scales from the teacher, F.S. rated "clinically significant" in attention issues, functional communication and study skills. During an observation, the assessor found that when the teacher walked away from directly instructing her, F.S. "appeared lost." F.S. also reported that "she doesn't have friends." Despite these flags that F.S. may have attention-related disabilities impacting her education, the assessment did not include a medical assessment as to those issues or discuss whether those flags may or may not be related to a health impairment.

148.   The District held an IEP meeting for F.S. on October 29, 2018 and found her eligible for services due to a specific learning disability and speech and language impairments.

149.   At the hearing on F.S.'s administrative complaint in October 2018, the District conceded that it had failed its child find duties and should have identified her in August 2016, two years before she filed her complaint for assessment. Despite that concession, the District has not provided F.S. with compensatory education for its two-year delay in identifying and assessing her.

150.   Moreover, the District has still failed to fully assess F.S. in all suspected areas of disability.  F.S.'s assessment did not fully evaluate for whether her documented attention issues rose to the level of a disability. The District should have conducted a medical or additional evaluation regarding the attention issues, so they could determine if F.S. met the criteria for a student with an Other Health Impairment under the IDEA. Thus, even after waiting two years to conduct an initial assessment for special education services, the District has still not fully assessed F.S., limiting its ability to comprehensively assess and provide her with special education services.

**Plaintiff I.H.**

151.   I.H. started at the District's Rose Avenue Elementary School for kindergarten and had significant difficulty in that first year. On February 26, 2016 the District held the first of four SST meetings for I.H.  At this SST, the District noted clear areas of concern that were red flags for possible disabilities including "Speech; Social/Emotional; Temper, throws fits; Angry; Lack of attention/focus." It noted that I.H. struggles with math, "can't orally segment, can't blend, can't rhyme." It offered a social skills "boys group," a speech "observation" and to "continue with all academic areas." This meeting was held without I.H.'s parents, and his parents were not provided with the notes or any information regarding requesting a referral for special education.

152.   I.H.'s grades at the end of kindergarten were primarily D's in academics and N (needs improvement) in responsibility and behavior.  The teacher's notes include "difficulty understanding" "easily distracted" "difficulty staying on task".

153.   Nevertheless, I.H. transitioned to first grade at Rose Avenue without a referral for a special education assessment, where he continued to demonstrate increasingly intense behavioral issues and academic needs. On October 25, 2016, the District held a second SST meeting, again without I.H.'s parents.  At this SST, the District documented that I.H. had a frontal lisp / articulation issue, was "low in all academic areas" and that he gets upset easily. Rather than conduct an evaluation for special education, the District continued its "wait and see" approach, recommending afterschool tutoring, continued social skills group, and another intervention called "ASP" (but only if there were "spots available").

154.   I.H.'s behavior continued to escalate throughout the year. He began throwing chairs and toppling over desks and using foul language, demonstrating increasingly dysregulated behavior on a much larger scale. On March 28, 2017 I.H.

38

~~Second~~Third Amended Complaint

kicked another student and was suspended. At some point, the school made a referral to an agency for clinical counseling to be provided at school, but still did not refer I.H. for a special education assessment or tell his parents about their right to request such an assessment.

155.   On April 26, 2017, the District held a third SST meeting, again without I.H.'s parents, documenting that I.H. was attending clinical counseling as a result of a school referral, that I.H. continued to have severe behaviors, and that he was far below basic in all academics. Areas of concern included "academic, emotional, health, attendance, social and home concerns." It noted that he struggles with focus and remembering information, and that he had a temper, explaining that he "runs out of class, hits, throws chairs, no self-control. Gets upset often. Physically aggressive." It also stated that there was minimal improvement in his academics, and that he had a diagnosis of "disruptive, impulsive and conduct disorder."

156.   Again, the SST team did not recommend a referral for a special education assessment. Instead, the notes indicate there would be a "504 Plan" for the 2017-2018 school year and counseling would continue. This is despite the fact that shortly after this meeting, the principal emailed the District stating that he believed that the situation raised safety issues for children and others at the school. Again, the meeting was held without I.H.'s parents. Although the SST indicated that a 504 Plan (for accommodations based on disability) would be provided, the District never created a 504 Plan and did not provide any accommodations.

157.   When I.H.'s mother requested a special education assessment, the school held another SST meeting on May 18, 2017. By that time I.H.'s records indicate that he was "far below basic" in all academic areas. Struggles with focus and remembering information…was dismissed from the after school program due to behavior concerns…does not participate or engaged in class…struggles with

39
SecondThird Amended Complaint

number sense and recognizing numbers." At this time, the SST team finally agreed to a referral to special education services.

158. I.H.'s mother finally received an assessment plan along with information needed by the psychologist (assessment protocols) from the District in May 2017 and returned it sometime over the summer of 2017. The District asked I.H.'s mother to sign the same assessment plan again on September 20, 2018 and again fill out the assessment protocols.

159. For his second-grade year, I.H. transferred to Cesar Chavez elementary school. His behavior concerns there began immediately, with referrals for discipline starting at the beginning of the year, and escalating by October to multiple large-scale incidents, resulting in repeated class evacuations and discipline including suspensions, physical holds and restraints, and calls to law enforcement.

160. Despite the clear and extreme escalation of the situation, the District failed to complete its assessment in a timely manner. Instead of issuing a report within 60 days as is required, the District waited until January 11, 2018 to complete I.H.'s initial special education. In addition, the District never provided any reasonable accommodations under Section 504 of the Rehabilitation Act to I.H. based on his diagnoses, despite clear documentation that the I.H. needed such accommodations.

161. Even though the District had not yet completed I.H.'s assessments, the District "opened" an IEP on November 9, 2017 to inform I.H.'s mother that the assessments were not complete. No eligibility for special education services was discussed and no services were offered at that IEP. Instead, the District told I.H.'s mother – without the benefit of any assessments – that I.H. was making a "deliberate choice" not to access the curriculum.

40
~~Second~~Third Amended Complaint

162.   I.H.'s assessment, which the District shared on January 10, 2018, found that, like the other Plaintiffs, he had severe academic deficits. His reading fluency and math facts fluency were both less than the first percentile. His reading comprehension, math calculation skills and written expression were all at or below the tenth percentile, with the single exception of spelling. The assessment also documented a history of spiraling behavior while at school. On rating scales completed by his parent and teacher he was deemed to be clinically significant in hyperactivity, aggression, conduct problems, depression, atypicality, withdrawal, and attention problems. At the time of the initial assessment, I.H. was exhibiting extreme behaviors, inability to stay in class, inability to interact with peers in a typical manner and inability to complete work.

163.   Despite the serious behavioral flags for autism identified in his assessment and I.H.'s uncle, who worked with a child with autism, discussing his concern regarding autism with both the teacher and administration, the District never assessed I.H. for autism. On January 11, 2018, the District held a second IEP, finding I.H. eligible for special education services under the category of Speech and Language Impairment due to his lisp, and Other Health Impairment, apparently due to his diagnoses of ADHD and disruptive disorder, although this is not entirely clear in the documentation. It offered I.H. limited speech and language services, limited special education instruction in math and reading, and a basic behavior plan based on incomplete information. However, the District offered no behavior services or counseling services—despite clear needs in these areas, including the numerous use of restraints, suspensions for behavior, classroom evacuations because of I.H.'s behavior, in school removals, and removal from participation with his peers.

164.   I.H.'s behavior continued to escalate, and by January 22, 2018 he had been suspended seven times. The District held a manifestation determination to

41

~~Second~~Third Amended Complaint

decide if his behavior was related to his disability.  The District found that it had failed to implement the IEP, because the behavior aide it had provided I.H was untrained.  Additionally, though I.H. needed intensive individual behavior services, the District did not include those services in the IEP.

165.   At some point in January 2018, because of I.H.'s increased behaviors, the District crafted a plan outside the IEP process to remove I.H. from his regular classroom and place him in a windowless conference room with a substitute teacher, an untrained behavior aide, and no other students.  The District's plan instructed that, only if I.H. demonstrated no "escalations" was he allowed back into his regular classroom. Unsurprisingly, I.H.'s behavior increased. This continued until late February of 2018, when the District held another IEP and counsel for I.H. identified that it was illegal to craft such a plan outside the IEP process.  At this IEP meeting, the District finally documented I.H.'s need for and entitlement to, the provision of a behavior aide and supervision of that aide.

166.   I.H. then returned to his general education class. After returning to class, I.H. had two incidents of extreme behavior. As a result of a March 9, 2018 behavior incident, the District held another manifestation determination, via two IEPS, on March 15 and 22, 2018. At that point, the District sent I.H. to Casa Pacifica, a nonpublic school for children with emotional disturbance, on an "interim placement" through the end of the school year.  I.H. remained at Casa Pacifica until June 8, 2018, at which point he. and the District disagreed about his educational placement. Casa Pacifica did not provide the correct type of behavior interventions for I.H., given his needs. While at Casa Pacifica, I.H. was injured on at least three occasions, including an incident where he received a gash in the back of his head that required four staples.

SecondThird Amended Complaint

167.   Importantly, I.H.'s IEP team was continuing to work off of incomplete information, as the District had never completed all necessary assessments, including an assessment for autism. Thus, he was still not completely "found" under the IDEA because the District had failed to evaluate for all suspected disabilities.

168.   As a result, in February 2018, counsel for I.H. requested an independent evaluation for Autism based on flags in his educational records and initial assessment.  The independent assessment for Autism was conducted by a national expert in autism, Dr. Betty Jo Freeman. She found that I.H. has autism, and that he had severe behavior deficits, among other conditions, that would impact his education.   Despite this finding, the District rejected the diagnosis of Autism at an IEP meeting in July of 2018, and, to date, has refused to find I.H. eligible as a student with Autism. Thus, he and the District have an ongoing dispute regarding the District's child find process with respect to the District's failure to identify and assess I.H. in all suspected areas of disability, including autism, as well as its failure to refer I.H. for appropriate services and placement. Additionally, the District refused to allow I.H. to return to school after his interim placement. Plaintiff had to file a complaint with OAH, which resulted in a ten-day hearing. The decision is expected by January 2018.  As a result of this ongoing dispute, I.H. has not been in school since school began in August of 2018.

**Plaintiff W.H.**

169.   W.H. is a second-grade student who has a learning disability that impacts the areas of reading, writing and math. Despite clear signs of suspected disability, and a regularly reiterated parent request for a special education assessment over the course of more than two years, to date, the District has not thoroughly assessed W.H. for her suspected disabilities and thus has not found W.H. eligible for special education services.

43

~~Second~~Third Amended Complaint

170.   In September 2016, when W.H. was in kindergarten, her mother made a request for a special education assessment because she was concerned about W.H.'s language, reading, writing and emotional needs. At that time, counsel for W.H. specifically informed the District that it could not use its SST process in responding to W.H.'s mother's request.  W.H.'s mother returned a signed assessment plan to the District on October 14, 2016.

171.   The District conducted an assessment and found that W.H. had an expressive language delay as well as deficits in phonological processing, auditory comprehension and attention.  Despite this finding, the District failed to find W.H. eligible for special education.

172.   W.H.'s parents disagreed with the District, both as to the thoroughness of its initial assessment and its denial of eligibility for special education.  They requested an independent psychoeducational and speech and language assessment. These independent assessments were completed in January 2018 and November 2017, respectively. Both assessments recommended special education eligibility for W.H. However, the District refused to accept either recommendation.

173.   Though the district failed to find special education eligibility, it did approve a plan for W.H. for accommodations under Section 504 of the Rehabilitation Act, stating that W.H.'s disability was "substantially impacting" her academics.  However, it continued to deny special education eligibility and services.

174.   W.H.'s parent obtained a third independent evaluation through an agreement with the District, which was completed on October 14, 2018. This evaluation that W.H. has a learning disability and also recommended eligibility for special education services.

44
~~Second~~Third Amended Complaint

175.   The evaluation confirmed that W.H., similar to the other Named Plaintiffs, is catastrophically low academically. As a second grader, she is functioning at the kindergarten level in reading, math, and writing. She is at the first percentile in reading and written expression.

176.   To date, the District has not accepted or considered this evaluation, contrary to its "child find" duties under the IDEA. Because the District has not made decisions based on an accurate assessment of W.H.'s suspected disabilities, it has improperly found W.H. not eligible for *any* special education services.

### Plaintiff I.B.

177.   Plaintiff I.B. is a fourth-grade student with issues of memory, attention, executive functioning, and auditory processing. Despite flags that he may be eligible for special education services at the very least in his third- and fourth-grade years, he has still not been found eligible for special education or provided accommodations for his disabilities.

178.   The District has been on notice that I.B. may have a disability at least since his third-grade year.  I.B.'s report cards have shown that he has difficulty staying on task, using time efficiently, listening, and following directions. Further, at the end of I.B.'s third-grade year, his standardized testing indicated that he read at a 2.2 grade level in Spanish, his dominant language—meaning that he read in his dominant language as if he were at the beginning of the second grade. The District's records indicate that it held at least one SST meeting for him at some point during or before I.B.'s third-grade year.

179.   I.B.'s parents requested that he receive a special education assessment on April 7, 2018, when I.B. was at the end of his third-grade year. I.B.'s mother was concerned about his focus, academic progress and social and emotional needs. His mother signed an assessment plan on April 24, 2018.

45
~~Second~~Third Amended Complaint

180.   The District assessed I.B. in June 2018.  That assessment documented I.B.'s issues with memory, attention, executive functioning and auditory processing. It noted difficulties concentrating, organizing, and staying on task. Among other things, his teacher noted "extreme difficulties" staying on task and following directions: "he has trouble focusing attention on one thing while ignoring distractions and appears disorganized." His teacher rated I.B. as "clinically significant" in the areas of learning problems, executive functioning, ability to plan and ability to organize materials, and her overall ratings indicated that I.B. may have attention deficit hyperactivity disorder. However, the assessment failed to identify I.B.'s disabling conditions or fully evaluate for attention, behavior, and other learning disabilities.

181.   Though the District's assessment identified clear evidence of disability that impact I.B.'s education, the District inappropriately found I.B. not eligible for special education services at an IEP meeting on September 6, 2018. I.B.'s parents disagreed and requested an independent evaluation on that same day. While the District agreed to fund an independent assessment, as of November 9, 2018, no such assessment had been initiated.

182.   Thus, I.B. is not receiving special education services to this day as a result of the District failure to recognize flags of I.B.'s suspected disability and its failure to complete an initial evaluation in all areas of I.B.'s suspected disability.

**Plaintiff Primero Los Niños**

183.   Primero Los Niños is a membership organization made up of parents of children with disabilities and/or difficulties learning English who attend school in the Oxnard School District.  Several parents realized the need for such a group in the summer of 2014, after learning that they had shared experiences seeking services for their children in the District. They began to have monthly meetings during the 2014-2015 school year.  The monthly meetings have attracted an

46

~~Second~~Third Amended Complaint

average of 10-12 members, although those members have changed over time. In between the monthly meetings, Primero Los Niños has also held informal meetings with individual families who have specific questions about their children's educational rights. Thus, the overall number of families served by Primero Los Niños is 15-20 at any given time.

184. At Primero Los Niños meetings, members typically discuss common concerns affecting their children's education and options for addressing those concerns. Primero Los Niños provides parents with educational information about their rights as well as the procedures for filing complaints on a variety of issues, including special education, language access and school conditions' issues.

185. The Oxnard School District's practice of failing to timely identify and thoroughly evaluate children who may need special education or other disability-based services and accommodations frustrates Primero Los Niños' mission of ensuring that children in the District have appropriate educational services.

186. In response to several questions and concerns raised by parents of students with suspected and/or known disability-related needs, Primero Los Niños has had to educate its members about their rights to have their children assessed for appropriate disability-based services and the procedures for challenging the District's failures to conduct such assessments.

187. Primero Los Niños has also spent significant amounts of time and resources fielding questions and complaints and seeking out referrals and options for advocacy regarding the District's failure to identify and serve the needs of children with disabilities.

188. Additionally, Primero Los Niños has formally requested public records from the District to identify relevant data and other public information needed to assess the effectiveness of the District's policies and practices regarding

47
~~Second~~Third Amended Complaint

its special education program, including its policies and practices regarding the identification and assessment of children with disability-related needs.

189.   Further, Primero Los Niños has hosted events where it has invited advocates to assist parents whose children need special educations services and have been unable to secure special education assessments from the District.

190.    Primero Los Niños continues to field complaints on these issues and has referred such complaints to legal advocacy groups.

191.   There have been at least twenty members of Primero Los Niños who have been affected by the Oxnard School District's practice of failing to timely identify and evaluate children who may need special education services or other disability-based services and accommodations.  Primero Los Niños has provided them information about their rights and referred them to other groups for more intensive advocacy.  Primero Los Niños continues to receive complaints and concerns about these issues and address them as these issues continue to arise.

192.   For example, M.Y. is eight years old and in the third grade at Sierra Linda Elementary School in the District. She has been diagnosed with anxiety and school phobia by her doctor and has been receiving clinical counseling services through a third-party provider. The school phobia resulted from serious and pervasive bullying at school, including being choked by the bully. Despite this, the District did not provide M.Y with accommodations under Section 504 for her disability, and instead asserted that M.Y. was not eligible for accommodations despite her diagnoses. The District similarly found her not eligible for special education. Members of Primero Los Niños answered M.Y.'s parents questions, discussed M.Y.'s situation, and ultimately referred M.Y. to Learning Rights Law Center for assistance with advocacy.

193.   Similarly, H.V. is nine years old and in the fourth grade at Sierra Linda Elementary School in the District. She was also referred to Learning Rights

48

SecondThird Amended Complaint

Law Center for advocacy through members of Primero Los Niños. H.V. has been seeking special education services since March of 2017. Her mother was concerned that she was struggling in all academic areas. After H.V.'s mother requested a special education assessment, the District held an SST meeting and conducted in incomplete assessment. That assessment did not find H.V. eligible for services, despite noting numerous red flags for suspected disabilities. As a result, H.V.'s family sought an independent evaluation, which was provided to the District in October 2017. At an IEP meeting, the District refused to accept the recommendation of eligibility from the independent evaluator. Instead, it waited another year, until October 18, 2018, to hold another IEP meeting to find H.V. eligible for services. By that time, she was a fourth grader functioning at the first-grade level in reading, with a reading score in the first percentile.

**Inability to Obtain Class or Systemic Relief in Administrative Actions**

194.   F.S., I.H. and Primero Los Niños have all filed administrative actions in an attempt to resolve these systemic and ongoing disputes at an administrative level. However, the California Office of Administrative Hearings ("OAH") has made clear that its jurisdiction is narrow, and that it will not hear any claims on behalf of a class, any requests for systemic relief, or any claims beyond the IDEA.

195.   F.S. and Primero Los Ninos filed their joint administrative complaint on August 30, 2018. On October 1, 2018, the Office of Administrative Hearings held that it does not have jurisdiction at all over the claims of the proposed organizational Plaintiff, Primero Los Niños; does not have jurisdiction over individual student's claims under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act; and does not have jurisdiction over any claims brought on behalf of the class of similarly situated individuals. *See* Ruling, dated October 1, 2018, attached as Exhibit D, at 2. It further held that it does "not have jurisdiction to hear Student's claims of systemic violation." *Id.* While it ruled that

49

~~Second~~Third Amended Complaint

a hearing would proceed, it excluded all claims but individual relief to F.S. under the IDEA, thus making it impossible for either of the proposed Plaintiffs to obtain the relief they seek through OAH.  The proposed Plaintiffs have therefore attempted to exhaust available administrative remedies on the systemic claims at issue for the class and have not "prevailed." Indeed, OAH has demonstrated the futility of attempting to exhaust the systemic claims by dismissing those claims for lack of jurisdiction. OAH heard F.S.'s individual claims on October 31, 2018.

113.196.     I.H. filed his administrative complaint on August 16, 2018. I.H. also pled additional claims against the District, including claims under the ADA and Section 504. Those claims also were dismissed by OAH for lack of jurisdiction on September 25, 2018. His IDEA claims were heard by an ALJ on October 4, 15-17, 22-25, 29-30. However, as evidenced by the ruling regarding F.S. and Primero Los Niños, I.H. is not able to obtain class relief through his administrative action.

## CLASS ALLEGATIONS

114.197.     Plaintiffs bring this action on behalf of themselves and all other persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2).

115.198.     The class consists of all students in Oxnard School District who have or may have disabilities and who have been or will be subject to the District's policies and procedures regarding identification and evaluation of students for purposes of providing services or accommodations under the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act and/or the Americans with Disabilities Act.

116.199.     Class action status for this litigation is proper because:

a. The class of students is so numerous that joinder of all members is impractical. Plaintiffs maintain that the class of persons consists of

50

SecondThird Amended Complaint

hundreds of young students. For instance, data regarding typical special education enrollment as compared to the District here suggests that somewhere between 200 and 400 students in need of services and accommodations remain unidentified by the District. Moreover, the student population changes over time and not all class members can be specifically identified.  In addition, many students who have a disability are not identified as such, because of Defendants' failure to fulfill their obligations under federal laws to locate, identify and assess youth suspected of having a disability.

b.  There are questions of law and fact common to the class.

c.  The claims of Plaintiffs are typical of the claims of the class. Plaintiffs are being and were denied their legal entitlement to special education, related services, and reasonable modifications to Defendants' policies and practices.

d.  Plaintiffs will fairly and adequately protect the interests of the class as there is no conflict between Plaintiffs and the other class members and Plaintiffs have retained counsel experienced in class action litigation relating to education, special education, and the civil rights of persons with disabilities.

e.  Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole.

## FIRST CAUSE OF ACTION

### Individuals With Disabilities Education Act

### 20 U.S.C. §14000, *et seq.*

~~117.~~200.    Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs.

51

~~Second~~Third Amended Complaint

118.201.    Under IDEA, as recipients of federal education funds, the Defendants have the duty to provide a Free Appropriate Public education (FAPE) to all students with disabilities. 20 U.S.C.§§ 1412(a)(l),(b), 1413(a).

119.202.    A FAPE consists of special education and related services that are consistent with curriculum standards set by the state of California and conform to the student's IEP. 20 U.S.C. § 1401(9). Special education is "specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability." 20 U.S.C.§ 1401(29).

120.203.    IDEA's primary mandate is the guarantee that "all children with disabilities have available to them a [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

121.204.    To carry out this broad mandate, the District must have in effect policies, procedures and programs to ensure that all children who are in need of special education and related aids and services are identified, located, evaluated and provided a specially-designed Individualized Education Program ("IEP"). 20 U.S.C. §§ 1412(a)(1), (a)(3)-(7), (a)(16), 1413(a)(1), 1414(a)-(e); 34 C.F.R. §§ 300.111, .301, .304-.311.

122.205.    More specifically, Districts must ensure that "children with disabilities residing in the State and children with disabilities attending private schools . . . regardless of the severity of their disabilities, and who are in need of special education and related aids and services are identified, located, and evaluated . . . ." 20 U.S.C. § 1412(a)(3)(A). This is commonly known as the "Child Find Duty."

123.206.    The Child Find Duty requires school districts to timely identify, locate, and evaluate all children with suspected disabilities. *Id.* §

52

SecondThird Amended Complaint

1412(a)(3); 34 C.F.R. §§ 300.101(c), 300.111. School districts, thus, must fulfill their Child Find obligation; otherwise, a child who has a disability or suspected disability under IDEA will not be identified and accordingly, will not receive appropriate special education.

124.207.    Thus, the Child Find Duty requires that a school district systematically seek out and find those students in need of special education and related services and evaluate those students in a timely manner, such that they can receive needed services and accommodations.

125.208.    Once a child is identified, school districts must promptly seek parental consent to evaluate him or her for special education, under mandated timeframes, including when the child has not made adequate progress after an appropriate period of time when provided with appropriate instruction. 20 U.S.C. §§ 1414(b)(6); 34 C.F.R. §§ 300.301, 300.309(c). School districts must evaluate a child who is referred for an evaluation by a parent unless they provide adequate written notice giving their reasons for refusal. 34 C.F.R. § 300.503. IDEA requires school districts to conduct comprehensive "initial evaluations" to "determine whether a child is a child with a disability" and "determine the educational needs of such child." 20 U.S.C. §§ 1414(a)-(c); see also 34 C.F.R. § 300.301.

126.209.    The evaluation must encompass all suspected areas of the child's disability. 20 U.S.C. § 1414(a)(3)(B). Evaluation results are then discussed with parents in an IEP team meeting to determine if the child is eligible for special education. *Id*. § 1414(a)(4).

127.210.    The results of these evaluations are used to determine the child's eligibility for special education and related aids and services as well as to make decisions about an appropriate educational program for the child.

128.211.    As a corollary to this, school districts must give parents prior written notice within a reasonable time before they propose or refuse to initiate or

SecondThird Amended Complaint

change the identification, evaluation, or educational placement or the provision of FAPE to the child. 34 C.F.R. § 300.503. Thus, school districts must obtain informed written parental consent in order to support an initial evaluation of a student and an initial provision of special education services. Parental consent is further required to provide special education services and re-evaluations. Parental consent means that the parent is "fully informed of all information relevant to the activity for which consent is sought, in his or her native language, or through another mode of communication," and that the parent "understands and agrees" in writing to the carrying out of the activity for which his or her consent is sought. 34 C.F.R. § 300.9.

129.212.    By failing to identify and evaluate students in need of services and accommodations Defendants have violated the protections of IDEA.

130.213.    As a result of the foregoing, Plaintiffs and members of the proposed class suffered and continue to suffer injury, including, but not limited to, denial of meaningful access to the benefits of a public education.

131.214.    Because Defendants' discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies. Plaintiffs seek injunctive relief and attorneys' fees as a result.

132.215.    Named Plaintiffs M.B. and I.G. also appeal the remedial portions of their underlying administrative decisions.

216.    Named Plaintiffs W.H., F.S., I.B., and M.B. seek compensatory educational services for Defendants' violations.

133.217.    Plaintiffs seek attorneys' fees both for this federal case, as well as the underlying administrative actions, OAH Case No. 2016100053, OAH Case No. 2016100009, and OAH Case No. 2016091036; OAH Case No. 2018090070.

## SECOND CAUSE OF ACTION

### Americans With Disabilities Act

54

SecondThird Amended Complaint

**42 U.S.C. §12131, *et seq.***

134.218.    Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs.

135.219.    Congress enacted the ADA upon finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. § 12101(a) (2).

136.220.    In response to these findings, Congress explicitly stated that the purpose of the ADA is to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b) (1)-(2).

137.221.    Title II of the ADA provides in pertinent part: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

138.222.    Pursuant to Title II public entities are required to provide meaningful access to their programs, services and activities. Among the requirements to provide meaningful access, public entities must modify their policies and procedures when necessary to accommodate disability related needs, also known as "reasonable accommodation." 28 C.F.R. §35.130(b)(7). Public entities cannot provide programs, services or benefits to a person with a disability that are not equal to those provided to others or deny a person with a disability the opportunity to participate in programs, services or activities. 28 C.F.R. §35.130(b)(1)(iii). Moreover, public entities are required to administer their

55
SecondThird Amended Complaint

programs, services and activities in the most integrated setting appropriate. *Id.* at §35.130(d).

139.223.    At all times relevant to this action, the District is a "public entity" within the meaning of Title II of the ADA and provides a program, service or activity to the general public.

140.224.    At all times relevant, including at the time of each alleged violation of the ADA, Plaintiffs and members of the proposed class are qualified individuals with disabilities within the meaning of the ADA. Their disabilities substantially limit a variety of major life activities, including but not limited to, learning, reading, writing, and concentrating.

141.225.    At all times relevant, including at the time of each alleged violation of the ADA, the District provided services, programs and activities in its public schools, and was obligated to provide Plaintiffs and members of the proposed class with reasonable accommodations that they needed to enjoy meaningful access to the benefits of those services, programs and activities, and otherwise not exclude them from its educational program.

142.226.    Defendants acted in violation of Title II of the Americans with Disabilities Act through failing to provide Plaintiffs and members of the proposed class with meaningful access to Defendants' educational program.

143.227.    As a result of the foregoing, Plaintiffs and members of the proposed class suffered and continue to suffer injury, including, but not limited to, denial of meaningful access to the benefits of Defendants' educational program.

144.228.    Because Defendants' discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies. Plaintiffs seek injunctive relief and attorneys' fees as a result.

**Named Plaintiffs' Individual Remedies**

56
SecondThird Amended Complaint

229.   With respect to I.H. individually the District has violated Title II of the Americans with Disabilities Act, and Plaintiff I.H. thereon alleges that Defendant committed the acts and omissions alleged herein with intent and/or deliberate indifference to Plaintiff's rights.

230.   As a result of the foregoing, I.H. suffered injury. As a direct and proximate result of the aforementioned acts, Plaintiff has suffered, and continues to suffer loss of educational services and attainment, as well as humiliation, hardship and anxiety, due to Defendant's failure to address accommodations, modifications, services and access required for Plaintiff's disabilities, and its exclusion of Plaintiff I.H. Plaintiff I.H. has also been physically injured by Defendants' actions. Plaintiff I.H. thus seeks monetary damages in addition to the injunctive relief and attorneys' fees outlined above.

231.   Plaintiffs F.S., I.H., W.H., M.B. and I.B. also seek compensatory services on an individual basis for the denial of their rights under this statute as part of an equitable remedy.

### THIRD CAUSE OF ACTION

### Section 504 of the Rehabilitation Act of 1973

### 29 U.S.C. § 794(a)

145.232.   Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs.

146.233.   Under Section 504, a qualified individual with a disability may not, solely by reason of his/her disability, be subjected to discrimination, excluded from participation in, or denied the benefits of, any program or activity receiving Federal financial assistance.  29 U.S.C. § 794(a).

147.234.   Under Section 504, the phrase "program or activity" includes a local educational agency.  29 U.S.C. § 794(b) (2) (B).

57

SecondThird Amended Complaint

148.235.    Under Section 504 public entities are required to provide meaningful access to their programs, services and activities. Specifically, the aids, benefits and services provided must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement." 34 C.F.R. §104.4(b)(2). Further, public entities may not "[p]rovide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others," *Id.* at §104.4(b)(1)(iii).

149.236.    Section 504 mandates that a student who is eligible for special education and related aids and services under Section 504 is entitled to receive FAPE. 34 C.F.R. § 104.33.

150.237.    Section 104.35(a) of the regulations requires school districts to conduct an evaluation of any student who needs or is believed to need special education or related aids and services because of disability before taking any action with respect to the studentsstudents' initial placementplacements and before any subsequent significant change in placement.

151.238.    At all times relevant, including at the time of each alleged violation of Section 504, Defendants received federal financial assistance as a public school.

152.239.    At all times relevant, including at the time of each alleged violation of Section 504, Plaintiffs and members of the proposed class were qualified individuals with disabilities within the meaning of Section 504 or were regarded as having a disability. Plaintiffs disabilities substantially limits a variety of major life activities, including but not limited to, learning, reading, writing, and concentrating.

153.240.    Defendants acted in violation of Section 504 by failing to provide Plaintiffs with meaningful access to their educational program.

58

SecondThird Amended Complaint

154.241.    As a result of the foregoing, Plaintiffs and members of the proposed class suffered and continue to suffer injury, including, but not limited to, denial of meaningful access to the benefits of a public education program.

155.242.    Because Defendants' discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies. Plaintiffs seek injunctive relief and attorneys' fees as a result.

<u>**Named Plaintiffs' Individual Remedies**</u>

243.   With respect to I.H. individually, the District has violated Section 504, and Plaintiff thereon alleges that Defendant committed the acts and omissions alleged herein with intent and/or deliberate indifference to Plaintiff's rights.

244.   As a result of the foregoing, I.H. suffered injury. As a direct and proximate result of the aforementioned acts, Plaintiff has suffered, and continues to suffer loss of educational services and attainment, as well as humiliation, hardship and anxiety, due to Defendant's failure to address accommodations, modifications, services and access required for Plaintiff's disabilities, and its exclusion of Plaintiff I.H. Plaintiff I.H. has also been physically injured by Defendants' actions. Plaintiff I.H. thus seeks damages in addition to the injunctive relief and attorneys' fees outlined above.

245.   Plaintiffs F.S., I.H., W.H., M.B. and I.B. also seek compensatory services on an individual basis for the denial of their rights under this statute as part of an equitable remedy.

<u>**PRAYER FOR RELIEF**</u>

Plaintiffs pray this Court enter judgment as follows:

1. A finding that Defendants' conduct violated the Individuals with Disabilities Education Act, 20 U.S.C. §1400, *et seq.*; Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* (the "ADA"); and Section

59

SecondThird Amended Complaint

504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 *et seq.* ("Section 504").

2. An injunction ordering Defendants to comply with the requirements of the IDEA, ADA, and Section 504, including but not limited to reform of policies and procedures within the District, appropriate training for all staff, a process for seeking out and evaluating those students in need of evaluations, and monitoring by independent expert(s).

3. Appropriate compensatory educational services for M.B., I.G~., F.S.,~ I.H., W.H. and I.B. under all applicable statutes

4. Compensatory monetary damages for Plaintiff I.H., according to proof.

5. An injunction ordering the District to provide J.R. with the full compensatory education granted in the Decision by Settlement in her case.

~4.~6.          Plaintiffs' reasonable attorneys' fees and costs in this action and the underlying administrative proceedings OAH Case No. 20161000053, OAH Case No. 2016100009, ~and~ OAH Case No. 2016091036, OAH Case No. 2018090070, including, but not limited to under, 20 U.S.C. §1415(i)(3); 42 U.S.C. §12205, and 29 U.S.C. §794(b).

~5.~7.          Such other and further relief as the Court deems just and proper.

Dated:  ~September 14, 2017~ November 12, 2018          LEARNING

RIGHTS LAW CENTER

—                                    LAW OFFICE OF SHAWNA L.

PARKS

60

~Second~Third Amended Complaint

DISABILITY RIGHTS

CALIFORNIAADVOCATES

By: _____

SHAWNA L. PARKS
*Attorneys for Plaintiffs*

SecondThird Amended Complaint