ALBERT ERKEL (SBN 93793)
aerkel@ghslaw.com
NORMA NAVA FRANKLIN (SBN 266827)
nnava@ghslaw.com
JANET LY (SBN 211401)
jly@ghslaw.com
GARCIA HERNANDEZ SAWHNEY, LLP
801 N. Brand Blvd., Suite 620
Glendale, CA 91203
PHONE (213)-347-0210
FAX (213) 347-0216

Attorneys for Defendants Oxnard School District,
Cesar Morales, Ernest Morrison, Debra Cordes,
Denis O'Leary, Veronica Robles-Solis, and
Monica Madrigal Lopez

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.R., a minor, by and through her guardian ad litem, Janelle McCammack; M.B., a minor, by and through her guardian ad litem, F.B.; I.G., a minor, by and through his guardian ad litem, M.E., on behalf of themselves and all those similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> OXNARD SCHOOL DISTRICT; CESAR MORALES, Superintendent of Oxnard School District, in his official capacity; ERNEST MORRISON, President of the Board of Trustees, in his official capacity; DEBRA CORDES, Clerk of the Board of Trustees, in her official capacity; DENIS O'LEARY, Trustee of the Board of Trustees, in his official capacity; VERONICA ROBLES-SOLIS, Trustee of the Board of Trustees, in her official capacity; MONICA MADRIGAL LOPEZ, Trustee of the Board of Trustees, in her official capacity; and DOES 1 TO 10, inclusive <br><br> Defendant | Case No.: 2:17-cv-04304-JAK-FFM <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' SECOND RENEWED MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> **[Supporting Declarations, Proposed Order, and Application to File Documents Under Seal Filed Concurrently]** <br><br> **Date:  June 17, 2019** <br> **Time:  8:30 a.m.** <br> **Court:  10B** <br>        **First Street Courthouse** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................1

II.   STATEMENT OF FACTS ................................................................................2

  A.   Plaintiffs ignored this Court's instruction and, once again, refused to identify sub-classes when defining the alleged class. ................................................................2

  B.   Student Support Teams are permissible under the IDEA and supplement a school district's child find process. ...................................................................................3

  C.   The District's policies and procedures for identifying and assessing students with suspected disabilities comply with federal and state law. ....................................4

  D.   The District heavily invested and prioritized its special education services to students.................................................................................................................5

  E.   The District does not have a system wide policy of holding SSTs as a substitute for special education assessments mandated under the IDEA. .............................6

  F.   Since 2016, the Oxnard School District found an additional 401 students in need of special education services......................................................................................8

  G.   Whether a student is or should be referred for special education assessment depends on a number of factors and involves a fact specific inquiry for each student. ...............................................................................................................9

  H.   D.C. and A.E. did not exhibits signs of requiring special education services........9

   i.   D.C..............................................................................................................9

   ii.  A.E. ..........................................................................................................10

   iii. M.L.'s parents often failed to respond to the District's attempts to contact them regarding M.L.'s academic performance...............................................................12

III.  ARGUMENT....................................................................................................13

DEFENDANTS' OPPOSITION TO SECOND RENEWED MOTION FOR CLASS CERTIFICATION

A.   PLAINTIFFS FAIL TO PROVE EACH ELEMENT OF RULE 23(a) BY A PREONDERANCE OF THE EVIDENCE. .......................................................13

B.   PLAINTIFFS FAIL TO PROVE THAT THE PROPOSED CLASS IS SO NUMEROUS THAT JOINDER WOULD BE IMPRACTICABLE. .................14

  i.   The Data previously relied on by Plaintiffs' expert to establish numerosity is outdated and non longer applicable. .........................................................14

C.   THERE IS NO COMMON QUESTION OF LAW OR FACT BETWEEN D.C., A.E., AND M.L. AND THE BROAD CLASS DEFINED IN THE FOURTH AMENDED COMPLAINT. ...................................................................16

  ii.  There is no commonality between class representatives A.E. and D.C. whom the District reasonably did not suspect as requiring special education services and class members whom the district knows or suspects require special education services but has yet to find them..............................................................16

  iii. There is no commonality between the broad class defined in the Fourth Amended Complaint and M.L., who spent his formative years in Mexico and whose English language barrier, rather than a learning disability, was the suspected hindrance to his academics. .....................................................................18

D.   THE PROPOSED CLASS REPRESENTATIVES' CLAIMS ARE ATYPICAL TO THOSE OF THE CLASS AND, ACCORDINGLY, THE PROPOSED CLASS REPRESENTATIVES CANNOT ADEQUATELY REPRESENT THE CLASS. ...........................................................................................18

E.   THE PROPOSED CLASS REPRESENTATIVES MUST FIRST EXHAUST ADMINISTRATIVE REMEDIES BEFORE ASSERTING THEIR CLAIMS IN THIS COURT. ........................................................................................20

F.   PLN LACKS STANDING TO ASSERT CLAIMS FOR INJUNCTIVE RELIEF ON BEHALF OF THE CLASS ....................................................................21

IV.  CONCLUSION.................................................................................................22

DEFENDANTS' OPPOSITION TO SECOND RENEWED MOTION FOR CLASS CERTIFICATION

1
2

# <u>TABLE OF AUTHORITIES</u>

3

Cases

4

*A.P. ex rel. Powers v. Woodstock Bd. of Educ.,*

5

   572 F.Supp.2d 221 (D.Conn.2008) ................................................................4

6

*Beth v. Carroll,*

7

   87 F.3d 80 (3rd Cir. 1996)..........................................................................21

8

*Californians for Disability Rights, Inc. v. California Dept. of Transp.,*

9

   249 F.R.D. 334 (N.D. Cal. 2008) ................................................................15

10

*D.K. v. Abington Sch. Dist.,*

11

   696 F.3d 233 (3d Cir. 2012) .........................................................................4

12

*Doe v. Arizona Dept. of Educ.,*

13

   111 F.3d 678 (9th Cir. 1997) ......................................................................20

14

*E. Bay Sanctuary Covenant v. Trump,*

15

   909 F.3d 1219 (9th Cir. 2018) ....................................................................21

16

*Ellis v. Costco Wholesale Corp.,*

17

   657 F.3d 970 (9th Cir. 2011) ................................................................15, 18

18

*Estate of Barabin v. AstenJohnson, Inc.,*

19

   740 F.3d 457 (9th Cir. 2014) ......................................................................15

20

*Hanon v. Dataproducts, Corp.,*

21

   976 F.2d 497 (9th Cir. 1992) ......................................................................19

22

*Heldmen v. Sobol,*

23

   962 F.2d 148 (2d Cir. 1992) .......................................................................21

24

*Hoeft v. Tucson Unified School Dist.,*

25

   967 F.2d 1298 (9th Cir. 1992) ...............................................................20, 21

26

*In re Hydrogen Peroxide Antitrust Litig.*

27

   (3rd Cir. 2009) 552 F.3d 305......................................................................14

28

*J.G. v. Board of Educ.,*
  830 F.2d 444 (2d Cir. 1987) ...................................................................21

*J.S. v. Scarsdale Union Free Sch. Dist.,* 826 F.Supp.2d 635 (S.D.N.Y.2011) ...................4

*Keegan v. American Honda Motor Co., Inc.,*
  284 F.R.D. 504, n. 83 (C.D. Cal. 2012) ..........................................14

*Kumho Tire Co., Ltd. V. Carmichael,*
  526 U.S. 137, 119 S. Ct. 1167, 143 (1999) .....................................15

*Leyva v. Medline Industries, Inc.,*
  716 F.3d 510 (9th Cir.2013) ...........................................................13

*New Mexico Ass'n for Retarded Citizens,*
  678 F.2d 847 (10th Cir. 1982) .........................................................21

*Oscar Private Equity Investments v. Allegiance Telecom, Inc.*
  487 F3d 261 (5th Cir. 2007) ............................................................14

*P.P. v. Compton Unified Sch. Dist.,*
  2015 WL 5752770 *18 (C.D. Cal. 2015) .........................................19

*Parsons v. Ryan,*
  754 F.3d 657 (9th Cir. 2014) .....................................................13, 16

*S.B. v. California Dept. of Educ.,*
  327 F.Supp.3d 1218 (E.D. Cal. 2018) .............................................20

*Teamsters Local 445 v. Bombardier, Inc.,*
  546 F.3d 196 (2d Cir. 2008) ............................................................14

*United States v. Vallejo,*
  237 F.3d 1008 (9th Cir. 2001) ....................................................4, 15

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338, 131 S.Ct. 2541 (2011) ..............................................13

Statutes

20 U.S.C. § 1412 ...................................................................................4

DEFENDANTS' OPPOSITION TO SECOND RENEWED MOTION FOR CLASS CERTIFICATION

34 C.F.R. § 300.307 ............................................................................................ 3

Fed. R. Evid. 702 .............................................................................................. 15

Fed.R.Civ.P. 23 ................................................................................... 13, 14, 18

Other Authorities

Newberg on Class Actions § 3:28 (5th ed. 2011) ............................................ 19

DEFENDANTS' OPPOSITION TO SECOND RENEWED MOTION FOR CLASS CERTIFICATION

<div align="center">

**MEMORANDUM OF POINTS AND AUTHORITIES**

</div>

## I.  INTRODUCTION

Plaintiffs, once again, fail to meet the elements for class certification under Federal Rule of Civil Procedure 23 (a) by a preponderance of the evidence.

In this most recent round of pleadings, Plaintiffs present A.E., D.C., and M.L. as the proposed class representatives for a broadly defined class of students with suspected disabilities who have yet to be found by the District.  Plaintiffs A.E. and D.C., however, are not students with suspected disabilities.  The preponderance of the evidence suggests that A.E. and D.C. are intelligent students with very good language skills who communicate well.  A.E. improved his grades after the school implemented measures discussed during an SST meeting.  D.C. improved her grades and behavior after the school executed a "Behavior Contract" with her that required periodic progress reports from her teachers.  Indeed, district staff, reasonably, did not suspect either D.C. or A.E. to require special education services.  A.E.'s and D.C.'s claims are therefore not common or typical of the proposed class.

M.L.'s claims are also not common or typical of the proposed class.  M.L. spent his formative early education years in Mexico where he received good grades.  He began experiencing academic difficulties when he transferred to the Oxnard School District at eight years old.  District staff reasonably attributed M.L.'s academic difficulties to a language barrier.  District staff also attempted several times without success to meet with M.L.'s family to discuss his academic progress.  M.L.'s claims are also not common or typical of the proposed class.

Even if Plaintiffs establish commonality or typicality, which they cannot, Plaintiffs fail to provide substantial evidence that they meet the numerosity element of class certification.  On this motion, Plaintiffs rely on the h2018 Declaration of Peter Leone to establish numerosity.  This declaration is based on outdated 2014-2016 enrollment data that Mr. Leone analyzed to reach the conclusion that the District is under-identifying approximately 200 students.

<div align="center">

1

</div>

More recent data suggests that the District's total student enrollment has decreased while the District's special education enrollment has increased.  The District currently estimates that approximately 12.8% of its students are enrolled in special education programs.

Finally, Plaintiffs admittedly failed to exhaust their administrative remedies, as required under the IDEA.  Plaintiffs' claims do not rise to the level of truly systemic wrongs that justify finding an exception to this exhaustion requirement.

Defendants request that the Court deny Plaintiffs class certification because they fail to exhaust administrative remedies and because they cannot meet all elements of Federal Rule of Civil Procedure 23(a).

## II.    STATEMENT OF FACTS

### A. Plaintiffs ignored this Court's instruction and, once again, refused to identify sub-classes when defining the alleged class.

Plaintiffs once again allege that the District denies its students a Free Appropriate Public Education ("FAPE") under the IDEA by implementing a "standard policy" of not assessing its special education students.  According to Plaintiffs, the District either refuses to assess students that it suspects require special education services or informally evaluates students using a Student Success Team (SST) meeting process *rather than* conducting formal assessments.  Dkt. 232, Fourth Amended Complaint ("Fourth AC"); ¶ 5; Dkt. 246, Request for Judicial Notice ("RJN"), Ex. A, Third Amended Complaint ("TAC"), ¶ 4.

Plaintiffs also, once again, seek injunctive relief against the District on behalf of a broadly defined class of students:

"All students in Oxnard School District who have or may have disabilities and who have been or will be subject to the District's policies and procedures regarding identification and evaluation of students for purposes of providing services or accommodations under the Individuals with

DEFENDANTS' OPPOSITION TO SECOND RENEWED MOTION FOR CLASS CERTIFICATION

Disabilities Education Act, Section 504 of the Rehabilitation Act and/or the Americans with Disabilities Act."

Dkt. 232 Fourth AC, ¶ 179; Dkt. 246, RJN, Ex. A, TAC, ¶ 198.

Plaintiffs refused to narrow the class definition despite two orders by this Court requesting that Plaintiffs address distinctions amongst its proposed class representatives. Indeed, on June 6, 2018, the Court requested that Plaintiffs define sub-classes to account for differences among class members. Dkt. 128, June 6, 2018 Civil Minute Order, p. 14 of 17. The Court requested a narrower class again on February 15, 2019 when it wrote, "Plaintiff may consider narrowing the class claims and the class definition to correspond to the claims of the proposed class representatives, creating sub-classes, and/or adding new proposed class representatives with standing to bring the broader set of class claims." Dkt. 207, February 15, 2019 Civil Minute Order, p. 17 of 18.

Despite these clear instructions from the Court, Plaintiffs refused to narrow their class definition.

**B. Student Support Teams are permissible under the IDEA and supplement a school district's child find process.**

Contrary to Plaintiffs' claims, SSTs are an important tool for the District to gather information and develop a complete picture of a student's needs prior to timely assessing the student. This process is permissible under and contemplated by the IDEA.

As part of a criteria to determine if a student has a specific learning disability, the IDEA mandates states to allow the use of a process based on the child's response to scientific or research based intervention. 34 C.F.R. § 300.307(a)(2). States may also allow the use of alternative research based procedures to determine whether a student has a specific learning disability. 34 C.F.R. § 300.307(a)(3). In California, school based SSTs provide a critical process to determine whether students who exhibit low academic performance or behavioral issues should be assessed for special education services.

Federal law requires school districts to determine whether a student has a specific learning disability. To do so, schools must meet "child find" obligations by locating and

1   identifying students suspected of having learning disabilities.  20 U.S.C. §

2   1412(a)(3)(A).   However, contrary to Plaintiffs' position, "child find" does not demand

3   that schools conduct a formal evaluation of every struggling student.  *D.K. v. Abington*

4   *Sch. Dist.*, 696 F.3d 233, 249 (3d Cir. 2012) (citing *J.S. v. Scarsdale Union Free Sch.*

5   *Dist.,* 826 F.Supp.2d 635, 661 (S.D.N.Y.2011) ("The IDEA's child find provisions do

6   not require district courts to evaluate as potentially 'disabled' any child who is having

7   academic difficulties.").) "A school's failure to diagnose a disability at the earliest

8   possible moment is not *per se* actionable, in part because some disabilities 'are

9   notoriously difficult to diagnose and even experts disagree about whether [some] should

10  be considered a disability at all.'"  *D.K.*, 696 F.3d at 249 (citing *A.P. ex rel. Powers v.*

11  *Woodstock Bd. of Educ.,* 572 F.Supp.2d 221, 226 (D.Conn.2008).)

12        In instances where it is not clear that a student who struggles academically may

13  require special education services, the District properly holds an SST to gather more

14  information about the Student.  Dkt. 81, Declaration of Amelia Sugden ("Sugden

15  Decl."), ¶ 25.  Indeed, the United States Department of Education *confirmed* that the

16  SST process is *permissible* under the IDEA.  During the public comments period

17  anticipating new federal regulations in 2006, the United States Department of Education

18  received a comment that "recommended clarification regarding whether States can

19  develop and implement policies that permit screening of children to determine if

20  evaluations are necessary."  *A.P. ex rel. Powers v. Woodstock Bd. of Educ.*, 572 F.Supp.

21  2d 221, 227, n. 2 (D. Conn 2008) (citing to 71 Fed. Reg. 46540, 46639.)  The

22  Department of Education responded that "[t]here is nothing in the Act that requires a

23  State to, *or prohibits a state from*, developing and implementing policies that permit

24  screening children to determine if evaluations are necessary."  *Id.* (emphasis added).

25  This response from the Department of Education confirms that SSTs are, and always

26  were, permissible under the IDEA.  *Id.*

27      **C. The District's policies and procedures for identifying and assessing students**

28          **with suspected disabilities comply with federal and state law.**

District procedure requires a student be referred for special education assessment upon Parent request or upon the request of a teacher or other staff person who believes that a student has a suspected learning disability.  Upon receiving a request from a parent for special education assessment, each school site is expected to respond to the request within the legal timeline of 15 calendar days with a proposed assessment plan.  If an SST is convened after a parental request for an assessment, the SST takes place before the conclusion of the 15 day deadline.  For example, in the case of A.E., an SST was held 9 days after A.E.'s parent made a written request[1] for an assessment.[2]  Declaration of Tiffany Grande ("Grande Decl."), ¶¶ 5-6.

In these instances, the SST is convened to gather input from the student's parent, the student's teacher, and other school staff regarding any concerns relating to the student. The information gathered from the SST is then used to generate an assessment plan, which is presented to Parent by the 15 day deadline.  Once the parent consents to the assessment plan, the District assesses the student for all areas of suspected disability. The same process and timeline is followed whether the request for assessment originates from a parent or from a school staff person.  Dkt. 81, Sugden Decl., ¶ 24.

**D. The District heavily invested and prioritized its special education services to students.**

Beginning in 2016, the District conducted trainings for its school administrators, school principals, assistant principals, school psychologists, speech pathologists, and

---

[1] Parent claims that she first made a verbal request for an assessment to Assistant Principal Genaro Magana on or about February 14 or 15, 2019.  Mr. Magana disputes Parent's claim.  In addition, it is the school's practice to have all visitors first sign a visitor log before meeting with school administrators. Parent's name does not appear on the school visitor logs for February 14 or 15, 2019.  Declaration of Genaro Magana ("Magana Decl."), ¶¶ 6-7, Ex. A.

[2] At the SST, A.E.'s parent decided that she did not want the assessment after all and instead decided to wait until the school had more information related to her child.  Grande Decl., ¶ 10; Garcia-Napoles Decl., ¶ 10.  The school ultimately did not give A.E. an assessment plan after parent made the informed choice to withdrew her request for an assessment.  Id. at ¶¶ 10-11.  Although parent claims that she did not understand her rights to continue with the assessment, Parent is a high school graduate who speaks fluent English.  Franklin Decl., ¶ 2, Ex. C, 11:2-6 Parent also received a copy of the special education "Parent Safeguards and Procedural Rights" at the SST.  Magana Decl., ¶ 9, Ex. B and ¶ 12.  This documents outlines the parent's right to continue with the assessment.

5

DEFENDANTS' OPPOSITION TO SECOND RENEWED MOTION FOR CLASS CERTIFICATION

special education teachers on the District's responsibilities regarding the "child find" process, and their responsibilities regarding the importance of SSTs.  Dkt. 81, Sugden Decl., ¶ 8.  At the beginning of the 2017-2018 school year, the Special Education Department also hosted a training for all general education teaching staff, paraprofessionals, aides, student study team members, school administrators, service providers, counselors, school psychologists, speech and language therapists, and any other school staff who worked with parents and students on their educational programs at Soria Elementary School, Elm Elementary School, and Sierra Linda Elementary School. The training addressed special education eligibility, child find duties, and the ability to directly refer a student for assessment, and provided guidelines to identify students who might have disabilities and might benefit from special education services. By the 2018-2019 school year, child find trainings were completed at all school campuses.  See, Id., ¶ 9 (indicating plans to hold District wide child find trainings to all staff).

In addition, the District added 22 new staff members, including special education managers, full time psychologists, translators, speech pathologists, and 5 specialist teachers to assist its special education student population.  Id., ¶ 11-12.  The District has also restructured and increased resources in its infant and pre-school programs and centralized and increased its inventory of assessments.  Id., ¶¶ 14-18.  Finally, the District hired consultants to review IEPs, to provide professional development to speech and language pathologists, and to develop a comprehensive behavior support plan for the District.  Id., ¶¶ 19-22.

**E. The District does not have a system wide policy of holding SSTs as a substitute for special education assessments mandated under the IDEA.**

A plain reading of Plaintiffs' pleadings, and their own counsels' admissions, clearly indicate that the District indeed has a policy of assessing students that require special education services.  For instance, Plaintiffs concede that the District found and assessed plaintiffs W.H. and I.B. prior to their filing a complaint in this action, but

DEFENDANTS' OPPOSITION TO SECOND RENEWED MOTION FOR CLASS CERTIFICATION

contend that their assessments were incomplete because the District ultimately failed to find them eligible for special education services.  Dkt. 232, Fourth AC, ¶¶ 131, 155, and 164; see also Dkt. 246, RJN, Ex. A, TAC, ¶¶ 162-163 (Stating that former Plaintiff I.H.'s assessment was incomplete but conceding that the District was providing special education services to I.H. prior to the filing of the Third Amended Complaint.)

Plaintiffs also repeatedly admit that the District is prompt to offer assessments once it discovers that it failed to "find" its students.  In discussing the difficulty of finding a Plaintiff with Article III standing, Plaintiffs' counsel stated:

> "The reason is, that in order to determine if they need to be identified, we
> need to get public records from the District.  And so we submit a public
> records request.  This identifies the student to the District and the District
> initiates a process, which we argue would not occur unless we were
> involved."

Dkt. 246, RJN, Ex. G, February 4, 2019 Reporter's Transcript, 20:13-18.  Plaintiffs' counsel even refused to disclose the identities of A.E., M.L., and D.C. to the District prior to filing the Fourth Amended Complaint because they admittedly did not want the District to immediately offer assessment plans.  Id., Ex. C, Pls. Opp'n to Defs.' Ex Parte Application, 8:16-24; Ex. D, Declaration of Stuart Seaborn in support of Pls. Opp'n to Defs.' Ex Parte Application, ¶ 5.  The District provided A.E., M.L., and D.C. assessment plans "within days" of discovering their identity from the Fourth Amended Complaint. Id., Ex. C, Pls. Opp'n to Defs.' Ex Parte Application, 8:25-9:1, n. 4 and 9:10-13, n. 5.  If Plaintiffs' allegations in paragraph 5 of their Fourth AC are true, then the District would *have no means* of offering assessment plans because, according to Plaintiffs, the SST process is the District's only means of evaluating students.  Dkt. 232, Fourth AC; ¶ 5 (see also); Dkt. 246, RJN, Ex. A, TAC, ¶ 4 (alleging that the District does not asses [and therefore offers no formal assessment plans], but rather engages in informal evaluations through the SST process.)

DEFENDANTS' OPPOSITION TO SECOND RENEWED MOTION FOR CLASS CERTIFICATION

The District also maintains data of instances where students bypass the SST process and instead are directly assessed upon a referral by District Staff.  Specifically, the District tracks its special education enrollment figures through its SIRAS system.[3]  Declaration of Katrina Madden in Support of Defendants' Opp'n to Pls' Second Renewed Motion for Class Certification ("Madden Decl."), ¶ 8, Ex. A.  In 2018, 277 of the students enrolled in the District's special education programs were found and assessed as a result of direct teacher referrals or referrals by other District personnel.  Id.

**F. Since 2016, the Oxnard School District found an additional 401 students in need of special education services**.

In its June 6, 2018 Civil Minute Order, the Court accepted data presented by Plaintiffs' expert, Peter Leone, that the District had lower student special education enrollment numbers than the state average.  Specifically, the Court stated in its order:

> "Based on a review of enrollment data from 2014-2016 school years, Leone states that 10.3% to 10.8% of students statewide were enrolled in special education programs, but range within the District was lower, *i.e.*, 8.5% to 9.4%.  Leone opines that if the rates of special education identification were the same as the statewide identification rate, at least 200 additional students in the District would be enrolled in such services."

Dkt. 128, June 6, 2018 Civil Minute Order, p. 12 of 17.

However, more recent data indicates that the District has increased its special education assessments while the District's total student enrollment numbers have concurrently decreased.  For instance, during the 2016-2017 school year, there were approximately 17,485 students enrolled in the District.  Madden Decl., ¶ 9, Ex. A.  In the 2018-2019 school year, that number decreased to 16,185 students.  Id.  In addition, the District increased the number of students enrolled in its special education programs from

---

[3] The SIRAS System is a comprehensive web-based special education management system that manages OSD's IEP documents, special education caseloads, and interfaces with the California Department of Education's ("CDE") special education reporting system known as CASEMIS.  Madden Decl., ¶ 4.

8

DEFENDANTS' OPPOSITION TO SECOND RENEWED MOTION FOR CLASS CERTIFICATION

1,688 in 2016 to 2,083 in 2018.  Id., ¶ 6.  Currently, approximately 12.8% of the
District's student population is receiving special education services.  Id.

**G. Whether a student is or should be referred for special education assessment**
**depends on a number of factors and involves a fact specific inquiry for each**
**student.**

There are multiple factors that determine whether a student should be referred for
special education assessment. These factors include whether a parent or staff person
(including a teacher) expressly requests that a student be assessed, whether SST
determines that an assessment is necessary after progress monitoring and response to
intervention, whether a student is an English Language Learner ("ELL") student or a
recent immigrant to this country, or even whether a student manifests an obvious
disability that interferes with his or her ability to participate in the general education
setting. Accordingly, every decision to assess a student for special education is based on
a highly individualized set of factors and is made on a case-by-case basis.  Dkt. 81,
Sugden Decl., ¶ 26; Dkt. 66, Declaration of Vicki Barber, ¶ 11.

**H.      D.C. and A.E. did not exhibits signs of requiring special education**
**services.**

   **i.   D.C.**

D.C. transferred to Driffil Elementary ("Driffil") at the beginning of eighth grade
from another school within the District.  Franklin Decl., ¶ 2, Ex. D, 17:24-18:9.
According to D.C.'s parent, D.C. transferred to Driffil because bullying was affecting her
grades.  Id., 29:2-13.

At Driffil, D.C. has sometimes exhibits defiant behavior.  However, her defiance is
not uncommon for a middle school girl.  Declaration of Carol Flores Beck ("Flores Beck
Decl."), ¶ 5; Declaration of Philip Bullard ("Bullard Decl."), ¶ 5.  D.C.'s parent does not
consider D.C. aggressive. Franklin Decl., ¶ 2, Ex. D, 14:16-18.  She does not yell at her
brother and sister and gets along well with her parents.  Id., 13:25-14:9

9

DEFENDANTS' OPPOSITION TO SECOND RENEWED MOTION FOR CLASS
CERTIFICATION

In addition, D.C.'s teachers and administrators had no suspicions that she required special education services.  Flores Beck Decl., ¶ 5; Bullard Decl. ¶ 5; Declaration of Liliana Medrano "Medrano Decl.", ¶ 4; Declaration of Louisa Jeworski ("Jeworski Decl."), ¶ 4.  D.C. expresses herself very well verbally and in writing.  Bullard Decl., ¶5. D.C.'s behavior also improved significantly after she executed a Behavior Contract that required her to receive progress reports from her teachers on a regular basis.  Bullard Decl., ¶ 5.  In these progress reports, D.C.'s teachers rated her behavior as "Excellent" and "Good" in most instances.  Franklin Decl., ¶ 2, Ex. B.

Recently, D.C. has shown that she is motivated to graduate middle school. Accordingly, she has made concerted efforts to make up missed work.  Bullard Decl., ¶ 6.

D.C. currently has a "B" in social studies and a "C+" in language arts.  Medrano Decl., ¶ 4; Jeworski Decl, ¶ 4.  She also just recently earned an "A" in on a vocabulary and reading comprehension test.  Jeworski Decl., ¶ 4; Declaration of Liliana Medrano "Medrano Decl.", ¶ 4.

Although parent claims that she sent a fax requesting an assessment, no one at the Driffil Elementary main office received or saw the faxed request, which was purportedly sent after business hours.  Flores Beck Decl., ¶ 6; Declaration of Mayra Velasquez ("Velasquez Decl."), ¶ 6.

D.C.'s parent did not inquire or confirm with anyone in the main office regarding whether the fax that she allegedly sent was received.  Flores Beck Decl., ¶ 6. Franklin Decl., ¶ 2, Ex. D, 47:3-16.

D.C. did not exhaust his administrative remedies as required by the IDEA prior to filing this lawsuit.

### ii.   A.E.

Since first grade, A.E.'s parent transferred him from one school or school district to another, year after year. Franklin Decl., ¶ 2, Ex. C, 14:1-21.  A.E. did not finish sixth grade because his parent sent him to Mexico.  Id., 34:8-12.  In 2018, the year prior to enrolling at Haydoc, A.E. spent an entire year in Mexico with no formal schooling.  Id.,

10

DEFENDANTS' OPPOSITION TO SECOND RENEWED MOTION FOR CLASS CERTIFICATION

35:20-37:7.  A.E. had only been enrolled at Haydoc Academy of Arts and Sciences ("Haydoc") a few weeks before his parent made a written request for an assessment. Grande Decl., ¶ 7-8; declaration of Monica Garcia-Napoles ("Garcia-Napoles Decl."), ¶ 9.

Despite this educational instability, A.E. is well behaved, is able to participate in normal peer social interactions, expresses himself well verbally and in writing, and is academically capable.  Lopez-Arellano Decl., ¶ 13.  A.E. keeps a journal with elaborate stories about himself.  The journal is written in complete sentences.  Teachers describe his ability to communicate and write is far above many of his classmates.  Declaration of Carlen Handley ("Handley Decl."), ¶ 6.  He has written in this journal for approximately the past four years.  Franklin Decl., ¶ 2, Ex.D, 73:8-79:9.

A.E. also maintains his own YouTube channel.  He writes and produces his own videos that he uploads to YouTube.  Id., 67:21-69:13.  Parent estimates that he has directed and produced approximately 16 YouTube videos.  Id.
A.E.'s language skills are very good.  He is able to articulate himself verbally and in writing.  Declaration of Mariana Garcia ("Garcia Decl."), ¶ 7.  A.E. is able to understand classroom content and is able to participate in class discussions with appropriate academic vocabulary.  Declaration of Elizabeth Montoya ("Montoya Decl."), ¶. 12.

A.E.'s grades have also improved without requiring special education services. After an SST was held to discuss A.E.'s academic progress, parent noticed that A.E.'s grades improved without the need for a formal assessment.  Franklin Decl., ¶ 2, Ex.D, 24:6-16.  Because A.E.'s grades improved after the SST, parent admits that she no longer had the concerns that she had when she first requested an assessment.  Id., 78:5-7.  It would not surprise parent if A.E. was not found eligible for special education services. Id., 79:16-21.

A.E. currently has a "B" in his math class.  Declaration of Altagracia Lopez-Arellano ("Lopez-Arellano Decl."), ¶ 7.  He has improved his grade in Science from an "F" to a "B" and his grade in English Language Development from a C to an A+.

DEFENDANTS' OPPOSITION TO SECOND RENEWED MOTION FOR CLASS
CERTIFICATION

Handley Decl., ¶ 9; Declaration of Patty Zamora ("Zamora Decl."), ¶ 8.  A.E. also has an A in physical education.  Declaration of Patrick Sayer ("Sayer Decl."), ¶ 6.

Teachers are not concerned that A.E. has problems controlling his behavior. Lopez-Arellano Decl., ¶ 8; Handley Decl., ¶ 11' Montoya Decl., ¶ 7; Garcia Decl., ¶ 9; Zamora Decl., 9.  They describe A.E. as very polite and respectful.  Montoya Decl., ¶ 7; Garcia Decl., ¶ 9.

Teachers at no point suspected him of needing special education services.  Lopez-Arellano Decl., ¶ 13; Handley Decl., ¶ 11-12; Garcia Decl., ¶ 10; Zamora Decl., ¶ 9; Sayer Decl., ¶ 7.   A.E.'s academic difficulties, in part, were apparently the result of him needing glasses.  Lopez-Arellano Decl., ¶ 10.  After A.E. received his glasses, he was able to improve in his classes.  Franklin Decl., ¶ 2, Ex.D, 73:2-73:23.

A.E. did not exhaust his administrative remedies as required by the IDEA prior to filing this lawsuit.

### iii.   M.L.'s parents often failed to respond to the District's attempts to contact them regarding M.L.'s academic performance.

Although M.L. was born in Ventura County, he moved with his family to Mexico when he was one year old.  Franklin Decl., ¶ 2, Ex. E, 9:23-10:24.  He lived in Mexico until he was eight years old then returned to Ventura County for the third grade.  Id. He attended school in Mexico from kindergarten to second grade.  Id. 10:25-11:15. M.L. would get good grades as a student in Mexico.  Id., 23:21-24:5.  He is fluent in three languages: Spanish, English, and Mixteco.  Id., 17:10-14.

District staff at Cesar Chaves Elementary (M.L.'s school) attempted to meet with parents several times to discuss M.L.'s academics.   On November 7, 2017, M.L.'s parents requested an SST to be held after school at 4:00 p.m. then failed to attend the SST. Franklin Decl., ¶ 2, Ex. F.  M.L.'s parents did not attend an SST until November 27, 2018 and only after several attempts by school staff to contact them.  Specifically, from November 14 – 26, 2018, school staff called and left messages with M.L.'s parents, and made two visits to the last known address of the family home.  Id.  At the second visit,

DEFENDANTS' OPPOSITION TO SECOND RENEWED MOTION FOR CLASS CERTIFICATION

school staff learned that the family had moved and obtained a different phone number.
Id.  Indeed, M.L.'s mother has only had her current cell phone for one year and claims
that she was not aware of any attempts by the District to reach her prior to obtaining her
current cell phone. Franklin Decl., ¶ 2, Ex.E,  31:6-14.

School staff expended great efforts to communicate with parents.  Parent input is
important for school staff to obtain a complete picture of M.L.'s ELL needs.  Declaration
of Teresa Silvas ("Silvas Decl."), ¶ 5.  Because M.L. spent his formative educational
years in Mexico, school staff believed that M.L.'s academic challenges were due to a
language barrier rather than a learning disability.  Declaration of Naomi Cortez ("Cortez
Decl."), ¶ 6; Silvas Decl., ¶ 5.

M.L. did not exhaust his administrative remedies as required by the IDEA prior to
filing this lawsuit.

## III.   ARGUMENT

### A. PLAINTIFFS FAIL TO PROVE EACH ELEMENT OF RULE 23(a) BY A PREONDERANCE OF THE EVIDENCE.

Class certification is governed by Federal Rule of Civil Procedure 23. Under Rule
23(a), a party seeking certification of a class or subclass must satisfy four requirements:
(1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.
*Parsons v. Ryan*, 754 F.3d 657, 674 (9th Cir. 2014).  The proposed class or subclass must
also satisfy the requirements of one of the sub-sections of Rule 23(b), "which defines
three different types of classes." *Parsons*, 154 F.3d at 674 (citing *Leyva v. Medline
Industries, Inc.,* 716 F.3d 510, 512 (9th Cir.2013).)  Here, Plaintiffs move for certification
under Rule 23(b)(2) which requires "the party opposing the class [to have] acted or
[have] refused to act on grounds that apply generally to the class, so that final injunctive
relief or corresponding declaratory relief is appropriate respecting the class as a whole."
Fed.R.Civ.P. 23(b)(2).

"Rule 23 does not set forth a mere pleading standard." *Parsons*, 154 F.3d at 674
(citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S.Ct. 2541 (2011).) A

DEFENDANTS' OPPOSITION TO SECOND RENEWED MOTION FOR CLASS
CERTIFICATION

party seeking class certification must affirmatively demonstrate compliance with the Rule and must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality amongst the parties, and adequacy of representation.  *Id.* Similarly, a party must affirmatively prove compliance with one of the three subsections of Rule 23(b).  *Id.* Factual determinations supporting Rule 23 findings must be made by a preponderance of admissible evidence.  *Keegan v. American Honda Motor Co., Inc.*, 284 F.R.D. 504, 521, n. 83 (C.D. Cal. 2012) (applying the preponderance of the evidence standard as the general standard of proof for civil cases); *See also*, *In re Hydrogen Peroxide Antitrust Litig.* (3rd Cir. 2009) 552 F.3d 305, 321 (holding that the court erred in certifying a class where Plaintiffs merely made a "threshold" showing); *Teamsters Local 445 v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008); *Oscar Private Equity Investments v. Allegiance Telecom, Inc.* 487 F3d 261, 269 (5th Cir. 2007)

Sometimes courts must probe behind the pleadings before coming to rest on a certification question.  *Dukes*, 564 U.S. at 350.  Certification is proper only once the court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.  *Id.* at 351.  Often, the rigorous analysis will entail some overlap with the merits of plaintiff's underlying claim. *Id.*

## B. PLAINTIFFS FAIL TO PROVE THAT THE PROPOSED CLASS IS SO NUMEROUS THAT JOINDER WOULD BE IMPRACTICABLE.

### i.  The Data previously relied on by Plaintiffs' expert to establish numerosity is outdated and non longer applicable.

Plaintiffs fail to show, by a preponderance of admissible evidence, that they meet the numerosity element of class certification.  To meet this element, Plaintiffs must show that their class is "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Courts have found a class of 40 or more members to be sufficiently numerous for class certification but that a class of 21 or fewer members is not sufficiently

1  numerous.  *Californians for Disability Rights, Inc. v. California Dept. of Transp.*, 249
2  F.R.D. 334, 346 (N.D. Cal. 2008).
3       On June 16, 2018, the Court relied on the Declaration of Peter Leone ("Leone
4  Declaration.") to conclude that the District had failed to find at least 40 students.  The
5  Leone Declaration, however, relied on enrollment data from 3 to 5 years ago.  Since
6  Leone's analysis of data from 2014-2016, the District's total student enrollment has
7  decreased while the total special education enrollment has increased.  Rule 702 requires
8  expert testimony (1) to be based upon sufficient facts or data, (2) to be the product of
9  reliable principles and methods, and (3) to apply principles and methods reliable to the
10 facts of the case.  Fed. R. Evid. 702.  The Ninth Circuit requires that expert testimony be
11 both "relevant and reliable."  *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463
12 (9th Cir. 2014)(citing *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001).
13 Reliability of the expert testimony depends on whether the expert has a "reliable basis in
14 the knowledge and experience of the relevant discipline."  *Barbarin*, 740 F.3d at 463
15 (citing *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 149, 119 S. Ct. 1167, 143
16 (1999)).  "The duty falls squarely upon the district court to act as a gatekeeper to exclude
17 junk science that does not meet Federal Rule of Evidence 702's reliability standards."
18 *Barbarin*, 740 F.3d at 463 (*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir.
19 2011)).
20      In this most recent motion for class certification, Plaintiffs continue to rely on
21 Leone's Declaration which is based on outdated data from 2014-2016.  Leone's
22 declaration is not longer reliable because it fails to account for the District's most recent
23 decrease in student enrollment as well as the District's significant increase in child find
24 and special education enrollment rates.  Indeed, the District estimates that approximately
25 12.8% of its student population is currently enrolled in special education programs.  This
26 estimate, based on the most recent enrollment data at the District, suggests that the
27 District has closed the purported "gap" that Leone found in the District's child find rates.
28 Declaration of Robert Manwaring ("Manwaring Decl."), ¶ 12.   A more detailed analysis

DEFENDANTS' OPPOSITION TO SECOND RENEWED MOTION FOR CLASS CERTIFICATION

than the one conducted by the Leone Declaration would need to be completed to actually determine whether or not there are still under-identified students in the District.  Id. Without considering the decrease in total student enrollment and the increase in special education enrollment since 2016, the Leone Declaration makes flawed conclusions without merit.  Id.

Plaintiffs failed to offer any admissible evidence that the District continues to under-identify students for special education services.  Accordingly, Plaintiffs fail to meet the element of numerosity.

### C. THERE IS NO COMMON QUESTION OF LAW OR FACT BETWEEN D.C., A.E., AND M.L. AND THE BROAD CLASS DEFINED IN THE FOURTH AMENDED COMPLAINT.

To establish commonality, Plaintiffs must prove by a preponderance of admissible evidence that there are common questions of law or fact common to the class.  *Wal-Mart*, 564 U.S. at 350; *Parsons*, 754 F.3d at 674-675.  Commonality requires the plaintiff to demonstrate that the class members have suffered the same *injury*, and not merely that they have all suffered a violation of the same law.  *Id.*  Accordingly, the claims must depend upon a common contention that is capable of class-wide resolution such that the determination of its truth or falsity will resolve an issue central to the validity of each one of the claims in one stroke.  *Id.*

**ii.   There is no commonality between class representatives A.E. and D.C. whom the District reasonably did not suspect as requiring special education services and class members whom the district knows or suspects require special education services but has yet to find them**.

Plaintiffs seek systemic relief on behalf of students with suspected disabilities whom Plaintiffs claim were not identified and evaluated.  A.E. and D.C. are not students with suspected disabilities.  Although both students experienced some difficulty in academics or behavior, both students improved their academics and behavior without an assessment.

DEFENDANTS' OPPOSITION TO SECOND RENEWED MOTION FOR CLASS CERTIFICATION

For instance, despite A.E. transferring from school to school every year and despite having no educational instruction for most of 2018, A.E.'s writing skills are far above his peers.  He communicates well and, for the last four years, has kept a journal of elaborate stories about his life.  A.E. has good language skills and a good ability to articulate himself verbally and in writing.  A.E. has also improved his grades without special education intervention and due, in part, to having acquired glasses that now allow him to read the board in his classes.  A.E. also writes, produces, and directs videos and maintains his own YouTube channel.  To date, A.E. has directed and produced approximately 16 videos.

The District did not delay in assessing A.E.  Rather, his parent withdrew her request for an assessment before the District's deadline to provide her with an assessment plan had expired.  Since A.E. had only enrolled at Haydoc a few weeks prior to her request for an assessment, parent agreed that the District required time to gather additional information before concluding that A.E. required special education services.

Like A.E., D.C. expresses herself well verbally and in writing.  Although she is sometimes defiant towards her teachers and administrators, her behavior improved after she executed a "Behavior Contract" with her middle school.  Under the behavior contract, D.C. has received routine progress reports from her teachers who frequently rated her behavior as "Excellent" or "Good."  She is now motivated to graduate from middle school and, consequently, has improved her grades in social studies and language arts.

Contrary to parent's claim, D.C.'s school did not receive any fax from parent requesting an assessment for her.  The fax was purportedly sent after school hours.  No one at the school received the fax or saw the faxed request.  Moreover, parent did not inquire or confirm with anyone regarding whether her fax was received, even though she frequently spoke to D.C.'s teachers and administrators after purportedly sending the fax. A preponderance of the evidence shows that A.E. and D.C. are not students with suspected disabilities.  District staff reasonably lacked any suspicion that either student

DEFENDANTS' OPPOSITION TO SECOND RENEWED MOTION FOR CLASS CERTIFICATION

might require special education services.  A.E. and D.C. do not share any common injury
with the proposed class members.

> ### iii.  There is no commonality between the broad class defined in the Fourth Amended Complaint and M.L., who spent his formative years in Mexico and whose English language barrier, rather than a learning disability, was the suspected hindrance to his academics.

The preponderance of the evidence shows that M.L. spent his early education years
in Mexico.  At eight years old, M.L. entered the Oxnard School District knowing little to
no English.  M.L., who received good grades in Mexico, began having academic
difficulties upon receiving instruction in English.

Reasonably, District staff attributed his academic difficulties to a language barrier.
As a result, District staff attempted several times to speak with M.L.'s family.  These
attempts included two visits to the last known address for the family home.  M.L.'s
parents did not inform the school that they had moved and did not provide the school
with updated contact information.  School staff was able to contact parents to discuss
M.L. only after they acquired updated contact information from individuals living in the
last known family address.

M.L. status as an ELL student is distinct from the class of defined students in
Plaintiffs' fourth amended complaint.  He does not share common injuries with the class.

> ## D. THE PROPOSED CLASS REPRESENTATIVES' CLAIMS ARE ATYPICAL TO THOSE OF THE CLASS AND, ACCORDINGLY, THE PROPOSED CLASS REPRESENTATIVES CANNOT ADEQUATELY REPRESENT THE CLASS.

Even if the court finds that commonality exists among the class, which it does not,
the class representatives' claims are not typical of the class claims.

To demonstrate typicality, Plaintiffs must show that the named parties' claims are
typical of the class. Fed.R.Civ.P. 23(a)(3); *Ellis v. Costco Wholesale Corp.*, 657 F.3d
970, 984 (9th Cir. 2011).  "The test of typicality 'is whether other members have the

DEFENDANTS' OPPOSITION TO SECOND RENEWED MOTION FOR CLASS
CERTIFICATION

same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Id.* (citing *Hanon v. Dataproducts, Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Id.* (internal citation and quotation marks omitted). The typicality requirement rests upon the belief that class representatives pursuing their own claims will pursue the claims of the class as well. *P.P. v. Compton Unified Sch. Dist.*, 2015 WL 5752770 *18 (C.D. Cal. 2015) (quoting Newberg on Class Actions § 3:28 (5th ed. 2011).)

For the reasons stated above, A.E. and D.C. do not have injuries similar to those of a class of students with suspected disabilities. Although they allege that the District should have known to assess them, the preponderance of the evidence shows that A.E. and D.C. are intelligent students who respond to standard consequences for poor grades or bad behavior. In A.E.'s case, simply getting him evaluated for glasses helped him improve his grades and his attention in the classroom. A.E. and D.C. are not typical of the defined class.

M.L. is also not a typical student when compared to the defined class. To the extent that M.L. has a recognized injury, that injury stems a tension between his status as an ELL student who spent his formative years in Mexico and a potential suspicion of a learning disability. This tension is not typical to that of the proposed class members.

Since A.E., D.C., and M.L.'s claims are different from those of the class, they cannot adequately represent the class. A.E. and D.C., whom District staff at no point suspected of having a learning disability, cannot represent a broad class of students that Plaintiffs claim are suspected of having a learning disability but have yet to be found. Similarly, M.L., whose academic difficulties were attributed to a language barrier, cannot represent a broad class of students who do not possess the same tension between status as ELL students and a suspicion of a potential need for special education services.

DEFENDANTS' OPPOSITION TO SECOND RENEWED MOTION FOR CLASS CERTIFICATION

### E. THE PROPOSED CLASS REPRESENTATIVES MUST FIRST EXHAUST ADMINISTRATIVE REMEDIES BEFORE ASSERTING THEIR CLAIMS IN THIS COURT.

The IDEA requires that A.E., D.C, and M.L. first exhaust administrative remedies. Plaintiffs argue that they should be excused from the IDEA's exhaustion requirement because the nature of their alleged systemic claims would make exhaustion futile.

The Ninth Circuit has considered and foreclosed Plaintiffs' argument in *Doe v. Arizona Dept. of Educ.*, 111 F.3d 678, 682 (9th Cir. 1997). An IDEA claim is "systemic" if "it implicates the integrity or reliability of the IDEA dispute resolution procedures themselves, or requires restructuring of the education system itself in order to comply with the dictates of the Act *S.B. v. California Dept. of Educ.*, 327 F.Supp.3d 1218, 1249 (E.D. Cal. 2018); see also *Hoeft v. Tucson Unified School Dist.*, 967 F.2d 1298, 1305 (9th Cir. 1992). A claim is not "systemic" if it involves only a substantive claim having to do with limited components of a program, and if the administrative process is capable of correcting the problem." *Id.*

Plaintiffs' claims are not truly "systemic" because they do not contest the integrity of the OAH administrative procedure or otherwise seek an overhaul of the District's education system. Instead, Plaintiffs merely contest the substantive portion of the District's child find process. Plaintiffs' request for class-wide injunctive relief do not change the inquiry. "The mere unavailability of injunctive relief at the administrative tribunal does not render the IDEA's administrative process inadequate." *Id.* at 1309. The administrative forum may adequately address Plaintiffs' claims if it is adequately equipped to address and resolve the issues presented. *Id.* An administrative forum is adequately equipped to resolve the issues presented, if the issues before it involve questions of substantive educational policy. *Id.* Even if injunctive relief is unavailable, an administrative process provides an adequate forum for addressing IDEA claims if it results in statutory compliance. *Id.*

Plaintiffs' allegations raise questions of substantive educational policy that the
OAH has the expertise to address.  For instance, allegations related to M.L. raise distinct
issues related to the timing of assessments for students who are English Language
Learners ("ELL") and who spend their formative educational years in a foreign country.
Allegations related to Plaintiffs W.H. and I.B. raise distinct issues related to assessments
that fail to find the student eligible for special education services.  These issues of
substantive educational policy are precisely the types of issues that the IDEA's
administrative process was designed to address.[4]  *Hoeft*, 967 F.2d at 1309.

## F.  PLN LACKS STANDING TO ASSERT CLAIMS FOR INJUNCTIVE RELIEF ON BEHALF OF THE CLASS

Plaintiffs' do not appear to request that the Court find PLN an adequate class
representative.  This notwithstanding, Plaintiffs argue in footnote 10 of their motion that
PLN has suffered an injury in fact.  However, this court previously determined that PLN
lacks standing.  Specifically, the Court stated:

> "As to direct standing, Plaintiffs have not shown that the challenged
> practices of the District "have perceptibly impaired [PLN's] ability to
> provide the services [it was] formed to provide."  *E. Bay Sanctuary
> Covenant v. Trump*, 909 F.3d 1219, 1241 (9th Cir. 2018).  As noted, PLN
> was formed to provide advocacy services to families to address the District's
> alleged failures to identify and then provide appropriate services to students
> with special needs.  The challenged practices do not divert resources from
> PLN"s core mission or otherwise impede its ability to perform the core

---

[4] This case is distinguishable from cases where courts have found administrative remedies inadequate to address truly structural, systemic reforms.  See *Beth v. Carroll*, 87 F.3d 80, 88 (3rd Cir. 1996) (alleging a challenge to the state's entire system for resolving due process complaints under the IDEA); *J.G. v. Board of Educ.*, 830 F.2d 444, 446-447 (2d Cir. 1987) (alleging that the City's school system deprived all students of proper notice and a hearing under the IDEA); *New Mexico Ass'n for Retarded Citizens*, 678 F.2d 847, 850 (10th Cir. 1982)  (alleging that the state's entire special education system was infirm for which no remedies were available at the administrative level); *Heldmen v. Sobol*, 962 F.2d 148, 159 (2d Cir. 1992)(a challenge that implicated the entire due process system.)

DEFENDANTS' OPPOSITION TO SECOND RENEWED MOTION FOR CLASS
CERTIFICATION

1   services for which it was established.  These include advocating on behalf of
2   students who have not been properly assessed by the District."
3   Dkt. 207, February 15, 2019 Civil Minute Order, page 17 of 18

4   Plaintiffs concede that PLN continues to provide its members with services that it
5   was formed to provide: educational support related to special education services at the
6   District.  Fourth AC, ¶ 33; RJN, Ex. A, TAC, ¶ 27.  Fourth AC, ¶ 169; RJN, Ex. A, TAC,
7   ¶ 185.  PLN continues to (1) respond to parent questions and complaints, (2) seek
8   referrals and options for advocacy regarding the District's child find policy, (3) issue
9   public records requests to obtain information regarding the District's child find policy,
10  and (4) host events to connect advocates with parents.  Fourth AC ¶¶ 171-173, RJN, Ex.
11  A, TAC, ¶¶ 187-189.  That PLN has chosen to focus more on the special education
12  component of its core mission rather than "other" components of its mission is
13  insufficient to establish a diversion of its resources.  Per Plaintiffs' allegations, PLN's
14  core purpose includes advancing the District's compliance with the IDEA's child find
15  requirement.  PLN's mission is therefore not hampered, and the organization suffers no
16  injury, by advocating that the District timely identify, locate, and assess students or by
17  introducing its members to legal advocates for additional assistance.  See *Fair Hous.*
18  *Council*, 666 F.3d at 1226 (Ikuta, J. dissenting).  PLN has also failed to establish that it
19  has lost a substantial amount of funding by focusing on the special education component
20  of its mission.  Plaintiffs' concession that PLN continues to focus on its core mission of
21  advocating for special education services at the District, a concession apparent on the
22  face of the complaint, establishes that PLN is focused on its core mission rather than
23  suffering an injury-in-fact.

24  PLN lacks direct organizational standing to assert claims on behalf of the class.

25  **IV.   CONCLUSION**

26  For all the aforementioned reasons, Defendants respectfully request that the Court
27  deny certification of Plaintiffs' proposed class.

28

DEFENDANTS' OPPOSITION TO SECOND RENEWED MOTION FOR CLASS CERTIFICATION

1
2      Dated: May 17, 2019                 GARCIA HERNANDEZ SAWHNEY, LLP
3
4
5
6      By_____
7              Norma Nava Franklin
                Attorneys for Defendants
8              Oxnard School District, Cesar Morales,
                Ernest Morrison, Debra Cordes,
9              Denis O'Leary, Veronica Robles-Solis, and
                Monica Madrigal Lopez
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANTS' OPPOSITION TO SECOND RENEWED MOTION FOR CLASS
CERTIFICATION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

      The undersigned attorney hereby certifies that on May 17, 2019, I caused a true and correct copy of the foregoing **DEFENDANTS' OPPOSITION TO PLAINTIFFS' SECOND RENEWED MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** to be electronically filed with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to counsel for all parties.


Dated:  May 17, 2019                              By:  _____ */s/Norma Nava Franklin*