LEARNING RIGHTS LAW CENTER
JANEEN STEEL (SBN 211401)
PATRICIA VAN DYKE (SBN 160033)
janeen@learningrights.org
patsy@learningrights.org
1625 W. Olympic Blvd, Suite 500
Los Angeles, CA 90015-4684
Phone: (213) 489-4030
Fax:   (213) 489-4033

DISABILITY RIGHTS ADVOCATES
STUART SEABORN (SBN 198590)
MELISSA RIESS (SBN 295959)
seaborn@dralegal.org
mriess@dralegal.org
2001 Center St., 4th Fl.
Berkeley, CA 94704
Phone: (510) 665-8644
Fax: (510) 665-8511

LAW OFFICE OF SHAWNA L. PARKS
SHAWNA L. PARKS (SBN 208301)
sparks@parks-law-office.com
4470 W. Sunset Blvd., Ste. 107-347
Los Angeles, CA 90027
Phone/Fax: (323) 389-9239

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.R., a minor, by and through her guardian ad litem, Janelle McCammack *et al.*,<br><br>          Plaintiffs,<br><br>     v.<br><br>OXNARD SCHOOL DISTRICT, *et al*.,<br><br>          Defendants. | Case No.: 2:17-cv-04304-JAK-FFM<br><br>**Plaintiffs' Notice of Motion and Motion for Partial Summary Judgment; Memorandum of Points and Authorities in Support Thereof**<br><br>**Date:  July 27, 2020**<br>**Time: 8:30 a.m.**<br>**Court:10B**<br>          **First Street Courthouse** |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on July 27, 2020, at 8:30 a.m. or as soon thereafter as the matter may be heard by the Hon. John A. Kronstadt in the United States District Court, Central District of California, Courtroom 10B, located at 350 W. 1st Street, Los Angeles, California 90012, Plaintiffs A.E., M.L., and D.C, each individually and on behalf of all others similarly situated, will and hereby move this Court for an order for partial summary judgment[1]. As set forth more fully herein, there is no genuine issue of material fact relating to Plaintiffs' claim that Defendant violated the Individuals with Disabilities Education Act, by failing to develop and implement effective "child find" policies and procedures that ensure that "[a]ll children . . . , regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated." 20 U.S.C. § 1412(a)(3)(A); *see also* 20 U.S.C. §§ 1412(a)(1), 34 C.F.R. §§ 300.111, 300.301–11. Consequently Defendant fails to identify and evaluate "children who are suspected of being a child with a disability. . .and in need of special education, even though they are advancing from grade to grade," 34 C.F.R. § 300.111(c)(1), and also fails to respond to parental requests for evaluation for special education services in a timely and legally required manner. 30 C.F.R. § 300.301. This motion is brought under Plaintiffs' First Cause of Action: Individuals with Disabilities Education Act. Based on the undisputed facts in this matter, Plaintiffs are entitled to judgment as a matter of law as to this issue. Plaintiffs bring this motion as to liability only.

This motion is based upon this notice; the accompanying memorandum of points and authorities; the concurrently filed declarations of Shawna L. Parks and Melissa Riess, and attached exhibits; the pleadings and records on file with the Court in this

---

[1] In the alternative, plaintiffs move for an order treating specified facts as established pursuant to Federal Rule of Civil Procedure 56.

Plaintiffs' Notice of Motion and Motion for Partial Summary Judgment - 1

action, including previously filed declarations[2]; and any argument or additional evidence as may be requested by the Court or presented at the time of hearing.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on March 5, 2020.

DATED: March 13, 2020

LEARNING RIGHTS LAW CENTER

LAW OFFICE OF SHAWNA L. PARKS

DISABILITY RIGHTS ADVOCATES

By: _____

Shawna L. Parks
Attorneys for Plaintiffs

---

[2] *See,* Dkt. #68, Defendants' Declaration of Santamaria; Dkt. #69, Defendants' Declaration of Anguiano; Dkt. #67, Defendants' Declaration of Fox; Dkt. #70, Defendants' Declaration of Serrano; Dkt. #72, Defendants' Declaration of Breitenbach; Dkt. #73, Defendants' Declaration of Wennes; Dkt. #88, Defendants' Declaration of Barber; Dkt. #233-7, Declaration of Fawell; Dkt. #48, Declaration of J.A. (re W.G.); Dkt. #54, Declaration of L.H. (re J.M.); Dkt. #51, Declaration of C.L. (re A.L.); Dkt. #49, Declaration of M.A. (re E.H.); Dkt. #53, Declaration of F.B. (re Meli.B); Dkt. #156, Declaration of F.B. (re I.B.); Dkt. #158, Declaration of C.W. (re A.W.); Dkt. #159, Declaration of L.O. (re H.V.); Dkt. #155, Declaration of E.P. (re W.H.); Dkt. #151, Declaration of Steel, and Exhs. 24-34, Dkt. #151-38 through 151-34; Dkt. #43, Declaration of Leone; Dkt. #98, Reply Declaration of Leone; Dkt. #152.

# **TABLE OF CONTENTS**

I.      INTRODUCTION…………………………………………….………...1

II.     UNDISPUTED FACTS…………...…………………………….………...3

     A.      OSD's Pre-Referral Policy of Using the CST/SST System Has Repeatedly Been Found to Deny and Delay Needed Special Education Referrals and Assessments, and Continues to the Present…………………………...3

     B.      OSD's Convoluted Policy Manual Failed to Change the Pre-Referral Process That Delays Assessments……………………………………..6

     C.      OSD Itself Has Stipulated to Liability on This Issue in Three Hearings, Covering Five Years, Scores of Staff, and Three Students Who Were Involved in the SST Process…………………………………………9

          1.      M.L.………………………………………………………9

          2.      F.S.……………………………………………..…10

          3.      J.R.………………………………………..………10

     D.      The Stories of O.L., D.C. and Scores of Other Students Demonstrate the Longstanding and Continued Failures of the District's System………………………………………...…………………11

          1.      O.L.…..………………………………………….......11

          2.      D.C.………..…………………………..…………..12

          3.      Other Students…..………………………………………12

     E.      OSD Data Shows that Although Special Education Enrollment Has Increased Since Plaintiffs Filed This Lawsuit, Assessments Continue to Be Delayed By the CST/SST Process……………………………….…13

III.    SUMMARY JUDGMENT STANDARD………...………………….…15

IV.    ARGUMENT……………………….....…………………….…...….16

     A.      OSD Has an Affirmative Obligation Timely to Identify and Evaluate Students with Suspected Disabilities Who May Need Special Education Services……………………………………………………16

1     1.  OSD Has an Affirmative Duty to Identify and Evaluate When There

2        is a Suspicion of a Disability; the Threshold is Low………………18

3     2.  OSD is Obligated to Respond to Parental Requests for Assessment by

4        Either Providing a Special Education Assessment, or at a Minimum,

5        Written Notice of its Reasons for Denial……………….…………..20

6     3.  IDEA, RTI is Limited to the Evaluation Process for Learning

7        Disabilities, and Cannot be Used to Delay Referrals for a Special

8        Education Assessment………...……………...……………....21

9   B.  The District's "Wait and See" Approach to Child Find, Which Makes Use

10     of A Pre-Referral Process, Delays Much-Needed Special Education

11     Assessments in Violation of the IDEA...……………….……………...23

12 V.  CONCLUSION……………...………………………………..………25

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)......................................................16

*Artichoker v. Todd County School District*, 3:15-CV-03021-RAL, 2016 WL 7489033
  (D.S.D. December 29, 2016)..........................................................................................22

*Bell v. City of Boise*, 709 F.3d 890 (9th Cir. 2013) .........................................................13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................16

*Compton Unified School Dist. v. Addison*, 598 F.3d 1181 (9th Cir. 2010).....................21

*Corpus Christi Indep. Sch. Dist.*, 31 IDELR ¶ 41, at 158, No. 105–SE–1298 (Jan. 19,
  1999)...............................................................................................................................18

*Dept. of Ed. v. Cari Rae S.*, 188 F. Supp. 2d 1190 (D. Haw. 2001) ...............................18

*El Paso Independent School Dist. v. Richard R.*, 567 F.Supp.2d 918 (W.D. Tex. 2008) 17

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ....13

*J.G. v. Douglas Cty. Sch. Dist.*, 552 F.3d 786 (9th Cir. 2008) .........................................17

*Lisa M. v. Leander Independent School OSD*, 924 F.3d 205 (5th Cir. 2019) .................22

*N.G. v. District of Columbia*, 556 F.Supp.2d 11 (D.C. Cir. 2008) .............................18, 19

*N.G. v. District of Columbia*, 556 F.Supp.2d 11 (D.D.C. 2008) .................................19, 22

*Pasatiempo by Pasatiempo v. Aizawa*, 103 F.3d 796 (9th Cir. 1996).......................21, 24

*Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516 (D.C. Cir. 2005)................18, 21

*Scott v. District of Columbia*, 2006 WL 1102839, No. Civ.A. 03–1672 DAR (D.D.C.
  March 31, 2006) .............................................................................................................23

*Spring Branch Independent School District v. O.W. by next friend Hannah W.*, 938 F.3d
  695 (5th Cir. 2019) .........................................................................................................22

*Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105 (9th Cir. 2016)...17, 18, 19,
  20

*W.H. v. Clovis Unified Sch. Dist.*, No. CVF-08-0374, 2009 WL 1605356 (E.D. Cal. June
  8, 2009)...........................................................................................................................18

*White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) .........................................................13

**Statutes**

20 U.S.C. § 1401 ...............................................................................16, 17

20 U.S.C. § 1412 ............................................................................2, 16, 17

20 U.S.C. § 1414 ................................................................................19,21

20 U.S.C. § 1415 ...............................................................................19, 20

30 C.F.R. § 300.11 ....................................................................................17

Cal. Educ. Code § 56303 ..........................................................................23

**Regulations and Rules**

34 C.F.R. § 300.301 ......................................................................17, 19, 20

34 C.F.R. § 300.111 ...............................................................................3, 18

34 C.F.R. § 300.502 ..................................................................................19

34 C.F.R. § 300.8 .....................................................................................17

Fed. R. Civ. P. 56 ...............................................................................15, 16

## I.  INTRODUCTION

The Oxnard School District[3] has an obligation under federal law to identify and evaluate children with disabilities so they can receive the special education services they need as well as the important procedural due process protections available to them under the IDEA. In contrast to this obligation, OSD's policies and procedures systematically deny and/or substantially delay assessments, despite obvious signs of disability, all under the misguided assumption that it must "wait and see" what happens in general education for months—if not years—before referring a child for a special education assessment. It is undisputed that OSD uses its CST/SST process[4]—a pre-referral system of general education interventions—before referring children for an assessment for eligibility for special education. This was true when the case was originally filed, and remains true today. The evidence demonstrates that this process continues to result in unlawful and detrimental delays in students receiving much-needed special education assessments, irrespective of OSD's efforts to increase its special education enrollment during the pendency of this case.

As a result of OSD's flawed child find policy, hundreds of children have been denied access to the programs and services that they need to achieve IDEA's core guarantee—a Free and Appropriate Public Education ("FAPE"). Perhaps as importantly, OSD's policies deprive families of the important procedural safeguards available under the IDEA.

It is undisputed that, since 2017, there have been six separate findings of liability by the Office of Administrative Hearings against OSD for failure to identify and evaluate students with suspected disabilities, findings that have specifically identified the illegality of OSD's ongoing policies. According to the Administrative Law Judge

---

[3] Defendants shall be referred to as "the District," "OSD," or "Oxnard."
[4] OSD states that its CST/SST process is a form of Response to Intervention ("RTI"). The acronym "CST" stands for Coordination of Services Team. The acronym "SST" stands for Student Success Team. [SUF #14].

Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment - 1

("ALJ") in a case decided in late 2018, "*Student's referral to a student success team was consistent with Oxnard's practice of attempting general education interventions through a student success team before assessing a student for possible disabilities requiring special education,*" "*but the student success team did not even discuss the possibility of assessments. Instead, Oxnard adopted a wait and see attitude...*" [SUF # 21.] Liability in these six due process cases span the time from November of 2013 through December of 2019 and cover the actions of staff at eight different schools in OSD. Collectively, thirty staff testified in these cases regarding OSD's child find policies and practices[5].

These cases are not isolated incidents, but are key findings that demonstrate a systemic failure of Oxnard to meet its child find obligations—across schools, grades, and staff. The findings in these adjudicated cases are echoed in the consistent testimony across depositions in this case regarding the continued use of the CST/SST pre-referral process as well as the experiences of current and former class members whose evaluations have been substantially delayed by these policies. These findings are also supported by the data in this case, which shows that, although OSD has increased its special education enrollment since the filing of this case, it has done so primarily through pulling students out of the CST/SST system who have been languishing in that system for months, years, and in some cases—multiple years.

OSD's policies, practices and procedures violate the requirements that "[a]ll children . . . , regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated." 20 U.S.C. § 1412(a)(3)(A). Moreover, they fail to identify, particularly in any timely way, "children who are suspected of being a child with a disability. . .and in need of special education, even though they are advancing from grade to grade," 34 C.F.R. § 300.111

---

[5] Indeed, three of these findings have been based on OSD's *own stipulations* as to liability that spanned the course of years. Each of the students for whom the District has stipulated as to liability were in the CST/SST process during the time frame covered by OSD's stipulation.

(c)(1), and fail to provide clear responses to parents seeking assessments so they can rely on the IDEA's robust procedural protections.

For these reasons, and as explained more fully below, the Court should grant this motion, finding as to liability under Plaintiffs' IDEA claims.

## II. UNDISPUTED FACTS

### A. OSD's Pre-Referral Policy of Using the CST/SST System Has Repeatedly Been Found to Deny and Delay Needed Special Education Referrals and Assessments, and Continues to the Present.

As of 2017 when this case was filed, OSD had no written special education policy other than a self-described "outdated" policy from 2004 that "wasn't current." [SUF #1.] The Director of Special Education, who "found" a paper copy in her office, did not know whether anyone was using this policy, and could not be sure if anyone else had paper copies.[6] [SUF #2.][7] However, the 2004 manual was the last written iteration of OSD's "child find" policy prior to 2018. [SUF #3.]

In practice, OSD engaged in a "wait and see" approach, and staff were otherwise misinformed as to their referral obligations, resulting in significant delays for children in need of assessments for special education. Testimony from the hearings for I.G. and M.B. confirms that OSD personnel's lack of understanding of child find requirements was widespread throughout the district. Between these first two administrative hearings, a total of twenty-one staff testified from four different schools and administration, over the course of nearly eleven days spread out over two separate months. [SUF #5.] Two separate Administrative Law Judges from OAH found the District's policies lacking:

- "[s]everal of the District's witnesses confirmed that District's standard process when a parent asked for an assessment…was to refer the request…to the [COST]

---

[6] Ms. Sugden has been on leave since approximately March of 2019. The Special Education Director position is currently filled by Interim Director, Katrina Madden. [SUF #4.]

[7] As described further below, in 2018, the District created a "task force" to draft a new policy manual for special education, which was the first update since 2004. [SUF #27.]

team, which then determined without any parental participation whether to hold a student study team to discuss a possible referral for assessment." [SUF #6.]

- "[M.B.'s] kindergarten, first, second, third and fourth grade general education teachers had no District training on appropriate procedures under the IDEA for referring a child who is suspected of having a disability that may qualify that child for special education services." [SUF #7.]
- "District staff at Juan Soria School [where M.B. attended kindergarten] did not directly commence assessments of Student when Mother expressed concerns. Instead, they first met privately as part of a [COST] team, and then held a student study team meeting to discuss whether to assess." [SUF #8.]
- "Testimony from Elm school principal and school psychologist …demonstrated they also did not understand the appropriate procedural requirements under the IDEA for referring children for special education assessments." [SUF #9.]
- "Fundamental to District's failure to timely assess was a general misunderstanding of a school district's child find obligations." [SUF #10.]
- "District personnel's misunderstanding in this regard was systemic." [SUF #11.]
- I.G.'s teacher "incorrectly believed medical issues were not a basis for . . . special education intervention…." [SUF #12.]
- "General education teachers, counselors, and administrators stated that they did not suspect Student to have a disability that might need to be addressed by special education services, because Student's absences were the consequence of a medical issue. Yet everyone agreed that Student's chronic absenteeism and early removal negatively affected his academics…." [SUF #13.]

As this Court identified in its Order on Plaintiffs' original motion for class certification, even when the District acts on an internal referral or staff identify the need for a disability-related assessment, it uses a pre-referral process, including SSTs and CSTs which serve to funnel students into special education assessments. *See* Dkt. 128 at 3 and [SUF #14.] The Court noted the existence of this system by relying on OSD's

Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment - 4

statements in its opposition to Plaintiffs' original motion for class certification, as well as consistent statements of OSD staff confirming the existence of this pre-referral process and OSD's defense of it as valid preliminary step before a special education assessment.[8] Defendant's opposition brief to Plaintiffs' first motion for class certification described the CST/SST as a "pre-referral process." [SUF #16.] Defendants' expert, Dr. Vicky Barber, also described the CST/SST as a "pre-referral process." [SUF #17.]

In October 2018, teachers and administrators testified in the I.H. due process hearing that special education referrals still involve the SST and COST systems, and that staff continue to rely on general education strategies when they suspect a student's disability. [SUF #18.] I.H.'s teacher testified that "If I suspect a disability, I would watch that child, provide interventions, and if I needed and I suspected a disability, then I could submit a referral for a filled assessment." [SUF #19.] In these hearings, another 9 staff from two different schools testified over ten days of hearings on the child find issue.[9] [SUF #20.]

The ALJ in this third hearing also found that "*Student's referral to a student success team was consistent with Oxnard's practice of attempting general education interventions through a student success team before assessing a student for possible disabilities requiring special education.*" [SUF #21.] The ALJ held that by the second SST meeting in October of 2016, there were "significant indicators of a potential disability affecting Student's learning, but the student success team did not even discuss the possibility of assessments. Instead, Oxnard adopted a wait and see attitude…" [SUF #22.] "Student should have been referred for assessment in October, 2016. Oxnard did

---

[8] Dkt. 128 at 3 (citing Dkt. 68, Declaration of Santamaria ¶¶ 11–13; Dkt. 69, Declaration of Anguiano ¶¶ 8–10; Dkt. 67, Declaration of Fox ¶¶ 7–10; Dkt. 70, Declaration of Serrano ¶¶ 11–14; Dkt. 72, Declaration of Breitenbach ¶¶ 6–10; Dkt. 73, Declaration of Wennes ¶¶ 8–10) and [SUF #15].

[9] I.H.'s hearing addressed issues beyond identification and evaluation, and thus the nine staff are a subset of the total witnesses in the case.

Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment - 5

not assess Student until January 2018." [SUF #23.] After the October 2016 SST meeting, there were two additional SST meetings conducted prior to I.H.'s referral for special education. [SUF #24.] I.H. was in the SST process for a total of fifteen months before he was finally referred for a special education evaluation. [SUF #25.]

**B. OSD's Convoluted Policy Manual Failed to Change the Pre-Referral Process That Delays Assessments**

OSD prepared a written special education policy manual in 2018. [SUF #26.] This manual is dated June 2018, and was intended to contain OSD's "Child Find" policy going forward. [SUF #28.] Notably, this first special education policy manual included a chapter on the CST and SST process. [SUF #29.] It also included a special education referral flowchart which instructs that *all* special education referrals, including from teachers and parents, would proceed through the SST process and general education interventions first. [SUF #30.]

In November 2018, OSD changed one page of the 200-plus page manual—the SST flowchart—to state that in response to a request for assessment, OSD should provide either an assessment plan or a "notice to parent of action and procedural safeguards." [SUF #31.] Although the remainder of the manual continues to be dated June 2018, this single page is dated November 7, 2018. [SUF #32.]

Katrina Madden, the Interim Director of Special Education, knew only that this page was changed because of "additional input," but did not know who provided the input. [SUF #33.] Ms. Madden stated in deposition that she believed Wayne Saddler, a contractor with OSD, was the primary drafter of the policy manual. [SUF #34.] On November 8, 2018, Mr. Saddler sent an email stating that "We're making this change at this time due to litigation issues. Please convert this to pdf and have it inserted into the

electronic version of the Policies and Procedures Manual."[10] [SUF #35.]

The most recent policy manual, which contains the altered flow chart, continues to include an entire chapter on the CST/SST process. [SUF #37.] The chapter on CST/SST process precedes the chapter on "Referral and Assessment." [SUF #38.] OSD's "Child Find" policy includes reference to the CST system. [SUF #39.] This manual creates two contradictory requirements. On the one hand, the manual states as a general matter that "'Child Find' is one of the most important special education legal obligations for school districts. . . . the District also has an obligation to specific students when the District knows—or should have known—that a student may have a disability." [SUF #40.] It also states that "In no case will the RtI2 process be used as a barrier or to delay an appropriate referral by parent or staff for special education assessment." [SUF #40.]

However, on the other hand, the manual advises that "Students should be referred to Special Education only after all other school resources have been considered and appropriately used in a general classroom experience. . . .Parents are strongly urged to utilize the general education intervention process before referring to Special Education." [SUF #40.] "For many students, the first step is a referral to the school problem-solving team, which may be known as Student Success Team (SST)…" [SUF #40.]

Regardless, staff continue to be unaware of this policy manual and/or do not rely on it. Katrina Madden, Interim Special Education Director and 30(b)(6) witness on written policies for the OSD, testified that "Q: …Do you have a copy of the policies and procedures manual for special education that you use? A: I have referenced it from time

---

[10] Even though the flowchart itself was changed because of "litigation issues," the manual itself continues to contain information that anticipates that referrals will only come through parents or SST teams, stating that "The school district has 15 days* from the time it receives a written request for assessment from either the school SST or the parents to develop either an Multidisciplinary Assessment Plan or a notice that it will not be starting an assessment." [SUF #36.]

1   to time. . . Is it my go-to guide? No. It—I would say it's a reference that we can use."[11]

2   [SUF #41.] Naomi Cortez, Assistant Principal, currently at Fremont Academy, testified

3   that she had read "pieces" of a binder that she believed contained written child find

4   trainings that was given to the Principal in the 2018-19 school year, but does not recall

5   the title. [SUF #43.]  Similarly, Jennifer Willis, a teacher from Cesar Chavez school

6   testified that she has seen pieces of the policy manual, but never the whole thing, and

7   was not sure what topics were covered in what she saw. [SUF #44.] Like Ms. Willis, Ms.

8   Fitz, another general education teacher, had never seen the whole special education

9   policy manual—only pieces. [SUF #45.] According to Ms. Fitz, she never received any

10  training in recognizing the signs of disability in a child [SUF #46.] Steve Tobey,

11  longtime school psychologist with OSD, testified that although he received a copy of the

12  policy manual, he has never pulled it out and referenced it in the context of an SST

13  meeting, and does not know if there has ever been any training on it. [SUF #47.]

14      Instead, Ms. Madden testified in January of 2020 that OSD continues to follow a

15  model closer to the original flowchart from the June 2018 manual. [SUF #48.] Ms.

16  Madden testified that OSD holds SST meetings after a teacher requests an assessment

17  and that assessments are not necessarily conducted as a result of those meetings. [SUF

18  #49.] With respect to parent requests for assessment, Ms. Madden testified that the OSD

19  also still holds SST meetings, and follows the prior flowchart, numbered OSD1678,

20  dated June 2018. [SUF #50.] As Ms. Madden explained, there is not a blanket policy in

21  OSD to provide an assessment after the SST. [SUF #51.]

22      At SST meetings, staff have conversations with parents about assessments, as a

23  result of which parents who have requested assessments may "understand that that's not

24

25  [11] Ms. Madden was the FRCP 30(b)(6) witness on, *inter alia,* "[t]he district's policies

26  and procedures for determining eligibility for special education and related services from 2014-15 academic year to the present," and "[a]ny written policies or procedures in the

27  district regarding identification and evaluation of students for special education and related services and/or Child Find for each year from the 2014-15 academic year to the

28  present." [SUF #42.]

exactly what they're looking for. And so if they put it in writing, we do ask them if they will put it in writing that they rescind that request." [SUF #52.] OSD's policy manual contains a sample withdrawal letter so that parents can withdraw their request for assessment. [SUF #53.] Thus, after a request for assessment, OSD holds an SST meeting, as a result of which either an assessment plan is generated *or* the student receives general education interventions. [SUF #54.] Dr. Tobey also testified in January of 2020 that OSD uses its CST process, which he described as a "pre-referral vehicle" as the initial entry point for all concerns about a student and that, if the concern is not remedied after a CST plan is developed, then the next step is an SST. [SUF #55.]

### C. OSD Itself Has Stipulated to Liability On This Issue in Three Hearings, Covering Five Years, Scores of Staff, and Three Students Who Were Involved in the SST Process.

#### 1. M.L.

In the most recent OAH decision, OSD stipulated on February 3, 2020 to liability for compensatory services for named plaintiff M.L. [SUF #56.] OSD stipulated on the record that "Oxnard denied Student a free appropriate public education from August 2017 through December 13, 2019, the date on which he filed his [due process] complaint, by: a. Failing to evaluate Student in all areas of suspected disability to determine eligibility for special education and related services, and b. Failing to offer an individualized educational program that was reasonably calculated to enable Student to make progress appropriate in light of his circumstances." [SUF #57.]

During the period covered by the stipulation, OSD held two SSTs for M.L., at which six different staff, including two teachers, two administrators, a school counselor and outreach coordinator, participated. [SUF #59.] M.L. was in the CST/SST process for at least eighteen months, from at least September 29, 2017 through at least the date on which he filed his federal complaint on April 1, 2019.[12] [SUF #60.] During this time period, M.L. failed every academic class. [SUF #61.] OSD's own evaluation, conducted

---

[12] The District issued an assessment plan for M.L. on April 5, 2019 after he was named in the fourth amended complaint. [SUF #58.]

after M.L. was added to this case, showed that M.L.—then in the eighth grade —was able to identify only ten out of twenty six letters and six sounds out of those ten letters with some inconsistencies, and that his instructional level was pre-primer.[13] [SUF #62.] It also stated that ML's "difficulties, such as those in his profile of scores, can significantly impact academic progress in the area of Reading." [SUF #63.] On December 12, 2019 OSD found M.L. eligible for special education services as a student with a Specific Learning Disability and Other Health Impairment. [SUF #64.] M.L. is thirteen years old and has been a student in OSD since 2014, with the exception of two trimesters in the 2016-17 school year spent in a neighboring district. [SUF #65.]

### 2.   F.S.

In October of 2018, OSD also stipulated to liability for failure to identify and evaluate F.S., a student who was involved in the SST process. [SUF # 66.] In F.S.'s due process case, OSD stipulated that its child find duty was triggered as of October 21, 2016, two years prior to the filing of the complaint, and that it did not refer F.S. for a special education evaluation. [SUF #67.] During the time frame for which OSD stipulated to liability, the OSD held two SSTs. [SUF #69]. However, OSD did not hold a first SST until February of 2018, sixteen months after it concedes it should have already identified and referred F.S. for a special education evaluation. [SUF #70][14].

### 3.   J.R.

OSD first stipulated to liability on March 13, 2017 in the decision regarding original named plaintiff J.R. There, the District stipulated to liability for compensatory services, stipulating that J.R. should have been found eligible by September 21, 2014

---

[13] "Pre-primer" refers to a child who is just beginning to read, and is typically used to refer to an instruction level appropriate for kindergarten or first grade.

[14] By the Fall of 2018, four months prior to F.S.'s first SST, her standardized scores rated her as in need of "urgent intervention" in both math and reading. [SUF #71] OSD's assessment ultimately showed that F.S.'s reading skills, comprehension and fluency all rated below the .1 percentile. [SUF #72]. Her math problem solving was also below the .1 percentile. [SUF #73]. F.S., who is an English Language Learner, also rated below the .1 percentile in broad reading in Spanish. [SUF #74].

(and thus referred for evaluation prior to that) and for failing to meet their child-find obligations. [SUF #77.] J.R.'s first SST was May 11, 2015, a full twenty months after the OSD conceded she should have been eligible for special education. [SUF #78].[15]

### D. The Stories of O.L., D.C. and Scores of Other Students Demonstrate the Longstanding and Continued Failures of the District's System.

O.L. and D.C. are two more recently identified students, originally identified in Plaintiffs' Third Motion for Class Certification. They also experienced significant delays in being assessed for special education. Similarly, a number of student plaintiffs previously identified did not receive timely assessments.

### 1. O.L.

Class member O.L. is eleven years old. [SUF #81.] He was assessed by OSD only after his physician's assistant sent a letter requesting assessment on February 15, 2019. [SUF #82.] At that point, O.L. had been in the CST/SST process in OSD for at least seventeen months, beginning in at least September 13, 2017 until OSD issued an assessment plan on March 12, 2019. [SUF #83]. During that time, O.L. had three SST meetings. [SUF #84]. At O.L.'s first SST in September of 2017, the notes reflect that O.L., then in fourth grade, "doesn't know his ABC's….cannot add 1 and 1." [SUF #85][16].

---

[15] The SST notes state that J.R., who was in the fifth grade at that time, had an instructional reading level of 1.2 grade level. [SUF #79.] The OSD found J.R. eligible for special education on December 13, 2016 as a student with a speech/language impairment. [SUF #80].

[16] During this time period, O.L. received "1s" in nearly all subjects, which is "far below" meeting benchmark standards. [SUF #86]. The second SST held in September of 2018 stated "Lack[s] phonic awareness, alphabetic knowledge. . . Difficulty recalling steps, memorizing facts. Struggles with number sense, basic facts (=, x)." [SUF #87]. Even after receiving the physician's assistant note, OSD held another SST for O.L. [SUF #88]. This SST states that O.L. "Can't identify letter names and sounds." [SUF #89]. The assessment for O.L. recommended eligibility as a student with a speech/language impairment. [SUF #90]. It found that O.L. rated on "core language" in the .3 percentile,

*footnote continued on next page*

## 2. D.C.

Named Plaintiff D.C. is fourteen years old and is now a student in Oxnard Union High School District. [SUF #94]. The District agreed to assess D.C. only after she was named in this case on April 1, 2019. [SUF #95]. OSD issued an assessment report that recommended that D.C. was not eligible for special education services. [SUF #96]. After D.C. moved to the high school district in the Fall of 2019, the high school district conducted its own assessment, finding that D.C. was eligible as a student with a specific learning disability, specifically dyslexia. [SUF #97][17].

### 3. Other Students

In the declarations already submitted to the Court, Plaintiffs detailed the stories of numerous students, including W.G., A.V., J.M., A.L., E.H., Meli.B., I.B., A.W., H.V., and W.H., all of whom were only evaluated and found eligible after they retained counsel. [SUF #101]; *see also* Motion for Class Certification, Dkt. #39, 14:24-17:16 (detailing stories of W.G., J.M., A.L., E.H., Meli.B.); and Renewed Motion for Class Certification, Dkt. #150, at 9:28-11:15, and 13:8-15 (detailing stories of I.B., W.H., H.V.). Half of these students were involved in the SST system prior to referral. [SUF #101]; *see also* Motion for Class Certification, Dkt. #39, 14:24-17:16 (detailing stories of W.G., J.M., A.L., E.H., Meli.B.).

---

meaning he was below 99.7% of children in this area. [SUF #91]. The core language score is a measure of general language ability that quantifies a student's overall language performance and is used to make decisions about the presence or absence of a language disorder." [SUF #92].

[17] In the Spring of 2019, when D.C. was at the end of the eighth grade, her standardized test scores reflected a 4.9 and 5.9 grade level in English Language Arts and Math respectively. [SUF #98]. On the reading screening administered by the high school district, D.C. rated significantly below average, falling below the .1 percentile, with her skill level needed for successful reading falling between second and third grade. [SUF #99]. On November 22, 2019, when D.C. was in the ninth grade, the high school district held an IEP finding D.C. eligible and offering special education services. [SUF #100].

**D.  OSD Data Shows that Although Special Education Enrollment Has Increased Since Plaintiffs Filed This Lawsuit, Assessments Continue to Be Delayed By the CST/SST Process.**

OSD's special education enrollment has increased since the filing of this case. [SUF #102]. As the data demonstrates, this increase largely reflects children in the SST process being referred for special education assessments after the complaint was filed. Since the complaint was filed, published data on special education enrollment has reflected an increase from 1582 to 1917 children in the K-8 setting[18], for an increase of 9.4% to 11.9% special education enrollment.[19] [SUF #103]. In 2017, when Plaintiffs filed this case, Plaintiffs' expert Dr. Peter Leone opined that OSD was likely missing two hundred students, conservatively. [SUF #103]. Between December 2017 and December 2018, OSD increased its K-8 special education enrollment by roughly 276 students. [SUF #104] This increased rate of growth post-dates the filing of this case.[20]

This post-litigation growth was fueled by students coming out of the CST/SST process. Data produced by OSD shows that few teachers directly refer for special education assessments. [SUF #105]; *see also* Chart, reflecting relative sources of special education referrals, Exh. UU to Parks Decl. In a district with more than 16,000 students, teacher referrals ranged from a low of 9 for the entire 2016-17 school year, to a high of

---

[18] Plaintiffs' calculations, consistent with past submissions, utilize ages 5-15, as students are not tracked, and thus reported in general enrollment, until they are "enrolled" at age 5.

[19] To date, the CDE has only published data through the 2018-19 school year.

[20] The most dramatic increase in numbers occurred in the 2018-19 school year, As the facts illustrate, there continue to be severe and pervasive problems identifying students with suspected disabilities in a timely manner in the district. However, even if the increased enrollment changed the underlying liability calculus, it is clearly a case only of voluntary cessation. *See Bell v. City of Boise*, 709 F.3d 890, 898-899 (9th Cir. 2013). "The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." *Bell*, 709 F.3d at 898 (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). *see also White v. Lee*, 227 F.3d 1214, 1242–44 (9th Cir. 2000).

44 in the 2017-18 school year. [SUF #106]. Although parent requests had been increasing in OSD through the 2017-18 school year, beginning in the 2018-19 school year, parent requests declined.[21] [SUF #107]; *see also* chart, reflecting relative sources of special education referrals, Exh. UU to Parks Decl. The rate of referral from SSTs has steadily increased from 178 in the 2015-16 school year to 370 in the 2018-19 school year, and 281 as of January 3, 2020 in the 2019-20 school year. [SUF #109]; *see also* chart, reflecting relative sources of special education referrals, Exh. UU to Parks Decl. By the 2018-19 school year, the CST/SST process was the most frequently used method of referral as compared to parent and teacher referrals. [SUF #110]; *see also* chart, reflecting relative sources of special education referrals, Exh. UU to Parks Decl.

However, the use of the CST/SST process delays referrals for assessment. Thus, to the extent OSD has increased its special education enrollment after the filing of this case, it has continued to do so through a process that dramatically delays student referrals. Even if the written policy by OSD is followed, a student referred out of the SST system will have been in that system no less than sixteen to twenty-four weeks, or roughly half an academic year. [SUF #111].

OSD itself does not monitor how the CST/SST process is being used. OSD maintains little to no centralized electronic information regarding its CST/SST program. There is no information in the electronic system regarding referrals, interventions or outcomes. [SUF #112]. Moreover, there is currently no centralized method to track data even on duration of involvement in the CST/SST system, other than resort to review of paper files maintained at each school site.[22] [SUF #113]. In reality, students in the

---

[21] Teacher Jennifer Willis testified that she has never seen a direct parent request for an assessment outside of the SST process. [SUF #108].

[22] *See* Testimony of Christopher Ridge, the Director of Pupil Services and the District's FRCP 30(b)(6) witness on "5. All systems or methods, …used to track the number of students in the SST process from the 2014-15 academic year to the present; 6. All systems or methods used to track the number of students in the COST/CST process in the District from the 2014-15 academic year to the present." [SUF #114].

Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment - 14

CST/SST system often spend years in the program before referral, or are only sent to SST well after they should have been identified. *See supra* regarding M.L., O.L., M.B., I.H., F.S.

Moreover, the set of thirty randomly selected SST files produced by District to its expert show substantial delay.[23] For example, Student 1 was referred for a special education evaluation by an SST team on October 15, 2019. [SUF #116.] By that point, however, he had been in the CST/SST process for three and a half years, with an initial SST in March of 2016. [SUF #117]. Similarly, Students 2, 8, 12, and 13 spent anywhere from a year to 23 months in the CST/SST system prior to being referred for special education assessment. [SUF #118]. Overall, the thirty files produced to Defendants' expert Dr. Nadeen Ruiz show that, on average, students spend a year (363 days) in the CST/SST system. [SUF #119]. For students who were ultimately referred to special education, the average was higher, with those students spending an average of 13 months (388 days) in the CST/SST system prior to referral. [SUF #120].

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment against a party is appropriate when the depositions, answers to interrogatories, and admissions on file, together with the affidavits or declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c). The moving party bears the initial burden of establishing the basis for its motion and identifying those portions of the pleadings and discovery responses that demonstrate an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its initial burden, the nonmoving party must then set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).Upon a showing that there is no genuine dispute of material fact as to particular claim(s) or

---

[23] These files were randomly selected by Defendants' expert, Dr. Nadeen Ruiz from the current CST/SST population. [SUF #115].

defense(s), the court may grant summary judgment in the party's favor on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought." F.R.C.P. 56(A).

## IV.  ARGUMENT

### A.  OSD Has an Affirmative Obligation to Timely Identify and Evaluate Students with Suspected Disabilities Who May Need Special Education Services

The IDEA requires that school districts receiving federal money provide to all students with disabilities a "Free Appropriate Public Education" ("FAPE"). 20 U.S.C. §§ 1412(a)(1), (b), 1413(a). A FAPE consists of special education and related services provided at public expense. A FAPE must meet state standards, and it must also conform to the student's individualized needs as captured by the student's Individualized Education Plan[24] ("IEP"). 20 U.S.C. §§ 1401(9), (29).

Under the IDEA, [t]he term "child with a disability means a child—

> (i) with mental retardation, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities[25]; and
>
> (ii) who, by reason thereof, needs special education and related services.
>
> 20 U.S.C. § 1401(3)(A).

Special education is defined as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability." 20 U.S.C. §1401(29). The IDEA defines the term "related services" to mean "transportation, and such developmental, corrective, and other supportive services (including ... occupational

---

[24] An Individualized Education Plan is a written document specific to each child eligible under the IDEA. 20 U.S.C. § 1401(14).

[25] Each of these disability categories has its own definition and criteria. 34 C.F.R. § 300.8(c) (definitions of disability categories).

therapy ...) as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26)(A). If a child "needs a related service and not special education, the child is not [eligible]." 34 C.F.R. § 300.8(a)(2)(i).

To comply with the IDEA and provide a FAPE, a district must take crucial preliminary steps. It must have in place "child find" policies and procedures that ensure that "[a]ll children . . . , regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated." 20 U.S.C. § 1412(a)(3)(A); *see also* 20 U.S.C. § 1412(a)(1), 30 C.F.R. §§ 300.11, 300.301–11. Congress enacted the IDEA's Child Find provisions to guarantee access to special education. *El Paso Independent School Dist. v. Richard R.*, 567 F.Supp.2d 918, 950 (W.D. Tex. 2008). "That this evaluation is done early, thoroughly, and reliably is of extreme importance to the education of children. Otherwise, many disabilities will go undiagnosed, neglected, or improperly treated in the classroom." *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1110 (9th Cir. 2016); *see also J.G. v. Douglas Cty. Sch. Dist.*, 552 F.3d 786, 794 (9th Cir. 2008); *El Paso Independent School Dist.*, 567 F.Supp.2d at 950 ("duty to have policies and procedures in place to locate and *timely* evaluate children with suspected disabilities in its jurisdiction") (emphasis added).

### 1. The District Has An Affirmative Duty to Identify and Evaluate When There Is a Suspicion of a Disability; The Threshold For Suspicion Is Relatively Low.

The obligation to identify and evaluate applies to "children who are suspected of being a child with a disability. . .and in need of special education, even though they are advancing from grade to grade." 34 C.F.R. § 300.111(c)(1). "That is, the child-find duty 'is triggered when the [state or LEA] has reason to suspect a disability, and reason to suspect that special education services may be needed to address that disability.'" *Dept. of Ed. v. Cari Rae S.*, 188 F. Supp. 2d 1190, 1194 (D. Haw. 2001) (citing *Corpus Christi Indep. Sch. Dist.*, 31 IDELR ¶ 41, at 158, No. 105–SE–1298 (Jan. 19, 1999) (citing *Davonne B. v. Houston I.S.D.*, No. 327–SE–596 (Texas H.O. Dec'n, May 2, 1997)).

"School districts may not ignore disabled students' needs, nor may they await parental demands before providing special instruction." *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005).

In other words, "when the district has notice that the child has displayed symptoms of that disability" a district must refer and assess *Timothy O.,* 822 F.3d at 1119; *see also W.H. v. Clovis Unified Sch. Dist.*, No. CVF-08-0374, 2009 WL 1605356, *5 (E.D. Cal. June 8, 2009); *Dept. of Ed. v. Cari Rae S.*, 188 F. Supp. 2d 1190 (D. Haw. 2001). The threshold for the school district's "suspicion is relatively low," *Cari Rae S.*, 188 F. Supp. 2d at 1195, and suspicion can come from a variety of sources, such as "expressed parental concerns about a child's symptoms," "expressed opinions by informed professionals," "or even by other less formal indicators, such as the child's behavior in or out of the classroom." *Timothy O.*, 822 F.3d at 1121. In other words, "when a district is aware that a student *may* have a disability. . . it has an obligation to evaluate the student…." *N.G. v. District of Columbia*, 556 F.Supp.2d 11, 27 (D.C. Cir. 2008) (emphasis in original).

Once the school district "suspect[s] [a] disability. . . a test must be performed so that parents can 'receive notification of, and have the opportunity to contest, conclusions regarding their children.'" *Timothy O. v. Paso Robles Unified School Dist.*, 822 F.3d 1105, 1120 (9th Cir. 2016) (*quoting Pasatiempo by Pasatiempo v. Aizawa*, 103 F.3d 796 (9th Cir.1996)). When a child has suspected disabilities, a school district must promptly seek parental consent to evaluate the child to "determine whether a child is a child with a disability" and to "determine the educational needs of such child." 20 U.S.C. §§ 1414(a)–(c). In other words, "as soon as a student is identified as a *potential* candidate for special education services, [the district] has a duty to locate that student and complete the evaluation process." *N.G. v. District of Columbia*, 556 F.Supp.2d 11, 25 (D.D.C. 2008) (emphasis in original) (citing *Hawkins v. District of Columbia*, 539 F.Supp.2d 108 (D.C. Cir. 2008); *District of Columbia v. Abramson*, 493 F.Supp.2d at 80, 85 (D.C. Cir. 2007). This affirmative obligation applies regardless of whether a parent has made a

specific request for an evaluation or asked for special education services. *N.G. v. District of Columbia*, 556 F.Supp.2d 11, 29 (citing *Scott v. District of Columbia*, 2006 WL 1102839 at *7-8 (D.D.C.2006) (holding that a district may not "await parental demands" before providing special instruction)).

The district must then create an assessment plan and seek consent from the child's parent. 20 U.S.C. § 1414(a)(1)(D). When evaluating a child, a school district must "'ensure that. . . the child is assessed in *all areas* of suspected disability.' 20 U.S.C. § 1414(b)(3)(B) (emphasis added)." *Timothy O.*, 822 F.3d at 1111. The district must then complete a full initial evaluation and hold an Individualized Education Plan meeting within sixty days from when the assessment plan is signed by the parent. 20 U.S.C. § 1414(b)(4)(B); 30 C.F.R. § 300.301. If a child's parents disagree with the district's assessment, they have the right to "obtain an independent educational evaluation of the child." 20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.502; *see also Timothy O.*, 822 F.3d at 1111.

In this case, although there are numerous undisputed instances of children who were displaying obvious signs of disability that easily met the low threshold of suspicion that triggers a special education evaluation, OSD nevertheless continues to keep children in the SST process for months, and sometimes years, without performing an assessment. This delay is not appropriate under any circumstances; harms students and families by denying them the rights and services available under the IDEA; and constitutes a violation of Oxnard's child find obligations.

**2. OSD is Obligated to Respond to Parental Requests for Assessment by Either Providing a Special Education Assessment, or at a Minimum, Written Notice of its Reasons for Denial.**

In addition to OSD's affirmative obligations, OSD must also respond to parental request for evaluation for special education services. 34 C.F.R. § 300.301. Under the implementing regulations, "a parent of a child . . . may initiate a request for an initial

evaluation to determine if the child is a child with a disability." *Id.* at § 300.301(b). The initial evaluation then "[m]ust be conducted within 60 days of receiving parental consent for the evaluation…." *Id.* at § 300.301(c)(1)[26].

The "'informed suspicions of parents, who may have consulted outside experts,' trigger the requirement to assess, even if the school OSD disagrees with the parent's suspicions because '[t]he identification [and assessment] of children who have disabilities should be a cooperative and consultative process.'" *Timothy O. v. Paso Robles Unified School Dist.*, 822 F.3d 1105, 1120 (9th Cir. 2016) (*quoting Pasatiempo by Pasatiempo v. Aizawa*, 103 F.3d 796 (9th Cir.1996))[27].

As the Ninth Circuit has stated, this is a mandatory duty when responding to a request for an initial evaluation by a parent. "[W]hen a parent requests an evaluation because he or she suspects that his or her child may be disabled, the parent must be notified of the [district's] response and how to challenge it. 20 U.S.C. § 1415(b)(3). The [district] must make clear to parents whether it proposes to undertake a [special education or other evaluation] or no evaluation at all, and it must afford parents an opportunity to challenge the proposal." *Pasatiempo by Pasatiempo v. Aizawa*, 103 F.3d 796, 803 (9th Cir. 1996).

These requirements apply even when a school district "[chooses] to ignore [a student's] disabilities and take no action." *Compton Unified School Dist. v. Addison*, 598 F.3d 1181, 1184 (9th Cir. 2010). "As the Supreme Court stated in the context of an unrelated provision of the IDEA, a "reading of the [Individuals with Disabilities Education] Act that left parents without an adequate remedy when a school district

---

[26] The only exceptions to this requirement are if the parent "repeatedly fails or refuses to produce the child for the evaluation;" or the child enrolls in school elsewhere prior to a determination regarding eligibility for special education. *Id.* at § 300.301(d).

[27] However, the procedural safeguards section of IDEA does allow districts to provide "Written prior notice to the parents of the child . . . whenever the local educational agency . . .refuses to initiate or change, the identification [or] evaluation . . . of the child…" 20 U.S.C. § 1415(b)(3)(B); *see also* 34 C.F.R. § 300.503(a)

unreasonably failed to identify a child with disabilities would not comport with Congress' acknowledgment of the paramount importance of properly identifying each child eligible for services." *Compton Unified School Dist.*, 598 F.3d at 1184 (quoting *Forest Grove School Dist. v. T.A.*, 557 U.S. 230, 244 (2009)).

Delay in this process constitutes a violation. For example, the D.C. Circuit noted a stipulated child find violation when a school refused to provide a form for requesting an evaluation for a student, and after waiting a year "test scores placed him in the bottom one percent of his age group for reading comprehension and the bottom five percent for reading overall. Nonetheless, without performing any disability evaluation, the school district placed Mathew in a regular fourth-grade class. Only after a full school year of unsatisfactory grades did DCPS recognize Mathew's disability and develop an IEP." *Reid ex rel. Reid v. OSD of Columbia*, 401 F.3d 516, 519 (D.C. Cir. 2005). This is precisely what happened to many of the students here.

### 3. Under IDEA, RTI is Limited to the Evaluation Process for Learning Disabilities, and Cannot be Used to Delay Referrals for a Special Education Assessment.

In the context of students who are suspected as having learning disabilities, a district may, as part of the evaluation, "use a process that determines if the child responds to scientific, research-based intervention as a part of the evaluation procedures described [above]." 20 U.S.C. §1414(b)(6)(B). This process is allowed under the statute only for students with suspected learning disabilities, and only *as part of* the evaluation process, not in order to determine whether to evaluate in the first instance.

However, this is distinct from "a "response to intervention process" ("RTI"), which is a general—not special—education methodology that offers tiers of progressively intensified support depending on a student's response to instruction." *Lisa M. v. Leander Independent School OSD*, 924 F.3d 205, 209 (5th Cir. 2019) (citing Genna Steinberg, Amending § 1415 of the IDEA: Extending Procedural Safeguards to Response-to-Intervention Students, 46 Colum. J.L. & Soc. Probs. 393, 395 (2013)).

Response to intervention strategies "cannot be used to delay or deny the provision of an [evaluation]." *Spring Branch Independent School District v. O.W. by next friend Hannah W.*, 938 F.3d 695, 707 (5th Cir. 2019) (citing *Lisa M.*, 924 F.3d at 209 n.4 (citing Memorandum from Melody Musgrove, Director, OSEP, to the State Directors of Special Education (Jan. 21, 2011), https://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/osep11-07rtimemo.pdf. ("RTI strategies cannot be used to delay or deny the provision of an [evaluation]"). Courts examining the question have reiterated "a school district cannot require that a student complete an RtI process before it conducts an evaluation for special education eligibility." *Artichoker v. Todd County School District*, 3:15-CV-03021-RAL, 2016 WL 7489033 at *6 (D.S.D. December 29, 2016) (quoting hearing officer).

Further, as case law has made clear, a district does not "excuse itself from the obligation to evaluate students merely because [of] . . . additional, alternative ways to accommodate the child." *N.G. v. District of Columbia*, 556 F.Supp.2d 11, 29 (D.D.C. 2008). A "parent's acceptance of the use of alternative strategies relieves a school district of the obligation to comply with the 'Child Find' provisions of the act." *Scott v. District of Columbia*, 2006 WL 1102839, No. Civ.A. 03–1672 DAR (D.D.C. March 31, 2006).[28] In this case, based on the SST files reviewed to date, District offered parents no choice but to proceed through the SST process, except in very rare circumstances

Finally, the California Department of Education itself has ruled that a similar

---

[28] The District will undoubtedly rely on California Education Code 56303, which states that "[a] pupil shall be referred for special educational instruction and services only after the resources of the regular education program have been considered and, where appropriate, utilized" to argue that it does not have to refer a student for special education services until all regular education programs have been utilized. However, this single code section does not trump the entire federal statutory scheme under the IDEA, nor the remainder of the California Education Code. Moreover, far from requiring the District to use all educational resources before referring a student for an initial evaluation, Section 56303 makes clear that the resources of the regular education program should only be used "where appropriate."

Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment - 22

process in which SSTs are required prior to referral to special education violates that California Education Code section that implements IDEA's child find requirement: "[t]he SST process is not required prior to special education assessment of a student. Furthermore, the District's policy for initial referrals for special education [of utilizing an SST] requires an unnecessary requirement in the identification of students who may be eligible for special education." California Department of Education, Investigation Report, Case S-0730-17/18, Exh. WW to Parks Decl.

**B.   The District's "Wait and See" Approach to Child Find, Which Makes Use of A Pre-Referral Process, Delays Much-Needed Special Education Assessments in Violation of the IDEA**

Here, rather than taking the affirmative steps required by the statute, it is clear that OSD engages in a "wait and see" approach. This has been confirmed by the six different OAH decisions, all of which found—based either on extensive testimony or OSD's own admission, a failure to identify and evaluate children over the course of years. [SUF #5-25]. It is further confirmed by OSD's own policies, procedures and practices, as demonstrated by the testimony in this case, and the written policies of the District itself. [SUF #26-32]. Nearly every staff member who testified, including the District's designee on child-find and its own expert, confirmed the use of the CST/SST as a pre-referral process which continues to this day. OSD staff concede that in response to parent requests OSD holds an SST. At this SST, parents can withdraw their request. OSD even includes a sample withdrawal letter in its Special Education Policy Manual. [SUF #33-55].

As made clear in the files produced by Defendants to their expert, OSD staff always holds an SST in response to a parent request for an assessment. At that SST, the team "agrees" to wait on an assessment. [SUF #33-55]. Parents in these situations are denied what *Pasatiempo* identifies as a critical procedural protection – a clear response on a parent's request for an assessment, and thus "an opportunity to challenge the proposal." *Pasatiempo*, 103 F.3d at 803.

Most critically, OSD's pre-referral process results in substantial delays in getting

needed special education services.  As the sample set of student files produced by OSD demonstrates, students are spending an average of a year in CST/SST and, even where e OSD eventually decides to assess those students, students spend an average of 15 months in CST/SST before being assessed for needed special education services. OSD admits it has not centralized system to track the CST/SST process and as discussed above, if its written policy is followed, a student referred out of the SST system will have been in that system no less than sixteen to twenty-four weeks, or roughly half an academic year.

The harms to students of these delays are confirmed not only by the decisions, but also by the stories of the individual children in this case, including but not limited to students like O.L. and D.C., who OSD failed to identify for years. [SUF #81-100]. It is also confirmed by the data from OSD, which shows that, although enrollment in OSD has increased in response to this lawsuit, it has done so primarily by pulling students out of the CST/SST system who have been languishing there for years. [SUF #102-107]. To the extent the OSD has attempted to change its written policies, it is clear that this was directly in response to the instant case and does not reflect current practices in the OSD. [SUF #34-40]. The District has defended and continues to defend the use of a pre-referral process as a gateway to special education assessments. Thus, without a declaration of liability, OSD will continue to utilize its illegal pre-referral process that allows children to languish for years without an appropriate assessment to determine the services they may need and denies their parents required procedural protections in the meantime.

**V. CONCLUSION**

For the foregoing reasons, Plaintiffs request that the Court grant Plaintiffs' motion as identified above.

1

2   DATED: March 13, 2020         LEARNING RIGHTS LAW CENTER

3                             LAW OFFICE OF SHAWNA L. PARKS

4                             DISABILITY RIGHTS ADVOCATES

5                             By: _____

6                               Shawna L. Parks

7                               Attorneys for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28