LEARNING RIGHTS LAW CENTER
JANEEN STEEL (SBN 211401)
PATRICIA VAN DYKE (SBN 160033)
janeen@learningrights.org
patsy@learningrights.org
1625 W. Olympic Blvd, Suite 500
Los Angeles, CA 90015-4684
Phone: (213) 489-4030
Fax:   (213) 489-4033

DISABILITY RIGHTS ADVOCATES
STUART SEABORN (SBN 198590)
MELISSA RIESS (SBN 295959)
seaborn@dralegal.org
mriess@dralegal.org
2001 Center St., 4th Fl.
Berkeley, CA 94704
Phone: (510) 665-8644
Fax: (510) 665-8511

LAW OFFICE OF SHAWNA L. PARKS
SHAWNA L. PARKS (SBN 208301)
sparks@parks-law-office.com
4470 W. Sunset Blvd., Ste. 107-347
Los Angeles, CA 90027
Phone/Fax: (323) 389-9239

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.R., a minor, by and through her guardian ad litem, Janelle McCammack *et al.*,<br><br>        Plaintiffs,<br><br>     v.<br><br>OXNARD SCHOOL DISTRICT, *et al.*,<br><br>           Defendants. | Case No.: 2:17-cv-04304-JAK-FFM<br><br>**Separate Statement of Uncontroverted Facts and Statements of Law in Support of Plaintiffs' Motion for Partial Summary Judgment**<br><br>**Date:  July 27, 2020**<br>**Time: 8:30 a.m.**<br>**Court: 10B**<br><br>**First Street Courthouse** |

Plaintiffs hereby submit their statement of uncontroverted facts and conclusions of law in conjunction with Plaintiffs' Motion for Partial Summary Judgment filed concurrently herewith.

## I. Uncontroverted Facts

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| 1. | As of 2017 when this case was filed, the District had no written special education policy other than a self-described "outdated" policy from 2004 that "wasn't current." | [Sugden Deposition 49:16-50:13; 53:7-18, Exhibit A to Parks Decl.] |
| 2. | The Director of Special Education, who "found" a paper copy in her office, did not know whether anyone was using this policy, and could not be sure if anyone else had paper copies. | [Sugden Depo. 12:20- 13:11 and 49:16-50:13, Exhibit A to Parks Decl.]. |
| 3. | However, the 2004 manual was the last written iteration of the District's "child find" policy. | [Sugden Depo. 56:19-57:6, Exhibit A to Parks Decl.]. |
| 4. | Ms. Sugden has been out on leave since approximately March of 2019. The Special Education Director position is currently filled by Interim Director, Katrina Madden. | [Madden Depo.9:3-7; 10-15:22, Exhibit B to Parks Decl.]. |
| 5. | Between these first two administrative hearings, a total of twenty-one District Staff testified from four different District schools and District administration, over the course |  [M.B. Order, p.1; I.G. Order, p.1, Exhibits C and D to Parks Decl.]. |

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
|  | of nearly eleven days spread out over two separate months. |  |
| 6. | An Administrative Law Judge from OAH found that: "[s]everal of the District's witnesses confirmed that District's standard process when a parent asked for an assessment…was to refer the request…to the COST team, which then determined without any parental participation whether to hold a student study team to discuss a possible referral for assessment." | [M.B. Order, p. 36-37, ¶ 17, Exhibit C to Parks Decl.]. |
| 7. | An Administrative Law Judge from OAH found that: "[M.B.'s] kindergarten, first, second, third and fourth grade general education teachers had no District training on appropriate procedures under the IDEA for referring a child who is suspected of having a disability that may qualify that child for special education services." | [M.B. Order, p. 36, ¶ 16, Exhibit C to Parks Decl.] |
| 8. | An Administrative Law Judge from OAH found that: "District staff at Juan Soria School [where M.B. attended kindergarten] did not directly commence assessments of Student when Mother expressed concerns. Instead, they first met privately as part of a COST team, and then held a student study | [M.B. Order, p. 36, ¶ 16, Exhibit C to Parks Decl.] |

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| | team meeting to discuss whether to assess." | |
| 9. | An Administrative Law Judge from OAH found that: "Testimony from Elm school principal and school psychologist …demonstrated they also did not understand the appropriate procedural requirements under the IDEA for referring children for special education assessments." | [M.B. Order, p. 36, ¶ 17, Exhibit C to Parks Decl.] |
| 10. | An Administrative Law Judge from OAH found that: "Fundamental to District's failure to timely assess was a general misunderstanding of a school district's child find obligations." | [I.G. Order, p. 35, ¶ 16, Exhibit D to Parks Decl.] |
| 11. | An Administrative Law Judge from OAH found that: "District personnel's misunderstanding in this regard was systemic." | [I.G. Order, p. 36, ¶ 17, Exhibit D to Parks Decl.] |
| 12. | An Administrative Law Judge from OAH found that: I.G.'s teacher "incorrectly believed medical issues were not a basis for . . . special education intervention…." | [I.G. Order, p. 30, ¶ 25, Exhibit D to Parks Decl.] |
| 13. | An Administrative Law Judge from OAH found that: "General education teachers, counselors, and administrators stated that they did not suspect Student to have a disability that might need to be addressed by | [I.G. Order, p. 35, ¶ 16, Exhibit D to Parks Decl.] |

Plaintiffs' Separate Statement of Uncontroverted Facts and Conclusions of Law

3

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| | special education services, because Student's absences were the consequence of a medical issue. Yet everyone agreed that Student's chronic absenteeism and early removal negatively affected his academics….¶" | |
| 14. | As this Court identified in its Order on Plaintiffs' original motion for class certification, even when the District acts on an internal referral or staff identify the need for a disability-related assessment, the District uses a prereferral process, including Student Support Teams ("SSTs") and Coordination of Services Teams ("COSTs"), which act as gate keepers for special education assessments. | [Dkt. 128 at 3.] |
| 15. | The Court noted the existence of this system by relying on the District's statements in its opposition to Plaintiffs' original motion for class certification, as well as consistent statements of District staff confirming the existence of this prereferral process and the District's defense of it as valid preliminary step before a special education assessment. | Dkt. 128 at 3 (citing Dkt. 68, Declaration of Santamaria ¶¶ 11–13; Dkt. 69, Declaration of Anguiano ¶¶ 8–10; Dkt. 67, Declaration of Fox ¶¶ 7–10; Dkt. 70, Declaration of Serrano ¶¶ 11–14; Dkt. 72, Declaration of Breitenbach ¶¶ 6–10; Dkt. 73, Declaration of Wennes ¶¶ 8–10). |

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| 16. | Defendant's opposition brief to Plaintiffs' first motion for class certification described the CST/SST as a "pre-referral process." | [Dkt. 62 at 3–4 (opposition brief describing "pre-referral process")]. |
| 17. | Defendants' expert, Dr. Vicky Barber, also described the CST/SST as a "pre-referral process." | [Dkt. 88, Barber Decl. ¶6]. |
| 18. | In October 2018, teachers and administrators involved in the I.H. due process hearing testified that special education referrals still involve the SST and COST systems, and that staff continue to rely on general education strategies when they suspect a student's disability. | [Llanes Testimony, I.H. Administrative Record, Volume VII. 3809:21-3810:19 and 3814:18-3816:14, Exhibit I to Parks Decl. (special education teacher testifying that staff proceed through three-tiered SST process before special education referral); Ordaz Testimony, Volume V.  2206:7-2208:17 and 2316:19-2320:2, Exhibit J to Parks Decl. (principal testifying that SST meetings are held in response to parent and teacher requests for assessments; parent requests never proceed to assessment without SST meeting); Billings Testimony, Volume |

Plaintiffs' Separate Statement of Uncontroverted Facts and Conclusions of Law

5

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| | | VI, 2977:24-2978:7, 2989:7-17, 3064:18-3065:6, Exhibit K to Parks Decl. (speech/language pathologist testifying that if a teacher requests an assessment, they will hold SST and tell teacher they need to do interventions first)] |
| 19. | I.H.'s teacher testified that "If I suspect a disability, I would watch that child, provide interventions, and if I needed and I suspected a disability, then I could submit a referral for a filled assessment." | [Moran Testimony, Volume V. 2401:12-2402:17 and 2403:8 – 2405:18, Exhibit L to Parks Decl.]. |
| 20. | In these hearings, another 9 staff from two different schools testified over ten days of hearings on the child find issue. | [I.H. Order at 1-10, Exhibit F to Parks Decl.]. |
| 21. | The ALJ in this third hearing also found that "*Student's referral to a student success team was consistent with Oxnard's practice of attempting general education interventions through a student success team before assessing a student for possible disabilities requiring special education.*" | [I.H. Order, p.4 ¶8 (emphasis added), Exhibit F to Parks Decl.] |

Plaintiffs' Separate Statement of Uncontroverted Facts and Conclusions of Law

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| 22. | The ALJ held that by the second SST meeting in October of 2016, there were "significant indicators of a potential disability affecting Student's learning, but the student success team did not even discuss the possibility of assessments. Instead, Oxnard adopted a wait and see attitude…" | [Order, p. 43, ¶23, Exhibit F to Parks Decl.]. |
| 23. | "Student should have been referred for assessment in October, 2016. Oxnard did not assess Student until January 2018." | [I.H. Order, p.2, Exhibit F to Parks Decl.]. |
| 24. | After the October 2016 SST meeting, there were two additional SST meetings conducted prior to I.H.'s referral for special education. | [I.H. Order, p.6-10, Exhibit F to Parks Decl.]. |
| 25. | I.H. was in the SST process for a total of fifteen months before he was finally referred for a special education evaluation. | [I.H. Order, p.5-10, Exhibit F to Parks Decl.]. |
| 26. | The District prepared a written special education policy manual in 2018. | [Sugden Depo. 50:10-52:21, Exhibit A to Parks Decl.]. |
| 27. | In 2018, the District created a "task force" to draft a new policy manual for special education, which was the first update since 2004. | [Sugden Depo. 49:16-50:13; 52:12-16; 54:2-5, Exhibit A to Parks Decl.]. |

Plaintiffs' Separate Statement of Uncontroverted Facts and Conclusions of Law

7

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| 28. | This manual was drafted by a committee and is dated June 2018, and was intended to contain the District's "Child Find" policy going forward. | [Sugden Depo. 50:10-52:21, 56:19-57:6, Exhibit A to Parks Decl.; June 2018 Policy Manual, Exhibit M to Parks Decl.] |
| 29. | This first special education policy manual included a chapter on the CST and SST process. | [June 2018 policy manual, OSD 1642, Exhibit M to Parks Decl.] |
| 30. | It also included a special education referral flowchart that instructed that all special education referrals, including from teachers and parents, would proceed through the SST process and general education interventions first. | [June 2018 policy manual flowchart, OSD 1678, Exhibit M to Parks Decl.]. |
| 31. | In November 2018 the District changed one page of the manual – the flowchart – to state that in response to a request for assessment that the District should provide either an assessment plan or a "notice to parent of action and procedural safeguards." | [November 2018 Policy Manual, OSD 978, Exhibit N to Parks Decl.; Email from Wayne Saddler, OSD 6518, Exhibit O to Parks Decl.] |
| 32. | While the remainder of the manual continues to be dated June 2018, this single page is dated November 7, 2018. | [Email from Wayne Saddler, OSD 6518, Exhibit O to Parks Decl; and November 2018 Policy Manual, OSD 978, Exhibit N to Parks Decl.] |

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| 33. | Katrina Madden, the Interim Director of Special Education, knew only that this page was changed because of "additional input," but did not know who the input was from. | [Madden Depo. 122:20-123:6, Exhibit B to Parks Decl.]. |
| 34. | Ms. Madden stated in deposition that she believed Wayne Saddler, a contractor with the District, was the primary drafter of the policy manual. | [Madden Depo. 84:17-25; 85:8-86-2, Exhibit B to Parks Decl.] |
| 35. | On November 8, 2018, Mr. Saddler sent an email stating that "We're making this change at this time due to litigation issues. Please convert this to pdf and have it inserted into the electronic version of the Policies and Procedures Manual." | [Email from Wayne Saddler, OSD 6517-6518, Exhibit O to Parks Decl.] |
| 36. | Even though the flowchart itself was changed because of "litigation issues," the manual itself continues to contain information that anticipates that referrals will only come through parents or SST teams, stating that "The school district has 15 days* from the time it receives a written request for assessment from either the school SST or the parents to develop either an Multidisciplinary Assessment Plan or a notice that it will not be starting an assessment." | [Policy Manual, OSD 976, Exhibit N to Parks Decl.]. |

| No. | Uncontroverted Fact | Evidence |
|-----|---------------------|----------|
| | | |
| 37. | The policy manual that contains the altered flow chart continues to include an entire chapter on the CST/SST process. | [November 2018 Policy manual, OSD 960-64; Table of Contents 942, Exhibit N to Parks Decl.]. |
| 38. | The chapter on CST/SST process precedes the chapter on "Referral and Assessment." | [November 2018 Policy Manual, OSD 942, Exhibit N to Parks Decl.]. |
| 39. | The District's "Child Find" policy, includes reference to the CST system. | [November 2018 Policy Manual, OSD 959, Exhibit N to Parks Decl.]. |
| 40. | On the one hand, the manual states as a general matter that "'Child Find' is one of the most important special education legal obligations for school districts. . . . the District also has an obligation to specific students when the District knows – or should have known – that a student may have a disability." It also states that "In no case will the RtI2 process be used as a barrier or to delay an appropriate referral by parent or staff for special education assessment." However, on the other hand, the manual advises that "Students should be referred to Special Education only after all other school resources have been considered | [November 2018 Policy Manual, OSD 954, Exhibit N to Parks Decl.]. |

| No. | Uncontroverted Fact | Evidence |
|-----|---------------------|----------|
|     | and appropriately used in a general classroom experience. . . .Parents are strongly urged to utilize the general education intervention process before referring to Special Education." "For many students, the first step is a referral to the school problem-solving team, which may be known as Student Success Team (SST)…" |  |
| 41. | Katrina Madden, Interim Special Education Director and 30(b)(6) witness on written policies for the District, testified that "Q: …Do you have a copy of the policies and procedures manual for special education that you use? A: I have referenced it from time to time. . . Is it my go-to guide? No. It -- I would say it's a reference that we can use." | [Madden Depo. 95:24-96:5; Madden Depo. 30:13-32:2 (30(b)(6) topics), Exhibit B to Parks Decl.]. |
| 42. | Ms. Madden was the FRCP 30(b)(6) witness on, *inter alia,* "[t]he district's policies and procedures for determining eligibility for special education and related services from 2014-15 academic year to the present," and "[a]ny written policies or procedures in the district regarding identification and evaluation of students for special education and related services and/or Child Find for | [Madden Depo. 30:13-32:2 (30(b)(6) topics), Exhibit B to Parks Decl.]. |

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| | each year from the 2014-15 academic year to the present." | |
| 43. | Naomi Cortez, Assistant Principal, currently at Fremont Academy, testified that she had read "pieces" of a binder that she believed contained written child find trainings that was given to the Principal in the 2018-19 school year, but does not recall the title. | [Cortez Depo. 40:12-41:16, Exhibit P to Parks Decl.]. |
| 44. | Jennifer Willis, a teacher from Cesar Chavez school testified that she has seen pieces of the policy manual, but never the whole thing, and was not sure what topics were covered in any pieces she saw. | [Willis Depo. 9:19-10:7 and 44:5-16, Exhibit Q to Parks Decl.]. |
| 45. | Ms. Fitz had never seen the whole special education policy manual--only pieces. | [Fitz Depo. 37: 5-10, Exhibit R to Parks Decl.]. |
| 46. | According to Ms. Fitz, she never received any training in recognizing the signs of disability in a child. | [Fitz Depo. 10:2-10:25 and 42:5-10, Exhibit R to Parks Decl.]. |
| 47. | Steve Tobey, longtime school psychologist with the District, testified that although he received a copy of the policy manual, he has never pulled it out and referenced it in the context of an SST meeting, and does not know if there has ever been any training on it. | [Tobey Depo. 8:16-23 and 40:9-44:6, Exhibit S to Parks Decl.]. |

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| 48. | Ms. Madden testified in January of 2020 that the District continues to follow a model closer to the original flowchart from the June of 2018 manual. | [Madden Depo. 30:13-32:2 (30(b)(6) topics); Madden Depo. 76:4-78:21, Exhibit B to Parks Decl.]. |
| 49. | Ms. Madden testified that the District holds SST meetings after a teacher request an assessment and that assessments are not necessarily conducted as a result of those meetings. | [Madden Depo. 68:24-69:19, Exhibit B to Parks Decl.]. |
| 50. | With respect to parent requests for assessment, Ms. Madden testified that the District also still holds SST meetings, and follows the prior flowchart, numbered OSD 1678, dated June 2018. | [Madden depo. 76:4-78:21; 77:9-78:1, Exhibit B to Parks Decl.]. |
| 51. | Ms. Madden explained:<br>Q: Is it the district's policy after a parent makes a request for an assessment and then the district holds an SST that the district will always provide an assessment after that SST?<br>A: Is it our policy to always do that? I don't think we have a blanket policy like that.... | [Madden Depo. 66:11-16, Exhibit B to Parks Decl.]. |

Plaintiffs' Separate Statement of Uncontroverted Facts and Conclusions of Law

13

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| 52. | At these meetings staff have conversations with parents about assessments, as a result of which parents who have requested assessments may "understand that that's not exactly what they're looking for. And so if they put it in writing, we do ask them if they will put it in writing that they rescind that request." | [Madden depo. 121:24-122:19, Exhibit B to Parks Decl.]. |
| 53. | The District's policy manual contains a sample withdrawal letter so that parents can withdraw their request for assessment. | [November 2018 Policy Manual, OSD 971, Exhibit N to Parks Decl.]. |
| 54. | After a request for assessment, the District holds an SST meeting, as a result of which either an assessment plan is generated *or* the student has general education interventions provided:<br><br>Q: Okay. And then, after the SST, what – I think what you're saying is it would depend on what happened at the SST as to whether they will make a referral for a special education assessment or whether they will implement accommodations and interventions in the general education curriculum? | [Madden Depo. 78:3-15, Exhibit B to Parks Decl.]. |

| No. | Uncontroverted Fact | Evidence |
|-----|---------------------|----------|
|  | A: Correct.<br><br>Q: Okay. So under the current procedure, after the SST team, as opposed to this flowchart, it could go in one of two directions, either interventions in general education or an assessment. Does that sound correct?<br><br>A: It does.... |  |
| 55. | Dr. Tobey also testified in January of 2020 that district uses its COST process, which he described as the "pre-referral vehicle" as the initial entry point for all concerns about a student and that, if the concern is not remedied after a COST plan is developed, then the next step is and SST. | [Tobey Depo. at 13:22-14:22; 18:4-9, Exhibit S to Parks Decl.]. |
| 56. | In the most recent OAH decision, the District stipulated on February 3, 2019 to liability for compensatory services for named plaintiff M.L. | [OAH M.L. Order, Exhibit H to Parks Decl.]. |
| 57. | The District stipulated on the record that "Oxnard denied Student a free appropriate public education from August 2017 through December 13, 2019, the date on which he filed his [due process] complaint, by: a. | [OAH ML Order at 3, Exhibit H to Parks Decl.]. |

Plaintiffs' Separate Statement of Uncontroverted Facts and Conclusions of Law

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
|  | Failing to evaluate Student in all areas of suspected disability to determine eligibility for special education and related services, and b. Failing to offer an individualized educational program that was reasonably calculated to enable Student to make progress appropriate in light of his circumstances." |  |
| 58. | The District issued M.L. an assessment plan after he was named in this case. | [M.L. Assessment Plan, P1, Exhibit Y to Parks Decl.] |
| 59. | During this time period covered by the stipulation the District held two SSTs for M.L., at which six different staff, including two teachers, two administrators, a school counselor and outreach coordinator, participated. | [ML SSTs, P57-68, Exhibit U to Parks Decl.]. |
| 60. | M.L. was in the CST/SST process for at least eighteen months, from at least September 29, 2017 through at least the date on which he filed his federal complaint on April 1, 2019. | [ML SSTs; Compare Tier II COST referral, P66 and Second SST, P57, Exhibit U to Parks Decl.]. |
| 61. | During this time period, M.L. failed every academic class. | [ML report cards, P11-14, 21-22, Exhibit V to Parks Decl.]. |
| 62. | The District's own evaluation, conducted after M.L. was added to this case, showed that M.L. – then in the eighth grade – was | [M.L. Assessment Report, P109, P200, Exhibit W to Parks Decl.]. |

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| | able to identify only ten out of twenty six letters and six sounds out of those ten letters with some inconsistencies, and that his instructional level was pre-primer. | |
| 63. | It also stated that ML's "difficulties, such as those in his profile of scores, can significantly impact academic progress in the area of Reading." | [M.L. Assessment Report, P215, Exhibit W to Parks Decl.]. |
| 64. | On December 12, 2019 the District found M.L. eligible for special education services as a student with a Specific Learning Disability and Other Health Impairment. | [M.L. Individualized Education Plan, P238, Exhibit X to Parks Decl.]. |
| 65. | M.L. is thirteen years old and has been a student in the District since 2014, with the exception of two trimesters in the 2016-17 school year spent in a neighboring district. | [M.L. Report Cards, P11-14, 21-22; M.L. Cumulative Notes, P8, Exhibit V to Parks Decl.]. |
| 66. | In October of 2018, the District also stipulated to liability for failure to identify and evaluate a student who was involved in the SST process. F.S. is currently nine years old. | [F.S. IEP 935, Exhibit Z to Parks Decl.] |
| 67. | In F.S.'s due process case, the District stipulated that its child find duty was triggered as of October 21, 2016, two years prior to the filing of the complaint, and that | [F.S. OAH Order, p. 4, ¶8, Exhibit G to Parks Decl.]. |

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
|  | it did not refer F.S. for a special education evaluation. |  |
| 68. | As a result, F.S. prevailed on the issue of the District failing to meet its child find duty and refer her for an evaluation. | [F.S. OAH Order, p. 5, Exhibit G to Parks Decl.]. |
| 69. | During the time frame for which the District stipulated to liability, the District held two SSTs for F.S. | [F.S. SST notes, P852-855, 861-863, Exhibit AA to Parks Decl.] |
| 70. | The District did not hold a first SST until February of 2018, sixteen months after the District concedes it should have already identified and referred her for a special education evaluation. | [F.S. SST notes, P 852-855, Exhibit AA to Parks Decl.; F.S. OAH Order, Exhibit G to Parks Decl.]. |
| 71. | By the Fall of 2018, four months prior to the first SST, F.S.'s standardized scores rated her as in need of "urgent intervention" in both math and reading. | [F.S. Assessment, P894, Exhibit BB to Parks Decl.] |
| 72. | Once assessed, the District's assessment showed that F.S.'s reading skills, comprehension and fluency all rated below the .1 percentile. | [Assessment, P905, Exhibit BB to Parks Decl.]. |
| 73. | Her math problem solving was also below the .1 percentile. | [Assessment, P905, Exhibit BB to Parks Decl.]. |
| 74. | F.S., who is an English Language Learner, also rated below the .1 percentile in broad reading in Spanish. | [Assessment, P907, Exhibit BB to parks Decl.]. |

Plaintiffs' Separate Statement of Uncontroverted Facts and Conclusions of Law

18

| No. | Uncontroverted Fact | Evidence |
|-----|---------------------|----------|
| 75. | The assessment recommended eligibility as a student with a Specific Learning Disability, and a Speech/Language impairment as a student with an expressive and receptive language disorder. | [Assessment, P923, 924, Exhibit BB to Parks Decl.]. |
| 76. | On October 29, 2018, the District held an IEP meeting and found F.S. eligible for services as a student with a Specific Learning Disability and Speech/Language Impairment. | [F.S. IEP, P935, Exhibit Z to Parks Decl.]. |
| 77. | In the decision regarding original named plaintiff J.R., the District stipulated to liability for compensatory services, stipulating that J.R. should have been found eligible by September 21, 2014 (and thus referred for evaluation prior to that) and for failing to meet their child-find obligations. | [J.R. OAH Order, p. 2 (Stipulated Issues, Factual Findings), Exhibit E to Parks Decl.] |
| 78. | J.R.'s first SST was May 11, 2015, a full twenty months after the District conceded she should have been eligible for special education. | [J.R. SST Notes, P1001, Exhibit CC to Parks Decl.] |
| 79. | Those SST notes state that J.R., who was in the fifth grade at that time, had an instructional reading level of 1.2 grade level. | [SST Notes, P1001, Exhibit CC to Parks Decl.] |

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| 80. | The District found J.R. eligible for special education on December 13, 2016 as a student with a speech/language impairment. | [J.R. IEP, P1025, 1028, Exhibit DD to Parks Decl.]. |
| 81. | Class member O.L. is eleven years old. | [O.L. IEP, P531, Exhibit FF to Parks Decl.] |
| 82. | He was assessed by the District only after his physician's assistant sent a letter requesting assessment on February 15, 2019. | [O.L. Assessment Plan, P561, Exhibit EE to Parks Decl.; Fawell Declaration, Dkt. #233-7; Fawell Note to School, P580, Exhibit GG to Parks Decl.] |
| 83. | At that point, O.L. had been in the CST/SST process in the District for at least seventeen months, beginning in at least September 13, 2017 until the District issued an assessment plan on March 12, 2019. | [CST/SST notes, P562-579, Exhibit HH to Parks Decl.; O.L. Assessment Plan, P561, Exhibit EE to Parks Decl.] |
| 84. | During that time, O.L. had three SST meetings. | [CST/SST notes, P562-579, Exhibit HH to Parks Decl.] |
| 85. | At O.L.'s first SST in September of 2017, the notes reflect that O.L., then in fourth grade, "doesn't know his ABC's….cannot add 1 and 1." | [2017 SST notes, P566, Exhibit HH to Parks Decl.]. |
| 86. | During this time period, O.L. received "1s" in nearly all subjects, which is "far below" meeting benchmark standards. | [O.L. Report Cards, P519-522, Exhibit II to Parks Decl.]. |

Plaintiffs' Separate Statement of Uncontroverted Facts and Conclusions of Law

20

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| 87. | The second SST held a year later in September of 2018 stated "Lack[s] phonic awareness, alphabetic knowledge. . . Difficulty recalling steps, memorizing facts. Struggles with number sense, basic facts (=, x)." | [2018 SST notes, P563, Exhibit HH to Parks Decl.] |
| 88. | After receiving the physician's assistant note, the District held another SST for O.L. | [March SST notes, P574-577, Exhibit HH to Parks Decl.]. |
| 89. | This SST states that O.L. "Can't identify letter names and sounds." | [March SST notes, P575, Exhibit HH to Parks Decl.]. |
| 90. | The assessment for O.L. recommended eligibility as a student with a speech/language impairment. | [O.L. Assessment, P784, Exhibit JJ to Parks Decl.] |
| 91. | It found that O.L. rated on "core language" in the .3 percentile, meaning he was below 99.7% of children in this area. | [O.L. Assessment, P811, Exhibit JJ to Parks Decl.] |
| 92. | "The Core Language score is a measure of general language ability that quantifies a student's overall language performance and is used to make decisions about the presence or absence of a language disorder." | [OL Assessment, P811, Exhibit OO to Parks Decl.]. |
| 93. | On December 12, 2019, the District found O.L. eligible for special education services as a student with a speech/language impairment, more than two years after his first SST meeting. | [O.L. IEP, P531, 548, Exhibit KK to Parks Decl.] |

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| 94. | Named Plaintiff D.C. is fourteen years old and is now a student in Oxnard Union High School District. | [D.C. IEP, P332, Exhibit LL to Parks Decl.] |
| 95. | The District agreed to assess D.C. after she was named in this case on April 1, 2019. | [D.C. assessment plan, P267, Exhibit MM to Parks Decl.] |
| 96. | The District issued an assessment report that recommended that D.C. was not eligible for special education services. | [D.C. OSD Assessment Report, P270, P303-305, Exhibit NN to Parks Decl.] |
| 97. | After D.C. moved to the high school district in the Fall of 2019, the high school district conducted its own assessment, finding that D.C. was eligible as a student with a specific learning disability, specifically dyslexia. | [D.C. OUHD assessment, P329, Exhibit OO to Parks Decl.]. |
| 98. | In the Spring of 2019, when D.C. was at the end of the eighth grade, her standardized test scores reflected a 4.9 and 5.9 grade level in English Language Arts and Math respectively. | [D.C. OSD Assessment, P277, Exhibit NN to Parks Decl.]. |
| 99. | On the reading screening administered by the high school district in the fall of her ninth grade year, D.C. rated significantly below average, falling below the .1 percentile, with her skill level needed for successful reading falling between second and third grade. | [D.C. OUHD Assessment, P316-317, Exhibit OO to Parks Decl.]. |

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| 100. | On November 22, 2019, when D.C. was in the ninth grade, the high school district held an IEP finding D.C. eligible and offering special education services. | [D.C. IEP, P332, Exhibit LL to Parks Decl.] |
| 101. | In the declarations already submitted to the Court Plaintiffs have provided the stories of numerous students, including W.G., A.V., J.M., A.L., E.H., Meli.B., I.B., A.W., H.V., W.H., all of whom were only evaluated and found eligible after they retained counsel. | [Declaration of J.A. (re W.G.), Dkt. #48; Declaration of L.H. (re J.M.); Dkt. #54; Declaration of C.L. (re A.L.), Dkt. #51; Declaration of M.A. (re E.H.), Dkt. #49; Declaration of F.B. (re Meli.B), Dkt. #53; Declaration of F.B. (re I.B.), Dkt. #156; Declaration of C.W. (re A.W.), Dkt. #158; Declaration of L.O. (re H.V.), Dkt. #159; Declaration of E.P. (re W.H.), Dkt. #155; Declaration of Janeen Steel, Dkt. #151, and Exhs. 24-34, Dkt. #151-38 through 151-34]; *see also* Motion for Class Certification, Dkt. #39, 14:24-17:16 (detailing stories of W.G., J.M., A.L., E.H., Meli.B.); and Renewed |

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| | | Motion for Class Certification, Dkt. #150, at 9:28-11:15, and 13:8-15 (detailing stories of I.B., W.H., H.V.). Half of these students were involved in the SST system prior to referral. [Decs for Declaration of J.A. (re W.G.), Dkt. #48; Declaration of L.H. (re J.M.); Dkt. #54; Declaration of C.L. (re A.L.), Dkt. #51; Declaration of F.B. (re Meli.B), Dkt. #53; Declaration of C.W. (re A.W.), Dkt. #158]; *see also* Motion for Class Certification, Dkt. #39, 14:24-17:16 (detailing stories of W.G., J.M., A.L., E.H., Meli.B.). |
| 102. | The District's special education enrollment has increased since the filing of this case. | [Cal. Dept. of Education data showing general education enrollment, P221-225, Exhibit PP to Parks Decl.; Cal. Dept. |

| No. | Uncontroverted Fact | Evidence |
|-----|---------------------|----------|
| | | of Education data showing special education enrollment, P226-237, Exhibit QQ to Parks Decl.; Enrollment Percentages Chart through December of 2018, Exhibit RR to Parks Decl.; Leone Declaration in Support of Class Certification, Dkt. #43; Leone Reply Declaration in Support of Class Certification, Dkt. #98; Parks Declaration in Support of Renewed Motion for Class Certification, Dkt. #152] |
| 103. | Since the complaint was filed, published data on special education enrollment has reflected an increase from 1582 to 1917 children in the K-8 setting, for an increase of 9.4% to 11.9% special education enrollment. | [Cal. Dept. of Education data showing general education enrollment, P221-225, Exhibit PP to Parks Decl.; Cal. Dept. of Education data showing special education enrollment, P226-237, Exhibit QQ to Parks Decl.; Enrollment Percentages Chart through December of 2018, Exhibit RR to Parks Decl.; Leone |

Plaintiffs' Separate Statement of Uncontroverted Facts and Conclusions of Law

| No. | Uncontroverted Fact | Evidence |
|-----|---------------------|----------|
| | | Declaration in Support of Class Certification, Dkt. #43; Leone Reply Declaration in Support of Class Certification, Dkt. #98; Parks Declaration in Support of Renewed Motion for Class Certification, Dkt. #152]. |
| 104. | Between December 2017 and December 2018, the District increased its K-8 special education enrollment by roughly 276 students. | [Cal. Dept. of Education data showing general education enrollment, P221-225, Exhibit PP to Parks Decl.; Cal. Dept. of Education data showing special education enrollment, P226-237, Exhibit QQ to Parks Decl.; Enrollment Percentages Chart through 2018, Exhibit RR to Parks Decl.] |
| 105. | Data produced by the District shows that few teachers directly refer for special education assessments. | [Defendants' Supplemental Responses to Plaintiffs First Set of Interrogatories, dated January 7, 2020, Exhibit SS to Parks Decl.] |
| 106. | In a district with more than 16,000 students, teacher referrals ranged from a low of 9 for | [Defendants' Supplemental Responses to Plaintiffs First |

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| | the entire 2016-17 school year, to a high of 44 in the 2017-18 school year. | Set of Interrogatories, dated January 7, 2020, Response to Interrogatory No. 6, p.6:8-7:2, Exhibit SS to Parks Decl.; Cal. Dept. of Education data showing general education enrollment, P221-225, Exhibit PP to Parks Decl.]. |
| 107. | While parent requests had been increasing in the District through the 2017-18 school year, beginning in the 2018-19 school year parent requests declined. | [Defendants' Supplemental Responses to Plaintiffs First Set of Interrogatories, dated January 7, 2020, Response to Interrogatory No. 5, p.5:12-6:7, Exhibit SS to Parks Decl.] |
| 108. | Teacher Jennifer Willis testified that she has never seen a direct parent request for an assessment outside of the SST process. | [Willis Depo. 27:8-12., Exhibit Q to Parks Decl.] |
| 109. | The rate of referral from SSTs has steadily increased from 178 in the 2015-16 school year to 370 in the 2018-19 school year, and 281 as of January 3, 2020 in the 2019-20 school year. | [Defendants' Supplemental Responses to Plaintiffs First Set of Interrogatories, dated January 7, 2020, Response to Interrogatory No. 4, p.4:15-5:11, Exhibit SS to Parks Decl.] |
| 110. | By the 2018-19 school year, the CST/SST process was the most frequently used | [Defendants' Supplemental Responses to Plaintiffs First |

Plaintiffs' Separate Statement of Uncontroverted Facts and Conclusions of Law

27

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| | method of referral as compared to parent and teacher referrals. | Set of Interrogatories, dated January 7, 2020, Exhibit SS to Parks Decl.] |
| 111. | Even if the written policy by the District is followed, a student referred out of the SST system will have been in that system no less than sixteen to twenty-four weeks, or roughly half an academic year. | [November 2018 Policy Manual, OSD 961-62, Exhibit N to Parks Decl.] |
| 112. | There is no information in the electronic system regarding referrals, interventions or outcomes. | [Ridge Depo. 39:6-40:21; 25:13-27:12 and Ridge Depo. Correction 26:14, Exhibit UU to Parks Decl.] |
| 113. | There is currently no centralized method to track data even on duration of involvement in the CST/SST system, other than resort to review of paper files maintained at each school site. | [Ridge Depo. 39:6-40:21; 25:13-27:12 and Ridge Depo. Correction 26:14, Exhibit VV to Parks Decl.; Sugden Depo. 80:9-81:7, Exhibit A to Parks Decl.] |
| 114. | Christopher Ridge is the Director of Pupil Services and was also the District's FRCP 30(b)(6) witness on "5. All systems or methods, including but not limited to any computer or software systems, used to track the number of students in the SST process in the District from the 2014-15 academic year to the present; 6. All systems or methods, | [Ridge Depo. 9:21-10:23 and 7:13-8:13, Exhibit VV to Parks Decl.; Plaintiffs' Notice of Deposition Pursuant to FRCP 30(b)(6), Exhibit T to Parks Decl.] |

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| | including but not limited to any computer or software systems, used to track the number of students in the COST/CST process in the District from the 2014-15 academic year to the present." | |
| 115. | These SST files produced by Defendants were randomly selected by Defendants' expert, Dr. Nadeen Ruiz, from the current CST/SST population. | [Riess Decl., ¶ 2 and Ex. 1 ("A Records Abstraction Study of the Oxnard School District's Coordination of Services/Student Success Team Procedures and Special Education Eligibility Assessment").] |
| 116. | Student 1 was referred for a special education evaluation by an SST team on October 15, 2019. | [Declaration of Melissa Riess ("Riess Decl.") ¶¶ 2-3 and Ex. 2 at OSD8901; *see also* Riess Decl. ¶¶ 2-7 and Ex. 4 ("Chart Calculating Number of Days in SST for Students 1-30").] |
| 117. | By that point he had been in the CST/SST process for three and a half years, with an initial SST in March of 2016. | [Riess Decl. ¶¶ 2-7; Ex. 4 to Riess Decl.; *see also* Riess Decl. Ex 2 at OSD8918, 8901.] |
| 118. | Students 2, 8, 12, and 13 spent anywhere from a year to 23 months in the CST/SST | [Riess Decl. ¶¶ 4-7 and Ex. 4; *see also* Riess Decl. Ex 2 at |

| No. | Uncontroverted Fact | Evidence |
|---|---|---|
| | system prior to being referred for special education assessment. | OSD8920, 8947 (Student 2); 9065, 9071 (Student 8); 9144, 9156 (Student 12); 9175, 9164 (Student 13).] |
| 119. | Overall, the thirty files reviewed by Defendants' expert Dr. Nadeen Ruiz show that on average students spend a year (363 days) in the CST/SST system. | [Riess Decl. ¶¶ 2-7 and Ex. 4.] |
| 120. | For students who were ultimately referred to special education, the average was higher, with those students spending an average of 13 months (388 days) in the CST/SST system prior to referral. | [Riess Decl. ¶¶ 2-7 and Ex. 4.] |

## II.    Conclusions of Law

1. The IDEA requires that school districts receiving federal money provide to all students with disabilities a "Free Appropriate Public Education" ("FAPE"). 20 U.S.C. §§ 1412(a)(1), (b), 1413(a).

2. A FAPE consists of special education and related services provided at public expense. A FAPE must meet state standards, and it must also conform to the student's individualized needs as captured by the student's Individualized

Education Plan[1] ("IEP"). 20 U.S.C. §§ 1401(9), (29).

3. Under the IDEA,

[t]he term "child with a disability means a child—

(i) with mental retardation, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities[2]; and

(ii) who, by reason thereof, needs special education and related services. 20 U.S.C. § 1401(3)(A).

4. Special education is defined as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability." 20 U.S.C. §1401(29). The IDEA defines the term "related services" to mean "transportation, and such developmental, corrective, and other supportive services (including ... occupational therapy ...) as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26)(A). If a child "needs a related service and not special education, the child is not [eligible]." 34 C.F.R. § 300.8(a)(2)(i).

5. To comply with the IDEA and provide a FAPE, a must take crucial preliminary steps. It must have in place "child find" policies and procedures that ensure that

---

[1] An Individualized Education Plan is a written document specific to each child eligible under the IDEA. 20 U.S.C. § 1401(14).

[2] Each of these disability categories has its own definition and criteria. 34 C.F.R. §300.8(c) (definitions of disability categories).

"[a]ll children . . . , regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated." 20 U.S.C. § 1412(a)(3)(A); *see also* 20 U.S.C. §§ 1412(a)(1), 30 C.F.R. §§ 300.111, 300.301–11.

6. Congress enacted the IDEA's Child Find provisions to guarantee access to special education. *El Paso Independent School Dist. v. Richard R.*, 567 F.Supp.2d 918, 950 (W.D. Tex. 2008).

7. "That this evaluation is done early, thoroughly, and reliably is of extreme importance to the education of children. Otherwise, many disabilities will go undiagnosed, neglected, or improperly treated in the classroom." *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1110 (9th Cir. 2016); *see also J.G. v. Douglas Cty. Sch. Dist.*, 552 F.3d 786, 794 (9th Cir. 2008); *El Paso Independent School Dist.*, 567 F.Supp.2d at 950 ("duty to have policies and procedures in place to locate and *timely* evaluate children with suspected disabilities in its jurisdiction") (emphasis added).

8. The obligation to identify and evaluate applies to "children who are suspected of being a child with a disability. . .and in need of special education, even though they are advancing from grade to grade." 34 CFR § 300.111(c)(1).

9. "That is, the child-find duty 'is triggered when the [state or LEA] has reason to suspect a disability, and reason to suspect that special education services may be needed to address that disability.'" *Dept. of Ed. v. Cari Rae S.*, 188 F. Supp. 2d 1190, 1194 (D. Haw. 2001) (citing *Corpus Christi Indep. Sch. Dist.*, 31 IDELR ¶ 41, at 158, No. 105–SE–1298 (Jan. 19, 1999) (citing *Davonne B. v. Houston I.S.D.*, No. 327–SE–596 (Texas H.O. Dec'n, May 2, 1997)).

10. "School districts may not ignore disabled students' needs, nor may they await

parental demands before providing special instruction." *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005).

11. In other words, " if a school district has notice that a child has displayed symptoms of a covered disability, it must assess that child in all areas of that disability using the thorough and reliable procedures specified in the [IDEA]. . *Timothy O.,* 822 F.3d at 1119; *see also W.H. v. Clovis Unified Sch. Dist.*, No. CVF-08-0374, 2009 WL 1605356, *5 (E.D. Cal. June 8, 2009); *Dept. of Ed. v. Cari Rae S.*, 188 F. Supp. 2d 1190 (D. Haw. 2001). The threshold for the school district's "suspicion is relatively low," *Cari Rae S.*, 188 F. Supp. 2d at 1195, and suspicion can come from a variety of sources, such as "expressed parental concerns about a child's symptoms," "expressed opinions by informed professionals," "or even by other less formal indicators, such as the child's behavior in or out of the classroom." *Timothy O.*, 822 F.3d at 1121. In other words, "when a district is aware that a student *may* have a disability. . . it has an obligation to evaluate the student…." *N.G. v. District of Columbia*, 556 F.Supp.2d 11, 27 (D.C. Cir. 2008) (emphasis in original).

12. Once the school district "suspect[s] [a] disability. . . a test must be performed so that parents can 'receive notification of, and have the opportunity to contest, conclusions regarding their children.'" *Timothy O. v. Paso Robles Unified School Dist.*, 822 F.3d 1105, 1120 (9th Cir. 2016) (*quoting Pasatiempo by Pasatiempo v. Aizawa*, 103 F.3d 796 (9th Cir.1996)).

13. When a child has suspected disabilities, a school district must promptly seek parental consent to evaluate the child to "determine whether a child is a child with a disability" and to "determine the educational needs of such child." 20 U.S.C. §§ 1414(a)–(c).

14. In other words, "as soon as a student is identified as a *potential* candidate for special education services, [the district] has a duty to locate that student and complete the evaluation process." *N.G. v. District of Columbia*, 556 F.Supp.2d 11, 25 (D.D.C. 2008) (emphasis in original) (citing *Hawkins v. District of Columbia*, 539 F.Supp.2d 108 (D.C. Cir. 2008); *District of Columbia v. Abramson*, 493 F.Supp.2d at 80, 85 (D.C. Cir. 2007).

15. This affirmative obligation applies regardless of whether a parent has made a specific request for an evaluation or asked for special education services. *N.G. v. District of Columbia*, 556 F.Supp.2d 11, 29 (citing *Scott v. District of Columbia*, 2006 WL 1102839 at *7-8 (D.D.C.2006) (holding that a district may not "await parental demands" before providing special instruction)).

16. The district must then create an assessment plan and seek consent from the child's parent. 20 U.S.C. § 1414(a)(1)(D).

17. When evaluating a child, a school district must "'ensure that. . . the child is assessed in *all areas* of suspected disability.' 20 U.S.C. § 1414(b)(3)(B) (emphasis added)." *Timothy O.*, 822 F.3d at 1111.

18. The district must then complete a full initial evaluation and hold an Individualized Education Plan meeting within sixty days from when the assessment plan is signed by the parent. 20 U.S.C. § 1414(b)(4)(B); 30 C.F.R. § 300.301.

19. If a child's parents disagree with the district's assessment, they have the right to "obtain an independent educational evaluation of the child." 20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.502; *see also Timothy O.*, 822 F.3d at 1111.

20. In addition to OSD's affirmative obligations, OSD must also respond to parental request for evaluation for special education services. 34 C.F.R. § 300.301. Under

the implementing regulations, "a parent of a child . . . may initiate a request for an initial evaluation to determine if the child is a child with a disability." *Id.* at § 300.301(b).

21. The initial evaluation then "[m]ust be conducted within 60 days of receiving parental consent for the evaluation…." *Id.* at § 300.301(c)(1)[3].

22. The "'informed suspicions of parents, who may have consulted outside experts,' trigger the requirement to assess, even if the school OSD disagrees with the parent's suspicions because '[t]he identification [and assessment] of children who have disabilities should be a cooperative and consultative process.'" *Timothy O. v. Paso Robles Unified School Dist.*, 822 F.3d 1105, 1120 (9th Cir. 2016) (*quoting Pasatiempo by Pasatiempo v. Aizawa*, 103 F.3d 796 (9th Cir.1996))[4].

23. As the Ninth Circuit has stated, this is a mandatory duty when responding to a request for an initial evaluation by a parent. "[W]hen a parent requests an evaluation because he or she suspects that his or her child may be disabled, the parent must be notified of the [district's] response and how to challenge it. 20 U.S.C. § 1415(b)(3). The [district] must make clear to parents whether it proposes to undertake a [special education or other evaluation] or no evaluation at all, and it must afford parents an opportunity to challenge the proposal." *Pasatiempo by Pasatiempo v. Aizawa*, 103 F.3d 796, 803 (9th Cir. 1996).

---

[3] The only exceptions to this requirement are if the parent "repeatedly fails or refuses to produce the child for the evaluation;" or the child enrolls in school elsewhere prior to a determination regarding eligibility for special education. *Id.* at § 300.301(d).
[4] However, the procedural safeguards section of IDEA does allow districts to provide "Written prior notice to the parents of the child . . . whenever the local educational agency . . .refuses to initiate or change, the identification [or] evaluation . . . of the child…" 20 U.S.C. § 1415(b)(3)(B); *see also* 34 C.F.R. § 300.503(a).

24. These requirements apply even when a school district "[chooses] to ignore [a student's] disabilities and take no action." *Compton Unified School Dist. v. Addison*, 598 F.3d 1181, 1184 (9th Cir. 2010).

25. "As the Supreme Court stated in the context of an unrelated provision of the IDEA, a "reading of the [Individuals with Disabilities Education] Act that left parents without an adequate remedy when a school district unreasonably failed to identify a child with disabilities would not comport with Congress' acknowledgment of the paramount importance of properly identifying each child eligible for services." *Compton Unified School Dist.*, 598 F.3d at 1184 (quoting *Forest Grove School Dist. v. T.A.*, 557 U.S. 230, 244 (2009)).

26. Delay in this process constitutes a violation. For example, the D.C. Circuit noted a stipulated child find violation when a school refused to provide a form for requesting an evaluation for a student, and after waiting a year "test scores placed him in the bottom one percent of his age group for reading comprehension and the bottom five percent for reading overall. Nonetheless, without performing any disability evaluation, the school district placed Mathew in a regular fourth-grade class. Only after a full school year of unsatisfactory grades did DCPS recognize Mathew's disability and develop an IEP." *Reid ex rel. Reid v. OSD of Columbia*, 401 F.3d 516, 519 (D.C. Cir. 2005).

27. In the context of students who are suspected as having learning disabilities, a district may, as part of the evaluation, "use a process that determines if the child responds to scientific, research-based intervention as a part of the evaluation procedures described [above]." 20 U.S.C. §1414(b)(6)(B).

28. This process is allowed under the statute only for students with suspected learning disabilities, and only *as part of* the evaluation process, not in order to determine

whether to evaluate in the first instance.

29. However, this is distinct from "a "response to intervention process" ("RTI"), which is a general—not special—education methodology that offers tiers of progressively intensified support depending on a student's response to instruction." *Lisa M. v. Leander Independent School OSD*, 924 F.3d 205, 209 (5th Cir. 2019) (citing Genna Steinberg, Amending § 1415 of the IDEA: Extending Procedural Safeguards to Response-to-Intervention Students, 46 Colum. J.L. & Soc. Probs. 393, 395 (2013)).

30. Response to intervention strategies "cannot be used to delay or deny the provision of an [evaluation]." *Spring Branch Independent School District v. O.W. by next friend Hannah W.*, 938 F.3d 695, 707 (5th Cir. 2019) (citing *Lisa M.*, 924 F.3d at 209 n.4 (citing  Memorandum from Melody Musgrove, Director, OSEP, to the State Directors of Special Education (Jan. 21,2011),https://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/osep11-07rtimemo.pdf. ("RTI strategies cannot be used to delay or deny the provision of an [evaluation]").

31. Courts examining the question have reiterated "a school district cannot require that a student complete an RtI process before it conducts an evaluation for special education eligibility." *Artichoker v. Todd County School District*, 3:15-CV-03021-RAL, 2016 WL 7489033 at *6 (D.S.D. December 29, 2016) (quoting hearing officer).

32. Further, as case law has made clear, a district does not "excuse itself from the obligation to evaluate students merely because [of]  . . . additional, alternative ways to accommodate the child."  *N.G. v. District of Columbia*, 556 F.Supp.2d 11, 29 (D.D.C. 2008).

33. A "parent's acceptance of the use of alternative strategies relieves a school district of the obligation to comply with the 'Child Find' provisions of the act." *Scott v. District of Columbia*, 2006 WL 1102839, No. Civ.A. 03–1672 DAR (D.D.C. March 31, 2006).

34. The California Department of Education itself has ruled that a similar process in which SSTs are required prior to referral to special education violates that California Education Code section that implements IDEA's child find requirement: "[t]he SST process is not required prior to special education assessment of a student. Furthermore, the District's policy for initial referrals for special education [of utilizing an SST] requires an unnecessary requirement in the identification of students who may be eligible for special education." California Department of Education, Investigation Report, Case S-0730-17/18, Exh. WW to Parks Decl.

35. Although California Education Code 56303, which states that "[a] pupil shall be referred for special educational instruction and services only after the resources of the regular education program have been considered and, where appropriate, utilized," this single code section does not trump the entire federal statutory scheme under the IDEA, nor the remainder of the California Education Code. Moreover, far from requiring the District to use all educational resources before referring a student for an initial evaluation, Section 56303 makes clear that the resources of the regular education program should only be used "where appropriate."

1  Respectfully submitted,

2  DATED: March 13, 2020          LEARNING RIGHTS LAW CENTER

3                                 LAW OFFICE OF SHAWNA L. PARKS

4                                 DISABILITY RIGHTS ADVOCATES

5                                 By: _____

6                                      Shawna L. Parks

7                                      Attorneys for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28