# Exhibit A

Atkinson-Baker Court Reporters
www.depo.com

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3   J.R., a minor, by and through her      )
     guardian ad litem, Janelle McCammack;  )
 4   M.B., a minor, by and through her      )
     guardian ad litem, F.B.; I.G., a minor,)
 5   by and through his guardian ad litem,  )   CERTIFIED COPY
     M.E., on behalf of themselves and all  )
 6   those similarly situated,              )
                                            )
 7          Plaintiffs,                     )
                                            )
 8      vs.                                 )   CASE No.:
                                            )   2:17-cv-
 9   OXNARD SCHOOL DISTRICT; CESAR          )   04304-JAK-FFM
     MORALES, Superintendent of Oxnard      )
10   School District, in his official       )
     capacity; ERNEST MORRISON, President   )
11   of the Board of Trustees, in his       )
     official capacity; DEBRA CORDES, Clerk )
12   of the Board of Trustees, in her       )
     official capacity; DENIS O'LEARY,      )
13   Trustee of the Board of Trustees, in   )
     his official capacity; VERONICA        )
14   ROBLES-SOLIS, Trustee of the Board of  )
     Trustees, in her official capacity;    )
15   MONICA MADRIGAL LOPEZ, Trustee of the  )
     Board of Trustees, in her official     )
16   capacity; and DOES 1 TO 10, inclusive  )
                                            )
17          Defendant                       )
     _____)

18

19             DEPOSITION OF AMELIA SUGDEN

20                 Oxnard, California

21             Tuesday, June 12, 2018

22

23   ATKINSON-BAKER, INC.
     COURT REPORTERS
     (800) 288-3376
24   www.depo.com
     REPORTED BY:  JOAN L. PARKER, CSR 12912
25   FILE NO.:  AC05F60
```

Atkinson-Baker Court Reporters
www.depo.com

1             UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3  J.R., a minor, by and through her    )
    guardian ad litem, Janelle McCammack; )
4  M.B., a minor, by and through her    )
    guardian ad litem, F.B.; I.G., a minor,)
5  by and through his guardian ad litem,  )
    M.E., on behalf of themselves and all  )
6  those similarly situated,           )
                                 )
7       Plaintiffs,            )
                                 )
8   vs.                      )  CASE No.:
                                 )  2:17-cv-
9  OXNARD SCHOOL DISTRICT; CESAR        )  04304-JAK-FFM
    MORALES, Superintendent of Oxnard    )
10  School District, in his official      )
    capacity; ERNEST MORRISON, President  )
11  of the Board of Trustees, in his     )
    official capacity; DEBRA CORDES, Clerk )
12  of the Board of Trustees, in her     )
    official capacity; DENIS O'LEARY,    )
13  Trustee of the Board of Trustees, in  )
    his official capacity; VERONICA      )
14  ROBLES-SOLIS, Trustee of the Board of )
    Trustees, in her official capacity;  )
15  MONICA MADRIGAL LOPEZ, Trustee of the )
    Board of Trustees, in her official   )
16  capacity; and DOES 1 TO 10, inclusive )
                                 )
17       Defendant              )
    _____)

18

19       Deposition of AMELIA SUGDEN, taken on behalf of

20  the Plaintiffs, on Tuesday, June 12, 2018, commencing at

21  10:07 a.m., at 600 East Esplanade Drive, Oxnard,

22  California, before Joan L. Parker, CSR No. 12912,

23  Certified Shorthand Reporter for the State of

24  California, pursuant to notice.

25

Atkinson-Baker Court Reporters
www.depo.com

```
 1              A P P E A R A N C E S:

 2

 3   FOR PLAINTIFFS:

 4        LAW OFFICE OF SHAWNA L. PARKS
          BY:  SHAWNA L. PARKS, ATTORNEY AT LAW
 5        4470 West Sunset Boulevard
          Suite 107-347
 6        Los Angeles, California  90027
          (323) 389-9239
 7        sparks@parks-law-office.com

 8                         -and-

 9        LEARNING RIGHTS LAW CENTER
          BY:  JANEEN STEEL, ATTORNEY AT LAW
10        205 South Broadway
          Suite 808
11        Los Angeles, California  90012
          (213) 489-4035
12        janeen@learningrights.org

13

14   FOR DEFENDANTS OXNARD SCHOOL DISTRICT, CESAR MORALES,
     ERNEST MORRISON, DEBRA CORDES, DENIS O'LEARY,
15   VERONICA ROBLES-SOLIS, AND MONICA MADRIGAL LOPEZ:

16        GARCIA HERNANDEZ SAWHNEY
          BY:  ALBERT A. ERKEL, JR., ATTORNEY AT LAW
17        2490 Mariner Square Loop
          Suite 140
18        Alameda, California  94501
          (510) 695-2802
19        aerkel@ghslaw.com

20

21

22

23

24

25
```

Atkinson-Baker Court Reporters
www.depo.com

```
 1                        I N D E X

 2

 3    WITNESS                  EXAMINATION              PAGE

 4    AMELIA SUGDEN

 5                         MS. PARKS              6, 84

 6

 7

 8

 9

10                        E X H I B I T S

11    MARKED FOR IDENTIFICATION                        PAGE

12      1        [Corrected] Declaration of Amelia Sugden      11
                 in Support of Defendant's Opposition to
13               Plaintiffs' Motion for Class
                 Certification, 17 pages
14
        2        Defendant's Federal Rule of Civil             59
15               Procedure 26(a)(1) Initial Disclosures,
                 9 pages
16
        3        Declaration of Vicki L. Barber, Ed.D. in      108
17               Support of Defendant Oxnard School
                 District's Opposition to Plaintiffs'
18               Motion for Class Certification, 9 pages

19      4        Oxnard - District of Residence Special        117
                 Education Enrollment by Age and Grade,
20               ECF page 1 of 41

21      5        Disproportionality Data for Indicator 9       122
                 and 10 for Oxnard School District
22               2016-2017, 2 pages

23      6        [Corrected] Declaration of Sally Wennes       127
                 in Support of Defendants' Opposition to
24               Plaintiffs' Motion for Class
                 Certification, ECF page 1 of 8
25
```

Atkinson-Baker Court Reporters
www.depo.com

```
 1    QUESTIONS INSTRUCTED NOT TO ANSWER

 2                    (None)

 3

 4         INFORMATION REQUESTED

 5                    (None)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Atkinson-Baker Court Reporters
www.depo.com

```
 1              OXNARD, CALIFORNIA; TUESDAY, JUNE 12, 2018

 2                         10:07 A.M.

 3

 4                       AMELIA SUGDEN,

 5   having been first duly sworn by the Certified Shorthand

 6   Reporter, was examined and testified as follows:

 7

 8                        EXAMINATION

 9   BY MS. PARKS:

10      Q.  Good morning.

11      A.  Morning.

12      Q.  Can you please state and spell your name for the

13   record.

14      A.  Yes.  Amelia Sugden, A-M-E-L-I-A S-U-G-D-E-N.

15      Q.  And I think I said when you were out of the room

16   that I'm battling a little bit of a summer cold.  So

17   I'll do my best to keep my voice up; and you do your

18   best to keep your voice up, 'cause I feel like I'm a

19   little bit in a tunnel.

20          So have you had your deposition taken before?

21      A.  Yes.

22      Q.  On how many occasions?

23      A.  A couple.

24      Q.  Were they work related?

25      A.  No.
```

Atkinson-Baker Court Reporters
www.depo.com

1    Q.  In your personal --

2    A.  Yes.

3    Q.  -- capacity?

4         THE REPORTER:  Wait for her to finish,

5    please.

6    BY MS. PARKS:

7    Q.  So I'm going to go through some rules as part of

8    the deposition.  Your lawyer may have gone over these

9    with you as well, but this will just help us all

10   literally and figuratively stay on the same page.

11        You can see everything's being recorded by our

12   court reporter here.  And so we have to try and help her

13   get a clean record.

14        And so one way we do that is try to not talk over

15   each other.  So I will do my best to wait until you're

16   finished with your answer, and you do your best to wait

17   until I finish with my question.

18        Okay?

19   A.  Yes.

20   Q.  And the other thing that will help the court

21   reporter is to make sure all of your answers are oral,

22   so "yes," "no," or some sort of verbal answer.

23        She can't interpret shrugs of the shoulders or

24   nods or shakes of the head.

25        Okay?

1     A.  Yes.

2     Q.  And at the conclusion of the deposition the court

3   reporter's going to put together a written transcript of

4   what we say today.  And you're going to have an

5   opportunity to review that and make any changes if you

6   think maybe she misheard something or misrecorded

7   something.

8          But I do want to caution you that if you're

9   making changes, we do have the ability to comment on the

10  fact that things were changed.

11         So do try --

12         And I know you will.

13         -- give your best testimony here today.

14         Okay?

15    A.  Okay.

16    Q.  And if at any point today you don't understand my

17  question, it's entirely possible I'm asking an unclear

18  question.  So please let me know.  Just speak up and you

19  can tell me you don't understand or ask me to rephrase.

20         Okay?

21    A.  Okay.

22    Q.  We always think that we're the clearest.  But

23  when you're asking questions for a whole day sometimes

24  things get fuzzy.

25         If you need a break at any time, just let us

```
 1   know.  It's not a forced march.
 2        So the only thing that we would ask is that if
 3   there's a question pending to finish your answer to the
 4   question and then we'll take a break.
 5        Okay?
 6   A.   Okay.
 7   Q.   And there are lots of facilities here.
 8        You know where the restrooms are.
 9        There's water.
10        We have candy.
11        And most obviously break for food or lunch or
12   whatever.
13   A.   Thank you.
14   Q.   Is there any reason that you cannot testify fully
15   and accurately today?
16   A.   No.
17   Q.   And as you'll see, you can see from the room,
18   this is a little bit different than a due process which
19   I know you've been in.  And we don't have a judge.
20        And so your lawyer will be making objections
21   today.  But unless he instructs you not to answer the
22   question, you can just wait for him to finish his
23   objection and then answer the question.
24        And if and when we need the judge to rule on
25   those later, he will.
```

Atkinson-Baker Court Reporters
www.depo.com

1    Class Certification.

2         Correct?

3    A.  Yes.

4    Q.  Is that a yes?

5    A.  Yes.

6    Q.  And I actually just want to take a look at

7    Exhibit A right now, which is your résumé.

8         I mean, I can confirm it's your résumé.  I think

9    it's your résumé.  And so I guess that's the first

10   question.

11        This is your résumé; correct?

12   A.  Yes.

13   Q.  And is this current, or is there anything you

14   would need to add to it?  Because I know this was filed

15   back in December.

16        And feel free if you need to take a minute to

17   look around, obviously.

18   A.  It appears to be current.

19   Q.  Okay.  That makes our jobs easier.

20        So currently you are the Director of Special

21   Education Services for the Oxnard School District;

22   correct?

23   A.  Yes.

24   Q.  And since 2015?

25   A.  Yes.

Atkinson-Baker Court Reporters
www.depo.com

```
 1      Q.  And in that position who do you directly report
 2   to?
 3      A.  To the assistant superintendent of educational
 4   services.
 5      Q.  And who is that?
 6      A.  Robin Freeman.
 7      Q.  And do you know who she reports to?
 8      A.  Yes.
 9      Q.  And is that -- does she report to the
10   superintendent?
11      A.  Yes.
12      Q.  Dr. Morales?
13      A.  (No verbal response.)
14      Q.  And you have staff who report directly to you?
15      A.  Yes.
16      Q.  And how many direct reports?
17      A.  Approximately ten.
18      Q.  And do those ten people all have the same title?
19      A.  No.
20      Q.  Okay.  Are you able to sort of -- to group them
21   into different capacity?
22      A.  Yes.
23      Q.  Okay.  So how would you group them, the ten who
24   report directly?
25      A.  So I have four program managers.
```

1          And then we developed a framework of what it
2    would include.

3          And we had the group come together.

4          And we have just completed the first draft.

5          And this is going to be rolled out next fall with
6    an intention of having an annual review to update and
7    improve.

8      Q.  And when you say a -- completed a first draft,
9    completed a first draft of what?

10     A.  Of a policy and procedure manual.

11     Q.  For special education?

12     A.  For special education.

13     Q.  Is that what it's called?

14         Is that its title?

15     A.  I think so.

16     Q.  And was there a policy and procedure manual for
17   special education that existed prior to this current
18   process?

19     A.  There -- there was an outdated one.  I believe
20   the last date of that was 2004.  And it was prior to
21   recertification of the IDA so it wasn't current.

22     Q.  Is anybody using it that you know of?

23     A.  I don't know.

24     Q.  Okay.  It was a paper document, I'm assuming?

25     A.  Paper document.

Atkinson-Baker Court Reporters
www.depo.com

1    Q.  And do you know where the copies of the paper

2   document lived?

3        For example, did school sites have copies of the

4   2004 manual?

5    A.  I can't be sure.

6        I found one in my department.

7    Q.  So you've -- there's no way for you to know who

8   had a copy and who didn't.

9    A.  No.

10    Q.  So the current process to develop the policy and

11  procedure manual for special education, that's the first

12  update that you're aware of since 2004?

13    A.  Yes.

14    Q.  Okay.  And you mentioned the task force of

15  people.

16    A.  Yes.

17    Q.  And who is on the task force?

18    A.  We had -- we had a parent.

19        We had teachers.

20        We had speech pathologists.

21        We had school psychologists.

22        And we had DHH itinerant.

23        And then administrators.

24        And then we had --

25        So that was the task force.

Atkinson-Baker Court Reporters
www.depo.com

```
 1          And then --
 2     Q.  Do you need some water?
 3     A.  Yeah.
 4               (A brief recess was taken.)
 5               THE WITNESS:  So the task force developed a
 6  first draft.
 7               And then we got input from the field.
 8               And then we developed a -- you know, we made
 9  corrections, additions.  And we did -- I think we did
10  three cycles of that.
11               And then -- and then we had an -- two open
12  meetings where we invited general education staff and
13  parents, people in the community.  And then we got input
14  from them as well.
15               MS. PARKS:  Let's take a break.
16               MR. ERKEL:  Okay.
17               (Recess taken:  11:21 a.m. to 11:31 a.m.)
18  BY MS. PARKS:
19     Q.  So before the break we were talking about
20  development of policies.  And you referenced a task
21  force of people --
22     A.  Yes.
23     Q.  -- who are brought together to draft a policy
24  procedure manual for special education.
25               And you talked about some of the types of people
```

Atkinson-Baker Court Reporters
www.depo.com

```
 1    on the task force.

 2            I wonder if you can tell us how many people,

 3    total, on that task force.

 4        A.  Eight to ten.

 5        Q.  Does it fluctuate depending on availability?

 6        A.  Yes.

 7        Q.  And were these people who volunteered, or were

 8    they chosen?

 9        A.  They were invited.

10        Q.  Were they invited by you?

11        A.  Yes.

12        Q.  And when was the task force first convened?

13        A.  I believe our first meeting was in January of

14    this -- of this year.

15        Q.  January of 2018?

16        A.  Yes.

17        Q.  And does it have a name other than the task

18    force?

19        A.  I think we call it the PPM, the Policy and

20    Procedure Manual task force.  But mostly we just say the

21    task force.

22        Q.  And who -- I understand the organization of the

23    district changed when you became the director of special

24    education.

25            Who was in charge of special education before
```

Atkinson-Baker Court Reporters
www.depo.com

1   you?

2      A.  Marikaye Phipps.

3      Q.  Is she still with the district?

4      A.  No.

5      Q.  Do you know what her title was?

6      A.  Director of people services.

7      Q.  And other than what I'll call the 2004 manual and

8   current draft of the new policy and procedure manual,

9   are there other special written policies for the

10  district?

11     A.  No.

12     Q.  So if we want to look at what the policies are

13  for the district once it's finished we will look at the

14  new manual.

15         And then the other document, understanding that

16  it's outdated, that we could reference is the 2004

17  manual?

18     A.  Yes.

19     Q.  And at the task force meetings are there

20  documents generated?

21         For example, are there agendas or notes that come

22  out of the meetings?

23     A.  We have agendas.  And then what resulted of it

24  was the -- the manual.  The notes are on the manual,

25  edited.  So there aren't separate notes.  It's just

Atkinson-Baker Court Reporters
www.depo.com

1   additions or edits.

2       Q.  So the -- for example, the things decided at the

3   task force meetings become incorporated into the new

4   draft of the manual?

5       A.  Correct.

6       Q.  And the -- you referenced that they were open

7   meetings?

8       A.  Yes.

9       Q.  And what do you mean by "open"?

10          Who were they open to?

11      A.  To anybody in the district and to parents of

12  students with IEPs.

13      Q.  Do you know when those occurred?

14      A.  Yes.

15      Q.  When did they happen?

16      A.  In May, two -- two evenings in May.  I'm not

17  going to recall the specific dates.

18      Q.  May of 2018?

19      A.  Yes.

20      Q.  And how were they advertised, if at all?

21      A.  Yes.  We produced a flyer as an invite, and we

22  sent it to all the school sites and asked that it be

23  posted like our normal postings.

24          And then we asked teachers to inform parents of

25  students with IEPs.

Atkinson-Baker Court Reporters
www.depo.com

```
 1      Q.  And did you attend those meetings?

 2      A.  Yes.

 3      Q.  Did people come?

 4      A.  At the first meeting, no one came.

 5      Q.  It's always disappointing.

 6      A.  It is.

 7      Q.  And at the second meeting did people attend?

 8      A.  Yes.

 9      Q.  Are you able to estimate how many?

10      A.  Between ten and fifteen.

11      Q.  And do you know who they were in the sense of

12   were they staff? parents?

13      A.  Parents and staff.

14      Q.  And did they provide feedback?

15      A.  Yes.

16      Q.  And how -- how did that process work?

17          Did they provide it verbally?

18          Were they written comments?

19          Or just kind of generally what -- what happened

20   at the meeting?

21      A.  It was all oral input.

22      Q.  And was somebody taking notes?

23      A.  Yes.

24      Q.  And did the task force --

25          Well, let me back up.
```

Atkinson-Baker Court Reporters
www.depo.com

1        Do you consider yourself part of the task force?

2    A.  Yes.

3    Q.  And in terms of the development of the document

4    is there somebody who has, sort of, final signoff on

5    what the policy manual is going to say?

6              MR. ERKEL:  You mean a single person?

7              MS. PARKS:  Yes.

8              THE WITNESS:  It's a very collaborative

9    process, but I have final say.

10   BY MS. PARKS:

11   Q.  And were there --

12        Going back to the open meeting where people came,

13   were there any changes that were made as a result of

14   that meeting in the -- to the draft policy and procedure

15   manual?

16   A.  I'm not sure if the input provided at that

17   meeting generated a change, because I think the input

18   had already been considered in the development of it.

19   Q.  And with respect to the issue of Child Find,

20   which we discussed conceptually before, does the policy

21   and procedure manual for special education include a

22   policy with respect to Child Find for the district?

23   A.  It includes detailed information, yeah.

24   Q.  So will that be the District's policy going

25   forward once it's completed?

Atkinson-Baker Court Reporters
www.depo.com

1      A.  Yes.

2      Q.  And with respect to the District Child Find

3  policy prior to this, the draft policy and procedure

4  manual for special education, would the last iteration

5  of the Child Find policy be in the 2004 outdated manual?

6      A.  Yes.

7            MR. ERKEL:  You're talking about a written

8  policy, aren't you?

9            MS. PARKS:  Yes.

10  BY MS. PARKS:

11      Q.  And is -- is there a policy beyond the written

12  policy?

13         In other words, is there some sort of policy the

14  District has on Child Find beyond what would be found in

15  writing?

16      A.  Yes.

17      Q.  And what is that?

18      A.  This last year we went through training of all

19  our school sites on the law as it relates to Child Find.

20      Q.  And when did that training occur?

21      A.  For three of our campuses, it occurred in August

22  of 2017.

23         And for the remaining campuses, it occurred

24  between January and March of 2018.

25      Q.  And so is that training -- would you consider

1   aware of.

2       And the reason that it's not just wholeheartedly

3   included as referenced is we want people to refer to the

4   most current document as things in practice change.

5       Q.  Is there a requirement in the district under

6   current procedures that an SST meeting be held prior to

7   a special education assessment?

8       A.  No.

9       Q.  And if -- if we wanted to track the numbers of

10  SST -- of students with SSTs, is there a way to do that

11  in the district?

12      A.  Yes.

13      Q.  How would we do that?

14      A.  Every school site has one person dedicated to the

15  scheduling, setting agendas, and follow-up notes for the

16  SSTs that are held at that site.  And they -- they keep

17  track of that.

18      Q.  Is that usually a particular position?

19      A.  It usually is, yes.

20      Q.  And who -- what position is that usually?

21      A.  The outreach counselors.

22      Q.  Is there -- would there be a way to see for

23  different students how long they've been in the SST

24  process?

25      A.  Yes, we should be able to see that.

Atkinson-Baker Court Reporters
www.depo.com

1    Q.  And how would we do that?

2    A.  Once the summary notes for the individual SST are

3  completed, the SST, a copy of those, go into the

4  student's cum. folder.

5    Q.  So we'd have to pull the individual SST notes to

6  see what the timeline was for a particular student?

7    A.  Yes.

8    Q.  And is there also something called a COST or a

9  CST?

10   A.  Yes.

11   Q.  And what is that?

12   A.  It's a Coordination of Services Team.

13   Q.  And what is -- is that a document or a process or

14  a thing or all of it, all of the above?

15   A.  It's a process.

16   Q.  Okay.

17   A.  It came about in our district probably about

18  15 years ago when there was a State grant called SB-65.

19       And this grant intended to fund one dedicated

20  position, which became our outreach counselors, to do

21  exactly what the name of this team says, to coordinate

22  services.

23       So the outreach counselors would help bring

24  resources that are available in the community that

25  sometimes families can't access and then develop and

1    scheduling an SST to discuss Parent or teacher's

2    request and to generate an assessment plan."

3         So is it the case that a teacher request for an

4    assessment has to go to an SST under the district

5    procedure?

6    A.  It is not my understanding of the district

7    procedure.

8         It appears it might be her understanding from the

9    way it's worded.

10   Q.  Is that question going to be addressed in the

11   upcoming policy and procedure manual for special

12   education?

13   A.  It is addressed.

14   Q.  And above in paragraph 12, it says:

15        "The vast majority of initial assessments

16   have come as a result of students being referred

17   to COST and SST."

18        Do you see where I am?

19   A.  Yes.

20   Q.  Do you know if that's the case in the district

21   generally, that the vast majority of initial assessments

22   come through either the COST or SST process?

23   A.  I don't know if I could draw a conclusion that

24   the vast majority comes from the SST process.

25        But I can tell you that the vast majority come

1    from staff referrals.

2        Q.  Is there a way we could tell by looking at data

3    in the district the percentage of initial assessment

4    referrals that come through COST or SST versus that come

5    directly from a parent or a teacher?

6        A.  There isn't an established data pool.  I would

7    have to query the sites to gather that information.

8        Q.  And if you could take a look at the next page,

9    paragraph 16.

10       A.  Thank you.

11              (Pause in the proceedings.)

12              THE WITNESS:  Yes.

13   BY MS. PARKS:

14       Q.  And paragraph 16 says (as read):

15           "For the 2017-2018 school year, the

16       faculty reviewed the cumulative files of

17       approximately 850 students on the campus.

18       The cumulative file did not review --

19       sorry.  The cumulative review did not

20       result in any referrals for assessments."

21           Were you at all involved in that review process?

22       A.  I was not.

23       Q.  Do you know what the staff were looking for or

24   how it was conducted?

25       A.  I recently ask the principals to have their

Atkinson-Baker Court Reporters
www.depo.com

```
 1  staffs do peer reviews at the beginning of the year and
 2  to look for patterns of concerns.
 3          And that if a child has not been referred to an
 4  SST process or has not been referred for assessment,
 5  that that would be a good time to highlight.  Again
 6  putting -- putting that student on their radar.
 7     Q.  Are you surprised that they reviewed 850 files
 8  and didn't -- it didn't result in any referrals for
 9  assessment?
10     A.  Not necessarily.
11          Because of what she goes on to say further in
12  that paragraph.  The teachers discussed accommodations,
13  interventions, and the possible need for further
14  follow-up.
15     Q.  So would they do those things prior to making a
16  referral for special education assessment?
17     A.  They might.
18     Q.  And do you know what --
19          And, again, I understand you didn't write this
20  and haven't reviewed it until today.
21          But do you know what she means by discussing
22  accommodations?
23              MR. ERKEL:  Objection.  Calls for
24  speculation.
25              THE WITNESS:  I don't.
```

```
 1   BY MS. PARKS:
 2      Q.  And if you can look at the next page,
 3   paragraph 20.
 4           And I have a specific sentence, but if you want
 5   to read the entire paragraph it might help give you
 6   context.
 7      A.  Which paragraph?
 8      Q.  20.
 9      A.  Thank you.
10              (Pause in the proceedings.)
11              THE WITNESS:  Okay.
12   BY MS. PARKS:
13      Q.  So I'm looking at line 20, and she's referencing
14   Ms. Austin Scott, who's a teacher at her school.
15           And she says:
16           "However, after I read Ms. Austin Scott's
17       direct request for assessment, I forwarded
18       the request to the School Psychologist and
19       the Outreach Coordinator to setup an SST
20       with Parent and team members to proceed
21       with assessment."
22           Do you see where I am?
23      A.  Yes.
24      Q.  So it seems as if, again, her understanding is
25   that with a request for a direct assessment from a
```

Atkinson-Baker Court Reporters
www.depo.com

```
 1   teacher, that it still goes through the SST.
 2        Does that seem correct?
 3             MR. ERKEL:  It's not how I read it but...
 4             THE WITNESS:  That's not how I read it
 5   either.
 6   BY MS. PARKS:
 7     Q.  I'm sorry?
 8     A.  That's not how I read it.
 9     Q.  How do you read it?
10     A.  They were proceeding with the assessment.  But
11   they scheduled the SST together, added the team and the
12   parent.
13     Q.  Oh.  An SST meeting was still required?
14     A.  It's not required.  It was scheduled.
15     Q.  So if a teacher makes a direct request for an
16   assessment can that just go to a school psychologist
17   under school -- under District procedure and an
18   assessment's completed?
19     A.  Yes.
20             MS. PARKS:  Okay.  I don't have anything
21   further.
22             MR. ERKEL:  I have no questions.
23             MS. PARKS:  Let's go off the record for one
24   second.
25             (Discussion held off the record.)
```

Atkinson-Baker Court Reporters
www.depo.com

```
 1               MS. PARKS:  So we'll stipulate that the

 2   original can go to counsel for the deponent.

 3               And, in particular, it's going to be

 4   directed to Janet Ly.

 5               MR. ERKEL:  "LEE."

 6               MS. PARKS:  We just had that discussion.

 7               -- Garcia Hernandez & Sawhney.

 8               Am I pronouncing that correctly?

 9               THE WITNESS:  Sawhney.

10               MS. PARKS:  Witness will have 30 days to

11   review, make any corrections, and sign it.

12               And you'll let us know if there are any

13   corrections made.

14               And then if the original is not available, a

15   certified copy can be used for any purpose including

16   motions and at trial.

17               MR. ERKEL:  So stipulated.

18               THE REPORTER:  Would you like a certified

19   copy?

20               MR. ERKEL:  Please.

21               (The deposition was concluded at 3:39 p.m.)

22

23

24

25
```

Atkinson-Baker Court Reporters
www.depo.com

```
 1   STATE OF CALIFORNIA      )
                              )
 2   COUNTY OF SANTA BARBARA  )  ss.

 3

 4

 5           I, AMELIA SUGDEN, hereby certify under

 6   penalty of perjury under the laws of the State of

 7   California that the foregoing is true and correct.

 8           Executed this _____ day of

 9   _____, 2018, at _____, California.

10

11

12

13

14

15   _____
                      AMELIA SUGDEN
16

17

18

19                   --ooOoo--

20

21

22

23

24

25
```

```
 1    STATE OF CALIFORNIA              )
                                       )
 2    COUNTY OF SANTA BARBARA          ) ss.

 3

 4              I, JOAN L. PARKER, CSR 12912, do hereby

 5    certify:

 6              That prior to being examined, the witness in

 7    the foregoing proceeding was by me duly sworn to testify

 8    to the truth, the whole truth, and nothing but the

 9    truth;

10              That said transcript was taken down by me in

11    shorthand and thereafter reduced to typewriting via

12    computer-aided transcription under my direction and

13    supervision, and is a true and correct transcription of

14    my original stenographic notes.

15              I further certify that I am neither counsel

16    for, nor related to, any party to said action, nor in

17    anywise interested in the outcome thereof.

18              UNDER PENALTY OF PERJURY, I declare that the

19    foregoing is true and correct.

20              Executed this 22nd day of June, 2018, at

21    Santa Barbara, California.

22

23    (signature requested)    _____
                               JOAN L. PARKER
24                             CSR No. 12912

25
```

# Exhibit B

```
 1                    UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3

 4    J.R., a minor, by and through    )
      her guardian ad litem, Janelle   )
 5    McCammack, et al.,               )     CASE No.
                                       )     2:17-cv-04304-
 6                   Plaintiffs,       )     JAK-FFM
                                       )
 7      vs.                            )
                                       )
 8    OXNARD SCHOOL DISTRICT, et al.,  )
                                       )
 9                   Defendants.       )
      ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

10

11

12

13

14                    DEPOSITION OF

15                    KATRINA MADDEN

16

17                  January 28, 2020

18                    10:09 A.M.

19

20           300 East Esplanade Drive, Ninth Floor
                    Oxnard, California 93036
21

22

23      Reported By:

24      Lori King Bean, CSR No. 13602

25      Lisa Black, CSR No. 7797
```

1

```
 1                    APPEARANCES OF COUNSEL

 2

 3    FOR THE PLAINTIFFS:

 4        LAW OFFICE OF SHAWNA L. PARKS
          BY:  SHAWNA L. PARKS, ESQ.
 5        4470 West Sunset Boulevard
          Suite 107-347
 6        Los Angeles, California 90027
          (323) 389-9239
 7        sparks@parks-law-office.com

 8        LEARNING RIGHTS LAW CENTER
          BY:  PATRICIA A. VAN DYKE "PATSY", ESQ.
 9        1625 West Olympic Boulevard
          Suite 500
10        Los Angeles, California 90015
          (213) 542-7290
11        patsy@learningrights.org

12    FOR THE DEFENDANTS:

13        GARCIA HERNANDEZ SAWHNEY, LLP
          BY:  ALBERT A. ERKEL, JR., ESQ.
14        2490 Mariner Square Loop
          Suite 140
15        Alameda, California 94501
          (510) 695-2802
16        aerkel@ghslaw.com

17

18

19

20

21

22

23

24

25

                                                    2
```

```
 1                        INDEX OF EXAMINATION

 2

 3   WITNESS:
     KATRINA MADDEN
 4

 5

 6   EXAMINATION:                          PAGE
     BY MS. PARKS                            6
 7

 8

 9

10                     INFORMATION REQUESTED

11                            NONE

12

13

14                 INSTRUCTION NOT TO ANSWER

15                            NONE

16

17

18                      INDEXED QUESTIONS

19                            NONE

20

21

22

23

24

25
```

3

```
 1                    INDEX OF EXHIBITS

 2

 3                DESCRIPTION                      PAGE

 4    EXHIBIT 1    Notice of Depositino of Oxnard    30
                   School District Pursuant to FRCP
 5                 30(b)(6)

      EXHIBIT 2    Oxnard School District Child      36
 6                 Find: Identifying and Assessing
                   Students for Special Education
 7                 Services PowerPoint
                   Presentation, Spring 2018
 8                 (Starts OSD 2321)

      EXHIBIT 3    3/10/17 Oxnard School District    41
 9                 Topics in Child Find PowerPoint
                   Presentation (Starts OSD 0001)
10    EXHIBIT 4    4/13/18 CoST/SST Revisited        55
                   PowerPoint Presentation (Starts
11                 OSD 0632)

      EXHIBIT 5    Pupil Services Admin Mandatory    56
12                 Trainings 2019-2020 (OSD 1173)

      EXHIBIT 6    Responding to Parent Requests     59
13                 for Assessment Handbook Excerpt
                   (Starts OSD 0204)
14    EXHIBIT 7    Oxnard School District Special    75
                   Education Department Policies
15                 and Procedures 2018 (Starts OSD
                   1639)
16    EXHIBIT 8    Oxnard School District Special    86
                   Education Department Policies
17                 and Procedures 2018 (Starts OSD
                   0939)
18    EXHIBIT 9    Oxnard School District Special    93
                   Education Department Policies
19                 and Procedures 2018 (Starts OSD
                   1868)
20    EXHIBIT 10   Oxnard School District Special    95
                   Education Department Policies
21                 and Procedures 2018 (Starts OSD
                   2092)
22    EXHIBIT 11   Declaration of Katrina Madden in 124
                   Support of Defendant's
23                 Opposition to Plaintiff's Second
                   Renewed Motion for Class
24                 Certification

25

                                                     4
```

```
 1              INDEX OF EXHIBITS (Continued...)

 2

 3                   DESCRIPTION                      PAGE

 4    EXHIBIT 12    Special Education Enrollment by    140
                    Age and Disability 5672538 - Oxnard
 5                  (Starts P000226)

 6    EXHIBIT 13    CALPADS Enrollment by Subgroup     144
                    Charts (Starts OSD 1178)
 7

 8    EXHIBIT 14    Oxnard School District Enrollment  150
                    History 2013-14 thru 2017-18 Actuals
                    (Starts OSD 1168)
 9

10    EXHIBIT 15    Disproportionality Data for        155
                    Indicator 9 + 10 for Oxnard School
                    District 2016-2017 (Starts P000261)
11

12    EXHIBIT 16    Defendant Oxnard School District's 161
                    Objections and Supplemental
13                  Responses to Plaintiff's First Set
                    of Interrogatories

14    EXHIBIT 17    2/20/18 Tier III Student Success    182
                    Team Meeting (Starts OSD 1250)
15

16    EXHIBIT 18    9/27/18 Tier III Student Success    188
                    Team Meeting (Starts OSD 1246)
17    EXHIBIT 19    12/19/19 SELPA and IEP             193
                    (Starts P000238)
18

19

20

21

22

23

24

25
```

5

```
 1              DEPOSITION OF KATRINA MADDEN

 2               Tuesday, January 28, 2020

 3

 4                    KATRINA MADDEN,

 5      having been duly administered an oath by the Court

 6       Reporter, was examined and testified as follows:

 7

 8                       EXAMINATION

 9    BY MS. PARKS:

10        Q    Can you please state and spell your name for

11    the record?

12        A    Katrina Madden, K-A-T-R-I-N-A, M-A-D-D-E-N.

13        Q    And, Ms. Madden, have you been deposed before?

14        A    I have not.

15        Q    Have you testified in a due process hearing?

16        A    I have.

17        Q    Okay.  How many occasions?

18        A    4.

19        Q    Okay.  So this is a little bit different than

20    that.  I'm sure your lawyer went over with you some of

21    the ground rules, but I'll -- I'm going to cover them

22    just so we're all on the same page --

23        A    Okay.

24        Q    -- literally and figuratively.

25             As you'll see, we're being recorded by a court
```

6

1   reporter.  She's going to, sometime after the

2   deposition, make a booklet with all the testimony in

3   written form.

4        You're going to have a chance to review it.

5   You can make any changes if you see anything that's

6   incorrect, either because you think you misspoke or she

7   misheard or whatever the reason.

8        I would just caution you to try and give your

9   best testimony today, which I know you'll do, because

10  the lawyers can comment if you make any changes to your

11  testimony later.  Okay?

12       A    Okay.

13       Q    And you're doing great so far.  We both need

14  to speak up and use words in both the questions and

15  answers so that the court reporter can record the

16  answers.  So if you nod your head or shrug your

17  shoulders, that's not something she can record.  Okay?

18       A    I understand.

19       Q    All right.  If anything is unclear -- and it's

20  entirely possible I will ask an unclear question today

21  with as many questions as we go through -- please just

22  let me know, and I will do my best to help you

23  understand.  Okay?

24       A    Okay.

25       Q    If you don't speak up and say that something's

7

```
 1    not clear to you, we'll just assume that you've

 2    understood the question.

 3         A    Okay.

 4         Q    If at any time you need a break, just let us

 5    know.  It's not a forced march.  We do have some stuff

 6    to get through today, but I'm going to try and do it as

 7    quickly as possible and get us out of here.  Okay?

 8         A    Okay.

 9         Q    The only caveat is if there's a pending

10    question, please answer the question before we take a

11    break.

12         A    Okay.

13         Q    And then, is there any reason that you're not

14    able to testify fully and completely today?

15         A    No.

16         Q    And did you do anything to prepare for today's

17    deposition?

18         A    I consulted with counsel.

19         Q    Okay.  So one additional rule throughout the

20    day:  I don't want to know about any communications

21    with counsel.  Those are privileged, and I'm not trying

22    to get at them.

23         A    Okay.

24         Q    Is there anything other than talking to your

25    lawyer that you did to -- to prepare for today's
```

                                                                    8

```
 1    deposition?

 2         A    I reviewed some depositions.

 3         Q    And what depositions did you review?

 4         A    Amelia's, Amelia Sugden's and Chris Ridge's.

 5         Q    And Amelia is who?

 6         A    She is the director of special education, and

 7    she is currently out on medical leave.

 8         Q    And Chris Ridge is who?

 9         A    The director of pupil services.

10         Q    And sometimes I may you ask you questions,

11    things we all may already know.  It's just so we have a

12    clear record.  Okay?

13         A    I understand.

14         Q    All right.  Any other documents you reviewed

15    to prepare for today's deposition?

16         A    No.

17         Q    And did you have discussions about today's

18    deposition with anybody other than your lawyers?

19         A    (Shakes head.)

20         Q    Was that a "no"?

21         A    No.

22         Q    Okay.

23         A    Sorry.

24         Q    That's okay.

25         A    I need to --
```

9

```
 1        Q    We'll all remind you.  It's a very artificial

 2   setup, and so it can be difficult to remember these

 3   things, but that's what we're all here for.

 4        A    I'll catch on.

 5        Q    Okay.  Oh, and then one other rule that we

 6   should try and do our best on, which is -- can also be

 7   difficult to remember is not to interrupt each other.

 8   So please let me finish my question before you answer,

 9   and I will let you finish your answer before I ask

10   another question.  Okay?

11        A    Yes.

12        Q    And that just helps the court reporter have a

13   clear record.

14        A    Okay.

15        Q    Okay.  And if I'm correct, you are the interim

16   special education director for Oxnard School District?

17        A    Yes.

18        Q    And how long have you had that position?

19        A    Since March of last year.

20        Q    Okay.  And is that position essentially while

21   Ms. Sugden is on leave?

22        A    Yes.

23        Q    Okay.  And is -- your position as interim

24   director, do you anticipate it will conclude at some

25   point?
```

                                                          10

```
 1    previous district, where -- who was that from?

 2        A    Oh, usually they did it by our administrators

 3    brought it back to our sites.

 4        Q    It was an internal training?

 5        A    Yes.  And I recall being part of it when I was

 6    an assistant principal giving that information to our

 7    sites.

 8        Q    And same question with respect to the

 9    Americans with Disabilities Act:  Since you've been at

10    Oxnard, have you received any outside training

11    regarding those requirements?

12        A    Not that I can recall, no.

13        Q    Okay.  So I'm going to hand you -- we'll mark

14    as Exhibit 1 -- actually, I'm going to hand it to her

15    first.  We'll mark as Exhibit 1 this copy.

16             (Deposition Exhibit 1 was marked for

17             identification by the Court Reporter.)

18    BY MS. PARKS:

19        Q    And this is a notice of deposition of Oxnard

20    School District, person to FRCP 30(b)(6).

21             And you were -- your deposition was noticed as

22    an individual, for Katrina Madden, but my understanding

23    is you're also here on certain categories for the

24    30(b)(6) deposition.

25             MS. PARKS:  Is that correct?
```

                                                                    30

```
 1              MR. ERKEL, JR.:  Yes.

 2              MS. PARKS:  Yeah.  Okay.

 3              MR. ERKEL, JR.:  1 -- 1, 10 and 11.

 4              MS. PARKS:  Okay.  That's what I was just

 5    going to confirm.

 6    BY MS. PARKS:

 7       Q    So if you look on the second page, my

 8    understanding is you're here on Topic 1:

 9                  "The district's policies and procedures

10    for determining eligibility for special education and

11    related services from 2014-15 academic year to the

12    present."

13              And then, if you turn to the next page,

14    Number 10:

15                  "Any trainings provided to district staff

16    regarding identification and evaluation of students for

17    special education and related services and/or Child

18    Find for each year from the 2014-15 academic year to

19    the present."

20              And Topic 11:

21                  "Any written policies or procedures in

22    the district regarding identification and evaluation of

23    students for special education and related services

24    and/or Child Find for each year from the 2014-15

25    academic year to the present."
```

31

 1          Does that sound right?

 2     A    Yes.

 3     Q    All right.  So let's start maybe most

 4  recently.  So we're currently in the 2019-20 school

 5  year; correct?

 6     A    Yes.

 7     Q    And have there been any trainings provided to

 8  district staff on identification and evaluation of

 9  students for special education services or Child Find

10  for this academic year?

11     A    Yes.

12     Q    And who provided those trainings?

13     A    Our law firm provided it for all the staff

14  that came new into the district.  And then our

15  superintendent and our -- the -- our super- -- our --

16  our superintendent and our assistant superintendent of

17  education services and myself trained our

18  administrators, did an update.

19          And we do have some new administrators, so we

20  did a training with all of them, and then they took our

21  training and went back and trained their staff.

22     Q    When you say "administrators," who does that

23  include?

24     A    All of our administrators in the district, so

25  site principals, assistant principals, our director of

                                                         32

1    that first SST meeting after the parent requests an

2    assessment, that an assessment is not conducted?

3            MR. ERKEL, JR.:  Objection.  Incomplete

4    hypothetical.

5            THE WITNESS:  I would have to have more

6    information as to what the conversation would be as to

7    why they would do that.

8    BY MS. PARKS:

9        Q    I guess my -- I may have a better question.

10       A    Okay.

11       Q    Is it the district's policy after a parent

12   makes a request for an assessment and then the district

13   holds an SST that the district will always provide an

14   assessment after that SST?

15       A    Is it our policy to always do that?  I don't

16   think we have a blanket policy like that.  Sometimes a

17   parent will say something like, "I just have trouble

18   helping them with their homework because of the

19   language barrier, the misunderstanding."

20           And so that's a -- that's not them thinking

21   there's something wrong with their child; that's

22   something else we can help them with, with after-school

23   tutoring or things like that.

24           So sometimes -- there's -- there's just so

25   many things that you would have -- would have to be

                                                            66

 1   part of that conversation for any kind of consideration

 2   like that.

 3       Q    And the SST app that the district holds after

 4   a parent makes a request for an assessment --

 5            MR. ERKEL, JR.:  The SST app?

 6            MS. PARKS:  I'll say it again.

 7   BY MS. PARKS:

 8       Q    The -- the SST that the district holds after a

 9   parent requests a special education assessment, does

10   that differ from any other kind of SST meeting?

11            MR. ERKEL, JR.:  Objection.  Incomplete

12   hypothetical.

13            THE WITNESS:  Well, typically, an SST is

14   because somebody is concerned about a student's

15   performance and how they're doing.  At that point,

16   there's not a suspected disability.  So that -- that's

17   a typical SST where we're just trying to get kids in

18   the general education supports to be more successful

19   with what they're doing.

20            If at any point that meeting, whether it's the

21   parent request who -- who would have already put us on

22   notice that they suspect something but it might not be

23   a disability until we have that conversation, if at any

24   point, though, in the conversation we are like, "This

25   is not just their progress and their performance

                                                          67

 1    that -- there's something else we need to look at,"

 2    then we'll go straight to assessment.

 3          Are they different?  It's different because

 4    the parent is already asking for an assessment and

 5    we're gathering information for an assessment plan or

 6    if we need to move forward with an assessment.

 7          But a typical SST is somebody's brought this

 8    student to the table because they're concerned about

 9    their performance, not because they think they have a

10    disability.  Does that make sense?

11    BY MS. PARKS:

12       Q    I think I understand.

13       A    Okay.

14          MR. ERKEL, JR.:  We've been going about an

15    hour and a half.  Is this a good time for a break?

16          MS. PARKS:  Yes.  Absolutely.  Let's take a

17    break.

18                    (Off the record.)

19    BY MS. PARKS:

20       Q    So before we took a break, we were talking

21    about the process for when a parent makes a request for

22    an assessment.

23       A    Yes.

24       Q    I want to switch to what happens when a

25    teacher makes a request for a special education

                                                          68

1    assessment.   What's the policy with respect to that?

2    What happens?

3        A    The same, same timeline.   They typically will

4    reach out to our psychologists or the school

5    psychologist or the site administrator, and we'll try

6    to get a meeting together to discuss their concerns and

7    move forward with an assessment.

8        Q    And is that also an SST meeting?

9        A    Yes.

10       Q    Sorry?

11       A    Yes.

12       Q    Yes.   Okay.

13            And are there times when after a teacher makes

14   a request and it goes to an SST meeting that there is

15   not an assessment conducted?

16            MR. ERKEL, JR.:   Objection.   Incomplete

17   hypothetical.

18            THE WITNESS:   Without having the information

19   on why that might happen, yes, it could happen.

20   BY MS. PARKS:

21       Q    And I understand that there's certain data

22   tracking that your department does in terms of sources

23   of referrals for special education assessments?

24       A    In our tracking system, I think that when they

25   put in the information when it goes to assessment, we

69

```
 1    of people.  Is that the committee that you just

 2    referred to?

 3        A    Yes.

 4        Q    Okay.  Take a look at page 1678.  It's a

 5    little hard to see because it's Bates-stamped over the

 6    date, but it's Roman numeral 7.10.

 7        A    Okay.

 8        Q    Yeah?

 9        A    Mm-hmm.

10        Q    Is this the current procedure in the district

11    for special education referral process?  It's a

12    flowchart.

13        A    It would depend on what was discussed at the

14    SST team.  If it's about performance, then they would

15    go through with the accommodations and the

16    interventions.  But if at that time they thought that

17    there was a suspected disability, they would go

18    straight to the assessment piece.

19        Q    Okay.

20             MR. ERKEL, JR.:  Shawna, if it helps, in -- in

21    Stewart's document --

22             MS. PARKS:  Mm-hmm.

23             MR. ERKEL, JR.:  -- there is a different page

24    710.

25
```

                                                              76

```
 1                      MS. PARKS:  Right.

 2    BY MS. PARKS:

 3        Q    So on --

 4                      MR. ERKEL, JR.:  It been revised --

 5                      MS. PARKS:  Yeah.

 6                      MR. ERKEL, JR.:  -- on November 7th.

 7                      MS. PARKS:  Okay.

 8    BY MS. PARKS:

 9        Q    So on -- on -- going back to Bates Number

10    OSD_1678 --

11        A    Yes.

12        Q    -- looking at the flowchart and starting at

13    the top, it says -- at the very top, it says "Initial

14    concern by school personnel," and then, to the right,

15    it says "Referral from parent/outside agency

16    physician" --

17        A    Yes.

18        Q    -- right?

19                      And then those both go to an SST.

20                      Is that piece currently the procedure in the

21    district?

22                      MR. ERKEL, JR.:  Can she use the -- the

23    current one?

24                      MS. PARKS:  I'm asking her if this is what

25    they do right now (indicating).
```

```
 1              THE WITNESS:  Yes.

 2    BY MS. PARKS:

 3       Q    Okay.  And then, after the SST, what -- I

 4    think what you're saying is it would depend on what

 5    happened at the SST as to whether they will make a

 6    referral for a special education assessment or whether

 7    they will implement accommodations and interventions in

 8    the general education curriculum?

 9       A    Correct.

10       Q    Okay.  So under the current procedure, after

11    the SST team, as opposed to this flowchart, it could go

12    in one of two directions, either interventions in

13    general education or an assessment.  Does that sound

14    correct?

15       A    It does.  But the caveat of that is they could

16    actually start trying to put accommodations and

17    interventions in place while the assessment is going on

18    if they feel that it would support the student, which I

19    would assume if we're moving towards assessment,

20    they've addressed some concerns and probably some

21    things they could do in the interim.

22       Q    Right.  Because assessments take 60 days --

23       A    Yes.

24       Q    -- at least?

25              And you may not want to wait those 60 days --
```

78

```
 1        A     I would have to look.

 2        Q     And is there some system we could look at to

 3   see when the first version was distributed and when a

 4   second version was distributed?

 5        A     I could probably look to find that

 6   information.

 7        Q     And do you know what the changes were between

 8   the first version and the second version?

 9        A     Honestly, I think it was a lot of edits that

10   we didn't catch, like 2 periods after a sentence,

11   things like that.  There was nothing major, substantial

12   that was changed.

13        Q     So there -- there -- there were no substantive

14   changes as between the first version and the second

15   version?

16        A     No.

17        Q     And going back for a second to the committee,

18   do you have an understanding of who -- who wrote the

19   policies and procedures manual?  And, yeah, if you want

20   to look, it's on OSD_1649 --

21        A     Yes.  Thank you.

22        Q     -- is the list of people.

23        A     I believe that Wayne Saddler helped put

24   everything together based on committee feedback, and he

25   was the one that was tasked with that.
```

84

```
 1        Q     And I believe you said you -- you reviewed

 2   some drafts of the manual?

 3        A     When we were looking at wording of different

 4   components of it, he would just give it to Amelia.  And

 5   sometimes they would ask us to also look at it just to

 6   make sure is it straightforward, does it make sense,

 7   could anybody pick this up and -- and use it.

 8        Q     And Wayne Saddler, it says here "retired

 9   administrator"?

10        A     Yes.

11        Q     Do you know anything more about who he is?

12        A     He is a retired administrator who had been an

13   administrator in Oxnard School District with a -- he

14   does have a special education credential, I believe.

15        Q     Does -- does he currently work for the

16   district?

17        A     He -- he comes in and supports from time to

18   time.  When we didn't have a manager at all, he -- when

19   Nadia had left, he came and kind of helped us get

20   things ready for the school year.  So from time to

21   time, he does come in and help us with different

22   things.

23        Q     I see.  So would you consider him, like, a

24   contractor or a consultant --

25        A     Yes.
```

85

1      Q    -- type person?

2      A    Yes.

3      Q    And then, do you know who had sort of final

4   say as to what went into the policy and procedure

5   manual for special education?

6      A    I think the committee worked through the bulk

7   of it to make it formatted, but I believe that Amelia

8   and -- and, I would assume -- no, I'm not going to

9   assume -- Amelia, I don't who she consulted with, but

10   she would have the final say.

11     Q    Okay.  Mark this 8.

12          (Deposition Exhibit 8 was marked for

13          identification by the Court Reporter.)

14          THE WITNESS:  I'm assuming this is different?

15   BY MS. PARKS:

16     Q    It is, yes.

17     A    Okay.

18          MR. ERKEL, JR.:  This is the Stewart volume.

19          MS. PARKS:  It is the Stewart volume.

20   BY MS. PARKS:

21     Q    So I just handed you what is also labeled

22   "Oxnard School District Special Education Department

23   Policies and Procedures."  This one is Bates-labeled

24   939, OSD_939 through OSD_1167.

25     A    Okay.

86

1    drafts.  I don't know which one came before the other

2    unless I had them in front of me.

3         Q    Do you recall when you saw the first draft?

4         A    No.

5         Q    We will mark this Exhibit 10.

6              (Deposition Exhibit 10 was marked for

7              identification by the Court Reporter.)

8    BY MS. PARKS:

9         Q    Also labeled "Oxnard School District Special

10   Education Department Policies and Procedures."  This

11   one is Bates-numbered 2092 through 2320.  This one is

12   mostly dated June of 2018, but also has, if you look on

13   2131, the revised flowchart dated November 7th, 2018.

14             You may not be able to answer this here.  I'm

15   trying to figure out if there's any difference between

16   this document and what we've marked as Exhibit 8.

17        A    I have no idea.

18        Q    Don't know?  Okay.

19             It was produced with different Bates numbers,

20   which leads me to think something might be different,

21   but I can't tell what it is.

22        A    Unless I sat down and compared and contrasted,

23   I --

24        Q    Okay.  Do you have a copy of the policies and

25   procedures manual for special education that you use?

95

1        A    I have referenced it from time to time.

2    Typically, when Amelia was there, we might go back to

3    it as a reference point, but we usually just talk

4    things through.  Is it my go-to guide?  No.  It -- I

5    would say it's a reference that we can use.

6        Q    So let's go back to Exhibit 8, if we can.

7        A    Sure.

8        Q    And I think the other 3 we can just set aside

9    for now.

10            MR. ERKEL, JR.:  Which one's 8?  What's the

11   cover?

12            MS. PARKS:  8 is the one that starts with

13   9 -- 939.

14            THE WITNESS:  Can I put 10 away then for --

15   BY MS. PARKS:

16       Q    Yeah.

17       A    -- a minute?

18            MR. ERKEL, JR.:  Oh, that's Stewart's

19   document.  Okay.

20            MS. PARKS:  Sure.

21   BY MS. PARKS:

22       Q    Yeah.  Partly, I'm just trying to figure out

23   what's in circulation and what is not in circulation.

24   So sorry for all the paper, but it was kind of the only

25   way to do it.

96

1    progress to access the education, it's not helping them

2    in any way, that if we continue down this path, we

3    still are going to see this gap, whatever that -- how

4    big or small it might be, then it -- it -- then they

5    do -- typically, I -- I'm not at those meetings, so I

6    can't tell you, but that is the presumption, that they

7    will go to an assessment because they're not seeing the

8    growth, the targeted growth that they -- they -- the

9    student should be making based on what other kids do

10   when they're in the process, right, typical peers.

11        Q    If you can take a look at page 971.

12        A    (Complies.)

13        Q    And at the top, it says "Sample Referral

14   Letter," and at the bottom, it says "Sample Withdrawal

15   Letter."

16        A    Mm-hmm.

17        Q    You see where I am?

18        A    Yes.

19        Q    Okay.  Do you know why a sample withdrawal

20   letter for an assessment request is included in the

21   policy manual?

22        A    I don't know specifically why it was put in

23   there other than it's a sample as a reference.

24        Q    Is that a common thing in the district for a

25   parent to withdraw their request for assessment?

                                                        121

```
 1              MR. ERKEL, JR.:  Objection.  Vague.

 2              THE WITNESS:  I don't know what you mean by

 3     refer them to withdraw.

 4     BY MS. PARKS:

 5         Q    Let me rephrase my question.

 6              Is it common for parents to withdraw their

 7     request for assessment in the district?

 8         A    Is it common?  I don't think it's common.  I

 9     think that sometimes parents ask for assessment and

10     they don't really know what that means.  And then, when

11     they have a conversation, they understand that that's

12     not exactly what they're looking for.  And so if they

13     put it in writing, we do ask them if they will put it

14     in writing that they rescind that request.

15         Q    And does the conversation where the parent

16     gains this understanding usually happen at the SST

17     meeting?

18         A    I don't -- I would -- I would think yes, but I

19     can't say for sure that all of them do.

20         Q    And then, looking at page 978 again, which is

21     the flowchart.

22         A    (Complies.)

23         Q    Do you know why this was revised in November

24     of 2018?

25              MR. ERKEL, JR.:  Objection.  Calls for
```

1    speculation.

2    BY MS. PARKS:

3         Q    If you know.

4         A    Additional input.

5         Q    Do you know who the input was from?

6         A    I do not.

7         Q    Do you know which version -- you -- strike

8    that.

9              Do you have a hard copy version of the policy

10   manual in your office?

11        A    I do.

12        Q    Do you know which version you have?

13        A    I don't.  I -- I know I have the current one.

14   I -- I mean, I don't know the number of it, though.

15        Q    And when the -- the new version went out,

16   was -- did anybody go -- go around and take back the

17   old versions?

18        A    Did -- like, physically, did we go around --

19        Q    Yes.

20        A    -- and take them back?  No, we physically did

21   not.  When the training happened, we said, "This is the

22   new version to replace."  They were in binders, and

23   everybody signed for them, and...

24        Q    Was there any kind of e-mail or intranet

25   announcement saying, "There's a new version.  Don't

                                                         123

 1    consult your old version"?

 2        A     There -- there was only one hard version at

 3    sites that we -- we distributed.  So we gave the new

 4    version to the administrators at a new training to tell

 5    them that via face-to-face.

 6        Q     The version online, is it downloadable?

 7        A     Yes.

 8        Q     Okay.  So was there anything that went out to

 9    say, like, if anybody had downloaded the old one, to

10    stop consulting it?

11        A     I don't know.

12            MS. PARKS:  Are we up to 11?

13            THE REPORTER:  Yes.

14            (Deposition Exhibit 11 was marked for

15            identification by the Court Reporter.)

16    BY MS. PARKS:

17        Q     So what I just handed you is your declaration

18    that was filed on May 17th, 2019, in -- in this case.

19    Do you need to read it over again?  Has it been a

20    while?

21        A     I think I had just stepped in to -- to cover

22    for Amelia, and so, yeah, it's been a minute.

23    (Reviewing document.)

24            Okay.

25        Q     So you think this was around the time when you

                                                              124

1    the High School District and what that looks like.

2    It's a big transition for kids, so they are an

3    important component.

4         Q     Does the High School District -- they come to

5    those meetings?

6         A     For the most part, yes, they do.  I know that

7    there is a week -- I think a week or two that's

8    dedicated specifically to transition meetings.  And so

9    they try to do them that way.

10              If for some reason they can't, I know that

11   they always offer that they will meet with the parents

12   to tour the school, to talk about their programs,

13   things like that.

14              And I know -- I think it's just this week we

15   have -- the students are actually touring the high

16   school.

17        Q     And the way it works is for students in

18   special education, whatever is on their I.E.P., when

19   they leave Oxnard School District is what will be

20   presumptively their I.E.P. when they get to the High

21   School District?

22        A     Yes.

23              MR. ERKEL:  Objection.  Vague.

24              THE WITNESS:  Sorry.

25              MS. PARKS:  It's okay.  I don't know what you

                                                          198

1    mean by presumptively.

2             THE WITNESS:  Well, let me talk about that.

3    So they are talking at the transition meeting and the

4    receiving team is learning about the team and so they

5    -- between the two teams they determine the appropriate

6    fate for transitioning into the high school.  Because

7    their programs do look a little bit different than

8    ours.  But for the most part the services are the same.

9             Does that make sense?

10   BY MS. PARKS:

11      Q    So, for example, in using Miguel as an

12   example, since he's in eighth grade, his services will

13   likely look the same at the high school level as they

14   are in his I.E.P. at his eighth grade level?

15             MR. ERKEL:  Objection.  Lack of foundation.

16   BY MS. PARKS:

17      Q    In your experience.

18             MR. ERKEL:  Wait a minute.  You said -- one

19   you said specific with respect to a student.  And now

20   you're transitioning to a general question.

21   BY MS. PARKS:

22      Q    Well, I'm asking for Miguel, based on your

23   experience, when he goes to high school, are these

24   services going to look like what are in his I.E.P. from

25   eighth grade?

                                                      199

1           MR. ERKEL:  Objection.  Lack of foundation.

2    She hasn't even read it.  You just showed it to her.

3           THE WITNESS:  I think the only way I can

4    answer that question is we don't know if this is the

5    last I.E.P. he will have before he gets out of eighth

6    grade.  So depending on what transitions between the

7    December I.E.P. and June, a lot of things could happen

8    and look different or they might stay the same.

9           And so when they sit down to a transition

10   meeting and talk about the program that he's currently

11   in and what his needs are, that determination would be

12   made on how the High School District could best support

13   him.  But I won't know until we know what I.E.P. we're

14   basing his transition on.

15   BY MS. PARKS:

16        Q    And to the extent he needs more services than

17   what's in his current I.E.P. or the I.E.P. when he

18   leaves the elementary School District, then that would

19   be on the High School District to provide?

20        A    Can you explain what you mean by that?

21        Q    Sure.  Once he finishes eighth grade, if he

22   needs more than what's in his last I.E.P. from the

23   Oxnard School District, then that would be on the High

24   School District to provide?

25           MR. ERKEL:  Objection.  Vague.

                                                          200

1              THE WITNESS:  When we have a student with an

2      I.E.P. and if for some reason we think that there is an

3      issue, we have to address it through an I.E.P.

4              And so if he's at the High School District and

5      they do not feel like the services that everybody

6      agreed to at the transition meeting are appropriate, it

7      would be their responsibility to hold a meeting to

8      address their concerns and to determine next steps.

9      BY MS. PARKS:

10         Q    And then if he needed more, the High School

11     District would be the provider at that point?

12         A    Yes.  Once I got into high school, yes.

13         Q    Just one more point of clarification.  That

14     transition meeting, is it an I.E.P. meeting?

15         A    Yes.

16         Q    So the I.E.P. could be changed as a result of

17     the transition meeting?

18         A    Yes, because our services don't necessarily

19     align.  Like maybe the periods are -- how they break

20     down it could be that they have one core and one

21     supplemental.

22              It just looks a little bit different.  So they

23     don't have to do an addendum for the services because

24     they are not on there right, they try to do the records

25     of change for the next year right the first time.

201

```
 1              MS. PARKS:  I don't have any further

 2   questions.          Do you?

 3              MR. ERKEL:  Me, no.

 4              MS. PARKS:  So let's stipulate that the

 5   original will go to counsel for the deponent.  The

 6   witness will have 30 days to review and make any

 7   corrections and sign.  You'll let us know of any

 8   changes.  And then if the original is not available a

 9   certified copy can be used for any purpose.

10              MR. ERKEL:  So stipulated.

11              (Whereupon the deposition was

12              concluded at 4:23 p.m.)

13                              *   *   *

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    STATE OF CALIFORNIA       )
                                )  ss.
 2    COUNTY OF VENTURA         )

 3              I, Lori King Bean, a licensed Certified

 4    Shorthand Reporter, duly qualified and certified as

 5    such by the State of California, do hereby certify:

 6              That prior to being examined, the witness

 7    named in the foregoing deposition was by me duly sworn

 8    to testify to the truth, the whole truth, and nothing

 9    but the truth;

10              That the said deposition was by me recorded

11    stenographically at the time and place first therein

12    mentioned; and the foregoing pages 6 through 135

13    constitute a full, true, complete and correct record of

14    the testimony given by the said witness;

15              That prior to the completion of the foregoing

16    deposition, review of the transcript was requested.

17              That I am a disinterested person, not being in

18    any way interested in the outcome of said action, not

19    connected with, nor related to any of the parties in

20    said action, or to their respective counsel, in any

21    manner whatsoever.

22              Executed this 9th day of February, 2020, at

23    Oxnard, California.

24
                        _____
25                      Lori King Bean, CSR No. 13602
```

203

```
 1    STATE OF CALIFORNIA      )
                               ) ss
 2    COUNTY OF VENTURA        )

 3            I, LISA B. BLACK, a Certified Shorthand

 4    Reporter in the State of California, and duly empowered

 5    to administer oaths, do hereby certify:

 6            That prior to being examined, the witness in

 7    the foregoing proceedings was by me duly sworn to

 8    testify to the truth, the whole truth, and nothing but

 9    the truth;

10            That said proceedings were taken down by me in

11    shorthand and thereafter transcribed into typewriting

12    or printing under my direction and supervision; and I

13    hereby certify that the foregoing pages 136 through 202

14    are a full, true and correct transcript of my notes so

15    taken.

16            That prior to the completion of the foregoing

17    deposition, review of the transcript was requested.

18            I further certify that I am neither counsel

19    for, nor related to, any Party to said action nor in

20    any way interested in the outcome thereof.

21            IN WITNESS WHEREOF, I have hereunto subscribed

22    my name and C.S.R. number on this____day of _____

23    2020.

24
      _____    _____7977_____
25    Certified Shorthand Reporter       C.S.R. Number
```

204

 1                DEPOSITION ERRATA SHEET

 2      Our Assignment No. 223578
        Case Caption:  J.R. v. Oxnard School District
 3

 4            DECLARATION UNDER PENALTY OF PERJURY

 5

 6         I declare under penalty of perjury that I have read

 7      the entire transcript of my Deposition taken in the

 8      captioned matter or the same has been read to me, and

 9      the same is true and accurate, save and except for

10      changes and/or corrections, if any, as indicated by me

11      on the DEPOSITION ERRATA SHEET hereof, with the

12      understanding that I offer these changes as if still

13      under oath.

14

15         Signed on the _____ day of _____, 20___.

16

17                    _____

18                              KATRINA MADDEN

19

20

21

22

23

24

25

                                                         205

Katrina Madden                                                              January 28, 2020

```
  1                             ERRATA SHEET

  2

  3        If any corrections to your deposition are necessary,
           indicate them on this sheet, giving the change, page
  4        number, line number and reason for change.

  5        PAGE  LINE  FROM                        TO

  6        ____  ____  _____         _____

  7        Reason  _____

  8        ____  ____  _____         _____

  9        Reason  _____

 10        ____  ____  _____         _____

 11        Reason  _____

 12        ____  ____  _____         _____

 13        Reason  _____

 14        ____  ____  _____         _____

 15        Reason  _____

 16        ____  ____  _____         _____

 17        Reason  _____

 18        ____  ____  _____         _____

 19        Reason  _____

 20        ____  ____  _____         _____

 21        Reason  _____

 22        ____  ____  _____         _____

 23        Reason  _____

 24        _____         _____

 25        Signature of Deponent                 Date
```

Exhibit C

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of:<br><br>PARENTS ON BEHALF OF STUDENT,<br><br>v.<br><br>OXNARD SCHOOL DISTRICT. | OAH Case No.  2016100009 |

## DECISION

Parents on behalf of Student filed a due process hearing request with the Office of Administrative Hearings, State of California, on September 22, 2016, naming Oxnard School District.

Administrative Law Judge Adrienne L. Krikorian heard this matter in Oxnard, California, on March 14, 15, 16, 21, 22 and 28, 2017.

Attorneys Shawna Parks and Janeen Steel represented Student.  Mother attended all hearing dates except March 22, 2017, testified on the last hearing day, and was assisted by a Spanish interpreter.  Attorney Lawrence Joe represented District.  Amelia Sugden, Director of Special Education Services, attended the hearing on behalf of District and testified.

A continuance was granted for the parties to file written closing arguments and the record remained open until May 3, 2017.  Upon timely receipt of the written closing arguments, the record was closed and the matter was submitted for decision.

## ISSUES

(1)      Did District deny Student a free appropriate public education since November 2012, by failing to meet its child find obligations by not evaluating Student in all areas of suspected disability, and not finding Student eligible for special education placement and related services?

(2)     Did District deny Student a FAPE since November 2012 by failing to offer Student an individualized education program that met Student's unique needs?

(3)     Did District deny Student a FAPE since November 2012 by failing to offer an IEP that was reasonably calculated to offer educational benefit to the Student?

(4)     Did District deny Student a FAPE since November 2012 by committing procedural violations that significantly impeded Parents' opportunity to participate in the decision-making process, by:

(a) Not providing Parents' with a copy of special education procedural safeguards; and/or

(b) Failing to inform Parents of District's obligation to offer assessments or provide an assessment plan if a need for special education services was suspected?


## SUMMARY OF DECISION

Student contends District failed its obligations under the Individuals with Disabilities Education Act from the fall of 2012 through the date she filed her complaint, denying her a FAPE and depriving Parents of the ability to participate in a meaningful way in developing her educational program.  Student contends District first failed to identify her as a child with a suspected disability despite ample evidence to the contrary, and then later inappropriately assessed her and failed to find her eligible for special education.  District contends that it used the "student study team" process, and implemented appropriate "responses to intervention" for Student.  District further contends that Student demonstrated no needs requiring assessment after it completed its initial assessment in May 2013, and until it offered to assess her in March 2016.

Student proved that, because of applicable exceptions to the two-year statute of limitations, she had viable claims as of November 13, 2013.  For the reasons discussed below, District's arguments that Student's claims after March 2016 should be barred based upon Parents' refusal to consent to assessment until November 2016, were not persuasive.

This Decision additionally finds that Student met her burden of proof on all issues, except for her contention that District violated its statutory "child find" duties, which was time-barred and moot.


## FACTUAL FINDINGS

1.      Student was a ten-year-old girl at the time of hearing.  She resided at all relevant times in District's boundaries with Parents, a twin sister, and a brother.  Student was developmentally delayed as a toddler.  She did not walk or speak until age two.  Her primary

language at home and school was Spanish.  She attended a private preschool until she was four years old.  District did not find her eligible for special education before she filed her complaint on September 22, 2016.

*Kindergarten- Special Education Assessment*

2.      Parents enrolled Student in a dual immersion language kindergarten program at District's Juan Lagunas Soria School at the beginning of the 2012-2013 school year.  The class consisted of 50 percent English speaking and 50 percent Spanish speaking students.  Teachers delivered instruction 90 percent in Spanish and 10 percent in English.  The class was co-taught by general education kindergarten teachers Ms. Carrillo and Aracely Martinez until Ms. Martinez went on leave toward the end of the school year.

3.      In early fall 2012, Mother expressed concerns to Ms. Martinez that Student might have autism, based on family history.  Mother also reported Student might have attention deficit hyperactivity disorder, might have dyslexia because of her tendency to reverse words, that she could not hold a pencil, and that she had aggressive behaviors at home.  Mother verbally requested that District fully assess Student.

4.      Ms. Martinez observed that Student was performing low academically.  However, she attributed the low performance to the fact that Student had just started kindergarten and came without any formal academic instruction from pre-school.  She did not observe the behavioral concerns in the classroom that Mother reported seeing at home.  On November 8, 2012, Ms. Martinez filled out a Coordination of Services Team referral form and provided it to District's outreach specialist Maria Magana.  Ms. Martinez's COST referral form reported low academic performance and Mother's concerns about autism and attention deficit.  Ms. Martinez noted on the referral form that she did not think Student had either condition.  The form did not refer to Student's inability to hold a pencil or Mother's concern about dyslexia/reversing words.

5.      Ms. Magana's role was to facilitate communications and meetings with parents and district staff.  She regularly communicated with Mother regarding Student, and was aware of Mother's concerns about Student's academic difficulties and behaviors.  She coordinated referral of the COST form to the District COST team responsible for evaluating those referrals.

6.      District's COST referral process was the preliminary step after a parent or teacher raised concerns about a student's progress or health issues.  The COST team included a school psychologist, the school principal, an educator, and an administrative representative.  It met weekly to discuss all students' progress, including addressing specific referrals from teachers.  When a parent or teacher requested or recommended assessments for special education, the COST team scheduled a student study team meeting, which included parents, to discuss the child's progress and all reported concerns.  District treated verbal requests for assessments as if they were written.  Decisions made by the student study team were documented in the notes from the meeting.  If a student study team decided not to refer for

3

assessments, District discussed that decision at the meeting and documented it in the notes.
It did not provide prior written notice under special education procedures.

7.      Ms. Magana coordinated and District held a student study team meeting for
Student on December 11, 2012.  The team included Parents, Ms. Martinez, a school
administrator, District school psychologist Steve Tobey, a Spanish interpreter, and
Ms. Magana.  Mother expressed her multiple concerns about Student's behaviors at home
and difficulties in learning at school.  The team reviewed Student's academic progress,
including benchmark testing, for the first semester of the school year.  Student was unable to
recognize sounds or vowels on the literacy tests.  She had difficulty retaining information.
She did not return homework.  The team discussed Student's multiple tardiness and
absences, and dynamics between Student and her siblings in the home environment.  The
team recommended multiple interventions for Student in the classroom, requested Mother to
sign a release for medical information, and recommended a special education evaluation by
Mr. Tobey.

8.      On January 22, 2013, Mr. Tobey sent Parents a Notice of Special Education
Referral and an Assessment Plan in Spanish and English.  Mother signed and returned the
Spanish version on January 25, 2013, along with the release for medical information.  Also
on January 25, 2013, District referred Student to the City Impact Counseling Center for
emotional and behavior concerns related by Mother to Ms. Martinez and Ms. Magana.  The
referral form marked high risk characteristics including defiance, temper tantrums, lack of
concentration and inattentiveness, unable to sit still, and difficulty following instructions.

9.      The January 2013 Assessment Plan identified the following areas of
assessment:  pre-academic/academic achievement; social emotional behavior; motor skills
development; intellectual development; and health.  The Assessment Plan did not identify
assessments for autism, ADHD, fine motor, central auditory processing disorder, or any other
area of suspected concern.

10.     Mr. Tobey was a licensed educational psychologist with a master's degree in
educational psychology.  He was employed with District as a school psychologist for
25 years.  He developed the referral question for assessment based on his evaluation of
concerns expressed by the student study team and the COST referral.  He did not speak
Spanish.  He assessed Student in English, with occasional assistance from a Spanish
interpreter, for possible disabilities in the areas of specific learning disability and emotional
disturbance.  Mr. Tobey did not administer specific assessment tools for autism, attention
deficit hyperactivity/attention deficit disorder, or speech and language deficits, because they
were not part of the referral question.  He did not tell Parents that he was limiting the
assessment to specific learning disability and emotional disturbance.

11.     As part of his assessment, Mr. Tobey reviewed Student's records, and
observed Student in the classroom, finding her to be on-task 80 percent of the time.  The
20 percent of the time Student was off-task was due solely to her inattention.  Mr. Tobey
considered whether concerns expressed by Mother and Ms. Martinez during the assessments

were the result of problems "intrinsic to Student" or other extrinsic factors that would be
exclusionary factors for special education eligibility.  In his opinion, consideration of
extrinsic factors, including tardiness, absences, and environmental factors, were an important
part of ruling out whether those factors impacted a child's performance at school.

12.      Mr. Tobey administered the Kaufman Assessment Battery for Children,
Second Edition; LA Preschool Test III; and Parent and Teacher Rating Forms on Connors
Behavior Rating Scales.  On the Kaufman II, Student's non-verbal cognitive abilities were in
the below average range in comparison to her peers.  Mr. Tobey administered Kaufman II
subtests with low to moderate cognitive demands in Spanish with the assistance of a
bilingual interpreter.  Student's scores in visual processing and short term memory were
below average, consistent with her other scores on the Kaufman II.  The LA Preschool Test
was a play-based assessment of cognitive functioning for children ages two through six.  Her
overall cognitive ability was five years and one month, approximately one year lower than
her age.  On the Connors Rating Scales for behavior Mother expressed significantly more
concerns and rated Student lower than did Ms. Martinez.  Mother's scores suggested that
Student was significantly impaired and had profound disciplinary problems.  Ms. Martinez's
scores did not reflect the same intensity as Mother's.  Mr. Tobey concluded Mother's
descriptions of Student's behaviors did not reflect Student's behaviors at school.

13.      Resource teacher Kathy Russell administered pre/academic and academic
tests, including the standardized English version of the Brigance Comprehensive Inventory
of Basic Skills, and a dominant language screening.  Student performed at or above
60 percent accuracy on the Essential Literacy Skills for Spanish.  Test results revealed that
Student performed at a higher level in Spanish than English, and struggled learning concepts
of "most" and "least," learning vowel and consonant sounds, and producing rhyming words
in response to a prompt.

14.      On May 6, 2013, Student's teachers developed a student study team
information sheet, which included Student's present levels of performance and classroom
modifications used by the teachers.  Those modifications included daily small group
instruction, preferential seating, a tablet for support with letter and sound identification and
segmenting and blending words, and homework with materials provided by the teachers.

15.      Mr. Tobey included the results of the multidisciplinary assessment in a report
dated May 21, 2013.  District held an IEP team meeting on May 21, 2013.  Mother and all
required District staff, including a general education and special education teacher, attended
the meeting.  Mother's primary language was Spanish.  She understood some spoken words
in English, but did not read or write in English.  A District interpreter assisted Mother
throughout the meeting.  The IEP team reviewed Mr. Tobey's assessment report.  The
District IEP team members did not find Student eligible for special education.  District
therefore did not develop an IEP for her.

16.      Mother never received the assessment report translated into Spanish.
Mr. Tobey did not recall explaining to Mother at the meeting his reasoning about which areas

of need he excluded from assessments. The school principal told Mother after the meeting that "nothing was wrong with" her daughter, some children's brains develop later than others, and Student's delays were less than two years below her age, which reflected the process of the brain maturing. Mother understood at the end of the meeting that District did not find Student eligible for special education services.

17.    Mother signed the English version of the IEP confirming her attendance, initialed confirming her receipt of the IEP and assessment reports in English, initialed her request for the IEP document in Spanish, and that she asked for and received interpretation in Spanish. Mother also acknowledged her agreement with the IEP team's eligibility findings and receiving her procedural rights and safeguards by initialing the IEP that she had received them. She initialed the English version of the IEP where she was told to. The interpreter did not interpret each initialed line word for word, and no one explained to her in detail what she was initialing. However, District provided Mother with the Spanish version of the IEP at the end of the meeting. Mother admitted she did not read the lines written in Spanish that corresponded to the lines she initialed in the English version. Although Mother testified that the interpreter did not accurately interpret all parts of the meeting, her testimony on this point was not entirely credible in part because the meeting was more than four years earlier than the hearing, and she never informed anyone at the meeting that she did not understand what happened at the meeting, or what she signed.

18.    Student's kindergarten co-teacher, Ms. Carrillo, recommended at the meeting to retain Student in kindergarten. On May 29, 2013, Parents declined to retain Student and informed District they would seek private tutoring for Student. Student promoted to first grade.

*First Grade – 2013-2014 School Year*

19.    Student attended first grade at District's Elm Elementary School. Teacher Blanca Rodriguez had a multiple subject bilingual teaching credential and taught for District for 15 years. She received no District-provided training in special education, including special education assessment referrals. Student remained in the dual immersion Spanish program, which in first grade focused instruction 80 percent in Spanish and 20 percent in English. She was sweet, sociable, and had friends at school.

20.    District held a student study team meeting on November 13, 2013. Ms. Rodriguez learned for the first time that District had assessed Student for special education earlier that year. The student study team discussed Student's performance during the first semester of school, reviewed kindergarten interventions and modifications, and considered Mother's current concerns that Student was still struggling. Student had been late to school several times and had several absences. She was struggling with reading comprehension, fluency, retention of information, and was low in all academic areas. Ms. Rodriguez suggested the student study team consider retaining Student in the first grade.

She opined at hearing that Student's difficulty in memory retention was "probably" a
disability.  The team recommended community-based counseling for Student, based upon
family issues.

21.     School psychologist Lupe Morales attended the meeting, along with school
principal Leticia Ramos.  Mother requested at the meeting that District assess Student for
special education.  No one assisted Mother with putting her request in writing.  However, her
request was documented in handwriting on the student study team notes.  Ms. Morales
advised Mother that, because Student had recently been assessed, assessing again would be
too soon.  Consistent with her general practice, she recommended Mother to wait to see if the
tiered general education interventions recommended by District staff worked for Student.

22.     Ms. Ramos explained to Parents that Student was "like a flower" and in the
spring "she would bloom."  She warned Mother if District did another assessment, Student
would be "labeled" as "disabled."  She would not be able to have a normal life in school.
Relying upon the representations by Ms. Morales and Ms. Ramos, Parents withdrew their
request for assessment at the meeting, which the team recorded in handwriting on the notes.

23.     The student study team recommended continuing with current modifications,
including repetition, differentiated instruction, educational games, challenging materials that
allowed for success, providing meaningful concrete rather than abstract activities, sitting
close to the teacher, one on one with teacher, practicing syllables at home daily, and parental
help with homework.

24.     No one during the meeting or afterwards informed Parents that they were still
entitled to ask for an independent educational evaluation if they disagreed with Mr. Tobey's
earlier assessment.  No one explained to Mother at that meeting that District had not assessed
Student to rule out autism, ADHD or fine motor needs based on Mother's initial concerns
expressed to Ms. Martinez.  District did not provide Parents with prior written notice that it
was declining to assess Student in response to Parents' request.  No one gave Parents a copy
of their procedural safeguards at or after the student study team meeting, or after Parents
withdrew their request for assessment.  Parents left the meeting believing that District was
serving Student's needs through the student study team process with recommended tiered
interventions.

25.     The student study team met again on March 27, 2014.  Mother continued to
express concerns about Student's lack of progress.  Student made minimal progress
academically based upon her scores from informal testing.  She was still at risk for retention.
She was tardy or absent several times during the year.  Student resisted getting ready for
school in the morning, and her resistance often resulted in her tardiness.  She did not like
going to school because she found school difficult and began to understand she was not
performing at the level of her peers.  Student also left school for medical appointments,
resulting in her absence for all or part of the school day.  Ms. Rodriguez reported Student
was not turning in daily homework; her homework looked like someone else had completed
it.  The team recommended continuing tiered interventions in the general education

classroom and considered retention in first grade.  It added color-coded vowels to remind of vowel sounds, timely arrival at school, and homework completed by Student.  District recommended another student study team meeting for May 2014, but it did not hold another meeting until the following school year.  No District staff recommended in first grade that Student should be assessed for special education or provided procedural safeguards to Parents.

26.     Student's first grade year-end progress report showed that she was performing at below basic level and needed improvement in all aspects of language arts, and three out of five areas of math.  Her skills in vocabulary recognition, spelling and language were minimal.  She needed improvement in homework completion.  She performed relatively better when instructed in Spanish.  District promoted Student to second grade at the end of the 2013-2014 school year.

*Second Grade – 2014-2015 School Year*

27.     Veronica Gonzalez was Student's second grade teacher.  Ms. Gonzalez had a bilingual multiple subject credential, a master's degree in education, and had been employed by District for 11 years at the time of hearing.  She was personally familiar with special education as a parent, but received no formal training from District on the IDEA or special education procedures.  Ms. Gonzalez attended District training in behavior modifications, what to look for when children with special needs misbehaved, and received a list of strategies for behavior and academics.  She was not familiar with the IDEA requirements for "child find," and had no training from District on referrals for special education assessments.

28.     Ms. Gonzalez knew Student had been assessed for special education at the end of kindergarten.  She was familiar with her cumulative records.  She knew Student had a history of tardiness and absences, and that she was performing one year behind other students.  Ms. Gonzalez monitored Student's progress to see if she understood the curriculum because she knew Student did not qualify for special education based on Mr. Tobey's assessment.

29.     Student was a sweet child in second grade, well-behaved, tried her best in class, made friends and was very sociable.  The classroom had 21-25 students, and instruction was 70 percent in Spanish.  Most of the students were English language learners.  Ms. Rodriguez taught all subjects in Spanish except for one hour a day of English language, where the students worked with sight words and phonics books in English.

30.     District held a student study team meeting for Student on September 25, 2014.  Parents attended along with District staff, including psychologist Ms. Morales, Ms. Ramos, and special education resource teacher Heather Jue.  Ms. Jue had a master's degree in special education and an education specialist instruction credential.  She was familiar with the requirements for referral for special education assessments.  She worked most of her day with special education students.  She attended the meeting to listen to concerns expressed by Student's teacher and Parents.

8

31.     Student's oral fluency scores on statewide standard tests were low; she was unable to recall words. She was not reading fluently, paused frequently between words, and did not retain correct vowel sounds. She was not spelling words correctly. She required the use of manipulatives or drawings in math, but still struggled with adding simple one digit numbers. She sought peer or adult assistance in math. Her behavior was on task and she followed rules.

32.     Mother reported Student had been medically diagnosed with attention deficit disorder, and possible dyslexia, but did not provide anything in writing to the team documenting those diagnoses. Ms. Gonzalez did not see any signs of dyslexia in the classroom which would have prompted her to follow up on Mother's concerns. Ms. Morales opined at hearing that a diagnosis of attention deficit disorder was not enough to refer a child for an assessment, even though she acknowledged that Student was making slow progress in second grade. She opined that if a child is not eligible for special education based on a diagnosis of attention deficit disorder, the student study team considers the impact of the diagnosis on the child's education, discusses interventions with the parents, and documents the findings in the student study team notes. Ms. Ramos opined that Mother's report of attention deficit disorder did not trigger the need for an assessment, in part because Mother did not provide a note from the doctor which documented the diagnosis and outlined whether Student required medication management. However, District staff knew Student was taking Ritalin at home. In Ms. Ramos's opinion, family dynamics at home were impacting Student's attendance and performance at school.

33.     With Ms. Jue's input, the student study team recommended that previous modifications and interventions continue. The team added classroom modifications and interventions including small group instruction and modified work in class and homework. It recommended Student work at home practicing syllables and, again, recommended family counseling, which Mother had rejected in first grade. The team encouraged Parents to bring Student to school on time. They recommended to Parents to follow up with an optometrist because Mother reported Student saw "color balls' in the air. Ms. Jue saw no red flags based on the information she heard at the meeting suggesting Student should be assessed for special education eligibility. No one suggested District assess Student for special education.

34.     District held another student study team meeting on February 9, 2015. Ms. Gonzalez provided a progress report from the first trimester. Student's scores on standardized tests were at the beginning level. She misspelled all words on spelling tests, which had been modified for her. She read eight words per minute on standardized tests, which was significantly below where she should have been. She paused frequently between words with unfamiliar text. She recognized only 38 out of 100 sight words in Spanish. She mixed up vowel sounds and did not retain correct vowel sounds. Although she understood the concept of adding single digit numbers, while using manipulatives (physical objects), she was not progressing to the level of adding two-digit numbers, which is the level at which she should have been performing.

35.     Ms. Gonzalez noticed Student appeared more confused and uncertain about routines, but was unsure of the cause.  District had arranged for after-school program support services, but Student only attended for a short time because Mother felt the day was too long for her.  The team recommended continued small group instruction with adult support and decodable books.  Parents provided private tutoring for English language after school.  Mother expressed no questions or concerns with Student's progress at the February 2015 meeting.

36.     On May 28, 2015, District held a third student study team meeting to discuss Student's second grade progress.  Parents attended along with District staff, including Ms. Jue and Ms. Morales.  Ms. Gonzalez reported Student continued to struggle academically with reading fluency, reversing letters, spelling, math homework, and addition.  Although Student showed some progress, she was performing significantly below second grade level.

37.     The team discussed Father's request to retain Student in second grade.  The team also discussed possibly assessing Student for special education.  The team concluded that, instead of assessing Student, District would matriculate Student to third grade, and transfer her out of the dual immersion program and into an English only classroom.  Parents agreed that Student was not successful in the dual immersion program and a single language program might be better for Student.  Student was still resisting going to school causing her to often be late.  District did not provide Parents with anything in writing confirming that it was deferring assessments, or declining to assess, in lieu of changing Student's educational program. The team also suggested that, as a general education intervention, Student work with a speech and language therapist in English language development, and specifically vocabulary.  This service was more intense, structured, and designed to address to her individual needs.  No one suggested Student should be assessed for special education eligibility in speech and language, or any other suspected disability.

38.     To support her transition to the new program, the team recommended that Student immediately begin attending Ms. Jue's special education resource class as a "guest" for English Language Arts and English development.  To qualify for this service, District's general education students must be performing two years below grade level.  Student was scheduled to attend for 20-30 minutes a day, five days a week.  The class met at the beginning of the school day.  However, because Student was often late to school she did not regularly attend the class.  By the end of second grade, Student had made little progress at school.

39.     Ms. Gonzalez opined that a child in the District should be performing two years below grade level before District staff considered assessing the child for special education.  If a child had a student study team, the team developed responses to intervention based on three tiers, the third tier being the most intensive.  She understood that if a parent asked for an assessment, the request would go straight to assessment.  However, she contradicted herself by stating the assessment request would first go through the COST team,

then a student study team, before District initiated an assessment plan. She did not
demonstrate a clear understanding of the process for special education assessment referrals.

40.     District knew Parents were very concerned that Student was struggling with
academics, had attention deficit disorder, and was making very little educational progress.
Mother attended a school board meeting during Student's second grade, along with parents
of other children. Mother expressed concern to the Board that District was not helping
Student make progress in school. She asked for help, although her testimony was unclear as
to what specific help she asked for or what response she received at the meeting.
Ms. Gonzalez did not recall that Mother ever asked for an assessment for Student during
second grade, and she never referred Student for assessments. In contrast, Mother credibly
testified she regularly expressed her concerns about Student's lack of progress and struggles
at school to Ms. Gonzalez and the student study team. Student matriculated to third grade
without any referral by District for special education eligibility.

*Third Grade – 2015-2016 School Year*

41.     Parents requested a student study team meeting at the beginning of third grade.
The team met on August 20, 2015. Ms. Morales, Ms. Jue and Ms. Ramos were among
District staff who attended the meeting. Student's teacher, Sara Cervantes, did not attend.

42.     Parents expressed concern that Student had low self-esteem, and that she was
low in all academic areas and was regressing. Mother felt Student was "playing catch up"
instead of learning new concepts. Student reversed letters without realizing she was doing
so; she put her shoes on the wrong feet. Student continued to resist going to school because
she felt she could not do the work. Student received private tutoring outside of school, and
Mother observed some improvement in reading as a result. The District team members
reported Student made little progress in the resource class, except for some improvement in
English language. The team recommended a "Tier 3" action plan, including continuing the
"guest" special education resource class, school counselor support, additional time for
interventions, and additional language development support by Ms. Jue.

43.     Ms. Cervantes had a multiple subject teaching credential and a master's degree
in education. She had no specific training in special education, other than what she received
during her credential program. She did not know at the beginning of the school year that
Student had been diagnosed with attention deficit disorder. She delivered instruction during
class in English. She was aware of the student study team interventions recommended for
Student, and implemented them. Student performed at the level of an average early first-
grader. She was best served by using materials at the pre-kindergarten level. Ms. Cervantes
opined at hearing that, during third grade, Student required urgent intervention. She was not
performing at third grade level. She was in the first percentile for reading and math. She
needed improvement staying on task, organizing her desk, and in penmanship. She needed
frequent redirection, which was serious enough to impede her learning. Ms. Cervantes did
not understand why Student's scores were so low, other than because Student came from a
dual immersion program and was in the first year of the English-only program. She did not

refer Student for special education assessments.  If she suspected a child had a disability, her
practice was to talk to the school psychologist, principal and parent to see what should
happen next.  In Student's case, Ms. Cervantes did not suspect during the early part of the
2015-2016 school year Student had a disability requiring assessments for eligibility.

44.     District staff met to discuss Student's progress in the latter half of the fall 2015
semester.  Parents were not included in the meeting.  Ms. Morales, Ms. Cervantes, Ms. Jue
and Ms. Ramos agreed Student was not making as much progress as they had hoped for.
Ms. Cervantes did not see improvement in Student's foundational phonic skills, and changed
her mind regarding the need for assessing Student.  The District team members
acknowledged Student's previous assessment was three years old and District needed
updated information.  The team decided it would offer Parents a special education
assessment plan for Student at the next student study team meeting.  District did not provide
Parents with a proposed assessment plan before February 25, 2016.

45.     On February 25, 2016, District held another student study team meeting.
Mother called in the morning of the meeting to inform District she could not attend because
her son was ill.  Father did not attend.  Instead, Student's private tutor attended the meeting.
District's primary purpose for calling the meeting was to offer an assessment for special
education.  District did not present an assessment plan to Student's tutor at this meeting
because the tutor did not hold Student's educational rights.

46.     Mother, who was concerned about Student's continued lack of progress, called
District's superintendent, Dr. Morales, in March 2016 and requested a meeting.  She
participated in a telephonic meeting with Dr. Morales during the first week of March 2016.
Special education manager Nadia Villapadua participated in the telephonic meeting.  Mother
expressed her concerns about Student's lack of progress at school.  After the meeting, at
Dr. Morales' direction, Ms. Villapadua developed a comprehensive assessment plan for
Student.  She met with Mother on March 8, 2016, and reviewed the details of the plan with
her.  She also provided Mother with procedural safeguards in Spanish, prepared by the
Ventura County Special Education Local Plan Area, and discussed timelines and parents'
rights.  Mother took the assessment plan to review with Father and her outside consultant.

47.     Parents retained counsel in the spring of 2016, and did not return the signed
assessment plan until November 2016, after Parents filed their due process complaint in
September 2016.  District followed up with Parents in May 2016 to obtain their signatures on
the proposed assessment plan.  Mother explained that she was considering the assessment
plan but wanted to talk to her private consultant and Dr. Morales.  Mother told
Ms. Villapadua that Student was receiving private tutoring.  District provided Parents with
prior written notice in May 2016 in a letter documenting District's attempts to obtain their
consent to assess Student, and attached another copy of the assessment plan and procedural
safeguards.  Ms. Villapadua understood Mother wanted to meet with the consultant and
superintendent, prepared a packet of information for the meeting, but no meeting occurred.

*2016-2017 School Year*

48.    Student attended fourth grade in general education teacher Corina Saturnino-Wright's English-only classroom.  Ms. Wright, who had a multiple subject bilingual, cross-cultural, language and academic development credential, had 20 years of teaching experience with District.  The classroom had 30 students.  Ms. Wright had no training in special education.  She talked to Ms. Cervantes, knew Student was involved in the student study team process, and that her performance was historically low in all areas.  She knew Student was constantly not focused and off-task.  Ms. Wright had a conference in the fall 2016-2017 semester with Father.  She informally met with Mother later in the semester.  Mother did not bring up any concerns about suspected disabilities or behavioral concerns.  Ms. Wright did not see Student engage in any self-injurious behavior, although she was aware that Student had begun to do so at home.  Ms. Wright was concerned about Student's academic deficiencies.

49.    District amended the March 2016 assessment plan to include assistive technology in October 2016, which Parents signed and returned through their attorney on November 7, 2016.  District began a comprehensive multi-disciplinary assessment of Student in November 2016, utilizing the amended version of the March 2016 assessment plan.  A variety of standardized assessment tools were utilized.  School psychologist Gabriela Dena Roman conducted the assessment in collaboration with other District staff, including Ms. Wright, and testified at hearing.  Ms. Roman had a pupil personnel services teaching credential, a master's degree in counseling with a specialty in school psychology, worked as a bilingual educator and literacy coach and, for the past 10 years, was a school psychologist for District.  She assessed Student in 2016, including reviewing her cumulative file, such that she had knowledge of Student's educational history at District.  Her experience and credentials qualified her to offer expert opinions regarding Student's needs based on her assessment results.

50.    The assessments were conducted primarily in Spanish by bilingual assessors.  Not all assessments were completed, and the multi-disciplinary assessment report was not final at the time of hearing, although the parties agreed that the March 9, 2017 version of the assessment report was sufficiently complete for purposes of the hearing.  Student had significant deficits and needs that justified finding her eligible for special education under the categories of other health impaired and language and speech disorder.  Ms. Roman opined Student had signs of intellectual disability, which she recommended should be monitored for possible eligibility.  Student did not test above "well below" or "limited" in any area.  She was extremely limited in Spanish broad oral language and oral comprehension.  Her auditory comprehension was very low.  She had extreme difficulty capturing instructional delivery.  She frequently responded to questions during assessment with "I don't know" and appeared anxious.  She struggled to sustain attention.  She had difficulty with visual activities, remembering and sound correspondence.  Student had significant difficulty with multitasking and attention.  In Ms. Roman's opinion, Student did not qualify under the category of specific learning disability.  She did not demonstrate the discrepancies required for eligibility under that category.  Ms. Roman recommended Student should receive instruction in a self-

13

contained classroom with a teacher who had a credential specific for language impairment. In her opinion, delivering appropriate supports and services to Student in a general education classroom would be difficult.

51.     Special Education Director Ms. Sugden testified at hearing.[1] District was working with the Lindamood-Bell Learning Processes Program, a learning approach to help students with reading and other learning issues, based in Santa Barbara, California to provide contracted services as a non-public agency for District students on District campuses. However, neither party offered any evidence that, at the time of hearing, District had offered Student Lindamood-Bell services in any area of need.

52.     District's regular school year consisted of 180 school days, or 36 weeks. School was in session from the middle of August until the middle of June during the 2013-2014, 2014-2015, and 2015-2016 regular school years.

*Expert Opinions*

53.     Karen Schnee was a licensed speech pathologist and a certified education specialist. She had master's degrees in special education/learning reading disorders, and in communication disorders. She had worked in private practice for 16 years as a consultant and diagnostician for children and adults with specific learning disabilities and developmental delays. Prior to her private practice, she worked in private institutions as a diagnostician and speech pathologist, and as a special education teacher. She has had training and experience in administering assessments in cognition, memory, achievement, auditory processing and speech and language. She frequently attended IEP meetings and received referrals for independent educational evaluations from school districts, parents and special education attorneys. Ms. Schnee was qualified to offer expert opinions on Student's behalf.

54.     Ms. Schnee assessed Student in February 2017, when Student was 10 years old. She reviewed Student's cumulative file including Mr. Tobey's 2013 assessment; District's recent multidisciplinary assessment reports; interviewed Mother; and administered selected assessment tools to supplement District's testing for a more thorough picture of Student's needs. Ms. Schnee reported her findings in a report dated March 1, 2017. At the time she testified, she did not know that District had recently found Student eligible for special education under the eligibility categories of other health impaired and speech and language.

---

[1] Student's IEP team met at least twice during this hearing to review assessments, and considered District's multi-disciplinary assessment report based on information it had. The parties in their post-closing briefs stipulated that after the last day of hearing, the IEP team found Student eligible for special education under the eligibility categories of other health impairment and speech and language.

55.    Ms. Schnee concluded that the nature and extent of Student's educational
challenges were not secondary to English being her second language, as District staff had
concluded over the years.  Instead, Ms. Schnee opined Student's challenges were secondary
to severe cognitive and language processing disorders, unrelated to a diagnosis of attention
deficit disorder, impacting her ability to access the core curriculum at school.  She was
critical of District's conclusions over the years that Student could access the curriculum in a
general education classroom, because Student's records showed she struggled as early as
kindergarten.  In her opinion, if District had done a language assessment in 2013 or
thereafter, including a thorough questionnaire of Mother's concerns at that time, District
should have discovered that Student's language development in Spanish was abnormal.

56.    Ms. Schnee opined that Student's historic disabilities had a "disastrous"
impact on her over the years because of the lack of appropriate interventions.  Sitting in a
general education classroom caused her to become frustrated and tired because she could not
process the information she was receiving.  Student had extremely severe phonological
processing problems, could not decode, had visual perceptive processing issues, and had
difficulty with numbers.

57.    Ms. Schnee opined Student should have been eligible for special education in
kindergarten based on testing results at that time.  Student was one of the most impacted
children she had ever assessed at Student's age.  Enough red flags existed in the 2013
assessment that District should have looked at whether Student was eligible as other health
impaired when it concluded she did not have a specific learning disability.  District should
have considered Mother's reports that Student had been diagnosed with attention deficit
disorder and followed up by assessing Student under that eligibility category.  In her opinion,
the fact that District was using the highest level of tiered interventions, including making
Student a "guest" in the special education resource support program, should have been a red
flag for District to consider finding her eligible for special education.

58.    Ms. Schnee offered several recommendations:  60 minutes daily of speech
therapy by a licensed speech therapist; intensive reading and math instruction in programs
such as Lindamood-Bell Learning Processes Program or On Cloud 9, the intensity and
duration of which should be determined by screening by Lindamood-Bell; an occupational
therapy evaluation with follow up services to address fine-motor development weaknesses;
direct academic instruction one hour daily by a special education teacher using a graphic
organizer to stimulate sentence construction; and a physical therapy evaluation with follow-
up services to address gross motor development weaknesses.  Ms. Schnee opined that
Student should receive compensatory services to address District's failure to identify and
treat Student's language disorder.  She was unable at hearing to specifically opine on the type
or duration of either compensatory services or the Lindamood-Bell type services, due to the
severity of Student's needs.  In her opinion, she was not certain that Student could ever
recover to grade level even with the interventions and programming she recommended.
Ms. Schnee charged Parents through their attorney $4,050 for her evaluation of Student.

59.     Ms. Villapadua, Ms. Roman, and District speech therapist Diane Dominguez concurred at hearing with Ms. Schnee that Student was eligible for special education, that she required an IEP and specialized academic instruction, and that she had limited language ability requiring speech and language therapy.  None of the four professionals disagreed as to the general nature of Student's disabilities, or that her difficulties were historic rather than recently developed.  Her levels of performance were consistently 99.9 percent below those of children at the same age.  None of the professionals disagreed that Student should be eligible for special education and required intensive interventions and services to help her make the appropriate level of progress toward her IEP goals when developed.

60.     Ms. Villapadua opined Student, at the time of hearing, was at kindergarten level in reading, and first grade in math.  She had auditory memory deficits.  Ms. Villapadua was unable to opine on how many years Student would need to reach grade level in her academic studies.  Ms. Villapadua opined that bilingual students like Student should be assessed in Spanish, and that the 2016-2017 assessments were appropriately conducted in Student's native language where necessary.  She also opined that providing Student compensatory hours after school, given Student's limited vitality, mental alertness and stamina, would be too much for her.  She agreed with Ms. Schnee that District could provide a blended program, which could include providing compensatory education hours during the school day.

61.     Ms. Dominguez opined, based upon her 2016 speech and language assessment results, Student would benefit from daily reading intervention, and speech and language services during the summer.  Student was moderate to severe in auditory comprehension.  Ms. Dominguez disagreed with Ms. Schnee's recommendation of speech and language therapy 60 minutes daily.  In her opinion, Student could make progress toward her goals with speech and language services three times a week for 30 minute sessions.  Pulling her out of class every day for one hour, as recommended by Ms. Schnee, would deprive Student of participation in other academic and social activities and would be too much for Student given her attention deficits and other needs.  While Ms. Schnee's overall testimony was credible, her estimate of five hours a week for speech and language services was less persuasive than Ms. Dominguez's recommendations, considering Student's significant learning deficits, lack of attention and memory deficits.  However, neither witness testified unequivocally whether any of the time they were recommending was for the regular school day, or as compensatory services.

LEGAL AUTHORITIES AND CONCLUSIONS

*Introduction – Legal Framework under the IDEA*[2]

     1.     This hearing was held under the IDEA, its regulations, and California statutes and regulations intended to implement it.  (20 U.S.C. § 1400 et. seq.; 34 C.F.R. § 300.1 (2006)[3] et seq.; Ed. Code, § 56000, et seq.; Cal. Code. Regs., tit. 5, § 3000 et seq.)  The main purposes of the IDEA are:  (1) to ensure that all children with disabilities have available to them a free appropriate public education (FAPE) that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living, and (2) to ensure that the rights of children with disabilities and their parents are protected.  (20 U.S.C. § 1400(d)(1); See Ed. Code, § 56000, subd. (a).)

     2.     A FAPE means special education and related services that are available to an eligible child at no charge to the parent or guardian, meet state educational standards, and conform to the child's individualized education program (IEP).  (20 U.S.C. § 1401(9); 34 C.F.R. § 300.17; Cal. Code Regs., tit. 5, § 3001, subd. (p).)  "Special education" is instruction specially designed to meet the unique needs of a child with a disability.  (20 U.S.C. § 1401(29); 34 C.F.R. § 300.39; Ed. Code, § 56031.)  "Related services" are transportation and other developmental, corrective and supportive services that are required to assist the child in benefiting from special education.  (20 U.S.C. § 1401(26); 34 C.F.R. § 300.34; Ed. Code, § 56363, subd. (a) [In California, related services are also called designated instruction and services].)  In general, an IEP is a written statement for each child with a disability that is developed under the IDEA's procedures with the participation of parents and school personnel that describes the child's needs, academic and functional goals related to those needs, and a statement of the special education, related services, and program modifications and accommodations that will be provided for the child to advance in attaining the goals, make progress in the general education curriculum, and participate in education with disabled and non-disabled peers.  (20 U.S.C. §§ 1401(14), 1414(d); Ed. Code, § 56032.)

     3.     In *Board of Education of the Hendrick Hudson Central School Dist. v. Rowley* (1982) 458 U.S. 176, 201 [102 S.Ct. 3034, 73 L.Ed.2d 690] ("*Rowley*"), the Supreme Court held that "the 'basic floor of opportunity' provided by the [IDEA] consists of access to specialized instruction and related services which are individually designed to provide educational benefit to" a child with special needs.  *Rowley* expressly rejected an interpretation of the IDEA that would require a school district to "maximize the potential" of each special needs child "commensurate with the opportunity provided" to typically developing peers.  (*Id.* at p. 200.)  Instead, *Rowley* interpreted the FAPE requirement of the IDEA as being met when a child receives access to an education that is reasonably calculated to "confer some educational benefit" upon the child.  (*Id.* at pp. 200, 203-204.)  In a recent

_____

    [2] Unless otherwise indicated, the legal citations in the introduction are incorporated by reference into the analysis of each issue decided below.

    [3] All citations to the Code of Federal Regulations are to the 2006 edition.

unanimous decision, the United States Supreme Court also declined to interpret the FAPE
provision in a manner that was at odds with the *Rowley* court's analysis, and clarified FAPE
as "markedly more demanding than the 'merely more than the de minimus test'…" (*Endrew
F. v. Douglas County Sch. Dist. RE-1 (2017) 580 U.S.____ [137 S. Ct. 988] (2017 WL
1066260)] (Endrew)*).  The Supreme Court in *Endrew* stated that school districts needed to
"offer a cogent and responsive explanation for their decisions..." and articulated FAPE as
that which is "reasonably calculated to enable a child to make progress appropriate in light of
the child's circumstance."  *Id.*

4.      The IDEA affords parents and local educational agencies the procedural
protection of an impartial due process hearing with respect to any matter relating to the
identification, evaluation, or educational placement of the child, or the provision of a FAPE
to the child.  (20 U.S.C. § 1415(b)(6); 34 C.F.R. 300.511; Ed. Code, §§ 56501, 56502,
56505; Cal. Code Regs., tit. 5, § 3082.)  The party requesting the hearing is limited to the
issues alleged in the complaint, unless the other party consents.  (20 U.S.C. § 1415(f)(3)(B);
Ed. Code, § 56505, subd. (i).)

5.      At the hearing, the party filing the complaint has the burden of persuasion by a
preponderance of the evidence.  (*Schaffer v. Weast* (2005) 546 U.S. 56-62 [126 S.Ct. 528,
163 L.Ed.2d 387]; see 20 U.S.C. § 1415(i)(2)(C)(iii) [standard of review for IDEA
administrative hearing decision is preponderance of the evidence].)  Here Student is the filing
party and therefore bears the burden of proof.

*Threshold Issue:  Statute of Limitations*

6.      Student contends the facts support a finding that exceptions to the two-year
statute of limitations apply, relating back to November 2012.  District contends Parents knew
or should have known they had a claim against District in May 2013, after the May 21, 2013
IEP meeting and Mr. Tobey's assessment.  District argues Student should have filed a claim
no later than two years after May 2013.  Because Student did not file until September 22,
2016, District argues her claims before September 22, 2014, were time-barred.

LEGAL AUTHORITY

7.      The statute of limitations in California is two years, consistent with federal
law.  (Ed. Code, § 56505, subd. (l); see also 20 U.S.C. § 1415(f)(3)(C).)  A request for a due
process hearing "shall be filed within two years from the date the party initiating the request
knew or had reason to know of the facts underlying the basis for the request."  (*Id.*)  The
statute of limitations for due process complaints precludes claims that occurred more than
two years before the date of filing the request for due process.  (Ed. Code § 56505(l); 20
U.S.C. § 1415(f)(3)(c); *M.M. v. Lafayette School District, et al* (9th Cir. 2014) 767 F.3d 842,
859 (*M.M.*).)

8.      In *G.L. v. Ligonier Valley School Dist. Authority* (3rd Cir. 2015) 802 F.3d 601
(*G.L.*) the Court concluded that sections 1415(f)(3)(C) and 1415(b)(6)(B) of the IDEA

18

function together "as a filing deadline that runs from the date of reasonable discovery, not as a cap on a child's remedy for timely-filed claims that happen to date back more than two years before the complaint is filed." (*G.L.*, *supra*, 802 F.3d at p. 616.) The Court explained that the IDEA's statute of limitations does, practically, curtail remedies in some cases: once a violation of the IDEA is reasonably discovered by a parent, any claim for that violation, however far back it dates, must be filed within two years of the "knew or should have known" date; "[i]f it is not, all but the most recent two years before the filing of the complaint will be time-barred; but if it is timely filed, then, upon a finding of liability, the entire period of the violation should be remedied." (*Id.* at pp. 620-621.) The Ninth Circuit Court of Appeals recently affirmed the "knew or should have known" approach in *G.L.* (*Avila v. Spokane School District 81* (9th Cir. 2017) 852 F.3d 936, 2017 WL 1173700.)

9.      A claim accrues for purposes of the statute of limitations when a parent learns of the injury that is a basis for the action, i.e., when the parent knows that the education provided is inadequate. (*M.D. v. Southington Board of Education* (2d Cir. 2003) 334 F.3d 217, 221.) In other words, the statute of limitations begins to run when a party is aware of the facts that would support a legal claim, not when a party learns that it has a legal claim. (See *El Pollo Loco, Inc. v. Hashim* (9th Cir. 2003) 316 F.3d 1016, 1039.)

10.      The "knowledge of facts" requirement does not demand that a party know the specific legal theory or even the specific facts of the relevant claim. Instead, the party must have known or reasonably should have known the facts underlying the supposed disability and their IDEA rights. (*Miller v. San Mateo-Foster City Unified School Dist.* (N.D. Cal. 2004) 318 F.Supp.2d 851, 861[citing *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1111]).

11.      In *Miller, supra*, 318 F.Supp.2d at p. 862, the child's parents became aware that the child may have a specific learning disability, but that the school district assessed him otherwise. The Court concluded the parents knew or should have known the facts that would have given them the required "suspicion of wrongdoing." The Court explained the IDEA does not contain any provision requiring educational authorities or school districts to apprise parents of what types of disabilities trigger the school district's requirement to provide a FAPE.

12.      Title 20 United States Code section 1415(f)(3)(D) and Education Code section 56505, subdivision (l), establish exceptions to the statute of limitations in cases where the parent was prevented from filing a request for due process due to specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint, or the local educational agency withheld information from the parent that was statutorily required to be provided to the parent. (*M.M., supra*, 767 F.3d at p. 859.)

13.      A notice of procedural safeguards must be given by a school district to a parent of a child with a disability a minimum of once a year and or: 1) upon initial referral for assessment or parent request for assessment; 2) upon filing a request for a due process hearing; or 3) upon parent request. (20 U.S.C. § 1415(d)(1)(A); 34 C.F.R. § 300.504(a).)

14.    Prior written notice must be given when the school district proposes or refuses to initiate a change in the identification, assessment, or educational placement of a child with special needs or the provision of a FAPE.  (20 USC §1415(b)(3) & (4); §1415(c)(1), §1414(b)(1); 34 CFR §300.503; Educ. Code §§ 56329 and 56506(a).)

15.    The procedures relating to prior written notice "are designed to ensure that the parents of a child with a disability are both notified of decisions affecting their child and given an opportunity to object to these decisions."  (*C.H. v. Cape Henlopen School Dist.* (3rd Cir. 2010) 606 F.3d 59, 70.)  Prior written notice must be sent "a reasonable time" before the public agency proposes or refuses to initiate or change the identification, evaluation, educational placement or provision of FAPE to the child.  (34 C.F.R. § 300.503(a)(1); Ed. Code, § 56500.4, subd. (a).)  This is to ensure that "parents have enough time to assess the change and voice their objections or otherwise respond before the change takes effect." (*Letter to Chandler,* 59 IDELR 110 (OSEP April 26, 2012).)

16.    A prior written notice must include (1) a description of the action proposed or refused by the agency; (2) an explanation for the action; (3) a description of each evaluation procedure, assessment, record, or report which is the basis of the action; (4) a statement that the parents of an individual with exceptional needs have protection under the procedural safeguards, and the means by which a copy of the procedural safeguards can be obtained; (5) sources for parents to contact to obtain assistance; (6) a description of the other options the IEP considered and the reasons why those options were rejected; and (7) a description of other factors relevant to the proposal or refusal of the agency.  (20 U.S.C. 1415(b)(3) and (c)(1); 34 C.F.R. § 300.503(a) and (b); Ed. Code, § 56500.4, subd. (a) and (b); see also Ed. Code, § 56500.5 [requiring "reasonable written prior notice" that a student "will be graduating from high school with a regular high school diploma . . ."].)  The notice is required even if the change is being proposed by the parent.  (*Letter to Lieberman*, 52 IDELR 18 (OSEP 2008).)

17.    When a violation of such procedures does not actually impair parental knowledge or participation in educational decisions, the violation is not a substantive harm under the IDEA.  (*C.H. v. Cape Henlopen School Dist., supra,* 606 F.3d at p. 70.)

ANALYSIS

CLAIMS THROUGH NOVEMBER 12, 2013

18.    Mother claimed at hearing she did not know in 2013 in what areas District was assessing Student, and did not understand that District did not assess in the areas of concern she expressed, including autism, ADHD, and fine motor.  District did not provide Parents with their procedural rights or prior written notice in January 2013 explaining why it was not assessing Student in autism, ADHD, or fine motor.  However, Parents received and signed the January 2013 proposed assessment plan in Spanish and it identified the areas in which District intended to assess Student.  Mother offered no credible or persuasive testimony that she questioned the content of the assessment plan at any time before the May 2013 IEP

20

meeting, or asked for additional testing between January 2013 and May 2013. She knew or had reason to know in what areas District planned to assess, Parents consented to the proposed assessments, and District did nothing to prevent Parents from challenging the January 2013 assessment plan or asking for additional assessments.

19.     Mother attended the May 2013 IEP meeting, had assistance from a Spanish interpreter, participated in discussions about the assessment results, had the opportunity to ask questions, and acknowledged on the English version of the IEP document her receipt of procedural safeguards. Mother learned for the first time at the May 2013 IEP meeting that District did not find Student eligible for special education, including finding needs in any of the areas in which she voiced concern to Ms. Martinez in late 2012. She understood from the school principal that, based upon Student's young age, the IEP team recommended interventions through student study team meetings, instead of special education eligibility, to allow Student time to mature. Although Mother denied at hearing that District informed her of her right to an independent assessment, her testimony on this issue was not entirely credible. First, Mother was understandably confused during her testimony about events that occurred almost four years before hearing. She frequently referred to "the girls," meaning Student and her twin sister, during her testimony and had to be redirected to focus only on Student. Mother's testimony regarding what she knew about Student's claims back in spring 2013 suggested she was not always clear regarding which daughter she was referring to at this hearing. Although no one offered into evidence a copy of the procedural safeguards provided to Mother at the May 2013 meeting, Mr. Tobey credibly testified District gave them to Parents, and Mother admitted she received them, and signed her initials acknowledging her receipt, notwithstanding her claim at hearing that the interpreter did not accurately interpret the meeting. Mother knew or should have known at the May 2013 IEP that she had procedural rights, including the right to pursue an independent assessment or a due process hearing, if she disagreed with District's decision regarding eligibility or the appropriateness of the multi-disciplinary assessment.

20.     Student offered no persuasive evidence that either exception applied to the statute of limitations for claims arising on or before May 13, 2013. Student did not prove that anything anyone from District said to Mother at the IEP meeting would have prevented Parents from pursuing their rights if they disagreed with the assessment results or the IEP team's decision on eligibility. Student's claims on and before May 13, 2013, are therefore time-barred.

21.     Mother communicated her concerns about Student's progress with Student's teachers at the beginning of the 2013-2014 school year. However, she knew or should have known from May 2013 until November 13, 2013 that she had the right to challenge District's May 2013 assessment and IEP findings. Student offered no evidence of any procedural violations or misrepresentations by District from May 2013 until November 13, 2013 that would have invoked either exception to the statute of limitations. Student did not prove District prevented Parents from pursuing their claims, known to them in May 2013, until the November 13, 2013 student study team meeting. Claims between May 2013 and November 13, 2013 are also time-barred.

*CLAIMS FROM NOVEMBER 13, 2013, THROUGH SEPTEMBER 22, 2014*

22.      District's conduct at the November 13, 2013 meeting, and thereafter,
prevented Parents from pursuing legal rights, and therefore Student's claims are not time
barred from and after November 13, 2013.  School psychologist Ms. Morales credibly
testified that one of the reasons the student study team met on November 13, 2013, was
because at the beginning of the 2013-2014 school year, Mother verbally expressed her
continued concerns to first grade teacher Ms. Rodriguez about Student, including that
Student had a diagnosis of attention deficit disorder.  Mother asked for another assessment.
Mother did not think Student's continued struggles and her ineligibility for special education
supports and services was logical.  Handwritten notes included in the study team report
document Mother's request for an assessment.  Ms. Rodriguez reported to the team that
Student continued to perform low in all academic areas.  She had difficulty retaining
information, which Ms. Rodriguez opined might be a disability.  Student's scores on testing
during the first semester were well below average.  She scored very low when asked to
identify high frequency words and in fluency.

23.      However, in response to Mother's verbal request for an assessment,
Ms. Morales told Mother at the meeting that assessing Student at that time was too soon after
the kindergarten assessment.  Elm Street principal Ms. Ramos told Mother that District staff
were providing help at school, would give her more support, would take her out of first grade
and send her to a kindergarten educational team to see if she could learn, and would modify
her work by giving her kindergarten work.  Mother would take her to the library to work on
her homework.  Mother credibly and persuasively testified that Ms. Ramos convinced
Parents that Student would be "labeled" as "disabled" if District assessed her.  The student
study team notes reflect in a handwritten note that Parents withdrew their request for
assessment at the meeting.

24.      Mother's testimony established that Parents relied on Ms. Ramos's and
Ms. Morales's representations, causing them to believe District had resolved their concerns
with the solutions offered at that meeting.  No one rebutted Mother's testimony that
Ms. Ramos warned Parents that assessing Student would effectively stigmatize her at school.
Notwithstanding that they had received procedural safeguards in May 2013, Parents
reasonably relied on those misrepresentations at the November 13, 2013 meeting, and as a
result they withdrew their assessment request.

25.      District also omitted important and valuable information for Parents by failing
to provide Parents with prior written notice at or after the November 2013 student study team
meeting in response to Parents' requests for an assessment.  District did not inform Parents in
writing, or in the student study team notes, that instead of asking District for another
assessment, they continued to have the right to challenge Mr. Tobey's assessment by asking
for an independent educational evaluation.  Nor did District inform Parents that they could
challenge, through due process, the findings of the May 2013 IEP team, or the November
2013 student study team's decision that Student did not need an assessment for special

education.  No one explained parental rights under the IDEA to parents, in part because none of the student study team members, except school psychologist Ms. Morales, had any training in special education procedures.

26.     District's misrepresentations that the problem had been solved through student study team interventions, and its failure to give prior written notice or procedural safeguards, caused Parents to withdraw their request for assessments and not pursue claims and rights on Student's behalf until at least February or March 2016, when Mother contacted a private consultant for help.  District's misrepresentations in November 2013 met one of the two exceptions to the statute of limitations.  Its failure to provide prior written notice or another copy of procedural safeguards met the second exception.

27.     Student's Issues 1 through 4, dating back to November 13, 2013, are not barred by the statute of limitations.

*Issue 1: Child Find and Duty to Assess*

28.     Student contends District failed its "child find" obligation by failing to appropriately assess her and failing to find her eligible for special education under the eligibility categories of other health impairment, language or speech disorder, or specific learning disability during the relevant statutory period.  District contends it offered to assess in March 2016 and Parents declined to consent until after they filed for due process, arguing her claims should therefore be limited to before March 2016.

LEGAL AUTHORITY

29.     The legal conclusions reached under the discussion of the statute of limitations are incorporated by reference.

30.     Under the IDEA and California law, a school district has an affirmative, continuing obligation to identify, locate, and evaluate all children with disabilities residing within its boundaries.  (20 U.S.C. § 1412(a)(3); Ed. Code, § 56300 et seq.)  The duty is not dependent on any action or inaction by parents; the district must "actively and systematically seek out all individuals with exceptional needs" who reside in the district.  (Ed. Code, § 56300.)  In addition, the district must develop and implement "a practical method" to locate those individuals.  (Ed. Code, § 56301.)

31.     A local educational agency shall provide for the identification and assessment of the exceptional needs of an individual, and the planning of an instructional program to meet the assessed needs.  Identification procedures shall include systematic methods of utilizing referrals of pupils from teachers, parents, agencies, appropriate professional persons, and from other members of the public.  Identification procedures shall be coordinated with school site procedures for referral of pupils with needs that cannot be met with modification of the regular instructional program.  (Ed. Code § 56302.)

32.    Before any action is taken with respect to the initial placement of an individual with exceptional needs in special education instruction, an individual assessment of the pupil's educational needs shall be conducted, by qualified persons in accordance with testing requirements set forth in Education Code section 56320 subds. (a) through (i).  (Ed. Code §§ 56320 & 56322.)

33.    All referrals for special education and related services shall initiate the assessment process and shall be documented.  (20 C.C.R. § 3021.)  A local educational agency must assess a special education student in all areas of suspected disability. (20 U.S.C. § 1414(b)(3)(B); 34 C.F.R. § 300.304 (c)(4); Ed. Code, § 56320, subd. (f).)  To assess or reassess a student, a school district must provide proper notice to the student and his or her parents. ( 20 U.S.C. § 1414(b)(1); Ed. Code, §56381, subd. (a).)  The notice consists of the proposed assessment plan and a copy of parental and procedural rights under the IDEA and state law.  (20 U.S.C. § 1414(b)(l); Ed. Code, § 56321, subd. (a).)  The assessment plan must be understandable to the student, explain the assessments that the district proposes to conduct, and provide that the district will not implement an IEP without the consent of the parent.  (Ed. Code, § 56321, subd. (b)(l)-(4).)  The proposed written assessment plan must contain a description of any recent assessments that were conducted, including any available independent assessments and any assessment information the parent requests to be considered, information about the student's primary language and information about the student's language proficiency.  (Cal. Code Regs., tit. 5, § 3022.)

34.    A pupil shall be referred for special educational instruction and services only after the resources of the regular education program have been considered and, where appropriate, utilized.  (Ed. Code § 56303.)

35.    The parents or guardians of a pupil who has been referred for initial assessment, or of a pupil identified as an individual with exceptional needs, shall be afforded an opportunity to participate in meetings with respect to the identification, assessment, and educational placement and the provision of a FAPE.  (34 CFR § 300.501; Ed. Code § 56304.)

ANALYSIS

*KINDERGARTEN THROUGH NOVEMBER 2013*

36.    The statute of limitations barred this claim before November 2013.  The statutory bar discussed above precludes any entitlement by Parents or Student to any remedies for that time.  The procedural violations that existed prior to November 2013 are discussed here solely as background to the remedies ordered below.

37.    Student met her burden of proof that District never assessed her in *all* areas of suspected need before she filed her complaint.  Although outside the statutory period, District did not assess Student in all areas of suspected need in spring 2013.  Mr. Tobey designed the referral questions without considering that Mother had expressed concern about attention deficit disorder, autism, and fine motor skills.  He administered assessments

24

looking only at specific learning disability and emotional disturbance as possible bases for eligibility, disregarding the referral data on the COST form. He also considered whether circumstances at home and outside of school impacted Student at school. Although District assessed in academics, it did not assess in any of the areas of Mother's concern. Ms. Schnee credibly opined that Student's deficits as she saw them in 2017 were historic and profound, and had District fully assessed Student in all areas of need in May 2013, Student should have been found eligible, even though she was young, based upon developmental factors.

38.     The evidence established that, while Student was in kindergarten and during the first semester of first grade, District procedurally violated the IDEA by failing to assess her in all areas of suspected need. Because of its failure, District deprived Parents of all necessary information for the decision-making process at the May 2013 IEP meeting. District's failure to fully assess in May 2013 also deprived Student of educational benefit and denied her a FAPE because she did not receive, during the fall semester of first grade, educational instruction in an appropriate setting from a special education teacher, or needed services such as speech and language therapy.

39.     However, District complied with the statutory "child find" obligation to actively and systematically seek out individuals with special needs. District timely responded to Mother's verbal request for an assessment, referred her request to the COST team, held a student study team meeting in December 2012 with Parents, generated an assessment plan which Mother signed, and assessed Student in the spring of 2013. It held an IEP meeting in May 2013 and provided Parents with the appropriate procedural safeguards. District met its statutory "child find" duties as contemplated under Education Code sections 56300 and 56301.

### NOVEMBER 2013 THROUGH SEPTEMBER 2016

40.     From November 2013 until at least September 22, 2016, District procedurally violated the IDEA by failing to refer Student for assessments and failing to assess Student in all areas of suspected need. Student proved all three prongs of the analysis for procedural violations applied.

41.     First, under *Rowley, supra,* 458 U.S. at p. 201, and *Endrew, supra,* 137 S.Ct. at p. 999, District's failure to assess Student denied her a FAPE and any progress appropriate based upon her circumstance. District should have at least reassessed Student for eligibility from and after November 2013, based on her lack of any appropriate academic progress, Parents' report that Student had been diagnosed with attention deficit disorder, and Mother's concerns of possible autism and deficits in fine motor skills. Ms. Morales compared Student to a blooming flower, instead of acknowledging Student had increasing needs and deficits that should have been assessed. District should have also assessed Student's language and speech disorders based upon her consistent low scores in vocabulary and poor language development, in the first, second and third grades. She consistently had low memory retention, struggled with numbers and spelling, but District did not assess her in academics. She struggled with fine motor skills, such as holding a pencil, but District did not consider

assessing her in occupational therapy. In second grade, District acknowledged her ongoing struggles at school. District expressed concerns about her tardiness, attributing her poor performance in part to absences and lateness. The team added interventions to her program in the form of special education services as a "guest" at the end of second grade in May 2015. The student study team justified the additional interventions as an alternative to assessing Student, hoping that doing so would help Student transition successfully to an English-only program. The team, which included special education resource teacher Ms. Jue, deferred assessments with a "wait and see" mindset. Those advanced interventions, to the extent Student accessed them, did not help Student make any progress. Student was progressively falling behind, which impacted her emotionally and caused her to avoid school, because she could not keep up with her classmates. District recommended outside counseling, but did not offer to assess.

42.      The evidence was overwhelming that District had enough information from November 2013 and through third grade to trigger its duty under the IDEA to reassess Student for special education eligibility. Instead, District relied instead on its practice of using the student study team process to address Student's growing needs, which proved to be disastrous for Student. While it was not unreasonable for District to try using some interventions through the student study team during first grade, the persistent reliance on the student study team process, as opposed to assessing in all areas of suspected need, denied Student a FAPE. With proper assessments, she should have been found eligible for special education as early as fall 2013. She would have received specialized academic instruction from a special education teacher in a smaller classroom. She would have received speech therapy and possibly other related services from licensed providers trained to work with children with special needs. She would have had the benefit of an IEP team knowledgeable in special education procedures to evaluate her progress, establish goals, and monitor and report on her progress. Student received none of those benefits through the time of hearing.

43.      During the first grade in 2013-14, Student was performing at below basic level and needed improvement in all aspects of language arts, and three out of five areas of math. Her skills in vocabulary recognition, spelling and language were minimal. She needed improvement in homework completion. She performed relatively better when instructed in Spanish. Student's first grade teacher did not know that Student had been assessed until the November 2013 student study team meeting. No one from District considered assessing Student for special education eligibility in any of the areas of suspected need evident to the student study team, and Parents. Ms. Morales and Ms. Ramos persuaded Parents to withdraw their request for assessments at the November 2013 student study team meeting, even though Student's records included the December 2012 COST referral which clearly noted Mother's concerns that Student had attention deficit hyperactivity disorder, autism and dyslexia.

44.      During the second grade in 2014-15, Student continued to struggle. Mother attended a school board meeting during the 2014-2015 school year to express her concerns. The student study team met three times. By the end of the school year, the team had implemented interventions and supports that included providing Student with special

26

education services in speech therapy, and resource support as a general education student. Yet, even though District considered assessing Student at the May 2015 meeting, District deferred assessing Student, instead changing her program to an English-only program. District did not start assessments of Student until 18 months later, in November 2016. Ms Schnee, Ms. Dominguez, Ms. Villapadua, and Ms. Roman credibly testified that Student had significant learning deficits in reading, writing, language processing, and fine motor, which were documented throughout Student's cumulative records, justifying the need for assessments from at least the time Student was in first grade.

45.     Student's third grade teachers in 2015-16 noted Student's deficits in vowel and consonant identification, number identification, language processing, and fine motor skills; her testing scores were consistently low in most areas. The student study team created and modified tiered interventions that became more intensive as Student's deficits became more noticeable. Her deficits did not occur over a short period of time; the deficits were historic and pervasive. Ms. Cervantes was concerned at the beginning of third grade that Student performed well below expected performances levels, prompting her to talk with Ms. Morales, Ms. Jue, and Ms. Ramos about assessing Student.

46.     Parents regularly asked Student's teachers and other District staff to help Student with her delays in learning before and throughout third grade. Mother contacted the school superintendent for help in March 2016. Parents were genuinely and legitimately concerned about Student's lack of progress and regularly expressed those concerns to District staff.

47.     Student's fourth grade teacher, Ms. Wright, became concerned in the fall of 2016 that Student was not making progress at school. At that point, Student was performing at early first grade level in most areas.

48.     Following the reasoning in the Ninth Circuit Court of Appeals in *Timothy O. v Paso Robles Unified School Dist.* (9th Cir. 2016) 822 F.3d 1105, 1124-1125, District's failure to assess Student from and after November 2013 substantially hindered Parents ability to participate in Student's educational program, and seriously deprived Parents, Student's teachers and District staff of the information necessary to develop an appropriate educational program with appropriate supports and services for Student. The outcome of the 2016-2017 District assessments, in combination with Ms. Schnee's, Ms. Dominguez's, Ms. Wright's and Ms. Roman's assessment reports and testimony, further proves this point. District found Student eligible for special education as other health impaired based upon her attention deficit disorder, and language and speech disorder based on her significant language processing deficits. Her levels of performance were 99.9 percent below those of children at the same age. Ms. Roman, Ms. Schnee and Ms. Cervantes credibly testified, and the student study team notes reflected, that Student historically demonstrated the same types of deficits as those found in District's multidisciplinary assessments. District should have found Student eligible as far back as November 2013. Its failure to do so deprived Parents of the opportunity to participate in an informed and meaningful way in her academic program from November 2013 through the time of hearing.

27

49.     Student met her burden of proving by the preponderance of evidence that, from November 13, 2013 through at least March 2016, when District offered Parents an assessment plan, District procedurally violated the IDEA by 1) failing to refer Student for reassessments for special education eligibility from and after November 13, 2013, 2) declining to assess based on Parents' requests without providing appropriate procedural safeguards or prior written notice, and 3) failing follow up in attempting to have Parents sign the March 2016 assessment plan in a timely manner.  The procedural violations resulted in 1) Student not being eligible for special education, 2) denied her a FAPE and the opportunity to acquire educational benefit from and after November 2013, and 3) deprived Parents of necessary information to allow them to participate in a meaningful way at an IEP meeting. Remedies will be discussed below.

*Issues 2 and 3:  Failure to offer Student an appropriate IEP*

50.     Student contends in Issue 2 that District denied a FAPE because it failed to offer Student an appropriate IEP during the statutory period that met her unique needs in academics and language.  In Issue 3 Student contends District denied Student a FAPE because it failed to offer Student an IEP that was reasonably calculated to offer her educational benefit.  District contends on both issues that Student demonstrated some progress through the second grade with student study team interventions, and that any liability for denial of FAPE should be limited to before March 2016 when District offered to assess Student.  The two issues will be analyzed together.

52.     Legal authorities and conclusions discussed in the preliminary issue and Issue 1 are incorporated by reference.

53.     Whether Student was denied a FAPE is determined by looking to what was reasonable at the time, not in hindsight.  (*Adams v. State of Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149 (*Adams*), citing *Fuhrman v. East Hanover Bd. of Education* (3d Cir. 1993) 993 F.2d 1031, 1041.)[4]

54.     District's 2017 multidisciplinary assessment and Ms. Schnee's assessment report, which was generated after Parents filed their due process complaint, and Ms. Schnee's, Ms. Dominguez's, Ms. Wright's and Ms. Ramon's  opinions revealed Student's historic educational needs and applied to what District should have known about Student's needs from November 2013 until September 22, 2016.  Both Ms. Schnee's and

---

[4]  In *E.M. v Pajaro Valley Unified School Dist., et al.* (9th Cir. 2011) 652 F.3d 999, 1006, the Ninth Circuit Court of Appeals held that the district court erred by not considering whether a report generated three years after the due process hearing was otherwise admissible and relevant to the determination of whether the district met its obligations to the student under the IDEA several years earlier.  (*E.M., supra,* 652 F.3d at p. 1006.)  The holding in *E.M.* does not abrogate the general principle articulated in *Adams, supra*, 195 F.3d at p.1149, that the actions of school districts cannot be judged exclusively in hindsight.

District's assessments confirmed that Student had disabilities that historically and significantly impacted her access to her education. The 2017 assessment confirmed that Student had historic and ongoing deficits in reading, language processing, attention, fine motor and social emotional skills that impacted her ability to access her education beginning in first grade and continuing through the time of hearing. District witnesses who assessed Student in 2017 agreed that Student required an IEP with comprehensive goals and related services to address those needs, and additional assessments. Those disabilities should have qualified her for special education in 2013 under the eligibility categories of other health impairment related to her attention deficit disorder, and speech and language impairment related to her language processing deficits. During this hearing, Student's IEP team found her eligible for special education. Student's needs were the same from first grade until the 2017 assessments, establishing that Student should have been found eligible for special education as early as May 2013.

55.     Student met her burden of proof on Issues 2 and 3, proving by a preponderance of evidence that 1) District denied Student a FAPE by failing to offer or provide Student an IEP from November 2013 until September 22, 2016, that addressed all her unique needs in academics and language development, and 2) District failed to offer or provide an IEP that was reasonably calculated to enable Student to make progress appropriate in light of Student's circumstance, which was known to District staff from as early the first semester of first grade.

56.     District argued its liability should be limited because it had attempted since March 2016 to assess Student without receiving cooperation from Parents. The argument was not persuasive. Failed attempts to obtain consent did not abrogate District's duty to act proactively to ensure Student's needs were identified and addressed. Under *I.R. v Los Angeles Unified School Dist.* (2015) 805 F.3d 1164, District could have filed for due process at any time during spring 2016, or after, to obtain an order granting it permission to assess Student without parental consent, and it did not do so.

57.     In summary, District's failure to assess Student in all areas of need at any time on or after November 13, 2013, through September 22, 2016, meant she was not eligible for special education services and supports. She did not have an IEP with goals and related services designed to address her unique needs. District deprived her of an educational benefit, as evidenced by her significant lack of progress up to the time of hearing. Additionally, District's failure to assess and develop an appropriate IEP in a timely manner deprived Parents and school staff of the opportunity to have enough information to participate in a meaningful way to develop an appropriate educational program for Student.

*Issue 4: Procedural Violations*

58.     Student contends District procedurally violated the IDEA by a) failing to provide Parents with a copy of special education procedural safeguards; and b) failing to inform Parents of District's obligation to offer assessments or provide an assessment plan if a

need for special education services was suspected. As a result, Student contends Parents were deprived of the opportunity to participate in a meaningful way in the development of Student's educational program.

59.    District contended that its practice was to provide parents with information during student study team meetings, occasionally conduct those meetings in the parents' native language, or provide an interpreter, and it provided ongoing training to the school principals and assistant principals on child find and special education assessment referrals. District also contended that, although many of the general education teachers were not familiar with child find and assessment referrals, they participated in the COST referral process and student study team meetings.

LEGAL AUTHORITY

60.    The parents of a child with a disability must be afforded an opportunity to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of FAPE to the child. (34 C.F.R. § 300.501(a); Ed. Code, § 56500.4.) A parent has participated in the development of an IEP in a meaningful way when he or she is informed of the child's problems, attends the IEP meeting, expresses disagreement regarding the IEP team's conclusions, and requests revisions in the IEP. (*N.L. v. Knox County Schools* (6th Cir. 2003) 315 F.3d 688, 693; *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d at p. 1036 [parent who has an opportunity to discuss a proposed IEP and whose concerns are considered by the IEP team has participated in the IEP process in a meaningful way].)

61.    In matters alleging procedural violations, the denial of a FAPE may only be shown if the procedural violations impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE, or caused a deprivation of educational benefits. (Ed. Code, § 56505, subd. (f)(2); see also *W.G. v. Board of Trustees of Target Range School Dist. No. 23* (9th Cir. 1992) 960 F.2d 1479, 1484 (*Target Range*).) The hearing officer "shall not base a decision solely on non-substantive procedural errors, unless the hearing officer finds that the non-substantive procedural errors resulted in the loss of an educational opportunity to the pupil or interfered with the opportunity of the parent or guardian to participate in the formulation process of the individualized education program." (Ed. Code, § 56505, subd. (j).)

62.    Procedural violations that interfere with parental participation in the development of the IEP "undermine the very essence of the IDEA." (*Amanda J. v. Clark County School Dist.* (9th Cir. 2001) 267 F.3d 877, 892.) An IEP cannot address the child's unique needs if the people most familiar with the child's needs are not involved or fully informed. (*Ibid.*) A school district cannot independently develop an IEP without input or participation from the parents and other required members of the IEP team. (*Target Range, supra,* 960 F. 2nd at p. 1484.)

63.     A notice of procedural safeguards must be given by a school district to a
parent of a child with a disability a minimum of once a year and/or: 1) upon initial referral
for assessment or parent request for assessment; 2) upon filing a request for a due process
hearing; or 3) upon parent request. (20 U.S.C. § 1415(d)(1)(A); 34 C.F.R. § 300.504(a).)

ANALYSIS

64.     The legal authorities and conclusions from the preliminary issue of the statute
of limitations, and Issues 1 through 3 are incorporated by reference.

65.     District committed procedural violations of the IDEA by failing to provide
prior written notice of its refusal at student study team meetings to assess, and failing to
inform Parent of District's obligation to offer assessments or provide an assessment plan.
Those violations met each of the three procedural analytical prongs discussed above.

66.     For example, District's standard policy was not to proceed straight to the
special education assessment process under the IDEA when requested, but instead to go
through the COST referral and student study team process, using the response to intervention
strategy in lieu of assessments. However, an RTI process does not replace the need for a
comprehensive evaluation. A public agency must use a variety of data gathering tools and
strategies even if an RTI process is used. The results of an RTI process may be one
component of the information reviewed as part of the evaluation procedures. An evaluation
must include a variety of assessment tools and strategies and cannot rely on any single
procedure as the sole criterion for determining eligibility for special education and related
services. (71 Fed. Reg. 46648 (Aug. 14, 2006).) Therefore, response to intervention is not
intended to be used as a substitute for the assessment process under the IDEA.

67.     Ms. Ramos's statements to Parents at the November 13, 2013 meeting,
warning that Student might be stigmatized by assessments, effectively misrepresented what
the IDEA requires a District to do when a Parent asks for an assessment. It also
demonstrated lack of knowledge at that time by a school administrator as to the proper
procedures for referring a child with a suspected disability for special education assessments,
or for providing the required procedural safeguards to parents.

68.     As another example, in response to Father's request to retain Student at the
May 2015 student study team meeting, although team members agreed an assessment might
be appropriate for Student, they recommended deferring assessing Student and to try instead
a "wait and see" intervention by changing her program to an English language immersion
program, with special education "guest" support. Yet, at no time during the meeting did
District expressly offer to assess Student or to provide Parents with an assessment plan,
giving them the opportunity to consent to assessments or reject them. District failed to
clearly explain to Parents, in writing, that they had a right to request an assessment for
Student at that time, and District had an obligation to provide them an explanation in writing
why it declined to do so. Instead, Parents concluded they had no other option but to agree

with District's proposal to "wait and see" hoping the change in program would help Student succeed in school. The student study team notes from that meeting made no reference to the subject of special education assessments, or the compromise arrangement District made with Parents.

69.     The procedural violations significantly impeded Parents' opportunity to participate in the decision-making process regarding the provision of a FAPE. Although Parents participated at and asked questions at student study team meetings, expressed concerns to District staff and participated in the development of the interventions, Parents' participation was not fully informed by the assessment information they should have had, had assessments been conducted. District's failure to timely offer Parents an assessment plan and pursue assessments of Student, or provide procedural safeguards, from and after November 2013, was a substantial procedural violation that deprived Parents of the opportunity to participate in a meaningful way, denied Student educational benefit, and Student a FAPE.


REMEDIES

1.      Student prevailed on all issues from November 13, 2013, through September 22, 2016. Student requested several remedies in her complaint, including a finding of eligibility, compensatory education, independent educational evaluations and training of District staff. However, after the complaint was filed, District conducted multidisciplinary assessments, and Student obtained Ms. Schnee's private assessment. The parties stipulated after hearing that Student was eligible for special education. Therefore, the remedies discussed below take into consideration the evidence the parties offered at hearing, their stipulation, and their closing arguments relating to currently appropriate remedies.

2.      School districts may be ordered to provide compensatory education or additional services to a student who has been denied a FAPE. (*Student W. v. Puyallup School Dist.* (9th Cir. 1994) 31 F.3d 1489, 1496.) These are equitable remedies that courts may employ to craft "appropriate relief" for a party. An award of compensatory education need not provide a "day-for-day compensation." (*Id.* at pp. 1496-1497.) The conduct of both parties must be reviewed and considered to determine whether equitable relief is appropriate. (*Id.* at p. 1496.) An award to compensate for past violations must rely on an individualized assessment, just as an IEP focuses on the individual student's needs. (*Reid ex rel. Reid v. District of Columbia* (D.D.C. Cir. 2005) 401 F.3d 516, 524, citing *Student W. v. Puyallup School District* (9th Cir. 1994) 31 F.3d 1489,1497.) The award must be fact-specific and be "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." (*Reid ex rel. Reid v. District of Columbia* (D.D.C. Cir. 2005) 401 F.3d 516, 524.)

3.      Here, Student first seeks an order finding Student eligible for special education under the eligibility categories of other health impairment and speech and language impairment. The parties' stipulation renders the requested remedy moot.

4.      Next, Student seeks four years of compensatory academic instruction from Lindamood-Bell or another similar program. Ms. Schnee recommended a blended program for Student, suggesting Lindamood-Bell was appropriate. Ms. Sugden testified District was in the process of contracting with Lindamood-Bell to provide services to the District. She acknowledged that a blended program for Student, incorporating compensatory educational hours with services, supports and other specialized academic instruction was feasible for Student. However, at the time of hearing, no witness credibly testified as to what was the appropriate number of hours of compensatory education for Student. Nevertheless, because the evidence unequivocally established that, during the applicable statutory period, Student was deprived of almost three years of educational benefit by District's failure to find her eligible for special education in November 2013, its failure to offer to or assess her in all areas of suspected disability between November 2013 and September 2016, and its failure to provide special education instruction, services and supports through the date Student filed her due process complaint, Student is equitably entitled to compensatory educational services to address her needs in academics.

5.      Therefore, District shall fund a comprehensive independent educational evaluation of Student by a licensed educational therapist or a nonpublic agency of Parents' choosing. The evaluator shall consider Student's academic needs both during the regular and extended school year, and during school breaks. District shall hold an IEP meeting not later than 30 calendar days after it receives the private evaluation report and recommendations, unless mutually agreed otherwise by District and Parents. The IEP team shall discuss the educational evaluation and develop an appropriate educational program for Student considering the evaluator's recommendations, including any recommendations for educational therapy after school hours or during breaks to compensate Student for missed specialized academic instruction from November 13, 2013 until September 22, 2016. District shall also fund up to four hours at the evaluator's usual hourly rate to prepare for and attend the IEP meeting.

6.      In the interim, until the assessment and IEP team meeting are completed, Student is entitled to compensatory education. Considering the evidence of Student's attentional issues and her severe learning deficits, providing hour for hour compensatory services is not practical. District shall fund a block of 72 hours, based upon three hours a week for six months, of compensatory academic instruction. These services are intended to provide Student with compensatory education until the educational evaluation is completed and the IEP team meets. The services shall be provided by a licensed educational therapist or non-public agency of Parents' choosing. The services shall be provided at a site that is convenient to Parents; if no site is available within the District's boundaries, District shall reimburse Parents for the cost of round trip transportation to the nearest location available to Student for the services based on the then current Federal rate. The block of hours may be used regardless if school is in session. The block of hours shall be available to Student

through March 31, 2018.  Student shall forfeit any unused hours ordered by this Decision after that date.  The compensatory education hours ordered by this Decision shall not be Student's "stay put" under title 20 United States Code section 1415(j), unless the IEP team decides otherwise with parental consent.  This remedy is in addition to any reasonable number of compensatory hours recommended by the independent evaluator and agreed to by the IEP team, including Parents.  This remedy does not impact Student's right to challenge the resulting IEP through due process.

7.      Student requests independent educational evaluations in autism, occupational therapy, physical therapy, and vision therapy based on her assertion that District never assessed Student before September 22, 2016.  Student is equitably entitled to a publicly funded independent educational evaluation focused on whether she demonstrates needs attributable to autistic-like characteristics by a qualified provider chosen by Parents.  District shall fund the assessment within 90 calendar days of this Decision in accordance with District policies for independent assessments.  However, because District administered testing for autism in its 2016-2017 multi-disciplinary assessment, the publicly funded evaluation ordered by this Decision shall satisfy Student's right to an independent assessment in autism if she challenges District's 2016-2017 assessments.

8.      Although Mother expressed concerns to Student's teachers and the student study team from and after November 2013 that Student struggled with grasping a pen and other fine motor skills, District did not assess her in occupational therapy before September 22, 2016.  Accordingly, Student is equitably entitled to a publicly funded independent occupational therapy evaluation by a qualified provider chosen by Parents.  District shall fund the assessment in accordance with District policies for independent assessments.  District shall fund the assessment within 90 calendar days of the date of this Order, and hold an IEP meeting within 30 days after its receipt of the assessment report, unless otherwise agreed by District and Parents.  The evidence was not conclusive that District assessed Student in occupational therapy in 2016-2017.  If it did so, the publicly funded evaluation ordered by this Decision shall satisfy Student's right to an independent assessment in occupational therapy if she challenges District's 2016-2017 occupational therapy assessment.  This remedy does not impact Student's right to challenge the resulting IEP through due process.

9.      Student seeks an independent educational evaluation regarding vision therapy. Student did not meet her burden of proof.  She offered no credible expert testimony or other evidence that Student exhibited deficits in vision before September 22, 2016, that should have prompted District to assess in that area during the statutory period.  The student study team members recommended Parents have Student medically evaluated in vision based on Mother's report at the September 2014 student study team meeting.  Student offered no evidence that the condition impacted her at school.  Ms. Roman noted at hearing that Student failed a vision exam, but did not opine that vision was a historic area of need based upon her review of Student's cumulative records.  Ms. Schnee's opinions regarding vision therapy

were equivocal, rendering them not persuasive as to the issues in this matter. Student is not entitled to an independent educational evaluation at public expense in vision as a remedy for claims in this matter.

10. Similarly, Student offered no evidence or expert testimony that supports a finding that District should have assessed Student in physical therapy before September 22, 2016. Student is not entitled to an independent educational evaluation at public expense in physical therapy as a remedy for the claims raised in this matter.

11. Next, Ms. Schnee and Ms. Dominguez agreed, and the evidence established, Student required speech and language therapy. Student had significant and historic language processing and memory issues. She required extensive interventions and supports to help her gradually acquire the language skills she had not received from first grade until September 2016. But, Ms. Schnee's recommendation of speech therapy 60 minutes daily five days a week, when considered in the context of Student's disabilities and unique needs, including what would be a far more intensive academic program than she had previously received, was excessive. Ms. Schnee's testimony and recommendations in her report were not clear as to whether her recommendations were focused on Student's daily program at school, or for compensatory purposes, or both. Ms. Dominguez's recommendation of 30 minutes two to three times a week was more plausible for Student's daily academic program given her unique needs. However, Ms. Dominguez's testimony was not clear as to whether she recommended those services as part of Student's IEP, or as compensatory services, or both.

12. Based on the evidence of Student's delays in language development, her attention span, and her memory deficits, Student is entitled to publicly-funded compensatory services in speech and language. Student received some speech therapy during second grade although neither party offered evidence as to the details of that service or for how long it was provided. Considering Ms. Schnee's recommendation of five hours a week of speech therapy, and Ms. Dominguez's recommendation of 30 minutes two or three times a week, Student is equitably entitled to a block of 120 hours of speech and language therapy, based upon 60 minutes a week for 40 weeks a year, including four weeks for summer, from November 13, 2013 until September 22, 2016, when District failed to assess Student. The services shall be provided by a nonpublic agency or licensed speech therapist chosen by Parents, focusing on Student's IEP goals developed by her IEP team. The service provider shall determine whether the compensatory services will be delivered individually or in a small group setting, based on Student's IEP goals. District shall reimburse Parents for the cost of round trip transportation to the nearest location available to Student for the services based on the then current Federal rate. The compensatory services may be used regardless of whether school is in session, including during breaks and summer. The block of hours shall be available to Student through December 31, 2019. Student shall forfeit any unused hours after that date.

13.    Because District failed several times to assess Student in speech and language development, and based on Student's notable language deficits during the statutory period, Parents are equitably entitled to reimbursement for Ms. Schnee's assessment in an amount not to exceed $4,050.

14.    In addition, staff training is an appropriate compensatory remedy under these facts.  The IDEA does not require compensatory education services to be awarded directly to a student.  Staff training can be an appropriate compensatory remedy, and is appropriate in this case.  (*Park v. Anaheim Union High School Dist.* (9th Cir. 2006) 464 F.3d 1025,1034 [student, who was denied a FAPE due to failure to properly implement his IEP, could most benefit by having his teacher appropriately trained to do so].)  Appropriate relief considering the purposes of the IDEA may include an award that school staff be trained concerning areas in which violations were found, to benefit the specific pupil involved, or to remedy procedural violations that may benefit other pupils.  (*Ibid*. Also, e.g., *Student v. Reed Union School Dist.,* (Cal. SEA 2008) Cal. Ofc. Admin. Hrngs. Case No. 2008080580] [requiring training on predetermination and parental participation in IEP's]; *Student v. San Diego Unified School Dist.* (Cal. SEA 2005) 42 IDELR 249 [105 LRP 5069] [requiring training regarding pupil's medical condition and unique needs].)

15.    District acknowledged that it trains school principals and vice principals in special education referrals.  But it also admitted that general education teaching staff did not receive training, but instead used the COST and student study team process to address children who needed help.

16.    Student's kindergarten, first, second, third and fourth grade general education teachers had no District training on the appropriate procedures under the IDEA for referring a child who is suspected of having a disability that may qualify that child for special education services.  Although this occurred prior to the statutory period, District staff at Juan L. Soria School did not directly commence assessments of Student when Mother expressed concerns.  Instead, they first met privately as part of a COST team, and then held a student study team meeting to discuss whether to assess.  They did not assist Mother in putting her request in writing.  Mr. Tobey's assessment excluded areas of concern voiced by Mother, and documented by Ms. Martinez.  The May 2013 IEP team did not fully explain, if at all, to Parents why they excluded areas of concern Mother reported to Ms. Martinez.

17.    Testimony from Elm school principal Ms. Ramos and school psychologist Ms. Morales demonstrated they also did not understand the appropriate procedural requirements under the IDEA for referring children for special education assessments. District staff persuaded Parents to withdraw their request for assessments in November 2013, claiming assessing was too soon and would stigmatize Student.  They neglected to provide Parents with procedural rights and prior written notice after doing so.  In May 2015, the student study team deferred assessments, and instead made a change in Student's program, with a "wait and see" mindset.  Several of District's witnesses confirmed that District's standard process when a parent asked for an assessment, particularly of a child as young as Student was in 2013, was to refer the request, whether verbal or in writing, to the COST

team, which then determined without any parental participation whether to hold a student study team to discuss a possible referral for assessment. No one assisted Parents in documenting their assessment requests in writing, as required by the IDEA.

18.     While some early intervention for Student before another assessment may have been appropriate after her initial assessment in kindergarten, the District did not procedurally comply with the IDEA when Parents asked for another assessment in November 2013. Additionally, District staff relied on responses to intervention over the span of seven student study team meetings, instead of assessing Student after she consistently failed to make any notable progress.

19.     Therefore, to ensure that all students and parents within District receive the benefits contemplated under the IDEA, staff training in special education and IDEA procedures, including the proper process for referral for assessments and child find obligations is an appropriate remedy.

## ORDER

1.     Student is entitled to no remedies for Student's claims before November 13, 2013 because they are time-barred. Therefore those claims are dismissed.

2.     District shall, within 120 days of this Decision, fund a comprehensive independent educational evaluation of Student by a licensed educational therapist or comparable agency of Parents' choosing. The assessor shall evaluate Student's academic needs at school and determine a reasonable number of compensatory hours needed to assist her in making progress toward grade level, based on her claims from November 2013 until September 22, 2016, when she received no special education instruction. District shall hold an IEP meeting not later than 30 calendar days after it receives the private evaluation report and recommendations, unless mutually agreed otherwise by District and Parents. The IEP team shall discuss the evaluation and, considering the evaluator's recommendations, develop an appropriate educational program, including a reasonable number of compensatory hours, for Student. District shall fund up to four hours at the evaluator's usual hourly rate to prepare for and attend the IEP meeting.

3.     District shall fund a block of 72 hours, based upon three hours a week for six months, of compensatory academic instruction. The services shall be provided by a licensed educational therapist or non-public agency of Parents' choosing. The services shall be provided at a site that is convenient to Parents; if no site is available within the District's boundaries, District shall reimburse Parents for the cost of round trip transportation to the nearest location available to Student for the services based on the then current Federal rate. The block of hours may be used regardless if school is in session. The block of hours shall be available to Student through March 31, 2018. Student shall forfeit any unused hours after that date. The compensatory education hours shall not be Student's "stay put" under title 20 United States Code section 1415(j), unless the IEP team decides otherwise with parental

consent. This remedy is in addition to any reasonable number of compensatory hours recommended by the independent evaluator and agreed to by the IEP team, including Parents. This remedy does not impact Student's right to challenge the resulting IEP through due process.

4.     District shall within 30 days of this Decision fund independent educational evaluations in autism, and occupational therapy, including fine and gross motor, by qualified providers of Parents' choosing. District shall hold an IEP meeting not later than 30 calendar days after it receives the last of the two assessment reports and recommendations, unless mutually agreed otherwise by District and Parents, to discuss the evaluations and incorporate agreed upon recommended services into Student's IEP. These independent evaluations shall satisfy Student's right to independent evaluations if Student challenges District's 2016-2017 multidisciplinary assessments of Student in the areas of autism and occupational therapy.

5.     District shall reimburse Parents within 45 days of this Decision, in an amount not to exceed $4,050, for the cost of Karen Schnee's January 2017 independent evaluation. If Parents have not paid Ms. Schnee directly, District may reimburse Parents through their attorneys upon receipt of proof of payment to Ms. Schnee.

6.     District shall fund a block of 120 hours of speech and language therapy. The services shall be provided by a nonpublic agency or licensed speech therapist chosen by Parents, focusing on Student's IEP goals developed by her IEP team. The service provider shall determine whether the compensatory services should be delivered individually or in a small group setting, based on Student's IEP goals. The compensatory services may be used regardless of whether school is in session, including during breaks and summer. The block of hours shall be available to Student through December 31, 2019. Student shall forfeit any unused hours after that date.

7.     District shall, no later than two months after the start of the 2017-2018 school year, provide six hours of training to its staff at Elm Elementary School and Juan L. Soria School. Trainees shall include all general education teaching staff and paraprofessionals or aides, student study team members, school administrators including principals and vice principals, service providers including school psychologists, occupational and speech and language therapists, and any other staff who work with parents and students, regardless of eligibility, on students' educational programs. The training shall focus on the general principles of the IDEA, including child find procedures, the special education assessment process under the IDEA, the statutory requirements for providing parents with prior written notice and procedural, safeguards, and the rights of parents to participate in a meaningful way in developing a child's educational program during the assessment process and at IEP meetings including determining whether the child is eligible for special education. The training shall be provided by qualified professionals who are either employed by or contracted with the Ventura County Special Educational Local Plan Area, or a private provider selected by District. This Order does not preclude District from offering this training to staff at other District schools.

8.    All other claims for relief are denied.

## PREVAILING PARTY

Pursuant to California Education Code section 56507, subdivision (d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided.  Here, Student was the prevailing party on all issues.

## RIGHT TO APPEAL

This Decision is the final administrative determination and is binding on all parties.  (Ed. Code, § 56505, subd. (h).)  Any party has the right to appeal this Decision to a court of competent jurisdiction within 90 days of receiving it.  (Ed. Code, § 56505, subd. (k).)

DATED:  May 25, 2017

DocuSigned by:

*Adrienne L. Krikorian*

3475616B5EDF4C6
ADRIENNE L. KRIKORIAN
Administrative Law Judge
Office of Administrative Hearings

Exhibit D

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

In the Matter of:

PARENTS ON BEHALF OF STUDENT,

v.

OXNARD SCHOOL DISTRICT.

OAH Case No. 2016091036

**DECISION**

Student filed a Due Process Hearing Request on September 22, 2016, with the Office of Administrative Hearings, State of California, naming Oxnard School District.  On November 4, 2016, OAH granted a continuance for good cause.

Administrative Law Judge Clifford H. Woosley heard this matter in Oxnard, California, on February 21, 22, 23, 24, and March 7, 2017.[1]

Attorneys Shawna L. Parks, Stuart Seaborn, and Janeen Steel appeared on behalf of Student.  Mother attended portions of the hearing.[2]  Attorney Lawrence Joe represented District.  Director of Special Education Services, Amelia Sugden, and Manager of Special Education, Nadia Villapudua, attended on behalf of District.

At the parties' request, OAH granted a continuance to April 3, 2017, for the filing of written closing arguments.  In light of recent appellate decisions, OAH again continued the matter to April 17, 2017, to allow the parties additional briefing time.  On April 17, 2017, the parties submitted their final written closing briefs, the record was closed, and the matter submitted for decision.

---

[1] The last day of hearing was conducted via telephonic conference.

[2] Mother excused herself from much of the hearing, providing permission for the hearing to proceed in her absence.

ISSUES[3]

1.       Has District denied Student a free appropriate public education when it failed
to meet its child find obligations by not evaluating Student in all areas of suspected
disability, and not finding Student eligible for special education placement and related
services, from (a) August 2013 and (b) fall 2014, to the filing of the complaint?

2.       Has District denied Student a FAPE by failing to offer Student an
individualized education program that met Student's unique needs and that was reasonably
calculated to offer education benefit to Student, from (a) August 2013 and (b) fall 2014, to
the filing of the complaint?

SUMMARY OF DECISION

Student proved by a preponderance of the evidence that District denied him a FAPE
by failing to meet its child find duties and refer Student for special education assessment in
the fall of 2014.  If Student had been assessed, he would have been found to have met the
eligibility criteria for other health impairment.  District's failure to timely assess denied
Student's right to a FAPE, because he should have been found eligible and otherwise entitled
to a FAPE and because he was deprived the educational benefit of the related services and
placement that he should have received in an IEP.  Therefore, District's failure to assess
Student in the fall of 2014 was a procedural violation that denied Student a FAPE.  Student
prevailed on Issue One (b).

Student did not prevail on his assertion in Issue One (a) that District's child find duty
was triggered as early as August of 2013.  The reason for Student's chronic absences and
Mother's repeated early removals from school remained a mystery throughout Student's first
grade year.  The evidence convincingly demonstrated that District did not have knowledge of
or reason to suspect a disability, and reason to suspect that special education services may be
needed to address that disability until the fall of 2014 when District was informed of
Student's possible sleeping disorder as the cause of his poor attendance.  Therefore,
District's failure to assess resulted in a denial of FAPE for two years, not three as Student
contends.

Student also demonstrated that District denied him a FAPE because he had not timely
received an IEP which would have addressed his unique needs as a child with a disability,
and conferred educational benefit so he could make progress appropriate for his
circumstances, since fall 2014, thus prevailing on Issue Two (b).  Student did not prevail on

---

[3]  The issues have been reorganized for purposes of analysis.  The ALJ has authority
to redefine a party's issues, so long as no substantive changes are made.  (*J.W. ex rel. J.E.W.
v. Fresno Unified School Dist.* (9th Cir. 2010) 626 F.3d 431, 442–443.)

2

his assertion in Issue Two (a) that District's denied Student a FAPE as early as August of
2013.

## FACTUAL FINDINGS

     1.     At the time of the hearing, Student was nine years old and in fourth grade at
District's Sierra Linda Elementary School.  He was eligible for special education services
with a primary eligibility of emotional disturbance and a secondary eligibility of other health
impairment.  Student first qualified for special education in November 2016 and, at all
relevant times, attended District schools.

*2012-2013 School Year: Kindergarten*

     2.     Student started kindergarten at District's Emilie Ritchen Elementary School
for the 2012-2013 school year. Mother felt that the kindergarten teacher was abusive.  She
said the teacher referred to Student as a "Mama's boy," ridiculed Student in front of the
class, and generally had a mean-spirited demeanor whenever interacting with her son.

     3.     As a consequence, Mother said she could not get Student to go to school.
Student did not want to go to class and, when attending, would become anxious and upset
because of the teacher's conduct.  Student was chronically absent and, when he did attend,
Mother repeatedly checked Student out of school before the end of the day.  While at
Ritchen, Student was absent 30 days and tardy 11 times, not including Mother's frequent
early removals from school.

     4.     District granted Mother's request to transfer Student out of Ritchen.  Student
started attending kindergarten at Sierra Linda in May 2013, about five weeks before the end
of the school year.  Armondo Arreguin was Student's new kindergarten teacher; he testified
at the hearing.  Student was a happy child, with no behavior issues.  Mr. Arreguin talked with
Mother daily.  He had a good working relationship with Mother, who told him that Student
was having a difficult time transitioning to kindergarten and did not much care for school.

     5.     Student was clingy with Mother and Mother wanted to be close to Student.
Mother acknowledged this, noting that Father had encouraged Mother to "cut the apron
strings," but Mother said it was hard.  Mr. Arreguin knew that Student had missed a lot of
school at Ritchen.  Even though kindergarten attendance was not mandatory, Mr. Arreguin
wanted Student to attend regularly.

     6.     Student was in afternoon kindergarten, from 11:30 a.m. to 3:00 p.m.
Mr. Arreguin persuaded Mother to drop Student off at class each day, and not return to check
on him.  When Mother confirmed that Student did fine after the first week, she did not come
to the school during class for the remainder of the school year.  Mother thanked Mr. Arreguin

that Student did well in his class, noting that she was finally able to do her chores.  While
attending Mr. Arreguin's class, Student was once absent, never tardy, and never checked out
early.  Mother thought Mr. Arreguin was a very good teacher.

      7.      Mr. Arreguin did not see any signs that Student was in need of referral for
special education assessment.  Student did not appear tired.  He was shy at first, but soon
adjusted and was involved.  Student worked on assignments, was responsive, participated in
small groups, and made friends.  Mr. Arreguin did not suspect a disability.  Mother never
told Mr. Arreguin that Student was receiving, or needed to receive any type of services; she
only talked about Student's struggles in transitioning from home to kindergarten.  Mother
never said Student was anxious.  Mother said that Student had a hard time with the prior
kindergarten teacher and did not like being in her class, making it hard for Mother to get
Student to school and to remain in class.

      8.      During testimony, Mr. Arreguin was referred to notations put on the
cumulative file by Student's prior kindergarten teacher.  Under a section entitled "referrals to
school services," the prior kindergarten teacher wrote "Tier I RTI."  "RTI" referred to a
Response-to-Intervention model of tiered instructional processes.  The tier model was
typically composed of three educational tiers, with some models using four tiers or
subdividing the tiers.  Tier 1 instructional program was the same as the core reading or math
curriculum.  Tier 1 intervention would normally be used to assist a student who required
some small group or one-on-one instruction.  Tier 2 usually consisted of children who fell
below expected benchmarks, were at some risk of academic failure, and needed more intense
intervention.  Tier 3 intervention was for children at high risk for failure and often considered
likely to be identified for special education.  Mr. Arreguin did not know what tier model or
the areas of the curriculum to which the prior kindergarten teacher was referring.
Mr. Arreguin did not ask anyone about the RTI.

      9.      During his testimony, Mr. Arreguin reviewed Student's Individual Student
Report, which included a section entitled "DIBELS Next Benchmark – Kindergarten
(2012-2013)."  DIBELS, Dynamic Indicators of Basic Early Literacy Skills, was a series of
short tests that assessed early childhood literacy.  Mr. Arreguin noted that District had not
used the DIBELS since 2013, that the third trimester scores were not on the report he was
shown, and that he was confident he had done the test with Student.  The test was a one-on-
one oral assessment of Student by the teacher consisting of words, sentences, and syllables.

      10.     At the beginning of kindergarten, Student's literacy scores were average
preschool level.  In the middle of year, the composite scores showed that there had not been
growth.  Mr. Arreguin thought this may have been a result of Student's poor attendance.
Mr. Arreguin did not understand what some of the prior kindergarten teacher's scores meant.
These scores did not provide reliable insight into Student's abilities.

      11.     Mr. Arreguin said that if a child received poor scores on the early literacy

4

skills tests, he would start some interventions, such as preteaching or reteaching, in a small group or individually.  He believed that this was similar to the "Tier 1 RTI" that the prior kindergarten teacher may have started.

12.     On the final report card, Student was Basic in nine academic areas consisting of language arts and math.  Student was Proficient in number sense, history/social science, science, physical education, visual arts, and music.  He demonstrated satisfactory effort and attitude in homework, citizenship, and behavior.  Mr. Arreguin commented that Student was progressing well in all areas, followed classroom rules, and was a nice boy.  Student needed to practice his rhyming, reading, and number writing.  He encouraged reading over the summer to better prepare Student for first grade.

*2013-2014 School Year: First Grade*

13.     Student attended first grade at Sierra Linda for the 2013-2014 school year. Georganna Pauley was Student's teacher; she testified at the hearing.  Ms. Pauley had been teaching first grade for almost 20 years.  Ms. Pauley demonstrated a clear recollection of her interaction with Student and Mother, often providing detailed descriptions of conversations and events.  She obviously cared about Student and was concerned about his performance in first grade.  Generally, Ms. Pauley was a credible and persuasive witness.

14.     Student's first grade class had 20 students.  Mother volunteered at the school and was on campus very often, if not daily.  Ms. Pauley talked to Mother a lot.  In the first trimester, Student had eight absences and, when at school, Mother frequently removed Student early.  In the first trimester progress report, Student was Below Basic in all three math sections.  He was Basic in the four language arts measures, history/social science, science, and physical education.  Ms. Pauley repeatedly explained to Mother that absences and early removals were negatively affecting Student's academics.  He was missing group time and tests, which affected his grades.

15.     On November 22, 2013, Ms. Pauley had a parent-teacher conference and provided Mother with a letter, formally indicating that Student was performing below grade level standards in Math.  Ms. Pauley proposed, and had already started, interventions of continuing small group support and the use of the Successmaker computer program, for improving math skills.  Mother signed the letter and acknowledged receipt.  Ms. Pauley had started Student on Successmaker earlier in the year.  Student used the program, but would not spend additional time.  His absences diminished the program's effectiveness.

16.     Student's absences increased to 18 in the second trimester.  Ms. Pauley continued working with Student one-on-one and in small groups.  Student performed best and improved academically in small groups, which were usually in the afternoon.  However, when Student was at school, Mother sometimes removed him after lunch.  Missing group time significantly contributed to Student's lack of improvement.  Early removal on Friday

caused Student to miss his weekly math tests.  The interventions had little opportunity for
success because Student was absent or taken home early.

17.     When in school, Student generally appeared bored.  Student often had trouble
focusing on work because he recurrently said he wanted to see Mother, who he knew was on
campus.  Ms. Pauley encouraged him to wait, at least until after lunch.  When Student did see
Mother, Mother usually removed him from school.  This pattern repeated throughout the
year.  Mother acknowledged Ms. Pauley's concerns, but continued to keep Student home or
remove him early.

18.     When in class the entire day, Student talked to friends on the playground and
got some class work done.  About two or three times, Student got angry in class, as if he "just
had it."  Ms. Pauley called for assistance.  The principal or outreach coordinator came and
took Student for a walk or talk.  Student soon returned.  Ms. Pauley had other students with
similar outbursts, who just needed some additional space or a break.  Student's angry
outbursts were not a typical behavior for Student.

19.     Every morning, Ms. Pauley devoted a portion of her class to social training,
helping her pupils understand their place in the community and home, their relationships
with each other, and how to care for others.  Socialization was part of first grade: talking
sincerely, asking to play, taking turns, looking at someone when speaking, attending, and
participating in class.  Teaching these skills and characteristics was part of first grade
curriculum.  This class instruction included Student, who Ms. Pauley tried to include
conversationally, without singling him out.

20.     Ms. Pauley was not responsible for following up with parents regarding
pupils' absences.  The school's office, administration, and outreach coordinator were
responsible for maintaining records and contacting parents if the absences were excessive.
For example, Mother had to sign Student out at the front office whenever she removed him
early.  Ms. Pauley repeatedly talked with Mother about how the absences were affecting
Student's opportunity.

21.     Despite these numerous conversations, Mother never indicated any specific,
ongoing problem that contributed to the absences.  Mother did not tell Ms. Pauley that
Student was diagnosed as chronically ill, had insomnia, or was taking medication.  Mother
did not explain why the absences more than doubled in the second trimester.  Ms. Pauley
thought that Student and Mother had an extraordinarily close bond that made it difficult to
disengage from each other.  Ms. Pauley repeatedly encouraged Mother to bring Student to
school and to encourage Student to stay in school.  However, though Mother would say
"yeah, we'll work at that," Student's attendance did not improve and the pattern of early
withdrawal continued.

22.     Mother testified that during first grade, Student screamed and cried in the

6

morning.  He did not want to go to school because he would be bullied and was afraid.
Mother said that Student was not sleeping, sometimes staying awake until 2 a.m.  Student's
doctor prescribed medicine to help Student sleep, but managing the medicine so Student
would sleep was difficult.  Mother claimed that Student said he was worried about school.
Mother insisted that she told the school about Student's insomnia and medication.  Mother
complained that the school provided no help or support.  These general contentions regarding
first grade were contradicted by testimony and documentation.  Mother said that she told
Ms. Pauley about the insomnia and that Student was on medication, at the parent-teacher
conference; Ms. Pauley credibly testified that Mother did not.  Ms. Pauley remained
perplexed all year as to why Student was regularly absent and removed early.  Ms. Pauley's
parent-teacher conference and letter, proposing interventions, and Mother's signature,
contradicted Mother's testimony that no one provided any help or support in first grade.
Mother's testimony regarding informing Ms. Pauley and others of Student's insomnia and
medication in first grade was not convincing.

23.     Susana Luna-Gamez was the Outreach Coordinator at Sierra Linda from
October 2001 to September 2014, when she became the school counselor.  As the outreach
coordinator, Ms. Luna worked with families regarding attendance issues.  The school's
attendance policy was that the school focused on pupils who had five or more unverified
absences, by meeting with parents.  Such meetings included the outreach coordinator, the
school principal, and sometimes the attendance clerk.  She also arranged meetings with
parents of students who had excessive excused absences.  The school considered an absence
excused if a parent gave a reason, such as being sick, going to doctor, or family emergency.
The school did not require verification of a pupil's illness.

24.     Ms. Luna learned of Student's frequent absences and talked to Mother.
Eventually, Ms. Luna arranged for a formal meeting with her, the school principal
Sally Wennes, and Mother, to inform Mother that Student was absent too much, advise
Mother of the state and District attendance policies, find out how to support Student, and
explain the consequences of letting absences continue.  One of the consequences was for
Parents to be referred to the School Attendance Review Board, which had statutory authority
to impose penalties upon parents who failed to have their children attend school, as mandated
by law.  After 14 excused absences, the school principal was empowered to refer a family to
the attendance review board.

25.     In preparation for the April 2, 2014 meeting, Ms. Luna prepared a form School
Attendance Contract for Mother's signature, documenting her awareness of the situation and
potential consequences of continued absences.  However, Mother did not appear for the
meeting.  Ms. Luna called Mother, who said she was not coming in because "they were
sick"; Ms. Luna made a note on the unsigned attendance contract.

26.     Mother attended a rescheduled meeting, which Ms. Luna recalled in some
detail, although she was uncertain of the date.  At the meeting, Mother said that Student had

7

a bad experience in kindergarten and was not coming to school as a result. Mother did not say what Student disliked about school. Mother did not tell Ms. Luna and Ms. Wennes that Student had a sleeping disorder, anxiety, or was taking medication. Mother did not say anything about her son worrying. Ms. Luna said that she and Ms. Wennes were trying to get a sense if Student's absences were a parent or student issue. Mother was not positive or open, did not want to participate in the meeting, and was generally resistant. Ms. Luna did not suspect that Student might have a disability. As a matter of her standard practice, Ms. Luna would have explained to Mother the possible referral to the attendance review board. Mother did not sign a School Attendance Contract. District did not document the attendance meeting.

27.     Ms. Wennes testified at the hearing. She was the principal of Sierra Linda from October 2010 through March 2016, when she left to become principal in another District school. She worked for District for seven years and had been an elementary school principal for 15 years. Ms. Wennes had multiple meetings and discussions with Mother regarding attendance beginning in Student's first grade until Ms. Wennes left Sierra Linda. Whenever Ms. Wennes discussed attendance, Mother became resistant, provided very little information, and quickly ended the conversation. Mother claimed that she showed Ms. Wennes Student's bottle of medication, but Ms. Wennes denied this. Mother did not tell Ms. Wennes that Student had insomnia and was taking medication.

28.     Ms. Wennes acknowledged that Student's first grade absences were excessive and that she could have referred Mother to the attendance review board process. Ms. Wennes typically tried to figure out why a student was absent and offered services or interventions. But she did not recall any services or interventions involving Student.

29.     For the remainder of the school year, Ms. Luna regularly communicated with Mother regarding absenteeism. Mother never told her Student's absences were caused by insomnia, a sleeping disorder, or that he was taking medication. Student's attendance improved slightly in the third trimester, down to 15 absences. Ms. Luna was not aware of the frequency of Mother's early removals of Student, which continued for the remainder of the year. District did not have another meeting with Mother during the first grade school year.

30.     Student's grades did not significantly improve over the year. Student learned and made progress, knowing more each trimester, but he was not at grade level. Ms. Pauley did not believe Student's poor performance was caused by a disability or that Student was a child who needed special education.

31.     Ms. Pauley believed her teaching experience enabled her to identify children who were learning or emotionally disabled. She had never received any specific training in identifying and referring pupils for special education assessment, although she had students who were referred for assessment or were in special education. At Sierra Linda, a teacher assisted a struggling student with one-on-on or group instruction. Then, a pupil could be

8

referred to a Coordinated Services Team.  The next level of support was a Student Success
Team, which included the parent and could provide a number of interventions and supports.
If the success team was proving ineffective, the pupil could be referred for special education
assessment.  Student was not referred to these more intensive interventions.  Ms. Pauley
believed the primary reason Student performed poorly was because of missed tests and
instruction time and because Mother had not provided any reason for the continued absences
and early removals.

32.     Student's final trimester grades were Below Basic in number sense, algebra
and functions, measurement and geometry, statistics and data analysis, and mathematical
reasoning.  He was Basic in word analysis and vocabulary development, reading
comprehension, writing, and written and oral conventions.  Student was Proficient in
listening and speaking.  Ms. Pauley's last comments were that Student was making slow
progress in reading and needed to memorize basic math facts.

33.     Student was absent 39 days for the school year.  The number of absences
could have resulted in a referral to the attendance review board.  District did not do so.

*2014-2015 School Year: Second Grade*

34.     Student attended second grade at Sierra Linda; The first day of school was
August 20, 2014.  Esperanza Pascual was Student's teacher; she testified at the hearing.
Ms. Pascual had been teaching second grade for almost 24 years and had been with District
for 25 years.

35.     Ms. Pascual described Student as a happy boy, who fell asleep in class about
once a week and had occasional angry outbursts.   When awakened from sleeping, Student
was irritable and not in a state to learn.  Student then asked for Mother, who frequently
withdrew Student early from class.  Mother was very involved with Student.  After taking
Student to class, she usually remained to see how he was doing.  Mother was always
available for Student whenever he wanted to see her.  On good days, Student was smiling,
energetic, laughing, and sharing.

36.     Student had angry outbursts five or six times over the school year, enough to
cause Ms. Pascual concern.  Student got upset, hit his desk, picked his desk up and slammed
it down on one occasion, and pulled his books out of his desk.  He was unable to do school
work and Ms. Pascual referred him to the school office, where Mother met and took him
home.  Student was chronically absent, more than 20 percent the first trimester and about 30
percent in the second and third trimesters.

37.     The absences, early withdrawals, sleeping, and angry outbursts caused Student
to miss a substantial amount of instruction and tests.  Ms. Pascual believed that Student was
capable, but he could not learn if he was not emotionally or physically able to participate in

class or was absent from class.  Ms. Pascual explained this to Mother, with whom she spoke almost daily.

38.     Ms. Pascual came to believe within a month or so after school started that Student's absences, lethargy, and sleeping in class were caused by his insomnia.  Ms. Pascual had reason to suspect that Student had a disability as of September 30, 2014.

39.     Mother told Ms. Pascual that Student had insomnia, that she struggled to get Student to sleep, and Student often was not able to wake up and come to school.  This also caused Student to be sleepy and irritable when at school.  Shortly before the Thanksgiving break, Mother said she was taking Student to a doctor for help with the insomnia. Ms. Pascual did not know what the doctor determined.  Ms. Pascual believed that Student's absences, lethargy, and sleeping in class were caused by his insomnia.  Neither Student nor District provided clear, unambiguous evidence of when Mother told Ms. Pascual that Student had insomnia, which caused the absences and early removals, but it was between the first day of school on August 20, 2014 and the Thanksgiving break.

40.     Over the years, Ms. Pascual had students who had been assessed and were receiving special education services.  She did not believe that Student had a disability because the absences, sleepiness, and irritability were caused by a medical issue.  If she believed Student had an academic problem, she would have referred Student to the success team process as a first step.  Medical issues were not referred to a student success team.  She did not believe that she could directly refer a pupil for special education assessment.

41.     Ms. Luna became Sierra Linda's school counselor at the beginning of the 2014-2015 school year.  She possessed a master's degree in school counseling and held a pupil personnel services credential.  She knew Mother from the previous year when Ms. Luna was the outreach coordinator involved in Student's attendance issue.

42.     In second grade, Mother told Ms. Luna that Student was being bullied at school and did not know how to make friends or handle himself socially.  Ms. Luna offered counseling and social skills classes to support Student; Mother agreed.

43.     Mother did not tell Ms. Luna that Student had insomnia, anxiety, or that he did not like coming to school.  Ms. Luna recalled being told by a teacher that Student fell asleep in class, but it did not appear to happen often.

44.     Ms. Pascual told Ms. Luna about Student's poor academics caused by poor attendance, early withdrawal (often within the first hour of school), and not being fully alert. Ms. Luna did not recall this and did not address these issues in her counseling of Student.

45.     Before the social skills group started, Ms. Luna provided Student with four or five individual counseling sessions.  Student did not tell Ms. Luna that he was being bullied

or that he was anxious.  In the individual sessions, Ms. Luna determined how Student was doing and if he was upset.  Student never cried during the sessions.  He did not say he had had trouble sleeping or disliked school.

46.     The social skills group started in late fall and met on Fridays for 10 weeks. The group did not meet over the holidays.  Student only attended four or five group sessions because of absences or early withdrawals.  Ms. Luna tried to follow-up with Student, holding individual sessions to make up for the lost time with the group.  The individual sessions were on an "ad hoc" basis; there was no schedule.  Ms. Luna did not provide any other services to Student during second grade.  The social skills group sessions had sign-in sheets, which Ms. Luna destroyed after a year.  Ms. Luna and District did not have any record of Student's individual counseling sessions, his participation in the social skills class, or his progress.

47.     Mother recalled three meetings with Ms. Wennes during second grade.  The first meeting concerned Student having a difficult day at school.  The second meeting was for attendance.  Mother was shown the computer attendance record, reflecting the excess absences.  Mother told them she had provided the school with notes from the doctor regarding Student's insomnia and medication.  However, Student never produced evidence of any writings from Student's doctor before the filing of the due process request.

48.     Mother attended a third meeting regarding attendance at the end of the school year.  By this time, Ms. Wennes knew or should have known about Student's insomnia, which Mother claimed was a primary cause for his absences and early removal.  Mother asked for help in getting Student in school.  Ms. Wennes suggested paring Student with one of his good friends, next year, thus encouraging Student to come and stay in school.  Mother did not receive an attendance contract and was not told about the attendance review board.

49.     Ms. Pascual believed that Student showed some progress by the end of second grade, except in mathematic standards, where Student's scores lowered as the year progressed.  Overall, Student ended the year low.  For the 10 reading standards, he was proficient in three and below proficient for the remaining seven standards.  Student was proficient in science, progressing toward proficient in history/social science and the two physical education standards, and exceeded standards in visual arts.  In math, Student ended the year with grades of proficient in one standard, below proficient in eight standards, and minimally proficient in the remaining nine standards.  Ms. Pascual believed Student had potential, but his absences substantially contributed to his low scores.

50.     Student was absent 55 days in second grade.  At the end of the year, Ms. Pascual wrote on Student's cumulative education file that Student had many health issues, missed many school days, and became aggressive and defiant.  Ms. Pascual, Ms. Wennes, and Ms. Luna did not inform Mother of her special education rights.

*2015-2016 School Year: Third Grade*

51.     Student attended Sierra Linda for the 2015-2016 school year, attending a third
grade class of 27 students.  Natalie Gonzales was Student's teacher; she testified at the
hearing.  Ms. Gonzales had been a District teacher for 15 years, taught third grade for
10 years, and was at Sierra Linda for two years.  She had an excellent recall of Student's
third grade year, answering questions in a forthright and sincere manner.  She demonstrated
genuine concern for Student and appeared to have a good relationship with Mother.
Ms. Gonzales was a credible and persuasive witness.

52.     Ms. Gonzales described Student as intelligent, kind, and a good friend to his
classmates.  He was a good reader, but struggled with math.  She experienced very few
behavior issues with Student, who was generally honest, respectful, and helpful.

53.     Mother brought Student to the classroom door, carrying his backpack.  This
was unusual; parents typically dropped their children off at the front of the school.  As a
consequence, Student had great difficulty separating from Mother.  Student would continue
to stare at Mother, reaching for her, as he came into class.  Ms. Gonzales urged Mother to
leave by letting her know that Student would be fine.  Ms. Gonzales noted on Student's
cumulative education file that Student had separation issues with Mother.

54.     The first trimester, Student was absent 12 days.  Also, for the first two months
of the school year, Mother picked Student up early everyday he was in school, because she
needed to pick up a sibling at another school.  As a result, Student missed the special intense
reading instruction which took place at the end of each school day. Additionally, Mother
often withdrew Student from school early, three or more times a week, at about lunchtime.
Student therefore missed math instruction, which was after lunch.  Because of excessive
absences and early withdrawals from school, Student had a hard time connecting with the
material.  Student then was frustrated or anxious and did not want to remain in class.

55.     Ms. Gonzales believed the lack of attendance was alarming and compromised
Student's ability to learn.  Mother told Ms. Gonzales that the absences were caused by
insomnia and that Student became anxious in the morning and did not want to come to
school.  Student was sometimes tired in class and became anxious about not being with
Mother.  However, Ms. Gonzales sensed that Student often simply did not want to come to
school and Mother allowed Student to stay home.  On a number of occasions, Mother
acknowledged that she needed to "back off" and let Student go, giving him more
independence.  In September or early October 2016, Ms. Gonzales made a referral for
attendance by emailing the outreach coordinator Elva Serrato and copying Ms. Wennes.  She
also informed them that Mother said Student had insomnia, became anxious, and then
resisted coming to school.

56.     Ms. Gonzales participated in two attendance meetings with Mother,

12

Ms. Serrato, and Ms. Wennes.  Ms. Serrato and Ms. Wennes held two additional meetings
with Mother.  On December 11, 2015, Mother participated in an attendance meeting that
included Ms. Serrato, Ms. Wennes, and Ms. Gonzales.  Mother was provided a proposed
School Attendance Contract for the 2015-2016 school year, upon which the outreach
coordinator wrote a note that Mother said the absences were caused by a medical reason but
this "was not by medical diagnosis."  Mother was given a medical release form, which would
have allowed District to contact Student's doctor.  Mother took the contract and release, to
return by December 14, 2015.  Mother did not return a signed contract or release.

57.     For a short time in January 2016, Student was in class four or five days a
week.  Student was less emotional when he was consistently in school.  However, Student
soon returned to frequent absences and early withdrawals.

58.     Ms. Gonzales did not believe Student had a learning disability.  If she had, she
would have made a referral to the coordinated services team, who would then decide if
Student should be referred to a student success team.  She thought Student's academic
challenges were caused by his lack of attendance; he could not learn if he was not in school.
Her goal was to get Student to come and remain in school.  At hearing, she acknowledged
that she had since become better acquainted with the Sierra Linda coordinated services team
process and, in hindsight, might have also referred Student because of his attendance.

59.     Ms. Gonzales had no specific training in special education assessment referral.
She believed that she could not make a referral for assessment without first going through the
coordinated services team and student success team.  She previously had special education
students in her class who received speech and language services.  Ms. Gonzales had never
directly referred a child for special education assessment.

60.     For language arts standards, Student progressed from first trimester grades of
five C's and two B's, ending the year with three A's in phonics and word recognition,
speaking and listening, and language, three B's in reading fluency, literature, informational
text, and one C in writing.  He received final grades of B in science and history/social
standards.  Student remained well below standards in math throughout the year, with final
grades of two C's in number sense and fractions and three D's in operations and algebraic
thinking, knowing math facts, and geometry.  His effort increased from satisfactory to
excellent in all areas.  He needed to improve in completing and returning homework and
classwork, was satisfactory for writing legibly and taking responsibility for learning and
behavior, and excellent in all seven remaining measures for behavior.

61.     Student was absent 47 days in third grade.  Ms. Gonzales thought the school
referred Mother to the attendance review board, but District did not do so.

*2016-2017 School Year: Fourth Grade*

62.     Carmen Serrano was Sierra Linda's new school principal in the 2016-2017 school year.  She arranged for a meeting with Mother and Student about a week before the start of school.  Mother told Ms. Serrano about Student's sleep disorder, anxiety, and medication, which caused a lot of absences.  Ms. Serrano said she would invest time and build a relationship with Student.  Mother felt that Ms. Serrano made a difference for Student at school.

63.     Student's fourth grade teacher was Melissa Turner, who testified at the hearing.  Ms. Turner had been teaching for 31 years, has had pupils who were assessed for special education, and students who were receiving special education services.  She was Student's teacher at the time of hearing, having met him when school started in August 2016.  She had not received specific training in identifying students for special education assessment, although she believed her decades of experienced enabled her to identify children suspected of a disability.

64.     Ms. Turner had spoken to Ms. Gonzales and was aware that absences harmed Student's academic performance.  Ms. Turner spoke to Mother, who told her that Student had issues with anxiety and insomnia.  Therefore, Ms. Turner did not push Student to produce, but encouraged him to stay and work in class.  Student said he was anxious only a few times, in response to Ms. Turner's offer to help him with math.  Student occasionally appeared tired in class, two to three times a month.  Ms. Turner discussed the absences with Ms. Serrano, noting Mother's reference to Student's anxiety and insomnia.  Also, early in the school year, Mother told Ms. Luna for the first time that Student was taking prescription medication to help him sleep.

65.     On September 22, 2016, Student filed his request for due process.

66.     Mother was not cooperative in scheduling a parent-teacher meeting with Ms. Turner.  Finally, Ms. Turner had a meeting with Mother on October 11, 2016, with Ms. Serrano and Ms. Luna.  Mother brought a one-paragraph October 6, 2016 letter from Sam K. Hansuvadha, M.D., which stated that Student had been diagnosed with insomnia since June 2012 and anxiety disorder on February 20, 2015.  Dr. Hansuvadha also said Student had "either claustrophobia or school phobia on May 27, 2016."  Student was taking 0.1 mg of Clonidine at bedtime and was waiting to be evaluated by a psychiatrist.

NOVEMBER 3, 2016 SECTION 504[4] MEETING AND SERVICE PLAN

---

[4]  Pupils may qualify for service plans under Section 504 of the Rehabilitation Act of 1973, which guarantees certain rights to disabled people, including students in public schools.  The Office of Administrative Hearings has no jurisdiction over Section 504 claims.

67.     District convened a Section 504 meeting on November 3, 2016.  Attending were: Mother; Student's attorney Janine Steel; Director of Special Education Services, Amelia Sugden; school psychologist, Rachel Boxer; District's attorney, Leah Smith (via telephone); and Ms. Serrano.  The attendees reviewed Dr. Hansubadha's letter and discussed how Student's diagnoses affected his education.  Student was absent, did not stay in class, did not complete work, could not catch up with missed work, would become stressed and anxious, and struggled managing his fatigue.

68.     The team found Student eligible under Section 504 and developed a Section 504 Service Plan, based on identified areas of difficulty.  To assist in completing work and catching up on missed work, Student's classwork would be modified; incomplete classwork would be sent home; Student would use a daily planner; and District would provide a home hospital teacher, two hours per week.  To encourage Student to maintain time in class, Student could use a "break card" and request to be referred to the counselor, school psychologist, or principal.  The counselor and Parent would only employ positive behavior support and communication, with a log.  To help Student manage his stress or anxiety, he could use a stress ball or silly putty; use a  break card; and attend school counseling, 30 minutes a week.  The school counselor would check Student in and out of school, daily, r would check in with Mother at school gate every morning to see how Student was doing; and the school counselor would talk with Student every afternoon.  To help Student manage fatigue, he could use a "rest card," which gave Student 10 to 15 minutes to rest; and could go to the school nurse.

69.     Mother signed and agreed to the Section 504 Service Plan.  Mother also signed an assessment plan for behavior, to be conducted by the Ventura County Behavioral Health department.

IMPLEMENTATION OF SECTION 504 SERVICE PLAN

70.     Student checked-in with Ms. Luna every morning when he came to school. Ms. Luna also saw Student at least twice per week, at the weekly counseling sessions and, informally, on an as needed basis.

71.     In the mornings, Ms. Luna asked Student how he was doing.  Student said

---

Student's Section 504 service plan is considered herein for the sole purpose of evaluating appropriate compensatory remedies that may be awarded by this decision.

things like he was "mad at school," worried about natural disasters (like a meteorite hitting the earth), or frightened by something he saw on television (horror movies). Student talked about his concerns for a while. Ms. Luna and he then discussed ways to overcome his worries, anger, or fears. Student typically moved on to his class.

72.     Student was usually quiet in class, but was talkative with his friends. Ms. Turner described Student as intelligent and creative, but apprehensive to instruction. Student did not like to do work that required him to put forth a lot of effort or work. He became anxious, sometimes worrying about current events. In these situations, Student used his break card, and went to the office or counselor.

73.     Overall, Student used the break cards appropriately, though occasionally he used them to avoid work he did not want to do. Sometimes when Student pulled out a break card, Ms. Turner encouraged Student to wait until after the instruction and Student agreed. Generally, the break cards helped Student better regulate, with the aim of keeping him in school.

STUDENT'S INITIAL PSYCHOEDUCATIONAL ASSESSMENT[5]

74.     School psychologist Jenny Ponzuric prepared an initial, 43-page Psychoeducational Assessment Report of Student, dated December 13, 2016.[6] District contracted with Ms. Ponzuric to conduct Student's psychoeducational assessment. Ms. Ponzuric had never previously worked with District or Student. Ms. Ponzuric had a 1997 bachelor's degree and a 1999 master's degree in psychology. She was a licensed educational psychologist and held California pupil personnel services and administrative services credentials. In 2007, she obtained a certificate in neuropsychology from Texan Women's University. Ms. Ponzuric was self-employed for three years and, previously, was a school psychologist with Conejo Valley Unified School District for 13 years. She had conducted between 700 and 750 psychoeducational assessments. Ms. Ponzuric's education and experience qualified her to conduct Student's assessment and prepare the report.

75.     Ms. Ponzuric reviewed available health and developmental records, Student's cumulative educational record, the Section 504 plan, and Student's release logs from

---

[5] Student's psychoeducational assessment report and individualized educational program are reviewed for the sole purpose of evaluating appropriate compensatory remedies that may be awarded by this decision. Both parties affirmed on the record that they are not seeking a determination of whether District's assessment and IEP provided Student with a FAPE.

[6] Drafts of the report were presented at Student's November 30, 2016 initial IEP team meeting and the finalized, updated report was presented at the second IEP team meeting on December 14, 2016.

16

Sierra Linda.  She interviewed Student and Mother and obtained input from Student's teacher.  Ms. Ponzuric observed Student in the classroom, during physical education class, and throughout the testing sessions, where Student was comfortable doing tasks but uncomfortable sharing information.  She administered or conducted the following standardized tests:  the Kaufman Assessment Battery for Children – 2nd edition; Wechsler Intelligence Scales for Children – 5th Edition; Comprehensive Test of Phonological Processing – 2nd Edition; Beery-Buktenica Developmental Test of Visual-Motor Integration – 6th Edition; Sentence Completion Task; and the Kinetic School Drawing.[7]

76.     Special education teacher Courtney Saldana conducted the achievement tests, pathologist Cindy Evans did the speech and language evaluation, school nurse Jennifer Curry contributed the health evaluation, and Ventura County Behavioral clinician Cynthia Kravets conducted an intensive social emotional services assessment report.  Ms. Ponzuric included these contributions in her final assessment report.

77.     Ms. Ponzuric summarized her findings, noting that the ongoing and primary concern was Student's attendance.  Absences, tardies, and early removal from school meant Student had missed about 25 percent of the learning experiences in the school setting since kindergarten.  Student missed at least two afternoons a week during fourth grade.

78.     Student demonstrated many processing strengths or areas within expected range and had intact thinking and problem solving skills, with and without the use of language.  He had average speed of processing for tasks that involved paper and pencil, as well as the fluency of his verbal skills.  Student had some difficulties in short-term verbal memory and some aspects of auditory processing (phonological processing, specifically).

79.     Academically, Student had average reading decoding, reading fluency, and reading comprehension skills. His written language skills were in the average range.  Though Student showed average math problem solving skills, he had evident difficulties with math calculations, with scores below the expected level.  Ms. Ponzuric noted that Student's lower math scores were consistent with informal assessment results and his academic history.

80.     Ms. Ponzuric found that Student had difficulties with anxiety that caused him to be absent or leave school early.  Ms. Ponzuric's professional opinion was that the absences and early removals created a cycle, leading to greater anxiety.  Student would miss class instruction and work, become anxious when he went to school because he did not understand, would then be removed early or kept home, and would miss more instruction.  Therefore, addressing Student's attendance was foundational to addressing his academics.

---

[7]  Student's counsel stipulated at hearing that Student was not claiming the psychoeducational assessment's standardized tests did not comply with test protocols or were otherwise not legally appropriate.

81.     Ms. Kravets found diagnoses of dysthymia, generalized anxiety disorder, and insomnia related to anxiety.  Ms. Kravets concluded that Student had insight into what was triggering his anxiety, but at that time, he did not have the coping strategies to calm himself.

82.     Ms. Ponzuric considered various special education eligibilities.   She concluded that Student was not eligible under the classification of specific learning disability. Also, referring to the speech pathologist's findings, Student did not meet the eligibility criteria for speech and language impairment because Student's language abilities were found to be at the level of his peers and did not adversely impact his ability to be understood and express himself in the school setting.

83.     Ms. Ponzuric found Student met the criteria for other health impairment eligibility.  Student's insomnia caused "limited alertness" on some days.  His anxiety impacted his vitality and alertness on the days he attended school.  These also kept him from consistently attending school, which adversely impacted his academic performance.

84.     Ms. Ponzuric found that Student met the eligibility criteria as a student with an emotional disturbance.  Student exhibited three of the five characteristics used in evaluating emotional disturbance eligibility.  Ms. Ponzuric noted Student had demonstrated anxious behaviors on a consistent basis, which impacted his educational performance because he had not been able to regularly attend school since kindergarten.  Ms. Ponzuric concluded her report by suggesting some accommodations and strategies to assist Student.

STUDENT'S INITIAL INDIVIDUALIZED EDUCATION PROGRAM MEETINGS

85.     District convened Student's initial individualized education program team meetings on November 30, 2016, and December 14, 2016.  Attendees at both meetings were: Mother; attorney Ms. Steel; Manager of Special Education, Nadia Villapudua; resource specialist program teacher, Courtney Saldana; Ms. Evans; Ms. Ponzuric; Ms. Curry; Ms. Kravets, attorney Ms. Smith (via telephone); Ms. Luna; and Ms. Serrano.

86.     The team reviewed the psychoeducational assessment and discussed special education eligibility.  The team found Student primarily eligible as a student with emotional disturbance, with a secondary eligibility of other health impairment.  The team agreed upon two goals for math, two goals for social-emotional functioning, a vocational goal, and a goal in writing.

87.     The IEP team continued the accommodations provided by the Section 504 Service Plan.  Additional accommodations included testing in a small group, preferential seating, access to a multiplication chart or calculator, an extra set of books at home, pairing of visual with verbal directions, and the use of self-monitoring strategies.

88.     The IEP also had a positive behavior intervention plan, which identified

18

Student's behavior that interfered with his learning (problem behavior) and caused Student not to regularly attend school. Irregular attendance meant missed instructional time. Consequently, Student would then not understand a lesson and become anxious, causing him to escape the situation by not coming to school or leaving early. Positive replacement behaviors included continued use of the break cards, ability to see the school counselor, and allowing Student to go to a safe, comfortable designated area on the school campus. The case manager was to develop a list of appropriate coping strategies with the other service providers. Whenever Student worked to completion on a task, he would receive positive reinforcement by the general education teacher. The behavior plan stated that positive reinforcement of work completion was also to be provided Parent before and after school hours. Ms. Kravets told the team that Ventura County Behavioral Health could provide child focused cognitive behavior therapy and break down interventions based on Student's individual needs, but cognitive behavior therapy was not further discussed.

89.    Special education services included specialized academic instruction in math for 160 minutes per week, four times a week, where the resource specialist teacher would pull Student out of class for small group instruction. Student also received 200 minutes a week of specialized academic instruction in writing, by the resource specialist in a small group, with 50 minutes a week reserved of individual support of Student's vocational and social/emotional goals. Those providing specialized academic instruction were to consult and collaborate on a weekly basis, for a minimum of 30 minutes a month. The team agreed to provide Student with two hours a week of specialized academic instruction at home by a special education teacher. However, the IEP clearly specifies the home instruction as an interim transitional service to support Student's attendance goal as of June 2017, at which time the home instruction services would be reevaluated, and was not intended to be a "stay-put" service after the November 2017 annual IEP meeting.

90.    A Ventura County Behavioral Health clinician would provide Student with intensive social emotional services, in the form of individual counseling, for 240 minutes a month, or a minimum of 60 minutes a week. The county behavioral clinician had a higher level of training to serve students with mental health diagnoses and was able to provide intensive therapeutic support. At the time of hearing, Ms. Luna had provided about 15 to 17 individual sessions with Student for the school year. Ms. Luna also met with Student informally and had unscheduled sessions, as needed. Ms. Luna testified that Student would benefit from additional, more consistent counseling from someone who could provide more time than a school counselor.

91.    Parents would receive a minimum of 40 minutes a month of social work services, consisting of parent education, parent training, and parent support in the form of referrals to community-based services.

92.    Ms. Ponzuric emphasized that the IEP services were designed to get Student to attend and remain in school, by decreasing his anxiety. The two hours a week of home

19

tutoring by a special education teacher would assist Student in doing his homework, catching up on classwork, and reteaching concepts, with the intent of minimizing Student's anxiety about attending school.  The specialized academic instruction at school was to assist in math and writing, helping to alleviate anxiety, and keep Student on campus.  Similarly, the counseling and social services were intended to decrease Student's anxiety and provide support for Parents in increasing Student's attendance.

93.     Mother signed and agreed to the IEP, which was implemented on January 9, 2017.  Mother was given the option to move Student to another fourth grade class but she decided to have Student remain in Ms. Turner's class, where Student said he was comfortable.

94.     District implemented the IEP.  Student received related services of specialized academic instruction and counseling by Ms. Luna and Ventura County behavioral. Ms. Turner utilized the accommodations and the behavior intervention plan, employing interventions as needed.  The special education teacher provided home tutoring, helping with classwork, homework, and keeping track of missing assignments and due dates.  Ms. Turner provided a list of homework assignment to Student at the end of each day, if he was present. She also electronically sent assignments to Mother daily.

95.     Student's absences and early removals from school did not improve after implementation of the Section 504 service plan and IEP.  As a consequence, Student missed instruction, class work, and related services.  For example, on the day Ms. Turner testified at the hearing, Ventura County Behavioral Health went to Sierra Linda to provide therapy but Student was absent.  Student was regularly missing the services that were calculated to increase his attendance.  Ms. Turner and Ms. Luna had been unable to find out what occurred at home, which caused Mother not to bring Student to school.  When asked, Mother sometimes said Student was upset or crying, but other times Mother said it was too hot, too windy, or too cold.  When asked why not in school, Student recently said his sister was depressed and Student had to stay home to watch his sister while Mother went shopping. Mother said Student had been sick often, including a problem with a nose bleed that would not stop.

96.     Student's first trimester grades reflect his many absences and early removals. For reading, Student was far below meeting benchmarks in literature, informational text, writing, speaking and listening, not meeting benchmark in language, and striving toward meeting benchmark in phonics and word recognition.  For math, Student was not meeting benchmark in operations and algebraic thinking, number sense and operation in base ten, and math facts.  He was striving toward meeting benchmark in science and social studies.  Ms. Turner noted Student needed improvement in taking responsibility for his own learning and behavior, staying on task and using time efficiently, listening and following directions, actively participating in class, and completing and returning homework and classwork. Student was satisfactory in legible writing, cooperating while in a group, critical thinking to

20

solve social problems, and respectful toward adults and peers.  He was excellent in the appropriate use of technology.

97.    At the time of hearing, Student had been absent about 40 days and was being removed from school early, on average two times a week.  Mother did not sign an attendance contract and District had not made a referral to the attendance review board.

*Student's Experts*

98.    Student called two experts to provide opinions regarding District's child find obligations and Student's compensatory services.  Both witnesses were highly qualified in their respective fields.  However, neither expert had assessed, observed, or met Student. Neither had interviewed or met Mother, met any of Student's teachers or counselors, produced a report that was reviewed by Student's IEP team, or attended Student's IEP meetings.  The experts reviewed documents, only.  Nor were the experts qualified to assess the conflicting testimony at hearing, concerning what information District knew concerning Student, and when District knew it.

LOIS A. WEINBERG, PH.D.

99.    Lois A. Weinberg had been a professor at Charter College of Education, California State University-Los Angeles, Division of Special Education and Counseling, since 2002.  She held a 1969 bachelor of arts in Spanish, a 1973 master's degree in philosophy of education, and a 1978 doctorate in philosophy of education, with a minor in educational psychology, all from UCLA.  From 1985 to 2002, Dr. Weinberg was an education specialist with Mental Health Advocacy Services, Inc.  She received and participated in numerous grants and consulting roles, frequently served on boards, committees, roundtables and symposiums, and prolifically published scholarly articles, taught workshops, and presented at professional organizations for more than 35 years.

100.    Dr. Weinberg reviewed all available documentation regarding Student, including his educational records, grade reports, assessments, and IEP documents.  She prepared a report of her document review.

101.    Dr. Weinberg generally believed that Student's absences and consequential struggles in school since kindergarten, especially in math, were sufficient notice to trigger District's child find duties since at least first grade.  Her opinion would be unaffected even if District had been unaware of the reasons for Student's low attendance.  She did not discuss the legal requirements for triggering child find nor otherwise address the legal guidelines for evaluating a district's conduct in the past.

102.    Her reading of the psychoeducational assessment, especially the observations of the school psychologist and the pathologist, caused her to conclude that Student would

21

benefit from one-to-one education.  She therefore recommended individual instruction, at least three time per week at home (one hour in addition to the two hours Student was provided in his IEP) and one-on-one specialized instruction in math and writing from a credentialed teacher, three time a week, as well as a paraeducator to work with Student in the classroom and keep him focused.[8]

103.    Dr. Weinberg cited research that indicated cognitive interventions for children with anxiety disorders might be helpful.  Here, such therapy might enable Student to remain in the instructional setting.  She suggested that such cognitive behavioral therapy include parents, since they are involved in a student's development of skills and strategies to properly evaluate and react to otherwise anxious situations.

104.    Dr. Weinberg recommended compensatory remedies be based upon the following services which Student should have been receiving for at least two years: (1) home teacher three times a week to complete his homework and to teach him the content he missed when absent because of his anxiety disorder; (2) individual instruction from a special education teacher during the school day three times per week for a total of 180 minutes for math; and (3) counseling at school, twice a week for 100 minutes total to address Student's anxiety.[9]

ANN SIMUN, PSY.D.

105.    Ann Simun was a neuropsychologist and, since 2005, was the principal at Neuropsychologist Partners, Inc., which provided neuropsychological and psychoeducational evaluations.  She received a bachelor's degree in psychology from Pitzer College in 1986, a master's degree in school psychology in 1989 from California State University – Los Angeles, and her doctorate in clinical psychology from Pepperdine University in 1998.  She also served as a neuropsychologist at St. Mary Medical Center from 2005 to 2009, and in a professional capacity various hospitals and clinics.

106.    Dr. Simun reviewed all available documentation regarding Student, including his educational records, grade reports, assessments, and IEP documents.  She greatly relied upon Ms. Ponzuric's psychoeducational report.  Dr. Simun opined that Student should have been referred to a student success team in kindergarten or first grade.  She believed that the absences and loss of instructional time greatly impacted Student's academics, which were consistently below basic, especially in math.  She was unaware that Student's attendance and

---

[8]  Paraeducator is defined as a school employee who works under the supervision of teachers or other professional practitioners.

[9]  Dr. Weinberg also enumerated additional services that she opined should be included in Student's current IEP in order to provide a FAPE.  However, the IEP's offer of FAPE is not an issue in these proceedings.

class participation substantively improved when he transferred to Sierra Linda for the remainder of his kindergarten year.

107.   Dr. Simun agreed with the IEP's recommended eligibilities of emotional disturbance and other health impairment, primary and secondary, respectively.  However, Dr. Simun believed that Student's anxiety, and his continuing absences, required more intensive mental health services.  Sixty minutes a week of counseling was insufficient.

108.   Dr. Simun noted that Student's continuing absences and early removals from school strengthened his tendency to avoid school because of his anxiety.  As this cycle continued, the pattern became more intractable.  She suggested a multipronged approach that included individual counseling with a psychologist trained in anxiety disorder, and school avoidance and phobias.

109.   She also urged consideration of cognitive behavior therapy.  Cognitive therapy was the most effective means of addressing anxiety.  Student would be trained in identifying the actual, as opposed to imagined, causes of his anxiety and provided skills and techniques of responding appropriately.  Cognitive behavior therapy differed from applied behavior therapy, which focused on the behavior by gathering data, identifying antecedents, and encouraging replacement behavior.

110.   Dr. Simun recommended: an in-depth comprehensive mental health assessment, by a clinical psychologist; a functional behavior assessment to better understand how to intervene in the anxiety/absence cycle; cognitive behavior therapy, offsite; 240 minutes a month of individual counseling, onsite, in frequent short sessions of 20 minutes a week (basically what is in the IEP); and a family component that includes Parents.

111.   She believed that Mother was trying to deal with a child who became terrified and her response was to keep him safe.  Parents had not been given techniques to address Student's anxious behaviors.  Something was happening at home, before school, that was keeping Student from going to school.  Mother needed support to learn better ways of responding than merely keeping or taking him home.

LEGAL CONCLUSIONS

*Introduction – Legal Framework under the IDEA*[10]

---

[10]   Unless otherwise indicated, the legal citations in the introduction are incorporated by reference into the analysis of each issue decided below.

23

1.      This hearing was held under the Individuals with Disabilities Education Act (IDEA), its regulations, and California statutes and regulations intended to implement it. (20 U.S.C. § 1400 et seq.; 34 C.F.R. § 300.1 (2006)[11] et seq.; Ed. Code, § 56000 et seq.; Cal. Code Regs., tit. 5, § 3000 et seq.)  The main purposes of the IDEA are:  (1) to ensure that all children with disabilities have available to them a free appropriate public education (FAPE) that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living, and (2) to ensure that the rights of children with disabilities and their parents are protected.  (20 U.S.C. § 1400(d)(1); See Ed. Code, § 56000, subd. (a).)

2.      A FAPE means special education and related services that are available to an eligible child at no charge to the parent or guardian, meet state educational standards, and conform to the child's individualized education program (IEP).  (20 U.S.C. § 1401(9); 34 C.F.R. § 300.17; Cal. Code Regs., tit. 5, § 3001, subd. (p).)  "Special education" is instruction specially designed to meet the unique needs of a child with a disability. (20 U.S.C. § 1401(29); 34 C.F.R. § 300.39; Ed. Code, § 56031.)  "Related services" are transportation and other developmental, corrective and supportive services that are required to assist the child in benefiting from special education.  (20 U.S.C. § 1401(26); 34 C.F.R. § 300.34; Ed. Code, § 56363, subd. (a) [In California, related services are also called designated instruction and services].)  In general, an IEP is a written statement for each child with a disability that is developed under the IDEA's procedures with the participation of parents and school personnel that describes the child's needs, academic and functional goals related to those needs, and a statement of the special education, related services, and program modifications and accommodations that will be provided for the child to advance in attaining the goals, make progress in the general education curriculum, and participate in education with disabled and non-disabled peers.  (20 U.S.C. § 1401(14), 1414(d)(1)(A); Ed. Code, §§ 56032, 56345, subd. (a).)

3.      In *Board of Education of the Hendrick Hudson Central School Dist. v. Rowley* (1982) 458 U.S. 176, 201 [102 S.Ct. 3034, 73 L.Ed.2d 690] ("*Rowley*"), the Supreme Court held that "the 'basic floor of opportunity' provided by the [IDEA] consists of access to specialized instruction and related services which are individually designed to provide educational benefit to" a child with special needs.  *Rowley* expressly rejected an interpretation of the IDEA that would require a school district to "maximize the potential" of each special needs child "commensurate with the opportunity provided" to typically developing peers. (*Id.* at p. 200.) Instead, *Rowley* interpreted the FAPE requirement of the IDEA as being met when a child receives access to an education that is reasonably calculated to "confer some educational benefit" upon the child. (*Id.* at pp. 200, 203-204.) The Ninth Circuit Court of Appeals has held that despite legislative changes to special education laws since Rowley, Congress has not changed the definition of a FAPE articulated by the Supreme

---

[11]    All subsequent references to the Code of Federal Regulations are to the 2006 version.

Court in that case. (*J.L. v. Mercer Island School Dist.* (9th Cir. 2010) 592 F.3d 938, 950 [In enacting the IDEA 1997, Congress was presumed to be aware of the Rowley standard and could have expressly changed it if it desired to do so.].)  Although sometimes described in Ninth Circuit cases as "educational benefit," "some educational benefit" or "meaningful educational benefit," all of these phrases mean the *Rowley* standard, which should be applied to determine whether an individual child was provided a FAPE. (*Id*. at p. 951, fn. 10.)  In a recent unanimous decision, the United States Supreme Court also declined to interpret the FAPE provision in a manner that was at odds with the *Rowley* court's analysis, and clarified FAPE as "markedly more demanding than the 'merely more than the de minimus test.'" (*Endrew F. v. Douglas School Dist. RE-1* (2017) 580 U.S.____ [137 S.Ct. 988, 1000] (*Endrew F.*).)  The Supreme Court in *Endrew F.* stated that school districts must "offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." (*Id*. at p. 1002.)

4.      The IDEA affords parents and local educational agencies the procedural protection of an impartial due process hearing with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a FAPE to the child.  (20 U.S.C. § 1415(b)(6) & (f); 34 C.F.R. § 300.511; Ed. Code, §§ 56501, 56502, 56505; Cal. Code Regs., tit. 5, § 3082.)  The party requesting the hearing is limited to the issues alleged in the complaint, unless the other party consents.  (20 U.S.C. § 1415(f)(3)(B); Ed. Code, § 56502, subd. (i).)  Subject to limited exceptions, a request for a due process hearing must be filed within two years from the date the party initiating the request knew or had reason to know of the facts underlying the basis for the request. (20 U.S.C. § 1415(f)(3)(C), (D); Ed. Code, § 56505, subd. (*l*).)  At the hearing, the party filing the complaint has the burden of persuasion by a preponderance of the evidence. (*Schaffer v. Weast* (2005) 546 U.S. 49, 56-62 [126 S.Ct. 528, 163 L.Ed.2d 387]; see 20 U.S.C. § 1415(i)(2)(C)(iii) [standard of review for IDEA administrative hearing decision is preponderance of the evidence].)  Here, Student carries the burden of persuasion.

*Issue 1:  Child Find*

5.      Student alleges that District failed to meet its child find obligation by not evaluating Student in all areas of suspected disability, since August 2013.  Generally, Student contends District's child find duties were triggered at the beginning of first grade because District was aware that his chronic absenteeism was caused by a sleep disorder and anxiety. District asserts that Student's academic struggles were caused by unexplained chronic absenteeism, which was a consequence of Mother's willingness to allow Student to remain at home or leave school early.  Mother did not transparently or consistently inform District personnel of a reason for Student's poor attendance until October 2016, when she provided a letter from Student's doctor.  Thus, District personnel had no reason to suspect Student had a disability needing special education services.  As discussed below, Student met his burden of proof that District's child find duty was triggered, but not before September 30, 2014.

LAW RELATED TO CHILD FIND DUTY

6.      The IDEA places an affirmative, ongoing duty on the state and school districts
to identify, locate, and evaluate all children with disabilities residing in the state who are in
need of special education and related services.  (20 U.S.C. § 1412(a)(3); 34 C.F.R.
§ 300.111(a).)  This duty is commonly referred to as "child find."  California law specifically
incorporates child find in Education Code section 56301, subdivision (a).

7.      A school district's child find obligation toward a specific child is triggered
when there is knowledge of, or reason to suspect, a disability, and reason to suspect that
special education services may be needed to address that disability.  (*Dept. of Education,
State of Hawaii v. Cari Rae S.*  (D. Hawaii 2001) 158 F.Supp. 2d 1190, 1194
("*Cari Rae S.*").)  The threshold for suspecting that a child has a disability is relatively low.
(*Id*. at p. 1195.)  A school district's appropriate inquiry is whether the child should be
referred for an evaluation, not whether the child actually qualifies for services.  (*Ibid.*)[12]  The
actions of a school district with respect to whether it had knowledge of, or reason to suspect,
a disability, must be evaluated in light of information that the district knew, or had reason to
know, at the relevant time.  It is not based upon hindsight.  (See *Adams v. State of Oregon*
(9th Cir. 1999) 195 F.3d 1141, 1149 (citing *Fuhrmann v. East Hanover Bd. of Educ.*
(3rd Cir. 1993) 993 F.2d 1031, 1041).)

8.      For purposes of evaluating a child for special education eligibility, the district
must ensure that "the child is assessed in all areas of suspected disability."  (20 U.S.C.
§ 1414(b)(3)(B); Ed. Code, § 56320, subd. (f).)  The determination of what tests are required
is made based on information known at the time.  (See *Vasheresse v. Laguna Salada Union
School Dist.* (N.D. Cal. 2001) 211 F.Supp.2d 1150, 1157–1158 [assessment adequate despite
not including speech/language testing where concern prompting assessment was deficit in
reading skills].)  A school district is also required to ensure that the evaluation is sufficiently
comprehensive to identify all the child's needs for special education and related services
whether or not commonly linked to the disability category in which the child has been
classified.  (34 C.F.R. § 300.304(c)(6).)

ANALYSIS OF CHILD FIND ISSUE

9.      Student was a bright, generally sweet and respectful child.  Student had a
difficult experience in kindergarten during 2012-2013, at Emilie Ritchen Elementary School.
Mother felt the kindergarten teacher was mean-spirited and abusive, publically ridiculing

_____

[12]   In a footnote in an unpublished decision, the Ninth Circuit Court of Appeals noted
that it has not yet articulated a test for determining when the child find obligation is
triggered.  (*G.M. ex. rel. G.M. v. Saddleback Valley Unified Sch. Dist.* (9th Cir. 2014)
583 Fed.Appx. 702, 703, fn. 1.)

Student.  Mother started to keep Student home, or remove him early from class, because Student did not want to be in school. While at Ritchen, Student was absent 30 days and tardy 11 times.

10.     In May 2013, Student transferred to Sierra Linda Elementary School.  Student finished the remaining five weeks of kindergarten in Mr. Arreguin's class.  Mr. Arreguin persuaded Mother to bring Student to school each day, and let him stay, to see how he would do.  Mother confirmed that Student did well and brought Student to school every day for the remainder of the year, except one day.  Mother was appreciative and thanked Mr. Arreguin. Student was happy, not tired, adjusted to the new class, worked on assignments, was responsive to instruction, participated in small groups, and made friends.  At no time did Mother indicate that Student's absences at Ritchen were for any reason other than her displeasure with the teacher.

11.     Student argues the first kindergarten teacher's note that Student received "Tier I RTI" intervention put District on notice of Student's need for assessment.  However, District convincingly demonstrated that such intervention was for core curriculum, perhaps consisting of preteaching or reteaching, in a small group or individually.  Such intervention was not for pupils at risk of academic failure.  Mr. Arreguin viewed Student's difficulty with math as a consequence of his many absences at Ritchen.  The Tier I intervention did not indicate Student was in need of assessment and Mr. Arreguin did not have reason to suspect Student had a disability and needed assessment.  Student finished kindergarten with excellent attendance, good academic performance, and responsive class participation.

12.     Student started first grade in August 2013.  Ms. Pauley regularly talked to Mother, especially about how Student's repeated absences and early removals from school negatively affected Student's academics.  This was especially true in math, where Student struggled with addition and subtraction.  Mother was on campus daily, often volunteering.

13.     Mother said she told Ms. Pauley and others at school that Student was absent because he had insomnia and was taking medication, had asked for help, and no one offered assistance.  However, Mother's contention in this regard was contradicted by others' testimony and unsupported by additional evidence.  Contrary to Mother's assertion that no one offered to help, Ms. Pauley informed Mother at the November 2013 parent-teacher conference that Student was below standards in math and outlined the interventions she was using to assist Student.  Mother acknowledged in writing that Student was receiving the interventions.  Ms. Pauley was convincing in her testimony that Mother never mentioned insomnia, a sleep disorder, or medication at the meeting.  As Student's absences and early removals increased over the year, Mother never indicated any specific, ongoing problem that contributed to the absences.

14.     Ms. Luna arranged a formal attendance meeting with Mother.  Mother failed to appear for the first meeting, saying "they were sick."  Mother appeared at a rescheduled

27

meeting with Ms. Luna and Ms. Wennes.  Mother was resistant, was not open to inquiry, and did not want to be at the meeting.  Ms. Luna demonstrated a good recollection of the attendance meeting, recalling that Mother did not say Student had a sleeping disorder, insomnia, anxiety, or was taking medication.  This was confirmed by Ms. Wennes, who noted that Mother quickly cut short any conversation regarding Student's attendance.

15.     Ms. Pauley and Ms. Luna continued to regularly communicate with Mother regarding absenteeism for the remainder of the year and Mother never said Student's absences were caused by insomnia, a sleeping disorder, or medication.  Ms. Pauley, Ms. Luna, and Ms. Wennes persuasively testified that Student's absences and early removals remained a mystery throughout the year.

16.     Student refers to District's December 2016 psychoeducational assessment as conclusively demonstrating that District's child find duties should have been triggered by first grade.  Ms. Ponzuric stated that Student had exhibited behavior that impacted his educational performance since kindergarten. However, in evaluating whether the child find duty was triggered, District's actions with respect to whether it had knowledge of, or reason to suspect, a disability must be evaluated in light of information District knew, or had reason to know, at the relevant time.  It is not based upon hindsight.  District knew Student had excessive absences, which affected Student's academics.  However, despite meetings and multiple inquiries, District personnel did not learn the reasons for Student's absences other than Student's attachment to Mother and Mother's willingness to keep him home or remove him early.

17.     Student further cites his experts' testimony, who independently came to the conclusion that Student should have been referred for assessment in first grade.  Dr. Simun and Dr. Weinberg were well-qualified, recognized experts in their respective fields.  However, a proposed expert must also possess factual information directly related to the issue upon which they provide an opinion.  Here, they were not qualified to render an opinion as to whether District's child find duty was triggered in first grade.  The experts reviewed documents, only.  They did not observe, interview, or meet Student, did not meet Mother, and did not talk to any of Student's teachers, counselors or school personnel.  They did not hear the witness testimony, which provided the evidence that enabled informed factual and legal findings.

18.     In conclusion, during Student's first grade year of 2013-2014, District did not have reason to suspect Student had a disability or that special education services may be needed to address that disability.  Without such information, District's child find duty was not triggered.[13]  Student did not meet his burden of proof as to Issue 1(a).

---

[13] Student's excessive absenteeism warranted referral to the attendance review board.  Pupils ages six through 18 years old are subject to compulsory full-time education (Ed. Code, §§ 48200).  The student attendance review board legislation (Ed. Code, §§ 48320–48325)

19.     Circumstances changed when Student started second grade in the 2014-2015 school year.  Ms. Pascual saw Student as a generally happy boy, who fell asleep in class about once a week and had angry outbursts.  Ms. Pascual then saw a pattern of frequent absences and early withdrawals, which were negatively affecting Student's academics.  Student was missing a substantial amount of instruction and tests.  She concluded that Student was capable, but Student could not learn if he was not emotionally or physically capable to participate in class or was absent.  She told the school counselor Ms. Luna about the poor attendance and early removals, including how Student was often not fully alert.

20.     Ms. Pascual explained to Mother that the poor attendance was harming Student's academics.  Mother told Ms. Pascual that Student had insomnia and described how she struggled to get Student to sleep and that Student often was not able to wake up and come to school in the morning.  Mother also told Ms. Pascual that this caused Student to be sleepy and irritable at school, which contributed to his early removal.  Therefore, District was now aware of information that should have caused personnel to suspect that Student had a disability or that special education services may have been needed to address that disability.

21.     Neither Student nor District provided clear, unambiguous evidence of when Mother told Ms. Pascual that Student had insomnia, which caused the absences and early removals.  The first day of school was August 20, 2014.  Mother told Ms. Pascual shortly before Thanksgiving break that she was taking Student to a doctor to help with the insomnia.  However, Ms. Pascual came to believe within a month or so after school started that Student's absences, lethargy, and sleeping in class were caused by his insomnia.  Ms. Pascual had reason to suspect that Student had a disability as of September 30, 2014, at which time District's child find duties were triggered.

22.     Ms. Pascual said that she did not suspect a disability in need of assessment.  She thought the absences, sleepiness, and irritability were caused by a medical issue.  Ms. Pascual's belief in this regard was similar to that of Ms. Luna and Student's other teachers.  However, chronic medical issues such as insomnia can form a basis for special education eligibility, such as other health impairment.

---

establishes panels to address absenteeism, when a minor becomes a habitual truant (Ed. Code, § 48262).  OAH does not have jurisdiction over attendance review board proceedings and, therefore, District's failure to refer Student is not discussed herein.

23.     A student may be eligible for special education and related services in the
category of other health impairment if he is a pupil with limited strength, vitality or alertness,
due to chronic or acute health problems which adversely affect his educational performance
(Cal. Code Regs., tit. 5, § 3030, subd. (b)(9)).  Ms. Pascual concluded Student could not
learn if he was not emotionally or physically capable to participate in class or was absent.
Accordingly, Mother's statement that Student had insomnia which caused lack of alertness in
school and which regularly prevented him from awakening to go to school, triggered
District's child find duty to refer Student for assessment.

24.     District argues that it established a referral structure which assured that pupils
in possible need of support were properly vetted by District professionals equipped to
evaluate a pupil's needs.  District cites how its teachers were trained to spot and refer
students suspected of needing academic support to a coordinated support team, which
gathered information and determined if the pupil should be referred to a student success team
that included additional professionals who would develop, with the parents, supports and
interventions to address the pupil's academic needs.  Sometimes, these teams referred a pupil
for special education assessment.

25.     Here, this referral process failed to address Student's educational needs and
meet District child find duties.  Ms. Pascual thought the absences, sleepiness, and irritability
were caused by a medical problem, not an academic problem.  She therefore did not refer
Student because she incorrectly believed medical issues were not a basis for success team or
special education intervention.  In fact, District personnel never referred Student to a support
or success team, further demonstrating that District's referral process did not herein satisfy
its child find obligations.

26.     In summary, Student met his burden of proof by demonstrating that District
failed to meet its child find duties and refer Student for assessment when it learned that
Student's poor attendance, fatigue, and irritability were allegedly caused by a sleeping
disorder or insomnia.  Ms. Pascual had reason to suspect that Student had a disability as of
September 30, 2014, at which time District's child find duties were triggered.  Student
prevailed on Issue 1(b).[14]

ANALYSIS: FAPE DENIAL FROM PROCEDURAL VIOLATION

27.     Child find does not guarantee eligibility for special education and related
services under the IDEA.  It is merely a locating and screening process used to identify those
children who are potentially in need of special education and related services.  Once

---

[14] Since the District's child find duty was first triggered within two years of the date
Student filed a due process request, this decision does not further discuss or analyze issues
related to the tolling of the two-year timeline for requesting hearing.

identified, the district must conduct an initial evaluation to confirm the child's eligibility for
special education.  (34 C.F.R § 300.301; Ed. Code, § 56302.1.)

28.      Violations of child find, and of the obligation to assess a student, are
procedural violations of the IDEA and the Education Code.  (*Cari Rae S.*, *supra*, 158 F.Supp.
2d at p. 1196; *Park v. Anaheim Union High School District* (9th Cir. 2006) 464 F.3d 1025,
1031.)  A procedural violation results in liability for denial of a FAPE only if the violation:
(1) impeded the child's right to a FAPE; (2) significantly impeded the parent's opportunity to
participate in the decision-making process; or (3) caused a deprivation of educational
benefits.  (20 U.S.C. § 1415(f)(3)(E)(ii); Ed. Code, § 56505, subd. (f)(2); see *W.G. v. Board
of Trustees of Target Range School Dist.* No. 23 (9th Cir. 1992) 960 F.2d 1479, 1484.)

29.      In the fall of 2014, Student had limited strength, vitality and alertness, due to
his chronic insomnia, which affected his educational performance.  Student's insomnia
caused "limited alertness" on some days and affected his ability to awaken on other days.
This kept him from consistently attending school, which adversely impacted his academic
performance.  The evidence demonstrates that if District had assessed Student in the fall
of 2014, Student would have been found to have met the eligibility criteria for other health
impairment.

30.      District's failure to assess Student when its child find duty was triggered
impeded Student's right to a FAPE, because he would have been found eligible and
otherwise entitled to a FAPE.  Further, the failure to assess deprived Student of the
educational benefit of the related services and placement that he would have received in an
IEP.  Therefore, District's failure to assess Student in the fall of 2014 was a procedural
violation that denied Student a FAPE.

*Issues 2(a) and (b):   Failure to Provide an IEP that Met Student's Unique Needs and that
Was Calculated to Offer Him Educational Benefit*

31.      Student alleges in Issue Two that District denied Student a FAPE by failing to
provide an individualized education program that met his unique needs and that was
reasonably calculated to offer educational benefit to Student, since August 2013.  District
generally argues that it was not obligated to provide an IEP because its child find duty had
not been triggered. As discussed above, Student demonstrated District was obligated to
provide Student with an individualized education program since the fall of 2014.  Student
therefore did not prevail as to Issue Two (a) but met his burden of proof as to Issue Two (b)
for the time period beginning in the fall of 2014.

32.      "Special education" is instruction specially designed to meet the unique needs
of a child with a disability.  (20 U.S.C. § 1401(29); 34 C.F.R. § 300.39; Ed. Code, § 56031.)
Here, Student was entitled to assessment in the fall of 2014.  As discussed above, Student
would have been found eligible as other health impaired and, therefore, would have received

special education if he was assessed in fall of 2014.  Because he was not assessed and could
not receive special education, Student has met his burden of proof as to Issue Two.  Student
has not had his unique needs as a child with a disability addressed by special education since
fall of 2014.

33.     An IEP must be reasonably calculated to "confer some educational benefit"
upon the child (*Rowley*), enabling the child "to make progress appropriate in light of his
circumstances" (*Endrew F.*).  Here, Student would have been entitled to special education
had he been assessed in fall 2014.  Student was not assessed until November 2016.  Parents
agreed to an IEP in December 2016 and Student started receiving special education placement
placement and services in January 2017.  Therefore, Student did not receive an IEP that
conferred educational benefit so he could make progress appropriate for his circumstances,
since fall 2014.  Student has met his burden of proof as to Issue Two (b).


REMEDIES

1.      Student prevailed as to Issue One (b) and Issue Two (b), beginning
September 30, 2014.  If District prepared an assessment plan at that time, Parents could be
assumed to have returned the same day, thus commencing the 60-day time period within
which District would assess and hold an IEP.  The 60 days are calendar days but do not
include days between the pupil's regular school sessions, terms, or days of school vacation in
excess of five school days.  (Ed. Code, § 56344(a).)  Sixty days from September 30, 2014 is
November 29, 2014, but this included the five-day Thanksgiving break.  So, District should
have held the first IEP team meeting by December 5, 2014.  Student's first IEP meeting was
not held until November 30, 2016.

*Compensatory Services*

2.      Federal law provides that a court that hears a civil action taken from a special
education administrative due process hearing "shall grant such relief as the court deems
appropriate." (20 U.S.C. § 1415(i)(2)(C)(iii); 34 C.F.R. § 300.516(c)(3)(2006).)  The United
States Supreme Court has held that this authority "confers broad discretion on the court" to
grant relief that is appropriate in light of the purpose of the IDEA.  (*School Committee of the
Town of Burlington, Massachusetts v. Department of Education* (1985) 471 U.S. 359, 369
[105 S.Ct. 1996, 85 L.Ed.2d 385].)  The broad authority to grant relief extends to the
administrative law judges and hearing officers who preside at administrative special
education due process proceedings.  (*Forest Grove School District v. T.A.* (2009) 557 U.S.
230 [129 S.Ct. 2484, 2494, fn. 11; 174 L.Ed.2d 168].)

3.      The fashioning of equitable relief in IDEA cases requires a "fact-specific"
analysis.  (*Parents of Student W. v. Puyallup School District No.* (9th Cir. 1994) 31 F.3d.
1489, 1497.)  School districts may be ordered to provide compensatory education or

32

additional services to a student who has been denied a FAPE. (*Id.* at p. 1496.) The conduct of both parties must be reviewed and considered to determine whether relief is appropriate. (*Ibid.*) These are equitable remedies that courts may employ to craft "appropriate relief" for a party. An award of compensatory education need not provide a "day-for-day compensation." (*Id.* at p. 1497.) The award must be fact-specific and be "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." (*Reid ex rel. Reid v. District of Columbia* (D.D.C. Cir. 2005) 401 F.3d 516, 524 )

ACADEMICS

4.     Student seeks compensatory education that is primarily based on computations covering the approximately two years Student was without an IEP: 197 hours of specialized academic instruction in math; 246 hours of academic instruction in writing; and 148 hours of academic instruction (akin to home instruction).

5.     However, an award of compensatory education need not provide a "day-for-day compensation. The guiding principle of compensatory education is what will benefit Student.

6.     The 2016 IEP team's approach provides appropriate guidance for what compensatory services are appropriate to benefit Student now. Part of the 2016 IEP team's strategy addressed Student's poor academic performance by intensive academic support in school and specialized academic instruction at home. The intent is to ameliorate lost instructional time and improve academic performance, thus decreasing Student's school performance anxiety and encouraging better school attendance.

*INTENSIVE ACADEMIC SUPPORT IN SCHOOL*

7.     The 2016 IEP provides 160 minutes a week for math and 200 minutes a week for writing, by a resource teacher. This is six hours a week of specialized academic instruction at school. Student receives these services in the classroom and in a small group out of the classroom, with some individual instruction. Consistent with the strategy of providing these services in school, some of Student's compensatory education should be provided in the school setting.

8.     Student responds well to individualized instruction. An additional hour of individualized instruction can specifically identify and address Student's struggles in the areas he missed because of the lost instructional time, within the context of his current curriculum. Using the two years in which Student should have had an IEP as a guideline, with 37-week school years, for an hour week, Student is entitled to school-based compensatory academic instruction of 74 hours.

### HOME INSTRUCTION

9.      The other part of the IEP's stratagem is to support Student at home, keeping him fully informed and current on his assignments, well-prepared to attend school.  The IEP provides two hours a week of home instruction by a special education teacher.  However, the IEP emphasized that this was a temporary service, designed to get Student to decrease anxiety, and would be revaluated within the context of his 2017 attendance goal.  Yet, Student is below basic in his academics and, having been denied an IEP for two years, is entitled to compensatory service for support he should have otherwise been receiving. Student shall receive 37 hours of additional District home instruction, by a special education teacher, one hour a week.

10.     Additionally, to specifically address lost instruction because of the failure to assess and provide services for two years, District will provide 37 hours of intensive academic instruction, through a nonpublic agency, to be used by Student whether school is in session.

### COUNSELLING AND BEHAVIOR THERAPY

11.     Student asks for 74 hours of individual counseling and 148 hours of off-site psychological counseling by a licensed psychologist, as compensatory mental health services.  However, no "fact specific" analysis supports Student's request for the counseling. If Student had been assessed in fall 2014, he would not have been found eligible for emotional disturbance; Student was not diagnosed with anxiety until the following year.  So the suggestion that Student would have been receiving counseling and intensive social - emotional services, to the extent provided in his present IEP, is conjecture. Dr. Hansuvadha's October 11, 2016 letter stated that Student was diagnosed with insomnia in June 2012, but Student was not diagnosed with anxiety disorder until February 20, 2015. Mother did not inform Ms. Pascual, Ms.Wennes, or Ms. Luna during Student's second grade.

12.     A more suitable approach to compensatory mental health services is to consider what would assist the Student now, to address emotional issues that might have been addressed earlier.  In this regard, Student submitted little evidence.  Student's two experts never met Student, much less evaluated his mental state.  Yet, they did provide insight as to possible avenues to be explored for possible additional or alternative mental health services.  Dr. Weinberg and Dr. Simun proposed evaluating Student for cognitive behavioral therapy to assist in regulating his anxiety.  Ms. Kravets apparently concurred; she concluded that Student had insight into what was triggering his anxiety, but at that time, he did not have coping strategies.  Ms. Kravets told the IEP team that Ventura County Behavioral Health could provide child-focused cognitive behavior therapy and break down interventions based on Student's individual needs.  However, the IEP did not further discuss this proposal.

34

13.     Pupils may be equitably entitled to publicly funded independent educational evaluations when a district was obligated to assess but failed to do so.  (See, e.g., *M.S. v. Lake Elsinore Unified School Dist.* (C.D. Cal. July 24, 2015) 2015 WL 4511947, at pp. 10-11; *Los Angeles Unified School Dist. v. D.L.* (C.D.Cal. 2008) 548 F.Supp.2d 815, 821-822.)  This equitable remedy is available independently from a student's statutory right to an independent educational evaluation.  (20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.502 (a)(1); Ed. Code, § 56329, subd. (b); *Letter to Baus*, 65 IDELR 81 (OSEP 2015).)

14.     Here, District had an opportunity to explore the viability of cognitive behavior therapy for Student.  It did not do so.  Also, District delayed providing IEP services to Student, which would likely have diminished Student's present need for mental health services.  Therefore, as an equitable and compensatory remedy, Student is entitled to a District funded independent educational assessment, to determine if Student is an appropriate candidate for cognitive behavior therapy to address his anxiety, with recommendations.  Such assessment will include Parents and suggest possible parental services to assist Parents in supporting Student's mental health.  District shall timely convene an IEP team meeting to review the assessment.  District's funding of the assessment shall include the assessor's time for attending the IEP team meeting.  The assessment shall be performed by a professional qualified to assess whether cognitive behavior therapy is indicated for Student's anxiety.

*Training of District Personnel*

15.     Staff training is also an appropriate remedy.  (*Park v. Anaheim Union High School Dist*, *supra*, 464 F.3d at p. 1034 [student, who was denied a FAPE due to failure to properly implement his IEP, could most benefit by having his teacher appropriately trained to do so].)  Appropriate relief in light of the purposes of the IDEA may include an award that school staff be trained concerning areas in which violations were found, to benefit the specific pupil involved, or to remedy procedural violations that may benefit other pupils.  (*Ibid*.  See also, e.g., *Student v. Reed Union School Dist.*, (OAH Case No. 2008080580) [requiring training on predetermination and parental participation in IEP's]; *Student v. San Diego Unified School Dist.* (OAH Case No. 2014120525) [requiring training regarding pupil's medical condition and unique needs].)

16.     Here, Student should have been assessed in the fall of 2014 but was not assessed until two year later.  Fundamental to District's failure to timely assess was a general misunderstanding of a school district's child find obligations.  General education teachers, counselors, and administrators stated that they did not suspect Student to have a disability that might need to be addressed by special education services, because Student's absences were the consequence of a medical issue.  Yet everyone agreed that Student's chronic absenteeism and early removal negatively affected his academics.  In fact, though Student's academics were obviously compromised by his lost instructional time, District personnel did not refer Student for a coordinated support team or a student success team.

17.     District personnel's misunderstanding in this regard was systemic.

18.     Therefore, to assure that Student and other special education students are afforded the procedural protections to which they are entitled under the IDEA and state law, District shall train its Sierra Linda Elementary School personnel in special education eligibility, child find duties, and the ability to directly refer a student for assessment, for a minimum of six hours.  Further, such training will provide guidelines to identify students who might have disabilities and might benefit by special education services.

## ORDER

1.     District shall provide Student 74 hours of school-based, one-on-one specialized academic instruction, outside of the classroom, at a rate of one hour per week, beginning within 30 days of the date of this order, and continue each full week that school is in session, until the 74 hours have been used.  The services will be provided by a special education or resource specialist teacher, at a regularly scheduled time each week.  If Student misses a scheduled session because he was absent from school, or removed early from school, District shall not be required to again offer the one-hour session, unless the absence or early withdrawal is excused with a note from a doctor, medical professional, or mental health professional.

2.     District shall provide Student 37 hours of additional home instruction beyond what is provided in his 2016 IEP, by a special education teacher, at a rate of one hour per week, beginning within 30 days of the date of this order, and continuing each full week that school is in session, until the 37 hours have been used.  If Student misses or cancels less than 24 hours before a scheduled session, District shall not be required to again offer the one-hour session, unless the absence or late cancellation is excused with a note from a doctor, medical professional, or mental health professional.

3.     District will fund 37 hours of intensive academic instruction through a nonpublic agency, to be used by Student whether or not school is in session.  Scheduling of instruction shall be made by Parents and the agency.  Any scheduled appointments which Student misses and for which the agency bills the District, pursuant to the agency's cancellation/scheduling policy, shall be counted toward the 37 hours.

4.     District shall fund an independent educational evaluation to determine if Student is an appropriate candidate for cognitive behavior therapy to address his anxiety, with treatment recommendations. The assessment shall be performed by a professional qualified to assess whether cognitive behavior therapy is indicated for Student's anxiety. Such assessment will include Parents and suggest possible parental services to assist Parents in supporting Student's mental health services, if deemed appropriate.  District shall timely convene an IEP team meeting to review the assessment.  District's funding of the assessment shall include the assessor's time for attending the IEP team meeting.

36

5.      District shall, no later than August 30, 2017, provide six hours of training to all Sierra Linda Elementary School general education teaching staff, paraprofessionals, aides, student study team members, school administrators, service providers, counselors, school psychologists, speech and language therapists, and any other staff who work with parents and students on their educational programs.  The training shall address special education eligibility, child find duties, and the ability to directly refer a student for assessment. Further, such training will provide guidelines to identify students who might have disabilities and might benefit by special education services.  The training shall be provided by qualified professionals either employed or contracted by the Ventura County Special Educational Local Plan Area, or a private provider selected by District. The training may be held concurrently or in coordination with any training ordered through any other OAH Decision issued within 90 days of this Decision, to the extent the ordered training overlaps or is duplicative.

PREVAILING PARTY

Education Code section 56507, subdivision (d), requires that this Decision indicate the extent to which each party prevailed on each issue heard and decided in this due process matter.  Student prevailed on Issue1 (b) and Issue 2 (b).  District prevailed on Issue 1 (a) and 2 (b).

RIGHT TO APPEAL THIS DECISION

This was a final administrative Decision, and all parties are bound by it.  Pursuant to Education Code section 56506, subdivision (k), any party may appeal this Decision to a court of competent jurisdiction within ninety (90) days of receipt.

DATED:  May 12, 2017

DocuSigned by:

_____3EEE11185C9F48D..._____
CLIFFORD H. WOOSLEY
Administrative Law Judge
Office of Administrative Hearings

37

Exhibit E

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

In the Matter of:

PARENT ON BEHALF OF STUDENT,

v.

OXNARD SCHOOL DISTRICT.

OAH Case No. 2016100053

## DECISION BY SETTLEMENT
### (Cal. Code Regs., tit. 5, § 3087)

Clifford H. Woosley, Administrative Law Judge, Office of Administrative Hearings, State of California, enters this Decision by Settlement pursuant to section 3087 of title 5 of the California Code of Regulations.

Student, by and through her Parent, filed a Due Process Hearing Request on September 22, 2016, with OAH, naming Oxnard School District.  On November 4, 2016, OAH granted a continuance of the hearing to January 31, 2017.

ALJ Woosley started the hearing on January 31, 2017.  Attorneys Janeen Steel and Shawna L. Parks appeared on behalf of Student.  Mother attended the hearing.  Attorneys Benifacio Bonny Garcia and Lawrence S. Joe appeared on behalf of District.  Director of Special Education Services, Amelia Sugden, and Manager of Special Education, Nadia Villapudua, attended on behalf of District.

After hearing commenced, but before the entry of evidence, the parties announced that they had reached a stipulation to amended issues in favor of Student and that the only matters remaining for hearing were the remedies.   The parties were granted an additional day to reach agreement as to remedies and, at parties' request, the matter was further continued to February 2, 2017.

On February 1, 2017, the parties submitted a proposed Stipulated Judgment, signed by the parties' attorneys, which OAH considered a request for a decision by settlement.  ALJ Woosley continued the hearing to a telephonic status conference on February 3, 2017, at which time ALJ Woosley thoroughly discussed the parties' request for a Decision by

Settlement.[1]

The matter was continued to Friday, January 10, 2017, at which time the parties filed a fully executed, proposed Stipulated Decision in lieu of a decision on the merits. The matter was then submitted for decision by settlement, pursuant to the terms of the parties' agreement.

## STIPULATED AMENDED ISSUES IN FAVOR OF STUDENT

1.     Since September 21, 2014, District denied Student a free appropriate public education by not meeting its child find obligations, not evaluating Student in all areas of suspected disability, and not finding Student eligible for special education placement and related services.

2.     Since September 21, 2014, District denied Student a FAPE by failing to offer Student an individualized education program that met Student's unique needs.

3.     Since September 21, 2014, District denied Student a FAPE by failing to offer an individualized education program that was reasonably calculated to offer educational benefit to Student.

4.     Student is eligible for special education and related services as a student with a speech or language impairment. District should have found Student eligible for special education and related services as a student with a speech or language impairment as of September 21, 2014.

## FACTUAL FINDINGS

1.     The parties stipulate that Student is 13 years old and attends the seventh grade at Kamala Elementary School within the Oxnard School District.

2.     The parties stipulate that Student is eligible for special education and related services under the category of speech or language impairment. The parties stipulate that District is the local education agency responsible for Student's special education services. The parties stipulate that District should have found Student eligible for special education as of September 21, 2014

3.     The parties entered into a Stipulated Decision, which they and their attorneys fully executed and which is part of the official record and incorporated herein. The parties have stipulated to four issues in favor of Student. The parties have further agreed to related and compensatory services.

---

[1] The recording of the status conference is part of this matter's official record.

4.      The stipulated issues in favor of Student have been set forth above.  The
stipulated related and compensatory education services have been incorporated in the Order
below.

5.      The Stipulated Decision does not contain any agreed-upon terms that are
contrary to the law.

LEGAL CONCLUSIONS

1.      The Individuals with Disabilities in Education Act and related state laws
strongly encourage the settlement of special education disputes.  (See, e.g., 20 U.S.C. §
1415(f)(1)(B); Ed. Code, § 56501.5, subd. (a) [requirement of resolution session before due
process hearing]; 20 U.S.C. § 1415(e); Ed. Code, § 56500.3 [availability of mediation before
due process hearing]; 20 U.S.C. § 1415(f)(1)(B)(ii); 34 C.F.R. § 300.510(d)(2)(2006); Cal.
Code Regs., tit. 5, § 4650, subd. (a)(4); *Wyner v. Manhattan Beach Unified Sch. Dist.* (9th
Cir. 2000) 223 F.3d 1026, 1028-1030 [administrative enforcement of settlements of due
process disputes].)

2.      Decision by settlement is authorized by California administrative law.  (Gov.
Code, § 11415.60; *Rich Vision Centers, Inc. v. Board of Medical Examiners* (1983) 144
Cal.App.3d 110, 115-116 [". . .we see no limitations on the conditions that may be included
in a settlement except that such conditions must not violate public policy"].)  Government
Code section 11415.60 does not apply to special education due process disputes (Cal. Code
Regs., tit. 5, § 3089), but the State Board of Education has adopted a similar regulation.
Section 3087 of title 5 of the California Code of Regulations provides:

Notwithstanding Government Code section 11415.60 of the Administrative
Procedure Act, a decision by settlement may be issued on terms the parties
determine are appropriate so long as the agreed-upon terms are not contrary to
the law.

3.      Based on Factual Finding 3 and Legal Conclusion 2, the parties have settled
their dispute on terms they have determined are appropriate.

4.      Based on Factual Finding 5 and Legal Conclusion 2, the Stipulated Decision
does not contain any agreed-upon term that is contrary to the law.


STIPULATED ORDER

The parties stipulate that Oxnard School District shall provide to Student the
following related and compensatory education services:

3

1.      Fund an assessment by Lindamood-Bell Learning Processes in Santa Barbara within one week of this Decision, or as soon thereafter as Lindamood-Bell's Santa Barbara office will schedule an assessment.

2.      Upon receipt of the Lindamood-Bell assessment, fund provision of Lindamood-Bell services that are recommended by Lindamood-Bell for a period of two years.  District will provide any appropriate venue or other supports for Lindamood-Bell to implement and provide its recommended services, including but not limited to any physical requirements, such as a location with the provision of any online services in classroom or on campus.  District will fund any re-evaluations that are suggested or required by Lindamood-Bell.  The Lindamood-Bell services will be provided during the regular school day and will be coordinated with Student's teacher.

3.      Student will be placed in a mild-moderate special day class at Oxnard School District's Haydoc Academy of Arts and Sciences that includes, but is not limited to, the following:

a.      30 minutes per week of individual speech services until the end of Student's eighth grade year;

b.      60 minutes per week of group speech services until the end of Student's eighth grade year;

c.      No fewer than 12 social skills sessions provided for one hour on a weekly basis, with the option of continuing if recommended by the supervising counselor; and

d.      Services by a Language and Academic Development ("LAD") credentialed teacher, as needed, to support the special day class teacher to provide writing instruction.

4.      If Lindamood-Bell recommends continued services during summer, District shall provide these services for the 2017 and 2018 extended school year.  If the Lindamood-Bell program is offered at the Ventura location, then District will provide round trip transportation.  If the Lindamood-Bell program is not offered at the Ventura location, District will provide the Lindamood-Bell services at a location where District offers Extended School Year.  (Extended School Year may not be available at Student's home school.)  If Lindamood-Bell does not suggest a summer program for Student, District will provide standard Extended School Year services in a District program.  For any summer programs, District will provide transportation if the location of service is more than a fifteen-minute walk from Parent's home.

5.      District is a kindergarten through eighth grade school district and Student will be enrolled in District through Summer 2018.  Thereafter, if any Lindamood-Bell services

4

required under by this decision remain, such services will be provided by District in coordination with the High School District and Parent.

6.      If Parent moves more than a fifteen-minute walk from Haydoc Academy of Arts and Sciences, but remains within District, District will provide Student with transportation.  If Parent moves out of District in the next two years, the District will coordinate providing any remaining Lindamood-Bell services with the Parent and Student's new school district as follows:  (1) during school, if an arrangement can be reached with the new school district, or (2) after school, if no arrangements are able to be made with the new school district within sixty days of Student's enrollment.

7.      Student withdraws and dismisses all other claims.

PREVAILING PARTY

Education Code section 56507, subdivision (d), requires that this Decision indicate the extent to which each party prevailed on each issue heard and decided in this due process matter.  Here, the parties stipulated that Student is the prevailing party on Issues 1, 2, 3, and 4.

RIGHT TO APPEAL THIS DECISION

This was a final administrative Decision, and all parties are bound by it.  Pursuant to Education Code section 56506, subdivision (k), any party may appeal this Decision to a court of competent jurisdiction within ninety (90) days of receipt.

DATED:  March 13, 2017

CLIFFORD H. WOOSLEY
Administrative Law Judge
Office of Administrative Hearings

# Exhibit F

BEFORE THE

OFFICE OF ADMINISTRATIVE HEARINGS

STATE OF CALIFORNIA

In the Matter of:

PARENT ON BEHALF OF STUDENT,

v.

OXNARD SCHOOL DISTRICT.

OAH Case No.  2018080844

**DECISION**

Student filed a due process hearing request (complaint) with the Office of Administrative Hearings, State of California, on August 17, 2018, naming Oxnard School District.  Oxnard served its written response to Student's complaint on September 26, 2018.  Administrative Law Judge Robert G. Martin heard this matter in Oxnard, California on October 4, 15, 16, 17, 22, 23, 24, 25, 29 and 30, 2018.

Janeen Steel and Shawna Parks, Attorneys at Law, represented Student.  Mother attended the hearing on behalf of Student.  Father attended on October 4, 15, 16 and 17, 2018.  Student did not attend the hearing.  Lawrence Joe and April Navarro, Attorneys at Law, represented Oxnard.  Oxnard Special Education Director Amelia Sugden attended the hearing on behalf of Oxnard.

At the parties' request, OAH continued the matter to December 3, 2018, for written closing arguments.  The record closed on December 3, 2018, upon timely receipt of closing briefs from the parties.

ISSUES

1.     Did Oxnard deny Student a free appropriate public education by failing in its child find duty from February 26, 2016 to the date of the filing of the complaint?

2.     Did Oxnard deny Student a FAPE by: (a) failing to make any offer of FAPE prior to January 11, 2018; (b) failing to make an appropriate offer of FAPE in the individualized education programs dated January 11, 2018, January 22, 2018, February 26, 2018, May 1, 2018, June 7, 2018, and July 26, 2018; and (c) failing to implement the January 11, 2018 offer of FAPE?

3.      Did Oxnard deny Student a FAPE by failing to use appropriate behavior interventions and by improper use of restraint and seclusion as a behavior intervention?

4.      Did Oxnard deny Student a FAPE by failing to comply with the following procedural requirements: (a) failing to make a clear written offer of FAPE in the initial IEP; (b) failing to complete an IEP within 60 days of the initial assessment plan; and (c) failing to include a general education teacher at the May 1, June 7 and July 26, 2018 IEP meetings?

## SUMMARY OF DECISION

Student's academic and behavioral challenges began when he entered kindergarten during the 2015-2016 school year.  Oxnard addressed Student's difficulties at a student success team meeting in February 2016.  By October 25, 2016, after the interventions put in place in February were complete and Student's academic and behavioral difficulties were more severe, Oxnard violated child find by failing to refer Student for assessment.  Student should have been referred for assessment in October, 2016.

Oxnard did not assess Student until January 2018.  Oxnard failed to complete the assessment and hold an initial IEP team meeting within the statutory timelines and failed to offer Student an IEP at any time before January 11, 2018, at which time Student was found eligible for special education.  The January 11 and 22, 2018 IEPs were not reasonably calculated to offer Student a FAPE under the circumstances.  Student's behaviors had escalated in frequency and physical aggression to the point where he was a danger to himself and others.  The January IEPs did not appropriately address Student's behavior issues.  As to the services offered, Oxnard did not implement the level of speech/language therapy and specialized academic instruction in the January 11, 2018 IEP.  Student did not prove the IEPs dated February 26, 2018, May 1, 2018, June 7, 2018, and July 26, 2018 failed to offer behavior support reasonably calculated to enable Student to make progress on his goals, at the time the IEPs were offered.

Student did not prove Oxnard used improper seclusion and restraint as a behavior intervention.  Student's behavior was extreme, violent, unpredictable and uncontrollable. Oxnard staff was properly trained to use reasonable restraint and seclusion to protect Student, and others, from physical harm.  Physical restraint was used only to the extent the restraint was necessary and only for the amount of time required under the circumstances.

## FACTUAL FINDINGS

1.      At the time of hearing, Student was an eight year-old third grader who had resided at all relevant times within the boundaries of Oxnard.  He was first found eligible for special education in January 2018.  Student had not attended school since June 2018, and was not receiving any educational program at home.

*Early Development*

2.      Student was born in August 2010.  Student was somewhat slow in reaching developmental milestones, but neither Parents, nor Student's pediatrician, thought that he might have a disability.  Student did not receive any medical treatments or services related to any disability.  Student did not attend preschool.

*2015-2016 Kindergarten at Rose Avenue Elementary*

3.      Student began his schooling in August 2015, at age five, in a general education kindergarten at Oxnard's Rose Avenue Elementary School.  Student liked being at school, and was generally kind, happy, and energetic.  At the end of each trimester of the school year, Student's teacher, Gina Hawkins, evaluated his performance in language arts and mathematics using letter grades in 22 common core state standards benchmarks used throughout the state of California, and in other states, to describe what a kindergarten student should know and be able to do in those subjects.  Ms. Hawkins evaluated Student for effort-only in five academic subjects – science, social studies, art, music and physical education.  She also evaluated Student's effort towards developing skills in sixteen aspects of work organization and task completion, classroom behavior, cooperation with peers, and following rules, needed for successful learning.

4.      In his first trimester, in the academic subjects in which he was graded only for effort – science, social studies, art, and music – Student's effort was satisfactory.  However, Student had difficulty understanding new concepts and was easily distracted, and he immediately began to struggle with language arts, mathematics, and mastering skills needed for successful learning.  Student made no progress towards reading common, frequently-used words like "the," "of," and "and."  He did not make good progress recognizing or writing upper and lower case letters, or identifying consonant letter sounds.  In mathematics, he did not make good progress identifying or writing numbers, or identifying and drawing shapes.  Overall, Student met none of the 14 first-trimester common core state standards benchmarks for language arts and mathematics.  Student also struggled to master the 16 skills for successful learning that he was supposed to learn in kindergarten, and his teacher rated him at risk to repeat kindergarten.  Student's development of skills of organizing himself and his work, working independently, and completing tasks, all needed improvement, as did his classroom behavior in the areas of self-control, listening skills, accepting responsibility, and expressing his feelings appropriately.  Student's cooperation with other Students needed improvement in the areas of treating his peers with respect and working cooperatively with them.  His ability to follow rules also needed improvement in the areas of following directions and showing respect for authority.

5.      Rose Avenue's Principal, Pablo Ordaz, first became aware of Student in November 2015, when Ms. Hawkins asked him to help transition Student from the playground back to class.  Shortly thereafter, at the monthly collaboration meeting with Mr. Ordaz and teachers to discuss student progress, Ms. Hawkins reported that Student was often upset or angry, and frequently took three to five minutes to calm down and return to class.  Student's academic progress was also poor.  Transitioning problems were common among general education kindergarteners at Rose Avenue.  Many of them received group counseling to help

3

them learn to transition, and individual counseling when their teacher or counselor observed them having trouble transitioning.  Mr. Ordaz asked school counselor Mayra Perez[1] to help Student with transitioning, and told Ms. Hawkins to arrange a student success team meeting with teacher, staff and Parents to discuss how to help Student academically and with transitioning.

6.      Ms. Hawkins asked Rose Avenue's outreach counselor, Raquel Rodriguez, to arrange a student success team meeting, which was ultimately scheduled for February 25, 2016.  Ms. Rodriguez, following her usual practice, gave Student's teacher, Ms. Hawkins, a note to put in Students' backpack to invite Parents to the meeting.  Parents did not receive the notice of the student success team meeting, and Ms. Rodriguez did not verify whether they would be attending.

7.      Prior to the meeting, Ms. Hawkins had an intervention services provider tutor meet with Student at school to help him learn letter sounds.  As of February 25, 2016, Student knew only 20 of these 78 sounds.  Ms. Hawkins also asked that the school's speech therapist, Angel Dominguez, attend the meeting to discuss Student's lisp that affected his ability to pronounce "s" and "z" and made him difficult to understand.

8.      Student's referral to a student success team was consistent with Oxnard's practice of attempting general education interventions through a student success team before assessing a student for possible disabilities requiring special education.  In this instance, there was no evidence that Parents, or Oxnard teachers or staff, discussed whether Student might have a disability before Oxnard scheduled the student success team meeting.

9.      Student's academic progress improved only slightly during his second trimester of kindergarten.  He made slow progress in reading, but continued to have difficulty staying on task, and memorizing basic math facts.  Overall, Student met none of the 22 common core state standards benchmarks for language arts and mathematics.  Student made little progress towards nine common core state standards: identifying upper and lower case letters; identifying consonant letter sounds; reading common, frequently-used words; reading text with purpose and understanding; writing; printing letters; spelling words phonetically; identifying and writing numbers; and counting objects.  Student made acceptable progress towards 13 other common core state standards: understanding concepts of print such as reading from left to right and top to bottom; identifying and producing rhyming words; identifying vowel sounds; understanding key ideas and details; participating in collaborative conversations; asking and answering questions; capitalizing words; recognizing and naming ending punctuation; comparing numbers; representing addition and subtraction using objects, fingers, etc.; solving addition and subtraction word problems; identifying and describing geometric shapes; and analyzing, comparing and creating shapes.

10.     Student's skills in organization and task completion did not improve.  His learning behaviors, and cooperation with peers, each improved slightly, as he made satisfactory efforts to express his feelings appropriately, and to treat his peers with respect.  His ability to

---

[1]  Mayra Perez is referred to herein as "school counselor" to avoid confusion with Student's second-grade principal, Brasilia Perez, who is referenced more frequently.

follow rules improved in two of four areas: he satisfactorily followed directions, and showed respect for authority.  He also continued to show respect for property, but his previously satisfactory effort to control his talking declined, and he needed improvement in that area.

FEBRUARY 25, 2016:  FIRST STUDENT SUCCESS TEAM MEETING

11.     Ms. Hawkins, Mr. Ordaz, Ms. Rodriguez, Mr. Dominguez, and the school counselor attended Student's February 25, 2016 student success team meeting.  Parents had not received notice of the meeting, and did not attend.  The team discussed rescheduling the meeting to give Parents an opportunity to attend, but decided to go forward with the meeting because Ms. Hawkins urgently wanted to address Student's academic issues.

12.     The participants discussed Student's strengths – that he was generally kind, happy and energetic.  Ms. Hawkins was concerned about Student's academic difficulties with letter sounds, counting and number recognition; his lack of attention and focus; social/emotional issues; his anger and tantrums; and his lisp.  Ms. Hawkins was concerned that Student's tantrums were interfering with his academics, because he was unable to focus on classroom instruction and his work for some time after each tantrum.

13.     Following discussion, the student success team decided on three strategies to address Student's issues: (1) the school counselor would enroll Student in a social skills boys' group to work on his anger and tantrums; (2) Mr. Dominguez would informally observe Student to see whether Student's lisp could be the result of a speech impairment needing a formal assessment for special education; and (3) Ms. Hawkins would continue her existing efforts to improve Student's academic performance.  The participants agreed to follow-up on Student's progress with another student success team meeting after eight to ten weeks.

14.     As of the February 25, 2016 meeting, the student success team members did not suspect Student had a disability and believed Student's difficulties were of types and intensity not unusual among general education students transitioning without preschool into their first year of school.  In Mr. Ordaz's experience, such issues usually resolved after an adjustment period without special education.  According to Mr. Ordaz, Oxnard did not have a policy against teachers referring a general education kindergartener for special education assessment, he could not recall an instance where a general education kindergartener was referred for assessment absent a specific formal request from a parent.

15.     Shortly after the student success team meeting, Mr. Dominguez observed Student in class for 25 minutes.  Student's lisp appeared to result from missing front baby teeth, and was normal for his age.  Mr. Dominguez did not believe that Student's lisp might be the result of a speech impairment requiring special education, and he reported that he did not believe Student needed to be assessed for a possible speech impairment.  Student began attending a boys' social skills group in March 2016 to address his temper, and Ms. Hawkins continued her existing efforts to improve Student's academics.

16.     In Student's final trimester of kindergarten, from March to June 2016, his academic performance improved only marginally.  Student ended the year failing to make any

5

progress in reading text with purpose and understanding, and without good progress in identifying letters and their sounds, or in identifying numbers and counting. He met the benchmarks in only two of 22 common core state standards; namely, Student was able to participate in collaborative conversations and ask and answer questions. Student's skills in organization and task completion, and in classroom behaviors, remained unchanged from the second trimester, with improvement from the first trimester shown only in his ability to express his feelings appropriately. Student's two areas of significant improvement from the first trimester were his cooperation with peers, where his efforts to treat peers with respect and work cooperatively with them went from needing improvement to satisfactory, and in following rules, where he began the year needing improvement in following directions and showing respect for authority, and ended the year with satisfactory efforts in those areas, as well as in the other evaluated areas of showing respect for property and controlling his talking.

17.    Despite Ms. Hawkins' first-trimester concern that Student might need to repeat kindergarten, and his lack of progress in subsequent trimesters towards meeting common-core benchmarks, mastering organization and task-completion skills, and controlling his classroom behavior, Oxnard promoted Student to first grade. Mother was concerned that Student had not made good progress in the 2015-2016 school year, and needed to repeat kindergarten. Mother spoke with Ms. Hawkins, who told her Oxnard generally was no longer having students repeat a grade. She also said that the school felt that Student could catch up with his peers during first grade.

*2016-2017 First Grade at Rose Avenue Elementary*

18.    Student, then six years old, returned to Rose Avenue Elementary in August 2016, as a pupil in teacher Michelle Moran's first grade general education class. As in kindergarten, Student enjoyed school and being in the classroom. He was willing to try new things and worked hard to complete tasks in a timely manner. However, despite his enthusiasm and hard work, Student continued to fall behind academically. Although he continued to receive satisfactory grades for effort in science, social studies, art, music and physical education, he met only one of eight common core benchmarks in his first trimester. Student was close to meeting the common core language benchmark. He was not meeting benchmarks in decoding words and text using phonics, speaking and listening, and mathematics operations. Student was far below meeting the benchmarks for word analysis skills, reading, and writing.

19.    Student continued to get upset easily. He also exhibited ongoing aggression towards some of his classmates; tripping them, ripping up their papers, and, in one instance, punching a classmate. At hearing, Ms. Moran described these behaviors as "nothing out of the ordinary."

OCTOBER 25, 2016 SECOND STUDENT SUCCESS TEAM MEETING

20.    Student's second student success team meeting convened on October 25, 2016. Ms. Moran, Mr. Ordaz, Ms. Rodriguez, Mr. Dominguez, the school counselor, and school psychologist Lucy Perales attended. Ms. Rodriguez spoke to Mother before the meeting.

Mother said Parents would not be able to attend the meeting, but authorized it to go forward without them.

21.     Ms. Rodriguez scheduled the student success team to proceed without Parents, instead of trying to reschedule, because Ms. Moran urgently wanted the team to meet to address Student's academic issues.  As Ms. Moran noted in Student's first-trimester report card, Student was "having a difficult time understanding and applying the concepts we learn at school. [Student] is at risk for retention."  As of October 25, 2016, all the interventions and strategies implemented following Student's February 25, 2016 student success team meeting were completed.  Student had completed the time allotted for participation in the social skills boys' group intended to work on his anger and tantrums.  Mr. Dominguez had observed Student and concluded that his frontal lisp was not indicative of a possible speech impairment needing assessment for special education, and Ms. Hawkins and Ms. Moran had completed their academic interventions.  However, Student still got upset easily, his lisp had not resolved, and his performance remained low in all academic areas.  Additionally, Student was frequently absent, did not bring his tablet to school, and had turned in no homework assignments since the start of the school year.

22.     The student success team did not discuss whether Student's continuing failure to make progress in his academics, his ability to understand and apply learning concepts, or his lisp, despite the interventions provided, might indicate a suspected disability.  The team discussed whether some of Student's academic and behavioral difficulties might be caused by family instability, but did not discuss that possibility with Parents.  Ultimately, the team decided to wait to see if Student's lisp resolved on its own as Mr. Dominguez expected, and to extend Student's participation in the boys' social skills group with the school counselor.  Additionally, the team decided to provide academic tutoring for Student four times per week after-school, if Parents agreed, and space was available.

23.     On November 17, 2016, Ms. Rodriguez met with Mother during Mother's parent/teacher conference with Ms. Moran.  Ms. Rodriguez reviewed the notes of the October 25, 2016 student success team meeting with Mother.  Mother signed the notes and approved Student's participation in an after-school program, which began in January 2017.

JANUARY-JUNE 2017: ESCALATING AGGRESSIVE BEHAVIORS

24.     Student's tantrums and aggressive behaviors increased markedly beginning in January 2017, after the winter break.  In the first major incident, Student became enraged for no apparent reason in Ms. Moran's class.  He cursed, overturned desks in the class, and tore the papers off the class bulletin boards, finally running from the classroom when Principal Ordaz arrived at Ms. Moran's request.  Mr. Ordaz called Mother to take Student home from school, then waited with Student and the school counselor for four hours until Mother arrived to take Student home.  Similar incidents occurred several times in the last week of January, 2017, and even more often in February and March, 2017.  Ms. Moran could not identify a consistent trigger for Student's destructive behavior, but it often started with his refusal to comply with a request from Ms. Moran, followed by rapid escalation into screaming, cursing, throwing chairs, then

running from the classroom outside to the school grounds.  Soon, the school was calling Mother three or four times a week to take Student home.

25.    On March 28, 2017, Ms. Moran was counseling Student and a classmate after an incident between them.  When his classmate bent over, Student said, "fuck it," and kicked the classmate in the head without any provocation.  Ms. Moran suspended Student for the remainder of March 28, and all of March 29.

26.    Student's tantrums traumatized his classmates.  Student's behavior also traumatized Ms. Moran, who suffered from panic attacks and chest pains, and described her experience as Student's teacher as her "worst year ever."  Fearing for her own safety and that of the other students in her class, Ms. Moran had to evacuate her classroom to escape Student on at least five occasions between March and June 2017.  She taught the other students a secret safe word, "ice cream," that she would say to signal the class to evacuate when Student began to get out of control.

27.    Despite Student's extreme behavior, and a continuing failure to make academic progress, Oxnard did not propose assessing the six-year old's possible need for special education.  Instead, it arranged for Student to participate again in the boys' social skills group, beginning in March 2017.  It also arranged weekly anger management therapy sessions from an outside provider, New Dawn Counseling, beginning in April 2017, and scheduled Student's third student success team meeting for April 26, 2017.

APRIL 26, 2017 THIRD STUDENT SUCCESS TEAM MEETING

28.    Ms. Moran, Mr. Ordaz, Ms. Rodriguez, the school counselor, and academic coach Gene Figueroa attended the April 26, 2017 student success team meeting.  Parents did not attend. The team's areas of concern academically were that Student struggled with focus and remembering information, was far below basic in all academic areas, and continued to be at risk of retention after his second trimester.  Behaviorally, Student could not control his temper. He got upset often and exhibited no self-control.  He was defiant and physically aggressive, hitting others, throwing chairs, and running from the classroom.

29.    The student success team reviewed Student's prior interventions.  Student had been tutored after school in reading and math from October 2016 until April 2017, and showed minimal improvement.  He had good and bad days in the after-school program, and needed improvement in the boys' social skills group.  The New Dawn therapy seemed to be helpful, and a New Dawn licensed marriage and family therapist, Ms. Lucero, had diagnosed Student as having and unspecified disruptive, impulse-control, conduct disorder.

30.    The student success team discussed whether Student should be assessed for a possible disability.  Ms. Moran testified she did not suspect a disability because she had "seen this before," where problems at home caused behavioral issues that later cleared up.  The team concluded they would try more general education interventions before having Student assessed for special education.  The team decided Student should continue his New Dawn therapy, and, at Ms. Lucero's suggestion, the team would develop a 504 Plan [Section 504 of the Rehabilitation

Act of 1973 (29 U.S.C. § 701 et seq.)] for Student.  Student also continued in his after-school program and boys' social skills group, but did not resume tutoring.

MAY 10, 2017 INCIDENT AND PARENT REQUEST FOR ASSESSMENT

31.     On May 10, 2017, Student escalated into a major tantrum.  He eloped from Ms. Moran's classroom onto the school yard and playground, and began throwing rocks at passing cars and at school staff.  Student was crying, yelling profanities, and was non-compliant. He kicked staff and attempted to hit them with his head.  Concerned for the safety of Student and others, Rose Avenue staff called Mother and the police.  Assistant principals Susan Mares and Suzanne Grajeda restrained Student with standing one-and two-person control holds for approximately eight minutes.  Student remained angry and defiant until his grandfather arrived to pick him up, at which point he de-escalated.   Later that day, Mother submitted a written request for a 504 plan for Student.  Oxnard scheduled a student success team meeting for May 18, 2018.

32.     On May 12, 2017, Mr. Ordaz sent a request to Oxnard behavior specialist Julia Bolognino for behavioral support for Student in the general education environment.

33.     On May 15, 2017, Student's after school program dismissed him because of his behaviors.

34.     On May 18, 2017, before the student success team meeting, Mr. Ordaz sent an email to Ms. Bolognino, Oxnard Special Education Director Amelia Sugden, and Oxnard Special Education Manager Kristin Haidet, to follow up on his request for additional behavioral support for Student.  Interpreting Mother's request for a 504 plan as a request for special education assessment, Mr. Ordaz explained Rose–Avenue staff would be holding a student success team meeting later that day with Parents, at which they would respond to Mother's request for a full assessment of Student.

35.     Mr. Ordaz explained that Rose Avenue had been working with Student during the school year using the student success team process, but Student's aggressive behaviors had increased.  Student was now very violent and defiant, was kicking, punching, and destroying school property, and had hurt other students and staff.  Student had also tried to climb fences and leave school.

36.     Mr. Ordaz explained that Rose Avenue staff was now being called to address Student's aggressive, disruptive behavior in his classroom or on the school campus as often as three or more times a day.  On three occasions staff had called the police school resource officer, and dispatch, for assistance.  Mr. Ordaz explained that Student had been working with New Dawn, and Rose Avenue staff had referred Student to the Ventura County Behavioral Health Department.  Mr. Ordaz informed the Health Department "My team has been working with [S]tudent, however, we need support as it is becoming more and more challenging to meet his needs on a daily basis."

MAY 18, 2017 FOURTH STUDENT SUCCESS TEAM MEETING

37.     On May 18, 2017, Oxnard convened Student's fourth student success team meeting.  Parents, Ms. Moran, Mr. Ordaz, Ms. Rodriguez, the school counselor, Mr. Figueroa, Ms. Perales, Mr. Dominguez, and Ms. Lucero attended.  The team's areas of concern with respect to academics were that Student was far below basic in all academic areas, struggled to focus and remember information, and did not participate or engage in class.  He struggled with number sense and recognizing numbers, and completed homework but never turned it in.  The team's concerns with Student's behavior were that he was defiant, and exhibited no self-control.  He was often upset and out of his seat, destroying the classroom environment and other students' work.  He was physically aggressive towards adults and students, and was hitting, throwing chairs, kicking and punching doors and walls, and climbing fences.

38.     The team recommended that Oxnard conduct a full special education assessment of Student in the areas of academics, social/emotional functioning, and speech and language.  The team's action plan for Student was to continue with therapy from New Dawn for emotional and anger management issues, follow up on Student's referral to Ventura County Behavioral Health Department, have Ms. Bolognino develop a behavior plan for Student, continue Student's participation in the boys' social skills group, and have Parents take Student to a physician to discuss his nasal congestion.

39.     Student finished his 2016-2017 school year meeting none of the common core state standards benchmarks for first grade.  His best grade was in speaking and listening, where he was striving towards meeting the benchmark.  In language, Ms. Moran graded him as not meeting the benchmark.  In all other academic standards, Ms. Moran graded Student far below the benchmark.

40.     Although Student's grades had declined since Ms. Moran had marked Student at risk of retention in his first two trimesters, Ms. Moran recommended him for promotion to second grade at the end of his third trimester.  At hearing, she testified that she recommended him for promotion to second grade because she did not believe that Student would get any educational benefit from repeating first grade, because he had not made even "a little bit" of growth in first grade, and seeing first grade materials again would not help him understand the material   She was also concerned that he would be old and tall for a first-grader if he repeated the grade.

MAY 31, 2017 STUDENT ASSESSMENT PLAN

41.     On May 31, 2017, Ms. Perales mailed Parents a letter enclosing a proposed assessment plan for Student, a copy of Parent Rights and Procedural Safeguards for Special Education, a Health and Development Questionnaire, a copy for each Parent of the parent rating scales for the Behavior Assessment System for Children, Third Edition, and a return envelope.  Ms. Perales' letter asked Parents to sign and return the assessment plan and completed health questionnaire and rating scales.

42.     The assessment plan identified Student's academics, attention, and behavior as areas of concern, and the reason for the assessment.  The plan specified six assessments: (i) a health assessment, including screening of Student's vision and hearing; (ii) an intellectual development assessment by a school psychologist; (iii) an academic achievement assessment by a special education teacher; (iv) a social/emotional behavior assessment by a school psychologist;  (v) a language/speech/communication development assessment by a speech-language pathologist; and (vi) a special circumstances educational support assessment to evaluate Student's potential need for a behavioral aide.

*2017-2018: Second Grade at Chavez Elementary School*

43.     In August, 2017, Student, then seven years old, started second grade at a new school, Chavez Elementary School, in teacher Maria Ponce's general education class.  Ms. Ponce had no training in addressing special education students with behavioral issues, or in the use of physical restraints.  Oxnard had not yet developed a behavior plan for Student, as called for in the May 18, 2017 student success team action plan.

44.     On his first or second day in Ms. Ponce's class, Student told Ms. Ponce he did not know how to write.  Ms. Ponce then found that Student could read only five words per minute, and could not count to 100.  Ms. Ponce approached Chavez Assistant Principal Naomi Cortez, to refer Student for special education testing.  Dr. Cortez told Ms. Ponce that Oxnard already planned to assess Student, and was just waiting for Parent's signature.

SEPTEMBER 20, 2017 SIGNED STUDENT ASSESSMENT PLAN

45.     On September 20, 2017, Mother returned the signed assessment plan for Student, a completed Health and Development Questionnaire, and a copy of the parent rating scales for the Behavior Assessment System for Children, completed by Mother.  Oxnard calculated pursuant to the Education Code that it had 60 days – until November 20, 2017, to complete the assessments and hold an individualized education program team meeting to review them.

SEPTEMBER – NOVEMBER 2017: STUDENT'S ESCALATING BEHAVIORS

46.     Student was well behaved at the start of the school year, but his previous aggressive and destructive behaviors emerged over the next two months; gradually at first, then with escalating frequency and severity.  On August 24, 2017, Student slapped another student in the face while standing in line for no reason.  Ms. Ponce reprimanded and counseled Student, assigned him recess detention, and called Mother.  On September 15, 2017, Ms. Ponce sent Student home for the afternoon after repeated outbursts in class during which he threw paper, books and crayons and moved classroom tables.  On September 18, Student received recess detention for pushing another student in line for no reason.  On September 19, Student twice pulled another student's hair.  On October 4, 2017, Ms. Ponce referred Student to a district behaviorist after he persisted in following another student in a threatening manner and then hit him in the neck.  On October 10, Student was suspended for injuring others when he walked around the classroom poking students with a pencil, then stepped on Ms. Ponce's feet when she tried to stop him.  On October 12, Student ran from the school to the playground, where he began throwing rocks at his

classroom windows, then at other students.  On October 24, Student damaged school property by tearing things off the classroom walls and writing on the floor.  On October 26, he damaged the classroom's 8 x 10 rug, remote control and headphones, and other students' property.  On November 1, 2017, Student was suspended for disrupting Ms. Ponce's class, insubordination, damaging school property, and attempting to harm himself and others. On November 2, he pushed and tripped another student, causing her to fall, then pushed her again when she got back up.

NOVEMBER 9, 2017 IEP TEAM MEETING AND CONTINUED IEP

47.     On November 9, 2017, Oxnard convened Student's initial IEP team meeting. Mother, Ms. Ponce, Chavez principal Brasilia Perez, Chavez assistant principal Derek Olson, school psychologist Annette Murguia, speech/language pathologist Shannon Billings, school nurse Marie Sagrado, and specialized academic instructor Margie Llanes attended.  Oxnard informed Mother that Oxnard needed more time to complete additional assessments.  Mother agreed to open the meeting and she asked Oxnard to notify her in advance when meeting is to reconvene.  Mother signed the IEP.

48.     After the November 9, 2017 IEP team meeting, Student's behaviors escalated alarmingly.  In incidents on November 13, 17, 27, 28, 29, and December 1, 2017, Student essentially shut down Ms. Ponce's class, cursing, ripping papers off the classroom walls, throwing books and chairs, and destroying school and student property.  The December 1, 2017 incident was representative of Student's behavior.  Student threw crayons at other students and Ms. Ponce.  When Mr. Olson attempted to intervene, Student refused to follow directions, kicked Mr. Olson, and tried to trip, head butt, and bite him.  Student threw a chair and other items at Mr. Olson, and repeatedly cursed Ms. Ponce and Mr. Olson, using extremely derogatory gender and racial expletives.  Student was suspended following the December 1, 2017 incident, and also following the November 29, 2017 incident, during which Student kicked staff members and threw rocks and a chair at them, while cursing them.

49.     Oxnard's schools were closed for the five-day Thanksgiving holiday, November 20-24, 2017, and from December 4, 2017 through January 5, 2018, due to the Thomas Fire that broke out in Ventura County on December 4, 2017, and Oxnard's winter break from December 18, 2017 until school resumed January 8, 2018.  Student's initial IEP was reconvened on January 11, 2018; 52 calendar days after November 20, 2017, but just eight school days.

*January 10, 2018 Multidisciplinary Assessment and January 11, 2018 Initial IEP*

50.     For Student's initial IEP, Oxnard conducted six assessments of Student over 18 days from September 20, 2017 through January 10, 2018, assembled the assessments into a single multidisciplinary assessment report dated January 10, 2018, and held Student's initial IEP team meeting on January 11, 2018.

12

*HEALTH*

51.     School nurse Ms. Sagrado conducted Student's health assessment including hearing and vision tests.  Student's health was generally good.  Mother provided information for the health assessment.  She reported Student had diagnoses of attention deficit and hyperactivity disorder (ADHD), disruptive disorder, and had had one minor episode of depression.  Mother described Student as "mostly angry" at home, and upset by little things.

*INTELLECTUAL DEVELOPMENT*

52.     School psychologist Ms. Murguia employed four generally-accepted and commonly-used standardized tests to measure Students cognitive abilities, auditory and visual processing, and motor integration.  Student exhibited no significant cognitive or processing deficits.  Student's ability to understand and use speech to communicate was in the average range.  Student's ability to solve unfamiliar problems was average to above average.  Student's short-term memory was average regarding hand movements, and slightly below average when recalling numbers.  Student's long-term memory was average.  Student's auditory processing – his ability to analyze and synthesize information transmitted through sound – was average to slightly below average.  Student's visual processing – his ability to use mental images to solve problems – was average, as was his processing speed.  Student's motor coordination, visual perception skills, and his visual-motor integration skills were all average.

*ACADEMIC ACHIEVEMENT*

53.     Special education teacher Ms. Llanes assessed Student's academic achievement based on information from Ms. Ponce on Student's current classroom performance, and on the standardized Woodcock-Johnson-IV Tests of Academic Achievement.  Student's classroom performance was consistently "very poor," with the exception of his relations with peers, which were "poor."  On the Woodcock-Johnson tests, Student's scores in reading comprehension, reading fluency, and math problem solving, placed him in the first to seventh percentile of children his age (well below average to below average).  Student scored slightly below average in math calculation skills (ninth percentile), and written expression (tenth percentile).

*SPEECH AND LANGUAGE*

54.     Speech/language pathologist Ms. Billings evaluated Student's speech, language, and communication skills by interviewing and directly observing Student, and administering four commonly used tests.  Student continued to exhibit the frontal lisp he displayed in kindergarten, which affected his intelligibility.  Ms. Billings found the lisp to be developmentally inappropriate, because it should have resolved by August, 2017, when Student reached the age of seven.  Student also distorted the /r/ sound at the beginning and end of words.  However, because difficulty with this sound is developmentally appropriate for boys until the age of nine, it did not indicate a disability.  Student's expressive language skills scored in the average range.  Student's impulsivity and lack of focus affected his receptive language skills, causing him to score in the below average range.

55.     Ms. Billings found that Student appeared to meet the criteria for eligibility for special education under the category speech and language impairment, based on his frontal lisp, an articulation disorder significantly interfering with his communication and which attracted adverse attention.

*SOCIAL-EMOTIONAL FUNCTIONING*

56.     Ms. Murguia assessed Student's social-emotional function by reviewing Student's school behavioral record, and administering the Behavior Assessment System for Children, Third Edition, rating scales to both Parents, and to his teacher, Ms. Ponce.

57.     In the overall area of externalized behaviors, all raters indicated that Student's behavior was in the clinically significant range (indicating significant maladaptive behavior). Parents reported Student was frequently disruptive, impulsive, and displayed uncontrolled behaviors; his teacher reported he had difficulty with self-control, was overactive, and restless. Teacher and Parents indicated Student's behavior included being argumentative, defiant or threatening others.  In the area of conduct problems, teacher reported Student frequently broke school and classroom rules.  Parents reported similar behavior in the home.

58.     In the area of internalized problems, all raters described Student's skills in the at-risk range (signifying the possible presence of disorders).   In the area of anxiety, teacher and Mother reported Student sometimes had difficulty making decisions, appeared to worry, and appeared nervous.  In the area of depression, teacher and Parents indicated Student was withdrawn and pessimistic. In the area of somatization, all raters indicated that Student was age appropriate, with Student complaining of health related problems about as frequently as his peers.

59.     Father and teacher scored Student's behavior in the clinically significant range; Mother rated him at-risk in behavior.  In the area of atypicality, teacher reported Student engaged in strange or odd behaviors and he appeared to be generally disconnected from his surroundings. Father reported such behaviors occurred at times; Mother did not report any such behaviors.  In the area of withdrawal, teacher described him as sometimes having difficulty making and keeping friends, and unwilling to participate in class discussions or lessons. Parents did not report this as an area of concern.  In the area of attentional problems, Parents described Student to sometimes having difficulty maintaining attention.

60.     Father and teacher rated Student's adaptive skills in the clinically significant range; Mother rated Student's adaptive skills in the at-risk range.  Teacher reported Student had difficulty adapting to changes in his schedule, routine or activity, and sometimes refused to adapt to the change presented.  Parents reported this behavior sometimes occurred.  In the area of social skills, all raters indicated Student experienced some difficulty complimenting others and making suggestions for improvement in a tactful and socially acceptable manner.  In the area of leadership skills, teacher and Father reported he sometimes had difficulty making decisions, lacked creativity and had difficulty working in a group.  In the area of study skills, teacher reported poor study skills, difficulty with organization and turning in any assignments or

homework.  In the area of functional communication, teacher and Parents reported Student
sometimes had difficulty stating his feelings and describing personal experiences.

61.     Based on Student's evaluation results, Ms. Murguia considered his potential
eligibility for special education under the categories of specific learning disability, other health
impairment, and emotional disturbance.

62.     Ms. Murguia concluded Student did not meet eligibility criteria for specific
learning disability, under the pattern of strengths and weaknesses model used by Oxnard to
identify a specific learning disability.  Student demonstrated a pattern of cognitive strengths in
the average or above range.  He also exhibited significant academic weaknesses.  However, he
did not exhibit both cognitive and academic weaknesses.

63.     Ms. Murguia concluded Student met eligibility criteria for other health
impairment, based on his medical diagnosis of ADHD; his scores in the clinically significant
range indicating significant maladaptive behavior in the areas of externalizing problems through
hyperactivity and aggression; and his difficulties maintaining necessary levels of attention in
class to participate in lessons that adversely affected his educational performance.

64.     Ms. Murguia concluded Student did not meet eligibility criteria for emotional
disturbance, which required that Student exhibit one or more of the following characteristics,
over a long period of time and to a marked degree, which adversely affected his educational
performance: (1) an inability to learn which cannot be explained by intellectual, sensory, or
health factors; (2) an inability to build or maintain satisfactory relationships with peers and
teachers; (3)  inappropriate types of behaviors or feelings under normal circumstances, exhibited
in several situations; (4) a general pervasive mood of unhappiness or depression; or (5) a
tendency to develop physical symptoms or fears associated with personal or school problems.

65.     Ms. Murguia found Student did not exhibit a general pervasive mood of
unhappiness or depression, or a tendency to develop physical symptoms or fears associated with
personal or school problems.  Both these conclusions were supported by Student's assessments.

66.     However, Ms. Murguia's explanation for her determination that Student did not
demonstrate an inability to learn which could not be explained by intellectual, sensory, or health
factors did not make sense.  Ms. Murguia stated, "Current academic assessment indicates that
Student's academic skills have declined.  However, it does not appear to be related to an
intellectual, sensory or health factor.  Rather, it appears to be the result of his non-compliant
behavior."  This explanation acknowledged both Student's inability to learn, and that his learning
difficulty was not the result of intellectual, sensory or health factors.  It appears this basis for a
finding of emotional disturbance was met.

67.     Ms. Murguia's determination Student did not exhibit inappropriate types of
behaviors or feelings under normal circumstances, was also not supported by Student's
assessment results.  Student's assessments found he exhibited inappropriate aggressive and
disruptive behaviors under normal circumstances, both at school and at home.  However,
Ms. Murguia found this basis for finding emotional disturbance was not met because Student

15

appeared to be able to control his behaviors, stopping tantrums instantly when he believed they were not getting him attention, or when his grandfather appeared, and because Student was able to explain his defiant behavior.

68.    Ms. Murguia also determined that Student's inappropriate behavior was not exhibited over a long period of time, or to a marked degree.  However, Ms. Murguia's explanations for these determinations again relied on factors not included in the description of the criteria for a finding of emotional disturbance.  Ms. Murguia admitted Student had "a history of behavioral misconduct in the school setting."  She then disregarded that finding based on her conclusion that the behavior "does not appear to be emotionally based."

69.    Finally, Ms. Murguia explained, "The qualifier 'to a marked degree' comprises two separate components, both of which must be present for the condition to be met: pervasiveness and intensity.  Pervasiveness – A student needs to demonstrate the characteristics of their disability across most settings (i.e. school, home, community).  While [Student] does display difficulty following rules set forth by his parents and teachers, his behavior appears to be under his control and appears to be willful at this time. This limiting criterion is not met."

*AUTISM*

70.    Ms. Murguia used the Childhood Autism Rating Scales-2, High Functioning, to assess Student for symptoms of autism.  This standardized assessment tool used behavioral scales completed by parents and practitioners to identify symptoms associated with autism in higher functioning children who might not exhibit classic autistic characteristics.  Its scales asked respondents to rate the test subject's behavior on a score from 1 to 4 in 15 key areas of functioning potentially related to autism diagnosis.  Mother rated Student's behavior age-appropriate in Social-Emotional Understanding, Emotional Expression and Regulation of Emotions, Body Use, Object Use, Visual Response, Listening Response, Taste, Smell, and Touch Response and Use, Nonverbal Communication, Thinking/Cognitive Integration Skills, Level and Consistency of Intellectual Response, and General Impressions.  She rated him age appropriate to mildly abnormal in Adaptation to Change, Fear or Anxiety, and Verbal Communication; and mildly abnormal in Relating to People.

71.    Ms. Murguia, Ms. Billings, and Ms. Llanes Ms. Murguia, rated Student's behavior age-appropriate in Social-Emotional Understanding, Relating to People, Body Use, Object Use, Visual Response, Listening Response, Taste, Smell, and Touch Response and Use, Fear or Nervousness, Verbal Communication, Nonverbal Communication, Thinking/Cognitive Integration Skills, Level and Consistency of Intellectual Response.  They rated him age appropriate to mildly abnormal in, Emotional Expression and Regulation of Emotions, and Adaptation to Change; and as having no characteristics of autism spectrum disorder in General Impressions.

72.    All raters agreed Student exhibited minimal to no characteristics associated with autism.  At school, Student initiated and engaged in reciprocal interactions with his peers and teaching staff.  At home Student initiated and engaged in social interactions with family members and friends.  Student's play skills scores indicated that he played with toys for their

intended purpose, and accessed playground equipment appropriately.  In the area of language development, Student used and followed non-verbal gestures, and communicated his wants and needs.  Student presented with well-modulated eye contact and responded to his name when called.  Areas of slight concern included Student's tendency to resist transitioning from one task to another directed task.

73.    Overall, the Childhood Autism Rating Scales-2, High Functioning rated Student as having minimal to no symptoms of autism.

*SPECIAL CIRCUMSTANCES EDUCATIONAL SUPPORT*

74.    Behavior specialist Ms. Garcia-Thomas evaluated whether Student required intensive individualized services such as a one-on-one instructional assistant or paraprofessional, to address needs in the areas of health and personal care, behavior towards teacher and peers, instruction (engagement in learning, and ability to participate), or inclusion/independence/social functioning.  Ms. Garcia-Thomas reviewed Student's school behavior records, interviewed Mr. Olson, Ms. Murguia, and Ms. Llanes, and observed Student at school on three occasions for a total of four hours in and out of the classroom.

75.    Ms. Garcia-Thomas concluded Student did not exhibit any significant health or personal care needs.  She found Student exhibited frequent challenging behaviors, including off-task behavior, noncompliance, property destruction, tantrums, and physical aggression of an intensity causing injury, particularly during frustrating or non-preferred activities that included most academic instruction.   Student's behaviors interfered with his learning and that of others.  He was noncompliant and off-task hourly.  He destroyed property on a daily basis, and engaged in aggression and tantrums weekly.

76.    Ms. Garcia-Thomas was observing Student for her assessment during the November 29, 2017 incident that led to one of Student's suspensions.  She watched his behavior escalate to a three-hour tantrum that included liberal use of profanity, property destruction, eloping from school, attempting to kick in Ms. Ponce's classroom door, pounding on the classroom windows, throwing rocks at Mr. Olson's face, and a chair at Ms. Garcia-Thomas.

77.    Ms. Garcia-Thomas also observed Student de-escalate when his maternal uncle arrived to pick him up.  On seeing his uncle, Student immediately stopped his behavior.  His uncle reminded him they had talked before Student came to school about good behavior.  Student's uncle asked if Student knew what would happen.  Student responded, "You're gonna hit me," and his uncle replied, "Yes, I'm gonna spank you."  Student immediately began cleaning up some of the property he had scattered during the course of his tantrum.

78.    Ms. Garcia-Thomas concluded that consistent, intensive, individualized support addressing Student's behaviors was absolutely necessary for Student to learn.  At hearing, Ms. Garcia-Thomas testified such support would be most effectively implemented with Student through one-on-one applied behavior analysis therapy, provided by a team of trained applied behavior analysis providers.  In her assessment, Ms. Garcia-Thomas concluded that Student's support team needed more accurate baseline data across his school day to address his behaviors,

and she subsequently created a specific data sheet to help the support team collect data. Because Student required frequent, individual reminders of positive reinforcement rewards to remain motivated to earn them, she prepared a positive behavior intervention plan for Student that described an individualized reinforcement system as well as proactive strategies, teaching strategies, and reactive strategies to address his behavior at school.

79.     In the area of instruction, Student required constant verbal prompts; one-on-one re-teaching; and clarification and reinforcement reminders to stay on task and complete academic work. He rarely participated in whole class lessons delivered by Ms. Ponce and produced little to no work, but attended and remained on-task more frequently during small group or individual instruction. In the area of inclusion, Student required some supervision during non-academic activities such as during transitions to recess, lunch, or transitioning between classrooms, to address profanity and aggression. Student also required redirection, monitoring, and priming to interact in socially appropriate ways with peers.

80.     Ms. Garcia-Thomas recommended Student receive a high level of special circumstances educational support to address his deficits in the areas of behavior and instruction, and a low level of support to assist him with inclusion.

JANUARY 11, 2018 CONTINUED IEP TEAM MEETING

81.     Student's initial IEP team meeting reconvened on January 11, 2018. Mother, Ms. Ponce, Ms. Perez, Ms. Murguia, Marisol Regoso, Ms. Billings, Ms. Llanes, Mr. Olson, school counselor Teresa Silva, outreach counselor Yolanda Gomez, Oxnard special education manager Katrina Madden; Ms. Garcia-Thomas, and Ms. Sagrado attended.

82.     Based on the IEP team's review of Student's initial assessments, the assessor's recommendations, and discussion at the IEP meeting, the IEP team found Student eligible for special education under a primary eligibility of Speech/Language Impairment based on his frontal lisp, with a secondary eligibility of Other Health Impairment based on his ADHD.

83.     The IEP offered Student placement in a general education classroom for 81 percent of the school day, with pull-out to a special education class for 265 minutes per week for related services.

84.     The IEP team developed seven annual goals for Student. These included two language/communication goals to be implemented by the speech/language pathologist; two social-emotional/behavioral goals to be implemented by "school staff"; and one goal each in reading, writing and math to be implemented by the resource specialist and general education teacher.

85.     The IEP included an attached positive behavior intervention plan, and a "reactive plan" setting forth strategies to be employed by school staff in response to escalating behavior exhibited by Student, from off-task behaviors, to non-compliance, to property destruction, and finally to aggression and severe tantrum behavior. The reactive plan advised staff that physical restraint of Student using holds was a last resort to be used only if Student was hurting himself or

18

others.  Only Nonviolent Crisis Prevention Intervention (NCPI) holds, developed by the Crisis Prevention Institute, could be employed, and only by staff trained in their use.  Ms. Ponce was not trained in the use of NCPI holds, and never attempted to place Student in any holds. Although Student's special circumstances educational support assessment had recommended Student receive intensive individualized services based on the determination that such services were "absolutely necessary" to address Student's behaviors and instruction, the IEP provided none.  Instead, the IEP made Student's classroom teacher (Ms. Ponce), assistant principal (Mr. Olson), and school psychologist (Ms. Murguia) responsible for implementing Student's behavior plan.

86.     To support Student, the IEP offered Student pull-out services of 100 minutes per month of small group speech and language services, 120 minutes per week of specialized academic instruction in math, and 120 minutes per week of specialized academic instruction in English/language arts.  The IEP also included 17 accommodations to assist Student with scheduling, following directions, responding to questions, transitioning, organization and study skills, and using the restroom.

87.     The January 11, 2018 IEP was confusing and incomplete.  For reasons no witness could explain, Student's least significant issue, a mild frontal lisp, was the basis for his primary special education eligibility category.  While the IEP included goals directed towards the lisp, and also towards improving Student's ability to pronounce /r/ sounds at the beginning and ends of words – which Student's assessment determined was not a disability, it included no goals directed towards Student's secondary disability of other health impairment based on ADHD. Most significantly, the overwhelming issue of Student's destructive, violently aggressive behavior was addressed inconsistently rather than comprehensively.  The IEP did not associate Student's extreme behaviors with any disability, and made no attempt to explain their cause. Considering the frequency, severity, and traumatizing effects of Student's behaviors, it was surprising that no functional behavioral assessment had been done to find their antecedents, consequences, and possible functions so the behaviors could be better understood and addressed. Two of Student's seven goals, and the positive behavior intervention plan, were directed towards Student's behaviors, but no trained behavioral support at all was provided to implement the goals or the behavior plan, contrary Ms. Garcia-Thomas's recommendations.

88.     Mother signed the January 11, 2018 IEP and gave written consent to all of its provisions on January 11, 2018.

JANUARY 11, 2018 IEP IMPLEMENTATION

89.     The January 11, 2018 IEP provided for a paraprofessional behavior aide, speech and language services and specialized academic instruction.  Oxnard did not fully implement these related services.

90.     Oxnard admitted at Student's January 22, 2018 manifestation team meeting that it was failing to implement Student's January 11, 2018 IEP because it could not locate and provide Student a full-time, trained, one-on-one paraprofessional.  Oxnard secured a permanent, trained behavioral technician for Student on February 8, 2018.  Service was to be provided by STAR of

CA Evidenced-based Resources Applied in Education ("ERA Ed."), a nonpublic agency that provided a range of behavioral health services.

91.     Student's speech and language services were not fully implemented.  Student was supposed to receive 100 minutes a week of small group speech services.  However, Ms. Billings testified that she only provided services at her scheduled time, and did not reschedule the time if the student was not able to attend.  Ms. Billings' records indicate Student received only 30 minutes of speech services on January 31, 2018, and an unspecified amount of time on February 14, 2018.  Student should have received 700 minutes of speech services in the seven weeks between January 22, 2018 and March 9, 2018.

92.     Ms. Llanes was to provide Student 240 minutes a week of specialized academic instruction in math and English language arts.  Ms. Llanes testified that she kept records of her services, but could not explain why the records produced by Oxnard showed a total of only 276 minutes:  87 minutes provided January 23-25, 2018;  20 minutes the second week;  45 minutes the third week;  57 minutes the fourth week; and 67 minutes the fifth week.  Ms. Llanes should have provided Student 1,680 minutes of specialized academic instruction during from January 22, 2018 through March 9, 2018.

JANUARY 12, 2018 INCIDENT

93.     On January 12, 2018 Student threw a chair at Ms. Llanes when she tried to bring him from Ms. Ponce's classroom to the special education classroom to provide him specialized academic instruction in English/language arts, and math, per his IEP.  Student began throwing things at Ms. Llanes, screaming "I'm number one, you're number two, and f*** you b****."  After Ms. Llanes finally guided Student out of Ms. Ponce's classroom, Student continued to kick and punch her, until the Ventura County Police Department School Resource Officer, who happened to be on campus that day, walked by.  When Student saw the resource officer, he immediately stopped kicking and punching Ms. Llanes.

94.     Student was suspended one day – January 16, 2018 – for his behavior towards Ms. Llanes.  Taking into account Student's six suspensions prior to his initial IEP, this was Student's seventh day of suspension during the school year.

JANUARY 19, 2018:  INSTRUCTION IN CONFERENCE ROOM

95.     On January 19, 2018, at Ms. Garcia-Thomas' suggestion, Student was removed from Ms. Ponce's classroom and provided general education instruction on a one-on-one basis, in an interior conference room.  Ms. Garcia-Thomas recommended this change to reduce the risk that Student might harm himself or others.  Student continued to receive his specialized academic instruction and small-group speech and language services on a pull-out basis in the special education classroom.  Student received his general education instruction in the conference room from January 19, 2018 until February 26, 2018.  If the substitute teacher who generally instructed Student was out, Ms. Perez or another teacher would cover.  During the time Student was taught in the conference room, Oxnard implemented a plan, developed by Ms. Garcia-Thomas, pursuant to which Student was re-integrated into Ms. Ponce's class for

increasing portions of the school day as his behavior improved.  Parents never consented to
Student being taught in the conference room instead of Ms. Ponce's classroom, and Oxnard
returned him to Ms. Ponce's class on February 26, 2018, at the demand of Mother and Student's
attorney at an IEP team meeting that day.

JANUARY 22, 2018 MANIFESTATION DETERMINATION/IEP TEAM MEETING

96.     On January 22, 2018, Oxnard convened simultaneously a manifestation
determination team meeting, and an IEP team meeting.  The manifestation determination
meeting was to determine whether Student's aggressive and destructive behavior, which had led
to a pattern of seven suspensions, was caused by, or had a direct and substantial relationship to,
Student's disability.  The IEP team meeting was to discuss proposed changes to Student's IEP.
Oxnard treated the meeting as an IEP team meeting, and January 11, 2018 IEP team members
Ms. Ponce, Ms. Perez, Ms. Murguia, Ms. Billings, Ms. Llanes, Mr. Olson, Ms. Madden, and
Ms. Garcia-Thomas attended, along with Mother, Student's uncle, and Student's home therapist,
Dain Acevedo.

97.     Regarding the manifestation determination, the team members concluded: (1)
Student's behavior was not caused by, nor had a direct and substantial relationship to, Student's
disabilities (speech/language impairment and ADHD); and (2) Student's behavior was the direct
result of Oxnard's failure to implement Student's IEP, because Oxnard had been unable to locate
a district or third party trained paraeducator to implement the positive behavior intervention plan
included in Student's IEP, and was only providing Student a substitute paraeducator who was not
trained.  The team's conclusion was odd for at least two reasons.  First, the manifestation
determination form stated if the team concluded that a student's behavior was the result of a
failure to implement the student's IEP, "the behavior must be considered a manifestation of the
disability."  Second, Student's IEP did not include any paraeducator services, but called for
Student's teacher, assistant principal, and school psychologist to implement his behavior plan.

98.     The January 22, 2018 meeting was documented on IEP forms that included
proposed changes to Student's IEP.  Ms. Madden explained to Mother that Oxnard was offering
to "remedy the problem" of its failure to implement Student's IEP, by making a FAPE offer to
Student of 60 days' interim placement at Casa Pacifica non-public school for diagnostic
assessment.  Ms. Madden said additional behavior intervention support for Student needed to be
a focus, along with additional assessments.  The IEP stated Oxnard "must conduct a functional
behavior assessment" for the purpose of developing a behavior intervention plan based on such
an assessment.  Mother was given a copy of a proposed assessment plan for Oxnard to conduct a
functional behavioral assessment of Student.

99.     Mother did not consent to the IEP, but said she would discuss the offer to change
schools with Student and respond by January 26, 2018.  Ms. Madden told Mother that, pending
Mother's decision on placing Student at Casa Pacifica, he would continue to receive one-on-one
general education instruction from a substitute teacher, supported by the substitute paraeducator,
in the conference room where he had been receiving instruction since January 19, 2018.

FEBRUARY 26, 2018 IEP TEAM MEETING

100.    On February 26, 2018, Student's IEP team met at Mother's request.  Mother, Student's uncle, Ms. Perez, Ms. Murguia, Mr. Olson, Ms. Ponce, Ms. Llanes, Ms. Garcia-Thomas, Ms. Madden, Ms. Sagrado, Student's attorney Janeen Steel, and Oxnard's attorney Ben Nieberg attended.

101.    Oxnard team members reported on Student's performance since the arrival of his full-time ABA-trained behavior aide from ERA Ed., and the implementation of his behavior plan.  Student was making steady progress, and had been back in Ms. Ponce's class the past two days for the entire school day.  The IEP team confirmed that Student's ABA-trained behavior aide was supervised by an ERA Ed. supervisor and Oxnard's behaviorist.  Mother signed an assessment plan for a functional behavioral assessment.

102.    At Mother's request, the IEP team added individual counseling services for Student at school.  When Ms. Steel requested that Student be returned full-time to his general education classroom, the team confirmed that Student would no longer be back in the separate classroom with the behavior technician and substitute teacher, but that Student needed a "cool down" area.  Ms. Garcia-Thomas stressed the need for a plan to keep Student and the other students at school safe.

103.    The IEP offered Student: (i) placement in the general education classroom; (ii) 120 minutes per week of specialized academic instruction in English/language arts, and 120 minutes per week of specialized academic instruction in math, each in the special education classroom; (iii) 100 minutes per month of speech and language services in a small group; (iv) 30 minutes per week school based individual counseling; (v) a one to one behavioral paraprofessional provided by an outside agency from 8:20 a.m. until 2:30 p.m. with behavior paraprofessional supervision provided by the school district behaviorist for four hours per month and outside agency supervision 20 hours a month.

104.    Mother initialed that she agreed with the eligibility determination, annual goals, and services contained in the IEP, and that she agreed with the IEP, except that she disagreed it was a FAPE, and reserved her claims involving FAPE or child find. She also threatened a discrimination complaint if Student was again placed in a separate classroom.

105.    On March 15, 2018, Mother returned the IEP, signed with the above reservations. Mother consented to the IEP with a statement that he should not be removed from his class.  The March 15, 2018 IEP remained Student's last agreed-upon, implemented IEP at the time of hearing.

106.    Mother disagreed with Oxnard's evaluation of Student for autism, and requested an independent educational evaluation at public expense.  Oxnard agreed to have Betty Jo Freeman, PhD., an autism expert based at the University of California Los Angeles, conduct the autism evaluation for Student.

107.     At Mother's request at Student's February 26, 2018 IEP team meeting, Student returned that day to full-time in Ms. Ponce's class.

MARCH 2, 2018 AND MARCH 9, 2018 INCIDENTS

108.     On March 2, 2018, Student became upset in Ms. Ponce's class and pulled papers off the walls, threw items, broke umbrellas and hit staff.

109.     On March 9, 2018, in an incident lasting almost two hours, and beyond the end of the school day, Student escalated when he returned to class from a visit to the health office and realized Ms. Ponce was giving out "Fun Friday" awards without him.  He began screaming profanity and attempting to kick in the classroom door, scaring his classmates to the point where some began crying and hiding under their desks, which had not happened before.  Student punched and kicked his paraeducator, destroyed school property, and used a metal rod to strike several windows, breaking one.  Student bit, kicked, and slapped school staff, and punched a teacher in the face.  Student also bit his paraeducator, causing her to bleed and to go to urgent care.  He repeatedly threatened to jump from a second-floor landing to the first floor below.  Attempts to de-escalate Student using techniques from his behavior plan, and six holds lasting from 10 seconds to two minutes failed, as Student re-escalated every time he appeared calm.  Student de-escalated when his Mother arrived at approximately 3:40 p.m., and she took him home.

110.     Ms. Garcia-Thomas was present for the March 9, 2018 incident.  She was on the second floor landing assisting with Student, who was in a screaming rage, and watched him de-escalate to a calm state in "about two seconds" when he heard his mother's footsteps coming up the school stairs.  Ms. Garcia-Thomas had observed Student do this before, on November 29, 2017, and others had told her of similar incidents they had observed.  Ms. Garcia-Thomas thought Student's behavior was extremely unusual, and might be associated with a mental disorder, such as bipolar disorder or oppositional-defiant disorder.  She suggested to Ms. Madden that Oxnard should arrange a mental health assessment with differential diagnostics to see if the results might help Parents and Oxnard understand Student's behavior.

MARCH 12, 2018 THROUGH APRIL 1, 2018: STUDENT AT HOME

111.     Friday, March 9, 2018, was Student's last day attending Chavez Elementary.  He was suspended from March 12 through15, 2018, and stayed home from March 16, 2018 through April 1, 2018, with home instruction during the week of March 19, 2018, and spring break the week of March 26, 2018.

MARCH 15, 2018 MANIFESTATION DETERMINATION TEAM MEETING AND MARCH 22, 2018 IEP TEAM MEETING.

112.     On March 15, 2018 Oxnard convened a manifestation determination team meeting to determine whether Student's behavior on March 9, 2028 was related to his disability and to discuss a possible change of placement for Student.  The team determined Student's actions were related to his disability, that Student's behavior was impacting his

ability to access the general curriculum; and that a change of placement needed to be considered. Oxnard team members also were concerned about safety at Chavez School. Oxnard recommended placement in either a mild/moderate special day class at a different school site (since that program was not available at Chavez School), or at Casa Pacifica. The family was invited to visit Casa Pacifica and the special day class program at Rose Avenue, while Student received home instruction.

113.    On March 22, 2018, the IEP team reconvened and the family agreed that Student would attend Casa Pacifica for the remainder of the school year. Following up on Ms. Garcia-Thomas's suggestion after the March 9, 2018 incident that Student should receive a mental health assessment, Ms. Madden suggested that Oxnard refer Student to the Ventura County Special Education Local Plan Area, Collaborative Educational Services Program, for an educationally-related social emotional services assessment.

114.    On or about March 30, 2018, Mother, through Ms. Steel, returned a signed copy of the March 15, 2018 IEP, consenting to Student's interim alternative placement at Casa Pacifica from April 2, 2018 to June 14, 2018.

*April 2, 2018 to June 14, 2018 Placement at Casa Pacifica*

115.    Student began attending Casa Pacifica on April 2, 2018. Oxnard supported Student at Casa Pacifica with a full-time behavior specialist and a supervisor from ERA Ed. to implement Student's existing positive behavior intervention plan prepared by Ms. Garcia-Thomas for Student's January 11, 2018 IEP.

116.    To prepare a detailed functional behavior assessment of Student, and develop a comprehensive behavior intervention plan to update Student's existing plan, ERA Ed. education supervisor Heather Brown and registered behavior technician Erika Andrade together observed Student's full school day at Casa Pacifica from April 2, 2018 through April 6, 2018. Ms. Andrade continued to observe Student's entire day every day through April 24, 2018, and Ms. Brown observed Student's entire day on April 25, 2018, and portions of three other days. Ms. Brown and Ms. Andrade collected data on the antecedents, consequences and functions of Student's target behaviors such as tantrumming and physical aggression. The data was assembled into functional behavior assessment report that Student's expert, Dr. Taubman, acknowledged as "pretty thorough." The report was given to Ms. Garcia-Thomas to use to update Student's existing positive behavior intervention plan with a more detailed comprehensive behavior intervention plan that could be reviewed and approved by Student's IEP team, and implemented using applied behavior analysis methods.

117.    Student arrived at Casa Pacifica defensive and uncommunicative. Observing that Student loved sports but disliked classwork, Casa Pacifica behavior specialist Anthony Pineda developed a rapport with Student by playing basketball with him and engaging in other sports. Student gradually developed a rapport with Mr. Pineda and other staff. Student also developed some friendships at Casa Pacifica, but other students often avoided him because of his aggressive behaviors, which were among the most extreme at the school.

24

118.    Mr. Pineda observed that after Student learned things students were not allowed to do in the classroom, he would do those things to be sent from class.  Mr. Pineda also found that if he asked Student a question about sports while Student was highly escalated and exhibiting extreme behaviors, Student would calmly answer the question, then return to the behavior.

119.    Student began at Casa Pacifica placed in an instructional classroom with a special education teacher, other students, and his one-on-one aide.  Because of his behaviors, as a form of behavior management not called for in Student's behavior plan, Casa Pacifica staff removed him from the instructional classroom when he exhibited behaviors, and placed him in a classroom with no teacher to work on worksheets.  If Student demonstrated good behavior, he was allowed to participate with the class and special education teacher.  However, Student never returned to the instructional classroom for more than 10-15 minutes before being removed from the class because of his behaviors.  Oxnard and Parents were unaware of this practice until it was disclosed by testimony at hearing.

120.    Oxnard and Parents were also unaware until hearing that Casa Pacifica staff interfered with Student's behavior plan by reassigning Student's ERA Ed. aides to work with other students, and have male aides from Casa Pacifica, who were not trained in applied behavior analysis, work with Student.  Staff did so because Student did not relate well to the female aides, who were trained in applied behavior analysis, and would escalate despite their interventions.

MAY 1, 2018 IEP TEAM MEETING

121.    On May 1, 2018, a 30-day review IEP team meeting was held to discuss Student's transition to Casa Pacifica.  Mother, Student's uncle, Ms. Steel, Mr. Nieberg, Ms. Garcia-Thomas, Ms. Madden, Ms. Brown, ERA Ed. clinical manager Jamie Vaughn, ERA Ed. clinical director Ariella Parker, Casa Pacifica principal Mark Capritto, Casa Pacifica clinical supervisor Erin Haven, Casa Pacifica clinician Catherine Race,  Casa Pacifica special education teacher Shaylyn Camacho, Casa Pacifica behavior specialist Anthony Pineda, and Casa Pacifica program specialist Shannon DeSantis attended.

122.    Ms. Garcia-Thomas reported she received a copy of the functional behavior analysis completed by ERA Ed., and the May 1, 2018 IEP included an updated, detailed comprehensive behavior intervention plan based on the information from ERA Ed.'s functional behavior assessment.

123.    The IEP team reported that Student had shown improvement in his behavior at the start of the day and in his sustained classroom attendance.  According to the IEP team, Student's behaviors during the morning routine had improved from not wanting to participate to Student raising his hand wanting to go first.

124.    The team discussed the challenges that Student continued to face.  Small incidents could still throw Student off, and Student still had difficulty with transitions (e.g., time to stand up, transition to different rooms, asking to complete an academic ask, denied or delayed access to something he wants).  Mark Capritto, Casa Pacifica's Principal, stated

25

Student's behaviors were getting better, but Student would sometimes escalate to the point where additional staff was needed to prevent him from harming himself or others.  Mr. Capritto said ERA Ed. was going to provide additional support so that Student would have two-on-one ERA Ed. support beginning the following week.

125.    The IEP team proposed increasing Student's speech therapy time from 25 minutes per week to 30 minutes per week, and allowed the speech therapy to be provided via individual or group therapy since there had been times when peers in his class who also received speech therapy wanted to "bring a friend."  Aside from the update to the behavior plan and the proposed increase in speech therapy, Oxnard's FAPE offer remained the same as his prior IEP.  However, Mother never consented to implement Student's May 1, 2018 IEP, or Ms. Garcia-Thomas's comprehensive behavior intervention plan for Student.

### May 17, 2018 Graduation From Home Therapy Program

126.    On May 17, 2018, Student graduated from a 60-day in-home therapeutic behavioral services program with his home therapist, Dain Acevedo.  The program successfully taught Student techniques for controlling his behaviors, at least in the home environment.  Mother believed the therapists could work with children both in the home and at school.  Mother was uncertain whether the therapy was based on applied behavior analysis or another therapeutic method.  Following the therapeutic behavioral services program, the intensity of Student's behaviors decreased markedly at home.  He would still tantrum on occasion, but no longer broke things or exhibited other extreme behaviors.  The reduction of extreme behaviors in the home following this therapy continued through the time of hearing.

### June 7, 2018 IEP Team Meeting

127.    Student's IEP team met on June 7, 2018 to review Student's functional behavior assessment, discuss Student's progress, and consider whether he was ready to return to a comprehensive campus at Oxnard.  Mother, Ms. Steel, Mr. Nieberg, Oxnard general education teacher Denise Evans, Ms. Garcia-Thomas, Ms. Madden, Mr. Vaughn, Ms. Parker, Casa Pacifica clinical program manager Sean Schoneman, Ms. Race, Ms. Camacho, Mr. Pineda, and Ms. DeSantis attended.

128.    Casa Pacifica and ERA Ed. personnel were asked about three incidents in which Student came home with injuries to his head or neck.  In the first, which required Student to go to the hospital to receive four staples to the back of his head, staff explained that Student was playing in the Multi-Sensory De-Escalation Room as a reward when he pushed the room's swing, which came back to hit him on the back of his head.  Staff administered first aid and bandaged Student's head before taking Student to the hospital.  In the second incident, in which Student came home with marks on his neck, staff reported that Student had the marks when he arrived at school and they thought it was eczema.  In the third incident, in which Student came home with a bump on his head, staff reported Student had fallen and bumped his head in the De-Escalation Room.

129.    After presenting Student's progress on goals, ERA Ed. Supervisor Heather Brown, presented Student's functional behavior assessment.  During the month of April, on average, Student exhibited tantrum behavior 1.18 times per day, physical aggression 5.45 times per day, verbal aggression 6.73 times per day, non- compliance 2.95 times per day, property destruction 0.85 times per day, and elopement 0.3 times per day.  The functional behavior assessment noted that problem behavior could occur at any time, but was most likely during academic periods and transitions from less structured periods.   Also, problem behavior was less likely to occur in a small group setting, and least likely in a one-on-one instructional setting with few or no peers present.  Ms. Brown recommended Student receive one-on-one instruction, or instruction in a small group setting, and be provided one-on-one support during the school day to ensure Student's participation in class, to block elopement attempts and aggressive behavior, and to follow-through with demands and redirect Student quickly to tasks.

130.    Casa Pacifica and ERA Ed. Staff described Student's progress on his behaviors at Casa Pacifica.  The frequency of Student's tantrums had decreased, although their extreme intensity had not changed.  Student had shown improvement participating in his classroom morning routine, which included identifying his emotions and how he was feeling. Student would now say "please" and "thank you" as well as apologize for his behaviors.  These were all things Student would not do when he first arrived at Casa Pacifica.  Casa Pacifica's Behavior Specialist also reported that Student was making friends and that he asked to exchange phone numbers with these peer friends.

131.    At hearing, Casa Pacifica staff testified that staff did not implement Students' behavior plan or IEP during his placement there.

132.    Ms. Steel requested Oxnard return Student to a comprehensive campus at Oxnard with a behavior plan.  Ms. Brown objected that Student was benefitting from the therapeutic program at Casa Pacifica, and should not be removed.  Also, while Student's last few weeks at Casa Pacifica had been successful, there hadn't been enough time to measure his progress from implementation of his comprehensive behavior intervention plan.  Casa Pacifica and ERA Ed. staff both recommended that Student not be placed at a comprehensive campus for extended school year, or for the 2018-2019 school year.

133.    Ms. Steel stated Mother would not agree to have Student attend extended school year at Casa Pacifica and that he would instead stay home.  The meeting concluded for the day, and was ultimately continued to July 26, 2018 to review the independent educational evaluation from Dr. Freeman.

134.    Student's last day of school at Casa Pacifica was June 14, 2018.  Student had not returned to school, nor received any educational program, from June 14, 2018 through the close of hearing.

JULY 26, 2018 FREEMAN AUTISM ASSESSMENT

135.     Betty Jo Freeman, Ph.D., is an autism clinician and researcher with more than 40 years' experience in autism diagnostic tools and behavior intervention methods.  She participated in the initial development of autism treatment methods based on the scientific discipline of applied behavior analysis, and has diagnosed, or supervised the diagnosis of, more than 10,000 children for autism.

136.     Dr. Freeman prepared a Psychological Assessment of Student that evaluated Student for autism.  To prepare her assessment, Dr. Freeman reviewed Oxnard's multidisciplinary assessment of Student, interviewed Mother and staff at Casa Pacifica, and observed Student at Casa Pacifica.  Dr. Freeman used four rating scales to collect information on Student from Mother and teachers.  Dr. Freeman met with Student and administered the Sentence Completion Test, Child Version, and the Autism Diagnostic Observation Schedule, Second Edition, Module 3.

137.     Based on her assessment, Dr. Freeman concluded that Student met the Diagnostic Statistical Manual.  Fifth Edition, 2013 (DSM-5) criteria for Autism Spectrum Disorder, as well as the educational criteria for special education services under the category of autism.

138.     In addition to suggesting that Student's primary special education eligibility category should be changed to autism to more accurately reflect Students' most significant areas of need, Dr. Freeman's conclusion had major implications for anyone developing a behavior management program for Student.  As Dr. Freeman explained in her report and testimony, previous behavior plans developed for Student were fundamentally flawed because they failed to take his autism into account, and focused on addressing his excessive behaviors, rather than his behavioral deficits that made it difficult or impossible for him to avoid the excessive behaviors. Student's behavior plans assumed Student possessed the skills needed to act appropriately instead of becoming upset, and to de-escalate from extreme behaviors once upset, but needed to be taught how to access and employ his skills.  In fact, according to Dr. Freeman, Student had no such skills and was incapable of avoiding upset or de-escalating from extreme behaviors. Student therefore needed to be carefully and systematically taught appropriate behaviors.

139.     Several considerations weigh against the persuasiveness of some of Dr. Freeman's opinions in this case.  Student did not present as obviously autistic.  Student expert, clinical psychologist Mitchell Taubman, Ph.D., had decades of experience evaluating children for autism and applying, and teaching others to apply, applied behavior analysis principles to address behavior.  Dr. Taubman met with Student for 15 to 30 minutes to see how Student presented.  Student was friendly and had a positive affect.  He was socially responsive and not standoffish, he responded appropriately to questions, made good eye contact, and exhibited no repetitive behaviors.  Even to Dr. Taubman's practiced eye, the only aspect of Student's presentation consistent with a characteristic of autism was that Student's conversation lacked sophistication.  However, Dr. Taubman acknowledged the difficulty evaluating a child's communication skills based on a short conversation with a strange adult.

140.    Oxnard educators who worked with Student disagreed with Dr. Freeman's observations of him for the Autism Diagnostic Observation Schedule that he lacked eye contact, exhibited a limited range and use of facial expressions, showed little, if any shared enjoyment in the interaction, and with respect to stereotyped or repetitive behaviors, exhibited sensory behaviors such as spinning objects, and frequent finger wiggling with the zipper on his jacket.  They also disagreed with that evaluation's conclusion that Student had "substantial deficits in verbal and nonverbal communication, significant impairments in reciprocal social interaction, and repetitive, abnormal and stereotyped behaviors and restricted interests."  Dr. Freeman's observations and conclusions were contrary to those obtained from rating scales provided by Mother, Ms. Murguia, Ms. Billings and Ms. Llanes for the Childhood Autism Rating Scale – 2 used in Oxnard's Multidisciplinary Assessment.

141.    At hearing, Dr. Freeman was highly critical of the Childhood Autism Rating Scale, characterizing it as a screening tool for potential autism, rather than an evaluation for a diagnosis of autism.  She did not, however, say that its estimates of whether a child was likely or unlikely to have autism were unreliable.  Dr. Freeman thought scientific studies existed comparing findings made using the Childhood Autism Rating Scale to findings made using the diagnostic tools used by Dr. Freeman, but she was unfamiliar with them.

142.    Dr. Freeman's report stated that Student had been referred to her "for updated assessment and differential diagnosis."  She initially testified that she had conducted a differential diagnosis that ruled out other potential conditions such as ADHD, oppositional defiant disorder, or emotional disturbance as reasons for his behavioral symptoms.  In cross-examination, Dr. Freeman admitted she had not conducted a differential diagnosis, since the only formal diagnostic instrument she had used to assess Student was the Autism Diagnostic Observation Schedule, which diagnosed only for autism.  Dr. Freeman's other five test instruments were intended to be used to identify potential issues or conditions, but not make formal diagnoses.

143.    Dr. Freeman characterized the Autism Diagnostic Observation Schedule she used to evaluate Student as the "Gold Standard" test instrument for diagnosing autism.  The Autism Diagnostic Observation Schedule is a standardized assessment of communication skills, social interaction, and the ability to use imaginative play, intended for use by a skilled practitioner in a clinical setting.  The examiner engages in specified activities with the subject and observes behaviors that have been identified as important in the diagnosis of autism spectrum disorders at different ages and developmental level. The activities use planned, as well as unstructured, social occasions in which a behavior of a particular type is likely to appear, and observe the subject's social interactions, communication, and other behaviors relevant to autism spectrum disorders.

144.    Based on the subject's social interaction with the examiner, scores are derived for Communication, Reciprocal Social Interaction, Imagination/Creativity, and Stereotyped Behaviors and Restricted Interests to determine potential diagnostic indicators for Autism Spectrum Disorders.

145.    Although Dr. Freeman reported Student's scores for each of the four screening tools that she used to evaluate Student, she did not report Student's scores for the Autism Diagnostic Observation Schedule, or whether they fell above or below cutoffs for autism and autism spectrum disorder.  Instead, she described some of her observations during the testing, such as "In the area of reciprocal social interaction, [Student] did not use eye contact to regulate social interaction.  He exhibited a limited range and use of facial expressions.  He smiled occasionally but did not look at the examiner."  Her conclusion regarding the results of the Autism Diagnostic Observation Schedule also did not refer to actual test scores, and was somewhat vague as to the exact basis for her diagnosis: "Results from this measure indicate substantial deficits in verbal and nonverbal communication, significant impairments in reciprocal social interaction, and repetitive, abnormal and stereotyped behaviors and restricted interests.  Thus, taken in the context of a complete psychological evaluation, results from this measure are conclusive for a diagnosis of Autism Spectrum Disorder."

146.    As Dr. Freeman's report noted, Title 5, California Code of Regulations, section 3030 (b)(1)(A) states: "Autism does not apply if a child's educational performance is adversely affected primarily because the child has an emotional disturbance, as defined in subdivision (b)(4) of this section."  Dr. Freeman's report mentions emotional disturbance only in reference to Oxnard's multidisciplinary report: "The report also identified and described a number of behavioral incidents indicating that Isaiah was having a great deal of difficulty in his school setting. . . . While emotional disturbance was discussed, [Student] was not given that eligibility."  Despite Student's extreme behaviors, Dr. Freeman did not evaluate Student for emotional disturbance, although she testified that based on her screening tests, she did not think that emotional disturbance applied.

147.    Dr. Freeman's report also did not discuss the possibility that ADHD might be the cause of some of Student's behaviors.  Dr. Freeman testified that she had asked for medical records relating to Students diagnosis of ADHD, but had not received them.  She testified that she did not believe that Student's behaviors were caused by ADHD because a child with ADHD knows how to calm down and can do so.  From her review of Student's educational records, she had found Student could not de-escalate, but had very intense behavioral episodes that lasted for a long time.  This was consistent with Dr. Freeman's opinion that, as a result of his autism-based behavioral deficits, Student did not have the skills necessary to de-escalate from extreme behaviors once upset.  When it was pointed out that Student had frequently been observed to de-escalate from extreme behavior within seconds after the arrival of certain authority figures such as his mother, uncle, or the campus police officer, Dr. Freeman's unsatisfying explanation was that autistic students frequently exhibit person-specific behaviors, and Student apparently had some skills.

148.    Many of Dr. Freeman's recommendations for addressing Student's behavioral needs appeared sound, and Oxnard agreed with them.  However, while Dr. Freeman disagreed with the results of Oxnard's autism assessment, Dr. Freeman's testimony failed to demonstrate that Oxnard did not assess Student for autism.

30

JULY 26, 2018 IEP TEAM MEETING

149.    On July 26, 2018, Student's IEP team met to review Dr. Freeman's
independent autism assessment.  Mother, Ms. Steel, Mr. Nieberg, psychologist Betty Jo
Freeman, Ms. Billings, Ms. Barcia-Thomas, Mr. Vaughn, Ms. Camacho, school
psychologist: Jenny Ponzuric, Casa Pacifica principal Mark Capritto, and Ms. Madden
attended.  Chavez Elementary principal Perez participated by phone.  Also participating by
phone, from Casa Pacifica, were mental health counselor Randy Osuna, Dr. Schoneman
Ph.D., Mr. Pineda and Ms. Race.

150.    Oxnard members of the IEP team disagreed with Dr. Freeman's opinion
Student was autistic.  Dr. Freeman stated that Student needed a small, structured program
beginning with one-on-one instruction and gradual re-introduction to a comprehensive
classroom.

151.    The team resumed discussion from July 7, 2018 of the appropriate placement
for Student.  Based on the information from Casa Pacifica and ERA Ed. staff, the team had
concerns about Student's readiness to return to a comprehensive campus because Student
was not ready to be integrated.  Oxnard, Casa Pacifica, and Era Ed. Team members believed
Student still required a high level of support including therapeutic support and staff, which
could not be provided on a comprehensive campus.  In addition, Student had made steady
progress on his behaviors at Casa Pacifica.

152.    Mr. Pineda from Casa Pacifica and Mr. Vaughn believed ERA Ed. could
create a program to be successfully implemented at Casa Pacifica.  Ms. Steel asked for
Oxnard's FAPE offer, and Oxnard's counsel stated Oxnard was offering Casa Pacifica as
placement.  Ms. Steel said Mother would not agree with placement at Casa Pacifica.  She
asked Oxnard to consider a home program for Student with 40-50 hours of applied behavior
analysis support.  District did not reject this proposal.  Ms. Madden asked whether Mother's
work schedule would allow her to arrange a home program for Student.  Mother said she
would check, and the team agreed to continue the IEP meeting to work on placement
options, including special education programs within Oxnard that could support Student on
a comprehensive campus, and home instruction if Mother would be available for such a
program.  The IEP team agreed to hold off on finalizing Student's IEP until after it heard
back from Mother about the home instruction, and Oxnard did not make a final offer of
FAPE on July 26, 2018.

JULY 26, 2018 TO AUGUST 17, 2018: EFFORTS TO FIND MUTUALLY-AGREEABLE
PLACEMENT FOR STUDENT

153.    Between August 2, 2018 and August 17, 2018, attorneys for Student and
Oxnard exchanged emails continuing their efforts to locate a mutually-agreeable placement
for Student.  On August 2, 2018, Ms. Steel emailed Mr. Nieberg, stating that Mother did not
know if she would be able to take time off to be home for Student's home instruction
program until the following week.  Ms. Steel asked Oxnard's attorney whether Oxnard

31

would pay Student's grandmother on an hourly basis since she would have to stop working while Student was in his applied behavior analysis home instruction program.

154.    On August 7, 2018, Mr. Nieberg asked Ms. Steel for an update regarding Mother's ability to implement Student's home instruction program.

155.    On August 9, 2018, Mr. Nieberg informed Ms. Steel Oxnard was willing to refer Student to North Hills Prep School, a non-public school in Van Nuys, California with a program for students in grades two through four focused on students with behavioral needs. Mr. Nieberg informed Ms. Steel that North Hills had eight students in a class, with one teacher and two paraeducators assigned to each classroom, and Oxnard would provide transportation to and from North Hills. If Mother agreed with referral, Oxnard would send information to staff at North Hills Prep for a final determination whether Student would be a good fit for North Hills.

156.    Ms. Steel replied that Mother would be able to visit North Hills on August 15, 2018. Mr. Nieberg noted that Oxnard was set to resume school on Thursday, August 16, 2018. He asked if Mother would allow Student to stay home August 16 and August 17, while North Hills Prep would accept him as a student, and said Oxnard would provide Student compensatory education for those dates.

157.    Mother never visited North Hills. Student filed his complaint in this matter on August 17, 2018.

*Seclusion and Holds*

158.    During the 2017-2018 school year, Student was restrained by physical holds during 23 incidents from October 12, 2017, through June 5, 2018. Student's experts, Dr. Taubman and Ms. Freeman, testified to the importance of using functional behavior analysis to develop a behavior intervention plan to teach Student ways to avoid escalation, but they did not propose any alternatives to seclusion or safe holds to prevent Student from injuring himself and others when highly escalated.

159.    Oxnard staff restrained Student using physical holds in 12 incidents. In accordance with Oxnard policy, these holds were all NCPI holds, and were administered by staff trained in their use, including Mr. Olson, Ms. Perez and Ms. Garcia-Thomas.

160.    On October 12, 2017, Student began throwing rocks at other students on the playground and threatened to run away from the school campus. Ms. Perez and Mr. Olson used a standing team control hold, each holding onto an arm, to walk him to a conference room to calm down. When released, he attacked Ms. Perez and Mr. Olson, who placed him in another hold until he de-escalated. The incident lasted 15 to 20 minutes.

161.    On November 13, 2017, Student refused Ms. Ponce's request to work on an assignment and became destructive, tearing things off the walls, kicking and hitting

classroom windows and doors, and throwing rocks at classroom windows.  Mr. Olson tried for an hour to calm Student down, then walked with Student to Mr. Olson's office, where Student continued damaging property.  Student ran from Mr. Olson's office towards some younger students.  Believing Student to be a risk to himself and the younger students, Mr. Olson used a standing one-person control hold, holding Student's arms, until Student de-escalated.  The incident lasted approximately 20 minutes.

162.    On November 17, 2017, Student lost a quarter he was playing with, escalated, and began throwing books and other items at other students and Ms. Ponce.  Ms. Ponce evacuated the class.  Yelling obscenities, Student threw and kicked a chair towards Ms. Ponce and Ms. Perez.  When Ms. Perez tried to use a one-person standing control hold, Student threw himself to the floor, then kicked Ms. Perez in the head when she bent down.  Mr. Olson held Student's feet to keep him from kicking, and he and Ms. Perez talked calmly with Student until he de-escalated.  The incident lasted 15 minutes.

163.    On November 28, 2017, Student began knocking things off desks in Ms. Ponce's class and Mr. Olson was called.  When Student grabbed at the lanyard around Mr. Olson's neck and tried to stomp on Mr. Olson's feet, Mr. Olson placed Student in a standing child control hold until he de-escalated.  The incident lasted five to ten minutes.

164.    On December 1, 2017, Student escalated in class, and ran down hallways tearing things off the walls, then outdoors.  Student threw a concrete door stop at Mr. Olson, and continued tearing down bulletin boards until he agreed to go to Mr. Olson's office, with Mr. Olson and Ms. Perez each holding a hand to escort him.  Student tried to trip them and drop to the ground, so Ms. Perez and Mr. Olson used a two-person standing control hold to walk Student to Mr. Olson's office.  In Mr. Olson's office, Student tried to kick and bite, and was placed in a child control hold.  After 10 to 15 minutes, Student de-escalated and Mr. Olson released him, but Student then threw a chair at Ms. Perez, and tried to flip over a table.  Mr. Olson placed Student in a child control hold again, until a special education teacher came into Mr. Olson's office and succeeded in distracting Student with a paper project until he de-escalated.  The incident lasted approximately one hour, with holds totaling 25 to 35 minutes.

165.    On January 19, 2018, his first day of instruction in the conference room, Student became agitated when he was not allowed to immediately deliver a party invitation to another student.  Student ran down the hallway, and Mr. Olson believed Student intended to elope from campus.  To prevent Student from eloping and possibly injuring himself, Mr. Olson, placed Student in a standing transport hold to lead him to the conference room.  In the conference room, Student began to throw papers, desks, and chairs.  Staff removed items that Student could throw.  When there was nothing left to throw, Student began to hit, kick, spit, pinch, and attempt to bite Mr. Olson.  Mr. Olson used the block and move technique to evade Student's assaults.  Student climbed on a counter and reached for items on top of the upper cabinets, including a fire extinguisher and a large metal box. Mr. Olson believed Student was in danger of hurting himself and removed him from the counter. The incident lasted about 45 minutes.

33

166.    On January 23, 2018, Student escalated while in Ms.Ponce's classroom. Student ripped pages out of a workbook and threw them onto the floor, covering the entire floor with paper and creating an unsafe environment for him and the other students in the classroom. "Lower level interventions were implemented" including being prompted to calm down, and take a break, and given choices for his actions. However, Student was hitting with an open hand, punching, kicking, spitting, and attempting to bite adults, so a child control hold was administered by Ms. Garcia-Thomas for 5-10 seconds.

167.    On January 24, 2018, after realizing that recess was over, Student pushed over a desk, grabbed a chair, and began throwing it against walls and towards Ms. Garcia-Thomas and Mr. Olson. Student attempted to bite staff and successfully climbed on top of a three and a half foot counter in order to kick the thermostat, creating a dangerous situation for himself. To prevent a fall, Mr. Olson guided Student onto a safe surface to stand. Student continued to attempt to bite and Mr. Olson held him in a child control position for about 10 seconds.

168.    On January 25, 2018, Student was observed in the school's bicycle cage, trying to remove another student's scooter. When approached by Ms. Perez, Student escalated to a violent tantrum, during which he struck Ms. Perez three times in the face with rocks, grabbed his paraeducator's buttocks, lifted her blouse, tried to grab her cell phone, chased and hit her when she began to walk away. Student chased Ms. Perez around the bicycle rack, trying to bite her arms and hands, while screaming extremely derogatory gender expletives and threats.

169.    On February 5, 2018, Student escalated on his way to class. In the conference room, Student flipped over his desk and threw wooden sticks from one of the games in the classroom at Mr. Olson, striking him in the head and causing him to bleed. Student also threw sand, covering the floor and creating a dangerous situation in which Student could slip, fall and hurt himself. Mr. Olson and Ms. Perez placed Student in an emergency hold until the sand was swept up. Ms. Perez was trained in NCPI techniques.

170.    Casa Pacifica staff, and Student's paraeducators, were trained in the use of safe holds for Student's safety or their own safety, and used them as a last resort only after interventions such a blocking and moving, verbal redirection, and distraction were unsuccessful in controlling dangerous behavior. Staff used holds during 11 incidents.

171.    On Student's first day at Casa Pacifica, April 2, 2018, transitioning from outdoors to class, Student entered the class and began screaming loudly. Student responded to each prompt from the teacher by screaming. He escalated as he was guided into the hallway, and attempted to bite, hit with an open fist, pull hair, throw chairs, and kick people and walls. Staff placed Student in a transportation hold and took him to the Multi-Sensory De-escalation Room (MSDR), a padded room with play equipment, where Student calmed down after a seven-minute hold. Later that day, Student was on a break using a computer, and refused to leave the computer when the break was over. He spit at staff, hit, and attempted to bite staff, and tried to pick up and throw the computer. Student refused staff

requests to leave the computer, and escalated as staff offered warnings and suggested alternatives. Student hit staff, spit at staff, attempted to bite, hit with an open fist, pull hair, throw chairs, and kick people and walls. Casa Pacifica staff placed Student in a standing two-person transport hold and walked him to MSDR.

172.    On April 12, 2018, Student threw sand at a classmate, eloped to the classroom, punched his ERA Ed. paraeducator in the face and bit her in the arm. Student's paraeducator placed him in a NCPI hold to prevent Student from injuring her, and walked him back outside, where he escalated and attempted to hit staff with sticks, kick and strike his paraeducator, and elope from campus. When Student ignored redirection, reminders of expected behaviors, and suggested options, staff placed him in a seated hold, then a standing transport hold to the MSDR. The hold duration totaled 13 minutes.

173.    On April 17, 2018, after Student assaulted his ERA Ed. paraeducator and threw chairs and other items on the floor, Casa Pacifica staff transported Student with a standing hold to the MSDR. The hold duration was two minutes.

174.    On April 18, 2018, Student objected to the seat he was assigned on the campus van, began spitting on staff, and moved to the front seat and attempted to move the shifter. Casa Pacifica staff physically removed Student from the van to prevent property damage. When Student then spit on staff and tried to elope from campus, Casa Pacifica staff placed him in a standing hold and walked him to the MSDR.

175.    On April 20. 2018, Student attempted to hit staff with an open and closed fist, but no contact was made due to other staff using body positioning. Student was verbally redirected and provided options. Strategies such as responsive blocks and ignoring were used. Student continued to hit, bite and kick staff. Student was held in a seated position and taken in a transport hold to the MSDR. The hold duration was 14 minutes.

176.    On April 24, 2018, Student threw sticks at staff, spit on staff, and threatened to kill them. Student also attempted to punch and kick staff, who used blocking techniques to avoid being injured. To keep Student from injuring himself or others, his ERA Ed. paraeducator placed him in a NCPI safe hold. After Student calmed down, his paraeducator and Casa Pacifica staff walked with him to the MSDR.

177.    On April 30, 2018, Student became physically and verbally aggressive with staff, including spitting on staff, and was walked to the MSDR to de-escalate. He escalated in the MSDR, and spit on, hit, kicked, and punched staff, and attempted to bite them. ERA Ed. and Casa Pacifica staff placed him in a two-person seated hold for two minutes.

178.    On May 16, 2018, Student eloped to the pool area and escalated when staff asked him to return. Student cursed staff, threatened to kill them, and spit at, hit, kicked, punched, and threw objects at staff. Staff used a 30-second child control hold to transport Student to the MSDR, where he de-escalated. Later the same day, the scenario repeated itself. Student was again transported to the MSDR in a child-control hold, then placed in a

one-person seated hold until he de-escalated.  Later that day, Student eloped to the pool area for a third time, and began to throw rocks at staff.  Staff reminded Student to make good choices, but Student attempted to stab the staff member with a stick.  Student was transported for 30 seconds, away from the pool area.  Student continued to escalate, told staff he was going to kill them and started to hit with open hand, bite, spit, and kick. Staff placed him in a one-person control hold and transported Student for about 1 minute to the MSDR.  The total duration of the holds was two minutes.

179.    On June 1, 2018, when asked to not spit at lunch, Student escalated and spit at, kicked, hit, and threw things at staff.  Staff used a standing transport hold for 15 seconds to take Student to the MSDR.

180.    On June 5, 2018, Student started following a classmate, taunting him, causing the classmate to lunge at Student, who fell to the ground.  Staff separated Student and the classmate.  Later, when Student again taunted the classmate into lunging at him, staff placed Student in a two-person standing transport hold for 15 seconds to separate him from the classmate, and prevent injury to either student.  When staff released him from the transport hold, he spit at, scratched, hit, bit, and kicked them, and was placed in a four-person seated hold for four minutes until calm.  When released from the hold, Student tried to run back to the classmate, and two staff members used a seated hold for three minutes to remove him from the area.  The hold duration totaled seven minutes.

*Post-Filing Communications, Filings, and Expert Testimony Regarding an Appropriate Placement and Educational Program for Student, Relevant to Remedies*

AUGUST 30, 2018 OXNARD FAPE OFFER

181.    On August 30, 2018, Oxnard communicated an offer to conduct a new functional behavior assessment of Student, and a FAPE offer of: (1) placement at Casa Pacifica, in a self-contained special education program with a 1:3 student staff ratio, and intensive social/emotional services from an Intensive School-Based Therapist (ISBT) available at all times within the daily program; plus related services of: (2) 1500 minutes per week of one-on-one behavioral trained paraprofessional provided by a non-public agency; (3) outside agency supervision provided on (what frequency of a basis?) [sic]; (4) implementation by the paraprofessional and Casa Pacifica Staff of a new behavior support plan based on results of the functional behavior assessment, and serving Student's behavior goals; (5) 1500 minutes per week specialized academic instruction; (6) 30 minutes per week individual speech services; (7) 30 minutes per week counseling; (8) 60 minutes per month social work services.  Other services to address the social emotional and behavioral needs of Student while at Casa will include music and fitness, and bi-weekly family nights are offered along with daily feedback about student progress to parents/caregivers, via e-communication.[2]  Student did not respond to this offer.

---

[2] Oxnard's August 30, 2018 FAPE offer is not at issue in this matter, but was considered with regard to remedies.

PROPOSED PLACEMENTS FOR STUDENT

182.     Ms. Garcia-Thomas believed the most appropriate placement for Student as of
June 2018, was Casa Pacifica, implementing the comprehensive behavior intervention plan
she developed for Student's May 1, 2018 IEP based on Student's April 2018 functional
behavior assessment.

183.     As demonstrated by expert testimony at trial, and expressed in the parties'
post-trial briefs, the parties agree that Student, as a result of his behaviors, is not ready to
return to any Oxnard public school classroom, in either a general education class or special
day class, due to concerns over his safety or that of others.

184.     Between the filing of the complaint and hearing of the matter, the parties
continued to attempt to locate a mutually-agreeable placement.  In addition to North Hills
Prep, the parties considered The Academy for Advancement of Children With Autism, a
non-public school in Chatsworth, California; Phoenix-Los Nogales School in Camarillo,
California, operated by the Ventura County Office of Education for students with significant
social-emotional and behavioral needs; and Triton Academy, also operated by the Ventura
County Office of Education, serving students with autism spectrum disorder.  The parties
found no mutually-agreeable placement that would accept Student.

PROPOSED EDUCATIONAL PROGRAM FOR STUDENT

185.     Dr. Freeman, Dr. Taubman and Ms. Garcia-Thomas recommended Student
receive one-on-one systematic behavior programming based on applied behavior analysis
principles for an entire school day, with educational opportunities as planned by a behavior
team.  The behavior program would be developed as a result of a behavior assessment,
monitored by staff trained in applied behavior analysis, supervised by a qualified behavior
specialist, with behavioral data collected.

186.     Dr. Freeman, Dr. Taubman and Ms. Garcia-Thomas recommended a behavior
team be put in place for Student consisting of a teacher, Parent, a full-time one-on-one
behaviorist, a full-time behavior supervisor, and an expert in development of proactive
applied behavior analysis programs, such as Dr. Peggy Van Fleet or Autism Partnership.

187.     In the opinion of Dr. Taubman, and Ms. Garcia-Thomas, Student requires an
intensive one-on-one educational program for at least one year to address behaviors before
attempting re-integration to a general education environment.

187.     Mother and Father work full time outside the home and would seek
reimbursement for the costs of a caretaker if Student was placed in the home.

37

LEGAL CONCLUSIONS

*Introduction – Legal Framework under the IDEA[3]*

1.       This hearing was held under the Individuals with Disabilities Education Act
(IDEA), its regulations, and California statutes and regulations intended to implement it. (20
U.S.C. § 1400 et. seq.; 34 C.F.R. § 300.1 (2006) et seq.; Ed. Code, § 56000, et seq.; Cal.
Code. Regs., tit. 5, § 3000 et seq.) The main purposes of the IDEA are: (1) to ensure that all
children with disabilities have available to them a free appropriate public education (FAPE)
that emphasizes special education and related services designed to meet their unique needs
and prepare them for employment and independent living, and (2) to ensure that the rights of
children with disabilities and their parents are protected.  (20 U.S.C. § 1400(d)(1); See Ed.
Code, § 56000, subd. (a).)

2.       A FAPE means special education and related services that are available to an
eligible child at no charge to the parent or guardian, meet state educational standards, and
conform to the child's individualized education program (IEP). (20 U.S.C. § 1401(9); 34
C.F.R. § 300.17; Cal. Code Regs., tit. 5, § 3001, subd. (p).) "Special education" is instruction
specially designed to meet the unique needs of a child with a disability. (20 U.S.C. §
1401(29); 34 C.F.R. § 300.39; Ed. Code, § 56031.) "Related services" are transportation and
other developmental, corrective and supportive services that are required to assist the child in
benefiting from special education. (20 U.S.C. § 1401(26); 34 C.F.R. § 300.34; Ed. Code, §
56363, subd. (a) [In California, related services are also called designated instruction and
services].) In general, an IEP is a written statement for each child with a disability that is
developed under the IDEA's procedures with the participation of parents and school
personnel that describes the child's needs, academic and functional goals related to those
needs, and a statement of the special education, related services, and program modifications
and accommodations that will be provided for the child to advance in attaining the goals,
make progress in the general education curriculum, and participate in education with
disabled and non-disabled peers.  (20 U.S.C. §§ 1401(14), 1414(d); Ed. Code, § 56032.)

3.       In *Board of Education of the Hendrick Hudson Central School District v.
Rowley* (1982) 458 U.S. 176, 201 [102 S.Ct. 3034, 73 L.Ed.2d 690] ("*Rowley*")*,* the Supreme
Court held that "the 'basic floor of opportunity' provided by the [IDEA] consists of access to
specialized instruction and related services which are individually designed to provide
educational benefit to" a child with special needs.  *Rowley* expressly rejected an
interpretation of the IDEA that would require a school district to "maximize the potential" of
each special needs child "commensurate with the opportunity provided" to typically
developing peers. (*Id.* at p. 200.)  Instead, *Rowley* interpreted the FAPE requirement of the
IDEA as being met when a child receives access to an education that is reasonably calculated
to "confer some educational benefit" upon the child. (*Id.* at pp. 200, 203-204.)

_____

[3]  Unless otherwise indicated, the legal citations in the introduction are incorporated
by reference into the analysis of each issue decided below.

4.      In a recent unanimous decision, the United States Supreme Court declined to
interpret the FAPE provision in a manner that was at odds with the *Rowley* court's analysis,
and clarified FAPE as "markedly more demanding than the 'merely more than the de
minimus test'…" (*Endrew F. v. Douglas County Sch. Dist. RE-1* (2017)
580  U.S. _____ [137 S. Ct. 988, 1000-1001] (*Endrew F.).*).  The Supreme Court in
*Endrew F.* stated that school districts needed to "offer a cogent and responsive explanation
for their decisions" and articulated FAPE as that which is "reasonably calculated to enable a
child to make progress appropriate in light of the child's circumstance." *Id.*

5.      The IDEA affords parents and local educational agencies the procedural
protection of an impartial due process hearing with respect to any matter relating to the
identification, evaluation, or educational placement of the child, or the provision of a FAPE
to the child. (20 U.S.C. § 1415(b)(6); 34 C.F.R. 300.511; Ed. Code, §§ 56501, 56502, 56505;
Cal. Code Regs., tit. 5, § 3082.)  The party requesting the hearing is limited to the issues
alleged in the complaint, unless the other party consents. (20 U.S.C. § 1415(f)(3)(B); Ed.
Code, § 56505, subd. (i).)  Subject to limited exceptions, a request for a due process hearing
must be filed within two years from the date the party initiating the request knew or had
reason to know of the facts underlying the basis for the request. (20 U.S.C. § 1415(f)(3)(C),
(D).)

6.      At the hearing, the party filing the complaint has the burden of persuasion by a
preponderance of the evidence.  (*Schaffer v. Weast* (2005) 546 U.S. 56-62 [126 S.Ct. 528,
163 L.Ed.2d 387]; see 20 U.S.C. § 1415(i)(2)(C)(iii) [standard of review for IDEA
administrative hearing decision is preponderance of the evidence].)  Here, Student was the
filing party and carried the burden of proof.

*Issue 1:  Child Find*

7.      Student contends Oxnard denied Student a FAPE by failing in its child find
duty from February 26, 2016 to May 18, 2017.  Student argues Oxnard failed its child find
duty to refer Student for assessment before May 18, 2017, and from May 18, 2017 to the
filing of the complaint, because it failed to appropriately assess Student for autism.

8.      Oxnard contends it did not have reason to suspect, before May 18, 2017, that
Student might have a disability requiring special education, and its child find duty to Student
was satisfied and ended when it referred Student for assessment on May 18, 2017.

9.      The IDEA and Education Code place an affirmative, ongoing duty on the state
and school districts to identify, locate, and assess all children with disabilities residing in the
state who are in need of special education and related services.  (20 U.S.C. § 1412(a)(3); 34
C.F.R. § 300.111(a); Ed. Code, § 56301, subd. (a).)  This duty is commonly referred to as
"child find."  "The purpose of the child-find evaluation is to provide access to special
education."  (*Fitzgerald v. Camdenton R-III School Dist.* (8th Cir. 2006) 439 F.3d 773, 776.)

10.     Through the child find requirement, Congress acknowledged the "paramount importance" of properly identifying each child eligible for special education services. (*Forest Grove School Dist. v. T.A.* (2009) 557 U.S. 230, 245 [129 S.Ct. 2484, 2495, 174 L.Ed.2d 168].)  The purpose of child find is to ensure that children with disabilities are found and have the opportunity to enter into the special education system. (*DL v. District of Columbia* (D.D.C. 2006) 450 F.Supp.2d 21, 22.)

11.     "Child find" does not guarantee eligibility for special education and related services under the IDEA.  It is merely a locating and screening process which is used to identify those children who are potentially in need of special education and related services.  Once a child is identified as potentially needing specialized instruction and services, the district must conduct an initial evaluation to confirm the child's eligibility for special education. (34 C.F.R § 300.301; Ed. Code, § 56302.1.)

12.     "Child find" does not address disputes about the content of assessments, eligibility categories, or IEP offers after children have been located and identified.  "Child find" relates to the location and identification of students who may be in need of assessment, and not to the results of those assessments once conducted.

13.     A school district has a child find duty whether or not the parent has requested special education testing or services.  (*Reid v. Dist. of Columbia* (D.C. Cir. 2005) 401 F.3d 516, 518.)  A school district's child find obligation toward a specific child is triggered when there is reason to suspect that he or she may be an individual with exceptional needs[4] as defined under Education Code section 56026 and in need of special education, even if the child is advancing from grade to grade.  (Ed. Code, § 56301, subd. (b)(1).)  A disability is "suspected," and therefore must be assessed by a school district, when the district has notice that the child has displayed symptoms of that disability. (*Timothy O. v. Paso Robles Unified School District* (9th Cir. 2016) 822 F. 3d 1105, 1119 [citations omitted] *cert. denied*, 137 S. Ct. 1578, 197 L. Ed. 2d 704 (2017).)  "Once either the school district or the parents suspect a disability, a test must be performed so that parents can 'receive notification of, and have the opportunity to contest conclusions regarding their children.'" (*Id.* at p. 1120.)

14.     The duty to assess for exceptional needs is broader than the duty to provide special education, and more easily triggered.  In deciding whether there is reason to suspect that a student has exceptional needs, a school district's appropriate inquiry is whether the student should be referred for an assessment, not whether the student actually qualifies for special education services. (*Dept. of Education, State of Hawaii v. Cari Rae S.* (D. Hawaii 2001) 158 F.Supp. 2d 1190, 1195 ("*Cari Rae S.*").)  Thus, the suspicion that a student has an impairment that is affecting the student's educational performance is sufficient to trigger a need for assessment.  (See, e.g., *Park v. Anaheim Union High School Dist., et al.* (9th Cir. 2006) 464 F.3d 1025, 1032 ["The District is not required to assess double vision or optic nerve damage if it does not affect a child's educational needs"], citing Ed. Code, § 56320.)  A

_____

[4]  The Education Code generally uses the term "exceptional needs" instead of the term "disability" found in the IDEA.

school district's duty to assess a student's eligibility for special education and related services is also triggered by any request for special education or assessment from the student's parent.  (Cal. Code Regs., tit. 5, § 3021(a).)  If the parent's request is verbal, the district must offer to assist the parent in preparing a written request.  (*Ibid.*)

15.     Clear signs that trigger the child find duty include a pupil who is performing below grade average in basic academic functions such as reading; failing grades; behavior and discipline problems; a significant amount of absences from school; concerns expressed by parents and teachers; signs of substance abuse; a medical diagnosis of a recognized disability; psychiatric hospitalizations; suicide attempts; and a request for an evaluation from the parents. (See e.g., *(Compton Unified School Dist. v. Addison* (9th Cir. 2010) 598 F.3d 1181, at pp. 1182-1183; *Cari Rae*, supra, 158 F.Supp.2d at p. 1195; *Wiesenberg v. Bd. of Education of Salt Lake City School Dist.* (D.Utah 2002) 181 F.Supp.2d 1307, at pp. 1311-1312; *Hicks v. Purchase Line School Dist.* (W.D.Pa. 2003) 251 F.Supp.2d 1250, at p. 1254; *N.G. v. District of Columbia* (D.D.C. 2008) 556 F.Supp.2d 11, at pp. 18-21.)

16.     The relationship between the duty to assess, the duty to provide special education services, and the duty to utilize general education resources where appropriate was concisely summarized in *Los Angeles Unified School District v. D.L.* (C.D. Cal. 2008) 548 F.Supp.2d 815, 819-820:

> To prevent districts from 'over-identifying' students as disabled, Congress mandated that states develop effective teaching strategies and positive behavioral interventions to prevent over-identification and to assist students without an automatic default to special education.  (20 U.S.C. § 1400(c)(5)(f).)  Schools, however, are charged with the 'child find' duty of locating, identifying and assessing all children who reside within its boundaries who are in need of special education and related services.  (20 U.S.C. § 1400(a)(3); [Ed. Code, §§ 56300- 56303].)  If a school district suspects that a general education student may have a disability, it must conduct a special education assessment to determine whether the student qualifies for special education services. (20 U.S.C. § 1414(a)(1)(a); [Ed. Code, § 56320].)  However, a student 'shall be referred for special education instruction and services only after the resources of the regular education program have been considered, and, where appropriate, utilized.' ([Ed. Code, § 56303].)

17.     Although a district is required to utilize the resources of its regular education program, where appropriate, to address a student's exceptional needs, it may not delay its assessment of a student with a suspected disability on the basis that it is utilizing a response to intervention approach to accommodate the student in the regular education program.  A district may deny a request to evaluate a student if it does not suspect a disability, but it must notify the parent of the basis of the decision and that basis cannot be that the district is waiting to see how the student responds to general education interventions.  (Office of

Special Education Programs (OSEP) *Memorandum to State Directors of Special Education*
(January 21, 2011) 56 IDELR 50.)

18.     Violations of child find, and of the obligation to assess a student, are
procedural violations of the IDEA and the Education Code.  (*Cari Rae S., supra,* 158 F.Supp.
2d 1190 at p.1196); *Park v. Anaheim, supra*, 464 F.3d 1025 at p. 1031.)  A procedural
violation results in liability for denial of a FAPE only if the violation: (1) impeded the child's
right to a FAPE; (2) significantly impeded the parent's opportunity to participate in the
decision-making process; or (3) caused a deprivation of educational benefits.  (20 U.S.C.
§ 1415(f)(3)(E)(ii); Ed. Code, § 56505, subd. (f)(2); see *W.G. v. Board of Trustees of Target
Range School Dist. No. 23* (9th Cir. 1992) 960 F.2d 1479, 1484.) (*Target Range*).)

19.     A child who is not eligible for special education is not denied a FAPE by a
procedural violation of the IDEA.  (*F.B.v. Napa Valley Unified School Dist.* (9th Cir. 2007)
496 F.3d 932, 942.)  Failure to identify and assess a child is not an actionable child find
violation unless the child is subsequently found eligible for special education.  However, a
child find violation leading to a failure to assess a child who is subsequently found eligible
for special education generally results in liability for denial of a FAPE, because the absence
of any information concerning the child's disability significantly impedes the child's right to
a FAPE, and the parent's opportunity to participate in the decision-making process, and may
cause a deprivation of educational benefits.  (See, e.g., *Timothy O. v. Paso Robles Unified
School Dist.* (9th Cir. 2016) 822 F.3d 1105, at p. 1124  ("On more than one occasion, we
have held that the provision of a free appropriate public education is 'impossible' when the
IEP Team fails to obtain information that might show that the child is autistic").)

20.     Parents must file a request for a due process hearing within two years from the
date they knew or had reason to know of the facts underlying the basis for the request. (20
U.S.C. § 1415(f)(3)(C), (D); Ed. Code, § 56505, subd. (l).)  Mother authorized the student
success team meeting to proceed on October 25, 2016 in Parents absence.  Ms. Rodriguez
reviewed the notes of the meeting with Mother on November 17, 2016.  On that date, Mother
received and signed notes of the follow-up October 25, 2016 success team meeting, at which
team members again reviewed Student's progress and behavior and did not refer him for
assessment.  The evidence did not support Student's claim the statute of limitations should
not apply to claims going back to February 26, 2016, under either of the statutory exceptions.
(20 U.S.C. § 1415(f)(3) (D); Ed. Code, § 56505, subd. (l).)

21.     Student started kindergarten in August 2015 kind, energetic and happy, and
enjoyed being at school.  He earned satisfactory marks for effort in all four academic subjects
in which he was graded for effort, indicating that he was trying to learn.  However, despite
his good attitude and effort, he did not make academic progress.  Instead, he had difficulty
understanding new concepts, was easily distracted, and immediately began to struggle with
his language arts, mathematics, meeting none of the 14 first-trimester common core state
standards benchmarks for language arts and mathematics.  Student also struggled to master
the 16 skills for successful learning that he was supposed to learn in kindergarten, and his
teacher rated him at risk for retention.  Although Student's attitude and effort remained

satisfactory in his second trimester, he made little improvement academically, or towards
mastering the learning skill he would need for first grade.

22.     Student's referral to a student success team at the end of his second trimester
was appropriate because there was no evidence Parents, teachers or staff suspected a
disability.  Oxnard did not violate its child find duties by holding the student success team
meeting on February 25, 2016.  Oxnard's practice, confirmed by Oxnard teachers and staff at
hearing, was to attempt general education interventions through a student success team
before assessing a student for possible disabilities requiring special education.  Oxnard
discussed Student's challenges and proposed a three step intervention approach to
accommodate the Student in his regular education program.  The team intended to follow up
on Student's progress in eight to ten weeks and schedule another meeting.  Student's
academic progress improved marginally, and behaviors improved, from March to June 2016.
Mother was concerned about his progress and thought Student needed to repeat kindergarten.
She spoke to Ms. Hawkins who informed her Oxnard did not have students repeat a grade
and that Student would catch up in first grade.

23.     Student started first grade in Ms. Moran's class at a different school in August
2016.  Oxnard held a second student success team meeting on October 25, 2016.  By that
time all of the strategies developed at the first meeting were implemented, completed and
unsuccessful.  The team discussed Student's challenges and Ms. Moran reported Student was
at risk to repeat first grade.  Oxnard should have, but did not, discuss whether Student's lack
of academic progress, behavioral difficulties and continuing speech impediment might be
due to any suspected disability.  These were all significant indicators of a potential disability
affecting Student's learning, but the student success team did not even discuss the possibility
of assessments.  Instead, Oxnard adopted a wait and see attitude, returned Student to the
boys' social skills group and, if Parent agreed, offered an after school tutoring program.

24.     With Mother's permission Student continued participating in the boys' social
skills group and began after school tutoring in January 2017.  From January to June 2017,
Student failed to make academic progress and his aggressive behavior escalated.

25.     The student success team met again on April 26, 2017.  The team discussed
whether Student should be assessed, the team decided to continue general education
interventions, even as Oxnard's New Dawn therapist diagnosed Student with unspecified
disruptive, impulse-control and conduct disorder.  On May 18, 2017, as the result of another
extreme behavior incident, the team met again and recommended a full special education
assessment.  An assessment plan was sent to Parents on May 31, 2017, near the end of the
school year.

26.     Parents returned the plan on September 30, 2018, near the beginning of the
next school year.  As part of the resulting assessment, Ms. Murguia assessed Student using
standardized tests and questionnaires which, overall, rated Student as having minimal or no
characteristics associated with autism.

27.     Student proved that, by October 25, 2016, Oxnard knew the success team strategies were completed, the strategies did not work and there was reason to suspect Student's challenges were caused by disabilities that required assessment.  Student proved Oxnard violated its child find obligation from October 25, 2016 through May 31, 2017. Student did not prove Oxnard failed to assess Student for autism.

*Issue 2(a): Failure to Make FAPE Offer Before January 11, 2018*

28.     Student contends Oxnard denied him a FAPE by failing to assess him and make a FAPE offer in early 2016, when his potential disability should have been identified and assessed.  Oxnard contends its January 11, 2018 FAPE offer was timely.

29.     When a student is referred for a special education assessment, whether by a school district or a parent, the district must provide the parent a written proposed assessment plan within 15 days of the referral, not counting days between the pupil's regular school sessions or terms or days of school vacation in excess of five school days from the date of receipt of the referral. (Ed. Code, § 56321, subd. (a).)  The parent has at least 15 days to consent in writing to the proposed assessment. (Ed. Code, § 56321, subd. (c)(4).)  The district then has 60 days from the date it receives the parent's written consent, excluding days between the pupil's regular school sessions or terms or days of school vacation in excess of five school days, to complete the assessments and develop an initial IEP, unless the parent agrees in writing to an extension. ((20 U.S.C. § 1414(a)(1)(C); Ed. Code, § 56043, subds. (c) & (f).)

30.     When Oxnard eventually referred Student for assessment on May 18, 2016, nearly seven months after the October 25, 2016 student success team meeting, the referral led to assessments that confirmed Student's eligibility for special education under categories of other health impairment based on attention deficit hyperactivity disorder, and speech impairment based on a frontal lisp.  Moreover, the October 25, 2016 success team meeting occurred near the beginning of Student's first grade school year and assessments would have been completed and an IEP team meeting held within that school year.  Oxnard would have been required under the statues to have developed an initial IEP for Student's second grade year.

31.     Oxnard denied Student a FAPE by failing to make any offer of FAPE prior to January 11, 2018.

*Issue 2(b): Failure to Offer FAPE in the January 11, 2018 IEP.*

32.     Student contends Oxnard failed to offer Student a FAPE in IEPs dated January 11, 2018, January 22, 2018, February 26, 2018, May 1, 2018, June 7, 2018, and July 26, 2018, because each failed to offer Student a one-on-one applied behavior analysis program, when, Student contends, the need for such a program was known to Oxnard

behavior specialist coordinator, Ms.Garcia-Thomas.[5]  Oxnard contends each of its IEPs offered Student an appropriate behavior program.

33.    In developing an IEP, the IEP team must consider the strengths of the child, the concerns of the parents for enhancing the child's education, the results of the most recent evaluations of the child, and the academic, developmental, and functional needs of the child. (20 U.S.C. § 1414(d)(3)(A); 34 C.F.R. § 300.324 (a).) The "educational benefit" to be provided to a child requiring special education is not limited to addressing the child's academic needs, but also social and emotional needs that affect academic progress, school behavior, and socialization.  (*County of San Diego v. California Special Educ. Hearing Office* (9th Cir. 1996) 93 F.3d 1458, 1467.) A child's unique needs are to be broadly construed include the child's academic, social, health, emotional, communicative, physical and vocational needs. (*Seattle School Dist. No. 1 v. B.S*. (9th Cir. 1996) 82 F.3d 1493,1500, citing H.R. Rep. No. 410, 1983 U.S.C.C.A.N. 2088, 2106.)

34.    If a child's behavior interferes with his or her learning or the learning of others, the IDEA requires the IEP team, in developing the IEP, to "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." (20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.324(a)(2)(i); Ed. Code, § 56341.1, subd. (b)(1).) An IEP is evaluated based on information available to the IEP team at the time it was developed; it is not judged exclusively in hindsight. (*Adams v. State of Oregon (9th Cir*. 1999) 195 F.3d 1141, 1149.) "An IEP is a snapshot, not a retrospective." (Id. at p. 1149, citing *Fuhrmann v. East Hanover Bd. of Education* (3rd Cir. 1993) 993 F.2d 1031, 1041.) It must be evaluated in terms of what was objectively reasonable when the IEP was developed. (*Ibid*.)  However, after-acquired information may be used to assess the reasonableness of a school district's determinations. (*E.M. v. Pajaro Valley Unified School Dist*. (9th Cir. 2009) 652 F.3d 999, 1004.)

35.    To determine whether a school district substantively offered a student a FAPE, the focus must be on the adequacy of the district's proposed program. (*Gregory K. v. Longview School District* (9th Cir. 1987) 811 F.2d 1307, 1313-1314.)  If the school district's program was designed to address the student's unique educational needs, was reasonably calculated to provide the student with some educational benefit, comported with the student's IEP, and was in the least restrictive environment, then the school district provided a FAPE, even if the student's parents preferred another program, and even if the parents' preferred program would have resulted in greater educational benefit. (*Ibid*.) School districts need to "offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances."  (*Endrew F*., supra, 580 U.S. ___ [137 S.Ct. 988].)

---

[5] Student's only stated contention regarding Student's IEPs dated January 11 and 22, February 26, May 1, June 7 and July 26, 2018 was that Oxnard denied Student a FAPE by failing to offer applied behavior analysis services.  Therefore, this is the only issue analyzed regarding Issue 2(b).

36.     As of Student's initial IEP meeting on January 11, 2018, Oxnard was aware that Student engaged in aggressive, violent behaviors that interfered with his learning and the learning of others.  Ms. Garcia-Thomas, had conducted a special circumstances educational support assessment of Student, and concluded that consistent, intensive, individualized support addressing Student's behaviors was absolutely necessary for Student to control his behaviors, and to learn.  She recommended Student receive full time one-on-one support from a trained behaviorist.

37.     Oxnard's January 11, 2018 and January 22, 2018 IEPs did not offer Student any one-on-one behavior support services.  Instead, an untrained substitute paraprofessional provided one-on-one services that were not included anywhere in the IEP document, and not approved by Parents.  The January 11, 2018, and January 22, 2018 IEPs failed to offer Student a FAPE.

38.     Oxnard's February 26, 2018 IEP offered Student placement in a general education classroom with substantial behavior support, including a one-on-one ABA behavior aide, from a non-public agency, for the entire school day.  Mother subsequently signed this IEP on March 15, 2016, although she disagreed the IEP offered a FAPE, and it remains Student's last implemented IEP.[6]  The ABA one-on-one behavior aide offered in the February 26, 2018 IEP was appropriate behavior support.  While reasonably calculated, on February 26, 2018, to provide educational benefit to Student, Student's behaviors further escalated at the beginning of March.

39.     On March 30, 2018, following the manifestation determination and IEP team meeting on March 22, 2018, Oxnard and Parents agreed to an interim alternative placement at Casa Pacifica from April 2, to June 14, 2018.

40.     Oxnard's May 1, 2018 IEP offered Student placement at Casa Pacifica with intensive social/emotional services available at all times within the daily program, provided by an intensive school-based therapist; a one to one behavioral paraprofessional provided by an outside agency 1500 minutes weekly, with outside agency supervision.  The IEP included a comprehensive positive behavior intervention plan to be implemented using applied behavior analysis methods.

41.     Ms. Garcia-Thomas was familiar with applied behavior analysis methods and

---

[6] At Student's request, official notice is taken of *Oxnard School District v. I.H. et. al.*, No. 2:18-cv-07357-SVW-AS (C.D. Cal. Oct. 31, 2018 Minute Order), in which the court denied Oxnard's motion for a preliminary injunction enjoining Student from attending or otherwise being present at Chavez Elementary School.  The court found Oxnard failed to show irreparable harm because Oxnard made clear it would turn Student away from Chavez, and Student's counsel stated "there is no threat that [Student] will try to attend Cesar Chavez elementary."  Student does not seek placement at Chavez Elementary School as a remedy in this matter, and has agreed in his closing brief that Chavez Elementary is not an appropriate placement for Student at this time.

used them in Student's program.  She prepared a comprehensive behavior intervention plan for Student that was incorporated into Student's May 1, 2018 IEP.  Parent never consented to the IEP or the behavior plan, but Ms. Garcia-Thomas believed implementing the comprehensive behavior intervention plan with Student at Casa Pacifica would have been the best program for him as of June 2018.  There was no indication she found Oxnard's behavior program deficient.

42.     Oxnard's June 7, 2018 and July 26, 2018 IEPs offered Student placement at Casa Pacifica with: (1) intensive social/emotional services available at all times within the daily program, provided by an intensive school-based therapist; (2) one to one behavioral trained paraprofessional provided by an outside agency 1500 minutes per week with outside agency supervision; (3) a one-to-one behavioral aide with the support of behavior interventionist as well as site staff to implement the behavioral support plan created specifically for Student following a functional behavioral assessment; (4) 1500 minutes per week specialized academic instruction; (5) 30 minutes weekly of individual speech services; (6) 30 minutes weekly of counseling; and 60 minutes per monthly social work services.

43.     Student made progress addressing his behaviors during the times he was placed at Casa Pacifica, before Parents withdrew Student from Casa Pacifica.  Student proved the January 11 and 22, 2018 IEPs denied Student a FAPE by failing to offer appropriate behavior support.  Student did not prove the IEPs dated February 26, 2018, May 1, 2018, June 7, 2018, and July 26, 2018 failed to offer behavior support.

*Issue 2(c): Failure to Implement January 11, 2018 IEP*

44.     Student contends Oxnard failed to implement the January 11, 2018 IEP, because, as Oxnard admitted in its manifestation determination meeting on January 22, 2018, it failed to provide Student a trained paraeducator, and failed to provide Student speech and language services and specialized academic instruction included in the IEPs.  Oxnard does not dispute these contentions.

45.     A school district must implement all components of a student's IEP.  (20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. § 300.323(c).)  When a student alleges the denial of a FAPE based on the failure to implement an IEP, in order to prevail, the student must prove that any failure to implement the IEP was "material," which means that the services provided to a disabled child fall "significantly short of the services required by the child's IEP." (*Van Duyn v. Baker School Dist. 5J* (9th Cir. 2007) 502 F.3d 811, 822 (*Van Duyn*).)  A minor discrepancy between the services provided and the services required in the IEP is not enough to amount to a denial of a FAPE.  (*Ibid.*)  "There is no statutory requirement of perfect adherence to the IEP, nor any reason rooted in the statutory text to view minor implementation failures as denials of a free appropriate public education." (*Ibid.*)  A brief gap in the delivery of services, for example, may not be a material failure. (*Sarah Z. v. Menlo Park City School Dist.* (N.D.Cal., May 30, 2007, No. C 06-4098 PJH) 2007 WL 1574569 at p. 7.)  "[T]he materiality standard does not require that the child suffer demonstrable educational harm in order to prevail.  However, the child's educational progress, or lack of it,

may be probative of whether there has been more than a minor shortfall in the services provided." (*Van Duyn, supra,* 502 F.3d at p. 822.)

46.     Oxnard acknowledged it did not provide a properly trained paraeducator and the evidence showed that Student's ability to access his education declined during the period in which he did not receive this service.  The records of Oxnard's speech and language pathologist and resource specialist proved that Oxnard failed to implement a material portion of the speech and language services and specialized academic instruction offered in his January 11, 2018 IEP.  Accordingly, Student prevailed on Issue 4(a).

*Issue 3:  Emergency Interventions and Seclusion*

47.     Student contends between May 2017 and June 2018 Oxnard and Casa Pacifica staff used inappropriate restraints as a systematic behavior intervention, and on several occasions between January 11, and March 8, 2018 Oxnard used inappropriate seclusion to control Student's behaviors.  Oxnard contends it used appropriate interventions and used restraints and seclusion according to law to prevent harm to Student and others.

48.     The IDEA does not directly address the use of restraint and seclusion in school.  However, if such methods are permitted by state law, and necessary for a particular child to receive a FAPE or to enable the child to participate in extracurricular and non-academic activities, they should be incorporated into the child's IEP or behavior plan. (*Letter to Anonymous,* 57 IDELR 49, 111 LRP 45428 (OSERS 2010); *Letter to Trader,* 48 IDELR 47 107 LRP 29537 (OSEP 2006).)

49.     Emergency interventions may only be used to control unpredictable, spontaneous behavior that poses clear and present danger of serious physical harm to the individual with exceptional needs, or others, and that cannot be immediately prevented by a response less restrictive than the temporary application of a technique used to contain the behavior. (Ed. Code, § 56521.1, subd. (a).)  Emergency interventions may not be used as a **s**ubstitute for a systematic positive behavior plan which is designed to change, replace, modify, or eliminate a targeted behavior.  (Ed. Code, § 56521.1, subd. (b).)

50.     An emergency intervention shall not be used for longer than is necessary to contain dangerous behavior posing serious harm to others or self.  A situation requiring a prolonged emergency intervention requires staff to seek the assistance of a school administrator or law enforcement agency.  (Ed. Code, § 56521.1, subd. (c).)  Emergency interventions shall not use an amount of force exceeding that which is reasonable and necessary under the circumstances. (Ed. Code, § 56521.1, subd. (d)(3).)  A physical escort means a temporary touching or holding of the hand, wrist, arm, shoulder, or back for the purposes of inducing a student who is acting out to walk to a safe location. (*U.S. Dept. of Education Restraint and Seclusion: Resource Document,* p. 10 (May 15, 2012).)

51.     The use of a separate classroom is appropriate where, as here, a student engages in conduct that is substantially likely to result in injury. (See e.g. *Rialto Unified*

48

*School District v. Student* (2013) OAH Case Number 2013090966 [Student was physically aggressive and engaged in eloping behaviors and caused, attempted, or threatened to cause physical injury (including death) to staff and students].)  Conduct that has been found substantially likely to result in injury includes hitting, kicking, shoving, biting, climbing on classroom furniture and cabinets, shouting obscenities, throwing objects at people, running out of the classroom, and banging on the doors of other classrooms. (*Long Beach Unified School Dist. v. Student* (2008) OAH Case Number 2008030017.)  Behaviors that have been found likely to result in injury also include: hitting an adult in the back, lunging at the teacher and trying to punch and hit her, yelling at and threatening people (*Fort Bragg Unified School Dist. v. Parent on behalf of Student* (2008) OAH Case Number 2008100507); throwing desks, knocking over a computer, yelling and screaming, hitting, kicking, punching, and biting adults (*Fullerton Joint Union High School Dist. v. Student* (2007) OAH case number 2007040584); and throwing objects, kicking other children, punching and kicking school staff, eloping from school and running into the street, knocking over another child, screaming, and destroying property (*Lancaster Elementary School Dist. v. Student* (2006) OAH case number 2006030771.)

52.     Oxnard did not use emergency interventions as a substitute for a systematic positive behavior plan.  Oxnard used emergency physical interventions, including physical escort, when Student presented a danger to himself or others.  Student's behavior was unpredictable and spontaneous.  His physical attacks on staff and other students caused physical harm, including injuries that resulted in physical injury and open wounds.  His severe tantrums included throwing things, pushing furniture, destroying property and using profanity and threats resulting in evacuation of his classroom.  Student's behaviors required properly trained Oxnard staff to use the temporary application of restraint for short periods of time to protect Student and others from injury and were not applied for longer than necessary.  Similarly, seclusions were not used for longer than necessary to protect Student and others from harm and did not exceed what was reasonable and necessary under the circumstances.

53.     Student did not prove that Oxnard used inappropriate behavior interventions or improper emergency procedures or seclusion under the circumstances.

*Issue 4(a): Failure to Make Clear Written Offer in in January 11, 2018 IEP*

54.     A determination of whether Oxnard failed to make a specific, written offer of FAPE at the January 11, 2018 IEP is not required in light of the conclusion that the January 11, 2018, IEP denied Student a FAPE.

*Issue 4(b):  Failure to Complete Initial IEP Within 60 Days of Signed Assessment Plan,*

55.     Student contends Oxnard denied him a FAPE by failing to assess Student and develop an initial IEP within 60 days of September 20, 2017, the date on which Mother returned consent to Oxnard's assessment plan for Student.  Oxnard contends that Mother consented to extend the 60-day deadline for developing Student's IEP when she signed the

November 9, 2017 IEP and agreed to reconvene the meeting at a later date.

56.     Procedurally, a school district has 60 days from the date it receives a parent's written consent to assess a child, excluding days between the pupil's regular school sessions or terms or days of school vacation in excess of five school days, to complete the assessments and develop an initial IEP, unless the parent agrees in writing to an extension.  (20 U.S.C. § 1414(a)(1)(C); Ed. Code, § 56043, subds. (c) & (f).) When a district delays the assessment of a child who is ultimately found eligible for special education and related services, the delay deprives parents of the assessment results they need to participate in the decision-making process, and it deprives the child access to educational benefits that begin upon the determination of eligibility.

57.     Here, the 60-day deadline for Oxnard to develop Student's initial IEP was November 20, 2017.  On November 9, 2017, Mother agreed in writing: (i) she was informed that more time was needed to complete additional assessments; (ii) she gave permission to open the meeting; and (iii) per her request, she would be notified with advance notice when the meeting was to reconvene.  Mother could have agreed to any of those three things while still refusing to agree to an extension of time to complete the assessments, or an extension of time to develop Student's initial IEP.  Mother's signature on the November 9, 2017 IEP did not constitute a written agreement for an extension of time to complete the assessments and develop an initial IEP for an unknown period of time unilaterally determined by Oxnard.

*Issue 4(c) Failure to Include General Education Teacher at IEP Team Meetings*

58.     Student contends Oxnard denied him a FAPE by failing to have a general education teacher present at Student's IEP meetings on May 1, 2018, June 7, 2018 and July 26, 2018.  District admits no general education teacher attended the May 1, 2018 or July 26, 2018 meeting, but contends a Oxnard general education teacher did attend the June 7, 2018 meeting, and absence of a general education teacher on May 1, 2018 and July 26, 2018 did not deny Student a FAPE because it did not significantly impede Parent's opportunity to participate in the decision-making process, cause a deprivation of educational benefits, or impeded Student's right to a FAPE.

59.     Each meeting to develop, review or revise the IEP of an individual with exceptional needs must be conducted by an IEP team. (Ed. Code, § 56341, subd. (a).)  The IEP team must include, "not less than one regular education teacher *of the pupil*, if the pupil is, or may be, participating in the regular education environment.  If more than one regular education teacher is providing instructional services to the individual with exceptional needs, one regular education teacher may be designated by the local educational agency to represent the others." (Ed. Code, § 56341, subd. (b)(2) (emphasis added).)

60.     The Ninth Circuit has held that "the plain meaning of the terms used in section 1414(d)(1)(B) compels the conclusion that the requirement that at least one regular education teacher be included on an IEP team, if the student may be participating in a regular classroom, is mandatory – not discretionary." (*M.L. v. Federal Way Sch. Dist.* (9th Cir. 2005)

394 F.3d 634, 643 (*M.L.*).) In *M.L.*, the Ninth Circuit found that a general education teacher was required at the IEP team meeting for preschooler in an integrated general education preschool classroom, even though information was available to the team about the teacher's opinions, and despite the recommendation of district team members for a special education classroom placement. (*Ibid.*)  A regular education teacher, to the extent appropriate, must participate in the development, review and revision of the student's IEP, including assisting in the determination of appropriate positive behavioral interventions and supports, and other strategies for the pupil, and the determination of supplementary aids and services, program modifications, and supports for school personnel that will be provided for the student. (20 U.S.C. § 1414(d)(3)(C); Ed. Code, § 56341(b)(2).)

61.     Mother never consented to anything more than temporary placement of Student in Casa Pacifica's non-public school environment.  At the time of the May 1, 2018, June 7, 2018 and July 26, 2018 IEP team meetings, it was thus contemplated, at least by Parents, that Student might be returning to the regular education environment, and that any IEP meeting would involve discussion of the least restrictive environment appropriate for Student.  Ms. Evans, an Oxnard general education teacher attended Student's June 7, 2018 IEP.

62.     The absence of a regular education teacher at Student's IEP team meetings on May 1, 2018, and July 26, 2018, impeded Mother's participation in the decision making process.

## REMEDIES

1.     Student prevailed on Issues 1, 2, and 4(b) and (c).  Oxnard prevailed on Issue 3.  Issue 4(a) was not decided.  As a remedy with respect to the issues on which Student prevailed, Student requests that Oxnard be directed to: (i) place Student in an intensive one-on-one instruction program – in home, or alternatively in a dedicated classroom on an Oxnard school campus – initially focused on addressing Student's behaviors using applied behavior analysis principles; (ii) set up a behavioral team using providers of Student's choosing, or agreed-upon by Student, to create, implement and supervise Student's behavioral program team; (iii) fund a behavioral evaluation for use by Student's behavior team; (iv) find Student eligible for special education as a student with autism; and (v) provide substantial compensatory education.

2.     Oxnard agrees that a behavioral program based on applied behavior analysis principles is appropriate, but contends that the most appropriate placement for such a program would be at Casa Pacifica.  It is clear from the evidence at trial and the post-trial briefing that Oxnard is committed to developing an appropriate program to help Student access his education and make progress on his behavioral issues and academics.  However, the parties learned at hearing that Casa Pacifica did not implement Student's IEP during his placement there.

3.     Courts have broad equitable powers to remedy the failure of a school district to provide a FAPE to a disabled child. (20 U.S.C. § 1415(i)(1)(C)(iii); Ed. Code, § 56505,

subd. (g); see *School Committee of the Town of Burlington, Massachusetts v. Dept. of Education* (1985) 471 U.S. 359, 369 [105 S.Ct. 1996, 85 L.Ed.2d 385] (*Burlington*).)  This broad equitable authority extends to an ALJ who hears and decides a special education administrative due process matter.  (*Forest Grove, supra,* 557 U.S. 230, 244, n. 11.)

      4.      When a school district fails to provide a FAPE to a student with a disability, the student is entitled to relief that is "appropriate" in light of the purposes of the IDEA. (*Burlington, supra*, 471 U.S. at p. 369-371.)  Parents may be entitled to reimbursement for the costs of placement or services that they have independently obtained for their child when the school district has failed to provide a FAPE. (*Id*; *Student W. v. Puyallup School district* (9th Cir. 1994) 31 F. 3d 1489, 1496 (*Puyallap*).) A school district also may be ordered to provide compensatory education or additional services to a student who has been denied a FAPE. (*Student W. v. Puyallup School district* (9th Cir. 1994) 31 F.3d 1489, 1496.) These are equitable remedies that courts may employ to craft "appropriate relief" for a party. An award of compensatory education need not provide a "day-for-day compensation."  (*Id.* pp. 1496-1497.) The conduct of both parties must be reviewed and considered to determine whether equitable relief is appropriate. (*Id.* at p. 1496.)  An award to compensate for past violations must rely on an individualized assessment, just as an IEP focuses on the individual student's needs. (*Reid ex rel. Reid v. Oxnard of Columbia* (D.D.C. Cir. 2005) 401 F.3d 516, 524, citing *Student W. v. Puyallup School district* (9th Cir. 1994) 31 F.3d 1489,1497.)   The award must be fact-specific and be "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." (*Reid ex rel. Reid v. Oxnard of Columbia* (D.D.C. Cir. 2005) 401 F.3d 516, 524.)

      5.      Student is currently receiving no education, and his greatest need is immediate access to a placement and program appropriate for his unique needs.  The nature of Student's unique needs remains unclear.  Student's medical diagnoses of attention deficit hyperactivity disorder and unspecified disruptive, impulsive and conduct disorder were unsupported by any reports or testimony.  The two available assessments of Student – Oxnard's multidisciplinary assessment and Dr. Freeman's autism assessment contained conflicting observations and conclusions, and each had flaws.  Dr. Freeman's autism diagnosis was undercut by her not evaluating for possible emotional disturbance, not disclosing test scores generated by her primary diagnostic tool, her observation of Student's behaviors not observed by others, and her emphasis of Student's inability to deescalate as a result of his autism, which was at odds with numerous observations by others of Student's ability to calm down from extreme escalation within moments of the arrival of Mother, his grandfather, his uncle, or a police officer.

      6.      The parties shall be ordered to obtain an independent psychoeducational assessment of Student by a mutually agreed-upon independent assessor at public expense. The assessor selected and the cost of the assessment shall be within Oxnard's guidelines for independent educational evaluations.

      7.      If the parties cannot agree to an assessor, each party shall provide the other

with three names of qualified assessors.  If the parties name the same assessor, that person shall conduct the assessment.  If the parties name two of the same assessors, Student shall designate who will conduct the assessment.   If the parties do not name any of the same providers, Oxnard shall provide Student a list of at least five qualified assessors that meet Oxnard's guidelines for independent educational assessments and Student shall pick an assessor from the list.  The parties shall select an assessor by this method no later than January 18, 2019.

8.    Although Oxnard and Student disagreed on the nature of Student's disability, they agreed an appropriate educational program for Student at this time would focus on a one-on-one behavior program based on applied behavior analysis.  In addition to the psychoeducational assessment, the parties shall be ordered to obtain an independent functional behavior assessment by a mutually agreed-upon independent assessor.  The assessor selected and the cost of the assessment shall be within Oxnard's guidelines for independent educational evaluations.  If the parties are unable to agree on the assessor, the provider will be selected in the manner set forth above.

9.    Oxnard shall obtain an educationally-related social emotional services assessment of Student from an assessor of Oxnard's choosing, at its expense.

10.    In order to provide an educational environment in which Student may be assessed, the parties shall convene an IEP team team meeting no later than February 1, 2019, to develop an interim educational placement.  The placement must include one-on-one systematic behavior programming based on applied behavior analysis principles for an entire school day, with educational opportunities as planned by a behavior team.  The behavior program shall be provided by and monitored by staff trained in applied behavior analysis, and supervised by a qualified behavior specialist, with behavioral data collected.

11.    As compensatory education for services that were not provided according to the January 11, 2018 IEP, Oxnard shall be ordered to provide Student ten hours of speech/language therapy services and100 hours of intensive academic instruction.  The compensatory services shall be provided by Oxnard or a mutually agreed-upon non-public agency.  If the parties are unable to agree on any of the providers, a provider shall be selected in the manner set forth above for the selection of independent assessors.

12.    Student's IEP team will be ordered to meet within 10 days of completion of Student's psychoeducational assessment and social emotional services assessments to review the assessments and revise Student's IEP.  If the parties cannot agree on a new IEP, Student's program implemented pursuant to this order will be stay-put.

## ORDER

1.    Oxnard shall provide, at public expense, an independent psychoeducational assessment of Student by a mutually agreed-upon independent assessor.  The assessor

selected and the cost of the assessment shall be at public expense within Oxnard's guidelines for independent educational evaluations.

2.        If the parties cannot agree to an assessor, each party shall provide the other with three names of qualified assessors.  If the parties name the same assessor, that person shall conduct the assessment.  If the parties name two of the same assessors, Student shall designate who will conduct the assessment.  If the parties do not name any of the same providers, Oxnard shall provide Student a list of at least five qualified assessors that meet Oxnard's guidelines for independent educational assessments and Student shall pick an assessor from the list.  The parties shall select an assessor by this method no later than January 18, 2019.

3.        Oxnard shall provide, at public expense, an independent functional behavior assessment by a mutually agreed-upon independent assessor.  The assessor selected and the cost of the assessment shall be at public expense within Oxnard's guidelines for independent educational evaluations.  If the parties are unable to agree on the assessor, the provider will be selected in the manner set forth above.

4.        Oxnard shall obtain an educationally-related social emotional services assessment of Student from an assessor of Oxnard's choosing, at its expense.

5.        The parties shall convene an IEP team meeting no later than February 1, 2019, to develop an interim educational placement for the purpose of assessment.  The placement must include one-on-one systematic behavior programming based on applied behavior analysis principles for an entire school day, with educational opportunities as planned by a behavior team.  The behavior program shall be provided by and monitored by staff trained in applied behavior analysis, and supervised by a qualified behavior specialist, with behavioral data collected.

6.        Oxnard shall complete the assessments and hold an IEP team meeting within the statutory time lines unless Oxnard obtains written consent to waive a timeline from Parent.

7.        Oxnard shall provide Student 100 hours of intensive academic instruction and ten hours of speech/language therapy as compensatory education.  The intensive academic instruction and speech language therapy shall be provided by Oxnard or a mutually agreed-upon non-public agency.  If the parties are unable to agree on any of the providers, a provider shall be selected in the manner set forth above for the selection of independent assessors. Student shall have until the end of the 2019-2020 school year to use these compensatory hours.  Hours not used by the end of the 2019-2020 school year are forfeited.

All other relief sought by Student is denied.

## PREVAILING PARTY

Pursuant to California Education Code section 56507, subdivision (d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided.  Here, Student was the prevailing party on Issues 1, 2 and 4(b) and (c).  Oxnard prevailed on Issue 3.

## RIGHT TO APPEAL

This Decision is the final administrative determination and is binding on all parties.  (Ed. Code, § 56505, subd. (h).)  Any party has the right to appeal this Decision to a court of competent jurisdiction within 90 days of receiving it.  (Ed. Code, § 56505, subd. (k).)

DATED: December 18, 2018

DocuSigned by:

_Robert G. Martin_

F77DE57DCC0E437...

ROBERT G. MARTIN
Administrative Law Judge
Office of Administrative Hearings

# Exhibit G

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of:<br><br>PARENTS ON BEHALF OF STUDENT,<br><br>v.<br><br>OXNARD SCHOOL DISTRICT. | OAH Case No. 2018090070 |

**DECISION**

Student filed a Due Process Hearing Request on August 30, 2018, with the Office of Administrative Hearings, State of California, naming Oxnard School District.

Administrative Law Judge Clifford H. Woosley heard this matter in Oxnard, California, on October 31, 2018.

Attorneys Janeen Steel and Melissa Riess appeared on behalf of Student.  Mother attended the hearing.  Attorneys April Navarro, Lawrence Joe, and Faatima Seedat represented Oxnard.  Director of Special Education Services, Amelia Sugden, and Manager of Special Education, Katrina Madden, attended on behalf of Oxnard.  OAH provided a Spanish language interpreter.

The matter was submitted for decision on October 31, 2018.

ISSUE[1]

Did Oxnard School District fail to meet its child find duty to identify, locate, and evaluate Student as to her need for special education services due to her suspected disability?[2]

SUMMARY OF DECISION

As a result of stipulated facts at the hearing, Student prevails on the sole issue. Oxnard failed to meet its child find duties and refer Student for special education assessment as of October 31, 2016.

FACTUAL FINDINGS

1.      At hearing, Oxnard stipulated that Oxnard's child find duty was triggered as of October 31, 2016.  Further, Oxnard stipulated that it did not refer Student for special education as of October 31, 2016.

2.      Oxnard representatives acknowledged and consented to the factual stipulations on the record.  Student accepted the factual stipulations.

3.      Student acknowledged that the complaint does not allege facts entitling Student to a tolling of the two-year statute of limitations.

LEGAL CONCLUSIONS

*Introduction – Legal Framework under the IDEA*

1.      This hearing was held under the Individuals with Disabilities Education Act (IDEA), its regulations, and California statutes and regulations intended to implement it.

---

[1]  The ALJ has authority to redefine a party's issues, so long as no substantive changes are made.  (*J.W. ex rel. J.E.W. v. Fresno Unified School Dist.* (9th Cir. 2010) 626 F.3d 431, 442–443.)

[2]  Student's complaint did not allege that she was eligible for special education nor that she was, therefore, entitled to a free appropriate public education.  Accordingly, FAPE is not at issue in this hearing.

2

(20 U.S.C. § 1400 et seq.; 34 C.F.R. § 300.1 (2006)[3] et seq.; Ed. Code, § 56000 et seq.; Cal. Code Regs., tit. 5, § 3000 et seq.)  The main purposes of the IDEA are:  (1) to ensure that all children with disabilities have available to them a free appropriate public education (FAPE) that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living, and (2) to ensure that the rights of children with disabilities and their parents are protected.  (20 U.S.C. § 1400(d)(1); See Ed. Code, § 56000, subd. (a).)

2.      A FAPE means special education and related services that are available to an eligible child at no charge to the parent or guardian, meet state educational standards, and conform to the child's individualized education program (IEP).  (20 U.S.C. § 1401(9); 34 C.F.R. § 300.17; Cal. Code Regs., tit. 5, § 3001, subd. (p).)  "Special education" is instruction specially designed to meet the unique needs of a child with a disability. (20 U.S.C. § 1401(29); 34 C.F.R. § 300.39; Ed. Code, § 56031.)

3.      The IDEA affords parents and local educational agencies the procedural protection of an impartial due process hearing with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a FAPE to the child.  (20 U.S.C. § 1415(b)(6) & (f); 34 C.F.R. § 300.511; Ed. Code, §§ 56501, 56502, 56505; Cal. Code Regs., tit. 5, § 3082.)  The party requesting the hearing is limited to the issues alleged in the complaint, unless the other party consents.  (20 U.S.C. § 1415(f)(3)(B); Ed. Code, § 56502, subd. (i).)  Subject to limited exceptions, a request for a due process hearing must be filed within two years from the date the party initiating the request knew or had reason to know of the facts underlying the basis for the request. (20 U.S.C. § 1415(f)(3)(C), (D); Ed. Code, § 56505, subd. (*l*).)  At the hearing, the party filing the complaint has the burden of persuasion by a preponderance of the evidence. (*Schaffer v. Weast* (2005) 546 U.S. 49, 56-62 [126 S.Ct. 528, 163 L.Ed.2d 387]; see 20 U.S.C. § 1415(i)(2)(C)(iii) [standard of review for IDEA administrative hearing decision is preponderance of the evidence].)  Here, Student carries the burden of persuasion.

*Child Find*

4.      The IDEA places an affirmative, ongoing duty on the state and school districts to identify, locate, and evaluate all children with disabilities residing in the state who are in need of special education and related services.  (20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.111(a).)  This duty is commonly referred to as "child find."  California law specifically incorporates child find in Education Code section 56301, subdivision (a).

5.      A school district's child find obligation toward a specific child is triggered when there is knowledge of, or reason to suspect, a disability, and reason to suspect that

---

[3] All subsequent references to the Code of Federal Regulations are to the 2006 version.

3

special education services may be needed to address that disability.  (*Dept. of Education, State of Hawaii v. Cari Rae S.*  (D. Hawaii 2001) 158 F.Supp. 2d 1190, 1194 ("*Cari Rae S.*").)  The threshold for suspecting that a child has a disability is relatively low. (*Id*. at p. 1195.)  A school district's appropriate inquiry is whether the child should be referred for an evaluation, not whether the child actually qualifies for services.  (*Ibid.*)[4]  The actions of a school district with respect to whether it had knowledge of, or reason to suspect, a disability, must be evaluated in light of information that the district knew, or had reason to know, at the relevant time.  It is not based upon hindsight.  (See *Adams v. State of Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149 (citing *Fuhrmann v. East Hanover Bd. of Educ.* (3rd Cir. 1993) 993 F.2d 1031, 1041).)

6.    Child find does not guarantee eligibility for special education and related services under the IDEA.  It is merely a locating and screening process which is used to identify those children who are potentially in need of special education and related services. Once a child is identified as potentially needing specialized instruction and services, the district must conduct an initial evaluation to determine the child's eligibility for special education.  (34 C.F.R § 300.301; Ed. Code, § 56302.1.)

*Discussion*

7.    Student alleges that Oxnard failed to meet its child find obligation by not identifying, locating, and referring Student for evaluation in all areas of suspected disability.

8.    Oxnard stipulated that its child find duty was triggered as of October 31, 2016, two years before the filing of Student's complaint.  Oxnard further stipulated that it did not refer Student for special education evaluation as of October 31, 2016.

9.    Student has acknowledged that her complaint does not allege facts entitling her to a tolling of the two-year statute of limitations.  Therefore, October 31, 2016 is the earliest date for which Student may later seek relief from Oxnard for its child find failure.

10.    Student has prevailed on the sole issue.  Oxnard failed to meet its child find duty and refer Student for special education evaluation as of October 31, 2016.

---

[4]  In a footnote in an unpublished decision, the Ninth Circuit Court of Appeals noted that it has not yet articulated a test for determining when the child find obligation is triggered.  (*G.M. ex. rel. G.M. v. Saddleback Valley Unified Sch. Dist.* (9th Cir. 2014) 583 Fed.Appx. 702, 703, fn. 1.)

4

ORDER

District failed to meet its child find duty and refer Student for special education evaluation as of October 31, 2016.

PREVAILING PARTY

Education Code section 56507, subdivision (d), requires that this Decision indicate the extent to which each party prevailed on each issue heard and decided in this due process matter. Student prevailed in the sole issue.

RIGHT TO APPEAL THIS DECISION

This was a final administrative Decision, and all parties are bound by it. Pursuant to Education Code section 56506, subdivision (k), any party may appeal this Decision to a court of competent jurisdiction within ninety (90) days of receipt.

DATED: November 13, 2018

DocuSigned by:

_____
3EEE11185C9F48D...
CLIFFORD H. WOOSLEY
Administrative Law Judge
Office of Administrative Hearings

5

# Exhibit H

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

_____

CASE NO. 2019120540

_____

PARENT ON BEHALF OF STUDENT,

v.

OXNARD SCHOOL DISTRICT.

_____

DECISION BY SETTLEMENT

(CAL. CODE REGS., TIT. 5, § 3087)

FEBRUARY 27, 2020

Cole Dalton, Administrative Law Judge, Office of Administrative Hearings, State of California, enters this Decision by Settlement pursuant to section 3087 of title 5 of the California Code of Regulations.  Administrative Law Judge is referred to as ALJ.  Office of Administrative Hearings is referred to as OAH.

On December 13, 2019, OAH received a Request for Due Process from Student. On January 13, 2020, Oxnard filed a response to Student's request with OAH.

ALJ Dalton began the due process hearing in Oxnard, California on February 4, 2020.  Attorneys Shawna Parks and Janeen Steel represented Student.  Mother attended the hearing.  OAH provided a Spanish language interpreter.  Attorneys Lawrence Joe and Ana Gallegos represented Oxnard.  Oxnard's Interim Director of Special Education Katrina Madden and Manager of Special Education Danielle Edwards attended the hearing.

After the hearing commenced, but before entry of evidence, the parties announced they reached a settlement agreement and requested a stipulated decision based upon the terms of the agreement.  The parties requested additional time to finalize the settlement agreement and obtain signatures.  ALJ Dalton recessed the hearing for an hour to provide the parties with sufficient time to finalize the agreement.

When the hearing reconvened, the parties presented ALJ Dalton with a fully executed agreement.  The agreement encompassed the parties' request for a decision by settlement.  ALJ Dalton took the parties' request for decision by settlement under submission and granted the parties' request for continuance to allow them an opportunity to file their agreement with OAH.  ALJ Dalton continued the matter to February 10, 2020, for a telephonic status conference.

On February 5, 2020, the parties filed their fully executed agreement with OAH, which OAH considered a request for decision by settlement.  On February 10, 2020, ALJ Dalton held a telephonic status conference to discuss the parties' agreement and request for decision by settlement.  For reasons stated on the record, the parties sought a short continuance to file a revised agreement.  ALJ Dalton continued the matter to February 12, 2020, at which time the parties filed a revised agreement with OAH.  The matter was then submitted for decision by settlement pursuant to the terms of the parties' agreement.

2

## STIPULATED ISSUES

1. Oxnard denied Student a free appropriate public education from August 2017 through December 13, 2019, the date on which he filed his complaint, by:

   a. Failing to evaluate Student in all areas of suspected disability to determine eligibility for special education and related services, and

   b. Failing to offer an individualized educational program that was reasonably calculated to enable Student to make progress appropriate in light of his circumstances.

## JURISDICTION

This hearing was held under the Individuals with Disabilities Education Act, its regulations, and California statutes and regulations.  (20 U.S.C. § 1400 et. seq.; 34 C.F.R. § 300.1 (2006) et seq.; Ed. Code, § 56000 et seq.; Cal. Code Regs., tit. 5, § 3000 et seq.) The IDEA affords parents and local educational agencies the procedural protection of an impartial due process hearing with respect to any matter relating to the identification, assessment, or educational placement of the child, or the provision of a free appropriate public education, referred to as FAPE, to the child.  (20 U.S.C. § 1415(b)(6) & (f); 34 C.F.R. § 300.511; Ed. Code, §§ 56501, 56502, and 56505; Cal. Code Regs., tit. 5, § 3082.)

The parties stipulate that Student is 13-years-old, attending eighth grade at Cesar Chavez School within Oxnard attendance boundaries.

## DECISION BY SETTLEMENT

The Individuals with Disabilities in Education Act and related state laws strongly encourage the settlement of special education disputes.  (See, e.g., 20 U.S.C. § 1415(f)(1)(B); Ed. Code, § 56501.5, subd. (a) [requirement of resolution session before

3

due process hearing]; 20 U.S.C. § 1415(e); Ed. Code, § 56500.3 [availability of mediation before due process hearing]; 20 U.S.C. § 1415(f)(1)(B)(ii); 34 C.F.R. § 300.510(d)(2)(2006); Cal. Code of Regs., tit. 5, § 4650, subd. (a)(4); *Wyner v. Manhattan Beach Unified School District* (9th Cir. 2000) 223 F.3d 1026, 1028-1030 [administrative enforcement of settlements of due process disputes].)

California administrative law authorizes decision by settlement.  (Gov. Code, § 11415.60; *Rich Vision Centers, Inc. v. Board of Medical Examiners* (1983) 144 Cal.App.3d 110, 115-116 ["...we see no limitations on the conditions that may be included in a settlement except that such conditions must not violate public policy."].)  Government Code section 11415.60 does not apply to special education due process disputes.  (Cal. Code Regs., tit. 5, § 3089), but the State Board of Education has adopted a similar regulation.  Section 3087 of title 5 of the California Code of Regulations provides:

Notwithstanding Government Code section 11415.60 of the Administrative Procedure Act, a decision by settlement may be issued on terms the parties determine are appropriate so long as the agreed-upon terms are not contrary to the law.

## AGREED UPON TERMS

The parties stipulate that Student is eligible for special education and related services under the category of specific learning disability and other health-impairment. The parties stipulate that Oxnard is the local education agency responsible for Student's special education services.  The parties stipulate that Oxnard should have found Student eligible for special education as of October 2017.  The parties stipulated Oxnard would provide compensatory education to Student.  The parties' agreed terms have been incorporated into the Order below.

The parties and their attorneys entered into an agreement which is part of the official record.

The stipulated facts in the parties' agreement constitute the written findings of fact in this Decision.  (See 20 U.S.C. § 1415(h)(4); Ed. Code, § 56505, subd. (e)(5).).  The parties settled their dispute on terms they determined are appropriate.  The agreement does not contain any provision that is contrary to law.

## CONCLUSIONS AND PREVAILING PARTY

Pursuant to California Education Code section 56507, subdivision (d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided.  Here, the parties agreed that Student prevailed on all issues for which Student sought a hearing.  Specifically:

1. Oxnard denied Student a free appropriate public education from August 2017 through December 13, 2019, the date on which he filed the complaint, by:
   a. Failing to evaluate Student in all areas of suspected disability to determine eligibility for special education and related services, and
   b. Failing to offer an individualized education program that was reasonably calculated to enable Student to make progress appropriate in light of his circumstances.

## ORDER

The parties stipulate that Oxnard shall provide to Student the following compensatory education:

1. Oxnard agrees to directly fund an intensive instructional program for Student for 86 weeks, which is equivalent to more than two academic school years

including extended school year, at Merrill Education Center, which located at 5743 Corsa Avenue, Suite 118, Westlake Village, California 91362, (818) 865-0008.  Oxnard agrees to fund 16 hours per week of one-to-one instruction by educational therapist(s) at Merrill Education Center for 86 weeks of one-to-one instruction, which is equivalent to a total of 1,376 hours.  Student's family agrees to work with Merrill Education Center directly to coordinate a start date for services that can begin any time after April 1, 2020, and will conclude no later than June 15, 2022.

2. Oxnard shall pay Merrill Education Center directly for Student's tuition, lunch, as well as other incidental costs for books and materials for the duration of the program identified in Paragraph 1.

3. Oxnard shall provide Student round-trip transportation to and from Student's home and Merrill Education Center for up to five days per week depending on the program schedule.  Oxnard agrees to fund this transportation for the duration of the program identified in Paragraph 1.

4. Student will enroll in the school/district of his choice for the duration of this program.  If at any time Merrill Education Center cannot provide the intensive program, Oxnard will meet and confer with attorneys for Student's family to discuss an alternative intensive educational program and the remaining hours designated for these services.

5. If Student's disability circumstances change, including but not limited to, a catastrophic injury or event, the parties will meet and confer within 15 days of said catastrophic injury or event to discuss an alternative program for the duration of the period in program as stated in Paragraph 1.

6. Upon completion of the program identified in Paragraph 1, the parties understand that Oxnard is no longer Student's district of responsibility and

that Student's educational program, thereafter, is the responsibility of the school district in which Student is enrolled.

## RIGHT TO APPEAL THIS DECISION

This is a final administrative decision, and all parties are bound by it.  Pursuant to Education Code section 56505, subdivision (k), any party may appeal this Decision to a court of competent jurisdiction within 90 days of receipt.

DocuSigned by:

Cole Dalton
—57CDEBDAC9CC499...

Cole Dalton

Administrative Law Judge

Office of Administrative Hearings

Exhibit I



# OFFICE OF ADMINISTRATIVE HEARINGS

## STATE OF CALIFORNIA

## OAH Case No. 2018080844



C███ C██, **Parent on behalf of**
█████ H█████, **Student**

*Petitioner*

## v.

# Oxnard School District

*Respondent*

## Administrative Record
## Volume VII of IX

# TABLE OF CONTENTS

## Volume I

Case Filings and Orders ........................................................................................................ 1

    Student's Special Education Complaint and Request for Mediation .................................... 1

    Student's Motion for Stay Put ...................................................................................... 34

        Attachment A: Declaration of Cynthia Cortez ........................................................ 41

        Attachment B: Declaration of Janeen Steel ........................................................... 43

            Exhibit A: November 9, 2017 IEP ............................................................. 47

            Exhibit B: January 22, 2018 IEP ............................................................... 65

            Exhibit C: February 26, 2018 and March 15, 2018 IEP ......................... 95

            Exhibit D: March 15, 2018 and March 22, 2018 IEP ............................. 113

            Exhibit E: August 16, 2018 Email re: Student Enrollment ..................... 137

    Scheduling Order Setting Telephonic Prehearing Conference and Due Process
Hearing .................................................................................................................... 141

    District's Notice of Representation and Request for Service via OAH E-Filing System ... 150

    Student's Motion to Begin the Due Process Hearing Timeline and to Set a New
Hearing Date ........................................................................................................... 153

        Attachment A: Declaration of Janeen Steel ........................................................ 158

    Order Granting Motion for Stay Put ............................................................................ 171

    Order Granting Motion to Start Due Process Hearing Timeline and Advancing Dates
for Prehearing Conference and Hearing ..................................................................... 175

    District's Motion to Reconsider and Revoke Stay Put Order ......................................... 178

        Declaration of Lawrence Joe ............................................................................... 197

            Exhibit A: August 24, 2017 through march 15, 2018 Detail Behavior
Report .................................................................................................... 208

            Exhibit B: May 2017 to March 2018 Behavior Emergency Reports ....... 221

            Exhibit C: Email Communications from October 24, 2017 to March
8, 2018 .................................................................................................. 260

            Exhibit D: February 5, 2018 Email ........................................................ 313

            Exhibit E: Pictures from the March 9, 2018 Incident .............................. 317

            Exhibit F: March 15, 2018 Manifestation Determination IEP ................. 324

Exhibit G: Documents Returned by Student's Attorney Regarding Placement ................................................................................ 348

Exhibit H: Various Behavior Emergency Reports ................................. 352

Exhibit I: May 1, 2018 30-Day Review IEP ........................................... 401

Exhibit J: June 7, 2018 IEP ................................................................... 425

Exhibit K: August 2, 2018 Email ........................................................... 451

Exhibit L: August 9, 2018 Emails ......................................................... 453

Exhibit M: August 10, 2018 Emails ...................................................... 458

Exhibit N: August 14, 2018 Email ......................................................... 461

Exhibit O: August 16, 2018 Email ......................................................... 463

Exhibit P: August 20, 2018 Email ......................................................... 472

Exhibit Q: August 30, 2018 Email ......................................................... 474

Exhibit R: Proof of Service of Ex Parte Application and Declarations.... 478

Exhibit S: September 7, 2018 Email ...................................................... 482

Exhibit T: September 13, 2018 Emails .................................................. 484

Exhibit U: District's Proposed Response to Student's Due Process Complaint ............................................................................................... 487

Declaration of Mark Capritto ............................................................................ 499

# Volume II

Declaration of Jamie Vaughn .......................................................................... 514

Declaration of Brasilia Perez .......................................................................... 523

District's Request for Judicial Notice ............................................................... 536

Exhibit A: District's August 17, 2018 Complaint in Ventura Superior Court ....................................................................................................... 540

Exhibit B: August 22, 2018 Notice of Removal of Action Filed in the United States Court for the Central District of California ......................... 561

Exhibit C: Docket in the Matter Pending in the United States Court for the Central District of California, Case No. 2:18-CV-07357-SVW-AS ......................................................................................................... 592

Exhibit D: September 12, 2018 Order Denying District's Ex Parte Application for a Temporary Restraining Order ...................................... 598

District's Notice of Related Cases .................................................................. 601

[Proposed] Order ........................................................................................... 606

Student's Opposition to District's Motion to Reconsider and Revoke Stay Put Order ...... 610

Declaration of Janeen Steel ................................................................ 621

    Exhibit A: February 26, 2018 IEP ...................................... 624

    Exhibit B: August 14, 2018 Email ...................................... 641

    Exhibit C: September 12, 2018 Denial of Temporary Restraining Order ................................................................. 643

    Evidentiary Objections to District's Declarations Regarding Motion to Reconsider and Revoke Stay Put ........................................ 646

District's Prehearing Conference Statement .................................. 693

Student's Prehearing Conference Statement ................................. 702

District's First Amended Prehearing Conference Statement ............ 721

Student's Amended Prehearing Conference Statement ................... 736

District's Reply in Support of Motion to Reconsider and Revoke Stay Put Order ........... 756

Order Denying Request for Reconsideration .................................. 764

Order Following Prehearing Conference ......................................... 768

Student's Witness and Exhibit List.................................................. 775

District's Response to Student's Due Process Complaint and Request for Mediation ..... 795

District's Certification of ADA-Compliant Facility and Rooms ......... 804

District's Supplemental Witness List .............................................. 808

District's Second Supplemental Witness List.................................. 813

Student's Amended Exhibit List ...................................................... 817

Student's Amended Witness List .................................................... 829

Student's Motion for Clarification of Issue 2(b) in Prehearing Conference Order............ 840

Student's 3rd Amended Exhibit List ................................................ 844

District's Objections to Student's Exhibits S1 and S113 ................. 855

Declaration of Benjamin Nieberg .................................................... 863

    Exhibit A: August 2, 2018 Email ....................................... 876

    Exhibit B: August 7, 2018 Email ....................................... 878

    Exhibit C: August 9, 2018 Email ....................................... 881

    Exhibit D: August 9, 2018 Email ....................................... 883

    Exhibit E: August 9, 2018 Email ....................................... 886

    Exhibit F: August 9, 2018 Email......................................... 889

    Exhibit G: August 9, 2018 Email ....................................... 893

    Exhibit H: August 9, 2018 Email ....................................... 898

Exhibit I: August 10, 2018 Email ..................................................................... 902

Exhibit J: August 10, 2018 Email ..................................................................... 905

Exhibit K: August 10, 2018 Email .................................................................... 908

Exhibit L: August 10, 2018 Email ..................................................................... 911

Exhibit M: August 14, 2018 Email .................................................................... 915

Exhibit N: August 14, 2018 Email .................................................................... 917

Exhibit O: August 16, 2018 Email .................................................................... 919

Exhibit P: August 16, 2018 Email ..................................................................... 921

Exhibit Q: August 16, 2018 Email .................................................................... 924

Exhibit R: August 16, 2018 Email .................................................................... 927

Student's Closing Brief ........................................................................................... 932

District's Closing Brief........................................................................................... 1006

Student's Request for Official Notice of Facts that May Judicially Noticed by the Courts ...................................................................................................................... 1071

Attachment A: Minutes in Case No. 2:18-CV-07357-SVW-AS Denying Motion for Preliminary Injunction and Granting Motion to Dismiss................... 1074

# Volume III

Hearing Exhibits ............................................................................................................. 1078

Hearing Exhibit List................................................................................................. 1078

Hearing Witness List................................................................................................ 1087

Student's Exhibits .................................................................................................... 1094

Exhibit S-2: 6/15/2016 Report Card - Kindergarten - Rose Avenue E.  (2015-2016) ................................................................................................................. 1094

Exhibit S-3: 6/15/2017 Report Card - 1st Grade - Rose Avenue E.  (2016-2017) ................................................................................................................. 1096

Exhibit S-4: 2018 Health Profile...................................................................... 1097

Exhibit S-5: 2017-2018 Detailed Behavior Report ........................................... 1099

Exhibit S-6: 2018 Student Profile .................................................................... 1111

Exhibit S-7: 2018 Behavior Log ...................................................................... 1112

Exhibit S-8: 2/25/2016 Student Success Team ................................................. 1116

Exhibit S-9: 10/25/2016 Student Success Team ............................................... 1117

Exhibit S-10: 3/28/2017 Suspension................................................................. 1118

Exhibit S-11: 3/29/2017 Suspension - Teacher Notice ..................................... 1119

Exhibit S-12: 4/26/2017 Student Success Team ............................................... 1121

Exhibit S-13: 4/24/2018 Student Success Team Teacher Input Form .............. 1124

Exhibit S-14: 5/10/2017 Behavior Emergency Report ...................................... 1125

Exhibit S-16: 5/18/2017 Special Education Referral Form................................ 1128

Exhibit S-17: 5/18/2017 Request for 504 Plan.................................................. 1129

Exhibit S-20: 5/31/2017 Lucy Perales Letter.................................................... 1130

Exhibit S-21: 6/14/2017 Lucy Perales Letter.................................................... 1131

Exhibit S-22: 8/24/2017 Discipline Referral ..................................................... 1132

Exhibit S-23: 9/15/2017 Office Discipline Referral ........................................... 1133

Exhibit S-24: 9/18/2017 Office Discipline Referral ........................................... 1134

Exhibit S-25: 9/19/2017 Office Discipline Referral 9:15am ............................. 1135

Exhibit S-26: 9/19/2017 Office Discipline Referral 1:15pm ............................. 1136

Exhibit S-27: 9/20/201 Signed Assessment Plan............................................. 1137

Exhibit S-28: 9/21/2017 Office Discipline Referral ........................................... 1138

Exhibit S-29: 10/4/2017 Office Discipline Referral ........................................... 1139

Exhibit S-30: 10/10/2017 Office Discipline Referral ......................................... 1140

Exhibit S-32: 12/4/201 Letter to School .......................................................... 1141

Exhibit S-33: 2017 Ponce 2nd Grade Student Evaluation Form...................... 1142

Exhibit S-34: 10/12/2017 Behavior Emergency Report ................................... 1143

Exhibit S-35: 10/24/2017 Olson - Email re: Student ........................................ 1147

Exhibit S-36: 10/26/2017 Olson - Email re: Student Behavior/Pictures ........... 1152

Exhibit S-37: 10/26/2017 Olson - Email re: Student Behavior ......................... 1158

Exhibit S-38: 10/27/2017 Olson - Email re: Student Behavior ......................... 1159

Exhibit S-39: 10/19/2017 Notice of 11/9/17 IEP.............................................. 1161

Exhibit S-41: 11/1/2017 Suspension................................................................ 1162

Exhibit S-42: 11/9/2017 IEP Completed on 1/11/2018 .................................... 1163

Exhibit S-43: 11/13/2017 Behavior Emergency Report ................................... 1180

Exhibit S-44: 11/13/22017 Email re:  New Behavior Plan ............................... 1182

Exhibit S-45: 11/13/2017 Olson - Email with Pictures...................................... 1184

Exhibit S-46: 11/14/2017 Olson - Email re: Implementing a Complete Plan ..... 1187

Exhibit S-47: 11/17/2017 Behavior Emergency Report ................................... 1188

Exhibit S-48: 11/17/2017 Email re: Student - Olson ........................................ 1191

Exhibit S-50: 11/27/2017 Email w/ Pictures - Olson ........................................ 1193

Exhibit S-51: 11/28/2017 Office Discipline Referral ......................................... 1198

Exhibit S-52: 11/28/2017 Behavior Emergency Report ..................................... 1199

Exhibit S-53: 11/28/2017 Email re: Student - Olson ......................................... 1201

Exhibit S-55: 11/28/2017 Email re: Student - Olson ......................................... 1208

Exhibit S-57: 11/29/2017 Email re: Student - Olson ......................................... 1210

Exhibit S-58: 11/29/2017 Suspension............................................................... 1212

Exhibit S-59: 2017-2018 Office Discipline Referral ........................................... 1213

Exhibit S-60: 12/1/2017 Behavior Emergency Report ...................................... 1214

Exhibit S-61: 12/1/2017 Suspensions .............................................................. 1218

Exhibit S-62: 12/11/2017 Email re: Student Returning to School - Yulianna Robles ............................................................................................................. 1219

Exhibit S-63: 12/11/2017 IEP Notice of 1/11/2018............................................ 1221

Exhibit S-64: 1/10/2018 Assessment - Multi-Disciplinary Team Report ........... 1222

Exhibit S-66: 1/12/2018 Suspension Notice for 1/16/2018 - 1/17/2018 ........... 1166

Exhibit S-67: 1/19/2018 Behavior Emergency Report ...................................... 1267

Exhibit S-68: 1/23/2018 Behavior Emergency Report ...................................... 1271

Exhibit S-69: 1/24/2018 Behavior Emergency Report ...................................... 1276

Exhibit S-70: 1/24/2018 Email re: Student - Olson ........................................... 1279

Exhibit S-73: 1/19/2018 Notice of 1/22/2018 IEP.............................................. 1281

Exhibit S-74: 1/22/2018 IEP.............................................................................. 1283

Exhibit S-75: 2018 Positive Behavior Intervention Plan ................................... 1289

Exhibit S-76: 2018 Speech Notes ..................................................................... 1291

Exhibit S-77: 1/26/2018 Email re: Student - Olson ........................................... 1292

Exhibit S-78: 1/28/2018 Letter to Vaca ............................................................ 1294

Exhibit S-79: 1/29/2018 Email re: Student - Olson ........................................... 1297

Exhibit S-80: 1/31/2018 Email re: Student - Ponce........................................... 1298

Exhibit S-82: 1/31/2018 Email re: Student - Garcia Thomas ............................ 1300

Exhibit S-85: 2/2/2018 Email re: Student - Olson ............................................. 1303

Exhibit S-86: 2/5/2018 The Small Classroom ................................................... 1305

Exhibit S-87: 5/2/2018 Behavior Emergency Report ........................................ 1310

Exhibit S-88: 5/2/2018 Email re: Student - Olson ............................................. 1314

Exhibit S-89: 2/5/2018 Olson Email w/ Pictures................................................ 1316

Exhibit S-90: 6/2/2018 Email re: Student - Garcia Thomas .............................. 1319

Exhibit S-91: 2/8/2018 Email re: Student - Olson ............................................. 1321

Exhibit S-93: 9/2/2018 Email re: Student - Olson ............................................. 1323

Exhibit S-94: 2/13/2018 Email re: Student - Olson ........................................... 1324

Exhibit S-96: 2/15/2018 Email re: Student - Olson ........................................... 1327

Exhibit S-100: 2/21/2018 Email re: Student - Olson ......................................... 1330

Exhibit S-103: 2/22/2018 Notice of 2/26/2018 IEP............................................ 1332

Exhibit S-104: 2/26/2018 IEP............................................................................ 1333

Exhibit S-105: 2018 Positive Behavior Intervention Plan Revised ................... 1350

Exhibit S-107: 2/3/2018 Email re: Student - Garcia Thomas ........................... 1354

Exhibit S-108: 5/3/2018 Garcia Thomas Report of Incident.............................. 1356

Exhibit S-110: 9/3/2018 Behavior Emergency Report ...................................... 1359

Exhibit S-112: 12/3/2018 Suspension............................................................... 1368

Exhibit S-114: 3/13/2018 Notice of 3/15/2018 IEP............................................ 1369

Exhibit S-116: 3/19/2018 Notice of 3/22/2018 IEP............................................ 1370

Exhibit S-117: 3/115/2018 IEP........................................................................... 1373

Exhibit S-120: 3/23/2018 Enrollment Packet ................................................... 1396

Exhibit S-121: 4/2/2018 Behavior Emergency Report 11:50am........................ 1431

Exhibit S-122: 4/2/2018 Behavior Emergency Report 1:30pm.......................... 1435

Exhibit S-123: 4/12/2018 Behavior Emergency Report 1:30pm........................ 1439

Exhibit S-126: 4/17/2018 Behavior Emergency Report .................................... 1444

Exhibit S-127: 4/18/2018 Behavior Emergency Report .................................... 1448

Exhibit S-128: 4/20/2018 Behavior Emergency Report .................................... 1452

Exhibit S-129: 4/24/2018 Behavior Emergency Report .................................... 1456

Exhibit S-130: 4/30/2018 Behavior Emergency Report .................................... 1460

Exhibit S-133: 5/1/2018 IEP ............................................................................. 1464

Exhibit S-134: 5/10/2018 Incident Report ........................................................ 1495

Exhibit S-136: 5/11/2018 Incident Report PM................................................... 1500

Exhibit S-137: Picture of Injury ........................................................................ 1501

Exhibit S-139: 5/16/2018 Behavior Emergency Report 8:53am........................ 1502

Exhibit S-140: 5/16/2018 Behavior Emergency Report 12:00pm...................... 1506

Exhibit S-141: 5/16/2018 Picture of Injury ....................................................... 1510

Exhibit S-142: 5/24/2018 Email and Picture of Injury....................................... 1511

Exhibit S-143: 6/1/2018 Behavior Emergency Report ...................................... 1513

Exhibit S-144: 6/5/2018 Behavior Emergency Report ...................................... 1518

Exhibit S-145: 4/26/2018 Treatment Plan ........................................................ 1523

Exhibit S-146: 3/5/2018 Functional Behavior Assessment ............................... 1527

Exhibit S-147: 6/7/2018 IEP ............................................................................ 1540

Exhibit S-148: 6/14/2018 Psychological Assessment ...................................... 1565

## Volume IV

Exhibit S-149: Curriculum Vitae of Betty Jo Freeman, Ph.D........................... 1584

Exhibit S-150: Curriculum Vitae of Mitchell Todd Taubman, Ph.D.................. 1609

Exhibit S-152: 10/26/2017 Sentence Completion ............................................ 1629

Exhibit S-153: 9/20/2017 Health, Developmental, and Social History
Questionnaire .................................................................................................. 1631

Exhibit S-154: 11/1/2017 Health, Developmental, and Social History
Questionnaire .................................................................................................. 1635

Exhibit S-155: 7/1/2017 BASC3 Parent Rating Scales dated as 2017 ............ 1639

Exhibit S-156: Different 7/1/2017 BASC3 Parent Rating Scales dated as
2017 ................................................................................................................ 1643

Exhibit S-157: 9/20/2017 BASC3 Parent Rating Scales - Father..................... 1647

Exhibit S-158: 9/20/2017 BASC3 Parent Rating Scales - Mother.................... 1651

Exhibit S-159: 11/6/2017 Childhood Autism Rating Scale 2nd Edition ............ 1655

Exhibit S-160: Kaufman Assessment Battery for Children................................ 1664

Exhibit S-161: 10/24/2017 KABC-II ................................................................. 1674

Exhibit S-162: 10/18/2017 Beery VMI.............................................................. 1697

Exhibit S-163: 11/15/2017 PASC3 Teacher Rating Scales - Ponce ................ 1729

Exhibit S-164: 10/18/2017 Clinical BASC3 Scoring ........................................ 1732

Exhibit S-165: 11/15/2017 BASC Assessment Information ............................. 1829

Exhibit S-166: 10/20/2017 TAPS-3.................................................................. 1880

Exhibit S-167: 11/1/2017 Test of Cognitive Abilities ........................................ 1904

Exhibit S-168: 2/2/2018 Reintegration Plan .................................................... 1934

Exhibit S-171: 8/20/2018 Declaration of Mark Capritto .................................... 1936

Exhibit S-172: 9/24/2018 Declaration of Amelia Sugden ................................ 1951

Exhibit S-176: 5/18/2017 Internal Emails from 5/18/2017 to 5/19/2017 ........... 1955

Exhibit S-177: 5/7/2018 Certificate of Therapeutic Behavioral Services
Graduation....................................................................................................... 1962

District's Exhibits.............................................................................................. 1963

Exhibit D-1: 1/28/2018 Perez Email re: Incident Report 1/24/2018 w/ Attachments ........................................................................................ 1963

Exhibit D-2: 2/7/2018 Garcia Email re: I.H. New Team Transition ................... 1973

Exhibit D-3: 3/12/2018 Perez Email re: Parent Concerns ................................. 1974

Exhibit D-4: 3/13/2018 Ridge Email re: Student Gun Threat ............................ 1976

Exhibit D-6: 8/2/2018 Steel Email re: Student ................................................... 1977

Exhibit D-7: 8/7/2018 Nieberg Email re: Student .............................................. 1978

Exhibit D-8: 8/9/2018 9:51am Steel Email re: Update on Student ................... 1980

Exhibit D-9: 8/9/2018 10:40am Steel Email re: Update on Student ................. 1981

Exhibit D-10: 8/9/2018 11:16am Steel Email re: Update on Student ............... 1983

Exhibit D-11: 8/9/2018 1:28pm Steel Email re: Update on Student ................. 1985

Exhibit D-12: 8/9/2018 1:35pm Nieberg Email re: Update on Student ............. 1988

Exhibit D-13: 8/9/2018 5:36pm Steel Email re: Update on Student ................. 1992

Exhibit D-14: 8/10/2018 11:34am Nieberg Email re: Today .............................. 1995

Exhibit D-15: 8/10/2018 11:34am Steel Email re: Student ................................ 1996

Exhibit D-16: 8/10/2018 2:16pm Nieberg Email re: Student ............................ 1998

Exhibit D-17: 8/10/2018 2:41pm Steel Email re: Student ................................. 2000

Exhibit D-18: 8/14/2018 Steel Email re: Student .............................................. 2003

Exhibit D-19: 8/14/2018 Joe Email re: Student ................................................ 2004

Exhibit D-20: 8/16/2018 5:16pm Steel Email re: Student ................................. 2005

Exhibit D-21: 8/16/2018 5:38pm Joe Email re: Student ................................... 2006

Exhibit D-22: 8/16/2018 5:40pm Steel Email re: Student ................................. 2008

Exhibit D-23: 8/16/2018 5:54pm Joe Email re: Student ................................... 2010

Exhibit D-24: 8/17/2018 Dean Email re: Student Placement Consideration ..... 2013

Exhibit D-29: 8/30/2018 12:20pm Joe Email re: Student FAPE Offer and Attachments ................................................................................... 2018

Exhibit D-37: 2015-2016 Oxnard School District School Calendar .................. 2044

Exhibit D-38: 2016-2017 Oxnard School District School Calendar .................. 2045

Exhibit D-39: 2017-2018 Oxnard School District School Calendar .................. 2046

Exhibit D-40: 2018-2019 Oxnard School District School Calendar .................. 2047

Exhibit D-41: Curriculum Vitae of Pablo Ordaz ................................................ 2048

Exhibit D-42: Curriculum Vitae of Amelia Corona-Sugen, M.S. ....................... 2051

Exhibit D-43: Curriculum Vitae of Susan M. Mares ........................................... 2053

Exhibit D-44: Curriculum Vitae of Bradilia Perez .............................................. 2059

Exhibit D-45: Curriculum Vitae of Maria G. Ponce............................................ 2061

Exhibit D-46: Curriculum Vitae of Shannon Billings .......................................... 2062

Exhibit D-47: Curriculum Vitae of Derek Olson.................................................. 2063

Exhibit D-48: Curriculum Vitae of Annette Murguia .......................................... 2064

Exhibit D-49: Curriculum Vitae of Margarita Llanes .......................................... 2066

Exhibit D-50: Angel Dominguez, M.A., CCC-SLP .............................................. 2068

Exhibit D-51: Curriculum Vitae of Katrina Madden ........................................... 2071

Exhibit D-52: Curriculum Vitae of Maria Isabel Garcia-Thomas, MS, BCBA..... 2074

Exhibit D-54: Curriculum Vitae of Raquel G. Rodriguez ................................... 2078

## Volume V

Decision....................................................................................................................... 2079

    Issues .................................................................................................................. 2079

    Summary of Decision .......................................................................................... 2080

    Factual Findings .................................................................................................. 2080

        Early Development ......................................................................................... 2081

        2015-2016 Kindergarten at Rose Avenue Elementary ................................. 2081

            February 25, 2016: First Student Success Team Meeting.................. 2083

        2016-2017 First Grade at Rose Avenue Elementary ...................................... 2084

            October 25, 2016 Second Student Success Team Meeting ............... 2084

            January-June 2017: Escalating Aggressive Behaviors....................... 2085

            April 26, 2017 third Student Success Team Meeting.......................... 2086

            May 10, 2017 Incident and Parent Request for Assessment.............. 2087

            May 18, 2017 Fourth Student Success Team Meeting....................... 2088

            May 31, 2017 Student Assessment Plan........................................... 2088

        2017-2018: Second Grade at Chavez Elementary School .............................. 2089

            September 20, 2017 Signed Student Assessment Plan ..................... 2089

            September - November 2017: Student's Escalating Behaviors .......... 2089

            November 9, 2017 IEP Team Meeting and Continued IEP ................ 2090

        January 10, 2018 Multidisciplinary Assessment and January 11, 2018 Initial IEP...................................................................................................................... 2090

            Health ................................................................................................. 2091

            Intellectual Development .................................................................... 2091

Academic Achievement ............................................................................. 2091

Speech and Language ............................................................................... 2091

Social-Emotional Functioning ................................................................... 2092

Autism ...................................................................................................... 2094

Special Circumstances Educational Support ............................................. 2095

January 11, 2018 Continued IEP Team Meeting ....................................... 2096

January 11, 2018 IEP Implementation....................................................... 2097

January 12, 2018 Incident ........................................................................ 2098

January 19, 2018: Instruction in Conference Room................................... 2098

January 22, 2018 Manifestation Determination/IEP Team Meeting ..... 2099

February 26, 2018 IEP Team Meeting....................................................... 2100

March 2, 2018 And March 9, 2018 Incidents ........................................... 2101

March 12, 2018 Through April 1, 2018: Student at Home .................... 2101

March 15, 2018 Manifestation Determination Team Meeting and
March 22, 2018 IEP Team Meeting ......................................................... 2101

April 2, 2018 To June 14, 2018 Placement at Casa Pacifica ........................... 2102

May 1, 2018 IEP Team Meeting .............................................................. 2103

May 17, 2018 Graduation from Home Therapy Program..................... 2104

June 7, 2018 IEP Team Meeting .............................................................. 2104

July 26, 2018 Freeman Autism Assessment ........................................ 2106

July 26, 2018 IEP Team Meeting.............................................................. 2109

July 26, 2018 To August 17, 2018: Efforts to Find Mutually-
Agreeable Placement for Student............................................................. 2109

Seclusion and Holds.................................................................................. 2110

Post-Filing Communications, Filings, And Expert Testimony Regarding an
Appropriate Placement and Educational Program for Student, Relevant to
Remedies ................................................................................................. 2114

August 30, 2018 Oxnard FAPE Offer ................................................... 2114

Proposed Placements for Student...................................................... 21115

Proposed Educational Program for Student ........................................ 2115

Legal Conclusions ........................................................................................... 2116

Introduction - Legal Framework under the IDEA................................... 2116

Issue 1: Child Find.................................................................................. 2117

Issue 2(a): Failure to Make FAPE Offer Before January 11, 2018................... 2122

Issue 2(b): Failure to Offer FAPE in the January 11, 2018 IEP ........................ 2122

Issue 2(c): Failure to Implement January 11, 2018 IEP ................................... 2125

Issue 3: Emergency Interventions and Seclusion .............................................. 2126

Issue 4(a): Failure to Make Clear Written Offer in in January 11, 2018 IEP ..... 2127

Issue 4(b): Failure to Complete Initial IEP Within 60 Days of Signed Assessment Plan ..................................................................................... 2127

Issue 4(c) Failure to Include General Education Teacher at IEP Team Meetings ................................................................................................. 2128

Remedies ................................................................................................................. 2129

Order .......................................................................................................................... 2131

Prevailing Party ........................................................................................................ 2133

Right to Appeal ......................................................................................................... 2133

Hearing Transcript ......................................................................................................... 2135

September 24, 2018 Prehearing Conference ........................................................ 2135

October 4, 2018 Hearing ......................................................................................... 2164

October 15, 2018 Hearing ....................................................................................... 2479

## Volume VI

October 16, 2018 Hearing ........................................................................................ 2699

October 17, 2018 Hearing ........................................................................................ 2975

## Volume VII

October 22, 2018 Hearing ........................................................................................ 3279

October 23, 2018 Hearing ........................................................................................ 3551

## Volume VIII

October 24, 2018 Hearing ........................................................................................ 3908

October 25, 2018 Hearing ........................................................................................ 4101

## Volume IX

October 29, 2018 Hearing ........................................................................................ 4425

October 30, 2018 Hearing ........................................................................................ 4820

Certification of the Administrative Record ................................................................... 5058

1          But the one instance you're thinking of was that

2     paraprofessional also assigned for behavioral reasons?

3          **THE WITNESS:**  Yes.

4          **THE COURT:**  Okay.  For behavioral reasons.  Thank

5     you.

6          Now I am done.

7          **THE WITNESS:**  Okay.

8          **THE COURT:**  Thank you.

9               (Pause)

10         **THE COURT:**  Okay.  Why don't we take a five-minute

11    break.  Do we have a next witness?

12         **MS. PARKS:**  Yes, we do.  She's on her way over here.

13         **THE COURT:**  Okay.  So we'll take a five-minute

14    break.  For everyone, it's 3:28.  See you in five

15    minutes.

16              (Whereupon, a recess was held from 3:28 p.m.

17              until 3:41 p.m.)

18         **THE COURT:**  Back on the record.  The time is 3:41.

19    We have our next witness.

20         Please raise your right hand.

21                        MARGARITA LLANES

22         having been duly sworn, testified as follows:

23         **THE WITNESS:**  Yes, I do.

24         **THE COURT:**  Have a seat.

25         **THE COURT:**  For our record, can you please state and

                              -259-

1    spell your full first and last name?

2         **THE WITNESS:**  My first name is Margarita,

3    M-A-R-G-A-R-I-T-A.  Last name is Llanes, L-L-A-N-E-S.

4         **THE COURT:**  Okay.  Ms. Parks, you have some

5    questions.  Proceed.

6                        DIRECT EXAMINATION

7    BY MS. PARKS:

8         Q    Good afternoon.

9         A    Good afternoon.

10        Q    Thank you for being with us.  What's your

11   current position?

12        A    I'm a resource specialist at Cesar Chavez

13   School.

14        Q    That's in Oxnard School District?

15        A    Yes.  That's in Oxnard School District.

16        Q    Do people sometimes refer to you as RSP?

17        A    Yes.

18        Q    And how long have you held that position?

19        A    Eight years.

20        **MS. STEEL:**  I see you do have a resume.

21        **MR. JOE:**  Your Honor, if we can interrupt.  We do

22   have a resume.  My apologies for not --

23        **THE COURT:**  All right.

24        **MR. JOE:**  -- realizing it until now.

25        **THE COURT:**  Thank you.  And this would be District's

                              -260-

1   49?

2       **THE COURT:**  Yes.  I note in passing we have one more

3   tab.  I think we probably more than one more District

4   resume?

5       **MR. JOE:**  We might need some, yes.

6       **MS. PARKS:**  Yes.

7       **THE COURT:**  So if you can bring in additional tabs

8   for all of your binders and as many resumes as you can

9   get in advance would be great.

10      Okay.  Proceed.

11  BY MS. PARKS:

12      Q    So I've just been handed what looks like your

13  resume.  So it looks like you've been at Cesar Chavez as

14  a resource specialist since 2010?

15      A    Yes.

16      Q    And then prior to that you were a special day

17  teacher -- special day class teacher in mild-moderate

18  class also in Oxnard School District?

19      A    Yes.

20      Q    And that looks like it was about for five

21  years --

22      A    Yes.

23      Q    -- from 2005 to 2010?

24      A    Um-hum.

25      Q    And then before that you were a paraeducator

-261-

1   for a number of years in Oxnard School District and then

2   also Ocean View School District?

3        A    Yes.

4        Q    And do you currently have credentials?

5        A    Yes.

6        Q    And what are those?

7        A    I have a credential as in -- a master's and a

8   credential in the special ed specialist instruction

9   provider.

10       Q    So you have a master's degree?

11       A    Yes.

12       Q    Okay.  And that's in special education?

13       A    Yes.

14       Q    And when did you obtain that?

15       A    2003, approximately.

16       Q    And then you also have a teaching credential?

17       A    Yes.

18       Q    And what teaching credential?

19       A    It's a mild-moderate specialist credential.

20       Q    And when did you obtain that?

21       A    2003.  It was both at the same time combined.

22       Q    Any other degrees or credentials other than

23   what we've just discussed?

24       A    No.  I have my certificates for children of

25   different special disabilities such as ADD and autism and

1    ADHD just to name a few.

2         Q    And what do you do as the resource specialist

3    at Cesar Chavez?

4         A    Currently I work with children from kinder

5    through 5th grade.

6         Q    And when you say you work with them, what types

7    of things do you do?

8         A    I work with them in their academic area such as

9    reading, writing, and math.

10        Q    Are you part of the special education

11   department?

12        A    Yes, I am.

13        Q    Okay.  And do you work with both special

14   education and general education students?

15        A    Yes.  When I co-teach with the other teachers.

16   I co-teach in 3rd grade, and I co-teach in 5th grade.

17        Q    What's the co-teaching?

18        A    Co-teach is giving my resource children an

19   opportunity to get academic access in the core

20   curriculum.  So I teach a lesson in language arts, and I

21   teach a lesson in science once a week with the grade

22   level teachers in 3rd and 5th grade.

23        Q    And do you also provide what are called pull-

24   out services?

25        A    Yes, I do.

                              -263-

1       Q     What are -- I used the term first, but what's

2   your understanding of it.

3       A     Pulling out the student and working with them

4   either one-on-one or a small group.

5       Q     And do you do that with special education

6   students?

7       A     Yes.

8       Q     Do you also do it with general education

9   students?

10      A     No.

11      Q     Do you work with any general education students

12  on what's referred to as interventions?

13      A     Interventions are provided by our extra support

14  teacher providers, and I also provide tutoring after

15  school.  So I work with students that have already been

16  identified in SST, in the SST process, and then I provide

17  tutoring for them to get a better picture of the student.

18      Q     And you mentioned SST, are you part of the

19  SST --

20      A     Yes.

21      Q     -- team?  And what's your understanding of what

22  the SST team is?

23      A     Student Study Team is a process in which the

24  parent, the teacher, counselor, principal, at times,

25  myself, if they feel that the student might have some

                          -264-

1   special needs, so then that's when I'm invited.  So yes.

2       Q    So it's convened if somebody thinks that a

3   student has some special needs?

4       A    Well, if they have -- let's see.  If they

5   feel -- there's a tier.  There's a three-tier.  They have

6   to go through basic support with children in the

7   beginning in small group in their classroom.  In the next

8   tier, they're identified with, okay.  Extra support

9   teachers, providers that provide that extra support, for

10  example, in reading and in math.

11          And then the third tier, that's when I come

12  into the picture.  They invite me to the SST to see if

13  since the other interventions weren't working, they want

14  to give me an opportunity to work with the student, and

15  then I have that opportunity to work with them.

16          I tutor them after school.  If I see some

17  progress, then we remeet in the SST meeting.  We share

18  the information with the parents and the SST team.  And

19  then from there, we, as a team, we decide whether the

20  parents wants to move forward with a full assessment or

21  agrees with the progress the child made.

22      Q    And when you say move forward with a full

23  assessment, what are you referring to?

24      A    I'm referring to including myself.  That's when

25  we do -- discuss with the parent if they're making that

-265-

1    request and they don't see the progress in that SST, then

2    we move forward with an assessment.  And a full

3    assessment means -- it could mean speech.  It could mean

4    academics.

5        Q    So when you say, full assessment, are you

6    referring to a special education assessment?

7        A    Yes.

8        Q    Okay.  And so is it your understanding that you

9    go through those three tiers prior to making a referral

10   for a special education assessment?

11       A    Yes.

12       Q    And the three tiers are through the SST

13   process?

14       A    Yes.

15       Q    And as a resource specialist when you provide

16   pull-out services, do you keep service logs?

17       A    Yes.

18       Q    And where do you -- how do you keep those?  Are

19   they handwritten, computerized?

20       A    I have them handwritten, and then I scan them

21   to myself.

22       Q    You scan them to yourself --

23       A    Yeah.

24       Q    -- what does that mean?

25       A    You know, I email it to myself so I can have,

                              -266-

# Exhibit J



# OFFICE OF ADMINISTRATIVE HEARINGS

## STATE OF CALIFORNIA

## OAH Case No. 2018080844

# C█████ C████, Parent on behalf of I████ H█████, Student

*Petitioner*

## v.

# Oxnard School District

*Respondent*

## Administrative Record
## Volume V of IX

# TABLE OF CONTENTS

## Volume I

Case Filings and Orders .......................................................................................................... 1

    Student's Special Education Complaint and Request for Mediation ...................................... 1

    Student's Motion for Stay Put ............................................................................................. 34

              Attachment A: Declaration of Cynthia Cortez ........................................................ 41

              Attachment B: Declaration of Janeen Steel ........................................................... 43

                    Exhibit A: November 9, 2017 IEP ............................................................. 47

                    Exhibit B: January 22, 2018 IEP .............................................................. 65

                    Exhibit C: February 26, 2018 and March 15, 2018 IEP ......................... 95

                    Exhibit D: March 15, 2018 and March 22, 2018 IEP ............................. 113

                    Exhibit E: August 16, 2018 Email re: Student Enrollment ..................... 137

    Scheduling Order Setting Telephonic Prehearing Conference and Due Process Hearing ............................................................................................................................. 141

    District's Notice of Representation and Request for Service via OAH E-Filing System ... 150

    Student's Motion to Begin the Due Process Hearing Timeline and to Set a New Hearing Date ..................................................................................................................... 153

              Attachment A: Declaration of Janeen Steel ........................................................ 158

    Order Granting Motion for Stay Put ................................................................................... 171

    Order Granting Motion to Start Due Process Hearing Timeline and Advancing Dates for Prehearing Conference and Hearing ............................................................................ 175

    District's Motion to Reconsider and Revoke Stay Put Order ............................................ 178

              Declaration of Lawrence Joe ................................................................................ 197

                    Exhibit A: August 24, 2017 through march 15, 2018 Detail Behavior Report .................................................................................................... 208

                    Exhibit B: May 2017 to March 2018 Behavior Emergency Reports ....... 221

                    Exhibit C: Email Communications from October 24, 2017 to March 8, 2018 ..................................................................................................... 260

                    Exhibit D: February 5, 2018 Email ........................................................ 313

                    Exhibit E: Pictures from the March 9, 2018 Incident .............................. 317

                    Exhibit F: March 15, 2018 Manifestation Determination IEP ................. 324

Exhibit G: Documents Returned by Student's Attorney Regarding Placement ............................................................. 348

Exhibit H: Various Behavior Emergency Reports ................................. 352

Exhibit I: May 1, 2018 30-Day Review IEP ............................ 401

Exhibit J: June 7, 2018 IEP ................................................. 425

Exhibit K: August 2, 2018 Email ......................................... 451

Exhibit L: August 9, 2018 Emails ....................................... 453

Exhibit M: August 10, 2018 Emails ..................................... 458

Exhibit N: August 14, 2018 Email ....................................... 461

Exhibit O: August 16, 2018 Email ....................................... 463

Exhibit P: August 20, 2018 Email ....................................... 472

Exhibit Q: August 30, 2018 Email ....................................... 474

Exhibit R: Proof of Service of Ex Parte Application and Declarations.... 478

Exhibit S: September 7, 2018 Email ..................................... 482

Exhibit T: September 13, 2018 Emails .................................. 484

Exhibit U: District's Proposed Response to Student's Due Process Complaint ................................................................... 487

Declaration of Mark Capritto ............................................................ 499

## Volume II

Declaration of Jamie Vaughn............................................................... 514

Declaration of Brasilia Perez ............................................................ 523

District's Request for Judicial Notice.................................................. 536

Exhibit A: District's August 17, 2018 Complaint in Ventura Superior Court........................................................................ 540

Exhibit B: August 22, 2018 Notice of Removal of Action Filed in the United States Court for the Central District of California......................... 561

Exhibit C: Docket in the Matter Pending in the United States Court for the Central District of California, Case No. 2:18-CV-07357-SVW-AS ............................................................................... 592

Exhibit D: September 12, 2018 Order Denying District's Ex Parte Application for a Temporary Restraining Order ..................................... 598

District's Notice of Related Cases ..................................................... 601

[Proposed] Order .............................................................................. 606

Student's Opposition to District's Motion to Reconsider and Revoke Stay Put Order ...... 610

Declaration of Janeen Steel ................................................................. 621

    Exhibit A: February 26, 2018 IEP ....................................... 624

    Exhibit B: August 14, 2018 Email ....................................... 641

    Exhibit C: September 12, 2018 Denial of Temporary Restraining Order ................................................................... 643

    Evidentiary Objections to District's Declarations Regarding Motion to Reconsider and Revoke Stay Put ........................ 646

District's Prehearing Conference Statement ...................................... 693

Student's Prehearing Conference Statement ..................................... 702

District's First Amended Prehearing Conference Statement .............. 721

Student's Amended Prehearing Conference Statement ..................... 736

District's Reply in Support of Motion to Reconsider and Revoke Stay Put Order ........... 756

Order Denying Request for Reconsideration ..................................... 764

Order Following Prehearing Conference ............................................ 768

Student's Witness and Exhibit List ..................................................... 775

District's Response to Student's Due Process Complaint and Request for Mediation ..... 795

District's Certification of ADA-Compliant Facility and Rooms ............ 804

District's Supplemental Witness List .................................................. 808

District's Second Supplemental Witness List ..................................... 813

Student's Amended Exhibit List ......................................................... 817

Student's Amended Witness List ........................................................ 829

Student's Motion for Clarification of Issue 2(b) in Prehearing Conference Order............ 840

Student's 3rd Amended Exhibit List ................................................... 844

District's Objections to Student's Exhibits S1 and S113 .................... 855

Declaration of Benjamin Nieberg ....................................................... 863

    Exhibit A: August 2, 2018 Email ....................................... 876

    Exhibit B: August 7, 2018 Email ....................................... 878

    Exhibit C: August 9, 2018 Email ....................................... 881

    Exhibit D: August 9, 2018 Email ....................................... 883

    Exhibit E: August 9, 2018 Email ....................................... 886

    Exhibit F: August 9, 2018 Email........................................ 889

    Exhibit G: August 9, 2018 Email ....................................... 893

    Exhibit H: August 9, 2018 Email ....................................... 898

Exhibit I: August 10, 2018 Email ................................................................ 902

Exhibit J: August 10, 2018 Email ............................................................... 905

Exhibit K: August 10, 2018 Email ............................................................. 908

Exhibit L: August 10, 2018 Email .............................................................. 911

Exhibit M: August 14, 2018 Email ............................................................. 915

Exhibit N: August 14, 2018 Email ............................................................. 917

Exhibit O: August 16, 2018 Email ............................................................. 919

Exhibit P: August 16, 2018 Email ............................................................. 921

Exhibit Q: August 16, 2018 Email ............................................................. 924

Exhibit R: August 16, 2018 Email ............................................................. 927

Student's Closing Brief ..................................................................................... 932

District's Closing Brief ..................................................................................... 1006

Student's Request for Official Notice of Facts that May Judicially Noticed by the Courts ............................................................................................................. 1071

Attachment A: Minutes in Case No. 2:18-CV-07357-SVW-AS Denying Motion for Preliminary Injunction and Granting Motion to Dismiss .................... 1074

## Volume III

Hearing Exhibits ..................................................................................................... 1078

Hearing Exhibit List ........................................................................................... 1078

Hearing Witness List .......................................................................................... 1087

Student's Exhibits .............................................................................................. 1094

Exhibit S-2: 6/15/2016 Report Card - Kindergarten - Rose Avenue E.  (2015-2016) ................................................................................................ 1094

Exhibit S-3: 6/15/2017 Report Card - 1st Grade - Rose Avenue E.  (2016-2017) ................................................................................................ 1096

Exhibit S-4: 2018 Health Profile ................................................................ 1097

Exhibit S-5: 2017-2018 Detailed Behavior Report ........................................... 1099

Exhibit S-6: 2018 Student Profile .............................................................. 1111

Exhibit S-7: 2018 Behavior Log ................................................................ 1112

Exhibit S-8: 2/25/2016 Student Success Team ................................................. 1116

Exhibit S-9: 10/25/2016 Student Success Team ............................................... 1117

Exhibit S-10: 3/28/2017 Suspension .......................................................... 1118

Exhibit S-11: 3/29/2017 Suspension - Teacher Notice .................................... 1119

Exhibit S-12: 4/26/2017 Student Success Team .............................................. 1121

Exhibit S-13: 4/24/2018 Student Success Team Teacher Input Form ............. 1124

Exhibit S-14: 5/10/2017 Behavior Emergency Report ...................................... 1125

Exhibit S-16: 5/18/2017 Special Education Referral Form................................ 1128

Exhibit S-17: 5/18/2017 Request for 504 Plan................................................. 1129

Exhibit S-20: 5/31/2017 Lucy Perales Letter................................................... 1130

Exhibit S-21: 6/14/2017 Lucy Perales Letter................................................... 1131

Exhibit S-22: 8/24/2017 Discipline Referral .................................................... 1132

Exhibit S-23: 9/15/2017 Office Discipline Referral .......................................... 1133

Exhibit S-24: 9/18/2017 Office Discipline Referral .......................................... 1134

Exhibit S-25: 9/19/2017 Office Discipline Referral 9:15am ............................. 1135

Exhibit S-26: 9/19/2017 Office Discipline Referral 1:15pm ............................. 1136

Exhibit S-27: 9/20/201 Signed Assessment Plan............................................ 1137

Exhibit S-28: 9/21/2017 Office Discipline Referral .......................................... 1138

Exhibit S-29: 10/4/2017 Office Discipline Referral .......................................... 1139

Exhibit S-30: 10/10/2017 Office Discipline Referral ........................................ 1140

Exhibit S-32: 12/4/201 Letter to School ......................................................... 1141

Exhibit S-33: 2017 Ponce 2nd Grade Student Evaluation Form...................... 1142

Exhibit S-34: 10/12/2017 Behavior Emergency Report ................................... 1143

Exhibit S-35: 10/24/2017 Olson - Email re: Student ....................................... 1147

Exhibit S-36: 10/26/2017 Olson - Email re: Student Behavior/Pictures ........... 1152

Exhibit S-37: 10/26/2017 Olson - Email re: Student Behavior ......................... 1158

Exhibit S-38: 10/27/2017 Olson - Email re: Student Behavior ......................... 1159

Exhibit S-39: 10/19/2017 Notice of 11/9/17 IEP.............................................. 1161

Exhibit S-41: 11/1/2017 Suspension............................................................... 1162

Exhibit S-42: 11/9/2017 IEP Completed on 1/11/2018 .................................... 1163

Exhibit S-43: 11/13/2017 Behavior Emergency Report ................................... 1180

Exhibit S-44: 11/13/22017 Email re:  New Behavior Plan ............................... 1182

Exhibit S-45: 11/13/2017 Olson - Email with Pictures..................................... 1184

Exhibit S-46: 11/14/2017 Olson - Email re: Implementing a Complete Plan ..... 1187

Exhibit S-47: 11/17/2017 Behavior Emergency Report ................................... 1188

Exhibit S-48: 11/17/2017 Email re: Student - Olson ........................................ 1191

Exhibit S-50: 11/27/2017 Email w/ Pictures - Olson ........................................ 1193

Exhibit S-51: 11/28/2017 Office Discipline Referral ......................................... 1198

Exhibit S-52: 11/28/2017 Behavior Emergency Report ..................................... 1199

Exhibit S-53: 11/28/2017 Email re: Student - Olson ......................................... 1201

Exhibit S-55: 11/28/2017 Email re: Student - Olson ......................................... 1208

Exhibit S-57: 11/29/2017 Email re: Student - Olson ......................................... 1210

Exhibit S-58: 11/29/2017 Suspension............................................................... 1212

Exhibit S-59: 2017-2018 Office Discipline Referral .......................................... 1213

Exhibit S-60: 12/1/2017 Behavior Emergency Report ...................................... 1214

Exhibit S-61: 12/1/2017 Suspensions .............................................................. 1218

Exhibit S-62: 12/11/2017 Email re: Student Returning to School - Yulianna Robles .............................................................................................................. 1219

Exhibit S-63: 12/11/2017 IEP Notice of 1/11/2018........................................... 1221

Exhibit S-64: 1/10/2018 Assessment - Multi-Disciplinary Team Report ........... 1222

Exhibit S-66: 1/12/2018 Suspension Notice for 1/16/2018 - 1/17/2018 ............ 1166

Exhibit S-67: 1/19/2018 Behavior Emergency Report ...................................... 1267

Exhibit S-68: 1/23/2018 Behavior Emergency Report ...................................... 1271

Exhibit S-69: 1/24/2018 Behavior Emergency Report ...................................... 1276

Exhibit S-70: 1/24/2018 Email re: Student - Olson ........................................... 1279

Exhibit S-73: 1/19/2018 Notice of 1/22/2018 IEP............................................. 1281

Exhibit S-74: 1/22/2018 IEP............................................................................. 1283

Exhibit S-75: 2018 Positive Behavior Intervention Plan ................................... 1289

Exhibit S-76: 2018 Speech Notes .................................................................... 1291

Exhibit S-77: 1/26/2018 Email re: Student - Olson ........................................... 1292

Exhibit S-78: 1/28/2018 Letter to Vaca ............................................................ 1294

Exhibit S-79: 1/29/2018 Email re: Student - Olson ........................................... 1297

Exhibit S-80: 1/31/2018 Email re: Student - Ponce.......................................... 1298

Exhibit S-82: 1/31/2018 Email re: Student - Garcia Thomas ........................... 1300

Exhibit S-85: 2/2/2018 Email re: Student - Olson ............................................ 1303

Exhibit S-86: 2/5/2018 The Small Classroom ................................................... 1305

Exhibit S-87: 5/2/2018 Behavior Emergency Report ........................................ 1310

Exhibit S-88: 5/2/2018 Email re: Student - Olson ............................................ 1314

Exhibit S-89: 2/5/2018 Olson Email w/ Pictures............................................... 1316

Exhibit S-90: 6/2/2018 Email re: Student - Garcia Thomas .............................. 1319

Exhibit S-91: 2/8/2018 Email re: Student - Olson ............................................ 1321

Exhibit S-93: 9/2/2018 Email re: Student - Olson ............................................ 1323

Exhibit S-94: 2/13/2018 Email re: Student - Olson .......................................... 1324

Exhibit S-96: 2/15/2018 Email re: Student - Olson .......................................... 1327

Exhibit S-100: 2/21/2018 Email re: Student - Olson ........................................ 1330

Exhibit S-103: 2/22/2018 Notice of 2/26/2018 IEP .......................................... 1332

Exhibit S-104: 2/26/2018 IEP ........................................................................ 1333

Exhibit S-105: 2018 Positive Behavior Intervention Plan Revised ................... 1350

Exhibit S-107: 2/3/2018 Email re: Student - Garcia Thomas ........................... 1354

Exhibit S-108: 5/3/2018 Garcia Thomas Report of Incident ............................. 1356

Exhibit S-110: 9/3/2018 Behavior Emergency Report ..................................... 1359

Exhibit S-112: 12/3/2018 Suspension ............................................................. 1368

Exhibit S-114: 3/13/2018 Notice of 3/15/2018 IEP .......................................... 1369

Exhibit S-116: 3/19/2018 Notice of 3/22/2018 IEP .......................................... 1370

Exhibit S-117: 3/115/2018 IEP ....................................................................... 1373

Exhibit S-120: 3/23/2018 Enrollment Packet .................................................. 1396

Exhibit S-121: 4/2/2018 Behavior Emergency Report 11:50am ....................... 1431

Exhibit S-122: 4/2/2018 Behavior Emergency Report 1:30pm ......................... 1435

Exhibit S-123: 4/12/2018 Behavior Emergency Report 1:30pm ....................... 1439

Exhibit S-126: 4/17/2018 Behavior Emergency Report ................................... 1444

Exhibit S-127: 4/18/2018 Behavior Emergency Report ................................... 1448

Exhibit S-128: 4/20/2018 Behavior Emergency Report ................................... 1452

Exhibit S-129: 4/24/2018 Behavior Emergency Report ................................... 1456

Exhibit S-130: 4/30/2018 Behavior Emergency Report ................................... 1460

Exhibit S-133: 5/1/2018 IEP .......................................................................... 1464

Exhibit S-134: 5/10/2018 Incident Report ...................................................... 1495

Exhibit S-136: 5/11/2018 Incident Report PM ................................................. 1500

Exhibit S-137: Picture of Injury ...................................................................... 1501

Exhibit S-139: 5/16/2018 Behavior Emergency Report 8:53am ....................... 1502

Exhibit S-140: 5/16/2018 Behavior Emergency Report 12:00pm ..................... 1506

Exhibit S-141: 5/16/2018 Picture of Injury ..................................................... 1510

Exhibit S-142: 5/24/2018 Email and Picture of Injury ...................................... 1511

Exhibit S-143: 6/1/2018 Behavior Emergency Report ..................................... 1513

Exhibit S-144: 6/5/2018 Behavior Emergency Report ..................................... 1518

Exhibit S-145: 4/26/2018 Treatment Plan ........................................................ 1523

Exhibit S-146: 3/5/2018 Functional Behavior Assessment .............................. 1527

Exhibit S-147: 6/7/2018 IEP ........................................................................... 1540

Exhibit S-148: 6/14/2018 Psychological Assessment ...................................... 1565

## Volume IV

Exhibit S-149: Curriculum Vitae of Betty Jo Freeman, Ph.D. ........................... 1584

Exhibit S-150: Curriculum Vitae of Mitchell Todd Taubman, Ph.D. .................. 1609

Exhibit S-152: 10/26/2017 Sentence Completion ............................................ 1629

Exhibit S-153: 9/20/2017 Health, Developmental, and Social History Questionnaire ................................................................................................. 1631

Exhibit S-154: 11/1/2017 Health, Developmental, and Social History Questionnaire ................................................................................................. 1635

Exhibit S-155: 7/1/2017 BASC3 Parent Rating Scales dated as 2017 ............. 1639

Exhibit S-156: Different 7/1/2017 BASC3 Parent Rating Scales dated as 2017 ............................................................................................................... 1643

Exhibit S-157: 9/20/2017 BASC3 Parent Rating Scales - Father ..................... 1647

Exhibit S-158: 9/20/2017 BASC3 Parent Rating Scales - Mother .................... 1651

Exhibit S-159: 11/6/2017 Childhood Autism Rating Scale 2nd Edition ............. 1655

Exhibit S-160: Kaufman Assessment Battery for Children ................................ 1664

Exhibit S-161: 10/24/2017 KABC-II ................................................................ 1674

Exhibit S-162: 10/18/2017 Beery VMI ............................................................. 1697

Exhibit S-163: 11/15/2017 PASC3 Teacher Rating Scales - Ponce ................ 1729

Exhibit S-164: 10/18/2017 Clinical BASC3 Scoring ......................................... 1732

Exhibit S-165: 11/15/2017 BASC Assessment Information ............................. 1829

Exhibit S-166: 10/20/2017 TAPS-3 ................................................................ 1880

Exhibit S-167: 11/1/2017 Test of Cognitive Abilities ........................................ 1904

Exhibit S-168: 2/2/2018 Reintegration Plan .................................................... 1934

Exhibit S-171: 8/20/2018 Declaration of Mark Capritto .................................... 1936

Exhibit S-172: 9/24/2018 Declaration of Amelia Sugden ................................. 1951

Exhibit S-176: 5/18/2017 Internal Emails from 5/18/2017 to 5/19/2017 ........... 1955

Exhibit S-177: 5/7/2018 Certificate of Therapeutic Behavioral Services Graduation ....................................................................................................... 1962

District's Exhibits ............................................................................................. 1963

Exhibit D-1: 1/28/2018 Perez Email re: Incident Report 1/24/2018 w/ Attachments ................................................................................... 1963

Exhibit D-2: 2/7/2018 Garcia Email re: I.H. New Team Transition ................... 1973

Exhibit D-3: 3/12/2018 Perez Email re: Parent Concerns ................................. 1974

Exhibit D-4: 3/13/2018 Ridge Email re: Student Gun Threat ........................... 1976

Exhibit D-6: 8/2/2018 Steel Email re: Student.................................................. 1977

Exhibit D-7: 8/7/2018 Nieberg Email re: Student .............................................. 1978

Exhibit D-8: 8/9/2018 9:51am Steel Email re: Update on Student ................... 1980

Exhibit D-9: 8/9/2018 10:40am Steel Email re: Update on Student ................. 1981

Exhibit D-10: 8/9/2018 11:16am Steel Email re: Update on Student ............... 1983

Exhibit D-11: 8/9/2018 1:28pm Steel Email re: Update on Student ................. 1985

Exhibit D-12: 8/9/2018 1:35pm Nieberg Email re: Update on Student............. 1988

Exhibit D-13: 8/9/2018 5:36pm Steel Email re: Update on Student ................. 1992

Exhibit D-14: 8/10/2018 11:34am Nieberg Email re: Today .............................. 1995

Exhibit D-15: 8/10/2018 11:34am Steel Email re: Student................................. 1996

Exhibit D-16: 8/10/2018 2:16pm Nieberg Email re: Student ............................. 1998

Exhibit D-17: 8/10/2018 2:41pm Steel Email re: Student.................................. 2000

Exhibit D-18: 8/14/2018 Steel Email re: Student............................................... 2003

Exhibit D-19: 8/14/2018 Joe Email re: Student ................................................. 2004

Exhibit D-20: 8/16/2018 5:16pm Steel Email re: Student.................................. 2005

Exhibit D-21: 8/16/2018 5:38pm Joe Email re: Student .................................... 2006

Exhibit D-22: 8/16/2018 5:40pm Steel Email re: Student.................................. 2008

Exhibit D-23: 8/16/2018 5:54pm Joe Email re: Student .................................... 2010

Exhibit D-24: 8/17/2018 Dean Email re: Student Placement Consideration ..... 2013

Exhibit D-29: 8/30/2018 12:20pm Joe Email re: Student FAPE Offer and Attachments ..................................................................................... 2018

Exhibit D-37: 2015-2016 Oxnard School District School Calendar ................... 2044

Exhibit D-38: 2016-2017 Oxnard School District School Calendar ................... 2045

Exhibit D-39: 2017-2018 Oxnard School District School Calendar ................... 2046

Exhibit D-40: 2018-2019 Oxnard School District School Calendar ................... 2047

Exhibit D-41: Curriculum Vitae of Pablo Ordaz ................................................. 2048

Exhibit D-42: Curriculum Vitae of Amelia Corona-Sugen, M.S. ....................... 2051

Exhibit D-43: Curriculum Vitae of Susan M. Mares............................................ 2053

Exhibit D-44: Curriculum Vitae of Bradilia Perez ............................................. 2059

Exhibit D-45: Curriculum Vitae of Maria G. Ponce.............................................. 2061

Exhibit D-46: Curriculum Vitae of Shannon Billings ........................................... 2062

Exhibit D-47: Curriculum Vitae of Derek Olson................................................... 2063

Exhibit D-48: Curriculum Vitae of Annette Murguia ........................................... 2064

Exhibit D-49: Curriculum Vitae of Margarita Llanes ........................................... 2066

Exhibit D-50: Angel Dominguez, M.A., CCC-SLP ............................................... 2068

Exhibit D-51: Curriculum Vitae of Katrina Madden ............................................ 2071

Exhibit D-52: Curriculum Vitae of Maria Isabel Garcia-Thomas, MS, BCBA..... 2074

Exhibit D-54: Curriculum Vitae of Raquel G. Rodriguez ................................... 2078

# Volume V

Decision.................................................................................................................... 2079

    Issues ................................................................................................................. 2079

    Summary of Decision ......................................................................................... 2080

    Factual Findings ................................................................................................. 2080

        Early Development ........................................................................................ 2081

        2015-2016 Kindergarten at Rose Avenue Elementary ................................. 2081

            February 25, 2016: First Student Success Team Meeting.................. 2083

        2016-2017 First Grade at Rose Avenue Elementary ........................................ 2084

            October 25, 2016 Second Student Success Team Meeting ............... 2084

            January-June 2017: Escalating Aggressive Behaviors........................ 2085

            April 26, 2017 third Student Success Team Meeting........................... 2086

            May 10, 2017 Incident and Parent Request for Assessment.............. 2087

            May 18, 2017 Fourth Student Success Team Meeting........................ 2088

            May 31, 2017 Student Assessment Plan............................................. 2088

        2017-2018: Second Grade at Chavez Elementary School .............................. 2089

            September 20, 2017 Signed Student Assessment Plan ..................... 2089

            September - November 2017: Student's Escalating Behaviors .......... 2089

            November 9, 2017 IEP Team Meeting and Continued IEP ................ 2090

        January 10, 2018 Multidisciplinary Assessment and January 11, 2018 Initial IEP............................................................................................................. 2090

            Health ................................................................................................. 2091

            Intellectual Development ................................................................... 2091

Academic Achievement ............................................................. 2091

Speech and Language ............................................................. 2091

Social-Emotional Functioning ............................................... 2092

Autism .................................................................................... 2094

Special Circumstances Educational Support ....................... 2095

January 11, 2018 Continued IEP Team Meeting .................. 2096

January 11, 2018 IEP Implementation................................... 2097

January 12, 2018 Incident ...................................................... 2098

January 19, 2018: Instruction in Conference Room.............. 2098

January 22, 2018 Manifestation Determination/IEP Team Meeting..... 2099

February 26, 2018 IEP Team Meeting................................... 2100

March 2, 2018 And March 9, 2018 Incidents ....................... 2101

March 12, 2018 Through April 1, 2018: Student at Home .... 2101

March 15, 2018 Manifestation Determination Team Meeting and March 22, 2018 IEP Team Meeting ....................................... 2101

April 2, 2018 To June 14, 2018 Placement at Casa Pacifica ........................... 2102

May 1, 2018 IEP Team Meeting ............................................ 2103

May 17, 2018 Graduation from Home Therapy Program..................... 2104

June 7, 2018 IEP Team Meeting ........................................... 2104

July 26, 2018 Freeman Autism Assessment ....................... 2106

July 26, 2018 IEP Team Meeting........................................... 2109

July 26, 2018 To August 17, 2018: Efforts to Find Mutually-Agreeable Placement for Student........................................ 2109

Seclusion and Holds............................................................... 2110

Post-Filing Communications, Filings, And Expert Testimony Regarding an Appropriate Placement and Educational Program for Student, Relevant to Remedies ........................ 2114

August 30, 2018 Oxnard FAPE Offer .................................... 2114

Proposed Placements for Student......................................... 21115

Proposed Educational Program for Student ......................... 2115

Legal Conclusions ............................................................................ 2116

Introduction - Legal Framework under the IDEA................... 2116

Issue 1: Child Find................................................................. 2117

Issue 2(a): Failure to Make FAPE Offer Before January 11, 2018.................. 2122

Issue 2(b): Failure to Offer FAPE in the January 11, 2018 IEP ........................ 2122

Issue 2(c): Failure to Implement January 11, 2018 IEP .................................... 2125

Issue 3: Emergency Interventions and Seclusion ............................................. 2126

Issue 4(a): Failure to Make Clear Written Offer in in January 11, 2018 IEP ..... 2127

Issue 4(b): Failure to Complete Initial IEP Within 60 Days of Signed Assessment Plan .................................................................................... 2127

Issue 4(c) Failure to Include General Education Teacher at IEP Team Meetings ........................................................................................... 2128

Remedies ........................................................................................................... 2129

Order .................................................................................................................. 2131

Prevailing Party ................................................................................................. 2133

Right to Appeal .................................................................................................. 2133

Hearing Transcript ...................................................................................................... 2135

September 24, 2018 Prehearing Conference ..................................................... 2135

October 4, 2018 Hearing ................................................................................... 2164

October 15, 2018 Hearing ................................................................................. 2479

## Volume VI

October 16, 2018 Hearing ................................................................................. 2699

October 17, 2018 Hearing ................................................................................. 2975

## Volume VII

October 22, 2018 Hearing ................................................................................. 3279

October 23, 2018 Hearing ................................................................................. 3551

## Volume VIII

October 24, 2018 Hearing ................................................................................. 3908

October 25, 2018 Hearing ................................................................................. 4101

## Volume IX

October 29, 2018 Hearing ................................................................................. 4425

October 30, 2018 Hearing ................................................................................. 4820

Certification of the Administrative Record ................................................................... 5058

 1   because I'm going to ask you to do that anyway.

 2        Do you need any time, Ms. Steel --

 3        **MS. STEEL:**  No, Your Honor.

 4        **THE COURT:**  -- with the new exhibit?  Okay.

 5        Please come over here.  This will be your chair.

 6   And I'm going to ask you to raise your right hand.

 7                        <u>PABLO ORDAZ</u>

 8         having been duly sworn, testified as follows:

 9        **THE COURT:**  Have a seat.  I.H.'s counsel, Ms. Steel,

10   has some questions for you, and then, I think, followed

11   by Mr. Joe.  Okay.

12        **MS. STEEL:**  Hi, Mr. Ordaz.

13        **THE WITNESS:**  Good morning.

14        **MS. STEEL:**  Is it Ordaz, or is that the --

15        **THE WITNESS:**  Ordaz.  You got it right.

16        **THE COURT:**  Oh, I'm sorry.  Could you please state

17   and spell your full first -- and last name for our

18   records?

19        **THE WITNESS:**  Sure.  Pablo Ordaz.  And last name is

20   O-R-D-A-Z.

21        **THE COURT:**  Thank you.

22        **THE WITNESS:**  Right.

23        **MS. STEEL:**  Thanks, Mr. Ordaz.  And thank you for

24   being here today.

25        **THE WITNESS:**  Thank you.

                              -43-

```
 1                      DIRECT EXAMINATION

 2   BY MS. STEEL:

 3        Q    I just have a few questions --

 4        A    Um-hum.

 5        Q    -- the first thing I'm going to actually have

 6   you do is -- there's going to be a couple of binders on

 7   the -- obviously -- the one over there is the District's,

 8   and then, there's two binders.  They have one of two and

 9   two of two on the side --

10        A    Okay.

11        Q    -- and so I will be directing you on --

12        A    Um-hum.

13        Q    -- (indiscernible).  Have you ever testified

14   before?

15        A    No.

16        Q    Okay.  And so here in the white binder, I'm

17   just going to have a few questions about your background,

18   but I think to facilitate it -- well, we just got your

19   resume, so I just have a few questions.

20        A    Sure.

21        Q    It's tab 41.  Do you recognize this document?

22        A    Yes, it's my resume.

23        Q    Do you need a minute to look at it to make sure

24   that it's the most updated, or any corrections you may

25   to it?
```

                                -44-

```
1        A    Sure.  Thank you.  Yes, the only update is

2   adding the -- the school principal --

3        Q    And when did the --

4        A    -- experience.

5        Q    -- principal start?

6        A    I was interim principal in 2000- -- I've got to

7   get my dates since -- remember since it was different

8   titles that I received.  I believe it was 2016 -- interim

9   principal.

10            The following year I was co-principal, and then

11  I'm the current principal.

12       Q    Okay.  So when did you become principal,

13  without the co-principal?

14       A    Actually, the school year 2017/2018.

15       Q    Okay.  And then prior to that, you were the co-

16  principal somewhere between 2016 and 2017?

17       A    Interim principal, co-principal.

18       Q    Kind of in the same time frame?

19       A    Right.  Um-hum.

20       Q    Who was the co-principal with you?

21       A    Ramona Villavicencio.

22       Q    Can you spell that?

23       A    Ramona, R-O-M-A (sic), Villacioncio (sic), if I

24  spelled it correctly.

25       Q    And did you have a division of duties?
```
                                  -45-

 1   couple of years?

 2       A    Oh, there might have been revisions, but I

 3   don't know exactly what might have changed.

 4       Q    That's fine.  The question I have is -- a

 5   couple of logistical things about SSTs.  Do parents get,

 6   like, a notice -- like, an invitation -- a written

 7   invitation to SSTs?

 8       A    Yes.

 9       Q    Okay.  And that was in place when I.H. was

10   there?

11       A    Correct.

12       Q    Okay.  And do you keep copies of those notices?

13       A    My outreach consultant does keep note -- copies

14   of those notices and notifications.

15       Q    Okay.  And so what is an outreach specialist?

16       A    An outreach specialist is the person who's in

17   charge of facilitating, coordinating the meetings, so

18   she's in charge of coordinating, setting up the meetings,

19   contacting the parent with the notices for the meeting,

20   and following up with the parent, we have versus -- you

21   know, we could be -- we have phone calls to check and see

22   if they're able to attend the meetings.

23       Q    Okay.  So what if the parent can't make the

24   meeting that day, what happens?

25       A    We'd reschedule the meeting as soon as

                        -53-

```
 1   possible.

 2        Q    Okay.  And do you have a record of how many

 3   times you called them, or where is that information kept?

 4        A    That would be my -- the outreach consultant

 5   will keep that information.

 6        Q    As part of the SST, do you provide any parents

 7   with information about special education assessments?

 8        A    We provide it at the beginning of the meeting

 9   with the parent rights.

10        Q    So you provided the parent rights during the

11   2015/2016 school year?

12        A    I don't recall, but typically, we provide it.

13        Q    Do you know -- did you attend any SSTs for

14   I.H.?

15        A    Yes, I did.

16        Q    Okay. Do you know if they were provided with

17   their education rights -- their special education

18   procedural rights?

19        A    I don't recall.

20        Q    Give me one second.  So have you heard of what

21   is, like, Child Find, or when there's a suspected

22   disability?

23        A    Yes.

24        Q    What is your understanding of that?

25        A    My understanding is if we suspect a disability
```

 1   from a student, we would recommend a formal evaluation to

 2   determine what that learning disability could be.

 3       Q    Okay.  And if there was a suspected disability,

 4   would you just wait and see what would happen?

 5       A    No, we would follow through with the

 6   assessment.

 7       Q    And can you go through that process, right?  So

 8   with -- we're talking about Rose Avenue.

 9            If a parent makes a request for an assessment,

10   what happens?

11       A    As soon as the parent makes a request for an

12   assessment with me, whether it's oral or written,

13   automatically that gets a -- a stamp at the time that

14   it's submitted --

15       Q    Um-hum.

16       A    -- and automatically comes to me, and it's

17   dispersed through my -- or -- or RSP outreach consultant

18   to start setting up the meeting within fifteen days, and

19   it is also given to the school psychologist and the

20   therapist and the RSP teacher.

21       Q    And you said, set up a meeting.  What kind of

22   meeting is set up in fifteen days?

23       A    Just to come and, you know, address the parent

24   if it's -- we don't have more inform -- to gather more

25   information and to determine, you know, what are the --

                              -55-

1  the parent's concerns as well as our concerns that the

2  school may have as to get more evidence and information,

3  based -- and -- and to assess -- so the areas where we

4  may have concerns of.

5          You know, sometimes, parents may have concerns

6  that we don't see, so we want to get that information

7  from them as well.

8      Q    And who's at that meeting?

9      A    At that meeting, is the child's classroom

10  teacher, the school counselor, the psychologist, the

11  outreach consultant, and at the time, we had an academic

12  coach, so the academic coach would be there as well, and

13  myself --

14      Q    So is --

15      A    -- or an administrator.

16      Q    And is that an SST?

17      A    Yes.

18      Q    So you have -- if a parent makes a request, you

19  hold an SST within fifteen days?

20      A    Correct.

21      Q    What if the parent can't meet within fifteen

22  days, what happens?  What if they have to meet in twenty-

23  five days?

24      A    I -- we move with -- you know, with the

25  assessment forward, but we -- we really want to get more

-56-

1   information from the parent, so we try to schedule a time

2   where the parent -- to get the rest of the information

3   from the parent.

4        Q    When you say, move forward, what does that

5   mean?

6        A    That means we ad -- we -- our team addresses

7   the request from the parent, but sometimes, the parent

8   may say in the request what their concern is, so we will

9   move forward with, you know, providing an intervention or

10  getting -- or writing -- you know, providing the parent

11  with an assessment.

12       Q    Okay.  So you're -- and I'm just going to

13  clarify --

14       A    Sure.

15       Q    -- you said, provide the parent with an

16  assessment?

17       A    Based on what -- they can -- traditionally, we

18  do not provide an assessment until we meet with the

19  parent --

20       Q    Okay.

21       A    -- but I know that there -- sometimes, it's

22  challenging and difficult for the parent to make the

23  meetings, so usually, our psychologist will follow up

24  with the parent as well and you know, get more

25  information over the phone, or the ORC will get more

Exhibit K



## OFFICE OF ADMINISTRATIVE HEARINGS
### STATE OF CALIFORNIA

## OAH Case No. 2018080844

**C█████ C███, Parent on behalf of**
**I████ H█████, Student**

*Petitioner*

### V.

# Oxnard School District

*Respondent*

## Administrative Record
## Volume VI of IX

# TABLE OF CONTENTS

## Volume I

Case Filings and Orders ........................................................................................... 1

  Student's Special Education Complaint and Request for Mediation .................................... 1

  Student's Motion for Stay Put ........................................................................... 34

          Attachment A: Declaration of Cynthia Cortez ....................................... 41

          Attachment B: Declaration of Janeen Steel ......................................... 43

                  Exhibit A: November 9, 2017 IEP ........................................... 47

                  Exhibit B: January 22, 2018 IEP ............................................. 65

                  Exhibit C: February 26, 2018 and March 15, 2018 IEP ......................... 95

                  Exhibit D: March 15, 2018 and March 22, 2018 IEP............................. 113

                  Exhibit E: August 16, 2018 Email re: Student Enrollment..................... 137

  Scheduling Order Setting Telephonic Prehearing Conference and Due Process Hearing............................................................................................... 141

  District's Notice of Representation and Request for Service via OAH E-Filing System ... 150

  Student's Motion to Begin the Due Process Hearing Timeline and to Set a New Hearing Date .................................................................................... 153

          Attachment A: Declaration of Janeen Steel ....................................... 158

  Order Granting Motion for Stay Put ..................................................................... 171

  Order Granting Motion to Start Due Process Hearing Timeline and Advancing Dates for Prehearing Conference and Hearing................................................... 175

  District's Motion to Reconsider and Revoke Stay Put Order............................................. 178

          Declaration of Lawrence Joe .......................................................... 197

                  Exhibit A: August 24, 2017 through march 15, 2018 Detail Behavior Report..................................................................... 208

                  Exhibit B: May 2017 to March 2018 Behavior Emergency Reports ....... 221

                  Exhibit C: Email Communications from October 24, 2017 to March 8, 2018 .......................................................... 260

                  Exhibit D: February 5, 2018 Email ....................................... 313

                  Exhibit E: Pictures from the March 9, 2018 Incident ...................... 317

                  Exhibit F: March 15, 2018 Manifestation Determination IEP ................ 324

Exhibit G: Documents Returned by Student's Attorney Regarding Placement ............................................................................... 348

Exhibit H: Various Behavior Emergency Reports ................................ 352

Exhibit I: May 1, 2018 30-Day Review IEP ........................................... 401

Exhibit J: June 7, 2018 IEP ................................................................... 425

Exhibit K: August 2, 2018 Email .......................................................... 451

Exhibit L: August 9, 2018 Emails ......................................................... 453

Exhibit M: August 10, 2018 Emails ...................................................... 458

Exhibit N: August 14, 2018 Email ........................................................ 461

Exhibit O: August 16, 2018 Email ........................................................ 463

Exhibit P: August 20, 2018 Email ........................................................ 472

Exhibit Q: August 30, 2018 Email ........................................................ 474

Exhibit R: Proof of Service of Ex Parte Application and Declarations .... 478

Exhibit S: September 7, 2018 Email ..................................................... 482

Exhibit T: September 13, 2018 Emails .................................................. 484

Exhibit U: District's Proposed Response to Student's Due Process Complaint ............................................................................. 487

Declaration of Mark Capritto ............................................................... 499

## Volume II

Declaration of Jamie Vaughn ................................................................ 514

Declaration of Brasilia Perez ............................................................... 523

District's Request for Judicial Notice .................................................... 536

Exhibit A: District's August 17, 2018 Complaint in Ventura Superior Court ..................................................................................... 540

Exhibit B: August 22, 2018 Notice of Removal of Action Filed in the United States Court for the Central District of California ....................... 561

Exhibit C: Docket in the Matter Pending in the United States Court for the Central District of California, Case No. 2:18-CV-07357-SVW-AS ........................................................................................ 592

Exhibit D: September 12, 2018 Order Denying District's Ex Parte Application for a Temporary Restraining Order ..................................... 598

District's Notice of Related Cases ........................................................ 601

[Proposed] Order ................................................................................ 606

Student's Opposition to District's Motion to Reconsider and Revoke Stay Put Order ...... 610

Declaration of Janeen Steel ............................................................................. 621

    Exhibit A: February 26, 2018 IEP ...................................................... 624

    Exhibit B: August 14, 2018 Email ...................................................... 641

    Exhibit C: September 12, 2018 Denial of Temporary Restraining Order ................................................................................................... 643

    Evidentiary Objections to District's Declarations Regarding Motion to Reconsider and Revoke Stay Put ........................................................ 646

District's Prehearing Conference Statement .................................................... 693

Student's Prehearing Conference Statement ................................................... 702

District's First Amended Prehearing Conference Statement ............................ 721

Student's Amended Prehearing Conference Statement ................................... 736

District's Reply in Support of Motion to Reconsider and Revoke Stay Put Order ........... 756

Order Denying Request for Reconsideration .................................................... 764

Order Following Prehearing Conference ........................................................... 768

Student's Witness and Exhibit List .................................................................... 775

District's Response to Student's Due Process Complaint and Request for Mediation ..... 795

District's Certification of ADA-Compliant Facility and Rooms ........................... 804

District's Supplemental Witness List ................................................................. 808

District's Second Supplemental Witness List .................................................... 813

Student's Amended Exhibit List ........................................................................ 817

Student's Amended Witness List ....................................................................... 829

Student's Motion for Clarification of Issue 2(b) in Prehearing Conference Order ........... 840

Student's 3rd Amended Exhibit List .................................................................. 844

District's Objections to Student's Exhibits S1 and S113 ................................... 855

Declaration of Benjamin Nieberg ...................................................................... 863

    Exhibit A: August 2, 2018 Email ........................................................ 876

    Exhibit B: August 7, 2018 Email ........................................................ 878

    Exhibit C: August 9, 2018 Email ........................................................ 881

    Exhibit D: August 9, 2018 Email ........................................................ 883

    Exhibit E: August 9, 2018 Email ........................................................ 886

    Exhibit F: August 9, 2018 Email ........................................................ 889

    Exhibit G: August 9, 2018 Email ........................................................ 893

    Exhibit H: August 9, 2018 Email ........................................................ 898

Exhibit I: August 10, 2018 Email ........................................................................ 902

Exhibit J: August 10, 2018 Email ....................................................................... 905

Exhibit K: August 10, 2018 Email ..................................................................... 908

Exhibit L: August 10, 2018 Email ...................................................................... 911

Exhibit M: August 14, 2018 Email ..................................................................... 915

Exhibit N: August 14, 2018 Email ..................................................................... 917

Exhibit O: August 16, 2018 Email ..................................................................... 919

Exhibit P: August 16, 2018 Email ...................................................................... 921

Exhibit Q: August 16, 2018 Email ..................................................................... 924

Exhibit R: August 16, 2018 Email ..................................................................... 927

Student's Closing Brief ............................................................................................. 932

District's Closing Brief .............................................................................................. 1006

Student's Request for Official Notice of Facts that May Judicially Noticed by the Courts ........................................................................................................................... 1071

Attachment A: Minutes in Case No. 2:18-CV-07357-SVW-AS Denying Motion for Preliminary Injunction and Granting Motion to Dismiss ................... 1074

## Volume III

Hearing Exhibits ................................................................................................................ 1078

Hearing Exhibit List ......................................................................................................... 1078

Hearing Witness List ........................................................................................................ 1087

Student's Exhibits ............................................................................................................. 1094

Exhibit S-2: 6/15/2016 Report Card - Kindergarten - Rose Avenue E.  (2015-2016) ................................................................................................................ 1094

Exhibit S-3: 6/15/2017 Report Card - 1st Grade - Rose Avenue E.  (2016-2017) ................................................................................................................ 1096

Exhibit S-4: 2018 Health Profile ........................................................................ 1097

Exhibit S-5: 2017-2018 Detailed Behavior Report ............................................ 1099

Exhibit S-6: 2018 Student Profile ....................................................................... 1111

Exhibit S-7: 2018 Behavior Log ......................................................................... 1112

Exhibit S-8: 2/25/2016 Student Success Team ................................................... 1116

Exhibit S-9: 10/25/2016 Student Success Team ................................................. 1117

Exhibit S-10: 3/28/2017 Suspension ................................................................... 1118

Exhibit S-11: 3/29/2017 Suspension - Teacher Notice ...................................... 1119

Exhibit S-12: 4/26/2017 Student Success Team ................................................. 1121

Exhibit S-13: 4/24/2018 Student Success Team Teacher Input Form ............. 1124

Exhibit S-14: 5/10/2017 Behavior Emergency Report ..................................... 1125

Exhibit S-16: 5/18/2017 Special Education Referral Form............................... 1128

Exhibit S-17: 5/18/2017 Request for 504 Plan................................................. 1129

Exhibit S-20: 5/31/2017 Lucy Perales Letter................................................... 1130

Exhibit S-21: 6/14/2017 Lucy Perales Letter................................................... 1131

Exhibit S-22: 8/24/2017 Discipline Referral .................................................... 1132

Exhibit S-23: 9/15/2017 Office Discipline Referral .......................................... 1133

Exhibit S-24: 9/18/2017 Office Discipline Referral .......................................... 1134

Exhibit S-25: 9/19/2017 Office Discipline Referral 9:15am ............................. 1135

Exhibit S-26: 9/19/2017 Office Discipline Referral 1:15pm ............................. 1136

Exhibit S-27: 9/20/201 Signed Assessment Plan............................................ 1137

Exhibit S-28: 9/21/2017 Office Discipline Referral .......................................... 1138

Exhibit S-29: 10/4/2017 Office Discipline Referral .......................................... 1139

Exhibit S-30: 10/10/2017 Office Discipline Referral ........................................ 1140

Exhibit S-32: 12/4/201 Letter to School ......................................................... 1141

Exhibit S-33: 2017 Ponce 2nd Grade Student Evaluation Form...................... 1142

Exhibit S-34: 10/12/2017 Behavior Emergency Report ................................... 1143

Exhibit S-35: 10/24/2017 Olson - Email re: Student ....................................... 1147

Exhibit S-36: 10/26/2017 Olson - Email re: Student Behavior/Pictures ........... 1152

Exhibit S-37: 10/26/2017 Olson - Email re: Student Behavior ......................... 1158

Exhibit S-38: 10/27/2017 Olson - Email re: Student Behavior ......................... 1159

Exhibit S-39: 10/19/2017 Notice of 11/9/17 IEP.............................................. 1161

Exhibit S-41: 11/1/2017 Suspension............................................................... 1162

Exhibit S-42: 11/9/2017 IEP Completed on 1/11/2018 ................................... 1163

Exhibit S-43: 11/13/2017 Behavior Emergency Report ................................... 1180

Exhibit S-44: 11/13/22017 Email re:  New Behavior Plan................................ 1182

Exhibit S-45: 11/13/2017 Olson - Email with Pictures..................................... 1184

Exhibit S-46: 11/14/2017 Olson - Email re: Implementing a Complete Plan ..... 1187

Exhibit S-47: 11/17/2017 Behavior Emergency Report ................................... 1188

Exhibit S-48: 11/17/2017 Email re: Student - Olson ........................................ 1191

Exhibit S-50: 11/27/2017 Email w/ Pictures - Olson ........................................ 1193

Exhibit S-51: 11/28/2017 Office Discipline Referral ........................................ 1198

Exhibit S-52: 11/28/2017 Behavior Emergency Report ...................................... 1199

Exhibit S-53: 11/28/2017 Email re: Student - Olson ......................................... 1201

Exhibit S-55: 11/28/2017 Email re: Student - Olson ......................................... 1208

Exhibit S-57: 11/29/2017 Email re: Student - Olson ......................................... 1210

Exhibit S-58: 11/29/2017 Suspension................................................................ 1212

Exhibit S-59: 2017-2018 Office Discipline Referral........................................... 1213

Exhibit S-60: 12/1/2017 Behavior Emergency Report ...................................... 1214

Exhibit S-61: 12/1/2017 Suspensions ............................................................... 1218

Exhibit S-62: 12/11/2017 Email re: Student Returning to School - Yulianna
Robles ............................................................................................................... 1219

Exhibit S-63: 12/11/2017 IEP Notice of 1/11/2018........................................... 1221

Exhibit S-64: 1/10/2018 Assessment - Multi-Disciplinary Team Report........... 1222

Exhibit S-66: 1/12/2018 Suspension Notice for 1/16/2018 - 1/17/2018 ........... 1166

Exhibit S-67: 1/19/2018 Behavior Emergency Report ...................................... 1267

Exhibit S-68: 1/23/2018 Behavior Emergency Report ...................................... 1271

Exhibit S-69: 1/24/2018 Behavior Emergency Report ...................................... 1276

Exhibit S-70: 1/24/2018 Email re: Student - Olson ........................................... 1279

Exhibit S-73: 1/19/2018 Notice of 1/22/2018 IEP............................................. 1281

Exhibit S-74: 1/22/2018 IEP.............................................................................. 1283

Exhibit S-75: 2018 Positive Behavior Intervention Plan................................... 1289

Exhibit S-76: 2018 Speech Notes ..................................................................... 1291

Exhibit S-77: 1/26/2018 Email re: Student - Olson ........................................... 1292

Exhibit S-78: 1/28/2018 Letter to Vaca ............................................................ 1294

Exhibit S-79: 1/29/2018 Email re: Student - Olson ........................................... 1297

Exhibit S-80: 1/31/2018 Email re: Student - Ponce.......................................... 1298

Exhibit S-82: 1/31/2018 Email re: Student - Garcia Thomas ........................... 1300

Exhibit S-85: 2/2/2018 Email re: Student - Olson ............................................ 1303

Exhibit S-86: 2/5/2018 The Small Classroom .................................................. 1305

Exhibit S-87: 5/2/2018 Behavior Emergency Report ....................................... 1310

Exhibit S-88: 5/2/2018 Email re: Student - Olson ............................................ 1314

Exhibit S-89: 2/5/2018 Olson Email w/ Pictures............................................... 1316

Exhibit S-90: 6/2/2018 Email re: Student - Garcia Thomas ............................. 1319

Exhibit S-91: 2/8/2018 Email re: Student - Olson ............................................ 1321

Exhibit S-93: 9/2/2018 Email re: Student - Olson ............................................... 1323

Exhibit S-94: 2/13/2018 Email re: Student - Olson ............................................ 1324

Exhibit S-96: 2/15/2018 Email re: Student - Olson ............................................ 1327

Exhibit S-100: 2/21/2018 Email re: Student - Olson ......................................... 1330

Exhibit S-103: 2/22/2018 Notice of 2/26/2018 IEP............................................. 1332

Exhibit S-104: 2/26/2018 IEP............................................................................. 1333

Exhibit S-105: 2018 Positive Behavior Intervention Plan Revised .................... 1350

Exhibit S-107: 2/3/2018 Email re: Student - Garcia Thomas ............................ 1354

Exhibit S-108: 5/3/2018 Garcia Thomas Report of Incident.............................. 1356

Exhibit S-110: 9/3/2018 Behavior Emergency Report ....................................... 1359

Exhibit S-112: 12/3/2018 Suspension................................................................ 1368

Exhibit S-114: 3/13/2018 Notice of 3/15/2018 IEP............................................ 1369

Exhibit S-116: 3/19/2018 Notice of 3/22/2018 IEP............................................ 1370

Exhibit S-117: 3/115/2018 IEP........................................................................... 1373

Exhibit S-120: 3/23/2018 Enrollment Packet .................................................... 1396

Exhibit S-121: 4/2/2018 Behavior Emergency Report 11:50am........................ 1431

Exhibit S-122: 4/2/2018 Behavior Emergency Report 1:30pm.......................... 1435

Exhibit S-123: 4/12/2018 Behavior Emergency Report 1:30pm........................ 1439

Exhibit S-126: 4/17/2018 Behavior Emergency Report .................................... 1444

Exhibit S-127: 4/18/2018 Behavior Emergency Report .................................... 1448

Exhibit S-128: 4/20/2018 Behavior Emergency Report .................................... 1452

Exhibit S-129: 4/24/2018 Behavior Emergency Report .................................... 1456

Exhibit S-130: 4/30/2018 Behavior Emergency Report .................................... 1460

Exhibit S-133: 5/1/2018 IEP .............................................................................. 1464

Exhibit S-134: 5/10/2018 Incident Report ......................................................... 1495

Exhibit S-136: 5/11/2018 Incident Report PM................................................... 1500

Exhibit S-137: Picture of Injury ......................................................................... 1501

Exhibit S-139: 5/16/2018 Behavior Emergency Report 8:53am........................ 1502

Exhibit S-140: 5/16/2018 Behavior Emergency Report 12:00pm...................... 1506

Exhibit S-141: 5/16/2018 Picture of Injury ........................................................ 1510

Exhibit S-142: 5/24/2018 Email and Picture of Injury........................................ 1511

Exhibit S-143: 6/1/2018 Behavior Emergency Report ...................................... 1513

Exhibit S-144: 6/5/2018 Behavior Emergency Report ...................................... 1518

Exhibit S-145: 4/26/2018 Treatment Plan.................................................................. 1523

Exhibit S-146: 3/5/2018 Functional Behavior Assessment ................................. 1527

Exhibit S-147: 6/7/2018 IEP .......................................................................................... 1540

Exhibit S-148: 6/14/2018 Psychological Assessment ....................................... 1565

# Volume IV

Exhibit S-149: Curriculum Vitae of Betty Jo Freeman, Ph.D............................ 1584

Exhibit S-150: Curriculum Vitae of Mitchell Todd Taubman, Ph.D................. 1609

Exhibit S-152: 10/26/2017 Sentence Completion ............................................... 1629

Exhibit S-153: 9/20/2017 Health, Developmental, and Social History
Questionnaire ................................................................................................................... 1631

Exhibit S-154: 11/1/2017 Health, Developmental, and Social History
Questionnaire ................................................................................................................... 1635

Exhibit S-155: 7/1/2017 BASC3 Parent Rating Scales dated as 2017 ............ 1639

Exhibit S-156: Different 7/1/2017 BASC3 Parent Rating Scales dated as
2017 ..................................................................................................................................... 1643

Exhibit S-157: 9/20/2017 BASC3 Parent Rating Scales - Father..................... 1647

Exhibit S-158: 9/20/2017 BASC3 Parent Rating Scales - Mother.................... 1651

Exhibit S-159: 11/6/2017 Childhood Autism Rating Scale 2nd Edition ............ 1655

Exhibit S-160: Kaufman Assessment Battery for Children.............................. 1664

Exhibit S-161: 10/24/2017 KABC-II ........................................................................... 1674

Exhibit S-162: 10/18/2017 Beery VMI....................................................................... 1697

Exhibit S-163: 11/15/2017 PASC3 Teacher Rating Scales - Ponce ................ 1729

Exhibit S-164: 10/18/2017 Clinical BASC3 Scoring ............................................ 1732

Exhibit S-165: 11/15/2017 BASC Assessment Information .............................. 1829

Exhibit S-166: 10/20/2017 TAPS-3............................................................................ 1880

Exhibit S-167: 11/1/2017 Test of Cognitive Abilities ......................................... 1904

Exhibit S-168: 2/2/2018 Reintegration Plan.......................................................... 1934

Exhibit S-171: 8/20/2018 Declaration of Mark Capritto..................................... 1936

Exhibit S-172: 9/24/2018 Declaration of Amelia Sugden ................................. 1951

Exhibit S-176: 5/18/2017 Internal Emails from 5/18/2017 to 5/19/2017 ........... 1955

Exhibit S-177: 5/7/2018 Certificate of Therapeutic Behavioral Services
Graduation......................................................................................................................... 1962

District's Exhibits............................................................................................................ 1963

Exhibit D-1: 1/28/2018 Perez Email re: Incident Report 1/24/2018 w/ Attachments ........................................................................................ 1963

Exhibit D-2: 2/7/2018 Garcia Email re: I.H. New Team Transition ................... 1973

Exhibit D-3: 3/12/2018 Perez Email re: Parent Concerns ................................. 1974

Exhibit D-4: 3/13/2018 Ridge Email re: Student Gun Threat ............................ 1976

Exhibit D-6: 8/2/2018 Steel Email re: Student................................................... 1977

Exhibit D-7: 8/7/2018 Nieberg Email re: Student .............................................. 1978

Exhibit D-8: 8/9/2018 9:51am Steel Email re: Update on Student ................... 1980

Exhibit D-9: 8/9/2018 10:40am Steel Email re: Update on Student ................. 1981

Exhibit D-10: 8/9/2018 11:16am Steel Email re: Update on Student ............... 1983

Exhibit D-11: 8/9/2018 1:28pm Steel Email re: Update on Student ................. 1985

Exhibit D-12: 8/9/2018 1:35pm Nieberg Email re: Update on Student............. 1988

Exhibit D-13: 8/9/2018 5:36pm Steel Email re: Update on Student ................. 1992

Exhibit D-14: 8/10/2018 11:34am Nieberg Email re: Today.............................. 1995

Exhibit D-15: 8/10/2018 11:34am Steel Email re: Student................................ 1996

Exhibit D-16: 8/10/2018 2:16pm Nieberg Email re: Student ............................ 1998

Exhibit D-17: 8/10/2018 2:41pm Steel Email re: Student.................................. 2000

Exhibit D-18: 8/14/2018 Steel Email re: Student............................................... 2003

Exhibit D-19: 8/14/2018 Joe Email re: Student ................................................. 2004

Exhibit D-20: 8/16/2018 5:16pm Steel Email re: Student.................................. 2005

Exhibit D-21: 8/16/2018 5:38pm Joe Email re: Student .................................... 2006

Exhibit D-22: 8/16/2018 5:40pm Steel Email re: Student.................................. 2008

Exhibit D-23: 8/16/2018 5:54pm Joe Email re: Student .................................... 2010

Exhibit D-24: 8/17/2018 Dean Email re: Student Placement Consideration ..... 2013

Exhibit D-29: 8/30/2018 12:20pm Joe Email re: Student FAPE Offer and Attachments ........................................................................................ 2018

Exhibit D-37: 2015-2016 Oxnard School District School Calendar ................... 2044

Exhibit D-38: 2016-2017 Oxnard School District School Calendar ................... 2045

Exhibit D-39: 2017-2018 Oxnard School District School Calendar ................... 2046

Exhibit D-40: 2018-2019 Oxnard School District School Calendar ................... 2047

Exhibit D-41: Curriculum Vitae of Pablo Ordaz................................................. 2048

Exhibit D-42: Curriculum Vitae of Amelia Corona-Sugen, M.S. ....................... 2051

Exhibit D-43: Curriculum Vitae of Susan M. Mares............................................ 2053

Exhibit D-44: Curriculum Vitae of Bradilia Perez ................................................ 2059

Exhibit D-45: Curriculum Vitae of Maria G. Ponce............................................. 2061

Exhibit D-46: Curriculum Vitae of Shannon Billings .......................................... 2062

Exhibit D-47: Curriculum Vitae of Derek Olson.................................................. 2063

Exhibit D-48: Curriculum Vitae of Annette Murguia ......................................... 2064

Exhibit D-49: Curriculum Vitae of Margarita Llanes .......................................... 2066

Exhibit D-50: Angel Dominguez, M.A., CCC-SLP .............................................. 2068

Exhibit D-51: Curriculum Vitae of Katrina Madden ........................................... 2071

Exhibit D-52: Curriculum Vitae of Maria Isabel Garcia-Thomas, MS, BCBA..... 2074

Exhibit D-54: Curriculum Vitae of Raquel G. Rodriguez ................................... 2078

## Volume V

Decision.................................................................................................................. 2079

    Issues .............................................................................................................. 2079

    Summary of Decision ...................................................................................... 2080

    Factual Findings .............................................................................................. 2080

        Early Development .......................................................................... 2081

        2015-2016 Kindergarten at Rose Avenue Elementary .................... 2081

            February 25, 2016: First Student Success Team Meeting.................. 2083

        2016-2017 First Grade at Rose Avenue Elementary ....................... 2084

            October 25, 2016 Second Student Success Team Meeting ............... 2084

            January-June 2017: Escalating Aggressive Behaviors........................ 2085

            April 26, 2017 third Student Success Team Meeting........................... 2086

            May 10, 2017 Incident and Parent Request for Assessment............... 2087

            May 18, 2017 Fourth Student Success Team Meeting........................ 2088

            May 31, 2017 Student Assessment Plan............................................. 2088

        2017-2018: Second Grade at Chavez Elementary School .............................. 2089

            September 20, 2017 Signed Student Assessment Plan ...................... 2089

            September - November 2017: Student's Escalating Behaviors .......... 2089

            November 9, 2017 IEP Team Meeting and Continued IEP ................ 2090

        January 10, 2018 Multidisciplinary Assessment and January 11, 2018 Initial IEP................................................................................................... 2090

            Health ............................................................................................... 2091

            Intellectual Development ................................................................... 2091

Academic Achievement ............................................................... 2091

Speech and Language ................................................................ 2091

Social-Emotional Functioning .................................................... 2092

Autism ....................................................................................... 2094

Special Circumstances Educational Support .............................. 2095

January 11, 2018 Continued IEP Team Meeting ......................... 2096

January 11, 2018 IEP Implementation ........................................ 2097

January 12, 2018 Incident .......................................................... 2098

January 19, 2018: Instruction in Conference Room ..................... 2098

January 22, 2018 Manifestation Determination/IEP Team Meeting ..... 2099

February 26, 2018 IEP Team Meeting ......................................... 2100

March 2, 2018 And March 9, 2018 Incidents ............................... 2101

March 12, 2018 Through April 1, 2018: Student at Home ........... 2101

March 15, 2018 Manifestation Determination Team Meeting and March 22, 2018 IEP Team Meeting ............................................. 2101

April 2, 2018 To June 14, 2018 Placement at Casa Pacifica .......... 2102

May 1, 2018 IEP Team Meeting .................................................. 2103

May 17, 2018 Graduation from Home Therapy Program .............. 2104

June 7, 2018 IEP Team Meeting ................................................. 2104

July 26, 2018 Freeman Autism Assessment ............................... 2106

July 26, 2018 IEP Team Meeting ................................................ 2109

July 26, 2018 To August 17, 2018: Efforts to Find Mutually-Agreeable Placement for Student ............................................... 2109

Seclusion and Holds ................................................................... 2110

Post-Filing Communications, Filings, And Expert Testimony Regarding an Appropriate Placement and Educational Program for Student, Relevant to Remedies ................................................. 2114

August 30, 2018 Oxnard FAPE Offer .......................................... 2114

Proposed Placements for Student ............................................... 21115

Proposed Educational Program for Student ................................ 2115

Legal Conclusions ...................................................................... 2116

Introduction - Legal Framework under the IDEA .......................... 2116

Issue 1: Child Find .................................................................... 2117

Issue 2(a): Failure to Make FAPE Offer Before January 11, 2018 ... 2122

Issue 2(b): Failure to Offer FAPE in the January 11, 2018 IEP ........................ 2122

Issue 2(c): Failure to Implement January 11, 2018 IEP ................................... 2125

Issue 3: Emergency Interventions and Seclusion ............................................ 2126

Issue 4(a): Failure to Make Clear Written Offer in in January 11, 2018 IEP ..... 2127

Issue 4(b): Failure to Complete Initial IEP Within 60 Days of Signed Assessment Plan ............................................................................................ 2127

Issue 4(c) Failure to Include General Education Teacher at IEP Team Meetings .......................................................................................................... 2128

Remedies ....................................................................................................... 2129

Order .............................................................................................................. 2131

Prevailing Party ............................................................................................. 2133

Right to Appeal ............................................................................................. 2133

Hearing Transcript ............................................................................................... 2135

September 24, 2018 Prehearing Conference ................................................. 2135

October 4, 2018 Hearing ............................................................................... 2164

October 15, 2018 Hearing ............................................................................. 2479

## Volume VI

October 16, 2018 Hearing ............................................................................. 2699

October 17, 2018 Hearing ............................................................................. 2975

## Volume VII

October 22, 2018 Hearing ............................................................................. 3279

October 23, 2018 Hearing ............................................................................. 3551

## Volume VIII

October 24, 2018 Hearing ............................................................................. 3908

October 25, 2018 Hearing ............................................................................. 4101

## Volume IX

October 29, 2018 Hearing ............................................................................. 4425

October 30, 2018 Hearing ............................................................................. 4820

Certification of the Administrative Record .......................................................... 5058

1      **THE COURT:**  All right.  And so Ms. Billings, have

2   you testified before?

3      **THE WITNESS:**  No.

4      **THE COURT:**  Okay.  So you -- why don't you just come

5   up now.  And I'm going to put us on the record which

6   means I'm starting the audiotape and explaining that

7   we're back for the day on the 17th.

8      And then I'll have you stand, swear you in, and who

9   will have questions for Ms. Billings on behalf of I.H.?

10     **MS. STEEL:**  Me.

11     **THE COURT:**  Okay.  Ms. Steel will have some

12  questions for you --

13     **THE WITNESS:**  Okay.

14     **THE COURT:**  -- and then followed up by Mr. Joe?

15     **MR. JOE:**  Yes.

16     **THE COURT:**  Okay.

17     We're back on the record in the matter of I.H.

18  versus Oxnard School District.  Today I is October the

19  17th, 2018.  The time is 9:16 a.m.

20     Our first witness is on the stand and I'll be

21  swearing her in, with examination by Ms. Steel followed

22  by Mr. Joe.

23     Please stand.  Raise your right hand.

24                    SHANNON BILLINGS

25      having been duly sworn, testified as follows:

                        -3-

1        THE WITNESS:  Yes, I do.

2        THE COURT:  Have a seat.  For our record, can you

3   please state and spell your full first and last name?

4        THE WITNESS:  Shannon Billings, S-H-A-N-N-O-N;

5   Billings, B-I-L-L-I-N-G-S.

6        THE COURT:  All right, Ms. Billings, Ms. Steel is

7   counsel for I.H. and she has some questions for you.

8        THE WITNESS:  Okay.

9                    DIRECT EXAMINATION

10  BY MS. STEEL:

11       Q    Hi, Ms. Billings.

12       A    Hi.  Good morning.

13       Q    Thank you for being here today.

14       A    Okay.

15       Q    And there's several binders on the table.  On

16  your right -- I mean, on your left, right?  Yes.

17       A    Um-hum.

18       Q    There are two binders, those are the Student's

19  exhibit binders.  And then on the -- on your right, is

20  the District's.  I'm going to have you open that one to

21  the tab of 46.

22            Do you recognize this document?

23       A    Yes.

24       Q    And what is it?

25       A    My resume, just a brief bullet point resume.

                         -4-

1        A    I was a brand new employee of the Oxnard School

2   District.  And so every school kind of has their own way

3   of doing things, their own way of communicating.  I came

4   from a much smaller school, so I didn't necessarily have

5   to go into the cum because I probably already knew the

6   child.

7        Q    Did you -- do you have a -- in that -- when you

8   got hired at Oxnard School District, who was your

9   supervisor as a new speech and language pathologist?  Did

10  you have -- do you have a supervisor?

11       A    That's not typical.  There was -- I was in my

12  clinical fellowship year, so I did have a clinical

13  fellowship supervisor who observed me eight hours a month

14  and would review my reports.

15       Q    So when you started at Oxnard, no one told you,

16  like, here's our process?

17       A    No.

18       Q    Okay.

19       A    No, because still even within the district

20  people kind of have their own way of going about doing

21  their job.

22       Q    Did you speak to the parent as part of your

23  assessment?

24       A    Not that I recall, but I don't typically unless

25  I have a concern or reason to.

                              -15-

1        **THE WITNESS:**  -- we absolutely have --

2        **THE COURT:**  -- talking about assessment, not actual

3    placement or -- or eligibility or IEP, just assessment --

4        **THE WITNESS:**  You know, if we can see progress, you

5    know, that -- that's happening incrementally over the

6    course of six weeks, an argument can be made that, you

7    know, progress can be made without, you know, deeper

8    interventions.

9        **THE COURT:**  Okay.  But not the interventions.  I'm

10   just talking about the assessments again.  Before you do

11   the assessment, you'll try to do a response --

12       **THE WITNESS:**  Sometimes.

13       **THE COURT:**  -- to intervention?  Sometimes.

14       **THE WITNESS:**  Sometimes.  Not always.

15       **THE COURT:**  And again this may be an asked and

16   answered question, so I'm going to object to my own, but

17   I'm going to ask it again anyway.

18       What differentiates between when you say sometimes

19   we do the response intervention and sometimes we go

20   straight towards assessment.  What differentiates in

21   those cases?

22       **THE WITNESS:**  Is this our first SST.  If this is our

23   first SST, let's see what we can do first.  Because a lot

24   of times an SST -- maybe not -- if a teacher might come

25   and say, you know, Johnny's not doing well in my class.

                                -90-

1   I -- I want Johnny assessed.  And so then the SST team

2   will say so what have you done in your classroom, what

3   interventions have you done?  Well, I haven't done

4   anything, he can't learn anything.  Well, we need you to

5   do these interventions, we need to see what he can do

6   with support first.  Let's check that out first.

7        **THE COURT:**  Okay.  All right, I think I understand.

8   Thank you very much.

9        **THE WITNESS:**  Um-hum.  And I hope I wasn't obtuse.

10  I was like, I was trying to answer but --

11       **THE COURT:**  No.

12       **THE WITNESS:**  -- okay.

13       **THE COURT:**  It was fine.

14       **THE WITNESS:**  Okay.

15       **THE COURT:**  Thank you for helping me.

16       Okay.  Mr. Joe?

17       **MR. JOE:**  Yes, thank you.

18                    CROSS-EXAMINATION

19  BY MR. JOE:

20       Q     Thank you, Ms. Billings, for being with us

21  this morning.

22            I just wanted to follow-up on the Judge's

23  questions, just real briefly to ask if you're conducting

24  a speech observation that's come to you, or referred to

25  you, by a teacher due to a concern that they might have,

                              -91-